*The Estate of Cindy Lou Hill, by and through its personal representative, Joseph A. Grube; and Cynthia Metsker, individually vs. Naphcare, Inc., et al.*

Case No. 2:20-cv-00410-RMP

Declaration of Edwin S. Budge

Exhibit R

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| THE ESTATE OF CINDY LOU HILL, by and through its personal representative, Joseph A. Grube; and CINDY METSKER, individually, | ) ) ) ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) No. |
| | ) 2:20-cv-00410-RMP |
| NAPHCARE, INC., an Alabama corporation; HANNAH GUBITZ, individually; and SPOKANE COUNTY, a political subdivision of the State of Washington, | ) ) ) ) ) |
| | ) |
| Defendants. | ) |

VIDEOTAPED 30(b)(6) DEPOSITION OF SPOKANE COUNTY

THROUGH DON HOOPER

July 21, 2021

Taken via Zoom

Page 2

```
 1                    APPEARANCES
 2   For the Plaintiffs:
 3                    Edwin Budge
                      Erik Heipt
                      Hank Balson
 4                    Alexandra Van Belle, legal intern
 5                    Budge & Heipt, PLLC
                      808 East Roy Street
 6                    Seattle, Washington 98102
                      206.624.3060
 7                    ed@budgeandheipt.com
                      erik@budgeandheipt.com
 8                    hank@budgeandheipt.com
 9
     For the Defendants NaphCare, Inc., and Hannah Gubitz:
10
                      Erin Ehlert
11                    Fain Anderson Vanderhoef Rosendahl
                      O'Halloran Spillane, PLLC
12                    701 Fifth Avenue
                      Suite 4750
13                    Seattle, Washington 98101
                      206.749.0094
14                    erine@favros.com
15
     For the Defendant Spokane County:
16
                      John Justice
17                    Lay, Lyman, Daniel, Kamerrer &
                      Bodganovich, PS
18                    2674 RW Johnson Boulevard Southwest
                      Tumwater, Washington 98512
19                    360.754.3480
                      jjustice@lldkb.com
20
21   Also present:
22                    Steve Crandall, videographer,
                      B&A Litigation Services
23
                      Steve Bartel, Spokane County risk
24                    manager
25
```

Page 3

```
 1                 EXAMINATION INDEX
 2   EXAMINATION BY:                        PAGE NO.
 3   Mr. Budge                                  5
 4
 5                  EXHIBIT INDEX
 6   EXHIBIT NO.    DESCRIPTION              PAGE NO.
 7   Exhibit No. 1  Notice of Deposition(s)      7
                    Pursuant to Civil Rule
 8                  30(b)(6)
 9   Exhibit No. 2  Spokane County Sheriff Field 28
                    Case Report, Case
10                  #2018-10119070
11   Exhibit No. 3  Medical Watch General        45
                    Observation for Cindy Hill
12
     Exhibit No. 4  Digital photographs          46
13
     Exhibit No. 5  Screenshot                   50
14
     Exhibit No. 6  Screenshot                   67
15
     Exhibit No. 7  C 214 - Records and Data     75
16                  Practices
17   Exhibit No. 8  Policy 207 Records and Date  76
                    Practices
18
     Exhibit No. 9  Law Enforcement Records      76
19                  Retention Schedule
20   Exhibit No. 10 Follow Up: Mortality Reports 78
21
22
23
24
25
```

Page 4

```
 1          BE IT REMEMBERED that on Wednesday,
 2   July 21, 2021, at 10:02 a.m., taken via Zoom before
 3   APRIL COOK, CCR, appeared DON HOOPER, the witness herein;
 4          WHEREUPON, the following proceedings
 5   were had, to wit:
 6
 7              <<<<<< >>>>>>
 8
 9          THE VIDEOGRAPHER:  We are going on the
10   record at 10:02 a.m. on July 21st, 2021.
11     This is Volume 1, Media Unit 1, of the video
12   recorded deposition of Spokane County 30(b)(6) in the
13   matter of Estate of Hill v. NaphCare, filed in the
14   United States District Court, Eastern District of
15   Washington, Case Number 2:20-cv-00410-RMP.
16     This deposition is being held via Zoom.  The
17   videographer is Steve Crandall from B&A Litigation
18   Services.  The court reporter is April Cook from
19   B&A Litigation Services.
20     Will counsel and all present please note their
21   appearances and affiliations for the record.
22          MR. BUDGE:  This is Ed Budge for the
23   plaintiffs, along with my co-counsel Erik Heipt and
24   Hank Paulson and our legal intern, Alexandra Van Belle.
25          MR. JUSTICE:  John Justice for
```

Page 5

```
 1   defendant Spokane County.
 2          MS. EHLERT:  Erin Ehlert for NaphCare.
 3          THE VIDEOGRAPHER:  Thank you.
 4     Will the court reporter please swear in the witness.
 5
 6   DON HOOPER,        having been first duly sworn
 7                by the Certified Court Reporter,
 8                testified as follows:
 9
10              EXAMINATION
11     BY MR. BUDGE:
12 Q  Sir, could you please state your name for the record.
13 A  Sure.  Donald --
14          MR BALSON:  Hank Balson for the
15   plaintiff.
16          THE WITNESS:  -- Donald A. Hooper.
17 Q  (By Mr. Budge)  All right.  Mr. Hooper, before I get into
18   my specific questions, I'm just gonna cover a few ground
19   rules for you.
20     I'm taking your deposition remotely today via Zoom.
21   I'm currently in my law office.  Where are you physically
22   located at this time?
23 A  The Spokane County Jail, 1100 West Mallon, Spokane,
24   Washington 99260.
25 Q  And is there anybody else in the room with you today?
```

Page 6

1  A  There is not.
2  Q  Do you have any documents that pertain to this case with
3     you today, either in the paper form or on a computer?
4  A  I don't.  I -- I probably have them on computer.  I don't
5     have them in front of me because there's a -- I guess
6     a pretty significant amount of documents, so I -- I
7     didn't figure I'd be able to refer to them.  So I don't
8     have anything in front of me now.
9  Q  Even though I'm taking your deposition remotely today via
10    Zoom, do you understand that this deposition is part of
11    a formal federal court proceeding?
12 A  I do.
13 Q  And do you understand that you're under oath today just
14    like you'd be if you were appearing live and in person in
15    a court of law?
16 A  I do.
17 Q  And do you understand that the deposition is being audio
18    recorded and video recorded?
19 A  I do.
20 Q  One of the reasons that the deposition is being video
21    recorded, in addition to being transcribed by the court
22    reporter, is that so we'll have an option of playing
23    certain portions of the video at the trial of this matter
24    so that the jury can listen to my questions and your
25    answers.

Page 7

1     Do you understand that?
2  A  Yes.
3  Q  If at any time you don't understand a question that
4     I ask to you, please ask me to clarify it or rephrase it
5     for you so that you understand it before you answer.
6     Okay?
7  A  Okay.
8  Q  And if you need a break at any time for any reason,
9     please let me know and I'll accommodate you.
10    All right?
11 A  Yes.
12 Q  I'm gonna be sharing certain documents with you today
13    that are exhibits to your deposition.  And the first
14    document that I'm going to be showing you is Exhibit
15    No. 1.
16          (Exhibit No. 1 marked for
17          identification.)
18 Q  (By Mr. Budge)  Are you able to see Exhibit No. 1 on your
19    screen?
20 A  I can.
21 Q  Do you recognize this document as being plaintiff's
22    Rule 30(b)(6) notice of deposition to Spokane County?
23 A  Yeah.  I mean, that's what it says.  I -- I've seen
24    a number of these documents.  I don't specifically
25    remember.  And so if you get to the bottom and -- and

Page 8

1     that's one that I've signed, then...
2  Q  I'm gonna give you the ability to scroll through the
3     document on your own.  Please let me know if you have
4     that ability.  And then feel free to scroll through that
5     on your own and let me know if you recognize Exhibit 1 to
6     be the 30(b)(6) notice of deposition for --
7  A  Sure.
8  Q  -- today's proceeding.
9  A  Yep, I recognize this document.
10 Q  All right.  Looking at the subjects that are identified
11    as the topics for today's deposition.  And you'll see
12    that the deposition topics include No. 1:
13       "Spokane County's policies, procedures, and
14    customs regarding the preservation or destruction of
15    video surveillance from the Spokane County Jail,
16    including, but not limited to, after the death of an
17    inmate."
18       Have you read Topic No. 1 and are you prepared to
19    testify today as a representative of Spokane County in
20    response to my questions on that topic?
21 A  I believe so.  I've -- I've read it.  It's been a while,
22    but I understand the -- our own customs and -- and -- of
23    preserving video.
24 Q  And have you agreed to testify today as a representative
25    for Spokane County on that topic?

Page 9

1  A  Yes.
2  Q  No. 2 says:
3       "Efforts undertaken to preserve surveillance video
4     from the Spokane County Jail following the death of
5     Cindy Lou Hill including, but not limited to, the
6     identity of the person or persons charged with preserving
7     the video, instructions concerning preservation of video,
8     and why certain portions were preserved and other
9     portions not preserved."
10       Having seen Topic No. 2, are you prepared to testify
11    as a representative of Spokane County in response to my
12    questions on that topic?
13 A  Yes.
14 Q  Topic No. 3 says:
15       "Failure to preserve surveillance video from the
16    Spokane County Jail following the death of Cindy Lou Hill
17    and the disposition of portions of video surveillance not
18    preserved."
19       Having seen that topic, are you prepared to testify
20    as a representative of Spokane County on that topic?
21 A  Yes.
22 Q  And Topic No. 4 says:
23       "The portions of video surveillance produced to
24    Plaintiffs in this action and the portions of video
25    surveillance not produced to Plaintiffs in this action,

Page 10

1    including, but not limited to, why Spokane County did
2    not produce surveillance video from the hallway outside
3    Cell 2W27 between the hours of 9:15 a.m. to 4:00 p.m.
4    on the date of Cindy Lou Hill's death and why it was" --
5    "why it did not produce video from the outside Cell 3W04
6    before 8:43 a.m. on the date of Cindy Lou Hill's death."
7        Having seen that topic, are you prepared to testify
8    as a representative of Spokane County in response to my
9    questions on that topic?
10 A   Yes.
11 Q   And, finally, Topic No. 5 says:
12       "Whether portions of video not produced in this
13   action can be restored or replaced."
14       Having read that topic, are you prepared to testify
15   as a representative of Spokane County in response to my
16   questions on that topic?
17 A   Yes.
18 Q   Okay.  Does the Spokane County Detention Services
19   Department operate the Spokane County Jail?
20 A   Yes.  Operates two facilities:  Spokane County Jail and
21   our Geiger facility, which is more the work-release and
22   work-crew facility.
23 Q   My questions today are going to be relating to the
24   Spokane County Jail.
25       Does the Spokane County Detention Services

Page 11

1    Department operate the video surveillance and recording
2    system that records activity inside the jail?
3 A   Yes.
4 Q   Could you please tell me about your current position with
5    Spokane County Detention Services and describe for me
6    your duties and responsibilities as they relate to the
7    Spokane County Jail?
8 A   Currently I'm an administrative lieutenant, which
9    I oversee our administrative areas, a lot of the support
10   positions like the kitchen.  I deal with discipline and
11   oversee the training and hiring departments.
12 Q   And how long have you served in the position of
13   administrative lieutenant?
14 A   Oh, about I think two years.  I think two years -- in
15   October it will be two years.
16 Q   What was your position as of August 25th, 2018, with the
17   Spokane County Detention Services?
18 A   At that time we had two lieutenants in -- within
19   detention services:  One at Geiger; one downtown.  I was
20   the only lieutenant downtown.
21 Q   Meaning of the only lieutenant at the Spokane County
22   Jail?
23 A   Correct.
24 Q   And so what were your duties and responsibilities as
25   the only lieutenant at the Spokane County Jail as of

Page 12

1    August of 2018?
2 A   That would be handling custody duties as well,
3    administrative duties, and -- as well as --
4    administrative duties as well as overseeing medical at
5    that time.  So...
6 Q   What is it about your current position with Spokane
7    County Detention Services that you think makes you well
8    positioned to testify about the topics that we've
9    designated for today's deposition?
10 A   Well, I -- maybe not the only one, but I've been
11   involved with litigation of this type; overseeing
12   documents; sending -- mostly the one that coordinates
13   with the attorneys when we're dealing with litigation
14   relating to inmate deaths or assaults or injuries.  So
15   I -- I guess I'm familiar with the documents, familiar
16   with the process.  I've been here 23 years and understand
17   the jail operations.
18 Q   Do you understand the jail operations as they relate to
19   the video surveillance and the processes and policies of
20   retaining custody of video surveillance recordings back
21   in August of 2018?
22 A   Yes, I believe so.
23 Q   Just briefly, I don't need the full version, but
24   a nutshell version, of your employment history with
25   Spokane County Detention Services leading up to the

Page 13

1    present time.
2 A   I said twenty -- I think about 23 years in June.  I
3    was an officer for around eight years; a sergeant for
4    about eight years, the years could be a little different;
5    a -- a sergeant with a number of different positions,
6    including those in charge of training and internal
7    investigations at different times; and then I've been
8    a lieutenant for the last four years.  I believe four
9    years in November.  And, like I -- like I said, I've done
10   both custody operations as well as administrative
11   operations as a lieutenant.
12 Q   Where are you in the chain of command?  Who is above you
13   in the chain of command at Spokane County Detention
14   Services?
15 A   It's changed over my career.  It's -- different times
16   we've had a assistant director as well.  This time
17   there's four lieutenants and we just have a director.
18   There's only a director in -- on top of me or in front of
19   me.  So...
20 Q   And so currently the only person who is above you in the
21   chain of command is the director of Spokane County
22   Detention Services?
23 A   Correct.
24 Q   And would that be Mike Sparber?
25 A   It is.  That's correct.

Page 14

1  Q   And back in August of 2018 was it also the case that
2      there was only one person above you in the chain of
3      command?
4  A   Oh, I did -- I'm -- I'm trying to think at this time when
5      he -- when promoted.  Might've been assistant director at
6      that time and a director.  I don't -- I don't exactly
7      know.  I -- I mean, I'm sure I could find out, but I
8      don't know right -- right offhand.  I think at that time
9      there was a assistant director between us.
10 Q   Okay.  So whether or not there was an assistant director
11     or not, the only people who might have been above you in
12     the chain of command back in August of 2018 would've been
13     the director of Spokane County Detention Services and
14     maybe an assistant director?
15 A   Correct.
16 Q   All the other people who work at Spokane County
17     Detention Services -- the sergeants, the corrections
18     officers, the other people who are employed to work at
19     the Spokane County Jail -- whether or not they're in your
20     direct line, are they all below you in terms of the chain
21     of command?
22 A   That'd be accurate.
23 Q   Roughly how many total employees at Spokane County
24     Detention Services?
25 A   Within all of Detention Services, both facilities, the

Page 15

1      Geiger and the downtown jail, I believe it's around 310
2      positions that are filled.
3  Q   And is there any way that you can just break that down
4      for me roughly as between the Geiger facility and the
5      Spokane County Jail?
6  A   I think it's around a third and two-thirds.  It's --
7      it's close.  It's not exact.  I think there's around 65
8      corrections officers at Geiger and there's about 146
9      downtown.  Sergeants?  There's about 6 sergeants -- 6 or
10     8 sergeants at Geiger and I believe there's 14 downtown.
11     So that -- roughly.
12 Q   And so when you say "downtown," do you mean the Spokane
13     County Jail?
14 A   I do.  I apologize.  I keep -- I keep referring to
15     downtown and Geiger, but the Spokane County Jail.
16 Q   No, that's fine.
17         And so just for the record, other than Detention
18     Services Director Mike Sparber, you are the highest
19     ranking person at the Spokane County Detention Services
20     on par with the only other lieutenant?
21 A   And now there's -- there's four total lieutenants.  So
22     I'm on par with the other three lieutenants.
23 Q   Okay.  As of August 25th, 2018, which is the date that
24     Cindy Hill died, did the Spokane County Jail have video
25     cameras located and operating throughout the Spokane

Page 16

1      County Jail?
2  A   They did.  We do.
3  Q   Were those video cameras positioned in such a way show --
4      so as to show the interior of the jail from a variety of
5      angles and positions?
6  A   Yes.
7  Q   And the video cameras' position within the interior of
8      the jail showed, among other things:  common areas,
9      hallways, and passageways, receiving areas, and a variety
10     of other portions of the jail.
11         Is that correct?
12 A   That's accurate.
13 Q   As of August 25th, 2018, did the video system at the
14     Spokane County Jail produce a live feed so the jail
15     workers could see various parts of the jail from -- from
16     one or more remote locations on a monitor screen or set
17     of screens?
18 A   Yes.
19 Q   Could you just tell me about how that system worked in
20     terms of the live feed?
21 A   The live feed?  We have a control room that operates the
22     elevators and most of the secure doors.  They have feed
23     for most of the cameras, most of the interior as well as
24     some exterior cameras.  Our sergeants' office has feeds
25     to the cameras.  A lot of us in command positions have

Page 17

1      access and have monitors in our offices have feed to the
2      cameras.  Maintenance.  I think there's some other, but
3      that -- does that answer your question?
4  Q   Yes.
5          You've told me about the live feed.
6          In addition to the live feed, as of August 25th,
7      2018, did the video system at the Spokane County Jail
8      routinely and regularly record and preserve, for at least
9      some period of time, video footage that could later be
10     retrieved and reviewed?
11 A   It does.
12 Q   And that was the case back in August of 2018?
13 A   It was.
14 Q   As of August 25th, 2018, could you please tell me about
15     how the video system at the Spokane County Jail worked in
16     terms of its recording and preservation of video footage
17     for later review?
18 A   My understanding, it's -- it's a DVR-like system.
19     It's actually called an NVR.  It's a network video
20     recorder and it's close to our control room.  It's in
21     a electronics room right outside the control room.  It
22     records a number of hard drives, not unlike a -- a DVR
23     at home for recording TV where -- and then we can --
24     because it's networked, I could go back into it from my
25     terminal in my office or a different location.  I could

THE ESTATE OF CINDY LOU HILL vs NAPHCARE
Hooper, Don - July 21, 2021

30(b)(6)
Pages 18..21

Page 18

1  even access it from home on a -- on my work computer and
2  then go review the -- the video footage from any of the
3  recording cameras.  So...
4 Q  Did all the cameras that recorded a live feed also have
5  the ability to record and -- and preserve that video for
6  later review?
7 A  All of the cameras are recorded, yes.
8 Q  And how were the recordings preserved for later retrieval
9  and review?  You -- you said there was -- there were hard
10  drives?
11 A  Correct.  My understanding, it's a raid array, so
12  there's -- there's a redundancy.  So if one went out,
13  it's recorded on multiple hard drives.  But it's on
14  a 60-day cycle.  My understanding, that's based on state
15  retention laws on video.  At Day 61 it starts recording
16  over itself, each camera.  And so we have 60 days' video
17  to review at any one time for all the cameras.
18 Q  Okay.  And so the system of recording would record to
19  a hard drive.
20    And was the hard drive or hard drives, to your
21  understanding, located there at the jail as opposed to
22  being off site?
23 A  They're at the jail in a electronics room right next to
24  our control room, correct.
25 Q  Do you know if the recordings were also preserved on any

Page 19

1  offsite server or location?
2 A  Not that I know of, no.
3 Q  Okay.  Who were the people at the jail -- and for all of
4  my questions I'm talking about the Spokane County Jail --
5  who were the people at the jail who had the ability to
6  pull up those recordings for later review?
7 A  Typically our maintenance department, the sergeant in
8  charge of maintenance.  I don't know if you wanna know
9  names or positions or I can --
10 Q  Positions.
11 A  Positions are maintenance sergeant/administrative
12  sergeant.  We had -- at that time there was four officers
13  in maintenance.  They typically pull up the video.
14    And are we talking about pulling a recording or just
15  viewing the video?  I'm sorry, can you clarify?
16 Q  Both.  Both viewing and pulling up the recording and
17  preserving it for a more permanent basis rather than just
18  that 60-day period.
19 A  Okay.  For -- for pulling it to record first, the
20  administrative -- or sergeant, the four maintenance
21  officers, our -- she's a administrative manager that's
22  in -- also in charge of public disclosure, and her
23  assistant at the time.  Those are the ones that would
24  pull recordings at the time in -- in 2018.
25 Q  Back in 2018 did you have the ability to pull up

Page 20

1  a recording?
2 A  I could view it.  I -- I've actually never pulled up
3  a recording.  I've never burned a recording myself.  I've
4  always had somebody else do it for me such as our
5  maintenance officers.
6 Q  All right.  And so the maintenance officer's available
7  to pull up recordings for review by higher level staff?
8  If --
9 A  Correct.
10 Q  -- if that level staff requested that they do so?
11 A  Yeah.  And that's typically how it went.  I -- if I
12  was looking for a recording for a certain incident,
13  I'd -- I would give them a call, if they were here, or
14  send an email and say, "Will you pull this video from
15  these cameras for this period of time?"
16 Q  And, similarly, if -- if you wanted to do more than
17  just view the video, but actually preserve the video
18  for a permanent basis -- in other words, to permanently
19  preserve the video -- did you or other people at the
20  jail have the ability to -- to make that -- give that
21  direction to the maintenance people who -- who work
22  there?
23 A  We did.  We still do.
24 Q  In terms of the way that video surveillance at the jail
25  was recorded and in terms of how those recordings could

Page 21

1  be pulled up and reviewed after an incident, was there
2  any difference in -- among the cameras or camera angles
3  or was it all the same?
4 A  Could you rephrase it?  Could you repeat that question
5  one more time?
6 Q  Sure.
7    Was there any difference in the cameras or the
8  camera angles in terms of the way the recording process
9  worked or in terms of how those recordings could be
10  pulled up and reviewed after an incident were they all
11  basically part of the same system?
12 A  I believe they're all part of the same system.  We do
13  have a few, they're called 360-degree cameras, and they
14  record, like just as it says, a 360-degree view.  After
15  you've pulled the recordings, you can manipulate the
16  image in a 360-degree way.  I -- I don't know if that
17  answers your question.  There's just a few of those
18  cameras.
19 Q  Okay.  But your understanding is that for the -- for
20  the vast majority of the cameras, they were all subject
21  to the same procedures in terms of how they would be
22  recorded and how those recordings would be preserved and
23  how those recordings could be later retrieved?
24 A  Yes, I think so.  I -- I believe so.
25 Q  Okay.  And in terms of the recording system as of

THE ESTATE OF CINDY LOU HILL vs NAPHCARE
Hooper, Don - July 21, 2021

30(b)(6)
Pages 22..25

Page 22

1  August 25th, 2018, there was, as I understand it,
2  a standard or set time for how long recordings would be
3  preserved as part of the usual and routine operation of
4  the jail.
5      Is that correct?
6 A  Correct.
7 Q  And my understanding from your earlier testimony is that
8  those recordings would be automatically preserved as part
9  of the routine operation of the jail for a period of
10  60 days.
11      Is that correct?
12 A  Correct.
13 Q  And after 60 days, beginning on the 61st day, they would
14  begin to write over.
15      Is that right?
16 A  Yes.
17 Q  And so beginning on the 61st day, the period of time --
18  well, I'm gonna get myself mixed up -- there would be
19  a block of time, a 60-day period of time where all
20  recordings at the jail would be preserved as a matter of
21  routine.
22      Is that right?
23 A  Yes, I -- I believe that's accurate.  It's -- any one
24  time we can review the last 60 days.
25 Q  And what is your explanation as to why that 60-day period

Page 23

1  was chosen and not some other period of time?
2 A  It was my understanding that was state retention law on
3  video -- on video recordings within detention facilities.
4  I -- I looked for it, actually, yesterday in our policy
5  manual.  I didn't see it found in -- or in our current
6  policies manual.  I believe it was based on state law.
7 Q  So as of August 25th, 2018, just for the record, all
8  video at the jail was preserved for a 60-day period of
9  time without any extra or additional effort being needed
10  to ensure the video preservation during that period of
11  time, correct?
12 A  Yes.
13 Q  Okay.  Suppose there -- and all of my questions are
14  gonna relate to August of 2018.  If I -- even if I don't
15  specifically preface my question that way, if you're ever
16  confused about what I'm talking about, let me know.
17      Okay?
18 A  Okay.
19 Q  Suppose there was an incident or an event of some kind
20  at the Spokane County Jail and the jail wanted to make
21  sure that video surrounding the incident was permanently
22  preserved and not deleted or overwritten or otherwise
23  destroyed after 60 days.
24      What was the procedure for ensuring that video
25  could be permanently preserved so that the video could be

Page 24

1  reviewed one or two or three years later?  Could you walk
2  me through that process?
3 A  Sure.  Whoever was requesting it would get ahold of
4  either one of the maintenance officers, the
5  administrative sergeant, or the person in charge of
6  public records and ask them to record -- or to pull
7  a copy of the video.  They'd burn it onto a DVD.  And
8  they'd request time period, location.  Like a lot of
9  times I would specify exactly what cameras I wanted.
10  Sometimes -- it depends on who was requesting.  Some
11  people would say, "I just want the floor 2 West."
12  Sometimes I would exactly "Camera 23, Camera 27, and
13  Camera 29."  They'd record a period and put it on a DVD
14  and typically bring it to me within a day or so.
15 Q  And once that DVD had been burned so that the video was
16  then permanently preserved, where would the DVD be kept,
17  if you know.
18 A  Yeah, it depends on what it was used -- a binder in
19  our IA, or Internal Affairs, office.  If it -- maybe
20  a use-of-force, if it was related to maybe an inmate
21  death, start building a binder right away.  If we've had
22  inmate -- in-custody deaths, we start building a binder
23  of all pertinent documents, reports -- reports, and
24  medical files, and things like that.  And I'd put it in
25  a sleeve inside that binder.

Page 25

1 Q  And so the people who worked in maintenance were
2  trained about which buttons to push and how to go about
3  permanently preserving any portions of the video that
4  Spokane County Detention Services deemed important to
5  permanently preserve?
6 A  Yes.
7 Q  Under what circumstances would Spokane County Detention
8  Services decide to ensure the permanent preservation of
9  jail surveillance recordings?
10 A  Well, some of the ones I -- I mentioned:  You know,
11  maybe a significant use of force, an injury to either
12  an inmate or a staff member, an -- an in-custody death,
13  serious assaults, gang fights.  Those are some examples.
14  It -- it's probably not all inclusive, but those are
15  examples.
16 Q  Do you know if there was any written policy on the types
17  of events that would qualify for permanent preservation?
18 A  I believe so and I don't know if it gives examples --
19  I've -- I've read the policy -- or if just significant
20  events.  And I -- I don't know exactly know the wording
21  of the policy, but, yeah, there is policy to retain video
22  on significant events.
23 Q  And inmate deaths would definitely qualify as significant
24  events?
25 A  I'd say that's the most significant event we've had,

Page 26

1   yeah.  Yes.
2  Q   Was there any type of policy about recording surrounding
3      footage?  For example, if there was a critical event, was
4      there any type of policy about not just recording -- not
5      just permanently preserving footage of the event itself,
6      but also footage of the area in question before and after
7      the event or for a certain period of time before or after
8      the event?
9  A   First, I'm not -- that -- I'm not familiar with the --
10     that -- to that level.  I don't -- not that I remember.
11     It could be there, but I -- I'd have to look at the
12     policy for that time to make sure.  I don't believe it
13     specifies surrounding time periods of events.
14  Q   When it came to the death of an inmate, someone who was
15     found dead in the jail or who was found unresponsive in
16     the jail and later pronounced dead after they were
17     removed from the jail, how was it decided what portions
18     of video to preserve as opposed to what portions of the
19     video to allow to be destroyed?
20  A   I -- I think it -- a number -- some judgment on the
21     detectives involved.  There's major crime detectives
22     whenever we have an in-custody death.  If a person
23     passed away at the hospital, sometimes that doesn't
24     happen because it's not investigated at the jail.  It
25     happens a day or two or three later.

Page 27

1      For a in-custody death that happens within the
2   facility, detectives -- one or more major crime
3   detectives -- and typically the ones that I've been
4   involved in, they're telling me exactly -- had -- like
5   that -- they're pointing, "I'd like that camera from this
6   period of time.  Can you give me five hours or four hours
7   or twelve?  Can you give me the time that precedes this?"
8   And then they're -- and they're asking for those kind of
9   things.  Also, either a lieutenant or a sergeant that's
10  involved, if they think it's pertinent, relevant video,
11  they'd -- they'd ask for it.  But -- so I'd say it could
12  come from both.
13  Q   Who are the people at the Spokane County Jail, following
14     the death of an inmate, who would make the decision about
15     what portions to preserve and what portions to allow to
16     be destroyed?
17  A   I'd say -- like I said, it could be a responding
18     detective.  It could be a -- a lieutenant or the
19     director, whoever responded to the incident as well.
20     And it could be the sergeants that were on duty at the
21     incident.
22  Q   And when you say lieutenant or director, that would
23     include yourself and Director Sparber?
24  A   It could, yes.
25  Q   Was Cindy Hill's death considered to be an in-custody

Page 28

1   death?
2  A   After the fact we did.  We -- we consider it an
3      in-custody death now, yes.
4  Q   At the time shortly following August 25th when Cindy Hill
5      was found to be unresponsive in her cell and then taken
6      to the hospital and pronounced dead, did the Spokane
7      County Detention Services consider her death to be an
8      in-custody death?
9  A   I -- I believe so.
10  Q   I'm gonna be showing you another exhibit now.
11          (Exhibit No. 2 marked for
12          identification.)
13  Q   (By Mr. Budge)  Are you able to see Exhibit 2 on my
14     screen?
15  A   I am, yep.
16  Q   Okay.
17  A   Yes.
18  Q   All right.  And I'm gonna just go ahead and, again, give
19     you the ability to control that yourself.
20  A   Okay.
21  Q   And let -- just kinda scroll through that and let me know
22     when you're done.
23  A   Sure.
24      Okay.  I -- I've read the document.
25  Q   Okay.  Do you recognize that as being the Field Case

Page 29

1   Report from the Spokane County Sheriff's Office authored
2   by the reporting officer, Urrutia-Soto?
3  A   I do.
4  Q   Turning to the third page, which I will scroll down to,
5   I want to draw your attention to the information at the
6   top of the page where it says:
7      "On 8/25/2018 at approximately 1817 hours" --
8   that's 6:17 p.m. -- "I, Deputy Urrutia" -- and then it
9   gives his number -- "and Deputy Richmond were in a
10  marked patrol unit B503 patrolling in the city of
11  Spokane Valley, Washington.  We were dispatched to
12  11 West Mallon Avenue (Spokane County Jail), in Spokane,
13  Washington, to a dead on arrival.  The complainant was
14  Jail Sergeant Justin White.  Sergeant White said there
15  was an in-custody death at that location.  The deceased
16  was Cindy L. Hill" -- and then it gives her date of
17  birth.
18      And then it says:
19      "The jail lieutenant was requesting Major Crimes
20  Detectives to investigate."
21      Let me just ask you:  This Spokane County sheriff's
22  office report says that the jail lieutenant was
23  requesting major crimes detectives to investigate.
24      Do you know, were you the jail lieutenant that was
25  being referenced by Detective Urrutia in this report?

Page 30

1  A  At that time it would've had to be.  I was the only
2     jail -- jail downtown lieutenant at the time.  There was
3     only one other lieutenant.  He was assigned to Geiger.
4  Q  Okay.  And do you see that it says:
5        "Prior to arriving, Sergeant White updated
6     communications and said Cindy passed away at Sacred Heart
7     Medical Center (SHMC) at approximately 1831 hours.  While
8     in route, I was told Major Crimes Detectives were going
9     to investigate Cindy's death at SHMC.  I was told to
10    conduct my investigation at the Jail."
11       Is it fair to say that on the evening of
12    Cindy Hill's death that you, as a lieutenant at the jail,
13    were requesting an investigation by the Spokane County
14    Sheriff's Office?
15  A  Yeah, correct.  That's our standard -- that's our policy
16     of any in-custody death.
17  Q  That's standard operating procedure?
18  A  It is.
19  Q  And then Officer Urrutia's report continues to describe
20     his process of gathering witness statements upon his
21     arrival at the Spokane County Jail.  It says more about
22     what he did upon arrival.  Could you just read with me?
23       "Upon arrival I started to gather the witnesses'
24     statements.  I spoke with Sergeant Justin White who said
25     the following:

Page 31

1        "He heard the first medical assistance call at
2     approximately 1725 hours.  He called for medical
3     assistance at Cell 2 West 27, as Cindy was unresponsive.
4     Cindy was not breathing and CPR/AED, automated external
5     defibrillator, were begun.  CPR was done until
6     Fire Engine 3 from Spokane arrived.  AMR Unit 121
7     arrived shortly after fire."
8        Do you see that?
9  A  I do.
10  Q  Okay.  And then it goes on so say that:
11       "Cindy was pronounced deceased at 1800 hours."
12       Do you see that?
13  A  I do.
14  Q  And so I believe you earlier agreed with me that
15     Cindy Hill's death was considered by Spokane County
16     Detention Services to be an in-custody death.
17       Do -- do you still agree with me about that?
18  A  I do.  The reports -- the reports mention it's an
19     in-custody death and also mention that she passed away at
20     the hospital.  But it -- it does say in-custody death in
21     the report.  So...
22  Q  And do you agree with me that Cindy Hill was found by
23     jail staff to be unresponsive in Cell 2 West 27 at or
24     around 5:25 p.m. on August 25th, 2018?
25  A  I agree.

Page 32

1  Q  And would you agree with me that Spokane County Detention
2     Services knew that it had an in-custody death on its
3     hands, namely the death of Cindy Hill, by at least the
4     early evening of August 25th, 2018?
5  A  Yes.
6  Q  Will you agree with me that, as of the time Spokane
7     County Detention Services knew that it had an in-custody
8     death on its hands, that all jail surveillance video from
9     August 25th, 2018, from all times during that day,
10     midnight through the entire balance of the day, still
11     existed and was still capable of permanent preservation?
12  A  Yes.
13  Q  Will you agree with me that, as of the time Spokane
14     County Detention Services knew that it had an in-custody
15     death on its hands, that all jail surveillance video from
16     August 25th, 2018, from all times would, according to
17     normal policy, still exist and be capable of permanent
18     preservation all the way up from -- till at least 60 days
19     following her death?
20  A  I agree.
21  Q  And will you agree with me that from the moment that
22     Spokane County Detention Services knew that it had an
23     in-custody death on its hands involving Cindy Hill that
24     it had at least 60 days to choose what portions of the
25     video to permanently preserve and, conversely, what video

Page 33

1     to destroy or allow to be destroyed?
2  A  I agree.
3  Q  Can you describe for me how and when you learned of the
4     death of Cindy Hill?
5  A  I believe the day -- on the night of the 25th, probably
6     around 18 -- 1800 or something like that or 18 -- 1800,
7     1830 at night.
8  Q  Were you involved in the decision to determine what
9     portions of video to permanently preserve?
10  A  Not that I recall.  I don't remember -- I don't recall
11     specifying what video.  I believe the detectives would
12     have specified.
13  Q  Who was the person or persons at the Spokane County Jail
14     who decided, for whatever reason, what portions of the
15     video to preserve and what portions of the video to allow
16     to be destroyed?
17  A  I believe, and this is not as much personal memory from
18     this incident as -- as dealing with a number of different
19     incidents, is when -- the detectives and the major
20     crime -- I think there's a sergeant from major crimes,
21     they're specifying they wanted what time period from what
22     cameras.
23  Q  But that's for purposes of their investigation, correct?
24  A  Correct.
25  Q  And the Spokane County Sheriff's Office is different from

THE ESTATE OF CINDY LOU HILL vs NAPHCARE
Hooper, Don - July 21, 2021

30(b)(6)
Pages 34..37

Page 34

1    Spokane County Detention Services, correct?
2  A  It is.  But they -- they're in charge of conducting the
3     investigation for in-custody deaths.
4  Q  Are they in charge of conducting internal investigations
5     at the jail?
6  A  We wait until after they've conducted their investigation
7     and then review their documents.  Typically use their
8     documents, which includes everything we would've had
9     available to us for our own -- own review.
10 Q  Are -- who was the liaison between the Spokane County
11    Sheriff's Office and the Spokane County Jail in terms of
12    choosing which portions of the video to permanently
13    preserve?  In other words, if somebody at the Spokane
14    County Sheriff's Office had given a direction to Spokane
15    County Detention Services to preserve certain portions,
16    who would that direction have been given to?
17 A  I'd say probably the lieutenant or the sergeant that was
18    on duty at the time.
19 Q  Not you, but somebody else?
20 A  It -- it could've been me.  Like I said, sergeant or
21    lieutenant.  It could've been me.  I would think the
22    sergeant involved as well.
23 Q  When the Spokane County Sheriff's Office is investigating
24    an in-custody death, what is the Spokane County Sheriff's
25    Office investigating for?

Page 35

1           MR. JUSTICE:  Object to the form.
2     Answer if you -- you --
3           THE WITNESS:  Yeah.
4           MS. EHLERT:  -- can answer.
5           THE WITNESS:  I guess maybe rephrase
6     that question.  What're they looking for?  What -- what
7     part are they investigating?  I'm not -- I'm not sure of
8     the question.
9  Q  (By Mr. Budge)  When the Spokane County Sheriff's Office
10    is investigating an in-custody death at the jail, are
11    they looking to see if there was a crime committed?
12 A  I believe that's one of the things.  If the -- if there
13    was more than one inmate in a cell.  Is there any
14    suspicious circumstances?  Could it've been an assault or
15    something else?  You know, was it a suicide?  Was it
16    natural cause?  Was it -- so those type of things that
17    they're investigating.
18 Q  Does the Spokane County Sheriff's Office have the
19    responsibility of directing the Spokane County Detention
20    Services Department with regard to what portions of
21    video, following an in-custody death, should be preserved
22    for purposes of public records requests?
23 A  I don't believe -- the Sheriff's Office, their stance on
24    it isn't related to public records.  They're looking to
25    investigate this -- they're -- they're looking for all

Page 36

1     video that'll help them determine maybe the cause of
2     death or any suspicious circumstances.  I don't believe
3     their portion is related to public disclosure, but I'm --
4     their -- their -- their investigation, after it's
5     complete, is also open to public disclosure as well.
6           So I don't -- I don't know if I answered your
7     question very well.
8  Q  What about civil litigation?  Does the Spokane County
9     Sheriff's Office have responsibility for directing
10    Spokane County Detention Services about what portions of
11    video to preserve following an in-custody death for
12    purposes of potential civil litigation?
13 A  I don't think that's their concern when they're directing
14    us to record video.  I don't --
15 Q  Okay.
16 A  -- think that's the sheriff's -- the detective on scene's
17    concern at the time.
18 Q  So in terms of potential civil litigation, whose
19    responsibility is it at Spokane County Detention Services
20    to determine what portions of video to preserve for
21    purposes of potential civil litigation?
22 A  I would say the sergeant or lieutenant that's on duty.
23    But that being said, the -- the -- the -- the sheriff --
24    the sergeant or the lieutenant on duty.
25          I guess that answers the question.

Page 37

1  Q  Meaning it's the responsibility of the sergeant or
2     lieutenant at Spokane County Detention Services to
3     determine what portions of video to preserve for purposes
4     of potential civil litigation?
5  A  Yes.  Or it could be the director as well.  It could be
6     the director.  Whoever was on the scene.
7  Q  Okay.  Regardless of whether it's the director of Spokane
8     County Detention Services or a sergeant or a lieutenant
9     working for the Spokane County Detention Services, will
10    you agree with me that, for purposes of civil litigation,
11    it's the responsibility of Spokane County Detention
12    Services to determine what portions to preserve for
13    purposes of potential civil litigation?
14 A  Yes.
15 Q  Okay.  Can you describe for me how and when you learned
16    of the death of Cindy Hill?
17          MR. JUSTICE:  Objection.  Asked and
18    answered, but you can answer again.
19          THE WITNESS:  I -- I -- like I said,
20    I believe, and this is more from reviewing the reports
21    than actually my memory of this -- of this incident three
22    years ago, is from a phone call from the sergeant.  And
23    I -- I responded somewhere down at the jail probably
24    a little after 1800.
25 Q  (By Mr. Budge)  Meaning that you actually physically went

THE ESTATE OF CINDY LOU HILL vs NAPHCARE
Hooper, Don -  July 21, 2021

30(b)(6)
Pages 38..41

Page 38

1  to the jail if you were not already there?
2  A  Correct.
3  Q  And -- and do you know who the sergeant was who first
4    advised you of Cindy Hill's death?
5  A  I believe that it was Sergeant White.
6  Q  And what were your duties and responsibilities with
7    regard to Miss Hill's death when you learned of her
8    death?  Could you take me through what the steps that you
9    went through --
10 A  I didn't --
11 Q  -- in --
12 A  -- I don't recall what steps I went through at that time.
13   I can tell you what I would typically go through.
14 Q  Sure.  Go ahead and tell me what you would typically go
15   through.
16 A  Typically I respond, check on condition of my officers;
17   check on conditions of the sergeant; making sure
18   everybody's okay there, physically and mentally okay;
19   and then try to coordinate and make sure we have
20   detectives on scene, typically they're there before
21   I even get there; see if the person's heading to the
22   hospital, like it sounds like Miss Hill did, and then
23   either coordinate with one of the sergeants or not; we
24   have a transport team go to the hospital as well,
25   sometimes the sergeant along with them, to determine the

Page 39

1    condition of the patient; and then somebody down here
2    coordinating the efforts; getting like a critical
3    incident team -- a critical incident citizen team down to
4    deal with the stress and the emotional impact to our
5    officers; getting ahold of risk management to get
6    somebody over; start pulling the documents such as the
7    reports and the medical file, I don't know if that's
8    all-inclusive, but that kind of thing; and just making
9    sure everything down here -- that the officers are
10   available for the detectives to interview, that -- that
11   kind of thing.  Kinda just overseeing the operation.
12 Q  And do you think that it's likely that in the case of
13   Cindy Lou Hill's death that you would have been the
14   person who would've done those ordinary and usual things?
15 A  I think --
16 Q  Uh --
17 A  -- I'm sorry.
18     Yeah, I think it's likely.
19 Q  Okay.  And so your normal procedure which you would have
20   followed beginning on the evening of Cindy Hill's death
21   would be to, number one, make yourself presently --
22   physically present at the jail if you weren't already
23   there, correct?
24 A  Correct.
25 Q  And, number two, to coordinate a response from staff,

Page 40

1    correct?
2  A  Correct.
3  Q  And, number three, inform risk management?
4  A  Correct.
5  Q  And, number four, begin the process of -- of gathering
6    and preserving materials relating to the confinement of
7    the deceased individual?
8  A  Yes.
9  Q  Okay.  And you would have, in that process, begun to
10   educate yourself about the facts and circumstances
11   surrounding her death to the extent that that information
12   was available to you?
13 A  Yeah, begin.  Or maybe the next day.  Maybe the next
14   workday I'd start.  But I'd start pulling the things and
15   then start reading the documents, reading the files, the
16   next -- within the next workday or something like that.
17 Q  All right.  And do -- do you think that you would've done
18   those things in reaction to Cindy Hill's death beginning
19   if not on the evening of her death, then at least by the
20   next day?
21 A  Yeah.  I think the -- as I recall I think it was maybe
22   a weekend.  I'm not exactly sure.  I'm thinking -- I'm
23   thinking it was a Saturday, but I could be wrong.  Maybe
24   the following Monday.
25 Q  But certainly within 60 days?

Page 41

1  A  Yes, within 60 days.
2  Q  Okay.  And -- and probably within just a day or two?
3  A  Probably within a day or two.
4      MR. JUSTICE:  Ed, do you think you
5    could look for kind of a break point here in the next few
6    minutes so we could take a quick break?
7      MR. BUDGE:  Yeah, absolutely.
8  Q  (By Mr. Budge)  Let me just ask you real quick before we
9    take that break:  Is it your usual process to inform
10   Spokane County Risk Management following the death of an
11   inmate at the jail?
12 A  That's our standard, correct.
13 Q  Why do you do that as part of your standard procedure?
14 A  It's maybe a high -- a high-liability situation, and --
15   and we inform of a number of high-risk events.  You know,
16   if a car wreck or a officer injury as well.
17 Q  Does the Spokane County Detention Services Department
18   anticipate the -- the possibility of -- of litigation
19   following the death of an inmate?  Is that one reason it
20   informs risk management right away?
21 A  That'd be one of them.
22      MR. BUDGE:  Okay.  All right.  Let's
23    go ahead and take that break.
24      THE VIDEOGRAPHER:  Please stand by.
25    We're going off the record.  The time is 10:57 a.m.

THE ESTATE OF CINDY LOU HILL vs NAPHCARE
Hooper, Don - July 21, 2021

30(b)(6)
Pages 42..45

Page 42

1             (Recess taken.)

2        THE VIDEOGRAPHER:  We are back on the

3   record.  The time is 11:11 a.m.

4  Q  (By Mr. Budge)  Lieutenant Hooper, are you ready to

5    continue?

6  A  I'm ready.

7  Q  Okay.  Lieutenant Hooper, the Spokane County Sheriff's

8    Office is a different department from the Spokane County

9    Detention Services Department; is that correct?

10  A  Correct.

11  Q  And the Spokane County Sheriff's Office does not operate

12    or control the Spokane County Jail; is that correct?

13  A  Correct.

14  Q  And the Spokane County Sheriff's Office does not operate

15    or control the Spokane County Jail's video surveillance

16    system, correct?

17  A  Correct.

18  Q  Spokane County Risk Management is yet a different

19    department from the Spokane County Detention Services

20    Department; is that correct?

21  A  Correct.

22  Q  Okay.  What do you understand to be the role of Spokane

23    County Risk Management?

24  A  I -- my understanding is just in the name.  They oversee

25    Labor & Industry claims, other things that happen in the

Page 43

1    operation of duties.  Car wrecks.  They -- I believe the

2    county is self-insured.  So when different events happen

3    in the community, a car wreck comes to mind or destroying

4    somebody's property or lost property or something like

5    that, they oversee all those type of processes.

6  Q  Do you understand Spokane County Risk Management to

7    oversee issues relating to civil litigation for various

8    Spokane County departments, including Spokane County

9    Detention Services?

10  A  Yes.

11  Q  Following the death of Cindy Lou Hill and your being

12    informed of her death, would you have probably gone to

13    Cell 2 West 27?

14  A  I would've.  I would've probably been to that area, yeah,

15    the area, and probably looked in the cell.

16  Q  Okay.  Would you have informed Director Sparber of

17    Miss Hill's in-custody death?

18  A  Yes.

19  Q  When do you believe you probably would've informed

20    Director Sparber?

21  A  He probably knew the same time I did.  So he was in --

22    probably knew somebody was serious medical duress, went

23    out to the hospital.  Probably knew about it the same

24    time I did, from the sergeant.

25  Q  Probably that same night?

Page 44

1  A  I imagine.

2  Q  Who else would you have made it a point to inform about

3    Cindy Hill's in-custody death?

4  A  Okay.  I mentioned risk management.  I mentioned the

5    director, the other lieutenant at the time.  Those are

6    the ones that come to mind.  I can't think of anybody

7    else.

8  Q  What would you have done following your being informed of

9    Cindy Hill's death in order to preserve evidence relating

10    to her confinement and death?

11  A  Like I said, myself or the on-duty sergeant would've

12    asked maintenance or our records officer to burn DVDs of

13    given video footage from the time period and the

14    location.

15  Q  What about preserving written materials or computer

16    records relating to Miss Hill's confinement?  What steps

17    would've been taken by Spokane County Detention Services

18    in order to preserve written materials such as documents?

19  A  Well --

20        MR. JUSTICE:  I'm just -- I'm just

21    gonna object that this is outside the scope of the

22    30(b)(6) deposition topics.  The -- the witness can

23    answer, but I just wanna make that objection for the

24    record.  Go ahead.

25        THE WITNESS:  Actually, I might have

Page 45

1    been -- there's no active steps necessary to retain

2    those documents.  The computer would retain them anyways.

3    And I don't believe I -- I -- it's a lengthy retention

4    period.  It -- so I -- I don't think I'd have to take any

5    active steps.

6  Q  (By Mr. Budge)  As of the evening of August 25th, did

7    you believe that Spokane County Detention Services was

8    obligated to preserve evidence relating to the

9    August 25th confinement of Cindy Hill in the Spokane

10    County Jail?

11  A  I would've, yes.  Like I said, I don't recall that, but

12    I -- I would've in the course of my normal duties.

13  Q  Would it have been standard operating procedure following

14    Miss Hill's death for Spokane County Detention Services

15    to preserve evidence relating to her August 25th

16    confinement?

17  A  Yes.

18  Q  Okay.  All right.  I'm gonna show you another document

19    now.  This is Exhibit 3 to your deposition.

20        (Exhibit No. 3 marked for

21        identification.)

22  Q  (By Mr. Budge)  Are you able to see Exhibit 3 on your

23    screen?

24  A  I am.

25  Q  Okay.  This is a one-page document that at the top is

THE ESTATE OF CINDY LOU HILL vs NAPHCARE
Hooper, Don - July 21, 2021

30(b)(6)
Pages 46..49

Page 46

1    titled "Medical Watch General Observation."
2        And let me ask you:  Do you recognize Exhibit 3 to
3    be a document called medical watch form for Cindy Hill
4    from the date of her death, August 25th, 2018?
5  A   I do.
6  Q   And do you see at the top that it lists her name and it
7    has the date of August 25th and the time of 9:30 a.m.?
8  A   I do.
9  Q   And do you see that it identifies Hill, Cindy, as being
10    housed in Cell 2 West 27?
11  A   I do.
12  Q   And do you see that there are a series of 12 handwritten
13    entries from various corrections officers, handwritten
14    starting at 10:15 a.m., and concluding with the notation
15    "Was taken to hospital" at the bottom of the form?
16  A   I do.
17  Q   And now I'm gonna show you Exhibit 4 to your deposition.
18            (Exhibit No. 4 marked for
19                identification.)
20  Q   (By Mr. Budge)  Exhibit 4 to your deposition consists of
21    two photographs bearing production number 00794 and
22    00795.
23        Do you see those two photographs that are --
24  A   I do.
25  Q   -- marked as Exhibit 4?

Page 47

1  A   I do.
2  Q   Do you recognize those photos as being the door to
3    Cell 2 West 27 where Cindy Hill was housed, upon which
4    was posted Cindy Hill's medical watch form with the 12
5    handwritten entries that we just went over?
6  A   I do.
7  Q   Is this form an official document of Spokane County
8    Detention Services?
9  A   It is.
10  Q   Shortly after Cindy Hill died, would you have become
11    aware that she was housed in Cell 2 West 27 on the date
12    of her death from the morning hours at or about 9:30 a.m.
13    until she was discovered unresponsive at or about
14    5:25 p.m.?
15  A   I -- as -- as if I would've been familiar with it?  I --
16    could you rephrase that question?  I'm sorry.
17  Q   Sure.  That's fine.
18        Regardless of whether it was from this form or
19    from other materials or people that you spoke with,
20    would you have become aware, shortly after Cindy Hill's
21    death, that on the day of her death, from the morning
22    at or about 9:30 a.m. until she was eventually found
23    unresponsive in the early evening, that she had been
24    housed for the duration of her last day in
25    Cell 2 West 27?

Page 48

1  A   Yes, I would've been aware of that.
2  Q   And shortly after Cindy Hill died, would you have
3    become aware of this medical watch form bearing those
4    12 handwritten entries from your corrections staff
5    throughout the day on August 25th?
6  A   Yeah, I would've received it the day of or -- or the
7    next workday, yes.
8  Q   And at the time that you first became aware of the fact
9    that Miss Hill was housed in Cell 2 West 27 under
10    circumstances where she was supposed to be on 30-minute
11    medical watch by jail corrections staff, will you agree
12    with me that all the jail surveillance footage from
13    August 25th still existed and was capable of permanent
14    preservation?
15  A   At that time, yes.
16  Q   And would all of that video footage from Miss Hill's last
17    day still exist and be capable of permanent preservation
18    for at least an additional 60 days?
19  A   Yes.
20  Q   Will you agree with me that, as of the time you first
21    became aware of the fact that Cindy Hill was housed in
22    2 West 27 under circumstances where she was supposed to
23    be under 30-minute medical watch by the jail's
24    corrections staff, that there were at least 60 remaining
25    days for the jail to choose what video to permanently

Page 49

1    preserve and, conversely, choose which video to destroy
2    or allow to be destroyed?
3  A   Yes.
4  Q   At the Spokane County Jail was there a video camera
5    pointed down the hallway that ran along the outside of
6    Cell 2 West 27?
7  A   Yes.
8  Q   And was that the case as of August 25th, 2018, that there
9    was a camera pointed down the hallway that ran outside of
10    2 West 27?
11  A   Yeah.  It's on the far end of the hall facing back --
12    coming back towards 27.
13  Q   Did that video camera that was pointed down that hallway
14    outside of Cindy Hill's cell, where she spent her last
15    day, make and record video footage of the activities in
16    the hallway?
17  A   Yes.
18  Q   And as with the other recorded jail surveillance
19    footage, was that particular video footage showing the
20    hallway outside of Cell 2 West 27 available for permanent
21    preservation for at least 60 days following Miss Hill's
22    death?
23  A   Yes.
24  Q   I'm now going to show you Exhibit 5 to your deposition.
25

THE ESTATE OF CINDY LOU HILL vs NAPHCARE
Hooper, Don - July 21, 2021

30(b)(6)
Pages 50..53

---

Page 50

1          (Exhibit No. 5 marked for
2          identification.)
3  Q  (By Mr. Budge)  And I will ask you:  Does Exhibit 5
4    appear to be a sample screenshot that shows the view of
5    the camera that was pointed down the hallway that ran
6    along the cell -- cell hallway that included 2 West 27?
7  A  I don't have the document yet.  It's not showing up.
8    I just have --
9  Q  Oh --
10  A  -- my --
11  Q  -- okay.
12      Can you see it now?
13  A  I can.
14  Q  In the lower right-hand corner it says:
15     "30(b)(6) Deposition Exhibit 5"
16      Can you see that?
17  A  I do.  I see it now.  And I see 2 West 29 on the top of
18    the picture is what I can see.
19  Q  Okay.  And if we're looking at this, the cell door beyond
20    2 West 29, opposite what appears to be a telephone, would
21    that be 2 West 28?
22  A  It would and the next one, 2 West 27.
23  Q  All right.  And so this screenshot, then, just for the
24    record, shows the hallway outside Cell 2 West 27 as
25    recorded by the Spokane County Jail's video surveillance

---

Page 51

1    system?
2  A  It does.
3  Q  And from this screenshot can we tell that, indeed, there
4    was a camera that was pointed down the hallway looking
5    down the length of that hallway that included the area
6    outside of 2 West 27?
7  A  We can, yeah.  From this picture, yes.
8  Q  All right.  And that camera was designed to regularly
9    record that hallway and any activity occurring in the
10    hallway throughout the course of the day?
11  A  Yes.
12  Q  If a member of corrections staff or NaphCare healthcare
13    staff walked the hallway at any given time during
14    the day, that fact would be recorded by this camera
15    angle, correct?
16  A  It would.
17  Q  And if a member of corrections staff claimed to have
18    walked down the hallway and paused at the outside of
19    Cindy Hill's door at 2 West 27 at 10:15 a.m. on the
20    morning of August 25th, 2018, the video surveillance
21    footage from this camera angle would have recorded
22    whether or not that person was actually in the hallway
23    at the claimed time, correct?
24  A  It would.
25  Q  And if a member of corrections staff claimed to have

---

Page 52

1    walked down the hallway and paused outside Cindy Hill's
2    door at 2 West 27 at 10:15 a.m. on the morning of
3    August 25th, 2018, would you agree with me that the
4    video surveillance footage would provide recorded
5    footage of who that person was?
6  A  You should be able to determine who it was.  Yeah, the
7    video's fairly high quality.
8  Q  And, similarly, if a member of corrections staff
9    claimed to have paused outside of Cindy Hill's door at
10    2 West 27 at 10:15 a.m. on the morning of August 25th,
11    the surveillance footage would record how long that
12    person paused outside the door, correct?
13  A  Yes.
14  Q  And will you agree with me that the same things are true
15    if any member of corrections staff claimed to have walked
16    down the hallway and paused at the outside of
17    Cindy Hill's door at 11:09, 11:23 --
18  A  12:07.
19  Q  -- 12:07, 12:40, 1:10, 1:43, 1:58, 2:30, 3:00, and
20    3:20 p.m.?
21  A  Yes, I would agree.
22  Q  And the same things are true if any member of NaphCare
23    healthcare staff claims to have walked down the hallway
24    and paused outside of Cindy Hill's door at any time on
25    August 25th, correct?

---

Page 53

1  A  The cameras would've recorded that as well.
2  Q  All right.  And they would've recorded the number of
3    people, the identity of those people, and how long they
4    paused outside of her door if they claimed to have done
5    so, correct?
6  A  Yeah, it's a realtime recording.  It can...
7  Q  Will you agree with me that if we had the video footage
8    that we know to have been filmed throughout the day on
9    August 25th and the footage that we know to have once
10    existed in recorded form from this hallway, that we could
11    compare that footage to the handwritten medical watch log
12    marked in this deposition as -- as Exhibit 3 and
13    determine whether these handwritten checks actually
14    occurred?
15  A  If we could compare the two, yeah, we could have, yes.
16  Q  And we could determine not only whether the handwritten
17    checks actually occurred, but if they were actually
18    conducted by the person who says that they conducted
19    them?
20  A  Yes.
21      MR. JUSTICE:  And I apologize.  I --
22  can I -- I need to go off the record for five minutes.
23  I've had an emergency come up.  I really apologize for
24  this.  It has nothing to do with this deposition.  If you
25  could give me five minutes to attend to that, I'd sure

---

THE ESTATE OF CINDY LOU HILL vs NAPHCARE
Hooper, Don -  July 21, 2021

Page 54

1   appreciate it.
2              MR. BUDGE:  Absolutely, John.  It's no
3   problem.
4              MR. JUSTICE:  All right.  Thank you.
5              THE VIDEOGRAPHER:  Please stand by.
6   We're going off the record.  The time is 11:28 a.m.
7              (Recess taken.)
8              THE VIDEOGRAPHER:  We are back on the
9   record.  The time is 11:36 a.m.
10  Q   (By Mr. Budge)  Lieutenant Hooper, are you ready to
11  continue?
12  A   I am.
13  Q   Okay.  Just before that break we were talking about
14  how if the video footage from throughout the day on
15  August 25th still existed, we could compare that video
16  footage with the handwritten form that you see here as
17  Exhibit 3 and determine, number one, when the checks
18  actually occurred, correct?
19  A   Correct.
20  Q   Whether they actually occurred, correct?
21  A   Correct.
22  Q   Whether they actually occurred by the person who claims
23  to have done them, correct?
24  A   Correct.
25  Q   And how long every such person paused at the outside of

Page 55

1   Cindy Hill's door during each recorded check if, in fact,
2   they were done, correct?
3   A   Correct.
4   Q   And if we had the video footage from the day of
5   August 25th from the hallway outside Cell 2 West 27,
6   we could determine whether any other person whose entry
7   is not on Exhibit 3 walked down the hallway outside
8   Cindy Hill's cell and paused outside her cell door at
9   any time during the course of the day, correct?
10  A   Correct.
11  Q   Including any member of NaphCare healthcare staff,
12  correct?
13  A   Correct.
14  Q   If you look at Exhibit 5, which is the screenshot that
15  we were talking about, do you see that there are a series
16  of 21 descriptions on the left-hand side of the screen
17  which appear to be different camera angles at different
18  locations from around the jail?
19  A   That's correct.
20  Q   Do you think that those are the sum total of the camera
21  angles in the jail or do you --
22  A   No, I --
23  Q   -- not?
24  A   -- do not.
25  Q   Okay.  There are other camera angles as well that are not

Page 56

1   listed here?
2   A   There are, yeah.  There's a -- I mean, right offhand,
3   we have a 4th floor, a 5th floor, a 6th floor.  There's
4   a number -- a number more cameras in booking area than
5   that.  So...
6   Q   Okay.  And if I enlarge this photograph just a little
7   bit, can we see at the top of the screen that there is
8   a little picture of a camera at -- and then it says
9   "6-2W Lwr Overflow-C112"?
10  A   I do.
11  Q   Do you know what those letters and numbers mean?
12  A   Well, I -- the very -- "6" I don't.  The "2W" is the
13  2nd floor, the west side.  "Lwr" I believe is lower.
14  "Overflow"?  This is this area where -- you see the
15  door down at the end of this picture all the way to the
16  back side of the picture there?  This is a overflow
17  area on 2 West that is from 2 -- 2 West 24 to 2 West 30,
18  I believe.  And the reason it's called overflow, it
19  actually bumps onto the east side of the building.
20  But it's built into overflow on that side of the floor.
21  And then "C112" I believe is actually the camera number.
22  Q   Okay.
23  A   And all the rest of the number looks like a date, like
24  2018, and probably 8 -- yeah, it looks like 8, the 25th.
25  And so some of those others is maybe a time stamp.

Page 57

1   Q   Okay.  And so basically this series of letters and
2   numbers indicates that -- the camera in question?
3   A   Yeah, I believe so.
4   Q   Okay.  And, similarly, on the left side of the screen
5   we can also see that there's a 2-2W -- excuse me -- a --
6   at the top, near the top, a "2-2W Lwr Overflow"?
7   A   Yes.
8   Q   And also a 9 -- "9-2W Lwr Overflow."
9   Do you see that?
10  A   I do see that.
11  Q   And also the present camera angle is 6 -- "6-2W Lwr
12  Overflow."
13  Are -- are those all designations that refer to the
14  same basic camera angle?
15  A   I believe they're referring to the same camera.  And I'm
16  not 100 percent sure here, but I believe -- behind this
17  screenshot here I believe those are all the cameras that
18  they have on an active viewing screen of your -- so you
19  can drag cameras from a queue.  And you go down the list,
20  "1-2W Front Door," "2W" -- and I believe there's -- it
21  looks like three or four different instances of the same
22  camera view is I believe what all those are.  The -- it's
23  all the "2W Lwr Overflow."  It's only one camera, but I
24  believe they have three or four different screen
25  instances -- I guess viewings of it.  Feeds from it maybe

Page 58

1    would be a better word.
2  Q  Okay.  So the important designation in terms of what
3    portion of the jail that you're looking at in any
4    particular camera angle is to the right of the letters
5    where it talks about -- to the right of the first number
6    where it talks about, like, "2W Lwr Overflow"?
7  A  Yeah.  The location, correct.
8  Q  Okay.
9  A  And it'd be helpful to see the "-C" number, you know,
10    because that tells you exactly the camera -- I believe
11    that -- when it says "-C112," or there's one down further
12    you can see, "C77," I believe that tells you the exact
13    camera number.  "C72," that's the camera number itself.
14  Q  Okay.  And at the bottom of the screenshot in the lower
15    right, can we see that there are segmented times and that
16    some of the times from this particular screenshot are
17    highlighted in red?
18  A  Yeah.  It looks like that's the viewing time.  It looks
19    from 4:00 -- or 4:00 p.m. -- a little tiny bit before
20    4:00 p.m. all the way to 4:02, 4:03.
21  Q  Right.
22      And so we can see that -- also that there's a box
23    in the lower right-hand corner that shows a calendar
24    identifying this as being a screenshot from August 25th,
25    2018?

Page 59

1  A  It -- it looks like that.  And then down below I see
2    3/25/21 as well in the date window.  So I don't -- I
3    don't know.  Is that 3/25?  Yeah, so -- so I see both
4    dates.
5  Q  That may be the time that it was burned and produced to
6    us.  I'm not sure.
7  A  Okay.
8  Q  But the actual calendar that's enlarged here that shows,
9    in blue, August 25th would refer to the date of the
10    recording?
11  A  It looks like, yes, correct.
12  Q  And the -- below that it says:
13      "Earliest Playback Time:  8/25/2018 3:59:59 p.m."
14      Would that show when the -- when this particular
15    recording starts?
16  A  That's what it appears to me, that's the earliest that
17    recording starts.
18  Q  Okay.  Now, at some point after Cindy Hill's death
19    did the Spokane County Detention Services Department
20    undertake efforts to permanently preserve some of the
21    video footage from the hallway outside Cell 2 West 27?
22  A  Yes.  I believe that's what we're looking at right there,
23    yes.
24  Q  Why did Spokane County Detention Services undertake
25    efforts to produce -- or, excuse me, to preserve some of

Page 60

1    the video footage from the hallway outside of
2    Cell 2 West 27?
3  A  Like I mentioned earlier, like, I don't have direct
4    memory of this instance.  But from dealing with others,
5    on recommendation from the detectives on scene, they're
6    like, "This video, an hour before -- two hours before to
7    an hour after."  You know, they -- they gave usually
8    a time window and what cameras, and usually I listen to
9    their recommendation.
10  Q  Let me just ask you this:  Within a day or two, probably
11    on the same day as Cindy Hill's death, would you agree
12    with me that Spokane County Detention Services knew that
13    this death would likely be investigated by law
14    enforcement?
15  A  I believe the day of.
16  Q  Would Spokane County Detention Services have known, at
17    least as of the time of Cindy Hill's death, that her
18    death would be subject to some form of internal
19    investigation?
20  A  Yes, same -- at the same time.
21  Q  Would Spokane County Detention Services have known that
22    Cindy Hill's death might well result in public records
23    requests by family members of the decedent seeking
24    information relating to her confinement?
25  A  It's always a possibility, yes.

Page 61

1  Q  Would Spokane County Detention Services have anticipated
2    the possibility that Miss Hill's death might result in
3    civil litigation?
4  A  As well the same -- same thing.  It's always a
5    possibility.
6  Q  And does Spokane County Detention Services pretty much
7    know that any jail death is reasonably likely to result
8    in civil litigation?
9  A  Yeah, likely.
10  Q  Okay.  And -- and for all of those reasons -- possible
11    civil litigation, public records requests,
12    internal/external investigations -- did Spokane County
13    Detention Services know that it was obligated to preserve
14    all relevant evidence relating to the circumstances
15    surrounding Miss Hill's confinement on the last day of
16    her life?
17  A  Did they know?  I -- I can only speak for what I --
18    what I would know.  But I believe anybody would know,
19    yeah, let's retain all the documents and all the video
20    and everything we think is relevant.
21  Q  Okay.  So could -- could you, in as much detail as you
22    possibly can, walk me through the jail's efforts to
23    permanently preserve portions of the video footage from
24    the hallway outside Cell 2 West 27?  What I'd like to
25    know is who was the person or the people who were charged

THE ESTATE OF CINDY LOU HILL vs NAPHCARE
Hooper, Don - July 21, 2021

30(b)(6)
Pages 62..65

Page 62

1    with the process of -- of preserving the video footage.
2    And then maybe you could take me through what those
3    people or -- or persons did.
4  A  I've talked to the people that were, and none of the
5    people that would've been charged actually remember the
6    incident.  We have a number of critical incidents in the
7    course of a year or a number of years, so I don't
8    remember telling anybody to do that.  But I can tell you
9    what I would do, what I would normally do, and as well as
10   the other officers and the sergeant.  They don't recall
11   Cindy Lou's incident versus other incidents we've had in
12   the jail.  They don't remember it specifically.
13 Q   Okay.  So let -- let me just make sure that we understand
14   for the record:  Is it the case that you are not able to
15   tell me, one way or the other, why certain portions of
16   the video were preserved and other portions of the video
17   were not preserved?
18 A  I -- I can't -- I can't tell you specifically, no.  I
19   don't know.
20 Q   Okay.  And you don't know who the person or people were
21   that were specifically charged with the responsibility
22   of deciding what portions of the video relating to
23   Cindy Hill's last day of confinement were.
24 A  I do not.
25 Q   And you've done your very best to try to find that

Page 63

1    information out before today?
2  A  I have.  I've asked all the people that would or could've
3    been, and nobody recalls the incident itself.  Like I
4    said, a number of videos throughout the course of a week,
5    less critical incidents than this, but there have been
6    other inmate deaths and that -- that nobody recalls the
7    incident itself, no.
8  Q   And nobody -- nobody is able to say for sure who the
9    people or the person might have been who pushed the
10   buttons to save certain portions and -- and not other
11   portions?
12 A  Correct.  Nobody knows at this point, no.  Nobody that
13   works with us knows.
14 Q   And nobody knows why certain portions were preserved and
15   why certain portions were not preserved?
16 A  I can only speculate, no.  So no.  For sure, no, I do
17   not.
18 Q   With regard to portions of the video surveillance from
19   outside 2 West 27 that were preserved, was that
20   a relatively easy thing to do or would that have been
21   a relatively easy thing to do?
22 A  Well, relatively easy?  It's fairly time consuming.  It
23   almost takes realtime.  You know, if it's an hour, it
24   takes about an hour of computer.  But setting a time
25   period in the computer, inserting DVDs, if it's a lengthy

Page 64

1    one, multiple DVDs, which this is, but -- so I guess
2    relatively easy.  I -- I think that's relatively easy.
3  Q   But I guess what I'm saying is:  In terms of the
4    processes that were in place for permanently preserving
5    portions of video surveillance, the Spokane County
6    Detention Services knew exactly how to do it if they had
7    wanted to do it, correct?
8  A  Yes, we do -- we do have the knowledge.
9  Q   Okay.  Are you aware of any written records, of any
10   instructions, that were given to anybody -- emails or
11   memo or anything like that -- in connection with deciding
12   what to preserve and what not to preserve?
13 A  Not that I recall right offhand.  I've -- I've seen
14   Miss Hill -- the file related to Miss Hill a number of
15   times.  I don't recall seeing that document in there.  It
16   may be and I don't know.
17 Q   Have -- have you looked to see, as part of your
18   preparation for this deposition and the topics that
19   I designated, whether there were any written instructions
20   or directives or anything like that from any one person
21   to any other person about "Preserve this.  Don't preserve
22   the other," or anything of that nature?
23 A  Is the question if I looked at anything?  Like I said,
24   I don't recall seeing anything.  It may be in the file.
25 Q   My question is whether you looked, in preparation for

Page 65

1    your deposition, to see if there was any record of any
2    type of instruction or communication documenting which
3    portions of the video to preserve and what portions not
4    to preserve.
5  A  Not recently, no.
6  Q   But you did everything that you could do in advance of
7    today's deposition to try to find out whether anybody
8    knew why certain portions were preserved and other
9    portions were not and you weren't able to come up with an
10   answer to that question?
11 A  We've been searching for this video, I think there's been
12   a number of requests from your office about the video,
13   for a number of months.  And so any other video and --
14   and recordings of video and everything else have been
15   looked at for -- for quite a period of time.
16 Q   And -- and -- and -- and in terms of if there were any
17   documents relating to instructions about, that may have
18   been given at or near the time of her death or in the
19   days following, what to preserve and what not to
20   preserve, do you expect you probably would've come
21   across that?
22 A  We would've.  And it would've been produced already.
23 Q   Okay.  Now, we know in this case that there were
24   portions of video surveillance from the area outside
25   Cell 2 West 27 from the day of Cindy Hill's death that

Page 66

1    were permanently preserved, correct?
2  A   Correct.
3  Q   And we know that there were other portions of the video
4      from the day of Cindy Hill's death from outside Cell
5      2 West 27 that were not preserved, correct?
6  A   Correct.
7  Q   And so will you agree with me that someone at Spokane
8      County Detention Services made the -- the conscious
9      choice to preserve certain portions of the video?
10  A   That's accurate, yes.
11  Q   And would you agree with me that with regard to the
12      portions that were not permanently preserved that there
13      was a -- a -- a -- a conscious choice by Spokane County
14      Detention Services to allow those other portions of the
15      video to be permanently erased?
16  A   Correct, yeah.  In -- in effect, if they didn't record
17      it in 60 more days, the officers that would've been in
18      charge of recording it knew that it would write over
19      itself.
20  Q   And so in choosing some portions of the video to
21      permanently preserve, Spokane County Detention Services
22      knew that at some point in -- toward the end of
23      October 2018, the portions that were not permanently
24      preserved would be destroyed or erased permanently,
25      correct?

Page 67

1  A   Yes.
2  Q   Okay.  With regard to the video showing the hallway
3      outside Cell 2 West 27, I want to show you what I believe
4      to be the entirety of the video that has been -- been
5      produced to us in this case pursuant to our requests for
6      production.  I'm gonna do my very best to share my
7      screen with you and show you what I'm talking about.
8      It'll take me just a minute to get it up here.
9  A   Okay.
10              (Exhibit No. 6 marked for
11                identification.)
12  Q   (By Mr. Budge)  All right.  Lieutenant Hooper, are -- are
13      you able to see my screen?
14  A   Yeah, I see one top corner with the same view of 2 West
15      29.
16  Q   Right.
17              (Video plays.)
18  Q   (By Mr. Budge)  So the portion of the video that I'm
19      showing you right now is from the camera angle looking
20      down the hallway outside Cell 2 West 27 titled "9-2W
21      Lwr Overflow-Camera C112."
22      Do you see that?
23  A   I do.
24  Q   And do you see that the timer begins at 8:43 a.m. or just
25      a few seconds before 8:43 a.m.?

Page 68

1  A   I do.
2  Q   And I am going to go ahead and fast-forward through what
3      I believe to be the entirety of this particular video.
4              (Video plays.)
5  Q   (By Mr. Budge)  And I will ask you if this video appears
6      to run from just about 8:43 a.m. or a few seconds before
7      that, which we saw at the beginning, until just about
8      a little bit past 9:11 a.m., a period of about
9      29 minutes.
10      Will you agree with me about that?
11  A   That -- that's accurate.  That looks accurate.
12  Q   Okay.  Now, the second video that I'm gonna show you is
13      from "2-2W Lwr Overflow."
14              (Video plays.)
15  Q   (By Mr. Budge)  And does it appear from the top of the
16      screen that this camera angle is also from Camera C112?
17  A   It looks like the same camera, correct.
18  Q   Okay.  And do you see that this camera angle from the
19      video titled "2-2 Lwr West Overflow" begins just after
20      9:05 a.m.?
21  A   I do.
22              (Video plays.)
23  Q   (By Mr. Budge)  Okay.  And if we fast-forward through the
24      balance of this, will you agree with me that it ends at
25      about 9:14 a.m. of a period -- so a period of about --

Page 69

1      a period of about 12 minutes or so?
2  A   Yes.
3  Q   Okay.  And so, together, will you agree with me that
4      those two videos show the period from approximately
5      8:43 a.m. until sometime around 9:15 a.m., a -- a period
6      of roughly 30 or 32 minutes?
7  A   Yes, I would agree.
8  Q   And then the final video that I'm going to show you is
9      from "6-2 Lwr Overflow."
10              (Video plays.)
11  Q   (By Mr. Budge)  And do you see that this video begins at
12      about 4:00 p.m.?
13  A   I do.
14              (Video plays.)
15  Q   (By Mr. Budge)  And if I run this at a high fast-forward
16      speed until the end, will you agree that in total this
17      video runs from about 4:00 p.m. until about 6:30 p.m.?
18  A   I would agree.
19  Q   Okay.  So what we have that's been preserved that we've
20      just looked at is approximately 30 or 32 minutes in the
21      morning of August 27th -- excuse me -- August 25th from
22      about 8:43 a.m. until about 9:15 a.m. and then the
23      afternoon and evening segment from about 4:00 p.m. to
24      6:30 p.m.
25      Will you agree with me about that?

THE ESTATE OF CINDY LOU HILL vs NAPHCARE
Hooper, Don - July 21, 2021

30(b)(6)
Pages 70..73

Page 70

1  A  I would agree with you.

2  Q  Okay.  Are you aware of any other video that was

3     preserved showing the hallway area outside Cell 2 West 27

4     on August 25th, 2018, other than the approximately

5     32 minutes in the morning from about 8:43 until about

6     9:15 and then the afternoon segment from about 4:00 p.m.

7     to about 6:30 p.m.?

8  A  No, I have no -- I know of no other video.

9  Q  Okay.  So with regard to the video that showed the

10    hallway outside Cell 2 West 27 where Cindy Hill was

11    confined throughout her last day leading to her death

12    in the early evening of August 25th, do you agree that

13    as of the date of her death and continuing for a period

14    of 60 days, Spokane County Detention Services had the

15    means and ability to permanently preserve the video

16    spanning for that entire day had it chosen to do so?

17  A  It could have, yes.

18  Q  Okay.  And the period of time running from approximately

19    9:15 in the morning until after 5:30 in the evening

20    spanned more than eight hours, correct?

21  A  I'm thinking about it, but, yeah, a number of hours,

22    sure.  Eight hours.

23  Q  And the only portions of the video from the hallway

24    outside Cell 2 West 27 that Spokane County Detention

25    Services chose to preserve were about 30 or 32 minutes

Page 71

1     from the very early morning period and then the

2     approximately two-and-a-half-hour period from 4:00 p.m.

3     till 6:30 p.m., correct?

4  A  Correct.

5  Q  Whereas the period of video that Spokane County Detention

6     Services chose to allow to be destroyed are the portions

7     spanning from about 9:15 in the morning until 4:00 p.m.,

8     correct?

9  A  Correct.

10  Q  And that portion of destroyed video spans about 6 hours

11    and 45 minutes.

12    Will you agree with me about that?

13  A  I would agree.

14  Q  Okay.  That 6-hour-and-45-minute span from 9:15 a.m. to

15    4:00 p.m., has that been permanently destroyed so that it

16    can no longer be restored or replaced?

17  A  Had we been -- there's no copies of it and -- and it

18    would've been written over a number of times since then.

19  Q  Okay.  And so, just for the record, it can no longer be

20    restored or replaced, correct?

21  A  It can no longer, yeah.  It's not possible.

22  Q  Without that 6-hour-and-45-minute span, will you agree

23    with me that it is not possible to verify through visual

24    observation whether or not any of the claimed checks that

25    are recorded in handwriting by the corrections officers

Page 72

1     were, in fact, conducted?

2  A  No way to confirm it by video, no.

3  Q  And will you agree with me that without that 6 hours and

4     45 minutes it's not possible to verify though visual

5     observation not only whether or not they were done, but

6     anything about the checks like how long the corrections

7     officers paused at Cindy Hill's cell if, in fact, they

8     did so?

9  A  I would agree.

10  Q  Would you agree that without that 6 hours and 45 minutes

11    it's impossible to verify visually whether any other

12    person, including, but not limited to, a member of

13    NaphCare healthcare staff, did or did not come down the

14    hallway at any time between 9:15 a.m. and 4:00 p.m.?

15  A  No way to confirm it at this point.

16  Q  In contrast to what actually occurred in this case

17    with regard to the video that was preserved and the

18    video that was destroyed, will you agree that it was

19    possible, with relative minimal effort, to preserve the

20    entire day's worth of video footage showing the outside

21    of the portion of the hallway where Cindy Hill was

22    confined during the 6 hours and 45 minutes that we now

23    know to be missing?

24  A  It would've been able to, yes.

25  Q  Okay.  And so will you agree that the decision to permit

Page 73

1     the destruction of that 6-hour-and-45-minute span was --

2     was an intentional decision by Spokane County Detention

3     Services?

4         MR. JUSTICE:  Object to the form.

5     You -- you can answer.

6            THE WITNESS:  And I -- I -- I guess

7     I wouldn't agree that it's a intentional act or an

8     oversight or a -- or it was produced at one time and --

9     and then no longer -- you know, it's lost or something.

10    So I -- I guess I don't know the answer to that.

11  Q  (By Mr. Budge)  And you can't tell me, despite your best

12    efforts, why Spokane County Detention Services chose not

13    to permanently preserve the 6-hour-and-45-minute span

14    that we now know to have been destroyed?

15  A  I -- I --

16         MR. JUSTICE:  Objection.

17           THE WITNESS:  -- I -- I --

18         MR. JUSTICE:  Asked and answered.  You

19    can answer.

20           THE WITNESS:  -- I have no way to

21    know.

22  Q  (By Mr. Budge)  Can you tell me when the decision was

23    made to preserve certain portions and not preserve other

24    portions?

25  A  I can speculate.  I can't tell you for sure.  I -- I

Page 74

1   would think the day of or within a couple of days, but
2   I -- like I said, I -- I'm not 100 percent sure of that.
3   I don't recall.
4 Q   Do you know whether anybody reviewed the
5   6-hour-and-45-minute period of deleted video before it
6   was permanently destroyed or erased?
7 A   I -- I don't know that.
8 Q   Are you aware of any written documentation of any kind
9   of what that 6-hour-and-45-minute span of video revealed?
10   Such as, for example, anybody created a timeline or
11   a summary or a series of screenshots or notes or anything
12   like that that showed what was on the video and what
13   wasn't on the video?
14 A   I don't know of any document, no.
15 Q   Do you know if anybody at Spokane County Detention
16   Services -- or anybody else, for that matter -- who can
17   testify under oath about what was on that
18   6-hour-and-45-minute span or what wasn't on that
19   6-hour-and-45-minute span?
20 A   I don't know of anybody.  I don't believe there is
21   anybody.
22 Q   Do you have any -- any further additional explanation
23   for Spokane County Detention Services' destruction of
24   the 6-hour-and-45-minute span that you haven't offered
25   or attempted to offer?

Page 75

1 A   I don't have any other information, no.
2 Q   Have you looked to see -- and perhaps you've answered
3   this and if you have, I apologize -- whether there were
4   any type of written standards or protocols that were in
5   place for the retention of surveillance video?
6 A   They are, but they talk about critical incidents.  You
7   know, incidents retained, video-related incidents.  It
8   doesn't specify the number of hours or anything.  It's
9   with not that level of specificity.
10 Q   I'm gonna show you Exhibit 7 to your deposition.
11               (Exhibit No. 7 marked for
12                  identification.)
13 Q   (By Mr. Budge)  Are you able to see Exhibit 7?
14 A   I am.
15 Q   Okay.  And this appears to be a one-page document titled
16   "Records and Data Practices."
17      Are you familiar with this particular document?
18 A   I -- I am.  I've read this policy.
19 Q   Okay.  What -- what is the intention of this policy?
20 A   Well, specifically I think, as we're -- as the things
21   we're discussing, is C 214.3 is just to retain all the
22   documents, records, electronic data, video, audio
23   recordings and that it's consistent with that WAC.
24 Q   Okay.  So it says:
25      "All official files, documents, records, electronic

Page 76

1   data, video and audio recordings and information held by
2   Detention Services shall be maintained subject to
3   WAC 44-14-03005.  Retention" -- "Record retention
4   schedules are established by the Washington Secretary of
5   State."
6      And then Exhibit 8, which I'll show you, is another
7   document relating to "Records and Data Practices,"
8   Spokane County Detention Services.
9               (Exhibit No. 8 marked for
10                  identification.)
11 Q   (By Mr. Budge)  Are you familiar with this document?
12 A   I believe I've seen it.  Not recently, but, yeah, I've
13   seen this document as well.
14 Q   And once again, if we look at this document,
15   Policy 207.4, "Retention of Records," again says:
16      "All official files, documents, records, electronic
17   data, video and audio recordings, and information held by
18   Spokane County Detention Services shall be maintained
19   subject to WAC 44-14-03005.  Retention schedules are
20   established by the Washington Secretary of State and
21   available on the office's website."
22      And then I'm going to show you Exhibit 9.
23               (Exhibit No. 9 marked for
24                  identification.)
25 Q   (By Mr. Budge)  Do you see that this is a document which

Page 77

1   bears the logo of the office of the Secretary of State in
2   the upper left-hand corner?
3 A   I do.
4 Q   Okay.  Are you familiar with this table from the
5   Washington Secretary of State for law enforcement records
6   retention?
7 A   I've seen it or a more recent version of it, yes.
8 Q   Okay.  And this one bears the date of January 2017.
9   It appears to have several different categories, one
10   of which relates to "Phone Conversations," one of which
11   relates to "Security Recordings" which "do contain an
12   incident identified by an inmate, agency personnel,
13   or pending public disclosure request" that says:
14      "Retain until appeals process, then destroy."
15      And the next one says:
16   "Recordings, Security - Incident Not Identified"
17      "Recordings, created as security measures, which do
18   not contain an incident identified by an inmate, agency
19   personnel, or pending public disclosure request.
20   "Retain for 60 days after date of recording, then
21   destroy."
22      And then the final one refers to "Requests
23   (Inmate)":
24      "Retain for 3 years after date of request, then
25   destroy."

Page 78

1     To be perfectly honest with you, when I look at
2   this, I find it very confusing.
3 A  Yeah, I would.
4 Q  But --
5 A  It -- it's confusing to me, too, because it doesn't have
6   much specificity related to -- or incident identified,
7   you know?  That's, I would think, the one that applies.
8   And it doesn't give any time periods that you want one
9   hour of recording?  Twelve hours of recording?  Two days?
10  You know, it doesn't -- doesn't give us a lot of
11  information.
12 Q  Right.  Okay.
13    But ultimately the way Spokane County had --
14  Spokane County Detention Services had its policy was
15  that jail surveillance recordings would be retained for
16  60 days and then destroyed unless otherwise preserved,
17  right?
18 A  Correct.  Yep.
19 Q  Okay.
20 A  Yeah, 64.
21              (Exhibit No. 10 marked for
22               identification.)
23 Q  (By Mr. Budge)  Exhibit 10 is -- which I have here up on
24  the screen -- appears to be in -- let me just kinda back
25  up and I'll identify this exhibit a little bit better.

Page 79

1     It -- it bears a couple of production numbers,
2   NCHG_004806 and 4805.  It appears to me to be an email
3   from Ian O'Neill at NapCare with an attachment that says
4   "Mortality Reports.Follow-Up."  And then maybe I'm wrong,
5   but the top appears to be the attachment.
6     Does that appear to be what that is?
7 A  And I'm just -- as I -- I look at it, and that's --
8   little table down below, because it looked like that
9   was an Excel.  The attachment says it was a doc with an
10  x.  I think that's an Excel.  I -- I was thinking this
11  document down below that's mostly blacked out was
12  actually the attachment.  And I'm not 100 percent sure
13  of that.
14 Q  Okay.  In any event, it -- it says at the top of the
15  document from acting Director Sparber, Donna Hypes, to
16  you, Lieutenant Hooper, and another lieutenant and
17  sergeant and others.
18    "As a top priority, our agency is currently catching
19  up on the completion of Inmate Mortality Reports."
20    And then Subpart 6 says:
21    "Video of incident (if available) - Lt. Hooper."
22    And then below that there's a table and it says:
23    "Hill, Cindy
24    "Medical/Command Review:  Need"
25    And then:

Page 80

1     "Video:  Need" under your name, Lt. Hooper.
2     Can you tell me what this is -- what this is all
3   about, this --
4 A  Yeah.
5 Q  -- apparent memo?
6 A  We were sending any of the recent inmate deaths to an
7   outside doctor to review.  And it looks like this is
8   just kinda to make sure that the binders we -- that I
9   was discussing had all the relevant documents -- the
10  death certificate, the copy of the police reports, our
11  own incident reports -- and as -- I'm just going down
12  1 through 7 -- as everything we need to conduct a
13  mortality review.
14 Q  Okay.  And so the idea was that you, Lieutenant Hooper,
15  would get the video relating to Cindy Hill that existed
16  as of April of -- of 2019 --
17 A  Correct.
18 Q  -- and compile it in such a way that it could be
19  delivered to Dr. Hammond for outside review?
20 A  I believe that's exactly it.  That's correct.
21 Q  Okay.  All right.
22              MR. BUDGE:  Off the record.
23              (Discussion off of the
24               stenographic record.)
25              THE VIDEOGRAPHER:  Please stand by.

Page 81

1   We're going off the record.  The time is 12:19.
2              (Recess taken.)
3              THE VIDEOGRAPHER:  We are back on the
4   record.  The time is 12:31 p.m.
5              MR. BUDGE:  All right.  Thank you,
6   Lieutenant Hooper, for this 30(b)(6) deposition.  I have
7   no further questions for you today.  I appreciate your
8   time.
9              THE WITNESS:  Okay.  You're welcome.
10             MR. JUSTICE:  All right.  See everyone
11  at 1:00.
12             THE VIDEOGRAPHER:  This concludes the
13  video recorded deposition of Spokane County 30(b)(6)
14  taken on July 21st, 2021.  The time is 12:31 p.m. and we
15  are off the record.
16             (Signature reserved.)
17             (Deposition concluded at
18              12:31 p.m.)
19
20
21
22
23
24
25

---

Page 82

```
 1              A F F I D A V I T

 2

          STATE OF WASHINGTON )

 3                           ) ss

          County of Pierce    )

 4

 5

 6     I, DON HOOPER, hereby declare under penalty of

 7   perjury that I have read the foregoing 30(b)(6)

 8   deposition and that the testimony contained herein is a

 9   true and correct transcript of my testimony, noting the

10   attached corrections.

11

12

13

14        _____

15                DON HOOPER

16

17

18

19

20   Date: _____

21

22

23

24

25
```

Page 83

```
 1   STATE OF WASHINGTON )    I, April Cook, CCR #3245,
                          ) ss a certified court reporter
 2   County of Pierce    )    in the State of Washington, do
                              hereby certify:
 3

 4
          That the foregoing 30(b)(6) deposition of SPOKANE
 5   COUNTY through its representative, DON HOOPER, was taken
     before me and completed, within the limits of technology, on
 6   July 21, 2021, and thereafter was transcribed under my
     direction; that the deposition is a full, true and complete
 7   transcript of the testimony of said witness, including all
     questions, answers, objections, motions and exceptions;
 8
          That the witness, before examination, was by me duly
 9   sworn to testify the truth, the whole truth, and nothing but
     the truth, and that the witness reserved the right of
10   signature;
11        That I am not a relative, employee, attorney or counsel
     of any party to this action or relative or employee of any
12   such attorney or counsel and that I am not financially
     interested in the said action or the outcome thereof;
13
          That I am herewith securely sealing the said deposition
14   and promptly delivering the same to Edwin Budge.
15        IN WITNESS WHEREOF, I have hereunto set my signature on
     the 27th day of July, 2021.
16

17

18

19        _____
          April Cook, CCR
20        Certified Court Reporter No. 3245
          (Certification expires 10/11/21.)
21

22

23

24

25
```

Page 84

```
SIGNATURE PROCEDURE INSTRUCTIONS TO WITNESS


Date: July 27, 2021

To: John Justice

Law, Lyman, Daniel, Kamerrer & Bogdanovich, PS

2674 RW Johnson Boulevard Southwest

Tumwater, Washington 98512

Case: ESTATE OF HILL v. NAPHCARE

30(b)(6) Deposition of: DON HOOPER

Date Taken: July 21, 2021

     The above transcript must be read and the Correction Sheet signed within 30

days of this notice or before the trial date.  If the Correction Sheet is not

signed within that time period, signature will be deemed waived

for all purposes.

     Following the instructions given on the Correction Sheet, please read the

enclosed transcript, sign the Correction Sheet, and mail the signed Correction

Sheet to our office at the above address.

Reporter: April Cook, CCR

cc: Edwin Budge, Erin Ehlert
```

Page 85

```
              CORRECTION SHEET

Deposition of: DON HOOPER

Date: July 21, 2021

Case:  ESTATE OF HILL v. NAPHCARE

Cause No.:  2:20-cv-00410-RMP

Reporter:  April Cook, CCR

Instructions: Please carefully read your deposition and on this correction

sheet make any changes or corrections in form or substance that you feel

should be made.  You may add additional sheets, if necessary.  After completing

this form, please sign your name in the space provided.

Please do not mark the transcript.  Thank you.

PAGE #   LINE #   CORRECTION              REASON FOR CORRECTION

SIGNATURE OF WITNESS: _____
```

### Exhibits

**Hooper 30(b)(6) Ex 1**  3:7 7:14,15, 16,18 8:5

**Hooper 30(b)(6) Ex 2**  3:9 28:11,13

**Hooper 30(b)(6) Ex 3**  3:11 45:19, 20,22 46:2 53:12 54:17 55:7

**Hooper 30(b)(6) Ex 4**  3:12 46:17, 18,20,25

**Hooper 30(b)(6) Ex 5**  3:13 49:24 50:1,3,15 55:14

**Hooper 30(b)(6) Ex 6**  3:14 67:10

**Hooper 30(b)(6) Ex 7**  3:15 75:10, 11,13

**Hooper 30(b)(6) Ex 8**  3:17 76:6,9

**Hooper 30(b)(6) Ex 9**  3:18 76:22,23

**Hooper 30(b)(6) Ex 10**  3:20 78:21, 23

---

**-**

**-C**  58:9

**-C112**  58:11

---

**0**

**00794**  46:21

**00795**  46:22

---

**1**

**1**  4:11 7:15,16,18 8:5,12,18 80:12

**1-2W**  57:20

**10**  78:21,23

**100**  57:16 74:2 79:12

**10:02**  4:2,10

**10:15**  46:14 51:19 52:2,10

**10:57**  41:25

**11**  29:12

**1100**  5:23

**11:09**  52:17

**11:11**  42:3

**11:23**  52:17

**11:28**  54:6

**11:36**  54:9

**12**  46:12 47:4 48:4 69:1

**121**  31:6

**12:07**  52:18,19

**12:19**  81:1

**12:31**  81:4,14,18

**12:40**  52:19

**14**  15:10

**146**  15:8

**1725**  31:2

**18**  33:6

**1800**  31:11 33:6 37:24

**1817**  29:7

**1830**  33:7

**1831**  30:7

**1:00**  81:11

**1:10**  52:19

**1:43**  52:19

**1:58**  52:19

---

**2**

**2**  9:2,10 24:11 28:11,13 31:3,23 43:13 46:10 47:3,11,25 48:9,22 49:6,10,20 50:6,17,20,21,22,24 51:6,19 52:2,10 55:5 56:17 59:21 60:2 61:24 63:19 65:25 66:5 67:3,14,20 70:3,10,24

**2-2**  68:19

**2-2W**  57:5,6 68:13

**2017**  77:8

**2018**  11:16 12:1,21 14:1,12 15:23 16:13 17:7,12,14 19:24,25 22:1 23:7, 14 31:24 32:4,9,16 46:4 49:8 51:20 52:3 56:24 58:25 66:23 70:4

**2019**  80:16

**2021**  4:2,10 81:14

**207.4**  76:15

**21**  4:2 55:16

**214.3**  75:21

**21st**  4:10 81:14

**23**  12:16 13:2 24:12

**24**  56:17

**25th**  11:16 15:23 16:13 17:6,14 22:1 23:7 28:4 31:24 32:4,9,16 33:5 45:6,9, 15 46:4,7 48:5,13 49:8 51:20 52:3,10, 25 53:9 54:15 55:5 56:24 58:24 59:9 69:21 70:4,12

**27**  24:12 31:3,23 43:13 46:10 47:3,11, 25 48:9,22 49:6,10,12,20 50:6,22,24 51:6,19 52:2,10 55:5 59:21 60:2 61:24 63:19 65:25 66:5 67:3,20 70:3,10,24

**27th**  69:21

**28**  50:21

**29**  24:13 50:17,20 67:15 68:9

**2:20-cv-00410-rmp**  4:15

**2:30**  52:19

**2nd**  56:13

**2W**  56:12 57:20,23 58:6

**2W27**  10:3

---

**3**

**3**  9:14 31:6 45:19,20,22 46:2 53:12 54:17 55:7 77:24

**3/25**  59:3

**3/25/21**  59:2

**30**  56:17 69:6,20 70:25

**30(b)(6)**  4:12 7:22 8:6 44:22 50:15 81:6,13

**30-minute**  48:10,23

**310**  15:1

**32**  69:6,20 70:5,25

**360-degree**  21:13,14,16

**3:00**  52:19

**3:20**  52:20

**3:59:59**  59:13

**3W04**  10:5

**4**

**4** 9:22 46:17,18,20,25
**44-14-03005** 76:3,19
**45** 71:11 72:4,10,22
**4805** 79:2
**4:00** 10:3 58:19,20 69:12,17,23 70:6 71:2,7,15 72:14
**4:02** 58:20
**4:03** 58:20
**4th** 56:3

**5**

**5** 10:11 49:24 50:1,3,15 55:14
**5:25** 31:24 47:14
**5:30** 70:19
**5th** 56:3

**6**

**6** 15:9 56:12 57:11 67:10 71:10 72:3, 10,22 79:20
**6-2** 69:9
**6-2W** 56:9 57:11
**6-hour-and-45-minute** 71:14,22 73:1,13 74:5,9,18,19,24
**60** 18:16 22:10,13,24 23:23 32:18,24 40:25 41:1 48:18,24 49:21 66:17 70:14 77:20 78:16
**60-day** 18:14 19:18 22:19,25 23:8
**61** 18:15
**61st** 22:13,17
**64** 78:20
**65** 15:7
**6:17** 29:8
**6:30** 69:17,24 70:7 71:3
**6th** 56:3

**7**

**7** 75:10,11,13 80:12

**8**

**8** 15:10 56:24 76:6,9
**8/25/2018** 29:7 59:13
**8:43** 10:6 67:24,25 68:6 69:5,22 70:5

**9**

**9** 57:8 76:22,23
**9-2W** 57:8 67:20
**99260** 5:24
**9:05** 68:20
**9:11** 68:8
**9:14** 68:25
**9:15** 10:3 69:5,22 70:6,19 71:7,14 72:14
**9:30** 46:7 47:12,22

**A**

**a.m.** 4:2,10 10:3,6 41:25 42:3 46:7,14 47:12,22 51:19 52:2,10 54:6,9 67:24, 25 68:6,8,20,25 69:5,22 71:14 72:14
**ability** 8:2,4 18:5 19:5,25 20:20 28:19 70:15
**absolutely** 41:7 54:2
**access** 17:1 18:1
**accommodate** 7:9
**accurate** 14:22 16:12 22:23 66:10 68:11
**act** 73:7
**acting** 79:15
**action** 9:24,25 10:13
**active** 45:1,5 57:18
**activities** 49:15
**activity** 11:2 51:9
**actual** 59:8

**addition** 6:21 17:6
**additional** 23:9 48:18 74:22
**administrative** 11:8,9,13 12:3,4 13:10 19:20,21 24:5
**advance** 65:6
**advised** 38:4
**Affairs** 24:19
**affiliations** 4:21
**afternoon** 69:23 70:6
**agency** 77:12,18 79:18
**agree** 31:17,22,25 32:1,6,13,20,21 33:2 37:10 48:11,20 52:3,14,21 53:7 60:11 66:7,11 68:10,24 69:3,7,16,18, 25 70:1,12 71:12,13,22 72:3,9,10,18, 25 73:7
**agreed** 8:24 31:14
**ahead** 28:18 38:14 41:23 44:24 68:2
**ahold** 24:3 39:5
**Alexandra** 4:24
**all-inclusive** 39:8
**amount** 6:6
**AMR** 31:6
**angle** 51:15,21 57:11,14 58:4 67:19 68:16,18
**angles** 16:5 21:2,8 55:17,21,25
**answers** 6:25 21:17 36:25
**anticipate** 41:18
**anticipated** 61:1
**apologize** 15:14 53:21,23 75:3
**apparent** 80:5
**appeals** 77:14
**appearances** 4:21
**appeared** 4:3
**appearing** 6:14
**appears** 50:20 59:16 68:5 75:15 77:9 78:24 79:2,5
**applies** 78:7
**approximately** 29:7 30:7 31:2 69:4, 20 70:4,18 71:2

**April** 4:3,18 80:16

**area** 26:6 43:14,15 51:5 56:4,14,17 65:24 70:3

**areas** 11:9 16:8,9

**array** 18:11

**arrival** 29:13 30:21,22,23

**arrived** 31:6,7

**arriving** 30:5

**assault** 35:14

**assaults** 12:14 25:13

**assigned** 30:3

**assistance** 31:1,3

**assistant** 13:16 14:5,9,10,14 19:23

**attachment** 79:3,5,9,12

**attempted** 74:25

**attend** 53:25

**attention** 29:5

**attorneys** 12:13

**audio** 6:17 75:22 76:1,17

**August** 11:16 12:1,21 14:1,12 15:23 16:13 17:6,12,14 22:1 23:7,14 28:4 31:24 32:4,9,16 45:6,9,15 46:4,7 48:5, 13 49:8 51:20 52:3,10,25 53:9 54:15 55:5 58:24 59:9 69:21 70:4,12

**authored** 29:1

**automated** 31:4

**automatically** 22:8

**Avenue** 29:12

**aware** 47:11,20 48:1,3,8,21 64:9 70:2 74:8

─────────── B ───────────

**B&a** 4:17,19

**B503** 29:10

**back** 12:20 14:1,12 17:12,24 19:25 42:2 49:11,12 54:8 56:16 78:24 81:3

**balance** 32:10 68:24

**Balson** 5:14

**based** 18:14 23:6

**basic** 57:14

**basically** 21:11 57:1

**basis** 19:17 20:18

**bearing** 46:21 48:3

**bears** 77:1,8 79:1

**begin** 22:14 40:5,13

**beginning** 22:13,17 39:20 40:18 68:7

**begins** 67:24 68:19 69:11

**begun** 31:5 40:9

**Belle** 4:24

**binder** 24:18,21,22,25

**binders** 80:8

**birth** 29:17

**bit** 56:7 58:19 68:8 78:25

**blacked** 79:11

**block** 22:19

**blue** 59:9

**booking** 56:4

**bottom** 7:25 46:15 58:14

**box** 58:22

**break** 7:8 15:3 41:5,6,9,23 54:13

**breathing** 31:4

**briefly** 12:23

**bring** 24:14

**Budge** 4:22 5:11,17 7:18 28:13 35:9 37:25 41:7,8,22 42:4 45:6,22 46:20 50:3 54:2,10 67:12,18 68:5,15,23 69:11,15 73:11,22 75:13 76:11,25 78:23 80:22 81:5

**building** 24:21,22 56:19

**built** 56:20

**bumps** 56:19

**burn** 24:7 44:12

**burned** 20:3 24:15 59:5

**buttons** 25:2 63:10

─────────── C ───────────

**C112** 56:21 67:21 68:16

**C72** 58:13

**C77** 58:12

**calendar** 58:23 59:8

**call** 20:13 31:1 37:22

**called** 17:19 21:13 31:2 46:3 56:18

**camera** 18:16 21:2,8 24:12,13 27:5 49:4,9,13 50:5 51:4,8,14,21 55:17,20, 25 56:8,21 57:2,11,14,15,22,23 58:4, 10,13 67:19 68:16,17,18

**cameras** 15:25 16:3,23,24,25 17:2 18:3,4,7,17 20:15 21:2,7,13,18,20 24:9 33:22 53:1 56:4 57:17,19 60:8

**cameras'** 16:7

**capable** 32:11,17 48:13,17

**car** 41:16 43:1,3

**career** 13:15

**case** 4:15 6:2 14:1 17:12 28:25 39:12 49:8 62:14 65:23 67:5 72:16

**catching** 79:18

**categories** 77:9

**CCR** 4:3

**cell** 10:3,5 28:5 31:3,23 35:13 43:13, 15 46:10 47:3,11,25 48:9 49:6,14,20 50:6,19,24 55:5,8 59:21 60:2 61:24 65:25 66:4 67:3,20 70:3,10,24 72:7

**Center** 30:7

**certificate** 80:10

**Certified** 5:7

**chain** 13:12,13,21 14:2,12,20

**changed** 13:15

**charge** 13:6 19:8,22 24:5 34:2,4 66:18

**charged** 9:6 61:25 62:5,21

**check** 38:16,17 55:1

**checks** 53:13,17 54:17 71:24 72:6

**choice** 66:9,13

**choose** 32:24 48:25 49:1

**choosing** 34:12 66:20

**chose** 70:25 71:6 73:12

**chosen** 23:1 70:16

**Cindy** 9:5,16 10:4,6 15:24 27:25 28:4 29:16 30:6,12 31:3,4,11,15,22 32:3,23 33:4 37:16 38:4 39:13,20 40:18 43:11 44:3,9 45:9 46:3,9 47:3,4,10,20 48:2, 21 49:14 51:19 52:1,9,17,24 55:1,8 59:18 60:11,17,22 62:11,23 65:25 66:4 70:10 72:7,21 79:23 80:15

**Cindy's** 30:9

**circumstances** 25:7 35:14 36:2 40:10 48:10,22 61:14

**citizen** 39:3

**city** 29:10

**civil** 36:8,12,18,21 37:4,10,13 43:7 61:3,8,11

**claimed** 51:17,23,25 52:9,15 53:4 71:24

**claims** 42:25 52:23 54:22

**clarify** 7:4 19:15

**close** 15:7 17:20

**co-counsel** 4:23

**command** 13:12,13,21 14:3,12,21 16:25

**committed** 35:11

**common** 16:8

**communication** 65:2

**communications** 30:6

**community** 43:3

**compare** 53:11,15 54:15

**compile** 80:18

**complainant** 29:13

**complete** 36:5

**completion** 79:19

**computer** 6:3,4 18:1 44:15 45:2 63:24,25

**concern** 36:13,17

**concluded** 81:17

**concludes** 81:12

**concluding** 46:14

**condition** 38:16 39:1

**conditions** 38:17

**conduct** 30:10 80:12

**conducted** 34:6 53:18 72:1

**conducting** 34:2,4

**confined** 70:11 72:22

**confinement** 40:6 44:10,16 45:9,16 60:24 61:15 62:23

**confirm** 72:2,15

**confused** 23:16

**confusing** 78:2,5

**connection** 64:11

**conscious** 66:8,13

**considered** 27:25 31:15

**consistent** 75:23

**consists** 46:20

**consuming** 63:22

**continue** 42:5 54:11

**continues** 30:19

**continuing** 70:13

**contrast** 72:16

**control** 16:21 17:20,21 18:24 28:19 42:12,15

**Conversations** 77:10

**conversely** 32:25 49:1

**Cook** 4:3,18

**coordinate** 38:19,23 39:25

**coordinates** 12:12

**coordinating** 39:2

**copies** 71:17

**copy** 24:7 80:10

**corner** 50:14 58:23 67:14 77:2

**correct** 11:23 13:23,25 14:15 16:11 18:11,24 20:9 22:5,6,11,12 23:11 30:15 33:23,24 34:1 38:2 39:23,24 40:1,2,4 41:12 42:9,10,12,13,16,17, 20,21 51:15,23 52:12,25 53:5 54:18, 19,20,21,23,24 55:2,3,9,10,12,13,19 58:7 59:11 63:12 64:7 66:1,2,5,6,16, 25 68:17 70:20 71:3,4,8,9,20 78:18 80:17,20

**corrections** 14:17 15:8 46:13 48:4, 11,24 51:12,17,25 52:8,15 71:25 72:6

**could've** 34:20,21 63:2

**counsel** 4:20

**county** 4:12 5:1,23 7:22 8:15,19,25 9:4,11,16,20 10:1,8,15,18,19,20,24,25 11:5,7,17,21,25 12:7,25 13:13,21 14:13,16,19,23 15:5,13,15,19,24 16:1, 14 17:7,15 19:4 23:20 25:4,7 27:13 28:7 29:1,12,21 30:13,21 31:15 32:1, 7,14,22 33:13,25 34:1,10,11,14,15,23, 24 35:9,18,19 36:8,10,19 37:2,8,9,11 41:10,17 42:7,8,11,12,14,15,18,19,23 43:2,6,8 44:17 45:7,10,14 47:7 49:4 50:25 59:19,24 60:12,16,21 61:1,6,12 64:5 66:8,13,21 70:14,24 71:5 73:2,12 74:15,23 76:8,18 78:13,14 81:13

**County's** 8:13

**couple** 74:1 79:1

**court** 4:14,18 5:4,7 6:11,15,21

**cover** 5:18

**CPR** 31:5

**CPR/AED** 31:4

**Crandall** 4:17

**created** 74:10 77:17

**crime** 26:21 27:2 33:20 35:11

**crimes** 29:19,23 30:8 33:20

**critical** 26:3 39:2,3 62:6 63:5 75:6

**current** 11:4 12:6 23:5

**custody** 12:2,20 13:10

**customs** 8:14,22

**cycle** 18:14

---

**D**

**data** 75:16,22 76:1,7,17

**date** 10:4,6 15:23 29:16 46:4,7 47:11 56:23 59:2,9 70:13 77:8,20,24

**dates** 59:4

**day** 18:15 22:13,17 24:14 26:25 32:9, 10 33:5 40:13,20 41:2,3 47:21,24 48:5,6,17 49:15 51:10,14 53:8 54:14 55:4,9 60:10,11,15 61:15 62:23 65:25 66:4 70:11,16 74:1

**day's** 72:20

**days** 22:10,13,24 23:23 32:18,24 40:25 41:1 48:18,25 49:21 65:19 66:17 70:14 74:1 77:20 78:9,16

**days'** 18:16

**dead** 26:15,16 28:6 29:13

**deal** 11:10 39:4

**dealing** 12:13 33:18 60:4

**death** 8:16 9:4,16 10:4,6 24:21 25:12 26:14,22 27:1,14,25 28:1,3,7,8 29:15 30:9,12,16 31:15,16,19,20 32:2,3,8, 15,19,23 33:4 34:24 35:10,21 36:2,11 37:16 38:4,7,8 39:13,20 40:11,18,19 41:10,19 43:11,12,17 44:3,9,10 45:14 46:4 47:12,21 49:22 59:18 60:11,13, 17,18,22 61:2,7 65:18,25 66:4 70:11, 13 80:10

**deaths** 12:14 24:22 25:23 34:3 63:6 80:6

**deceased** 29:15 31:11 40:7

**decedent** 60:23

**decide** 25:8

**decided** 26:17 33:14

**deciding** 62:22 64:11

**decision** 27:14 33:8 72:25 73:2,22

**deemed** 25:4

**defendant** 5:1

**defibrillator** 31:5

**deleted** 23:22 74:5

**delivered** 80:19

**department** 10:19 11:1 19:7 35:20 41:17 42:8,9,19,20 59:19

**departments** 11:11 43:8

**depends** 24:10,18

**deposition** 4:12,16 5:20 6:9,10,17,20 7:13,22 8:6,11,12 12:9 44:22 45:19 46:17,20 49:24 50:15 53:12,24 64:18 65:1,7 75:10 81:6,13,17

**Deputy** 29:8,9

**describe** 11:5 30:19 33:3 37:15

**descriptions** 55:16

**designated** 12:9 64:19

**designation** 58:2

**designations** 57:13

**designed** 51:8

**destroy** 33:1 49:1 77:14,21,25

**destroyed** 23:23 26:19 27:16 33:1,16 49:2 66:24 71:6,10,15 72:18 73:14 74:6 78:16

**destroying** 43:3

**destruction** 8:14 73:1 74:23

**detail** 61:21

**detective** 27:18 29:25 36:16

**detectives** 26:21 27:2,3 29:20,23 30:8 33:11,19 38:20 39:10 60:5

**detention** 10:18,25 11:5,17,19 12:7, 25 13:13,22 14:13,17,24,25 15:17,19 23:3 25:4,7 28:7 31:16 32:1,7,14,22 34:1,15 35:19 36:10,19 37:2,8,9,11 41:17 42:9,19 43:9 44:17 45:7,14 47:8 59:19,24 60:12,16,21 61:1,6,13 64:6 66:8,14,21 70:14,24 71:5 73:2,12 74:15,23 76:2,8,18 78:14

**determine** 33:8 36:1,20 37:3,12 38:25 52:6 53:13,16 54:17 55:6

**died** 15:24 47:10 48:2

**difference** 21:2,7

**direct** 14:20 60:3

**directing** 35:19 36:9,13

**direction** 20:21 34:14,16

**directives** 64:20

**director** 13:16,17,18,21 14:5,6,9,10, 13,14 15:18 27:19,22,23 37:5,6,7 43:16,20 44:5 79:15

**discipline** 11:10

**disclosure** 19:22 36:3,5 77:13,19

**discovered** 47:13

**discussing** 75:21 80:9

**discussion** 80:23

**dispatched** 29:11

**disposition** 9:17

**District** 4:14

**doc** 79:9

**doctor** 80:7

**document** 7:14,21 8:3,9 28:24 45:18, 25 46:3 47:7 50:7 64:15 74:14 75:15, 17 76:7,11,13,14,25 79:11,15

**documentation** 74:8

**documenting** 65:2

**documents** 6:2,6 7:12,24 12:12,15 24:23 34:7,8 39:6 40:15 44:18 45:2 61:19 65:17 75:22,25 76:16 80:9

**DON** 4:3 5:6

**Donald** 5:13,16

**Donna** 79:15

**door** 47:2 50:19 51:19 52:2,9,12,17, 24 53:4 55:1,8 56:15 57:20

**doors** 16:22

**downtown** 11:19,20 15:1,9,10,12,15 30:2

**drag** 57:19

**draw** 29:5

**drive** 18:19,20

**drives** 17:22 18:10,13,20

**duly** 5:6

**duration** 47:24

**duress** 43:22

**duties** 11:6,24 12:2,3,4 38:6 43:1 45:12

**duty** 27:20 34:18 36:22,24

**DVD** 24:7,13,15,16

**DVDS** 44:12 63:25 64:1

**DVR** 17:22

**DVR-LIKE** 17:18

### E

**earlier** 22:7 31:14 60:3

**earliest** 59:13,16

**early** 32:4 47:23 70:12 71:1

**east** 56:19

**Eastern** 4:14

**easy** 63:20,21,22 64:2

**Ed** 4:22 41:4

educate 40:10

effect 66:16

effort 23:9 72:19

efforts 9:3 39:2 59:20,25 61:22 73:12

Ehlert 5:2 35:4

electronic 75:22,25 76:16

electronics 17:21 18:23

elevators 16:22

email 20:14 79:2

emails 64:10

emergency 53:23

emotional 39:4

employed 14:18

employees 14:23

employment 12:24

end 49:11 56:15 66:22 69:16

ends 68:24

enforcement 60:14 77:5

Engine 31:6

enlarge 56:6

enlarged 59:8

ensure 23:10 25:8

ensuring 23:24

entire 32:10 70:16 72:20

entirety 67:4 68:3

entries 46:13 47:5 48:4

entry 55:6

erased 66:15,24 74:6

Erik 4:23

Erin 5:2

established 76:4,20

Estate 4:13

evening 30:11 32:4 39:20 40:19 45:6 47:23 69:23 70:12,19

event 23:19 25:25 26:3,5,7,8 79:14

events 25:17,20,22,24 26:13 41:15 43:2

eventually 47:22

everybody's 38:18

evidence 44:9 45:8,15 61:14

exact 15:7 58:12

EXAMINATION 5:10

examples 25:13,15,18

Excel 79:9,10

excuse 57:5 59:25 69:21

exhibit 7:14,16,18 8:5 28:10,11,13 45:19,20,22 46:2,17,18,20,25 49:24 50:1,3,15 53:12 54:17 55:7,14 67:10 75:10,11,13 76:6,9,22,23 78:21,23,25

exhibits 7:13

exist 32:17 48:17

existed 32:11 48:13 53:10 54:15 80:15

expect 65:20

explanation 22:25 74:22

extent 40:11

exterior 16:24

external 31:4

extra 23:9

**F**

facilities 10:20 14:25 23:3

facility 10:21,22 15:4 27:2

facing 49:11

fact 28:2 48:8,21 51:14 55:1 72:1,7

facts 40:10

Failure 9:15

fair 30:11

fairly 52:7 63:22

familiar 12:15 26:9 47:15 75:17 76:11 77:4

family 60:23

fast-forward 68:2,23 69:15

federal 6:11

feed 16:14,20,21,22 17:1,5,6 18:4

feeds 16:24 57:25

feel 8:4

Field 28:25

fights 25:13

figure 6:7

file 39:7 64:14,24

filed 4:13

files 24:24 40:15 75:25 76:16

filled 15:2

filmed 53:8

final 69:8 77:22

finally 10:11

find 14:7 62:25 65:7 78:2

fine 15:16 47:17

fire 31:6,7

floor 24:11 56:3,13,20

footage 17:9,16 18:2 26:3,5,6 44:13 48:12,16 49:15,19 51:21 52:4,5,11 53:7,9,11 54:14,16 55:4 59:21 60:1 61:23 62:1 72:20

force 25:11

form 6:3 35:1 46:3,15 47:4,7,18 48:3 53:10 54:16 60:18 73:4

formal 6:11

found 23:5 26:15 28:5 31:22 47:22

free 8:4

front 6:5,8 13:18 57:20

full 12:23

**G**

gang 25:13

gather 30:23

gathering 30:20 40:5

gave 60:7

Geiger 10:21 11:19 15:1,4,8,10,15 30:3

General 46:1

give 8:2 20:13,20 27:6,7 28:18 53:25 78:8,10

THE ESTATE OF CINDY LOU HILL vs NAPHCARE
Hooper, Don - July 21, 2021

30(b)(6)
Page 92Index: ground..investigations

ground 5:18

guess 6:5 12:15 35:5 36:25 57:25 64:1,3 73:6,10

**H**

hall 49:11

hallway 10:2 49:5,9,13,16,20 50:5,6, 24 51:4,5,9,10,13,18,22 52:1,16,23 53:10 55:5,7 59:21 60:1 61:24 67:2,20 70:3,10,23 72:14,21

hallways 16:9

Hammond 80:19

handling 12:2

hands 32:3,8,15,23

handwriting 71:25

handwritten 46:12,13 47:5 48:4 53:11,13,16 54:16

Hank 4:24 5:14

happen 26:24 42:25 43:2

hard 17:22 18:9,13,19,20

heading 38:21

healthcare 51:12 52:23 55:11 72:13

heard 31:1

Heart 30:6

Heipt 4:23

held 4:16 76:1,17

helpful 58:9

high 41:14 52:7 69:15

high-liability 41:14

high-risk 41:15

higher 20:7

highest 15:18

highlighted 58:17

Hill 4:13 9:5,16 15:24 28:4 29:16 31:22 32:3,23 33:4 37:16 38:22 43:11 45:9 46:3,9 47:3,10 48:2,9,21 64:14 70:10 72:21 79:23 80:15

Hill's 10:4,6 27:25 30:12 31:15 38:4,7 39:13,20 40:18 43:17 44:3,9,16 45:14 47:4,20 48:16 49:14,21 51:19 52:1,9, 17,24 55:1,8 59:18 60:11,17,22 61:2,

15 62:23 65:25 66:4 72:7

hiring 11:11

history 12:24

home 17:23 18:1

honest 78:1

Hooper 4:3 5:6,16,17 42:4,7 54:10 67:12 79:16,21 80:1,14 81:6

hospital 26:23 28:6 31:20 38:22,24 43:23 46:15

hour 60:6,7 63:23,24 78:9

hours 10:3 27:6 29:7 30:7 31:2,11 47:12 60:6 70:20,21,22 71:10 72:3,10, 22 75:8 78:9

housed 46:10 47:3,11,24 48:9,21

Hypes 79:15

**I**

IA 24:19

Ian 79:3

idea 80:14

identification 7:17 28:12 45:21 46:19 50:2 67:11 75:12 76:10,24 78:22

identified 8:10 77:12,16,18 78:6

identifies 46:9

identify 78:25

identifying 58:24

identity 9:6 53:3

image 21:16

imagine 44:1

impact 39:4

important 25:4 58:2

impossible 72:11

in-custody 24:22 25:12 26:22 27:1, 25 28:3,8 29:15 30:16 31:16,19,20 32:2,7,14,23 34:3,24 35:10,21 36:11 43:17 44:3

incident 20:12 21:1,10 23:19,21 27:19,21 33:18 37:21 39:3 62:6,11 63:3,7 77:12,16,18 78:6 79:21 80:11

incidents 33:19 62:6,11 63:5 75:6,7

include 8:12 27:23

included 50:6 51:5

includes 34:8

including 8:16 9:5 10:1 13:6 43:8 55:11 72:12

inclusive 25:14

individual 40:7

Industry 42:25

inform 40:3 41:9,15 44:2

information 29:5 40:11 60:24 63:1 75:1 76:1,17 78:11

informed 43:12,16,19 44:8

informs 41:20

injuries 12:14

injury 25:11 41:16

inmate 8:17 12:14 24:20,22 25:12,23 26:14 27:14 35:13 41:11,19 63:6 77:12,18,23 79:19 80:6

inserting 63:25

inside 11:2 24:25

instance 60:4

instances 57:21,25

instruction 65:2

instructions 9:7 64:10,19 65:17

intention 75:19

intentional 73:2,7

interior 16:4,7,23

intern 4:24

internal 13:6 24:19 34:4 60:18

internal/external 61:12

interview 39:10

investigate 29:20,23 30:9 35:25

investigated 26:24 60:13

investigating 34:23,25 35:7,10,17

investigation 30:10,13 33:23 34:3,6 36:4 60:19

investigations 13:7 34:4 61:12

**involved** 12:11 26:21 27:4,10 33:8 34:22

**involving** 32:23

**issues** 43:7

**it've** 35:14

---

### J

**jail** 5:23 8:15 9:4,16 10:19,20,24 11:2, 7,22,25 12:17,18 14:19 15:1,5,13,15, 24 16:1,4,8,10,14,15 17:7,15 18:21,23 19:3,4,5 20:20,24 22:4,9,20 23:8,20 25:9 26:15,16,17,24 27:13 29:12,14, 19,22,24 30:2,10,12,21 31:23 32:8,15 33:13 34:5,11 35:10 37:23 38:1 39:22 41:11 42:12 45:10 48:11,12,25 49:4, 18 55:18,21 58:3 61:7 62:12 78:15

**jail's** 42:15 48:23 50:25 61:22

**January** 77:8

**John** 4:25 54:2

**judgment** 26:20

**July** 4:2,10 81:14

**June** 13:2

**jury** 6:24

**Justice** 4:25 35:1 37:17 41:4 44:20 53:21 54:4 73:4,16,18 81:10

**Justin** 29:14 30:24

---

### K

**kind** 23:19 27:8 39:8,11 41:5 74:8

**kinda** 28:21 39:11 78:24 80:8

**kitchen** 11:10

**knew** 32:2,7,14,22 43:21,22,23 60:12 64:6 65:8 66:18,22

**knowledge** 64:8

---

### L

**Labor** 42:25

**law** 5:21 6:15 23:2,6 60:13 77:5

**laws** 18:15

**leading** 12:25 70:11

**learned** 33:3 37:15 38:7

**left** 57:4

**left-hand** 55:16 77:2

**legal** 4:24

**length** 51:5

**lengthy** 45:3 63:25

**letters** 56:11 57:1 58:4

**level** 20:7,10 26:10 75:9

**liaison** 34:10

**lieutenant** 11:8,13,20,21,25 13:8,11 15:20 27:9,18,22 29:19,22,24 30:2,3, 12 34:17,21 36:22,24 37:2,8 42:4,7 44:5 54:10 67:12 79:16 80:14 81:6

**lieutenants** 11:18 13:17 15:21,22

**life** 61:16

**limited** 8:16 9:5 10:1 72:12

**list** 57:19

**listed** 56:1

**listen** 6:24 60:8

**lists** 46:6

**litigation** 4:17,19 12:11,13 36:8,12, 18,21 37:4,10,13 41:18 43:7 61:3,8,11

**live** 6:14 16:14,20,21 17:5,6 18:4

**located** 5:22 15:25 18:21

**location** 17:25 19:1 24:8 29:15 44:14 58:7

**locations** 16:16 55:18

**log** 53:11

**logo** 77:1

**long** 11:12 22:2 52:11 53:3 54:25 72:6

**longer** 71:16,19,21 73:9

**looked** 23:4 43:15 64:17,23,25 65:15 69:20 75:2 79:8

**lost** 43:4 73:9

**lot** 11:9 16:25 24:8 78:10

**Lou** 9:5,16 10:4,6 39:13 43:11

**Lou's** 62:11

**lower** 50:14 56:13 58:14,23

**Lt** 79:21 80:1

**Lwr** 56:9,13 57:6,8,11,23 58:6 67:21 68:13,19 69:9

---

### M

**made** 44:2 66:8 73:23

**maintained** 76:2,18

**maintenance** 17:2 19:7,8,11,13,20 20:5,6,21 24:4 25:1 44:12

**major** 26:21 27:2 29:19,23 30:8 33:19,20

**majority** 21:20

**make** 20:20 23:20 26:12 27:14 38:19 39:21 44:23 49:15 62:13 80:8

**makes** 12:7

**making** 38:17 39:8

**Mallon** 5:23 29:12

**management** 39:5 40:3 41:10,20 42:18,23 43:6 44:4

**manager** 19:21

**manipulate** 21:15

**manual** 23:5,6

**marked** 7:16 28:11 29:10 45:20 46:18,25 50:1 53:12 67:10 75:11 76:9, 23 78:21

**materials** 40:6 44:15,18 47:19

**matter** 4:13 6:23 22:20 74:16

**Meaning** 11:21 37:1,25

**means** 70:15

**measures** 77:17

**Media** 4:11

**medical** 12:4 24:24 30:7 31:1,2 39:7 43:22 46:1,3 47:4 48:3,11,23 53:11

**Medical/command** 79:24

**member** 25:12 51:12,17,25 52:8,15, 22 55:11 72:12

**members** 60:23

**memo** 64:11 80:5

**memory** 33:17 37:21 60:4

**mentally** 38:18

**mention** 31:18,19

mentioned  25:10 44:4 60:3

midnight  32:10

Might've  14:5

Mike  13:24 15:18

mind  43:3 44:6

minimal  72:19

minute  67:8

minutes  41:6 53:22,25 68:9 69:1,6,20 70:5,25 71:11 72:4,10,22

missing  72:23

mixed  22:18

moment  32:21

Monday  40:24

monitor  16:16

monitors  17:1

months  65:13

morning  47:12,21 51:20 52:2,10 69:21 70:5,19 71:1,7

mortality  79:4,19 80:13

multiple  18:13 64:1

**N**

names  19:9

Naphcare  4:13 5:2 51:12 52:22 55:11 72:13 79:3

natural  35:16

nature  64:22

NCHG_004806  79:2

needed  23:9

network  17:19

networked  17:24

night  33:5,7 43:25

normal  32:17 39:19 45:12

notation  46:14

note  4:20

notes  74:11

notice  7:22 8:6

November  13:9

number  4:15 7:24 13:5 17:22 26:20 29:9 33:18 39:21,25 40:3,5 41:15 46:21 53:2 54:17 56:4,21,23 58:5,9,13 62:6,7 63:4 64:14 65:12,13 70:21 71:18 75:8

numbers  56:11 57:2 79:1

nutshell  12:24

NVR  17:19

**O**

O'NEILL  79:3

oath  6:13 74:17

object  35:1 44:21 73:4

objection  37:17 44:23 73:16

obligated  45:8 61:13

observation  46:1 71:24 72:5

occurred  53:14,17 54:18,20,22 72:16

occurring  51:9

October  11:15 66:23

offer  74:25

offered  74:24

offhand  14:8 56:2 64:13

office  5:21 16:24 17:25 24:19 29:1,22 30:14 33:25 34:11,14,23,25 35:9,18, 23 36:9 42:8,11,14 65:12 77:1

office's  76:21

officer  13:3 29:2 30:19 41:16 44:12

officer's  20:6

officers  14:18 15:8 19:12,21 20:5 24:4 38:16 39:5,9 46:13 62:10 66:17 71:25 72:7

offices  17:1

official  47:7 75:25 76:16

offsite  19:1

on-duty  44:11

one-page  45:25 75:15

open  36:5

operate  10:19 11:1 42:11,14

operates  10:20 16:21

operating  15:25 30:17 45:13

operation  22:3,9 39:11 43:1

operations  12:17,18 13:10,11

opposed  18:21 26:18

opposite  50:20

option  6:22

order  44:9,18

ordinary  39:14

overflow  56:14,16,18,20 57:6,8,12,23 58:6 68:13,19 69:9

Overflow-c112  56:9

Overflow-camera  67:21

oversee  11:9,11 42:24 43:5,7

overseeing  12:4,11 39:11

oversight  73:8

overwritten  23:22

**P**

p.m.  10:3 29:8 31:24 47:14 52:20 58:19,20 59:13 69:12,17,23,24 70:6,7 71:2,3,7,15 72:14 81:4,14,18

paper  6:3

par  15:20,22

part  6:10 21:11,12 22:3,8 35:7 41:13 64:17

parts  16:15

passageways  16:9

passed  26:23 30:6 31:19

past  68:8

patient  39:1

patrol  29:10

patrolling  29:10

Paulson  4:24

paused  51:18 52:1,9,12,16,24 53:4 54:25 55:8 72:7

pending  77:13,19

people  14:11,16,18 19:3,5 20:19,21 24:11 25:1 27:13 47:19 53:3 61:25 62:3,4,5,20 63:2,9

**percent** 57:16 74:2 79:12

**perfectly** 78:1

**period** 17:9 19:18 20:15 22:9,17,19, 25 23:1,8,10 24:8,13 26:7 27:6 33:21 44:13 45:4 63:25 65:15 68:8,25 69:1, 4,5 70:13,18 71:1,2,5 74:5

**periods** 26:13 78:8

**permanent** 19:17 20:18 25:8,17 32:11,17 48:13,17 49:20

**permanently** 20:18 23:21,25 24:16 25:3,5 26:5 32:25 33:9 34:12 48:25 59:20 61:23 64:4 66:1,12,15,21,23,24 70:15 71:15 73:13 74:6

**permit** 72:25

**person** 6:14 9:6 13:20 14:2 15:19 24:5 26:22 33:13 39:14 51:22 52:5,12 53:18 54:22,25 55:6 61:25 62:20 63:9 64:20,21 72:12

**person's** 38:21

**personal** 33:17

**personnel** 77:12,19

**persons** 9:6 33:13 62:3

**pertain** 6:2

**pertinent** 24:23 27:10

**phone** 37:22 77:10

**photograph** 56:6

**photographs** 46:21,23

**photos** 47:2

**physically** 5:21 37:25 38:18 39:22

**picture** 50:18 51:7 56:8,15,16

**place** 64:4 75:5

**plaintiff** 5:15

**plaintiff's** 7:21

**plaintiffs** 4:23 9:24,25

**Playback** 59:13

**playing** 6:22

**plays** 67:17 68:4,14,22 69:10,14

**point** 41:5 44:2 59:18 63:12 66:22 72:15

**pointed** 49:5,9,13 50:5 51:4

**pointing** 27:5

**police** 80:10

**policies** 8:13 12:19 23:6

**policy** 23:4 25:16,19,21 26:2,4,12 30:15 32:17 75:18,19 76:15 78:14

**portion** 36:3 58:3 67:18 71:10 72:21

**portions** 6:23 9:8,9,17,23,24 10:12 16:10 25:3 26:17,18 27:15 32:24 33:9, 14,15 34:12,15 35:20 36:10,20 37:3, 12 61:23 62:15,16,22 63:10,11,14,15, 18 64:5 65:3,8,9,24 66:3,9,12,14,20, 23 70:23 71:6 73:23,24

**position** 11:4,12,16 12:6 16:7

**positioned** 12:8 16:3

**positions** 11:10 13:5 15:2 16:5,25 19:9,10,11

**possibility** 41:18 60:25 61:2,5

**possibly** 61:22

**posted** 47:4

**potential** 36:12,18,21 37:4,13

**Practices** 75:16 76:7

**precedes** 27:7

**preface** 23:15

**preparation** 64:18,25

**prepared** 8:18 9:10,19 10:7,14

**present** 4:20 13:1 39:22 57:11

**presently** 39:21

**preservation** 8:14 9:7 17:16 23:10 25:8,17 32:11,18 48:14,17 49:21

**preserve** 9:3,15 17:8 18:5 20:17,19 25:5 26:18 27:15 32:25 33:9,15 34:13, 15 36:11,20 37:3,12 44:9,18 45:8,15 49:1 59:20,25 61:13,23 64:12,21 65:3, 4,19,20 66:9,21 70:15,25 72:19 73:13, 23

**preserved** 9:8,9,18 18:8,25 21:22 22:3,8,20 23:8,22,25 24:16 35:21 62:16,17 63:14,15,19 65:8 66:1,5,12, 24 69:19 70:3 72:17 78:16

**preserving** 8:23 9:6 19:17 25:3 26:5 40:6 44:15 62:1 64:4

**pretty** 6:6 61:6

**Prior** 30:5

**priority** 79:18

**problem** 54:3

**procedure** 23:24 30:17 39:19 41:13 45:13

**procedures** 8:13 21:21

**proceeding** 6:11 8:8

**proceedings** 4:4

**process** 12:16 21:8 24:2 30:20 40:5,9 41:9 62:1 77:14

**processes** 12:19 43:5 64:4

**produce** 10:2,5 16:14 59:25

**produced** 9:23,25 10:12 59:5 65:22 67:5 73:8

**production** 46:21 67:6 79:1

**promoted** 14:5

**pronounced** 26:16 28:6 31:11

**property** 43:4

**protocols** 75:4

**provide** 52:4

**public** 19:22 24:6 35:22,24 36:3,5 60:22 61:11 77:13,19

**pull** 19:6,13,24,25 20:7,14 24:6

**pulled** 20:2 21:1,10,15

**pulling** 19:14,16,19 39:6 40:14

**purposes** 33:23 35:22 36:12,21 37:3, 10,13

**pursuant** 67:5

**push** 25:2

**pushed** 63:9

**put** 24:13,24

---

**Q**

**qualify** 25:17,23

**quality** 52:7

**question** 7:3 17:3 21:4,17 23:15 26:6 35:6,8 36:7,25 47:16 57:2 64:23,25 65:10

**questions** 5:18 6:24 8:20 9:12 10:9, 16,23 19:4 23:13 81:7



THE ESTATE OF CINDY LOU HILL vs NAPHCARE
Hooper, Don - July 21, 2021

30(b)(6)
Page 96Index: queue..routinely

**queue** 57:19

**quick** 41:6,8

---

**R**

**raid** 18:11

**ran** 49:5,9 50:5

**ranking** 15:19

**reaction** 40:18

**read** 8:18,21 10:14 25:19 28:24 30:22 75:18

**reading** 40:15

**ready** 42:4,6 54:10

**real** 41:8

**realtime** 53:6 63:23

**reason** 7:8 33:14 41:19 56:18

**reasons** 6:20 61:10

**recall** 33:10 38:12 40:21 45:11 62:10 64:13,15,24 74:3

**recalls** 63:3,6

**received** 48:6

**receiving** 16:9

**recent** 77:7 80:6

**recently** 65:5 76:12

**recess** 42:1 54:7 81:2

**recognize** 7:21 8:5,9 28:25 46:2 47:2

**recommendation** 60:5,9

**record** 4:10,21 5:12 15:17 17:8 18:5, 18 19:19 21:14 23:7 24:6,13 36:14 41:25 42:3 44:24 49:15 50:24 51:9 52:11 53:22 54:6,9 62:14 65:1 66:16 71:19 76:3 80:22,24 81:1,4,15

**recorded** 4:12 6:18,21 18:4,7,13 20:25 21:22 49:18 50:25 51:14,21 52:4 53:1,2,10 55:1 71:25 81:13

**recorder** 17:20

**recording** 11:1 17:16,23 18:3,15,18 19:14,16 20:1,3,12 21:8,25 26:2,4 53:6 59:10,15,17 66:18 77:20 78:9

**recordings** 12:20 18:8,25 19:6,24 20:7,25 21:9,15,22,23 22:2,8,20 23:3 25:9 65:14 75:23 76:1,17 77:11,16,17

78:15

**records** 11:2 17:22 24:6 35:22,24 44:12,16 60:22 61:11 64:9 75:16,22, 25 76:7,15,16 77:5

**red** 58:17

**redundancy** 18:12

**refer** 6:7 57:13 59:9

**referenced** 29:25

**referring** 15:14 57:15

**refers** 77:22

**regard** 35:20 38:7 63:18 66:11 67:2 70:9 72:17

**regularly** 17:8 51:8

**relate** 11:6 12:18 23:14

**related** 24:20 35:24 36:3 64:14 78:6

**relates** 77:10,11

**relating** 10:23 12:14 40:6 43:7 44:9, 16 45:8,15 60:24 61:14 62:22 65:17 76:7 80:15

**relative** 72:19

**relevant** 27:10 61:14,20 80:9

**remaining** 48:24

**remember** 7:25 26:10 33:10 62:5,8, 12

**REMEMBERED** 4:1

**remote** 16:16

**remotely** 5:20 6:9

**removed** 26:17

**repeat** 21:4

**rephrase** 7:4 21:4 35:5 47:16

**replaced** 10:13 71:16,20

**report** 29:1,22,25 30:19 31:21

**reporter** 4:18 5:4,7 6:22

**reporting** 29:2

**reports** 24:23 31:18 37:20 39:7 79:19 80:10,11

**Reports.follow-up.** 79:4

**representative** 8:19,24 9:11,20 10:8, 15

**request** 24:8 77:13,19,24

**requested** 20:10

**requesting** 24:3,10 29:19,23 30:13

**requests** 35:22 60:23 61:11 65:12 67:5 77:22

**reserved** 81:16

**respond** 38:16

**responded** 27:19 37:23

**responding** 27:17

**response** 8:20 9:11 10:8,15 39:25

**responsibilities** 11:6,24 38:6

**responsibility** 35:19 36:9,19 37:1,11 62:21

**rest** 56:23

**restored** 10:13 71:16,20

**result** 60:22 61:2,7

**retain** 25:21 45:1,2 61:19 75:21 77:14,20,24

**retained** 75:7 78:15

**retaining** 12:20

**retention** 18:15 23:2 45:3 75:5 76:3, 15,19 77:6

**retrieval** 18:8

**retrieved** 17:10 21:23

**revealed** 74:9

**review** 17:17 18:2,6,9,17 19:6 20:7 22:24 34:7,9 79:24 80:7,13,19

**reviewed** 17:10 21:1,10 24:1 74:4

**reviewing** 37:20

**Richmond** 29:9

**right-hand** 50:14 58:23

**risk** 39:5 40:3 41:10,20 42:18,23 43:6 44:4

**role** 42:22

**room** 5:25 16:21 17:20,21 18:23,24

**roughly** 14:23 15:4,11 69:6

**route** 30:8

**routine** 22:3,9,21

**routinely** 17:8

**B**&**A** LITIGATION SERVICES

**Rule** 7:22

**rules** 5:19

**run** 68:6 69:15

**running** 70:18

**runs** 69:17

**S**

**Sacred** 30:6

**sample** 50:4

**Saturday** 40:23

**save** 63:10

**scene** 37:6 38:20 60:5

**scene's** 36:16

**schedules** 76:4,19

**scope** 44:21

**screen** 7:19 16:16 28:14 45:23 55:16 56:7 57:4,18,24 67:7,13 68:16 78:24

**screens** 16:17

**screenshot** 50:4,23 51:3 55:14 57:17 58:14,16,24

**screenshots** 74:11

**scroll** 8:2,4 28:21 29:4

**searching** 65:11

**seconds** 67:25 68:6

**Secretary** 76:4,20 77:1,5

**secure** 16:22

**security** 77:11,16,17

**seeking** 60:23

**segment** 69:23 70:6

**segmented** 58:15

**self-insured** 43:2

**send** 20:14

**sending** 12:12 80:6

**sergeant** 13:3,5 19:7,12,20 24:5 27:9 29:14 30:5,24 33:20 34:17,20,22 36:22,24 37:1,8,22 38:3,5,17,25 43:24 44:11 62:10 79:17

**sergeant/administrative** 19:11

**sergeants** 14:17 15:9,10 27:20 38:23

**sergeants'** 16:24

**series** 46:12 55:15 57:1 74:11

**served** 11:12

**server** 19:1

**services** 4:18,19 10:18,25 11:5,17,19 12:7,25 13:14,22 14:13,17,24,25 15:18,19 25:4,8 28:7 31:16 32:2,7,14, 22 34:1,15 35:20 36:10,19 37:2,8,9,12 41:17 42:9,19 43:9 44:17 45:7,14 47:8 59:19,24 60:12,16,21 61:1,6,13 64:6 66:8,14,21 70:14,25 71:6 73:3,12 74:16 76:2,8,18 78:14

**Services'** 74:23

**set** 16:16 22:2

**setting** 63:24

**share** 67:6

**sharing** 7:12

**sheriff** 36:23

**sheriff's** 29:1,21 30:14 33:25 34:11, 14,23,24 35:9,18,23 36:9,16 42:7,11, 14

**SHMC** 30:7,9

**shortly** 28:4 31:7 47:10,20 48:2

**show** 16:3,4 45:18 46:17 49:24 59:14 67:3,7 68:12 69:4,8 75:10 76:6,22

**showed** 16:8 70:9 74:12

**showing** 7:14 28:10 49:19 50:7 67:2, 19 70:3 72:20

**shows** 50:4,24 58:23 59:8

**side** 55:16 56:13,16,19,20 57:4

**signature** 81:16

**signed** 8:1

**significant** 6:6 25:11,19,22,23,25

**similarly** 20:16 52:8 57:4

**Sir** 5:12

**site** 18:22

**situation** 41:14

**sleeve** 24:25

**somebody's** 43:4

**sounds** 38:22

**span** 71:14,22 73:1,13 74:9,18,19,24

**spanned** 70:20

**spanning** 70:16 71:7

**spans** 71:10

**Sparber** 13:24 15:18 27:23 43:16,20 79:15

**speak** 61:17

**specific** 5:18

**specifically** 7:24 23:15 62:12,18,21 75:20

**specificity** 75:9 78:6

**specifies** 26:13

**speculate** 63:16 73:25

**speed** 69:16

**spent** 49:14

**spokane** 4:12 5:1,23 7:22 8:13,15,19, 25 9:4,11,16,20 10:1,8,15,18,19,20, 24,25 11:5,7,17,21,25 12:6,25 13:13, 21 14:13,16,19,23 15:5,12,15,19,24, 25 16:14 17:7,15 19:4 23:20 25:4,7 27:13 28:6 29:1,11,12,21 30:13,21 31:6,15 32:1,6,13,22 33:13,25 34:1, 10,11,13,14,23,24 35:9,18,19 36:8,10, 19 37:2,7,9,11 41:10,17 42:7,8,11,12, 14,15,18,19,22 43:6,8 44:17 45:7,9,14 47:7 49:4 50:25 59:19,24 60:12,16,21 61:1,6,12 64:5 66:7,13,21 70:14,24 71:5 73:2,12 74:15,23 76:8,18 78:13, 14 81:13

**spoke** 30:24 47:19

**staff** 20:7,10 25:12 31:23 39:25 48:4, 11,24 51:12,13,17,25 52:8,15,23 55:11 72:13

**stamp** 56:25

**stance** 35:23

**stand** 41:24 54:5 80:25

**standard** 22:2 30:15,17 41:12,13 45:13

**standards** 75:4

**start** 24:21,22 39:6 40:14,15

**started** 30:23

**starting** 46:14

**starts**  18:15 59:15,17

**state**  5:12 18:14 23:2,6 76:5,20 77:1,5

**statements**  30:20,24

**States**  4:14

**stenographic**  80:24

**steps**  38:8,12 44:16 45:1,5

**Steve**  4:17

**stress**  39:4

**subject**  21:20 60:18 76:2,19

**subjects**  8:10

**Subpart**  79:20

**suicide**  35:15

**sum**  55:20

**summary**  74:11

**support**  11:9

**Suppose**  23:13,19

**supposed**  48:10,22

**surrounding**  23:21 26:2,13 40:11 61:15

**surveillance**  8:15 9:3,15,17,23,25 10:2 11:1 12:19,20 20:24 25:9 32:8,15 42:15 48:12 49:18 50:25 51:20 52:4, 11 63:18 64:5 65:24 75:5 78:15

**suspicious**  35:14 36:2

**swear**  5:4

**sworn**  5:6

**system**  11:2 16:13,19 17:7,15,18 18:18 21:11,12,25 42:16 51:1

**T**

**table**  77:4 79:8,22

**takes**  63:23,24

**taking**  5:20 6:9

**talk**  75:6

**talked**  62:4

**talking**  19:4,14 23:16 54:13 55:15 67:7

**talks**  58:5,6

**team**  38:24 39:3

**telephone**  50:20

**telling**  27:4 62:8

**tells**  58:10,12

**terminal**  17:25

**terms**  14:20 16:20 17:16 20:24,25 21:8,9,21,25 34:11 36:18 58:2 64:3 65:16

**testified**  5:8

**testify**  8:19,24 9:10,19 10:7,14 12:8 74:17

**testimony**  22:7

**That'd**  14:22 41:21

**that'll**  36:1

**thing**  39:8,11 61:4 63:20,21

**things**  16:8 24:24 27:9 35:12,16 39:14 40:14,18 42:25 52:14,22 75:20

**thinking**  40:22,23 70:21 79:10

**till**  32:18 71:3

**time**  5:22 7:3,8 11:18 12:5 13:1,16 14:4,6,8 17:9 18:17 19:12,23,24 20:15 21:5 22:2,17,19,24 23:1,9,11 24:8 26:7,12,13 27:6,7 28:4 30:1,2 32:6,13 33:21 34:18 36:17 38:12 41:25 42:3 43:21,24 44:5,13 46:7 48:8,15,20 51:13,23 52:24 54:6,9 55:9 56:25 58:18 59:5,13 60:8,17,20 63:22,24 65:15,18 70:18 72:14 73:8 78:8 81:1, 4,8,14

**timeline**  74:10

**timer**  67:24

**times**  13:7,15 24:9 32:9,16 58:15,16 64:15 71:18

**tiny**  58:19

**titled**  46:1 67:20 68:19 75:15

**today**  5:20,25 6:3,9,13 7:12 8:19,24 10:23 63:1 81:7

**today's**  8:8,11 12:9 65:7

**told**  17:5 30:8,9

**top**  13:18 29:6 45:25 46:6 50:17 56:7 57:6 67:14 68:15 79:5,14,18

**topic**  8:18,20,25 9:10,12,14,19,20,22 10:7,9,11,14,16

**topics**  8:11,12 12:8 44:22 64:18

**total**  14:23 15:21 55:20 69:16

**trained**  25:2

**training**  11:11 13:6

**transcribed**  6:21

**transport**  38:24

**trial**  6:23

**true**  52:14,22

**Turning**  29:4

**TV**  17:23

**twelve**  27:7 78:9

**twenty**  13:2

**two-and-a-half-hour**  71:2

**two-thirds**  15:6

**type**  12:11 26:2,4 35:16 43:5 65:2 75:4

**types**  25:16

**typically**  19:7,13 20:11 24:14 27:3 34:7 38:13,14,16,20

**U**

**ultimately**  78:13

**understand**  6:10,13,17 7:1,3,5 8:22 12:16,18 22:1 42:22 43:6 62:13

**understanding**  17:18 18:11,14,21 21:19 22:7 23:2 42:24

**undertake**  59:20,24

**undertaken**  9:3

**unit**  4:11 29:10 31:6

**United**  4:14

**unlike**  17:22

**unresponsive**  26:15 28:5 31:3,23 47:13,23

**updated**  30:5

**upper**  77:2

**Urrutia**  29:8,25

**Urrutia's**  30:19

**Urrutia-soto**  29:2

**B**A  LITIGATION SERVICES

**use-of-force** 24:20

**usual** 22:3 39:14 41:9

---

**V**

**Valley** 29:11

**Van** 4:24

**variety** 16:4,9

**vast** 21:20

**verify** 71:23 72:4,11

**version** 12:23,24 77:7

**versus** 62:11

**video** 4:11 6:18,20,23 8:15,23 9:3,7,
15,17,23,24 10:2,5,12 11:1 12:19,20
15:24 16:3,7,13 17:7,9,15,16,19 18:2,
5,15,16 19:13,15 20:14,17,19,24 23:3,
8,10,21,24,25 24:7,15 25:3,21 26:18,
19 27:10 32:8,15,25 33:9,11,15 34:12
35:21 36:1,11,14,20 37:3 42:15 44:13
48:16,25 49:1,4,13,15,19 50:25 51:20
52:4 53:7 54:14,15 55:4 59:21 60:1,6
61:19,23 62:1,16,22 63:18 64:5 65:3,
11,12,13,14,24 66:3,9,15,20 67:2,4,
17,18 68:3,4,5,12,14,19,22 69:8,10,
11,14,17 70:2,8,9,15,23 71:5,10 72:2,
17,18,20 74:5,9,12,13 75:5,22 76:1,17
79:21 80:1,15 81:13

**video's** 52:7

**video-related** 75:7

**videos** 63:4 69:4

**view** 20:2,17 21:14 50:4 57:22 67:14

**viewing** 19:15,16 57:18 58:18

**viewings** 57:25

**visual** 71:23 72:4

**visually** 72:11

**Volume** 4:11

---

**W**

**WAC** 75:23 76:3,19

**wait** 34:6

**walk** 24:1 61:22

**walked** 51:13,18 52:1,15,23 55:7

**wanna** 19:8 44:23

**wanted** 20:16 23:20 24:9 33:21 64:7

**Washington** 4:15 5:24 29:11,13
76:4,20 77:5

**watch** 46:1,3 47:4 48:3,11,23 53:11

**website** 76:21

**Wednesday** 4:1

**week** 63:4

**weekend** 40:22

**west** 5:23 24:11 29:12 31:3,23 43:13
46:10 47:3,11,25 48:9,22 49:6,10,20
50:6,17,20,21,22,24 51:6,19 52:2,10
55:5 56:13,17 59:21 60:2 61:24 63:19
65:25 66:5 67:3,14,20 68:19 70:3,10,
24

**What're** 35:6

**White** 29:14 30:5,24 38:5

**window** 59:2 60:8

**wit** 4:5

**witnesses'** 30:23

**word** 58:1

**wording** 25:20

**words** 20:18 34:13

**work** 14:16,18 18:1 20:21

**work-crew** 10:22

**work-release** 10:21

**workday** 40:14,16 48:7

**worked** 16:19 17:15 21:9 25:1

**workers** 16:15

**working** 37:9

**works** 63:13

**worth** 72:20

**would've** 14:12 30:1 34:8 39:14
40:17 43:14,19 44:11,17 45:11,12
47:15 48:1,6 53:1,2 62:5 65:20,22
66:17 71:18 72:24

**wreck** 41:16 43:3

**wrecks** 43:1

**write** 22:14 66:18

**written** 25:16 44:15,18 64:9,19 71:18

74:8 75:4

**wrong** 40:23 79:4

---

**Y**

**year** 62:7

**years** 11:14,15 12:16 13:2,3,4,8,9
24:1 37:22 62:7 77:24

**yesterday** 23:4

---

**Z**

**Zoom** 4:2,16 5:20 6:10