1  Budge & Heipt, PLLC
    808 E. Roy St.
2  Seattle, WA 98102
    (206) 624-3060
3

4

5

6

7              UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF WASHINGTON
8

9  THE ESTATE OF CINDY LOU HILL, by        No.  2:20-cv-00410-MKD
    and through its personal representative,
10 Joseph A. Grube; and CYNTHIA
    METSKER, individually,                   DECLARATION OF HANK BALSON
11                                            IN SUPPORT OF PLAINTIFFS'
                        Plaintiffs,           OPPOSITION TO SPOKANE
12          vs.                               COUNTY'S MOTION FOR
                                              SUMMARY JUDGMENT
13 NAPHCARE, INC, an Alabama
    corporation; HANNAH GUBITZ,
14 individually; and SPOKANE COUNTY,
    a political subdivision of the State of
15 Washington,

16                      Defendants.

17

18

19

20

DECL. OF HANK BALSON – Page 1

I, HANK BALSON, declare as follows:

1.    I am over the age of 18, am competent to testify in this matter, and make this declaration based on my personal knowledge.

2.    I am one of the attorneys for the plaintiffs in this matter.

3.    Attached to this declaration as **Exhibit A** is a true and correct copy of the autopsy report on the death of Cindy Hill.

4.    Attached to this declaration as **Exhibit B** is a true and correct copy of the Spokane County Jail Facility Admission Report for Cindy Hill.

5.    Attached to this declaration as **Exhibit C** is a true and correct copy of the contract between Spokane County Detention Services and NaphCare, Inc., dated July 1, 2017.

6.    Attached to this declaration as **Exhibit D** are true and correct copies of the 2018 Progress Notes from Cindy Hill's NaphCare medical record.

7.    Attached to this declaration as **Exhibit E** are true and correct copies of the 2018 COWS assessments from Cindy Hill's NaphCare medical records.

8.    Attached to this declaration as **Exhibit F** are true and correct excerpts from the deposition of Defendant Hannah Gubitz, RN.

DECL. OF HANK BALSON – Page 2

9.     Attached to this declaration as **Exhibit G** is a true and correct copy of the Medical Watch General Observation form that was created for Cindy Hill on August 25, 2018.

10.    Attached to this declaration as **Exhibit H** are true and correct excerpts from the deposition of Spokane County Jail Lieutenant Don Hooper.

11.    Attached to this declaration as **Exhibit I** are true and correct excerpts from the deposition of Spokane County Detention Services Director Michael Sparber.

12.    Attached to this declaration as **Exhibit J** is a true and correct copy of a screenshot from video footage produced by Spokane County, showing Ms. Hill being moved to Cell 2W27 at approximately 9:10 a.m. on August 25, 2018.

13.    Attached to this declaration as **Exhibit K** is a true and correct copy of Defendant Hannah Gubitz' answer to Plaintiffs' Interrogatory No. 2 in this matter.

14.    Attached to this declaration as **Exhibit L** is a true and correct copy of an e-mail from Hannah Gubitz dated August 26, 2018.

15.    Attached to this declaration as **Exhibit M** is a true and correct copy of the report by Plaintiffs' expert Sebastian Schubl, MD.

16.    Attached to this declaration as **Exhibit N** is a true and correct copy of an incident report written by Spokane County Jail Officer Matthew Milholland.

DECL. OF HANK BALSON – Page 3

BUDGE&HEIPT, PLLC
ATTORNEYS AT LAW
808 E. Roy St.
SEATTLE, WA 98102
TELEPHONE: (206) 624-3060

17.    Attached to this declaration as **Exhibit O** are true and correct copies of medical records pertaining to Cindy Hill from Providence Sacred Heart Medical Center.

18.    Attached to this declaration as **Exhibit P** are true and correct excerpts from the deposition of Spokane County Jail Officer Tren Byington.

19.    Attached to this declaration as **Exhibit Q** are true and correct excerpts from the deposition of Spokane County Jail Officer Matthew Milholland.

20.    Attached to this declaration as **Exhibit R** are true and correct excerpts from the deposition of Spokane County Jail Officer Jessica Wirth.

21.    Attached to this declaration as **Exhibit S** are true and correct excerpts from the deposition of Spokane County Jail Officer Travis Titchenal.

22.    Attached to this declaration as **Exhibit T** are true and correct excerpts from the deposition of Spokane County Jail Officer Carolyn Hoschka.

23.    Attached to this declaration as **Exhibit U** is a true and correct copy of Spokane County Jail Policy C508—Inmate Safety Checks.

24.    Attached to this declaration as **Exhibit V** is a true and correct copy of the report by Plaintiffs' expert Lori Roscoe, DNP, APRN.

25.    Attached to this declaration as **Exhibit W** are true and correct excerpts from the deposition of former NaphCare Chief Medical Officer Emily Feely, M.D.

DECL. OF HANK BALSON – Page 4

BUDGE&HEIPT,PLLC
ATTORNEYS AT LAW
808 E. Roy St.
SEATTLE, WA 98102
TELEPHONE:  (206) 624-3060

26.     Attached to this declaration as **Exhibit X** is a true and correct copy of the NaphCare policy pertaining to Nursing Assessment Protocols.

27.     Attached to this declaration as **Exhibit Y** is a true and correct copy of the NaphCare Nursing Assessment Protocol regarding Abdominal Pain or Injuries.

28.     Attached to this declaration as **Exhibit Z** is a true and correct copy of the report by Plaintiffs' expert Andy Barnett, MD.

29.     Attached to this declaration as **Exhibit AA** are true and correct excerpts from the deposition of former NaphCare Medical Director for the Spokane County Jail, Jeffrey Maple, M.D.

30.     Attached to this declaration as **Exhibit BB** is a true and correct copy of the report by Plaintiffs' expert Robert Ayers.

31.     Attached to this declaration as **Exhibit CC** is a true and correct copy of the Cindy Lou Hill Death Review prepared by Steven Hammond, M.D.

32.     I have reviewed all of the NaphCare medical records pertaining to Cindy Hill produced in this case, including Ex. D (2018 Progress Notes) and Ex. E (2018 COWS assessments). There is no documentation in any of the records of Nurse Gubitz (or any other provider) offering Ms. Hill medication to relieve her abdominal pain on August 25, 2018.

33.     I have reviewed all of the NaphCare medical records pertaining to Cindy Hill produced in this case, including Ex. D (2018 Progress Notes) and Ex. E

DECL. OF HANK BALSON – Page 5

(2018 COWS assessments), as well as all Spokane County Jail records pertaining to her placement on medical watch on August 25, 2018. There is no documentation in the records of any licensed medical professional attempting to see Ms. Hill between approximately 8:45 a.m., when Nurse Gubitz witnessed her screaming due to her extreme abdominal pain, and approximately 3:00 p.m., when Nurse Gubitz claims she saw Ms. Hill in Unit 2W and offered to assess her. There is also no documentation of Ms. Hill receiving any sort of medical monitoring or assessment during that timeframe.

I declare under penalty of perjury under the laws of the United States that the foregoing statements are true and correct.

Executed this 4th day of February, 2022, at Seattle, Washington.

s/ Hank Balson
HANK BALSON, WSBA #29250

DECL. OF HANK BALSON – Page 6

BUDGE & HEIPT, PLLC
ATTORNEYS AT LAW
808 E. Roy St.
SEATTLE, WA 98102
TELEPHONE: (206) 624-3060

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned certifies that on the date stated below this document was filed with the Clerk of the Court for the United States District Court for the Eastern District of Washington, via the CM/ECF system, which will send notification of such filing to the following e-mail addresses:

| | |
|---|---|
| Ketia B. Wick, WSBA #27219<br>Erin E. Ehlert, WSBA #26340<br>Fain Anderson VanDerhoef Rosendahl<br>701 Fifth Avenue, Suite 4750<br>Seattle, WA 98104<br>ketia@favros.com<br>erine@favros.com<br>Attorneys for Defendants NaphCare,<br>Inc., and Hannah Gubitz | John E. Justice, WSBA #23042<br>Law, Lyman, Daniel, Kamerrer &<br>Bogdanovich, P.S.<br>PO Box 11880<br>Olympia WA 98508<br>jjustice@lldkb.com<br>(360) 754-3480<br>Attorney for Defendant Spokane<br>County |

Dated this 4th day of February, 2022.

 s/ Hank Balson
Hank Balson

DECL. OF HANK BALSON – Page 7

BUDGE❖HEIPT, PLLC
ATTORNEYS AT LAW
808 E. Roy St.
SEATTLE, WA 98102
TELEPHONE: (206) 624-3060

*The Estate of Cindy Lou Hill, by and through its personal representative, Joseph A. Grube; and Cynthia Metsker, individually vs. Naphcare, Inc., et al.*

Case No. 2:20-cv-00410-RMP

Declaration of Hank Balson

Exhibit A



# Spokane County
## W A S H I N G T O N

OFFICE OF THE
**MEDICAL EXAMINER**

MEDICAL EXAMINER
SALLY S. AIKEN, M.D.
FORENSIC PATHOLOGIST

MEDICAL EXAMINER
JOHN D. HOWARD, M.D.
FORENSIC PATHOLOGIST

## AUTOPSY REPORT

| | |
|---|---|
| AUTOPSY NO: | **18-2954** |
| NAME OF DECEDENT: | **HILL, CINDY** |
| DATE OF BIRTH: | ▓▓▓▓▓▓   SEX: FEMALE |
| DATE PRONOUNCED/FOUND: | 08/25/2018 |
| DATE OF AUTOPSY: | 08/27/2018 @ 0945 HOURS |
| LOCATION: | FORENSIC INSTITUTE @ HOLY FAMILY HOSPITAL; SPOKANE, WA. |
| RESPONSIBLE PARTY: | SPOKANE COUNTY MEDICAL EXAMINER'S OFFICE |
| PROSECTOR: | SALLY S. AIKEN, M.D. |
| ASS'T PROSECTOR: | FERNANDO CALDERON / EMILY MELTON |

## NOTICE: THIS REPORT IS CONFIDENTIAL IN THE STATE OF WASHINGTON

**You are being given this report because you are named in the statute below as being authorized to have a copy of the autopsy or postmortem report, either of which may include other reports and records. These are highly confidential documents! You may not give or show any of these documents to anyone except as authorized by law.**

**RCW 68.50.105** Autopsies, postmortems - Reports and records confidential – Exceptions. **(Effective January 1, 2014.)** (1) Reports and records of autopsies or postmortems shall be confidential, except that the following persons may examine and obtain copies of any such report or record: The personal representative of the decedent as defined in RCW11.02.005, any family member, the attending physician or advanced registered nurse practitioner, the prosecuting attorney or law enforcement agencies having jurisdiction, public health officials, the department of labor and industries in cases in which it has an interest under RCW 68.50.103, or the secretary of the department of social and health services or his or her designee in cases being reviewed under RCW74.13.640. (2)(a) Notwithstanding the restrictions contained in this section regarding the dissemination of records and reports of autopsies or postmortems, nor the exemptions referenced under RCW42.56.240(1), nothing in this chapter prohibits a coroner, medical examiner, or his or her designee, from publicly discussing his or her findings as to any death subject to the jurisdiction of his or her office where actions of a law enforcement officer or corrections officer have been determined to be a proximate cause of the death, except as provided in (b) of this subsection. (b) A coroner, medical examiner, or his or her designee may not publicly discuss his or her findings outside of formal court or inquest proceedings if there is a pending or active criminal or civil action, concerning a death that has commenced prior to January 1, 2014. (3) The coroner, the medical examiner, or the attending physician shall, upon request, meet with the family of the decedent to discuss the findings of the autopsy or postmortem. For purposes of this selection, the term "family" means the surviving spouse, state registered domestic partner, or any child, parent, grandparent, grandchild, brother, or sister of the decedent, or any person who was guardian of the decedent at the time of death. [2013 c 295 § 1:2011 c 61 § 1. Prior:2007 c 439 § 1; 2007 c 156 § 23; 1987 c 331 § 58; 1985 c 300 § 1; 1977 c 79 § 2; 1953 c 188 § 9. Formerly RCW 68.08.105]



RFP 1-0536

AUTOPSY NO:    **18-2954**
DECEASED:      **HILL, CINDY**
Page 2

## SUMMARY OF CASE FINDINGS

I.    ACUTE BACTERIAL PERITONITIS DUE TO RUPTURED DUODENAL-LIVER ADHESIONS WITH PERFORATION OF DUODENUM:
    A.    600 cc OF TURBID INTRA-ABDOMINAL FLUID
    B.    DUODENAL DEFECT MEASURING 1.2 CM WITH SURROUNDING LYSED ADHESIONS COVERING AN AREA MEASURING 6 CM
    C.    UNDER-SURFACE OF LIVER SHOWING LYSED ADHESION (MICROSCOPIC EXAMINATION: PIGMENT-LADEN MACROPHAGES AND NECROSIS OF SURFACE LIVER CELLS)
    D.    MICROSCOPIC EXAMINATION OF LARGE BOWEL GRAM STAIN SHOWING GRAM-POSITIVE RODS
    E.    PERITONEAL CULTURE RESULT: NEGATIVE EXCEPT FOR STAPHYLOCOCCUS COAGULASE NEGATIVE (PROBABLE CONTAMINANT)
    F.    PERICARDIAL CULTURE RESULT: NO GROWTH, NO ANAEROBES ISOLATED

II.    VITREOUS HUMOR SHOWING NO EVIDENCE OF DEHYDRATION (LAB PROVIDENCE HOLY FAMILY HOSPITAL): Sodium = 140 Nmol/L, Glucose = 95 mg/dL, Creatinine = 0.9% mg/dL, Urea Nitrogen = 25 mg/dL

III.    NO SIGNIFICANT EXTERNAL EVIDENCE OF INJURY, AND NO INTERNAL EVIDENCE OF INJURY

IV.    TOXICOLOGY: SEE SEPARATE REPORT

## OPINION:

This 55-year-old female was booked into the Spokane County Jail on 8/21/18, and was under a medical watch for opioid withdrawal. She had a cellmate until the day of death, 8/25/2018, when she was moved into a single cell. The cellmate said that the decedent had been sick with vomiting, moaning and complaining of being hot. Jail medical staff noted the decedent had complained of abdominal pain.

On the fourth day of her incarceration, after the decedent had been moved into a single-occupancy cell, she was found unresponsive in her cell by jail staff. She was removed from her cell, and resuscitation was attempted. She was transported to a local hospital, but died in the Emergency Department.

The death is attributed to acute bacterial peritonitis due to ruptured duodenal-liver adhesions with perforation of duodenum.

RFP 1-0537

AUTOPSY NO:   **18-2954**
DECEASED:     **HILL, CINDY**
Page 3

Investigation by the Spokane Sheriff's Department revealed no evidence of traumatic injury or of assault during this incarceration. It is possible that the vomiting of opioid withdrawal resulted in lysis of the adhesions. The source of the adhesions is not clear, but the decedent had remote cholecystectomy. Because of these considerations, the manner of death is natural.

Dual toxicologic testing was performed by the Washington State Toxicology Laboratory and by National Medical Services Laboratories.   The Washington State Toxicology testing was negative.   NMS testing was positive for Naloxone (Narcan) administered during resuscitation, and for methamphetamine and methamphetamine metabolite (amphetamine).   NMS quantitated methamphetamine and amphetamine in low concentrations, just above laboratory reporting limits, likely accounting for intra-laboratory differences.   Methamphetamine has a long half-life and this low concentration is consistent with use prior to incarceration.

_____  ,  11/9/18
Sally S. Aiken, M.D.                   (date signed)
Forensic Pathologist

SSA/pke
Dt:11/08/2018

Reviewed By:

John D. Howard, M.D.   Date Signed   11-13-2018

AUTOPSY NO:   **18-2954**
DECEASED:      **HILL, CINDY**
Page 4

## BACKGROUND INFORMATION:

The decedent is a 55-year-old female, who apparently was found unresponsive in her jail cell at "1725" hours. CPR was begun immediately, and she was transported to Providence Sacred Heart Medical Center, but died in the Emergency Department. She was the only inmate housed in the cell. Her medical history is notable for hypertension, and alcohol abuse. An autopsy is authorized for further investigation of the death.

## IDENTIFICATION:

The body is found in a body pouch sealed by tag number "0316980." The decedent's name and this tag number are written on the body pouch, along with the date "8-25-18." Around the right ankle is a morgue band bearing the decedent's name, the date "8-25-18," and the correct tag number. Subsequent to autopsy, identity is confirmed by friction ridge (fingerprint) comparison.

## EVIDENCE OF MEDICAL INTERVENTION:

1.    An intraosseous catheter on the right tibia, secured with a blue and white endotracheal tube holder, which has straps encircling the right calf.

2.    Encircling the right wrist is a hospital identification band, name "HILL, CINDY LOU."

3.    A cardioversion pad on the upper aspect of the right breast, with a second pad in the left anterior axillary line.

4.    Circular EKG lead pads, one on each side of the lower abdomen, and two on the upper chest.

5.    An endotracheal tube in the mouth, secured with an endotracheal tube holder which has large waxy pads over the cheeks, and a Velcro strap encircling the neck.

6.    A pulse oximeter lead on the left index finger.

7.    Found overlying the sternum is a circular puncture wound, presumed to be from placement of an intravascular catheter open to air, an intraosseous catheter, or a needle which extended into the pericardial sac. Also, adjacent to this, continuing to the left parasternal margin is a 1-1/2 inch area of green ecchymosis, from chest compressions.

AUTOPSY NO:   **18-2954**
DECEASED:     **HILL, CINDY**
Page 5

8.   A butterfly catheter positioned on the dorsum of the left hand and secured with clear dressing and tape. Attached to this is a "Y"-port.

9.   A needle puncture wound on the ventral surface of the left forearm, covered with folded gauze, secured with tape.

## EXAMINATION OF THE HANDS:

When the body is initially examined, the hands are not covered with paper bags. There is a band-aid on the right ring finger. Deep to this band-aid is what appears to be a needle puncture wound. The fingernails are dirty for the most-part, and have rounded ends which overhang by up to 1/8 inch. There is brown debris at the nail beds. Some of the fingernails on the right are coated with bits of red and sparkly silver nail polish.

The left hand fingernails are also dirty and have similar overhang. They are also covered with bits of red nail polish. Dark red to brown debris is found at the proximal nail beds at the left hand also. The fingernail overhang is the same.

## CLOTHING:

This item of clothing is found on the body:

1.   A pair of orange cotton panties, bikini-cut. These have a white waistband and are labeled "8" in permanent ink along the left side. The waistband has been turned inward on the right side of the body. There is some dark, almost black fecal soiling of the crotch of this garment. The inner label of the garment says size "8."

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

## EXTERNAL EXAMINATION:

The body is that of a thin, white female whose general appearance is consistent with her age, recorded as 55-years. The body is well-preserved, except for the greenish discoloration at the left parasternal margin. It is cold to the touch, and has been refrigerated. There is cold coagulation of the abdomen. Rigidity is marked and symmetrical in the upper and lower extremities and there is marked jaw rigidity, though the jaw remains in a semi-open position because of the endotracheal tube. Lividity is dorsal, pink, and fixed. The body measures 62-3/4 inches and weighs 123 pounds.

When the body is initially examined, red blood stains are seen on the right pretibia.

AUTOPSY NO:    **18-2954**
DECEASED:    **HILL, CINDY**
Page 6

This is in the vicinity of the intraosseous catheter. A small amount of white material is also seen on the right pretibia, and white chalky material is found over the medial left patella and left distal thigh. This is swabbed.

The scalp is covered with dark-brown, curly hair measuring to 3-1/2 inches from the roots to the ends anteriorly, and is 7 inches from the roots to the ends posteriorly. Found loosely attached to the hair is a bright blue, covered rubber band. The eyebrows are dark-brown and have been extensively plucked and trimmed. The eyelashes are long and dark-brown. Delicate white hairs are found over the cheeks. On the tip of the chin is black and white, sparse stubble measuring to 1/8 inch. The body hair is dark brown and present in a normal adult female distribution, with stubble over the pubic area measuring to 3/4 inch, stubble over the lower extremities, and stubble in the axillae measuring to 1/4 inch.

The ears are well-formed and symmetrically placed with creases in the ear lobules and single pierced ear holes. The forehead is furrowed.  The irides appear dark in color, with some clouding of the corneas and arcus senilis. The sclerae have slight icterus. The conjunctival surfaces of the eyelids are congested, but there are no conjunctival petechiae. Skin turgor is normal. A few telangiectasias are scattered over the cheeks. The nose is aligned normally and on the bridge of the nose is a horizontal, delicate, 3/4 inch long scar. There are no injuries to the lips. The teeth are natural and somewhat discolored and grey-brown. A few divot-like defects are found on several of the upper incisor teeth, appearing remote. There is crowding of the teeth in the lower mouth. The oral mucosa is pale and the frenula are intact. No intraoral petechiae are seen.

The trachea is midline and there are no injuries to the neck. The chest is symmetrical. The body overall is tanned, sparing the bathing suit area. Scattered adjacent to the sternal notch are multiple circular scars on the order of 1/8 inch. The arms also have solar tanning.

The upper extremities are aligned normally. A possible single needle puncture wound is found in the right antecubital crease. There are no injuries to the right upper extremity, and no injuries to the hand.

The left upper extremity has a navy-colored, nonprofessional-looking tattoo of a sort of starburst, 1-1/2 inches in dimension. Dried red-brown blood is seen on the lateral left triceps muscle, when the body is initially examined. The left antecubital crease has two needle puncture wounds. Found on the ventral surface of the left forearm are a total of ten violaceous scars, measuring to 3/8 inch, most of them horizontally oriented. The dorsum of the left forearm has two closely spaced scabs, each 1/8 inch in dimension. The dorsum of the left forearm also has a total of three scars, measuring to 3/4 inch. On the medial side of the left forearm is a purple to blue ecchymosis, 2-1/2 x 2 inches in dimension, with central needle puncture wounds.

AUTOPSY NO:   **18-2954**
DECEASED:   **HILL, CINDY**
Page 7

On the dorsum of the medial left wrist are two scars measuring to 1/2 inch.

The abdomen is firm, with cold coagulation. On the upper umbilicus is a horizontal 1 inch long scar. Crossing the suprapubic area is a horizontal 5 inch long scar, and on the left lower quadrant of the abdomen is another scar, this one linear and 1/2 inch. The external genitalia are those of a normal-appearing female. There are no introital injuries. The vagina is examined via speculum, and there are no vaginal injuries. The cervix is flat, and the cervical os is non-parous, measuring 4 mm.

The lower extremities are aligned normally. There are no significant injuries to the lower extremities. A few scars are scattered over the left patella. On the dorsum of the left great toe is a 3 mm ulcer, covered with some granulation tissue, bright red in color. The toenails are coated with sparkly red, clear, and silvery nail polish. Located medial to the right pretibia are two scars measuring to 1 inch. The soles of the feet are callused and dirty. A few violaceous, raised skin lesions are seen on the right upper hip, covering a 1-1/2 inch area.

A second examination of the back again reveals no injuries. The vertebral column is aligned normally. Some debris is attached to the right calf, appearing to be a few flecks of dirt. The anus is dilated postmortem. There is an anal tag from 10 o'clock to 1 o'clock. There are no anal or perianal injuries. The anal vault contains green stool. Scattered over the right buttock are a few tiny pustules.

No needle tracks or tattoos are seen.

## INTERNAL EVIDENCE OF INJURY:

1.     On the anterior subgaleum, a 3 cm area of purple subgaleal hemorrhage. Examination of the scalp overlying this demonstrates no injuries. There are no injuries to the skull or brain.

## INTERNAL EVIDENCE OF MEDICAL INTERVENTION:

1.     The needle puncture wound over the sternum appears shallow.

2.     The endotracheal tube is appropriately positioned in the trachea.

3.     Fracture of the mid-body of the sternum with no associated hemorrhage. There are fractures of right anterior-lateral ribs #2-7 and left anterior-lateral ribs #2-7. These are in the same vertical planes and are consistent with chest compressions of cardiopulmonary resuscitation.

AUTOPSY NO:    **18-2954**
DECEASED:    **HILL, CINDY**
Page 8

Most of the rib fractures have no surrounding hemorrhage, but fractures of the first few ribs superiorly have scant amounts of surrounding hemorrhage.

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

## INTERNAL EXAMINATION:

**HEAD:**  Reflection of the scalp shows the single area of subgaleal hemorrhage. The calvarium is intact. Removal of the calvarium shows the epidural space to be normal. Likewise, no collections of subdural blood are present. The brain is removed in the usual manner and weighs 1125 grams. The leptomeninges are smooth and glistening and the gyri demonstrate their usual orientation and configuration. The vessels at the base of the brain are normally disposed and no anomalies are identified. Serial sections of the brain show the cerebral cortical ribbon to be intact. The usual anatomical landmarks of the cerebrum, midbrain, cerebellum, pons, and medulla demonstrate no abnormalities. Removal of the dura from the base of the skull shows the usual anatomical features without abnormalities. The pituitary fossa is unremarkable. The foramen magnum demonstrates the normal orientation and the first portion of the spinal cord at the level of the transection viewed through the foramen magnum is unremarkable.

**NECK ORGANS:**  No hemorrhage is present in the prevertebral space and careful palpation of the cervical spinal column demonstrates no fractures. A layered dissection of the remaining structures of the neck is performed. No hemorrhage is present in the musculature of the tongue or in the soft tissues of the anterior neck. The hyoid bone is small, but dense and fused symmetrically. The hyoid bone is intact, as are the thyroid cornua and remaining bony and cartilaginous structures of the neck. The tracheal mucosa is unremarkable.

**BODY CAVITIES:**  The body cavities are opened in the usual manner. The pleural surfaces are smooth and glistening and the pericardium is unremarkable. There is acute peritonitis, further described below. The mediastinum and retroperitoneum show the usual anatomical features.  The leaves of the diaphragm are intact. On the right hemidiaphragm is black-colored pigment, which appears to be from remote hemorrhage. The organs are anatomically disposed. There is no internal evidence of significant acute injury. The parietal pleura is stripped from the posterior aspect of both chest walls, again revealing no posterior rib fractures or injuries.

## ORGAN SYSTEMS

**CARDIOVASCULAR:**  The heart weighs 330 grams. Examination of the epicardium shows it to be intact. The chambers demonstrate their usual shape and configuration with no gross hypertrophy.

AUTOPSY NO:   **18-2954**
DECEASED:   **HILL, CINDY**
Page 9

The coronary arteries are normally disposed and there is no significant atherosclerosis. Cut surfaces of the myocardium show a normal color and no thickening of the ventricular walls is identified with the left ventricle measuring 1.3 cm and the right measuring 0.4 cm. The valves are intact with the usual anatomic relationships, and the atria are unremarkable. The AV node of the conduction system is retained. The aorta follows its usual course and the origins of the major vessels are normally disposed and unremarkable. The great vessels of the venous return are in their usual position and unremarkable.

**RESPIRATORY SYSTEM:** The larynx and trachea are empty, and are continuous in the usual manner with the primary, secondary and tertiary bronchi, which are also empty. The right and left lungs weigh 310 and 300 grams, respectively. The pleural surfaces have large streaks of dark black pigment. Cut surfaces show tan to pink parenchyma, which is somewhat rubbery and has superimposed dot-like area of pigment. There is no evidence of injury to the lungs, and no consolidation of the air spaces. The pulmonary vessels occupy their usual relationships without evidence of emboli.

**HEPATOBILIARY SYSTEM:**  The liver weighs 900 grams. On the undersurface (inferior aspect) of the right lobe of the liver, just lateral to the falciform ligament is a 3 cm area where the liver capsule has been stripped. Adjacent to this, in the liver capsule, there is some pigment. This is photographed, and appears to conform with the lysed adhesions resulting in the duodenal perforation described elsewhere. Cut surfaces of the liver show a tan parenchyma of normal density. There is abundant scar tissue in the gallbladder fossa, and the gallbladder is absent. Staples are seen in x-rays of the abdomen, typical of cholecystectomy. The biliary tree is otherwise normally disposed and no abnormalities are demonstrated.

**LYMPHORETICULAR SYSTEM:**  The spleen weighs 70 grams with a smooth, glistening capsule and an unremarkable parenchyma with the usual anatomical features. The thymus is atrophic and replaced by fat. The lymph nodes, where noted, show no notable pathologic change.

**URINARY SYSTEM:**  The right and left kidneys weigh 100 and 120 grams, respectively. The cortical surfaces on the left are smooth and glistening, but the right kidney has some broad-based scars. There is good preservation of the cortices and corticomedullary differentiation. The pelves show the usual anatomical relationships and are continuous into normal appearing ureters, which insert into an unremarkable bladder containing 10 cc of urine.

**INTERNAL GENITALIA:**  The uterus occupies the usual position and is small. The cervix is non-parous. The cervix has a very flattened contour. The endometrium is thin and tan. There have been remote bilateral tubal interruptions which extend from near the uterus, for a length of several centimeters.

AUTOPSY NO:    **18-2954**
DECEASED:    **HILL, CINDY**
Page 10

The ovaries are senescent-appearing.

**GASTROINTESTINAL TRACT:**  Upon opening the abdominal cavity it is noted that the decedent has peritonitis. The abdomen contains an estimated 600 cc of cloudy, thin, light-brown liquid. The peritoneal liquid is cultured. Loops of small bowel have erythema and attached fibrin. This is most prominent in loops of small bowel of the upper abdomen, extending also along the right pericolic gutter, such there is peritonitis surrounding the cecum. Fluid has pooled in the central abdomen and in both the right and left upper quadrants. The peritonitis is caused by a perforation of the anterior aspect of the duodenum, just distal to the pylorus. This duodenal defect is 1.2 cm, and has fairly smooth edges. Surrounding the defect on the anterior surface of the duodenum and extending to adjacent connective tissue is a discolored area, consistent with remote adhesions and hemorrhage. This discolored area is brown to yellow, and 6 cm in dimension, with spotty areas of black coloration from presumed hemosiderin. A mirror image of this zone of adhesion is found on the undersurface of the right lobe of the liver, as has been described. Sections of the duodenal perforation and surrounding lysed adhesions and old hemorrhage are submitted in cassette (5).

The pharynx and esophagus are unremarkable with no abnormalities identified. The stomach lies in a normal position and contains 300 cc of thin, brown liquid. The mucosal lining of the stomach is intact. The duodenal perforation is described elsewhere. The remaining small bowel has variable erythema of peritonitis and attached fibrin. The entire length of the small and large bowel is opened. Sections showing the peritonitis on the small bowel and on the peritoneal sidewall are submitted together in cassette (4). There are no foreign bodies in the small bowel, which mostly contains brown, fairly thin fecal matter. The entire large bowel is opened longitudinally and contains dark-colored fecal matter, not appearing to be melena. There are no foreign objects in the large bowel. The appendix is present and shows no evidence of appendicitis. The appendix was not photographed until 8/28/18 (due to caseload). The body cavity was re-opened. The appendix was identified on the previous opened cecum, and photographed. Sections of the appendix were submitted in (1x).

**ENDOCRINE SYSTEM:**  The pituitary, thyroid, adrenals and pancreas show the usual anatomical features without evidence of natural disease or injury.

**MUSCULOSKELETAL SYSTEM:**   No other fractures are identified and the skeletal muscle demonstrates the normal appearance. The bone marrow, where visualized, is unremarkable.

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

AUTOPSY NO:   **18-2954**
DECEASED:     **HILL, CINDY**
Page 11

**MATERIALS TAKEN FOR TOXICOLOGY:** Two peripheral blood samples are submitted to the Washington State Toxicology Laboratory. Toxicology results are reported separately.

**TISSUE BIOPSY SPECIMENS TAKEN:** Standard Collection (retained in fixative).

**HISTOLOGY SECTIONS TAKEN:** Standard Collection, plus peritoneum and loops of small bowel showing peritonitis in cassette (4), duodenum at perforation in cassette (5), along with liver site of perforation, and (1x) appendix.

**WHOLE ORGANS RETAINED FOR FURTHER STUDY AFTER RELEASE OF THE BODY:** None

**PHOTOGRAPHS:** Yes

**X-RAYS:** Yes; full-body, showing no evidence of traumatic injury (CPR rib fracture)

**WITNESSES:** None

SSA:pke
Dt:08/27/2018

## MICROSCOPIC EXAMINATION:

**HEART:** (1) Slight autolysis. Focal myofiber hypertrophy and scattered contraction bands. Focal interstitial fibrosis.

**LUNG:** (2) Emphysematous changes, air/fat emboli. Abundant peribronchial black pigment. Changes of asthma, including basement membrane thickening and smooth muscle hypertrophy.

**KIDNEY:** (2) Autolysis, congestion. Scattered tubular microcalcifications.

**LIVER:** (1, 6) Minimal steatosis. Slight autolysis and congestion. Triads expanded by fibrous tissue.

**LIVER SURFACE WHERE CAPSULE WAS STRIPPED:** (6) Necrosis of surface liver cells with fibrosis and some pigment-laden macrophages. Some xanthochromatic pigment.

**APPENDIX:** (4) Normal appendix.

RFP 1-0546

AUTOPSY NO:    **18-2954**
DECEASED:    **HILL, CINDY**
Page 12

**DUODENUM AT AND NEAR PERFORATION SITE:** (5) Some giant cells and pigment-laden macrophages on serosa in vicinity of defect. No polarizable foreign matter. At perforation site there are acute inflammatory cells that extend through serosa. Gram stain shows no bacteria, but some yeast.

**SMALL BOWEL:** (6) Serosa has polymorphoneutrophils, and fibrin. No bacteria are seen on serosa with gram stain.

**LARGE BOWEL:** (6) Early peritonitis with polymorphoneutrophils and bacteria on serosa. Gram stain confirm gram-positive rods.

**UTERUS:** (2) Decidualized endometrium with cystic atrophy.

**THYROID** (2) No pathologic abnormality.

**PANCREAS:** (1) Moderate autolysis, no pancreatitis, but small pseudocyst is seen.

**ADRENAL:** (1) Slight autolysis and congestion.

**SPLEEN:** (1) Congestion, slight autolysis.

**BRAIN:** (3 – cerebrum, cerebellum, hippocampus) Slight autolysis.

SSA:pke
Dt:11/08/2018

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

**RETENTION:**

Blood, body fluids, tissues, organs (partial portions of routinely, or under some circumstances whole), and physical/trace materials collected (the exact samples vary by case as needed for diagnostic or evidentiary purposes, and by availability) during the examination are routinely held for a period of time after release of the body and will undergo biohazard disposal unless transferred to a laboratory or other agency, or otherwise released by special arrangement.

AUTOPSY NO:    **18-2954**
DECEASED:      **HILL, CINDY**
Page 13

| Body Fluid/Organs, Evidence Retention Summary Chart | |
|---|---|
| 6 Months | Refrigerated – blood, urine, vitreous |
| | Frozen – gastric |
| | Frozen – liver |
| 1 Year | Bullets |
| | Ligatures |
| | Other items of physical evidence |
| | Hair |
| 3 Years | Frozen – red top |
| | Frozen – purple top |
| 3 Years | Formalin fixed tissue including whole organs fixed in formalin |
| 10 Years | Histology blocks |
| Indefinite | Microscopic slides |
| Indefinite or Archive | Fingerprint cards |
| | Blood cards |

RCW 68.50.106
Autopsies, post-mortems – Analyses – Opinions – Evidence – Costs

In any case in which an autopsy or post-mortem is performed, the coroner or medical examiner, upon his/her own authority or upon the request of the prosecuting attorney or other law enforcement agency having jurisdiction, may make or cause to be made an analysis of the stomach contents, blood, or organs, or tissues of a deceased person and secure professional opinions thereon and retain or dispose of any specimens or organs of the deceased which in his/her discretion are desirable or needful for anatomic, bacteriological, chemical, or toxicological examination or upon lawful request are needed or desired for evidence to be presented in court. Costs shall be borne by the county.

[1993 c 228 § 19; 1987 c 331 § 59; 1975-'76 2nd ex.s. c 28 § 1; 1953 c 188 § 10. Formerly RCW 68.08.106]

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =



**TOXICOLOGY LABORATORY**
**WASHINGTON STATE PATROL**
2203 Airport Way South Suite 360 Seattle, WA 98134
(206) 262-6100  FAX No. (206) 262-6145



## TOXICOLOGY TEST REPORT

| | |
|---|---|
| **Attention:** | Dr. Sally S Aiken |
| **Agency:** | Spokane Co Medical Examiner |
| **Address:** | N Spokane Professional Bldg |
| | 5901 N Lidgerwood Ste 24B |
| | Spokane, WA 99208 |

**Tox Case #:** ST-18-10604    **Case Type:** Death Investigation    **Report Date:** 11/2/2018

| **Agency Case #:** 18-2954 | **Subject Name:** Cindy Hill |
|---|---|

**Evidence:** The following evidence was submitted to the Laboratory by Sally Aiken of the Spokane Co Medical Examiner on 8/30/2018 via USPS-1st Class Mail:
    (1)  ST-18-10604-A: VGray, Blood - Peripheral
    (2)  ST-18-10604-B: VGray, Blood - Peripheral

## Volatile Analysis Results:

**ST-18-10604-A: Blood - Peripheral**

ST-18-10604-A was tested by Headspace - Gas Chromatography for the presence of acetone, ethanol, isopropanol, and methanol on 09/12/2018. The following result was obtained:

    **None Detected**

## Drug Analysis Results:

**ST-18-10604-A: Blood - Peripheral**

ST-18-10604-A was tested by Enzyme Multiplied Immunoassay Technique (EMIT) for the presence of amphetamines, barbiturates, benzodiazepines, cannabinoids, cocaine metabolite, and opiates on 09/07/2018. The following result(s) was obtained:

    **None Detected**

ST-18-10604-A was tested by Gas Chromatography-Mass Spectrometry/Nitrogen Phosphorus Detector for the presence of basic drugs and metabolites on 09/12/2018. The following result(s) was obtained:

    **None Detected**

ST-18-10604-A was tested by Liquid Chromatography/Tandem Mass Spectrometry for amphetamines on 10/16/2018. The following result(s) was obtained:

    **None detected**
    (test conducted by Naziha Nuwayhid, Forensic Scientist 3)

## COMMENTS

*All testing was performed by the Forensic Scientist listed below except as otherwise indicated. The Forensic Scientist has technically reviewed all relevant pages of testing documentation in the case record.*



· Request ID: ST-18-10604-0001

Reviewed *[signature]*
11/7/18

RFP 1-0549

Request ID: ST-18-10604-0001

Examined by:

David Nguyen
Forensic Scientist 3

Date: 11 , 2 , 2018

Reviewed by:

Elizabeth Wehner
Reviewer

Date: 11 , 3 , 2018

Request ID: ST-18-10604-0001

RFP 1-0550



**NMS Labs**

NMS Labs                                            **CONFIDENTIAL**

3701 Welsh Road, PO Box 433A, Willow Grove, PA 19090-0437
Phone: (215) 657-4900   Fax: (215) 657-2972
e-mail: nms@nmslabs.com
Robert A. Middleberg, PhD, F-ABFT, DABCC-TC, Laboratory Director

**Toxicology Report**                    Patient Name HILL, CINDY
Report Issued   09/18/2018 14:01         Patient ID 18-2954 18175135
                                         Chain 30220161
                                         Age 56 Y          ·DOB ▬▬▬
60181                                    Gender F
Pathology Assoc. Medical Labs
Attn: Sendouts                           Workorder   18256725
110 W. Cliff Drive
Spokane, WA  99204                       Received    09/04/2018 14:46

Chain of custody documentation has been maintained for the analyses performed by NMS Labs.

Unless alternate arrangements are made by you, the remainder of the submitted specimens will be
discarded six (6) weeks from the date of this report; and generated data will be discarded five (5)
years from the date the analyses were performed.

Sample ID 18256725-001                   Collect Dt/Tm Not Given
Matrix Blood                             Source Central Blood
Patient Name HILL, CINDY
Patient ID 18-2954 18175135
Container Type Gray Vial                 Approx Vol/Weight 4.85 mL

Receipt Notes      None Entered

| Analysis and Comments | Result | Units | Reporting Limit | Notes |
|---|---|---|---|---|
| **8052B Postmortem, Expanded, Blood (Forensic)** | | | | |
| Analysis by Enzyme-Linked Immunosorbent Assay (ELISA) | | | | |
| Salicylates | None Detected | mcg/mL | 120 | |
| Cannabinoids | None Detected | ng/mL | 10 | |
| Barbiturates | None Detected | mcg/mL | 0.040 | |
| Analysis by Headspace Gas Chromatography (GC) | | | | |
| Ethanol | None Detected | mg/dL | 10 | |

Synonym(s):   Ethyl Alcohol

Ethyl alcohol (ethanol, drinking alcohol) is a central
nervous system depressant and can cause effects such
as impaired judgment, reduced alertness and impaired
muscular coordination. Ethanol can also be a product
of decomposition or degradation of biological samples.

Results for sample 18256725-001 are continued on next page


RECEIVED
NOV 0 7 2018
By

Page 1 of 6                              NMS v.39.0

Reviewed ☐ ack... 11/7/18

RFP 1-0551



**NMS Labs**
3701 Welsh Road, PO Box 433A, Willow Grove, PA 19090-0437
Phone: (215) 657-4900   Fax: (215) 657-2972
e-mail: nms@nmslabs.com
Robert A. Middleberg, PhD, F-ABFT, DABCC-TC, Laboratory Director

**CONFIDENTIAL**

Sample ID 18256725-001
Matrix Blood
Patient Name HILL, CINDY
Patient ID 18-2954 18175135

Collect Dt/Tm Not Given
Source Central Blood

| Analysis and Comments | Result | Units | Reporting Limit | Notes |
|---|---|---|---|---|
| Blood Alcohol Concentration (BAC) | None Detected | g/100 mL | 0.010 | |
| Methanol | None Detected | mg/dL | 5.0 | |

Synonym(s):   Methyl Alcohol

Endogenous blood levels of methanol from metabolic and dietary sources are approximately 0.15 mg/dL.

Exposure to 800 ppm methanol for 8 hours produced a maximum average blood methanol concentration of 3.1 mg/dL.

| | | | | |
|---|---|---|---|---|
| Isopropanol | None Detected | mg/dL | 5.0 | |

Synonym(s):   Isopropyl Alcohol

Three workers exposed to 191 - 200 ppm isopropanol in air had blood isopropanol concentrations <1 mg/dL; acetone levels were 4 - 16 mg/dL during the exposure. After a sponge bath with isopropanol, one adult had a blood isopropanol concentration of 10 mg/dL.

In a study of 31 isopropanol deaths, postmortem blood concentrations ranged from 10 to 250 mg/dL (mean, 140 mg/dL) and acetone blood concentrations ranged from 40 - 300 mg/dL (mean, 170 mg/dL).

| | | | | |
|---|---|---|---|---|
| Acetone | None Detected | mg/dL | 5.0 | |

Reported normal endogenous acetone levels in blood are up to 3 mg/dL. Levels associated with diabetic or fasting ketoacidosis range from 10 - 70 mg/dL.
After exposure to 100 and 500 ppm acetone for 2 hr, reported blood acetone concentrations peaked at 2 and 10 mg/dL, respectively.
A blood level of 250 mg/dL was reported in an individual who became lethargic following ingestion of acetone.

Analysis by High Performance Liquid Chromatography/Time of Flight-Mass Spectrometry (LC/TOF-MS)

| | | | | |
|---|---|---|---|---|
| Amphetamine | See Comment | ng/mL | 10 | |

Synonym(s):   Benzphetamine Metabolite

Comment:   Based on this screening result, confirmation testing was performed. Refer to the confirmation test result(s).

| | | | | |
|---|---|---|---|---|
| Methamphetamine | See Comment | ng/mL | 10 | |

Results for sample 18256725-001 are continued on next page

NMS v.39.0

Reviewed & aiken
11/7/18

RFP 1-0552



**NMS Labs**

3701 Welsh Road, PO Box 433A, Willow Grove, PA 19090-0437
Phone: (215) 657-4900 Fax: (215) 657-2972
e-mail: nms@nmslabs.com
Robert A. Middleberg, PhD, F-ABFT, DABCC-TC, Laboratory Director

**CONFIDENTIAL**

Sample ID 18256725-001
Matrix Blood
Patient Name HILL, CINDY
Patient ID 18-2954 18175135

Collect Dt/Tm Not Given
Source Central Blood

| Analysis and Comments | Result | Units | Reporting Limit | Notes |
|---|---|---|---|---|
| Synonym(s): Benzphetamine Metabolite | | | | |
| Comment: Based on this screening result, confirmation testing was performed. Refer to the confirmation test result(s). | | | | |
| Naloxone | Positive | ng/mL | 1.0 | |
| Synonym(s): Narcan® | | | | |
| The reported qualitative result for this substance was based upon a single analysis only. If confirmation testing is required please contact the laboratory. | | | | |
| Scope Statement | See Comment | | | |
| Comment: The following is a general list of compound classes included in this screen. The detection of any specific analyte is concentration-dependent. Note, not all known analytes in each specified compound class are included. Some specific analytes outside these classes are also included. For a detailed list of all analytes and reporting limits, please contact NMS Labs. Amphetamines, Anticonvulsants, Antidepressants, Antihistamines, Antipsychotic Agents, Benzodiazepines, CNS Stimulants, Cocaine and Metabolites, Hallucinogens, Hypnosedatives, Hypoglycemics, Muscle Relaxants, Non-Steroidal Anti-Inflammatory Agents, Opiates and Opioids. | | | | |

**52485B Amphetamines Confirmation, Blood**

Analysis by High Performance Liquid Chromatography/
Tandem Mass Spectrometry (LC-MS/MS)

| | | | | |
|---|---|---|---|---|
| Ephedrine | None Detected | ng/mL | 5.0 | |
| A single 24 mg oral dose resulted in a peak plasma concentration of approximately 100 ng/mL. During chronic daily oral therapy with 15 mg (3 times daily), a plasma level of 95 ng/mL was reported at 4 hours, and 65 ng/mL at 6 hours after one 15 mg dose. | | | | |
| Pseudoephedrine | None Detected | ng/mL | 5.0 | |

Results for sample 18256725-001 are continued on next page

NMS v.39.0

*Reviewed & action*
*11/7/18*

RFP 1-0553



**NMS Labs**

3701 Welsh Road, PO Box 433A, Willow Grove, PA 19090-0437
Phone: (215) 657-4900   Fax: (215) 657-2972
e-mail: nms@nmslabs.com
Robert A. Middleberg, PhD, F-ABFT, DABCC-TC, Laboratory Director

**CONFIDENTIAL**

Sample ID 18256725-001
Matrix Blood
Patient Name HILL, CINDY
Patient ID 18-2954 18175135

Collect Dt/Tm Not Given
Source Central Blood

| Analysis and Comments | Result | Units | Reporting Limit | Notes |
|---|---|---|---|---|
| Following a 60 mg oral dose (immediate-release tablet or syrup), mean peak plasma concentrations of 180 to 360 ng/mL were reported at 3 hours. | | | | |
| Following a 120 mg oral dose (controlled-release capsule), mean peak plasma concentrations of 265 to 315 ng/mL were reported. | | | | |
| Chronic administration of 360 mg/day (of a controlled-release preparation) resulted in mean steady-state plasma concentrations between 500 and 640 ng/mL over a 10-day period. | | | | |
| Phenylpropanolamine | None Detected | ng/mL | 5.0 | |
| Synonym(s):   PPA; Norephedrine | | | | |
| Phenylpropanolamine is a drug as well as the metabolite of Ephedrine. | | | | |
| Following a single 50 mg oral dose (immediate-release tablet), the mean peak plasma concentration was 180 ng/mL at 1 to 2 hours. | | | | |
| Following a single 150 mg oral dose (sustained-release preparation), the mean peak plasma concentration was 280 ng/mL at 6 hours. | | | | |
| Norpseudoephedrine | None Detected | ng/mL | 5.0 | |
| Synonym(s):   Cathine | | | | |
| Norpseudoephedrine is a metabolite of Pseudoephedrine. | | | | |
| Amphetamine | 13 | ng/mL | 5.0 | |
| Amphetamine is a drug as well as the metabolite of Methamphetamine. | | | | |
| Therapeutic Range (treatment of Narcolepsy or Attention Deficit Disorder) with doses between 10 and 30 mg daily; Mean peak plasma concentrations between 35 and 110 ng/mL. | | | | |
| Phentermine | None Detected | ng/mL | 5.0 | |
| Synonym(s):   Adipex-P®; Pro-Fast®; Ionamin® | | | | |

Results for sample 18256725-001 are continued on next page

NMS v.39.0

*Reviewed & Allison*
*11/7/18*

RFP 1-0554



**NMS Labs**

3701 Welsh Road, PO Box 433A, Willow Grove, PA 19090-0437
Phone: (215) 657-4900  Fax: (215) 657-2972
e-mail: nms@nmslabs.com
Robert A. Middleberg, PhD, F-ABFT, DABCC-TC, Laboratory Director

**CONFIDENTIAL**

Sample ID 18256725-001
Matrix Blood
Patient Name HILL, CINDY
Patient ID 18-2954 18175135

Collect D/T/m Not Given
Source Central Blood

| Analysis and Comments | Result | Units | Reporting Limit | Notes |
|---|---|---|---|---|
| A single 26 mg/70 kg oral dose produced a mean peak blood concentration of 80 ng/mL at 4 hours, declining to 30 ng/mL after 40 hours. | | | | |
| Adults receiving 30 mg daily oral doses for 2 weeks achieved a mean steady-state plasma concentration of 360 ng/mL (range 160 to 510 ng/mL). | | | | |
| Methamphetamine | 5.1 | ng/mL | 5.0 | |
| Benzphetamine is rapidly metabolized to Amphetamine and Methamphetamine. | | | | |
| This test reports Methamphetamine as the total of the undifferentiated d and l enantiomers. The ratio of these enantiomers is important in determining whether the source of Methamphetamine is from over the counter medications, prescribed medication or controlled substances. Call lab for further information on d to l enantiomer ratio determination. | | | | |
| MDA | None Detected | ng/mL | 5.0 | |
| Synonym(s):    3,4-Methylenedioxyamphetamine; Adam; MDMA Metabolite | | | | |
| MDA is a metabolite of MDMA and methylenedioxyethylamphetamine (MDEA) and is abused for its central nervous system stimulant and hallucinogenic properties. The peak concentration of the MDA metabolite following a 110 mg dose of MDMA was reported as 28 ng/mL at 4 hours. | | | | |
| The blood to plasma ratio of MDA is approximately 1.2 - 1.3 | | | | |
| MDEA | None Detected | ng/mL | 5.0 | |
| Synonym(s):    3,4-methylenedioxyethylamphetamine; Eve | | | | |
| A single oral 140 mg dose given to 8 adults produced peak plasma concentrations that averaged 260 ng/mL at 2.2 hours. | | | | |

NMS v.39.0

*Reviewed S aiken*
*11/7/18*

RFP 1-0555



**NMS Labs**
3701 Welsh Road, PO Box 433A, Willow Grove, PA 19090-0437
Phone: (215) 657-4900  Fax: (215) 657-2972
e-mail: nms@nmslabs.com
Robert A. Middleberg, PhD, F-ABFT, DABCC-TC, Laboratory Director

**CONFIDENTIAL**

Workorder 18256725 was electronically
signed on 09/18/2018 13:07 by:

Erik Flail, B.A.
Certifying Scientist

Page 6 of 6

NMS v.39.0

Reveiwed *[signature]* 11/7/18

RFP 1-0556

*The Estate of Cindy Lou Hill, by and through its personal representative, Joseph A. Grube; and Cynthia Metsker, individually vs. Naphcare, Inc., et al.*

Case No. 2:20-cv-00410-RMP

Declaration of Hank Balson

Exhibit B

# Facility Admission Report




Spokane County
WASHINGTON

| Booking #<br>18013056 | Jacket#<br>412473 | Offender Name: HILL, CINDY LOU<br>Alias:<br>SSN: ████4696<br>Birth Place: CA<br>Date of Birth: ██████<br>Age: 55<br>Address: ████████<br> WA    99201<br>Phone: (509) 369 - 9187 |

**HILL, CINDY LOU**

| | |
|---|---|
| Sex: Female | Hair Color: BROWN |
| Race: White | Eye Color: HAZEL |
| Height: 5' 1" | Complexion: MEDIUM |
| Weight (lbs.): 125 | Build: LIGHT |
| Other Features: | |

| | | | |
|---|---|---|---|
| Arresting Authority: 002 - SPOKANE CITY | | Cell Assignment: Booking Livescan | |
| Arresting Officer: PONTO | | Classification: Pretrial | |
| Searching Officer: | | County of Charge: | |
| Booking Officer: Ponto, Sean P | | Billing Agencies: | |
| Book Date/Time: 08/21/2018 12:05 | | SID #: WA12042586 | |
| Last Rebook Date/Time: | | FBI #: | |
| Booking Assistant Officer(s) | | | |

## Property Storage Location(s):   SCJ 131

## Detainers / Holds

| Agency Name | Reason for Hold | Hold Date | Hold Expires Date |
|---|---|---|---|
| LINCOLN CO | WACIC SAYS LINCOLN CO ONLY BUT THE WARRANT BOND IS 10,100 CHARGE: NEG DRIVING 1ST | 8/21/2018 12:00:00 AM | |

## Current Charges

| Case #: | | Case Bond Type: | | Case Bond Amount: | | |
|---|---|---|---|---|---|---|
| Charge Case # | Charge Code | Counts | Charge Description | | Citation/Control # | |
| Court Type: | | Charge Status: | Document Type: | Bond Amount | Charge Bond | |
| 171049451 | 69.50.4013(1) | 1 | CNTL SUB(POSS-FEL) | | FC | 2017-9680040 |
| Spokane County Superior Court | | *Pretrial* | SC Warrant | $0.00 | Bond set by Court Paperwork | |
| Comments: | | | | | | |

## Active Alerts

| Alert | Details | Created Date | Expires Date |
|---|---|---|---|
| Z Do Not USE - Medical - DT's | please house in safety cell for wd monitor | 6/26/2016 6:32:00 PM | |
| Z Do Not USE - Medical - Extra Fluids | please provide jug of water at meals | 6/26/2016 6:32:00 PM | |

## Housing / Billing

| Details | Created Date | Expires Date |
|---|---|---|
| 001 - SPOKANE COUNTY | 8/21/2018 1:53:00 PM | |



SPOCO Facility Admission Report printed for HILL, CINDY LOU
JailTracker ® Report Printed On 08/21/2018 13:54 by UserID 550

Default
Page 1 of 1

RFP 1-0001

*The Estate of Cindy Lou Hill, by and through its personal representative, Joseph A. Grube; and Cynthia Metsker, individually vs. Naphcare, Inc., et al.*

Case No. 2:20-cv-00410-RMP

Declaration of Hank Balson

Exhibit C

# HEALTH SERVICES AGREEMENT

THIS AGREEMENT by and between Spokane County Detention Services of the State of Washington (hereinafter referred to as the "County") and NaphCare, Inc., an Alabama corporation, (hereinafter referred to as "NaphCare"), is entered into and effective as of the July 1, 2017 and shall continue through June 30, 2018 and shall be renewed automatically for additional one year terms beginning July 1, 2018 up to six (6) additional years.

WHEREAS, the County owns and operates the Spokane County Jail located at 1100 W. Mallon Avenue, Spokane, WA 99260 and the Geiger Corrections Center located at 3507 S. Spotted Road, Spokane, WA 99260 (hereinafter collectively referred to as "Facility"); and

WHEREAS, the County has the obligation to provide for the health, safety, and welfare of all Inmates incarcerated at the Facility; and

WHEREAS, the objective of the County is to provide for the delivery of quality health care to all Inmates in the physical custody of the County in accordance with applicable law; and

WHEREAS, NaphCare is in the business of providing correctional health care services and desires to provide such services for the County under the terms and conditions hereof;

NOW, THEREFORE, in consideration of the covenants and promises hereinafter made, the parties hereto agree as follows:

## ARTICLE 1: HEALTH CARE SERVICES

1.1    General Engagement. The County hereby engages NaphCare to provide and to arrange to provide for the delivery of medical care, mental health care and dental care to individuals under the physical custody and control of the County ("Inmates"), and NaphCare hereby accepts such engagement according to the terms and provisions hereof. In the provision of such services, NaphCare agrees to meet or exceed all constitutional standards of health care, as well as meet the recognized standard of care for the provision of health care by qualified health care professionals in Washington State, any other applicable Federal and State statutes, case law and any other applicable Order of a Court, while adhering to the Standards of the National Commission on Correctional Health Care (NCCHC).

1.2    Scope of General Services. NaphCare will provide on a regular basis professional medical, mental health, dental and related health care and administrative services for the Inmates, including, but not limited to: a program for preliminary screening of Inmates upon arrival at the Facility, a comprehensive health evaluation of each Inmate following admission to the Facility, regularly scheduled care for non-urgent, urgent, and emergency episodic care, care for chronic conditions, nursing coverage, regular physician visits on site, infirmary or medical housing unit care, hospitalization, medical specialty services, diagnostic and therapeutic services (e.g. imaging, radiation therapy), transportation requiring medically equipped or staffed vehicles, medical records management, pharmacy services, health education and training services, a quality assurance program, utilization management, administrative support services, and other services, all as more specifically described hereinafter and in the Scope of Work (Exhibit A) and NaphCare's Proposal (Exhibit B). To the extent health care is required and cannot be rendered on site, NaphCare will make appropriate off-site arrangements for the rendering of such care. NaphCare will provide emergency medical response to visitors and Facility staff as necessary and appropriate on site at no cost to the County.

1.3    Incorporation of NaphCare Proposal. Except as otherwise agreed herein, the health services to be provided by NaphCare under the terms of this Agreement shall be those described in the attached Exhibits "A", "B", "D" and "E" and ) shall become a part of this Agreement. NaphCare's Policies and Procedures (pages 1-

1

166 of the Proposal) are considered as examples of policies and procedures NaphCare had implemented in other contracts and not part of this Agreement.

1.4    Naphcare Staffing. At a minimum, NaphCare shall provide daily staffing at the Facility in accordance with the staffing matrix included in Exhibit E. NaphCare will perform a monthly self-audit of our payroll records in order to ensure compliance with meeting the staffing obligations required by the contract. To fulfill its staffing obligations, NaphCare may utilize pro re nata ("PRN") staffing and/or a current staff member(s) to fulfill the needs of any vacant position that is temporarily vacant. In the event a current staff member is utilized to fill the scheduled hours of another staff member, NaphCare must utilize a like-kind or higher level staff member to fulfill the vacant staff position. A paid hour by NaphCare for staffing is hereby defined as an hour paid to a staff member to fill the hours set forth in the contract, which shall include hours worked on-site, telemedicine/tele-psych hours, PTO (Paid Time Off), training/orientation, and holiday hours. NaphCare shall maintain a licensed physician available on call 24/7 to NaphCare staff as well as Facility staff.

1.5    Patient Safety Program. Naphcare will develop the appropriate policies, training, leadership, and oversight, aimed toward avoiding adverse patient events. Elements of the program will include, but are not limited to:

A.    A voluntary error reporting system for errors or dangerous conditions that might lead to an error, where the error or condition had not resulted in patient harm;

B.    A mandatory error reporting system for all other errors;

C.    A system whereby errors or dangerous conditions are recorded and tracked; and

D.    An appropriate group of staff (e.g. leadership committee) that: reviews the list of errors and dangerous conditions on a regular basis; appropriately prioritizes assignment of analyses for these errors and dangerous conditions for root cause analysis; reviews the results of the root cause analyses; implements sustainable fixes and monitoring of identified problems.

1.6    Order Tracking Program. NaphCare will develop and operate an order tracking system that ensures that nursing and practitioner (physician, nurse practitioner, physician assistant, dentist, or other licensed prescriber) plans or orders for requests for tests, interventions, referrals, or outside records, are executed, received, and reviewed timely and in accordance with policy.

1.7    Off-site Risk and Services. NaphCare shall be responsible for all off-site charges, including inpatient and outpatient hospitalization (medical, surgical, dental and mental health), emergency room visits, ambulance services (including ground and air), specialty consults, physician fees, off-site dental fees, off-site treatment and diagnostics, including dialysis, contracted laboratory and radiology services, outpatient procedures and surgeries, physical and occupational therapy, ancillary hospital services, follow-up physician services, for clinic services, long term off-site facility care, specialty medical items ordered for an inmate from a third-party, and all other off-site fees, including dialysis, for healthcare services rendered to an inmate up to $15,000 Per Inmate Per Incident. Onsite labs and radiology performed inside the facility will not be factored into this cap. NaphCare shall seek and obtain from any Inmate information concerning any health insurance the Inmate may have which may cover services rendered by NaphCare. NaphCare will, to the extent possible, collaborate with local hospitals providing off-site services to Inmates and ensure that they enroll Inmates having qualifying inpatient admission stays, into Medicaid and that they bill Medicaid, or, if applicable, that they bill any known Inmate health insurance provider for the Inmate's admission.

- "Incident" shall mean a single medical illness, condition, injury or disease for a single inmate that may or may not manifest itself or cause many seemingly unrelated symptoms, but where the medical cause of such symptoms is medically diagnosed as that single medical illness, condition,

2

NCHG 001552

injury or disease that is duly recognized by current medical standards. The frequency of treatment of a condition or symptom shall have no bearing on whether such condition or symptom is caused by incident.

- "Single Incident Total" shall mean the aggregate of all third-party medical fees for incidents that take place during the applicable contract term.

- "Single Incident Total Documents" shall mean all invoices, bills and other documents that evidence a Single Incident Total that exceeds the Individual Inmate Cap of $15,000.00.

- NaphCare will pay provider and Facility claims for services rendered, regardless of whether they are above or below the Individual Inmate Cap, and will bill the County for any Single Incident Total exceeding $15,000.00. Any such bill must be submitted by NaphCare to the County within six (6) months from the date that NaphCare receives the bill from the third party provider. The County shall not be responsible for paying or reimbursing NaphCare for any bills submitted after this six (6) months period of time. The County shall pay NaphCare within forty five (45) days of receipt of invoice.

1.8    Pharmaceutical Services. NaphCare will provide a total pharmaceutical system for the Facility, operated in accordance with all federal and state laws and regulations. The system will include the ability to process new prescriptions, fill orders for dispensing within the Facility, and keep necessary records. NaphCare will utilize the Washington State Department of Corrections approved formulary except in cases where the County has provided written permission to deviate from the DOC formulary. All medications will be prescribed by appropriately licensed staff and dispensed by a licensed nurse in accordance with the requirements of the Washington Board of Pharmacy. NaphCare will administer new medications within the timeframe ordered by the physician or, if none was specified, within a clinically appropriate timeframe not to exceed 24 hours. NaphCare will arrange and bear the costs of all prescription and non-prescription over-the-counter medications prescribed by a duly licensed physician or other appropriate health care provider.

NaphCare will cooperate, work with and share information with outside providers of any special health program which the County is currently engaged in (e.g. Methadone) or may become engaged in in the future. NaphCare agrees to assure that their staff received whatever additional training and/or certification is necessary to safely and legally participate in these programs. The County recognizes that such additional training and/or certification may require negotiation between NaphCare and the County over any increased costs or fees.

The County reserves the right to select the Washington State Department of Corrections (DOC) as its Pharmacy vendor at any time during this agreement. The County shall provide a 30 day notice to NaphCare stating its intent to terminate the use of NaphCare's pharmacy. If the County elects to use the DOC Pharmacy, NaphCare agrees to cooperate with the DOC Pharmacy throughout the remainder of this Agreement.

1.9    Exceptions to Treatment. In addition to other provisions excluded pursuant to this Agreement, NaphCare will not be responsible for any medical testing or obtaining samples which are forensic in nature, except as required by court order or by any local, state, or federal statute or regulation.

1.10    Change in Standard of Care or Scope of Services. The price in Article 7, below, reflects the scope of services as finally agreed upon by the parties to this Agreement. Should any new treatments, community standards of care, drug classes or diagnostic tests be mandated by community health care standards, or should the County request a change that increases the scope of services and care in this Agreement, and NaphCare's increased service/care results in verifiable increases in cost to NaphCare, the parties agree to negotiate the price of any increased cost. Prior to such negotiation, NaphCare agrees to provide the County information sufficient to evaluate the scope and necessity of and any increase in cost.

NCHG 001553

## ARTICLE 2: PERSONNEL

2.1    Incorporation of NaphCare Proposal. NaphCare will provide medical, mental health, dental, technical and support personnel as necessary for the rendering of health care services to Inmates as contemplated herein.

2.2    Licensure, Certification and Registration of Personnel. NaphCare will ensure that all personnel provided or made available by NaphCare to render services hereunder shall be licensed, certified or registered, as appropriate, in their respective areas of expertise as required by applicable law. Further, NaphCare shall ensure that they are competent to do the work they do, perform only work within the scope of license, and are appropriately supervised. All licenses, certificates or registrations shall be in good standing. If requested by the County, NaphCare shall provide to the appropriate, designated officer or department a copy of the license, certificate or registration of personnel employed by NaphCare. LPNs will not independently perform assessments or formulate nursing care plans. Such assessments do no include fully programmed protocols (e.g. COWS) or order sets which do not require a nursing judgment and whose implementation is triggered by policy or a patient specific order. LPNs will not be relied upon as the primary responder to emergencies.

2.3    Minimal Staffing Levels. NaphCare will maintain a minimum nursing staffing level of three (3) RNs and two (2) LPNs (one Charge RN, One Intake RN, One Geiger RN, two Medication pass LPNs) at all times except with the prior approval of the Director/designee. It is the intent of the Director/designee to approve short term vacancies of these positions on an infrequent basis when, in the sole opinion of the Director/designee, the vacancy will not significantly impact safe operations. Neither the HSA nor DON may cover for any line position except for emergency call-outs or with the prior approval of the Director/designee.

2.4    County's Satisfaction with HealthCare Personnel. If County should become dissatisfied with any health care personnel provided by NaphCare, County will give written notice to NaphCare of its reasons for dissatisfaction, except as noted in Article 2.4(A), below. NaphCare agrees to cooperate with the County and respond to inquiries or complaints about its personnel, including lack thereof, or contractors in a timely manner. Should the County have security or other concerns about NaphCare's employee's and/or contractors' fitness or ability to perform at the Facility, NaphCare will exercise its best efforts to resolve the problem or other concerns, including lack of personnel. If a problem involving fitness or ability of a Naphcare Employee or Independent Contractor is not resolved to County's satisfaction NaphCare will remove the individual according to NaphCare's personnel policy or independent contractor agreement.

    A.   All NaphCare personnel, subcontractors, and agents shall meet minimum standards as determined by the County prior to receiving a security clearance to enter the Facility. If, at any time during the course of their employment or contract engagement, any NaphCare employee or subcontractor engages in conduct (either on or off duty) which threatens the security of the Facility or would otherwise render that person ineligible for a security clearance, notwithstanding any other provision of this Agreement, County reserves the right to withdraw that person's security clearance and shall immediately notify NaphCare.

    B.   Initial and continued assignment of staff and subcontractors by NaphCare shall be subject to approval of the County. All persons employed by NaphCare or its subcontractors shall not be deemed to be the employees of County by reason of any provision of this Agreement.

    C.   NaphCare shall continuously maintain personnel files (or copies thereof) of all NaphCare employees assigned to the Facility.

2.5    Subcontracting and Delegation. In order to satisfy its obligations hereunder, NaphCare will engage certain health care professionals as independent contractors rather than as employees, and County expressly

NCHG 001554

consents to such subcontracting or delegation within the limits specified in Article 2.4(A) above. As the relationship between NaphCare and these health care professionals will be that of independent contractor, NaphCare will not be considered or deemed to be engaged in the practice of medicine or other profession's practices by these professionals, and NaphCare will not exercise control over the manner or means by which these independent contractors perform their professional duties. However, these professional independent subcontractors shall indemnify and hold Spokane County harmless as well as comply with the insurance requirements specified in Article 8 of this Agreement. NaphCare shall provide proof of subcontractor insurance in the form of a Certificate of Insurance to the County upon request. Further, any actions/omissions of these independent contractors are still subject to indemnification by NaphCare as described in Article 8 herein.

2.6    Discrimination. During the performance of this Agreement, County, NaphCare, their employees, agents, subcontractors, and assignees agree as follows:

A.  No one will discriminate against any employee or applicant for employment because of race, religion, color, sex or national origin, except where religion, sex or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of the contractor. Each will agree to post in conspicuous places, available to employees and applicants for employment, notices setting forth the provisions of this nondiscrimination clause.

B.  All solicitations or advertisements for employees will state that NaphCare is an equal opportunity employer.

C.  Notices, advertisements and solicitations placed in accordance with federal law, rule or regulation shall be deemed sufficient for the purpose of meeting the requirements of this Article.

## ARTICLE 3: REPORTS AND RECORDS

3.1    Medical Records. NaphCare will utilize TechCare®, to  maintain a comprehensive, accurate medical record for each Inmate who has received health care services. Naphcare will implement an appropriate electronic and/or paper-based fail-safe system that will support seamless, continued, and safe, patient care in the event that TechCare®, becomes temporarily unavailable  These medical records will be maintained pursuant to applicable federal, state laws and regulations, and will be kept separate from the Inmate's confinement record. A copy of the applicable medical record will be available to accompany any Inmate who is transferred from the Facility to any other location where a copy of the record is required.. Medical records will be kept confidential, and NaphCare will follow the County's policy with regard to access by Inmates and Facility staff to medical records, subject to applicable law regarding confidentiality of such records.  No information contained in the medical records will be released by NaphCare except as provided by the County's policy, by a court order, or otherwise in accordance with applicable Federal, State laws and regulations.  Inmate medical records are and will remain the property of the County. Upon termination of this agreement, if the County does not continue to use TechCare®, NaphCare at its own cost, is responsible for arranging meaningful transfer of all clinical data within TechCare®, into the medical record software the County has chosen to use going forward, provided the software is capable of receiving the records. Barring a system outage, each patient's up-to-date medical record will be available to the County or its designee at all times.

3.2    Public Records Act. This Agreement and all public records associated with this Agreement shall be available from the County for inspection and copying by the public where required by the Public Records Act, Chapter 42.56 RCW (the "Act").  To the extent that public records then in the custody of the Contractor are needed for the County to respond to a request under the Act, as determined by the County, the Contractor agrees to make them promptly available to the County.  If the Contractor considers any portion of any record provided to the County under this Agreement, whether in electronic or hard copy form, to be protected from disclosure under law, the Contractor shall clearly identify any specific information that it claims to be confidential or proprietary.  If the County receives a request under the Act to inspect or copy the information so identified by

5

the Contractor and the County determines that release of the information is required by the Act or otherwise appropriate, the County's sole obligations shall be to notify the Contractor (a) of the request and (b) of the date that such information will be released to the requester unless the Contractor obtains a court order to enjoin that disclosure pursuant to RCW 42.56.540. If the Contractor fails to timely obtain a court order enjoining disclosure, the County will release the requested information on the date specified.

The County has, and by this section assumes, no obligation on behalf of the Contractor to claim any exemption from disclosure under the Act. The County shall not be liable to the Contractor for releasing records not clearly identified by the Contractor as confidential or proprietary. The County shall not be liable to the Contractor for any records that the County releases in compliance with this section or in compliance with an order of a court of competent jurisdiction.

3.3   Quality Assurance. In order to assure compliance with all the terms of this contract, the County retains the right to review all non-proprietary documents used to conduct health care operations at the Facility with reasonable notice, either via County employees or its agent(s). The County also retains the right to have its employees or agent(s) review patient medical records at anytime without notice, in a manner consistent with Federal and State laws and regulations. To that end, NaphCare shall provide independent on-site and remote read-only access to TechCare® to the County's employees or its agent(s). The County or its agent(s) may conduct formal audits of specific performance indicators as described in Exhibit D on a quarterly basis. Such audit may include review of documents chosen/sampled by the County in a manner and quantity chosen by the County, including random and purposive methods. NaphCare is expected to perform at, or better than, the minimal threshold described in Exhibit D. Performance below the specified level may result in application of penalties as specified in Exhibit D. The County will provide NaphCare the list of patient names, dates of events, and explanations for all audits with fiscal impact. NaphCare will have the opportunity to review and contest the results of any of these audits. Such contest must be communicated to the County within 30 days of receipt and include specific items with which it disagrees. The County will take this input under advisement and make any appropriate adjustments to the audit results. The County's decisions and adjustments are final. The existence of Exhibit D and penalties for failure to perform key elements of care at a minimal level does not imply that the County finds it acceptable for the vendor to perform below these levels as long as the vendor pays the associated penalties.   Severe, repeated or chronic failures to satisfy performance indicators may, at the sole discretion of the County, constitute cause for termination of this agreement pursuant to the provisions of Article6.2 (B).

3.4   HIPAA and HITECH Compliance. The parties shall comply with all requirements of the Federal Health Insurance Portability and Accountability Act of 1996 (HIPAA) and the Federal Health Information and Technology for Economic and Clinical Health Act (HITECH Act) as applicable, which relate to the Parties' responsibilities under this Agreement. The Parties agree to comply with the provisions set forth in the HIPAA Business Associate Agreement attached hereto as Exhibit C. This paragraph will survive termination of this Agreement, regardless of the reason for termination.

3.5   Regular Reports by NaphCare to the County. NaphCare shall provide to the County, on a date and in a form mutually acceptable to NaphCare and the County, reports relating to care and services rendered under this Agreement.   Such reports shall be submitted on a regular, periodic, or on an as-requested basis, to be determined by the mutual agreement of NaphCare and the County.

3.6   Inmate Information. In order to assist NaphCare in providing the best possible health care services to Inmates, the County will provide NaphCare with information pertaining to Inmates that NaphCare and the County mutually identify as reasonable and necessary for NaphCare to adequately perform its obligations hereunder, which shall include allowing NaphCare access to the Facility's Inmate information management system as it relates to pertinent information that may assist NaphCare in rendering necessary medical, mental health and/or dental care to Inmates housed within the Facility.   NaphCare will provide the Facility with

NCHG 001556

information pertaining to Inmates identified by the County on a need-to-know basis to maintain the safety of the Facility.

3.7    NaphCare Records Available to the County with Limitations on Disclosure. In addition to the exchange of Inmate information under    Articles 3.1 and 3.3, NaphCare shall make available to the County, at the County's request and at no cost, all records, documents and other papers relating to the direct delivery of health care services to Inmates hereunder if the delivery of health care services to an Inmate is an issue in any public records request, claim or litigation by or against the County, NaphCare, or their agents, contractors, or employees within five (5) days of such request.  Failure to provide the requested information will result in penalties paid at the actual cost (see Exhibit D).  The County understands that many of the systems, methods, procedures, written materials, computer programs and other controls employed by NaphCare in the performance of its obligations hereunder are proprietary in nature and will remain the property of NaphCare. During the term of this Agreement and after its termination, information and/or documentation concerning this proprietary material may not be used, distributed, copied, or otherwise utilized by the County except as required by law or Court Order.

3.8    County's Records Available to NaphCare with Limitations on Disclosure. During the term of this Agreement, and for a reasonable time thereafter, the County will provide NaphCare, at NaphCare's request, the County's records relating to the provision of health care services to Inmates as may be reasonably requested by NaphCare or as are pertinent to the investigation or defense of any claim related to NaphCare's conduct and performance. Consistent with applicable law, the County will make available to NaphCare such records as are maintained by the County, hospitals and other outside health care providers involved in the care or treatment of Inmates, to the extent the County has any control over those records, as NaphCare may reasonably request. Any such information provided by the County to NaphCare that the County considers confidential shall be kept confidential by NaphCare and shall not, except as may be required by law or court order, be distributed to any third party without the prior written approval of the County. NaphCare shall notify the Director/designee and seek approval of any NaphCare media official statements that may effect the County.

## ARTICLE 4: SECURITY

4.1    General. NaphCare and the County understand the importance of security services to the safety of the agents, employees and subcontractors of NaphCare as well as for the security of Inmates and the County's staff, consistent with the correctional setting. Accordingly, both the County and NaphCare will cooperate with each other in addressing security issues. The County will use reasonable efforts to provide sufficient security to enable NaphCare and its personnel to safely and adequately provide the health care services described in this Agreement, however, nothing herein shall be construed to make the County, its deputies or employees a guarantor of the safety of NaphCare's employees, agents or subcontractors, including their employees.

4.2    Security Override. In the event that NaphCare recommends health care services for any Inmate or NaphCare recommends that an Inmate be sent off-site for medical services, the County will not override NaphCare's health care recommendations unless the transport poses a risk to the safety of the community, Facility staff or the Inmate(s).

4.3    Security During Transportation Off-Site. The County will provide security in connection with the transportation of any Inmate between the Facility and any other location for off-site services.

## ARTICLE 5: OFFICE SPACE, EQUIPMENT, INVENTORY AND SUPPLIES

5.1    General. The County agrees to provide NaphCare with office space, equipment, and utilities at the Facility sufficient to enable NaphCare to perform its obligations pursuant to this Agreement. County shall be responsible for providing substitute space, if reasonably available and necessary, as mutually agreed by both

NCHG 001557

parties should NaphCare recommend that the designated Facility are inadequate for the purposes hereof or that the designated medical Facility become unsafe for any reason.

5.2   Information Technology. Contractor will install, maintain, and support an information technology infrastructure within the Facility. This infrastructure will be utilized only by Contractor's staff and authorized County personnel to support the provision of healthcare services within the Facility. To the extent property belonging to the County is required to be utilized by NaphCare personnel or other authorized personnel, said property shall be equipped to operate NaphCare's TechCare® system.

5.3   Delivery of Possession. The County will provide to NaphCare, beginning on the date of commencement of this Agreement, the use of all supplies, medical equipment, and office equipment in place at the Facility health care unit which are the County's property or in the possession of the County. At the termination of this Agreement, NaphCare will return to the County possession and control of all medical equipment and office equipment, in working order, reasonable wear and tear excepted, which were in place at the Facility's health care unit prior to the commencement of services under this Agreement. Any equipment and/or supplies belonging to the County will remain the property of County and any equipment supplied or purchased by NaphCare shall remain the property of NaphCare at the termination of the Agreement.

5.4   Equipment. NaphCare will be responsible for the cost of new and/or replacement equipment needed to safely provide patient care. NaphCare will be responsible for ongoing repair and maintenance of all medical equipment.

5.5   General Maintenance Services. The County will provide for each Inmate receiving health care services the same services and Facility provided by the County for all Inmates at the Facility including, but not limited to, daily housekeeping services, dietary services, building maintenance services, personal hygiene supplies and services, and linen supplies.

## ARTICLE 6: TERM AND TERMINATION OF AGREEMENT

6.1   Term. This Agreement shall commence at 12:00 A.M. on July 1, 2017 through June 30, 2018, unless terminated as provided elsewhere in this Agreement. This Agreement shall be renewed automatically for six (6) additional one year terms beginning July 1, 2018, unless either party gives notice of non-renewal not less than 90 days prior to the expiration of any one year term.

6.2   Termination. Notwithstanding the provisions of Article 6.1, this Agreement may be sooner terminated on the first to occur of the following:

A. By mutual agreement.

B. Termination for Cause. The County shall give notice to NaphCare that NaphCare has materially defaulted in the performance of any of its obligations hereunder and such default shall not have been cured within thirty (30) days following the giving of such notice in writing, the party giving notice shall have the right to immediately terminate this Agreement. At the option of the County, the County may require NaphCare to assume liability for any and all damages, including excess of re-procuring similar products or services.

C. Termination Without Cause. Either party may terminate this Agreement without cause by providing not less than ninety (90) days prior written notice. Notice hereunder shall be provided pursuant to Article 9.3 of this Agreement.

6.3   Responsibility for Inmate Health Care. Upon termination or expiration of this Agreement, all responsibility for providing on-site health care services to all Inmates will be immediately transferred from NaphCare to the County.

NCHG 001558

6.4    Payment for Services Performed.  In the event that this Agreement is terminated for any reason, the County agrees to pay NaphCare for services actually performed through the date of termination.

## ARTICLE 7: COMPENSATION

7.1.    Base Compensation.  County will pay NaphCare annual sum of $6,113,656.68 payable in equal monthly installments of $509,471.39.  NaphCare will bill County by the first day of the month for which services will be rendered, and County agrees to pay NaphCare on or before the last day of the month in which services are rendered. In the event this Agreement should terminate on a date other than the end of a calendar month, compensation to NaphCare will be pro-rated accordingly for the shortened month.

Upon each annual anniversary year of the Agreement, NaphCare's pricing will be as follows:

| NaphCare Pricing | Monthly | Annual |
|---|---|---|
| Renewal Year 1 | $524,755.53 | $6,297,066.38 |
| Renewal Year 2 | $540,498.20 | $6,485,978.37 |
| Renewal Year 3 | $556,713.14 | $6,680,557.72 |
| Renewal Year 4 | $573,414.54 | $6,880,974.45 |
| Renewal Year 5 | $590,616.97 | $7,087,403.69 |
| Renewal Year 6 | $608,335.48 | $7,300,025.80 |

7.2    Taxes.  NaphCare understands and acknowledges that the County will not withhold Federal or State income taxes. Where required by State or Federal law, NaphCare authorizes the County to make withholding for any taxes other than income taxes (i.e., Medicare). All compensation received by NaphCare will be reported to the Internal Revenue Service at the end of the calendar year in accordance with the applicable IRS regulations. It is the responsibility of NaphCare to make the necessary estimated tax payments throughout the year, if any, and NaphCare is solely liable for any tax obligation arising from NaphCare's performance of this Agreement. NaphCare hereby agrees to indemnify the County against any demand to pay taxes arising from NaphCare's failure to pay taxes on compensation earned pursuant to this Agreement.

NaphCare will collect sales and use taxes imposed on goods or services acquired hereunder as required by law within their contracted rate. NaphCare must pay all taxes including, but not limited to: Business and Occupation Tax, taxes based on NaphCare's gross or net income, or personal property to which the County does not hold title. The County is exempt from Federal Excise Tax.

## ARTICLE 8: LIABILITY AND RISK MANAGEMENT

8.1 Insurance.  NaphCare shall furnish and maintain all insurance as required herein and comply with all limits, terms and conditions stipulated therein, at their expense, for the duration of the contract. Following is a list of requirements for this contract. Any exclusion that may restrict required coverage must be pre-approved by the Spokane County Risk Management Department. NaphCare's insurer shall have a minimum A.M. Best's rating of A-VII and shall be authorized to do business in the State of Washington. Evidence of such insurance shall be submitted to the Spokane County Purchasing Department and consist of a completed and signed copy of the certificate of insurance and required policy endorsements. The insurance policy or policies will not be canceled, materially changed or altered without forty-five (45) days prior notice submitted to the Detention Services Director or designee. The policy shall be endorsed and the certificate shall reflect that the County of Spokane is an additional named insured on the Contractor's general liability policy with respect to activities under the contract. The policy shall provide and the certificate shall reflect that the insurance afforded applies separately to each insured against whom claim is made or suit is brought except with respect to the limits of the company's liability.

9

NCHG 001559

8.1.1  The policy shall be endorsed and the certificate shall reflect that the insurance afforded therein shall be primary insurance and any insurance or self-insurance carried by the County shall be excess and not contributory insurance to that provided by NaphCare.

8.1.2  NaphCare shall not commence work, nor shall NaphCare allow any subcontractor to commence work on any subcontract until a Certificate of Insurance with additional insured endorsement, meeting the requirements set forth herein, has been approved by Spokane County Risk Management Department and filed with the Detention Services Director or designee. Upon request, NaphCare shall forward to the Spokane County Risk Management Department the original policy, or endorsement obtained, to NaphCare's policy currently in force.

8.1.3  Failure of NaphCare to fully comply with the insurance requirements set forth herein, during the term of the Agreement, shall be considered a material breach of contract and cause for immediate termination of the Agreement at the County's discretion.

8.1.4  Providing coverage in the amounts listed shall not be construed to relieve NaphCare from liability in excess of such amounts.

8.2    Required Coverage. The insurance shall provide the minimum coverage as set forth below:

8.2.1  General Liability Insurance.  NaphCare shall have Commercial General Liability with minimum limits of $1,000,000 per occurrence, $3,000,000 aggregate which includes general aggregate, products, completed operation, personal injury and fire damage.

8.2.2  Proof of Automobile Insurance.  NaphCare shall carry, for the duration of this Agreement, comprehensive automobile liability coverage of $1,000,000 for any vehicle used in conjunction with the provision of services under the terms of this Agreement. Said policy shall provide that it shall not be canceled, materially changed, or renewed without forty five (45) days written notice prior thereto to Spokane County.

8.2.3  Workers Compensation.  When NaphCare has employees of the company, NaphCare shall carry Worker's Compensation Industrial Injury Insurance coverage and effective in Washington State. Proof of insurance shall be reflected on NaphCare's Certificate of Insurance or by providing NaphCare's State Industrial Account Identification Number.

8.2.4  Professional Liability Insurance. NaphCare shall provide errors & omissions coverage in the form of Professional liability insurance coverage in the minimum amount of $1,000,000 per medical incident, $3,000,000 per annual aggregate per physician/dentist or other contracted insured and $5,000,000 per annual aggregate for corporate ancillary personnel.

8.2.5  Additional Insured Endorsement.  General and Professional Liability Insurance must state that Spokane County, it's officers, agents and employees, and any other entity specifically required by the provisions of this Agreement will be specifically named additional insured(s) for all coverage provided by this policy of insurance and shall be fully and completely protected by this policy from all claims. Language such as the following should be used "Spokane County, It's Officers, Agents And Employees Are Named Additional Insured."

8.3    Hold Harmless.  To the fullest extent permitted by law, NaphCare agrees to indemnify, defend and hold harmless the County, its agents, officers and employees, from and against all loss or expense, including but not limited to reasonable attorney's fees, for bodily injury, including death, and property loss or damage arising out of any wrongful act, deliberate indifference, negligence, or omission of NaphCare, its agents, employees or

10

subcontractors. NaphCare will have no obligation to indemnify, defend and hold harmless the County, its agents, officers and employees for any injury or damage cause by or resulting from or caused by a negligent act, or omission of the County, its agents, employees or subcontractors. NaphCare's obligations pursuant to this provision will not apply to any claim, liability, cost or expense incurred in connection with treatment of any Inmate's injury if such treatment occurred prior to the Inmate's custody by the County or at any time the Inmate was outside the County's custody. NaphCare's obligations pursuant to this provision will not apply to any claim, liability, cost or expense solely caused by the acts or omissions of any of the County officers, agents, or employees which prevent an Inmate from receiving medical care as directed by NaphCare. The County shall promptly notify NaphCare of any incident, accident, claim or lawsuit of which the County becomes aware that does or may potentially involve NaphCare, and shall fully cooperate in the defense of such claim. NaphCare may retain sole control of the defense while the action is pending should it so choose. NaphCare further agrees to indemnify, defend and hold harmless the County, its agents, officers and employees from and against all claims or liability for compensation arising out of injuries sustained by any employee or agent or subcontractor or subcontractor's employee of NaphCare. This provision shall survive the termination or expiration of this Agreement.

8.4    Indemnity. County agrees, to the extent permitted by law to indemnify, defend and hold harmless NaphCare or any of its agents, officers and employees, from and against all loss or expense, including but not limited to reasonable attorneys fee(s), for bodily injury, including death, and property loss, damage or unfair labor or employment practices claims solely resulting from or caused by a negligent act or omission by County or its employees or agent. This provision shall survive the termination or expiration of this Agreement.

## ARTICLE 9: MISCELLANEOUS

9.1    Independent Contractor Status. The parties acknowledge that NaphCare is an independent contractor. Nothing in this Agreement is intended, nor shall be construed to create, an agency relationship, an employer/employee relationship, or a joint venture relationship among the parties.

9.2    Assignment and Subcontracting. Except as provided in Article 2.6, NaphCare shall not assign this Agreement, or any of its rights or obligations under this Agreement, without the express written consent of the County. The parties hereby agree that various independent contractors serving as medical providers will be utilized in carrying out the obligations contained in this Agreement.

9.3    Notice. Unless otherwise provided herein, all notices or other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given if delivered personally in hand or sent by certified mail, return receipt requested, postage prepaid, and addressed to the appropriate party at the following address or to any other person at any other address as may be designated in writing by the parties:

NaphCare:        James S. McLane
                 Chief Executive Officer
                 NaphCare, Inc.
                 2090 Columbiana Road, Suite 4000
                 Birmingham, Alabama 35216

County:          Spokane County Detention Services
                 Attn: John C. McGrath, Director
                 1100 West Mallon Avenue
                 Spokane, WA  99260

9.4    Governing Law and Venue. This Agreement and the rights and obligations of the parties hereto shall be governed by, and construed according to, the laws of the State of Washington. Any litigation arising out of this

11

Agreement shall be brought in a State Court in Spokane County, Washington and/or in the United States District Courts in the Eastern District of Washington.

9.5    Amendment. This Agreement may be amended or revised if approved by authorized parties, only in writing, and signed by all parties to this Agreement.

9.6    Waiver of Breach. The waiver by any party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to be, a waiver of any subsequent breach of the same or other provision hereof.

9.7    Other Contracts and Third-Party Beneficiaries. The parties agree that they have not entered into this Agreement for the benefit of any third person or persons, and it is their express intention that the Agreement is intended to be for their respective benefit only and not for the benefit of any non-party who might otherwise claim to be deemed to constitute a third-party beneficiary hereof.

9.8    Severability. In the event any provision of this Agreement is held to be unenforceable for any reason, the unenforceability thereof shall not affect the remainder of the Agreement, which shall remain in full force and effect.

9.9    Force Majeure. Neither party shall be held responsible for any delay or failure in performance, other than payment obligations and provision of medical, mental health, dental, and nursing services, to the extent that such delay or failure is caused by fire, riot, flood, explosion, war, strike, embargo, government regulation, civil or military authority, or act of God.

9.10    Effect of This Agreement. This Agreement, including the attachments, and documents previously incorporated herein as the Proposal and Exhibits, constitutes the complete understanding between the Parties with respect to the terms and conditions set forth herein and supersede all previous written or oral agreements and representations. This Agreement may be modified only in a writing that expressly references this Agreement and is executed by all of the parties hereto.

9.11    Survival. The provisions of this Agreement pertaining to the obligation to pay for services rendered pursuant to this Agreement shall survive the termination of this Agreement.

9.12    TechCare®. NaphCare will provide its proprietary electronic medical records software system ("software") commonly referred to as "TechCare®" for use in the Facility. NaphCare shall maintain ownership of this software and the County shall be entitled to quantitative and select information as required by the County. At the termination or expiration of this Agreement, NaphCare shall remove the software. All Inmate medical information contained by the software should be provided to the County in some media format acceptable to the County's new provider.

The County agrees that it will not:

(i)    Lease, loan, resell, sublicense or otherwise distribute the software to parties who are not Spokane County governmental entities;

(ii)    Permit third-party access to, or use of, the software, except as permitted in within this Agreement;

(iii)    Create derivative works based on the software;

(iv)    Reverse engineer, disassemble, or decompile the software; or

(v)    Remove any identification or notices contained on the software.

9.12.1 The County and/or Facility will notify NaphCare in the event either party becomes aware of any unauthorized third-party access to, or use of, the software.

12

NCHG 001562

9.12.2 NaphCare shall be responsible for providing a firewall, maintenance, backup data, virus corruption, and licenses for this software.

9.13    Enforcement. In the event any party incurs legal expenses or costs to enforce the terms of this Agreement, each party shall be responsible for its own costs.

9.14    Compliance with Laws. The Parties hereto expressly acknowledge that it has been, and continues to be, their intent to comply fully with all Federal, State and local laws, Court Orders, rules, and regulations. In the event of any legislative or regulatory change or determination, whether federal or state, that has or would have a significant adverse impact on either party thereto in connection with the performance of its obligations, or should any party be deemed for any reason to be in violation of any statute or regulation arising from this Agreement, this Agreement shall be renegotiated to comply with the applicable provisions of then current law.

9.15    Confidentiality. It is understood that in the course of the engagement established under this Agreement, each party may learn of or obtain copies of confidential or proprietary software, systems, manuals, documents, protocols, procedures, or other materials developed by or belonging to the other party, and not generally available to the public (hereinafter referred to as "Confidential Information"). All Confidential Information shall be and remain the property of the party originally having ownership thereof. Neither party will, without the express written consent of the other party, use the Confidential Information of the other party, except as expressly contemplated by this Agreement, and the receiving party shall cease all use of the other party's Confidential Information upon the termination or expiration of this Agreement. Except as required by law or legal process, each party shall maintain the confidentiality of the Confidential Information provided hereunder, and shall not disclose such information to third parties. This provision shall survive the termination or expiration of this Agreement.

9.16    Execution and Approval. The parties warrant that the officers/individuals executing below have been duly authorized to act for an on behalf of the parties for the purposes of confirming this Agreement.

9.17    Payment of Taxes. NaphCare shall be solely responsible for paying any and all taxes associated with its business as it concerns this Agreement, including but not necessarily limited to income and social security taxes.

9.18    Inconsistency between Documents. In the event there is an inconsistency between the provisions of this Agreement, exclusive of Exhibit A, and Exhibit B as to the responsibilities of NaphCare, the broader responsibility shall govern.

9.19    Headings. The section headings appearing in this Agreement have been inserted solely for the purpose of convenience and ready reference. In no way to they purport to, and shall not be deemed to define, limit or extend the scope of intent of the sections to which they pertain.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date opposite their respective signature block, with the effective date being the date of the lasts signature.

DATED: 6/30/2017

BOARD OF COUNTY COMMISSIONERS
OF SPOKANE COUNTY, WASHINGTON

AL FRENCH, Chair

13

NCHG 001563

ATTEST:

_____
Ginna Vasquez
Clerk of the Board

DATED: _____

JOSH KERNS, Vice-Chair
_____

SHELLY O'QUINN, Commissioner
_____

NAPHCARE, INC.

_____
By: James S. McLane
Its: Chief Executive Officer

14

NCHG 001564

## EXHIBIT A
## SCOPE OF WORK

NaphCare's Responsibilities:

A. NaphCare shall provide health care services as outlined in Exhibit B on behalf of Spokane County Detention Services for Inmates physically in the custody and housed in the Spokane County Jail located at 1100 W. Mallon, Spokane, WA 99260 and Geiger Corrections Center located at 3507 S. Spotted Rd., Spokane, WA 99260, as well as emergency care to Facility staff and visitors at these locations.

B. NaphCare shall operate health care services in an ethical and humane manner which respects patient right to privacy within the unavoidable limitations of a custodial environment.

C. NaphCare shall provide services that meet all legal and community standards for correctional health care and be consistent with the National Commission on Correctional Health Care (NCCHC) standards.

D. NaphCare shall develop and provide to the County for review and approval comprehensive written policies and procedures that meet legal and community standards for quality of care in a correctional setting. All policies of NaphCare that involve responsibility of County staff shall be negotiated and reviewed at least annually. The rights and ownership of policies, procedures, and printed materials produced specifically for Spokane County under the Scope of Work for this Agreement shall be vested in the County. Subsequent changes to or new policies will be provided to the County for approval prior to going into effect.

E. NaphCare shall operate the health care program in a cost-effective manner with full reporting and accountability to the Director of Spokane County Detention Services or his/her designee.

F. NaphCare agrees to participate in cross training with Facility staff and when necessary provide training to Facility staff in the effective use of clinical services or other related health care operations.

G. Any Inmates referred to medical at initial screening shall be seen by at a minimum a Registered Nurse ("RN") who has been properly trained and approved by the facility medical director to perform screenings. At least one RN shall be assigned to handle booking health care screenings at all times. From time to time, during exceptionally high volume periods, the RN may be assisted by an Licensed Practical Nurse (LPN) provided that the RN provides direct (in person) supervision, reviews all work performed by the LPN prior to the patient leaving the booking area, and personally conducts further evaluation of the patient if necessary. The content of the screening shall be in accordance with the most current NCCHC Standards. Any significant findings during the initial screening process will result in a follow-up visit with a practitioner in a clinically appropriate timeframe (see Exhibit D, Performance Indicators, for details). All diversions for medical reasons at booking will be tracked and reported to the County and reviewed through a quality improvement process jointly staffed by the County and NaphCare.

H. Within 14 days of arrival, a practitioner shall perform a Health Assessment on all Inmates. An RN may perform this function if s/he has been appropriately trained and credentialed by NaphCare to perform history and physical examinations. The content of the screening shall be in accordance with the most current NCCHC Standards. If performed by an RN, any significant findings will result in a follow-up visit with a physician in a clinically appropriate timeframe.

I. Management of withdrawals. Inmates determined to be at risk for withdrawal will be administered a comprehensive assessment and if determined to be in withdrawal, shall be housed in a designated area if available and will be managed, after consultation with a practitioner, according to NaphCare's policies

15

NCHG 001565

and procedures for alcohol withdrawal (commonly referred to as Clinical Institute Withdrawal Assessment for Alcohol- "CIWA") and opiate withdrawal (commonly referred to as Clinical Opiate Withdrawal Scale- "COWS"). Inmates presenting with a risk of withdrawal, but no current evidence of withdrawal, will be monitored based on clinical indication as determined by CIWA and/or COWS. If such a patient develops evidence of withdrawal or other symptoms, the patient will be managed after consultation with a practitioner, according to NaphCare's policies and procedures. Only licensed practitioners can remove someone from withdrawal protocol in less than 48 hours. A log of the status of all Inmates being monitored for any withdrawal will be kept. All Inmates are assessed for suicide risk at intake, including those with withdrawal issues.

J.  NaphCare will conduct an adequate number of dental clinics to assure that Inmate problems are treated in a clinically appropriate time frame. NaphCare will provide all medically necessary dental care, including, but not limited to pain relief, treatment of infections and periodontitis, extractions, and temporary restorations.

K.  NaphCare clinical staff will conduct and document daily welfare checks on all Inmates in any cell designated by the County as an isolation cell.

L.  NaphCare will be responsible for scheduling (coordinated with custody staff who will be responsible for transport) for all medically necessary outside appointments.

M.  Transfer to Other Facilities. NaphCare will be notified by the Facility as soon as possible of any planned transfers to other correctional facilities. Prior to transfer, NaphCare will prepare a copy of an individual health record for any Inmate being sent to another correctional facility. If necessary for safe continuity of care, the nurse and/or practitioner will make oral contact with their counterparts at the receiving facility. If transfer occurs without notification to NaphCare, the preceding steps will be taken as soon as NaphCare learns of the transfer.

N.  NaphCare shall integrate its services with the existing Facility mental health providers including maintaining shared medical records in TechCare®, continuing current verified psychiatric medications as medically indicated at booking, and initiating treatment with psychotropic medication for uncomplicated psychiatric conditions consistent with community standards for primary care practitioners.

O.  NaphCare shall be responsible as the agent of the County, for purchasing medical supplies necessary to comply with this Agreement.

NaphCare will provide the TechCare® Daily Report and a monthly Health Services Report ("HSR") detailing clinical statistics related to the Facility. NaphCare's TechCare® system can generate up to 100 reports that provide pertinent, meaningful information for the first year of the contract term. NaphCare will provide such reports promptly at no charge to the County. These reports will include, but not be limited to:

1.  All patient trips data: patient name, identification number, date of birth, date of trip, provider or facility visited, type of provider (e.g. cardiologist, ER, hosp adm, etc.); for ER/urgent care trips, also include: initial reason for referral, mode of transportation; for hospitalizations, also include: date of release.

2.  All patients monitored for and/or treated for intoxication, withdrawal, risk of withdrawal data: patient name, identification number, date of birth, date treatment or monitoring began.

16

NCHG 001566

3. All patients newly diagnosed with or suspected of skin or soft tissue infection (SSTI) or other communicable/sexually transmitted infections or ectoparasites data: patient name, identification number, date of birth, nature of infection (e.g. abscess scalp, diarrhea, TB, etc.). Note: this report includes suspected communicable infections, even if no antibiotics were given or no culture was obtained; the report does not need to (but may) contain infections which are not typically communicable.

4. All patients seen for a scheduled encounter in the jail health services data: patient name, identification number, date of visit, nature of visit (episodic care, chronic care maintenance, wound care, etc.), discharging professional (i.e. RN or practitioner responsible for determining the next plan of care).

5. All requests for urgent or emergent care (if it is easier for NaphCare, this information may be included in the previous report, appropriately labelled) data: patient name, identification number, date of request, location of patient at time of request, discharging professional (i.e. RN or practitioner responsible for determining the next plan of care).

6. All patients currently being followed on a regular basis for a chronic disease data: patient name, identification number, date of admission, chronic disease condition, for mental health diagnoses whether or not the patient is on the mental health caseload.

P. Following the initial one year modification of the TechCare® system to fit the operations and layout of the County, any additional reports exceeding the 100 report threshold which are requested by the County after the first year of the contract term, will be invoiced by NaphCare to County at a rate of $175.00 per hour.

Q. NaphCare shall initiate its system ensuring that quality is continuously monitored and appropriate corrective actions are taken as indicated. The County maintains the right to audit health care issues either via County staff or its agent(s). Any deficiencies noted via audit will result in a written plan of corrective action by NaphCare.

R. NaphCare shall adhere to Spokane County Detention Services security policies and procedures.

S. NaphCare shall provide a monthly staffing schedule to the designated contact for Detention Services.

T. NaphCare shall designate one person as its Authorized Representative. NaphCare's Authorized Representative shall be present at the facility as is necessary to assure satisfactory performance of this Agreement.

U. All proposed NaphCare employees must undergo a background check conducted by Spokane County Detention Services prior to starting work in the facility. The County will notify NaphCare if any proposed employee is not approved for work in the facility. If an employee is refused clearance for assignment to the Jail and/ or Geiger, NaphCare shall be notified and given thirty (30) days to find a replacement.

V. NaphCare shall provide a local representative to attend management meetings as set forth by the Detention Services Director or designee.

W. All records of NaphCare bearing upon medical services operations on the County's premises shall be maintained by NaphCare. The County shall have the right to inspect, at any time during business hours, records that pertain to this Agreement. Records shall be kept on file for three (3) years, or for such other

NCHG 001567

period of time as may be required by the County after the end of this Agreement. The County shall have the right to conduct reviews and inspections of the medical services operations.

X. NaphCare shall comply with all Federal, State and Local laws, regulations and requirements applicable to the services and operations provided herein, and applicable Federal and State wage and hour requirements. NaphCare shall obtain any and all licenses or permits necessary for the provision of medical services on the premises, as direct cost of operation, except those that may be imposed by the County to bring up to code the facilities, whereby the County shall be responsible. Upon request, NaphCare shall provide copies of all staff/facility licensure that NaphCare maintains.

Y. NaphCare will assist with performing the initial mental health screenings on Inmates and refer any to medical if it is determined that the Inmate requires medical attention.

County Responsibilities:

A. Maintain supportive Facility mental health services professionals (i.e., LCSW, MSW, MHP). County Mental Health professionals will integrate its services with NaphCare including maintaining shared medical records.

B. Ensure mental health professionals utilize NaphCare's TechCare® software system to ensure continuity of care.

C. Spokane County Detention Services will provide custody staff to transport Inmates to scheduled outside appointments and NaphCare will work with designated custody staff to assure these appointments are kept in a manner that respects both the needs of the Inmate and the security concerns of the Facility staff.

D. When transportation for off-site care by Facility staff in a Facility vehicle is medically appropriate, transportation will be the responsibility of the County.

E. Adequate heat, lights, ventilation, and all other utilities as well as repairs and maintenance of County medical equipment or County-owned equipment, and office supplies (i.e., county forms, copy paper, etc., long distance phone calls, Language Line interpreter services, medical hazardous waste disposal, and provision of PC's at each work station, copy and fax machine for use by NaphCare). The County shall not be responsible for maintenance of NaphCare equipment. The County shall not permit any interruptions in utility service, except in emergency circumstances reasonably beyond the control of the County, for necessary repairs, or for improvement of the service, and in such case the County agrees to notify NaphCare as soon as reasonably possible of any interruption or proposed interruption in utility service.

F. Extermination services and the removal of trash and garbage from the clinic.

G. General maintenance to the building structure including, but not limited to, the maintenance of water, gas, sewer, ventilation, lighting, air conditioning, refrigeration, duct work, floor coverings, wall and ceiling surfaces. Shall be responsible for all equipment, floor drains, light fixtures, and other such building maintenance as may be reasonably required by the County.

H. Security, control and limitation of Inmate movement in, to and from the medical clinic, including physical security of employees, suppliers, and other authorized visitors.

NCHG 001568

I.  The Detention Services Director, or designee, shall be the Authorized Representative under NaphCare for issues pertaining to the facility.

J.  Provide, at its expense, criminal history background check of NaphCare employees/subcontractor(s).

K.  County shall provide necessary space for medical services for NaphCare's use. The County will provide access to the necessary data, and other technology that is in existence at the time the Agreement is executed.

L.  County shall provide four (4) parking spaces for NaphCare's Health Services Administrator, Director of Nursing, Medical Director and for a Nurse Practitioner.

M. NaphCare and County will confer 90 days prior to end of first term to discuss any issues surrounding Agreement services.

NCHG 001569

**EXHIBIT B**
**NAPHCARE'S RESPONSE TO COUNTY'S RFP P10051**

NCHG 001570

# EXHIBIT C
## BUSINESS ASSOCIATE AGREEMENT

THIS BUSINESS ASSOCIATE AGREEMENT (the "*BAA*") is made and entered into between NaphCare, Inc. ("*NaphCare*"), and the party identified on the signature page of this BAA ("*Customer*").

Customer is a Covered Entity, or is a Business Associate to one or more Covered Entities, that possesses information about individuals that is protected under the Health Insurance Portability and Accountability Act of 1996, the Health Information Technology for Economic and Clinical Health Act (commonly referred to as the "HITECH Act"), and the regulations promulgated under the foregoing from time to time by the United States Department of Health and Human Services (collectively, as amended from time to time, "*HIPAA*").

Customer and NaphCare have entered into one or more agreements (collectively, the "*Agreement*") pursuant to which NaphCare will provide certain services to Customer (the "*Services*"), and in the course of providing the Services, Customer may make available to NaphCare or have NaphCare obtain or create on its behalf information that may be deemed protected health information subject to the provisions of HIPAA.

In order to comply with the applicable provisions of HIPAA, the parties agree as follows:

### 1. Definitions.

1.1 Capitalized terms used but not otherwise defined in this BAA shall have the meanings ascribed in HIPAA (whether or not such terms are capitalized therein).

1.2 "*Effective Date*" means the date indicated on the signature page of this BAA or, if later, the first date upon which NaphCare receives or creates PHI.

1.3 "*PHI*" means Protected Health Information received by NaphCare from or on behalf of Customer or created by NaphCare for or on behalf of Customer.

### 2. Permitted Uses. NaphCare may use PHI only as permitted or required by this BAA for the following purposes:

(i) as necessary to provide the Services;

(ii) to carry out its legal responsibilities;

(iii) for the proper business management and administration of NaphCare;

(iv) to provide Data Aggregation services relating to the Health Care Operations of Customer to the extent, if any, necessary or requested pursuant to the Services; and

(v) as Required By Law.

### 3. Permitted Disclosures. NaphCare may disclose PHI only as permitted or required by this BAA for the following purposes:

(i) as necessary to provide the Services;

(ii) for the proper business management and administration of NaphCare or to carry out its legal responsibilities, if NaphCare has obtained reasonable assurances that the recipient will (A) hold such PHI in confidence, (B) use or further disclose it only for the purpose for which it was received or as Required By Law, and (C) notify NaphCare of any instance of which the recipient becomes aware in which the confidentiality of such PHI has been breached;

(iii) for the proper business management and administration of NaphCare or to carry out its legal responsibilities, if Required By Law; and

(iv) as otherwise Required By Law;

provided, however, that any disclosure to an agent or subcontractor of NaphCare shall be pursuant to a written agreement between NaphCare and such agent or subcontractor containing substantially the same restrictions and conditions on the use and disclosure of PHI as are set forth in this BAA.

### 3.1 Transfer of PHI.

NaphCare and/or Customer may transfer PHI via encrypted or secure email or via other means permitted by law. Said transfer shall only disclose the minimum necessary PHI.

### 4. Prohibited Uses and Disclosures. Subject to Customer's compliance with its obligations set forth in Section 14 as applicable, NaphCare shall not use or further disclose PHI in a manner that would violate HIPAA if done by the Customer. NaphCare shall not sell PHI or use or disclose PHI for purposes of marketing or fundraising. Unless Customer gives its prior, express written consent, NaphCare shall not de-identify any PHI except as necessary to provide the Services, and unless expressly provided otherwise in a written agreement between the parties, (i) as between NaphCare and Customer all

21

NCHG 001571

de-identified PHI shall be and remain exclusively the property of Customer, (ii) NaphCare assigns to Customer all of NaphCare's right, title, and interest therein, if any, and (iii) NaphCare shall not use any such de-identified PHI for any purpose other than to provide the Services and shall not disclose the same to any third party except with the prior written consent of Customer or as otherwise required by applicable law or upon the order of a court of competent jurisdiction.

**5.   Safeguards.** NaphCare shall establish and maintain appropriate safeguards intended to prevent use or disclosure of PHI other than as provided in this BAA.   Without limiting the foregoing, NaphCare shall establish and maintain, in compliance with HIPAA and any applicable guidance issued pursuant thereto, administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of any PHI that is Electronic Protected Health Information or any other Electronic Protected Health Information maintained or transmitted by NaphCare for or on behalf of Customer, and NaphCare shall establish and maintain policies and procedures, and comply with the documentation requirements, set forth in HIPAA. In the event PHI is maintained and not disposed of, said PHI may be stored in a technical format as determined by NaphCare to be safe and secure. Said format may include on-site computer servers maintained by NaphCare or off-site cloud based secure storage.

**6.   Reports   to   Customer;   Breach Notification.**

6.1   Without unreasonable delay and in no case later than 10 days after discovering a Breach involving PHI that is Unsecured Protected Health Information, NaphCare shall report such Breach to Customer in writing, setting forth the date of discovery thereof, the identities of affected individuals (or, if such identities are unknown at that time, the classes of such individuals), a general description of the nature of the incident, and such other information as is required pursuant to HIPAA or reasonably requested by Customer. For purposes hereof, a Breach shall be deemed discovered by NaphCare when it is known to NaphCare or, by exercising reasonable diligence, would have been known to NaphCare.

6.2   NaphCare shall report to Customer in writing any use or disclosure of PHI that is not permitted by this BAA, other than a Breach involving PHI that is Unsecured Protected Health Information, within 30 days of NaphCare's discovery thereof.

6.3   NaphCare shall report to Customer in writing any Security Incident involving PHI that is Electronic Protected Health Information within 30 days of NaphCare's discovery thereof.   The parties acknowledge and agree that this section constitutes notice by NaphCare to Customer of the ongoing   occurrence   of   incidents   that   may constitute Security Incidents but that are trivial and do not result in unauthorized access, use, or disclosure of PHI that is Electronic Protected Health Information, including without limitation pings and other broadcast attacks on NaphCare's firewall, port scans, unsuccessful log-on attempts, and denials of service, for which no additional notice to Customer shall be required.

**7.   Reimbursement; Mitigation.** NaphCare shall reimburse Customer for all reasonable and necessary   out-of-pocket   costs   incurred   by Customer to provide required notices of a Breach involving PHI that is Unsecured Protected Health Information, and NaphCare shall take all actions reasonably   necessary   and   cooperate   with Customer as reasonably requested to mitigate, to the extent practicable, any harmful effect of such occurrence.

**8.   Minimum Necessary.** NaphCare shall request, use, and disclose only the minimum amount of PHI necessary to provide the Services.

**9.   Access and Amendment.** With respect to an Individual as to whom NaphCare maintains PHI, NaphCare shall notify Customer promptly upon receipt of a request from such an Individual for access to or a copy of such Individual's PHI or to amend such Individual's PHI.   To the extent permitted under HIPAA, and except as otherwise required upon the order of a court of competent jurisdiction,   (i) NaphCare   shall   direct   such Individual to make such request of Customer and (ii) NaphCare shall not consent to such access, deliver such copy, or comply with such request except as directed by Customer.   With respect to PHI maintained by NaphCare in a Designated Record Set, to the extent required by HIPAA of a Covered Entity, NaphCare shall (i) make available PHI to Individuals or Customer, as requested by Customer and in accordance with HIPAA, and (ii) upon   receipt   of   notice   from   Customer, promptly amend any portion of the PHI so that Customer may meet its amendment obligations under HIPAA.

NCHG 001572

**10. Accounting for Disclosures.** NaphCare shall document all disclosures of PHI by NaphCare and information related to such disclosures as would be required for Customer to respond to a request by an Individual for an accounting of disclosures of PHI in accordance with HIPAA. NaphCare shall maintain such information for the applicable period set forth in HIPAA. NaphCare shall deliver such information to Customer or, upon Customer's request, to the Individual, in the time and manner reasonably designated by Customer, in order for Customer to respond to a request by an Individual for an accounting of disclosures of PHI in accordance with HIPAA. The obligations set forth in this section shall survive the expiration or any termination of this BAA and shall continue, as to a given instance of a disclosure, until the earlier of (i) the passing of the time required for such information to be maintained pursuant to HIPAA or (ii) the delivery to Customer of all such information in a form and medium reasonably satisfactory to Customer and the return or destruction of all PHI as provided in this BAA.

**11. Additional Restrictions.** If Customer notifies NaphCare that Customer has agreed to be bound by additional restrictions on the uses or disclosures of PHI pursuant to HIPAA, NaphCare shall be bound by such additional restrictions and shall not use or disclose PHI in violation of such additional restrictions.

**12. Audit.** If NaphCare receives a request, made on behalf of the Secretary of the Department of Health and Human Services, that NaphCare make its internal practices, books, and records relating to the use or disclosure of PHI available to the Secretary of the Department of Health and Human Services for the purposes of determining Customer's or NaphCare's compliance with HIPAA, NaphCare promptly shall notify Customer of such request and, unless enjoined from doing so by order of a court of competent jurisdiction in response to a challenge raised by Customer or NaphCare (which challenge NaphCare shall not be obligated to raise), NaphCare shall comply with such request to the extent required of it by applicable law. Nothing in this BAA shall waive any attorney-client privilege or other privilege applicable to either party.

**13. Remuneration.** NaphCare shall not receive remuneration, directly or indirectly, in exchange for PHI; provided, however, that this prohibition shall not affect payment to NaphCare by Customer pursuant to the Services.

**14. Obligations of Customer.** Customer shall (i) notify NaphCare of any limitation in Customer's Notice of Privacy Practices to the extent that such limitation may affect NaphCare's use or disclosure of PHI, (ii) notify NaphCare of any changes in, or revocation of, permission by an Individual to use or disclose PHI, to the extent that such change may affect NaphCare's use or disclosure of PHI, (iii) notify NaphCare of any restriction on the use or disclosure of PHI to which Customer has agreed in accordance with HIPAA, to the extent that such restriction may affect NaphCare's use or disclosure of PHI, and (iv) obtain any authorization or consents as may be Required by Law for any of the uses or disclosures of PHI pursuant to the Services.

**15. Term and Termination.** This BAA shall become effective on the Effective Date and shall continue in effect until the earlier to occur of (i) the expiration or termination of the Agreement or (ii) termination pursuant to this section. Either party may terminate this BAA effective immediately if it determines that the other party has breached a material provision of this BAA and failed to cure such breach within 30 days of being notified by the other party of the breach. If the non-breaching party reasonably determines that cure is not possible, such party may terminate this BAA effective immediately upon written notice to other party.

**16. Effect of Termination.** Upon termination of this BAA, NaphCare shall deliver to Customer the disclosure accounting information as provided in this BAA and (i) if feasible, return to Customer or destroy all PHI that NaphCare maintains in any form and retain no copies of such PHI, or (ii) if return or destruction is not feasible, notify Customer and extend the protections of this BAA to the PHI and limit its further use or disclosure to those purposes that make the return or destruction of the PHI infeasible. The requirements of this section shall survive termination or expiration of this BAA and shall be in force as long as any PHI remains in the custody or control of NaphCare.

**17. Miscellaneous.**

17.1 Amendments. This BAA may not be modified, nor shall any provision hereof be waived or amended, except in a writing duly signed by authorized representatives of the parties; provided, however, that upon the enactment of any

NCHG 001573

law or regulation affecting the use or disclosure of PHI, or on the publication of any decision of a court of competent jurisdiction relating to any such law, or the publication of any interpretive policy or opinion of any governmental agency charged with the enforcement of any such law or regulation, Customer may, by written notice to NaphCare, propose to amend this BAA in such a manner as Customer reasonably determines necessary to comply therewith, and such proposed amendment shall become operative unless NaphCare rejects such amendment by written notice to Customer within 30 days thereafter, in which case, either party may terminate this BAA by written notice to the other.

17.2 <u>Notices</u>. Notices and reports given under this BAA shall be in writing and sent to NaphCare at Attn: Privacy and Security Officer, NaphCare, Inc., 2090 Columbiana Road, Suite 4000, Birmingham, AL 35216, and to Customer at the address shown on the signature page hereof. Such notices shall be deemed delivered (i) when personally delivered, (ii) on the second business day after deposit, properly addressed and postage pre-paid, when sent by certified or registered U.S. mail to the address provided herein, or (iii) on the next business day when sent with next-business-day instruction by recognized overnight document delivery service to the address provided herein.

17.3 <u>Governing Law</u>. This BAA shall be governed and construed under the laws of the state that governs the Agreement, other than its conflicts of laws principles.

17.4 <u>Waiver</u>. A waiver with respect to one event shall not be construed as continuing, or as a bar to or waiver of, any right or remedy as to subsequent events.

17.5 <u>No Third Party Beneficiaries</u>. Nothing express or implied in this BAA is intended to confer, nor shall anything herein confer, upon any person other than the parties and the respective successors or assigns of the parties, any rights, remedies, obligations, or liabilities whatsoever.

17.6 <u>Interpretation</u>. In the event of an inconsistency between the provisions of this BAA and mandatory provisions of HIPAA, as amended, or its interpretation by any court or regulatory agency with authority over either party hereto, HIPAA (interpreted by such court or agency, if applicable) shall control. Where provisions of this BAA are different from those mandated under HIPAA, but are nonetheless permitted by such rules as interpreted by relevant courts or agencies, the provisions of this BAA shall control.

17.7 <u>Counterparts</u>. This BAA may be executed in counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument. Such counterparts may be delivered in faxed or scanned electronic form, and each shall be deemed an original.

*Signature Page to Follow*

NCHG 001574

IN WITNESS WHEREOF, the parties have executed this Agreement on the date opposite their respective signature block, with the effective date being the date of the lasts signature.

DATED: _____

BOARD OF COUNTY COMMISSIONERS
OF SPOKANE COUNTY, WASHINGTON

_____
AL FRENCH, Chair

ATTEST:

_____
Ginna Vasquez
Clerk of the Board

_____
JOSH KERNS, Vice-Chair

_____
SHELLY O'QUINN, Commissioner

DATED:_____

NAPHCARE, INC.

_____
By: James S. McLane
Its: Chief Executive Officer

| | |
|---|---|
| **Customer Name:** | Spokane County Detention Services |
| **Customer Address (for notices):** | Spokane County Detention Services<br>Attn: John C. McGrath, Director<br>1100 West Mallon<br>Spokane, WA 99260 |
| **Effective Date:** | July 1, 2017 |

25

NCHG 001575

# EXHIBIT D
# PERFORMANCE INDICATORS

The following information pertains to the auditing of the Performance Indicators in this Exhibit and the calculation of Penalties.

1. Penalties:

    a.  Are calculated and assessed no more often than once a quarter;

    b.  Are calculated on full percentage points after rounding;

    c.  Are calculated as the stated penalty amount multiplied by the number of percentage points variance from the threshold value, unless otherwise indicated;

    d.  Are calculated using the event as the unit of analysis, unless otherwise specified; and

    e.  Are based on events only occurring during the quarter under review. (In other words, the audit may not look back at events from previous quarters.)

    f.  A maximum  total penalty of up to $25,000  may potentially be assessed against NaphCare by County every quarter in which this Agreement is effective (there shall be no assessment of any penalties during the first quarter of this Agreement).

2. An individual patient record may be used in the audit of more than one Performance Indicator.

3. Multiple events in an individual patient record may be used in the audit of a single Performance Indicator. For example, if a patient were sent to the emergency room on two occasions, both visits may be counted individually in the audit.

4. Performance Indicators are listed as follows:

## 4.1 Intake

| Performance Indicator | Threshold Value | Penalty |
|---|---|---|
| A. Intake Screenings are completed within 3 hours of arrival at the Facility (arrival is defined as receiving an inmate number via JMS). | 95% | $1000 |
| B. Findings on intake screening are handled as follows:<br>-Any patient with an active non-chronic disease, stable or non-stable: a provider is alerted and appropriate care initiated.<br>-Any patient with active unstable chronic disease: the patient's care is reviewed by a provider within 2 days;<br>-Any patient with active stable chronic disease: the patient's care is reviewed by a provider within 5 days. | 95% | $1000 |
| C. Health Assessments are completed within the timeframe specified in the contract, Exhibit A, Section H. | 100% | $750 if all sampled values are less than 21 days after admission. Otherwise, penalty calculated as $200 for each patient day beyond with a limit of 20 patients in sample |
| D. Health assessments are completed within the timeframe specified in the contract, Exhibit A, Section H. | 95% | $1500 |
| E. Medical records are timely requested by the practitioner when clinically appropriate. Where there is a reasonable suspicion that the patient may have a health condition and/or be taking medications, but no records have been received, a provider will review in a clinically appropriate timeframe, but no later than 24 hours, to determine appropriate care. | 95% | $1500 |
| F. All cases of intoxication, withdrawal, or risk of withdrawal will be managed according to policy. | 95% | $2000 |

## 4.2 Medications

| Performance Indicator | Threshold Value | Penalty |
|---|---|---|
| A. Upon arrival at the Facility, patients receive the next scheduled dose of any medication they should be taking unless otherwise ordered by a provider. | 95% | $750 |
| B. New medications are administered within the timeframe ordered by the provider or, if none was specified, within a clinically appropriate timeframe not to exceed 24 hours. | 100% | $1000 |
| C. On-going medications are administered without gap across refill and renewal junctures. Note: where a patient with the capacity to participate with the refill or renewal process fails to follow the relevant instructions, a resultant gap will not be counted as a failure. | 95% | $1500 |
| D. NaphCare will submit a pharmacy report to the County on a monthly basis for pharmaceuticals administered.  The report shall bear the inmates' name and medications. | 90% | $3000 for each occurrence |

26

NCHG 001576

| Performance Indicator | Threshold Value | Penalty |
|---|---|---|
| E. Nurses conduct and document medication administration according to policy. Note: the unit of analysis is a patient-dosing time. Thus if there were multiple errors in administration of medications to a single patient at the morning pill line on a single day, this would count as a single failure. | 95% | $2000 |

## 4.3 Access to Care

| Performance Indicator | Threshold Value | Penalty |
|---|---|---|
| A. Following submission of a written request for care expressing a clinical symptom or problem (e.g. excludes requests for an administrative service such as a copy of records, the date of a future service, a refill of a current and chronic medication), the patient will be seen at a visit within 48 hours and in accordance with clinic policy. | 95% | $1000 |
| B. Following an oral request for urgent care from an Inmate, whether communicated directly to a NaphCare employee or via a County employee, an RN or provider will make an assessment (in person or by phone, with the patient, as appropriate) within 2 hours and take appropriate clinical action. | 100% | $2500 |

## 4.4 Practitioner and Nursing Care and Documentation for Medical, MH, and Dental Care

| Performance Indicator | Threshold Value | Penalty |
|---|---|---|
| A. All care (and documentation of such care) delivered during any clinical event is appropriate.. This includes care delivered by nursing staff and practitioners for all visits or decisions regarding patient care, including but limited to intake screening, health assessments, emergent, urgent, or episodic care, annual assessments, mandated assessments, chronic care, telephone consultations, utilization decision, decisions resulting from review of records. | 95% | $1000 |
| B. Unscheduled hospital/ER/urgent care center usage is preventable (i.e.more likely than not the unscheduled event did not result from deficient ambulatory care prior to the event) | 100% | $3000 per event + actual Facility staff and transportation costs<br><br>For any penalty greater than $15,000, at NaphCare's request, the case may be referred to 3 physician panel including the original reviewer, a non-involved physician of NaphCare's choosing, and a physician of the County's choosing, the final decision to be made by majority vote. |
| C. Patients with dental non-emergencies/urgencies are seen by a dentist within two weeks of referral, unless the patient refuses or is unavailable for the visit. | 90% | $500 |

## 4.5 Care Continuity

| Performance Indicator | Threshold Value | Penalty |
|---|---|---|
| A. Nursing and practitioner plans or orders for requests for tests, interventions, referrals, or outside records, are only ordered by appropriately licensed staff and executed, received, and reviewed timely and in accordance with policy. | 95% | $1500 |
| B. Upon return from any off-site clinical trip, all Inmates are evaluated (including receipt and review of a patient-specific clinical report with findings and recommendations if any recommendations were generated during the visit) by an RN or practitioner prior to the Inmate returning to the living unit. | 95% | $2000 |
| C. Upon return from an ER or urgent care center visit, procedure, hospitalization, or any other trip resulting in immediate recommendations, the patient is assessed by an RN prior to return to the living unit, and the electronic chart noted for review by provider as appropriate. | 95% | $1500 |
| D. Recommendations received from an ER or urgent care center visit, procedure, hospitalization, or any other consultation are followed by NaphCare unless the reason for not following them is obvious or an appropriate rationale is documented. | 95% | $1000 |
| E. Inmates admitted to a hospital are returned to the jail as soon as it is clinically safe to do so. Where appropriate, there is documentation of NaphCare's good faith efforts to secure an earlier release. | 95% | Penalty = actual cost of unnecessary hospitalization (custody staff + any other hospital costs borne by the County) |
| F. Inmates are released to the community in accordance with policy, including but not limited to:<br>-For any medication started in the Facility, if necessary, the Inmate receives a 10 day supply of the medication or a prescription to bridge to their next scheduled appointment for this condition, not to exceed a total of 90 days from release;<br>-For any condition newly diagnosed in the Facility, assistance with arranging follow-up;<br>-For any condition for which the patient was previously receiving care in the community, assistance with arranging follow-up if the patient has been in the Facility for longer than 90 days. | 95% | $500 |

27

### 4.6 Refusals (Meds, Visits, Interventions)

| Performance Indicator | Threshold Value | Penalty |
|---|---|---|
| A. All refusals for medications, clinical encounters, and interventions shall be received in person by health care staff and documented, in accordance with policy. | 95% | $1500 |

### 4.7 Grievances

| Performance Indicator | Threshold Value | Penalty |
|---|---|---|
| A. All grievances are addressed appropriately, timely, and respectfully, and in accordance with policy, and include face-to-face encounters when appropriate. Emergency grievances are, at a minimum, assessed as soon as they are received.. In other words, if the assessment reveals that there is no clinical emergency, the grievance may be resolved as would a non-emergency grievance. | 90% | $500 |

### 4.8 Reports

| Performance Indicator | Threshold Value | Penalty |
|---|---|---|
| A. All reports are submitted as required by the contract | 100% | $100 per report, per business day overdue (Monday-Friday, excluding Federal Holidays) |
| B. All records requested for public disclosure, regulatory requirements, or litigation, are produced within 14 days from the date the written request is made to the Naphcare site manager. | 100% | Actual cost to the County resulting from tardiness. |

NCHG 001578

**EXHIBIT E**
**NAPHCARE STAFFING MATRIX**

| Position Title | Hours | FTE |
|---|---|---|
| **DAYS** | | |
| Health Services Administrator (RN) | 40 | 1 |
| Director of Nursing (RN) | 40 | 1 |
| Medical Director | 24 | .6 |
| Nurse Practitioner / Physician's Assistant (20Hr Geiger) | 60 | 1.5 |
| Psychiatrist | 4 | .1 |
| Psych Nurse Practitioner | 40 | 1 |
| Dentist | 8 | .2 |
| Charge RN | 84 | 2.1 |
| Sick Call RN | 80 | 2 |
| Booking RN | 84 | 2.1 |
| Geiger RN | 84 | 2.1 |
| LPN | 168 | 4.2 |
| Pharmacy Tech | 40 | 1 |
| Medical Assistant (2 Downtown/1 Geiger) | 120 | 3 |
| Dental Assistant | 8 | .2 |
| **NIGHTS** | | |
| Charge RN | 84 | 2.1 |
| Booking RN | 84 | 2.1 |
| Geiger RN | 84 | 2.1 |
| LPN | 168 | 4.2 |

NCHG 001579

*The Estate of Cindy Lou Hill, by and through its personal representative, Joseph A. Grube; and Cynthia Metsker, individually vs. Naphcare, Inc., et al.*

Case No. 2:20-cv-00410-RMP

Declaration of Hank Balson

Exhibit D

Spokane County Detention Center
1100 West Mallon Ave
Spokane, WA 99260

8/28/2018 10:49:37 AM Central Daylight Time

## Progress Notes -HILL, CINDY LOU 412473 (18013056)

Hannah Gubitz Charge RN POSTED ON 8/26/2018 7:21:19 AM Central Daylight Time

Type: NURSE

No longer on medical watch.

Hannah Gubitz Charge RN POSTED ON 8/25/2018 12:45:41 PM Central Daylight Time

Type: NURSE

Patient placed on 30" medical watch for severe abdominal pain and having to be dragged to door by cellmate to be assessed. Patient refused to get up or walk to door, screaming and repeating "I'm sick" over and over. CO Torosian notified.

Justin Rogers MA POSTED ON 8/23/2018 5:37:37 PM Central Daylight Time

Type: BENZO

Patient refused to provide urine sample at time of collection.

SOAP NOTE BY: Sheila Hudkins Charge RN POSTED ON 8/22/2018 6:40:43 PM Central Daylight Time

Type: NURSE

### Subjective

Called for nurse to evaluate pt at court holding.

### Objective

BP: 125/79    Temp: 98.1    Pulse: 71    Resp: 17    Wt: na    SaO2: 98    BS: na    Pain: 5

Pt laying on bench in holding cell.

### Assessment

Pt states uses heroin daily. Piloerection skin on arms. Pupils mildly dilated.

### Plan

Emailed statcare for comfort medications, placed on COWS. Ordered UDS.

### Education

HILL, CINDY LOU 412473 (18013056)

RFP 1-0038

Kara Contabile Charge RN POSTED ON 8/22/2018 6:39:15 PM Central Daylight Time          Type: NURSE

Pt DT assessment done in court transfer holding. Unable to give pt Gatorade but encouraged pt to continue to push fluids when they go back to their cell.

SOAP NOTE BY: Casey Gladney Corporate NP POSTED ON 8/22/2018 6:04:31 PM Central Daylight Time          Type: STATCARE

**Subjective**

Patient reports recent and/or significant opiate use.

**Objective**

BP: /          Temp:          Pulse:          Resp:          Wt:          Sa02:          BS:          Pain:

**Assessment**

Opiate withdrawal

**Plan**

-Initiate COWS assessments with clonidine dosed per COWS score recommendations.
-Hold clonidine for SBP<90mmHg, DBP<60mmHg or pulse <60
-Encourage po fluid intake
-Low bunk for safety.

**Education**

Deferred until withdrawal complete.

| Treatment Name | Order Sig | Start | Stop |
|---|---|---|---|
| GIVE COOL FLUIDS OR ELECTROLYTE SOLUTION (E.G., GATORADE) PO IF ALERT | three times per day | 8/22/2018 12:00:00 AM Central Daylight Time | 8/26/2018 11:59:59 PM Central Daylight Time |

| Drug Name | Drug Strength | Quantity | Start | Stop | Complete Sig |
|---|---|---|---|---|---|

HILL, CINDY LOU 412473 (18013056)

RFP 1-0039

| Drug Name | Drug Strength | Quantity | Start | Stop | Complete Sig |
|-----------|--------------|----------|-------|------|--------------|
| Ondansetron HCl Oral | 4 MG | 1 | 8/22/2018 12:00:00 AM | 8/28/2018 11:59:59 PM | Take 4 mg by mouth twice per day for 7 day(s). Dispense 14 tablet. 0 Refill(s) PRN Nausea or vomiting |
| Aluminum-Magnesium-Simethicone Oral | 200-200-20 MG/5ML | 1 | 8/22/2018 12:00:00 AM | 8/28/2018 11:59:59 PM | Take 200-200-20 mg/5ml by mouth twice per day for 7 day(s). Dispense 14 suspension. 0 Refill(s) PRN GI upset |
| Dicyclomine HCl Oral | 20 MG | 1 | 8/22/2018 12:00:00 AM | 8/24/2018 11:59:59 PM | Take 20 mg by mouth three times per day for 3 day(s). Dispense 9 tablet. 0 Refill(s) PRN Abdominal cramps from withdrawal |
| Loperamide HCl Oral | 2 MG | 1 | 8/22/2018 12:00:00 AM | 8/28/2018 11:59:59 PM | Take 2 mg by mouth twice per day for 7 day(s). Dispense 14 capsule. 0 Refill(s) PRN Diarrhea |
| Ibuprofen Oral | 600 MG | 1 | 8/22/2018 12:00:00 AM | 8/28/2018 11:59:59 PM | Take 600 mg by mouth twice per day for 7 day(s). Dispense 14 tablet. 0 Refill(s) PRN body aches or pain |

Tamara Wattenburger RN POSTED ON 8/21/2018 7:55:20 PM Central Daylight Time

Type: NURSE

Late entry.

HILL, CINDY LOU 412473 (18013056)

RFP 1-0040

1400- O2 sat reading ranging from 85%-94% on RA, unstable and intermittently unable to read. Patients breathing is even and unlabored. No signs of cyanosis.Alternate O2 monitor used to compare. Same outcome. Aplied 2 L 02 via NC when O2 sat reached 85%, reading increased to 97% and stable. O2 removed after 5 minutes to reassess patients sats on RA. O2 sats remained stable at at 94% over the next 10 minutes. Due to adequate oxygenation at this time O2 left off. Instructed patient to notify officers if experiencing difficulty breathing.

Tamara Wattenburger RN POSTED ON 8/21/2018 3:04:26 PM Central Daylight Time                    Type: NURSE

Onsite provider Denae contacted to report current O2 sats. TRBO recieved to apply supplemental oxygen to see if sats improve.

Tamara Wattenburger RN POSTED ON 8/21/2018 2:58:22 PM Central Daylight Time                    Type: NURSE

Abnormal Vital Signs/Readings: Send Alert to Nurse's Queue

Oxygen Saturation: 86

Tamara Wattenburger RN POSTED ON 8/21/2018 2:55:39 PM Central Daylight Time                    Type: NURSE

Abnormal Vital Signs/Readings: Send Alert to Nurse's Queue

Oxygen Saturation: 86

Tamara Wattenburger RN POSTED ON 8/21/2018 2:49:49 PM Central Daylight Time                    Type: RECONCILIATION

Comments for Drug Reconciliation--
Drug: omeprazole unk QD
Comment: reported med
Filling Pharmacy: Fred Meyer
Pharmacy Address: 400 S. Thor St
Pharmacy Phone: 509-532-4033

Tamara Wattenburger RN POSTED ON 8/21/2018 2:49:49 PM Central Daylight Time                    Type: RECONCILIATION

Comments for Drug Reconciliation--
Drug: albuterol unk PRN
Comment: Reported med for COPD
Filling Pharmacy: Fred Meyer
Pharmacy Address: 400 S. Thor St
Pharmacy Phone: 509-532-4033

Tamara Wattenburger RN POSTED ON 8/21/2018 2:49:25 PM Central Daylight Time                    Type: NURSE

Abnormal Vital Signs/Readings: Send Alert to Nurse's Queue



HILL, CINDY LOU 412473 (18013056)

RFP 1-0041

Oxygen Saturation: 86

Tsubasa Bruce Charge RN POSTED ON 12/6/2017 8:42:33 PM Central Standard Time            Type: RECONCILIATION

Comments for Drug Reconciliation--
Drug: albuterol inhaler
Comment:
Filling Pharmacy: Fred Meyer
Pharmacy Address: 400 S. Thor St
Pharmacy Phone: 509-532-4033

Tsubasa Bruce Charge RN POSTED ON 12/6/2017 8:42:33 PM Central Standard Time            Type: RECONCILIATION

Comments for Drug Reconciliation--
Drug: omeprazole
Comment:
Filling Pharmacy: Fred Meyer
Pharmacy Address: 400 S. Thor St
Pharmacy Phone: 509-532-4033

Tsubasa Bruce Charge RN POSTED ON 12/6/2017 8:42:33 PM Central Standard Time            Type: RECONCILIATION

Comments for Drug Reconciliation--
Drug: bentyl
Comment:
Filling Pharmacy: Fred Meyer
Pharmacy Address: 400 S. Thor St
Pharmacy Phone: 509-532-4033

Tony Wertz LPN POSTED ON 10/19/2016 7:58:13 PM Central Daylight Time            Type: NURSE

PT MEDICALLY CLEARED FOR RELEASE. VSS, CORRECTIONS STAFF NOTIFIED.

Becky Christensen NP POSTED ON 10/18/2016 6:40:28 PM Central Daylight Time            Type: NP NOTE

OPIATE discontinued, REASON: Stable detox day 4 with negative scores. May transfer to GP per classification

SOAP NOTE BY: Katrina Schmell NP POSTED ON 10/18/2016 11:40:52 AM Central Daylight Time            Type: CHRONIC CARE

**Subjective**

Pt fatigued, reports "upset stomach". Feels dehydrated. Tearful regarding her family situation and feels like she dissapointed her mother. Also reports she is grateful that officer picked her up. She reports diarrhea, no emesis. Last used heroin 7 days ago. Denies EtOH and other subtances.

HILL, CINDY LOU 412473 (18013056)                                    RFP 1-0042

*The Estate of Cindy Lou Hill, by and through its personal representative, Joseph A. Grube; and Cynthia Metsker, individually vs. Naphcare, Inc., et al.*

Case No. 2:20-cv-00410-RMP

Declaration of Hank Balson

Exhibit E

 Spokane County Detention Center
1100 West Mallon Ave
Spokane, WA 99260

8/28/2018 10:49:37 AM Central Daylight Time

## COWS - Completed by: Race Polston LPN on 8/26/2018 2:13:39 AM Central Daylight Time

**PICTURE NOT AVAILABLE**

| | | | | |
|---|---|---|---|---|
| **Patient:** | HILL, CINDY LOU | **#:** | 412473 (18013056) | **Lang:** |
| **DOB:** | (Age=55) | **Sex:** | F | **Race:** W |
| **Housing:** | --- | **SSN#:** | **HIDDEN** | **Type:** |
| **Status:** | NOT ACTIVE | **Booking Date:** | 8/21/2018 12:05:00 PM Central Daylight Time | **Release:** 8/26/2018 8:43:36 AM |

☐ Refused          ☑ Unavailable

☐ **Patient Refused**

| BP | Temp | Pulse | Resp | SaO2 | BS | Pain | Height(ft) |
|---|---|---|---|---|---|---|---|
| / | | | | | | | 0 |

| Height(in) | Weight | BMI | MAP |
|---|---|---|---|
| 0 | | | |

Current Allergies

No Known Drug Allergy

Total COWS Score - 0

Consider reassessing in 6 hours.

Resting Pulse Rate - Ask

Measured after patient is sitting or lying for one minute

0 Not Assessed

Sweating - Ask

Over past 1/2 hour not accounted for by room temperature or patient activity

0 Not Assessed

Restlessness - Ask

Observation during assessment

0 Not Assessed

Pupil Size - Ask

0 Not Assessed

Bone or Joint Aches - Ask

If patient was having pain previously, only the additional component attributed to opiates withdrawal is scored

0 Not Assessed

Runy Nose or Tearing - Ask

Not accounted for by cold symptoms or allergies

0 Not Assessed

GI Upset - Ask

Over last 1/2 hour

0 Not Assessed

Tremor - Ask

Observation of outstretched hands

0 Not Assessed

Yawning - Ask

Observation during assessment

0 Not Assessed

Anxiety or Irritability - Ask

0 Not Assessed

Gooseflesh Skin - Ask

0 Not Assessed

HILL, CINDY LOU 412473 (18013056)

RFP 1-0051

Additional Comments:

Is the patient pregnant?

☐ Yes

☑ No



Spokane County Detention Center
1100 West Mallon Ave
Spokane, WA 99260

8/28/2018 10:49:37 AM Central Daylight Time

**COWS** - Completed by: Hannah Gubitz Charge RN on 8/25/2018 6:10:32 PM Central Daylight Time

> **PICTURE
> NOT AVAILABLE**

| Patient: | HILL, CINDY LOU | #: | 412473 (18013056) | Lang: | |
|---|---|---|---|---|---|
| DOB: | (Age=55) | Sex: | F | Race: | W |
| Housing: | --- | SSN#: | **HIDDEN** | Type: | |
| Status: | NOT ACTIVE | Booking Date: | 8/21/2018 12:05:00 PM Central Daylight Time | Release: | 8/26/2018 8:43:36 AM |

☑ Refused              ☐ Unavailable

**☑ Patient Refused**

| BP | Temp | Pulse | Resp | SaO2 | BS | Pain | Height(ft) |
|---|---|---|---|---|---|---|---|
| / | | | | | | | 0 |
| Height(in) | Weight | BMI | MAP | | | | |
| 0 | | | | | | | |

Current Allergies

No Known Drug Allergy

Total COWS Score - 0

Consider reassessing in 6 hours.

Resting Pulse Rate - Ask

Measured after patient is sitting or lying for one minute

0 Not Assessed

Sweating - Ask

Over past 1/2 hour not accounted for by room temperature or patient activity

0 Not Assessed

Restlessness - Ask

HILL, CINDY LOU 412473 (18013056)

RFP 1-0053

Observation during assessment

0 Not Assessed

Pupil Size - Ask

0 Not Assessed

Bone or Joint Aches – Ask

If patient was having pain previously, only the additional component attributed to opiates withdrawal is scored

0 Not Assessed

Runy Nose or Tearing - Ask

Not accounted for by cold symptoms or allergies

0 Not Assessed

GI Upset - Ask

Over last 1/2 hour

0 Not Assessed

Tremor - Ask

Observation of outstretched hands

0 Not Assessed

Yawning - Ask

Observation during assessment

0 Not Assessed

Anxiety or Irritability - Ask

0 Not Assessed

Gooseflesh Skin - Ask

0 Not Assessed

Additional Comments:

Patient refused assessment. No s/sx of distress noted. CO Janke present.

Is the patient pregnant?

☐ Yes
☑ No

HILL, CINDY LOU 412473 (18013056)

RFP 1-0055



Spokane County Detention Center
1100 West Mallon Ave
Spokane, WA 99260

8/28/2018 10:49:37 AM Central Daylight Time

## COWS - Completed by: Hannah Gubitz Charge RN on 8/25/2018 12:51:45 PM Central Daylight Time

**PICTURE NOT AVAILABLE**

| | | | | | | |
|---|---|---|---|---|---|---|
| **Patient:** | HILL, CINDY LOU | **#:** | 412473 (18013056) | **Lang:** | |
| **DOB:** | ▇▇▇ (Age=55) | **Sex:** | F | **Race:** | W |
| **Housing:** | --- | **SSN#:** | **HIDDEN** | **Type:** | |
| **Status:** | NOT ACTIVE | **Booking Date:** | 8/21/2018 12:05:00 PM Central Daylight Time | **Release:** | 8/26/2018 8:43:36 AM |

☐ Refused          ☐ Unavailable

☐ **Patient Refused**

| BP | Temp | Pulse | Resp | SaO2 | BS | Pain | Height(ft) |
|---|---|---|---|---|---|---|---|
| 130 / 86 | na | 78 | 16 | 95 | na | na | 0 |

| Height(in) | Weight | BMI | MAP | | | | |
|---|---|---|---|---|---|---|---|
| 0 | na | NA | 100.67 | | | | |

Current Allergies

No Known Drug Allergy

Total COWS Score - 4

Minimal withdrawal symptoms. Consider reassessing within 8 hours.

Resting Pulse Rate - Ask

Measured after patient is sitting or lying for one minute

0 80 or below

Sweating - Ask

Over past 1/2 hour not accounted for by room temperature or patient activity

0 Not Assessed

Restlessness - Ask

HILL, CINDY LOU 412473 (18013056)                              RFP 1-0056

Observation during assessment

0 Able to sit still

Pupil Size - Ask

0 Not Assessed

Bone or Joint Aches - Ask

If patient was having pain previously, only the additional component attributed to opiates withdrawal is scored

0 Not Assessed

Runy Nose or Tearing - Ask

Not accounted for by cold symptoms or allergies

0 Not present

GI Upset - Ask

Over last 1/2 hour

0 Not Assessed

Tremor - Ask

Observation of outstretched hands

0 Not Assessed

Yawning - Ask

Observation during assessment

0 Not Assessed

Anxiety or Irritability - Ask

4 Patient so irritable/anxious that participation in the assessment is difficult

Gooseflesh Skin - Ask

0 Not Assessed

HILL, CINDY LOU 412473 (18013056)

RFP 1-0057

Additional Comments:

Patient laying on floor on arrival to cell wearing pants but no shirt. Patient indicated she did want to be checked but stated she was too sick to move. Notified patient we could not enter the cell without an additional officer. Patient's roommate rolled her in a blanket and dragged her to the cell door where she lay next to the toilet screaming. Patient's cellmate indicated patient was having severe abdominal pain and it was most likely her appendix. Patient curled in fetal position on floor, barely allowed this RN to check vitals. Patient allowed minimal assessment of abdomen. No bruising, swelling, redness, or masses noted on visual assessment or palpation. Patient screamed even louder before this RN even touched abdomen shouting that this RN was hurting her. Patient would not answer questions about what her pain was on a scale of 1-10, when it started, or what it felt like. She stated it was on her right lower abdomen but screamed in pain on gentle palpation of entire abdomen and back. Patient taken to 2W via wheelchair for medical watch.

Is the patient pregnant?

☐ Yes
☑ No

HILL, CINDY LOU 412473 (18013056)



Spokane County Detention Center
1100 West Mallon Ave
Spokane, WA 99260

8/28/2018 10:49:37 AM Central Daylight Time

## COWS - Completed by: Michael Kallsen Charge RN on 8/25/2018 1:44:24 AM Central Daylight Time

**PICTURE NOT AVAILABLE**

| | | | | | |
|---|---|---|---|---|---|
| **Patient:** | HILL, CINDY LOU | **#:** | 412473 (18013056) | **Lang:** | |
| **DOB:** | ▮▮▮▮ (Age=55) | **Sex:** | F | **Race:** | W |
| **Housing:** | --- | **SSN#:** | **HIDDEN** | **Type:** | |
| **Status:** | NOT ACTIVE | **Booking Date:** | 8/21/2018 12:05:00 PM Central Daylight Time | **Release:** | 8/26/2018 8:43:36 AM |

☑ Refused          ☐ Unavailable

☐ **Patient Refused**

| BP | Temp | Pulse | Resp | SaO2 | BS | Pain | Height(ft) |
|---|---|---|---|---|---|---|---|
| / | | | | | | | 0 |

| Height(in) | Weight | BMI | MAP |
|---|---|---|---|
| 0 | | | |

Current Allergies

No Known Drug Allergy

Total COWS Score - 0

Consider reassessing in 6 hours.

Resting Pulse Rate - Ask

Measured after patient is sitting or lying for one minute

0 Not Assessed

Sweating - Ask

Over past 1/2 hour not accounted for by room temperature or patient activity

0 Not Assessed

Restlessness - Ask

HILL, CINDY LOU 412473 (18013056)

RFP 1-0059

Observation during assessment

0 Not Assessed


Pupil Size - Ask

0 Not Assessed


Bone or Joint Aches - Ask

If patient was having pain previously, only the additional component attributed to opiates withdrawal is scored

0 Not Assessed


Runy Nose or Tearing - Ask

Not accounted for by cold symptoms or allergies

0 Not Assessed


GI Upset - Ask

Over last 1/2 hour

0 Not Assessed


Tremor - Ask

Observation of outstretched hands

0 Not Assessed


Yawning - Ask

Observation during assessment

0 Not Assessed


Anxiety or Irritability - Ask

0 Not Assessed


Gooseflesh Skin - Ask

0 Not Assessed

Additional Comments:

Inmate declined to be checked at this time, verbalized denial of any S/S of DT's, None noted CO Najera present

Is the patient pregnant?

☐ Yes
☑ No



HILL, CINDY LOU 412473 (18013056)



Spokane County Detention Center
1100 West Mallon Ave
Spokane, WA 99260

8/28/2018 10:49:37 AM Central Daylight Time

## COWS - Completed by: Kara Contabile Charge RN on 8/24/2018 4:55:52 PM Central Daylight Time

**PICTURE
NOT AVAILABLE**

| | | | | | |
|---|---|---|---|---|---|
| **Patient:** | HILL, CINDY LOU | **#:** | 412473 (18013056) | **Lang:** | |
| **DOB:** | (Age=55) | **Sex:** | F | **Race:** | W |
| **Housing:** | --- | **SSN#:** | **HIDDEN** | **Type:** | |
| **Status:** | NOT ACTIVE | **Booking Date:** | 8/21/2018 12:05:00 PM Central Daylight Time | **Release:** | 8/26/2018 8:43:36 AM |

☑ Refused                    ☐ Unavailable

☐ **Patient Refused**

| BP | Temp | Pulse | Resp | SaO2 | BS | Pain | Height(ft) |
|---|---|---|---|---|---|---|---|
| / | | | | | | | 0 |
| **Height(in)** | **Weight** | **BMI** | **MAP** | | | | |
| 0 | | | | | | | |

Current Allergies

No Known Drug Allergy

Total COWS Score - 0

Consider reassessing in 6 hours.

Resting Pulse Rate - Ask

Measured after patient is sitting or lying for one minute

0 Not Assessed

Sweating - Ask

Over past 1/2 hour not accounted for by room temperature or patient activity

0 Not Assessed

Restlessness - Ask

HILL, CINDY LOU 412473 (18013056)

RFP 1-0062

Observation during assessment

0 Not Assessed

Pupil Size - Ask

0 Not Assessed

Bone or Joint Aches - Ask

If patient was having pain previously, only the additional component attributed to opiates withdrawal is scored

0 Not Assessed

Runy Nose or Tearing - Ask

Not accounted for by cold symptoms or allergies

0 Not Assessed

GI Upset - Ask

Over last 1/2 hour

0 Not Assessed

Tremor - Ask

Observation of outstretched hands

0 Not Assessed

Yawning - Ask

Observation during assessment

0 Not Assessed

Anxiety or Irritability - Ask

0 Not Assessed

Gooseflesh Skin - Ask

0 Not Assessed

HILL, CINDY LOU 412473 (18013056)

RFP 1-0063

Additional Comments:

Pt refused VS. Will continue to monitor. Pt in court holding. Sts feeling much better.

Is the patient pregnant?

☐ Yes
☑ No



Spokane County Detention Center
1100 West Mallon Ave
Spokane, WA 99260

8/28/2018 10:49:37 AM Central Daylight Time

**COWS** - Completed by: Kara Contabile Charge RN on 8/24/2018 10:38:36 AM Central Daylight Time

PICTURE
NOT AVAILABLE

| Patient: | HILL, CINDY LOU | #: | 412473 (18013056) | Lang: | |
|----------|-----------------|-----|-------------------|-------|---|
| DOB: | (Age=55) | Sex: | F | Race: | W |
| Housing: | --- | SSN#: | **HIDDEN** | Type: | |
| Status: | NOT ACTIVE | Booking Date: | 8/21/2018 12:05:00 PM Central Daylight Time | Release: | 8/26/2018 8:43:36 AM |

☐ Refused                    ☐ Unavailable

☐ **Patient Refused**

| BP | Temp | Pulse | Resp | SaO2 | BS | Pain | Height(ft) |
|----|------|-------|------|------|-----|------|-----------|
| 126 / 78 | 96.1 | 82 | 16 | 95 | na | na | 0 |

| Height(in) | Weight | BMI | MAP | | | | |
|------------|--------|-----|-----|---|---|---|---|
| 0 | na | NA | 94.00 | | | | |

Current Allergies

No Known Drug Allergy

Total COWS Score - 10

Mild withdrawal symptoms. Consider reassessing within 8 hours.
GIVE NOW! Administer .1mg Clonidine

Resting Pulse Rate - Ask

Measured after patient is sitting or lying for one minute

1 81-100

Sweating - Ask

Over past 1/2 hour not accounted for by room temperature or patient activity

0 No report of chills or flushing

HILL, CINDY LOU 412473 (18013056)

RFP 1-0065

Restlessness - Ask

Observation during assessment

0 Able to sit still

Pupil Size - Ask

0 Not Assessed

Bone or Joint Aches – Ask

If patient was having pain previously, only the additional component attributed to opiates withdrawal is scored

1 Mild diffuse discomfort

Runy Nose or Tearing - Ask

Not accounted for by cold symptoms or allergies

1 Nasal stuffiness or unusually moist eyes

GI Upset - Ask

Over last 1/2 hour

3 Vomiting or diarrhea

Tremor - Ask

Observation of outstretched hands

0 No tremor

Yawning - Ask

Observation during assessment

0 No yawning

Anxiety or Irritability - Ask

1 Patient increasing irritability or anxiousness

Gooseflesh Skin - Ask

3 Piloerection of skin can be felt or hairs standing up on arms

Additional Comments:

Is the patient pregnant?

☐ Yes

☑ No



Spokane County Detention Center
1100 West Mallon Ave
Spokane, WA 99260

8/28/2018 10:49:37 AM Central Daylight Time

## COWS - Completed by: Michael Kallsen Charge RN on 8/24/2018 2:30:47 AM Central Daylight Time

**PICTURE NOT AVAILABLE**

| | | | | | |
|---|---|---|---|---|---|
| **Patient:** | HILL, CINDY LOU | **#:** | 412473 (18013056) | **Lang:** | |
| **DOB:** | ▓▓▓▓ (Age=55) | **Sex:** | F | **Race:** | W |
| **Housing:** | — | **SSN#:** | **HIDDEN** | **Type:** | |
| **Status:** | NOT ACTIVE | **Booking Date:** | 8/21/2018 12:05:00 PM Central Daylight Time | **Release:** | 8/26/2018 8:43:36 AM |

☐ Refused                    ☐ Unavailable

☐ **Patient Refused**

| BP | Temp | Pulse | Resp | SaO2 | BS | Pain | Height(ft) |
|---|---|---|---|---|---|---|---|
| 110 / 84 | 97.1 | 67 | 16 | 95 | na | 0 | 0 |

| Height(in) | Weight | BMI | MAP | | | | |
|---|---|---|---|---|---|---|---|
| 0 | na | NA | 92.67 | | | | |

Current Allergies

No Known Drug Allergy

Total COWS Score - 6

Minimal withdrawal symptoms. Consider reassessing within 8 hours.

Resting Pulse Rate - Ask

Measured after patient is sitting or lying for one minute

0 80 or below

Sweating - Ask

Over past 1/2 hour not accounted for by room temperature or patient activity

0 No report of chills or flushing

Restlessness - Ask

HILL, CINDY LOU 412473 (18013056)



Observation during assessment

0 Able to sit still

Pupil Size - Ask

0 Not Assessed

Bone or Joint Aches - Ask

If patient was having pain previously, only the additional component attributed to opiates withdrawal is scored

0 Not present

Runy Nose or Tearing - Ask

Not accounted for by cold symptoms or allergies

1 Nasal stuffiness or unusually moist eyes

GI Upset - Ask

Over last 1/2 hour

5 Multiple episodes of diarrhea or vomiting

Tremor - Ask

Observation of outstretched hands

0 Not Assessed

Yawning - Ask

Observation during assessment

0 Not Assessed

Anxiety or Irritability - Ask

0 Not Assessed

Gooseflesh Skin - Ask

0 Not Assessed



HILL, CINDY LOU 412473 (18013056)

RFP 1-0069

Additional Comments:

Is the patient pregnant?

☐ Yes

☑ No



Spokane County Detention Center
1100 West Mallon Ave
Spokane, WA 99260

8/28/2018 10:49:37 AM Central Daylight Time

## COWS - Completed by: Kara Contabile Charge RN on 8/23/2018 10:05:59 AM Central Daylight Time

**PICTURE NOT AVAILABLE**

| | | | | | |
|---|---|---|---|---|---|
| **Patient:** | HILL, CINDY LOU | **#:** | 412473 (18013056) | **Lang:** | |
| **DOB:** | ▆▆▆▆ (Age=55) | **Sex:** | F | **Race:** | W |
| **Housing:** | --- | **SSN#:** | **HIDDEN** | **Type:** | |
| **Status:** | NOT ACTIVE | **Booking Date:** | 8/21/2018 12:05:00 PM Central Daylight Time | **Release:** | 8/26/2018 8:43:36 AM |

☐ Refused          ☐ Unavailable

☐ **Patient Refused**

| BP | Temp | Pulse | Resp | SaO2 | BS | Pain | Height(ft) |
|---|---|---|---|---|---|---|---|
| 127 / 73 | 96.5 | 87 | 16 | 96 | na | na | 0 |

| Height(in) | Weight | BMI | MAP | | | | |
|---|---|---|---|---|---|---|---|
| 0 | na | NA | 91.00 | | | | |

Current Allergies

No Known Drug Allergy

Total COWS Score - 12

Mild withdrawal symptoms. Consider reassessing within 8 hours.
GIVE NOW! Administer .1mg Clonidine

Resting Pulse Rate - Ask

Measured after patient is sitting or lying for one minute

1 81-100

Sweating - Ask

Over past 1/2 hour not accounted for by room temperature or patient activity

1 Subjective report of chills or flushing

HILL, CINDY LOU 412473 (18013056)

RFP 1-0071

Restlessness - Ask

Observation during assessment

3 Frequent shifting or extraneous movements of legs/arms


Pupil Size - Ask

0 Not Assessed


Bone or Joint Aches – Ask

If patient was having pain previously, only the additional component attributed to opiates withdrawal is scored

2 Patient reports severe diffuse aching of joints/muscles


Runy Nose or Tearing - Ask

Not accounted for by cold symptoms or allergies

0 Not present


GI Upset - Ask

Over last 1/2 hour

3 Vomiting or diarrhea


Tremor - Ask

Observation of outstretched hands

0 No tremor


Yawning - Ask

Observation during assessment

0 No yawning


Anxiety or Irritability - Ask

2 Patient obviously irritable/anxious


Gooseflesh Skin - Ask

0 Skin is smooth


HILL, CINDY LOU 412473 (18013056)

RFP 1-0072

Additional Comments:

Is the patient pregnant?

☐ Yes
☑ No

HILL, CINDY LOU 412473 (18013056)

RFP 1-0073



Spokane County Detention Center
1100 West Mallon Ave
Spokane, WA 99260

8/28/2018 10:49:37 AM Central Daylight Time

## COWS - Completed by: Tsubasa Bruce Charge RN on 8/23/2018 5:01:20 AM Central Daylight Time

**PICTURE
NOT AVAILABLE**

| | | | | | |
|---|---|---|---|---|---|
| **Patient:** | HILL, CINDY LOU | **#:** | 412473 (18013056) | **Lang:** | |
| **DOB:** | (Age=55) | **Sex:** | F | **Race:** | W |
| **Housing:** | --- | **SSN#:** | **HIDDEN** | **Type:** | |
| **Status:** | NOT ACTIVE | **Booking Date:** | 8/21/2018 12:05:00 PM Central Daylight Time | **Release:** | 8/26/2018 8:43:36 AM |

☑ Refused          ☐ Unavailable

☑ **Patient Refused**

| BP | Temp | Pulse | Resp | SaO2 | BS | Pain | Height(ft) |
|---|---|---|---|---|---|---|---|
| / | | | | | | | 0 |
| **Height(in)** | **Weight** | **BMI** | **MAP** | | | | |
| 0 | | | | | | | |

Current Allergies

No Known Drug Allergy

Total COWS Score - 0

Minimal withdrawal symptoms. Consider reassessing within 8 hours.

Resting Pulse Rate - Ask

Measured after patient is sitting or lying for one minute

0 Not Assessed

Sweating - Ask

Over past 1/2 hour not accounted for by room temperature or patient activity

0 Not Assessed

Restlessness - Ask

HILL, CINDY LOU 412473 (18013056)

RFP 1-0074

Observation during assessment

0 Able to sit still

Pupil Size - Ask

0 Not Assessed

Bone or Joint Aches - Ask

If patient was having pain previously, only the additional component attributed to opiates withdrawal is scored

0 Not Assessed

Runy Nose or Tearing - Ask

Not accounted for by cold symptoms or allergies

0 Not Assessed

GI Upset - Ask

Over last 1/2 hour

0 No GI symptoms

Tremor - Ask

Observation of outstretched hands

0 No tremor

Yawning - Ask

Observation during assessment

0 Not Assessed

Anxiety or Irritability - Ask

0 Not Assessed

Gooseflesh Skin - Ask

0 Not Assessed

HILL, CINDY LOU 412473 (18013056)

Additional Comments:

Pt refused to be checked, she stated "nope! no s/s of withdrawals, Kuhn present

Is the patient pregnant?

☐ Yes

☑ No



Spokane County Detention Center
1100 West Mallon Ave
Spokane, WA 99260

8/28/2018 10:49:37 AM Central Daylight Time

## COWS - Completed by: Kara Contabile Charge RN on 8/22/2018 6:38:56 PM Central Daylight Time

| | PICTURE NOT AVAILABLE |
|---|---|

| **Patient:** | HILL, CINDY LOU | **#:** | 412473 (18013056) | **Lang:** | |
|---|---|---|---|---|---|
| **DOB:** | ▮▮▮▮ (Age=55) | **Sex:** | F | **Race:** | W |
| **Housing:** | --- | **SSN#:** | **HIDDEN** | **Type:** | |
| **Status:** | NOT ACTIVE | **Booking Date:** | 8/21/2018 12:05:00 PM Central Daylight Time | **Release:** | 8/26/2018 8:43:36 AM |

☐ Refused          ☐ Unavailable

☐ **Patient Refused**

| BP | Temp | Pulse | Resp | SaO2 | BS | Pain | Height(ft) |
|---|---|---|---|---|---|---|---|
| 139 / 98 | 97.5 | 93 | 16 | 99 | na | na | 5 |

| Height(in) | Weight | BMI | MAP |
|---|---|---|---|
| 1 | na | 0.0 | 111.67 |

Current Allergies

No Known Drug Allergy

Total COWS Score - 5

Minimal withdrawal symptoms. Consider reassessing within 8 hours.

Resting Pulse Rate - Ask

Measured after patient is sitting or lying for one minute

1 81-100

Sweating - Ask

Over past 1/2 hour not accounted for by room temperature or patient activity

1 Subjective report of chills or flushing

Restlessness - Ask

HILL, CINDY LOU 412473 (18013056)

RFP 1-0077

Observation during assessment

0 Able to sit still

Pupil Size - Ask

0 Pupils pinned or normal size for room light

Bone or Joint Aches - Ask

If patient was having pain previously, only the additional component attributed to opiates withdrawal is scored

0 Not present

Runy Nose or Tearing - Ask

Not accounted for by cold symptoms or allergies

0 Not present

GI Upset - Ask

Over last 1/2 hour

2 Nausea or loose stool

Tremor - Ask

Observation of outstretched hands

0 No tremor

Yawning - Ask

Observation during assessment

0 No yawning

Anxiety or Irritability - Ask

1 Patient increasing irritability or anxiousness

Gooseflesh Skin - Ask

0 Skin is smooth

Additional Comments:

Is the patient pregnant?

☐ Yes

☑ No

HILL, CINDY LOU 412473 (18013056)

RFP 1-0079



Spokane County Detention Center
1100 West Mallon Ave
Spokane, WA 99260

8/28/2018 10:49:37 AM Central Daylight Time

**COWS** - Completed by: Sheila Hudkins Charge RN on 8/22/2018 5:57:29 PM Central Daylight Time

PICTURE
NOT AVAILABLE

| | | | | | | |
|---|---|---|---|---|---|---|
| **Patient:** | HILL, CINDY LOU | **#:** | 412473 (18013056) | **Lang:** | | |
| **DOB:** | ▮▮▮▮ (Age=55) | **Sex:** | F | **Race:** | W | |
| **Housing:** | --- | **SSN#:** | **HIDDEN** | **Type:** | | |
| **Status:** | NOT ACTIVE | **Booking Date:** | 8/21/2018 12:05:00 PM Central Daylight Time | **Release:** | 8/26/2018 8:43:36 AM | |

☐ Refused          ☐ Unavailable

☐ **Patient Refused**

| BP | Temp | Pulse | Resp | SaO2 | BS | Pain | Height(ft) |
|---|---|---|---|---|---|---|---|
| 125 / 79 | 98.1 | 71 | 17 | 98 | na | 5 | 5 |

| Height(in) | Weight | BMI | MAP | | | | |
|---|---|---|---|---|---|---|---|
| 1 | na | 0.0 | 94.33 | | | | |

Current Allergies

No Known Drug Allergy

Total COWS Score - 5

Minimal withdrawal symptoms. Consider reassessing within 8 hours.

Resting Pulse Rate - Ask

Measured after patient is sitting or lying for one minute

0 80 or below

Sweating - Ask

Over past 1/2 hour not accounted for by room temperature or patient activity

0 No report of chills or flushing

Restlessness - Ask

HILL, CINDY LOU 412473 (18013056)

Observation during assessment

0 Able to sit still

Pupil Size - Ask

1 Pupils possibly larger than normal for room light

Bone or Joint Aches - Ask

If patient was having pain previously, only the additional component attributed to opiates withdrawal is scored

1 Mild diffuse discomfort

Runy Nose or Tearing - Ask

Not accounted for by cold symptoms or allergies

0 Not present

GI Upset - Ask

Over last 1/2 hour

0 No GI symptoms

Tremor - Ask

Observation of outstretched hands

0 No tremor

Yawning - Ask

Observation during assessment

0 No yawning

Anxiety or Irritability - Ask

0 None

Gooseflesh Skin - Ask

3 Piloerection of skin can be felt or hairs standing up on arms

HILL, CINDY LOU 412473 (18013056)

RFP 1-0081

Additional Comments:

Is the patient pregnant?

☐ Yes

☑ No

*The Estate of Cindy Lou Hill, by and through its personal representative, Joseph A. Grube; and Cynthia Metsker, individually vs. Naphcare, Inc., et al.*

Case No. 2:20-cv-00410-RMP

Declaration of Hank Balson

Exhibit F

THE ESTATE OF CINDY LOU HILL vs NAPHCARE
Gubitz, Hannah - August 13, 2021

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON


THE ESTATE OF CINDY LOU HILL, by       )
and through its personal               )
representative, Joseph A. Grube;       )
and CINDY METSKER, individually,       )
                                       )
                Plaintiffs,            )
                                       )
           vs.                         ) No.
                                       ) 2:20-cv-00410-RMP
NAPHCARE, INC., an Alabama             )
corporation; HANNAH GUBITZ,            )
individually; and SPOKANE COUNTY,      )
a political subdivision of the         )
State of Washington,                   )
                                       )
                Defendants.            )

VIDEOTAPED DEPOSITION OF HANNAH GUBITZ

August 13, 2021

Taken via Zoom

```
 1        that would lead to a diagnosis or any orders being

 2        written, that would require a higher provider.

 3   Q    And so was it the case in August of 2018 that a RN was

 4        not permitted to make a medical diagnosis?

 5   A    RNs are not permitted to make medical diagnosis,

 6        regardless of time.

 7   Q    Have you ever heard the term acute abdomen?

 8   A    Yes, I have.

 9   Q    What is an acute abdomen?

10   A    My understanding of an acute abdomen is that it is a

11        patient who presents with acute problems pertaining to

12        that part of their body.

13   Q    Would you agree with me that an acute abdomen relates to

14        the onset of severe abdominal pain?

15                       MS. WICK:  Object to the form.  Go

16        ahead.

17                       THE WITNESS:  I believe so.

18   Q    (By Mr. Budge)  Is it true that an acute abdomen has

19        a large number of possible causes?

20   A    Yes, it is.

21   Q    Is an acute abdomen a condition that demands urgent

22        treatment and attention by a medical doctor?

23                       MS. WICK:  Object to the form.  Go

24        ahead.

25                       THE WITNESS:  It would depend on the
```

 1   Q   What about auscultation or listening?

 2   A   **That would also be something that you could do, depending**

 3       **on patient reports and if they are willing to comply with**

 4       **an assessment.**

 5   Q   Miss Gubitz, can an acute abdomen indicate a variety of

 6       conditions that are life threatening if not addressed by

 7       a medical doctor on an urgent basis?

 8   A   **Yes, they can.**

 9   Q   Can an acute abdomen indicate the following conditions:

10       acute appendicitis?

11   A   **Yes.**

12   Q   What is acute appendicitis?

13   A   **Acute appendicitis is when the appendix is either**

14       **inflamed or has burst.**

15   Q   Is that an urgent condition requiring intervention by

16       a medical doctor?

17   A   **Yes, it is.**

18   Q   Can an acute abdomen indicate cholecystitis?

19   A   **I believe so.**

20   Q   What is that?

21   A   **Cholecystitis is inflammation of the gallbladder, if I**

22       **remember correctly.**

23   Q   Is that an urgent condition requiring intervention by

24       a medical doctor?

25   A   **It can be.**

1  Q   What about pancreatitis?  Can an acute abdomen indicate

2      pancreatitis?

3  A   **I believe so.**

4  Q   What is pancreatitis?

5  A   **Pancreatitis is inflammation of the pancreas.**

6  Q   Is that an urgent condition that requires intervention by

7      a medical doctor?

8  A   **Yes.**

9  Q   What about acute diverticulitis?  Can an acute abdomen

10     indicate acute diverticulitis?

11 A   **Yes, it can.**

12 Q   What is acute diverticulitis?

13 A   **That would be inflammation of the colon.**

14 Q   Is that an urgent condition requiring intervention by

15     a medical doctor?

16 A   **It can be.**

17 Q   What about acute, sorry, peritonitis?  Can acute abdomen

18     indicate acute peritonitis?

19 A   **Yes, it can.**

20 Q   What is acute peritonitis?

21 A   **That would be inflammation of the lining in the abdomen.**

22 Q   Is that an urgent condition requiring intervention by

23     a medical doctor?

24 A   **Yes, it is.**

25 Q   What about intestinal ischemia?  Can an acute abdomen

```
 1        indicate intestinal ischemia?
 2   A    I believe so.
 3   Q    Is that an urgent condition requiring intervention by
 4        a medical doctor?
 5   A    I believe so.
 6   Q    Can an acute abdomen indicate a rupture of an abdominal
 7        adhesion?
 8   A    Yes, it can.
 9   Q    What are abdominal adhesions?
10   A    That would be where two organs or two pieces of abdomen
11        have kind of fused together and there is a tissue bridge
12        between the two.
13   Q    Is a rupture of an abdominal adhesion a urgent condition
14        requiring intervention by a medical doctor?
15   A    It can be.
16   Q    What is a duodenal liver adhesion?
17   A    I believe that would be a tissue bridge between the
18        duodenum and the liver.
19   Q    Can an acute abdominal -- excuse me.  Can an acute
20        abdomen indicate a rupture of a duodenal liver adhesion?
21   A    I believe so.
22   Q    Is that something that requires urgent intervention by
23        a medical doctor?
24   A    It can be.
25   Q    Were you aware, back in August of 2018, that an acute
```

1      abdomen might indicate any or all of these various

2      conditions?

3   A  Yes.

4   Q  Is it the case that significant abdominal pain is the

5      primary symptom associated with an acute abdomen?

6                       MS. WICK:  Object to the form.  Go

7      ahead.

8                       THE WITNESS:  Significant abdominal

9      pain is also the primary symptom for a wide variety of

10     medical conditions, including opiate withdrawal.

11  Q  (By Mr. Budge)  With an acute abdomen, is it the case

12     that significant abdominal pain is the primary symptom?

13                      MS. WICK:  Object to the form.

14                      THE WITNESS:  I believe so.  I have

15     not had a ton of experience with acute abdomens, as I am

16     not a medical provider higher than an RN.

17  Q  (By Mr. Budge)  Before August 25th of 2018, have you had

18     any significant experience with an acute abdomen?

19  A  I would say that I had some experience with an acute

20     abdomen.

21  Q  Okay.  Could you describe how much experience you had

22     with acute abdomens before August 25th of 2018?

23  A  I spent a year working on a post-op floor where we had

24     a wide variety of patients, including patients with

25     abdominal pain and abdominal surgery.

 1     underlying abdominal conditions that were much more
 2     serious than opiate withdrawal, correct?
 3  A  That is correct.
 4  Q  And you knew that her condition might -- might possibly
 5     indicate an urgent condition requiring the intervention
 6     of a medical doctor, correct?
 7  A  It could have, yeah.
 8  Q  All right.  Can you tell me whether you felt that
 9     Miss Hill was exaggerating or faking?
10  A  At the time I did not necessarily think that she was
11     exaggerating or faking.  I have a -- especially with
12     patients who are incarcerated, you kind of just need to
13     take them at their word.
14  Q  And so did you take Miss Hill at her word with regard to
15     the extent of her described pain?
16  A  Yes, I did.
17  Q  And did you at any time feel in your mind that Miss Hill
18     was probably exaggerating or faking in any degree?
19  A  I did not.
20  Q  So the pain that she was describing, the pain that her
21     cellmate was describing, the shouting that you described,
22     you -- you took all of that at face value?  You didn't
23     discount it as a patient who was just trying to get
24     attention or anything like that?
25  A  I did not.

1  Q  And did that person say anything back to you?

2  A  **My memory is that they said that they understood.**

3  Q  Do you know how Miss Hill was placed in the wheelchair

4     that took her up to 2 West?

5  A  **I do not.**

6  Q  I thought you had said earlier in your testimony that you

7     had some information about how she was placed in the

8     wheelchair.

9        Do -- do you recall that or am I misremembering?

10 A  **I believe I stated that I knew that a wheelchair was**

11    **brought and that I did not think that she stood to get**

12    **into it, but I don't explicitly remember how she got into**

13    **the wheelchair.**

14 Q  In fact, you don't even remember if you were there,

15    right?

16 A  **I remember standing at the desk to fill out the medical**

17    **watch paperwork and wheelchair being brought.  I do not**

18    **remember what happened after that.**

19 Q  Now, as a result of the first encounter with Miss Hill,

20    is it the case that you were not able to rule out any

21    serious underlying abdominal condition that Miss Hill

22    might be suffering from?

23 A  **That is the case, yes.**

24 Q  You were not able to rule out acute appendicitis, acute

25    cholecystitis, correct?

1  A  **That would have required a diagnosis that I am not able**

2     **to provide.  I could not rule out a number of things.**

3  Q  Right.

4        You couldn't rule out pancreatitis or acute

5     diverticulitis, correct?

6  A  **That is correct.**

7  Q  And you couldn't rule out peritonitis, correct?

8  A  **That is correct.**

9  Q  And you could not rule out a rupture caused by the

10    separation of a duodenal liver adhesion, correct?

11 A  **That is correct.**

12 Q  Miss Hill's cellmate suggested to you that perhaps

13    Miss Hill was suffering from appendicitis, right, or --

14    or that it was her appendix?

15 A  **That is correct.**

16 Q  And did you consider whether it might be Miss Hill's

17    appendix?

18 A  **I did consider that, but the limited physical assessment**

19    **that she allowed me to do did not provide further kind of**

20    **push in the direction that it would have been related to**

21    **her appendix.**

22 Q  So you just didn't have enough information as a result of

23    your first encounter to really make an assessment about

24    whether it could've been any of those things, correct?

25 A  **I would say that that is correct.**

1   Q   And you didn't come to any conclusions about what was

2       causing or might be causing her abdominal pain, correct?

**3   A   Not anything definite.**

4   Q   I'm gonna now refer you again to Exhibit No. 1, which are

5       your answers to the interrogatories.

6          Do you see that there on the screen?

**7   A   Yes, I do.**

8   Q   And this time I'm gonna refer you to Interrogatory No. 3

9       on the seventh page, which was posed to you as follows:

10       "Identify all dates and times that you communicated

11      with any other person (or any other person communicated

12      with you) about Cindy Lou Hill or any aspect of her

13      condition or confinement, either before or after her

14      death, whether in person, via telephone, or via any form

15      of electronic or written" -- "form of written or

16      electronic communication.  If you are unable to state the

17      date and time of any such contact, please provide your

18      best estimate.  With respect to each such communication,

19      please state the manner of the communication (e.g.,

20      in-person, telephone, email, etc.), identify the

21      person(s) with whom you communicated, describe the

22      subject matter of the communication, and identify who

23      else was part of the communication (e.g., persons who

24      were copied on emails or who were present during the

25      communication)."

1  Q   Okay.  And so if you had wanted to contact a doctor or

2      a physician assistant or a nurse practitioner and

3      describe Miss Hill's condition to him or her, is it the

4      case that you could have done that with relative ease?

5  A   **Yes, it is the case.**

6  Q   And you decided not to contact the higher-level provider

7      about Miss Hill, correct?

8  A   **Not at that time, yes.**

9  Q   Well, not at any time, correct?

10 A   **Correct.  I chose to put her somewhere where we could**

11     **keep a better eye on her and do a reassessment before**

12     **contacting a provider.**

13 Q   Right.

14         And just so we're clear for the record:  It was your

15     decision not to contact a higher-level provider about

16     Miss Hill, right?

17 A   **That is correct.**

18 Q   What if you had wanted to ensure that -- given -- given

19     that you were only able to do a limited assessment, what

20     if you had wanted to contact a higher-level provider to

21     come and see Miss Hill in her jail cell?  Were there

22     procedures available for you to make that happen?

23 A   **On a Saturday that would have required transferring her**

24     **out of the facility to a hospital, as in my experience**

25     **the on call providers did not come to the facility on**

1          their off days.

2    Q    All right.  And so is it the case that on August 25th,

3          2018, in response to your first encounter with Miss Hill,

4          if you had wanted her to be actually seen by a doctor or

5          a physician assistant or an advanced registered nurse

6          practitioner, the only option available to you would've

7          been to initiate steps to get her taken to the ER?

8    A    **That is correct.**

9    Q    And it was your decision not to initiate the steps that

10         would have gotten Miss Hill to the ER, correct?

11   A    **That is correct.**

12   Q    Did you consider consulting with any of your nurse

13         colleagues who were physically present at the jail about

14         Miss Hill after your first encounter?

15   A    **I don't have a clear memory of wanting to or then**

16         **consulting with any of the other nursing staff.**

17   Q    Can you tell me how many other RNs would have been on

18         shift at the time you were seeing Miss Hill on the 25th

19         of August?

20   A    **There would have two other RNs in the building at that**

21         **time.**

22   Q    And then were there also LPNs or LVNs?

23   A    **There would've been two LVNs in the building at that**

24         **time.**

25   Q    But if you had wanted to consult with another nurse at

1    ahead.

2                     THE WITNESS:  I would say that is

3    correct.  But given her stable vital signs and lack of

4    kind of major abnormalities noted on the assessment I did

5    do, I wanted to keep an eye on her and do a reassessment.

6  Q  (By Mr. Budge)  Well, were you making a diagnosis?

7  A  I am not able to make a diagnosis as I am not a medical

8    doctor.  I am able to collect symptoms and kind of decide

9    plan of care from there.

10 Q  Okay.  So given what you knew about her acute abdominal

11   pain and given that you couldn't do the kind of

12   assessment that you wanted to do, why didn't you call

13   a higher-level provider?

14 A  I chose not to call a higher-level provider, given that

15   at the beginning of my interaction with her she was calm

16   and responsive.  It was not until her roommate brought

17   her forward that she started really kind of shouting and

18   complaining of pain.  My limited visual and physical

19   assessment did not show any gross abnormalities, and her

20   vital signs were stable.  And I wanted to monitor her for

21   slightly longer and do a reassessment before contacting

22   a higher-level provider to have a better picture of what

23   was going on with her.

24 Q  When did you intend to do the next reassessment?

25 A  I would've done it midafternoon with the rest of the

1      left-hand side of the screen is you?

2   A   **It appears to be, yes.**

3   Q   And the person you're standing next to, is that

4      CO Torosian?

5   A   **Yes, it appears so.**

6   Q   And in your right hand are you holding the Styrofoam

7      cups?

8   A   **No.  They are hung off of the radio hanging off of my**

9      **right hip.**

10  Q   Right.

11        And what're you holding in your left hand that

12     appears to be a red object?

13  A   **That was the caddy that we would put Gatorade packets and**

14     **medications in and carry around with us for detox**

15     **assessments.**

16  Q   And the white, what appears to be paper in your left

17     hand, would that have been the list of people to be seen

18     for withdrawal?

19  A   **Yes.**

20                          (Video plays.)

21  Q   (By Mr. Budge)  And then at -- by 8:50:32 have you and

22     the corrections officer departed the area?

23  A   **It appears so, yes.**

24  Q   And so will you now agree with me that the time of the

25     first encounter with Cindy Hill happened at about

1    8:43 a.m. or so till about 8:48 a.m.?

2                    MS. WICK:  Object to the form.  Go

3    ahead.

4                    **THE WITNESS:  I would agree with that**

5    **based on the time stamps, yes.**

6  Q  (By Mr. Budge)  And that the total duration of the

7    encounter, including where you're standing outside the

8    door and then when you go behind the door, is about five

9    minutes and 30 seconds?

10 A  **It would appear so, yes.**

11                   MR. BUDGE:  And I wanna show you now

12   Exhibit 14 to your deposition.

13                       (Exhibit No. 14 marked for

14                        identification.)

15 Q  (By Mr. Budge)  Can you see that this is a screenshot

16   showing the same camera angle?

17     I'm sorry, if you answered, I didn't hear.

18 A  **Oh, yes.  Sorry.  I can see that.**

19 Q  Okay.  And do you see in the lower right-hand corner of

20   the screen that it shows the time as being 9:08 a.m. on

21   August 25th?

22 A  **Yes, I can see that.**

23 Q  And do you see that there's a person in a wheelchair

24   outside the Cell 3 West 04?

25 A  **Yes, I can see that.**

 1    questions about skin color, skin, abdomen and

 2    palpitation, rebound, tenderness, bowel sounds.

 3        Do you see that?

 4  A   I do see that.

 5  Q   And it says under "Assessment" that if there's acute

 6    distress, notify, in big letters, provider and begin

 7    treatment.

 8        Do you see that?

 9  A   I do see that.

10  Q   Was Miss Hill in acute distress?

11                  MS. WICK:  Object to the form.  Go

12    ahead.

13                  THE WITNESS:  I would say so.

14  Q   (By Mr. Budge)  Right.

15        And so if you had been following this form, and --

16    and in contrast to the -- in contrast to the COWS form,

17    would you have notified the provider as -- as directed

18    under the "Assessment" section?

19                  MS. WICK:  Object to the form.  Calls

20    for speculation.  Go ahead.

21                  THE WITNESS:  I honestly don't know

22    that I could say what I would've done if I had this form

23    in front of me.

24  Q   (By Mr. Budge)  Do you have any other explanation that

25    you haven't provided so far as to why you didn't pull up

1      cells in the medical wing of the jail?

2   A  The cells in the medical wing of the jail are what we use

3      for patients who had chronic medical conditions, patients

4      who had a below-the-knee amputation or were high

5      infection risks.  The medical watch cells on 2 West were

6      used for patients who needed acute medical monitoring

7      because there was more staff available to keep an eye on

8      them at any given time.

9   Q  So patients with acute conditions would be moved to

10     2 West?

11  A  If they needed acute monitoring, they would be moved to

12     2 West.  And then we would reassess them and determine if

13     they needed to be rehoused where they had originally been

14     transferred from or if they needed to be housed long term

15     up in the medical cells in the other building.

16  Q  And was it your decision to move Miss Hill to 2 West,

17     as opposed to the medical wing, because she had an acute

18     condition and not a chronic or long-lasting condition?

19  A  Partly.  It's also the availability of staff to monitor

20     patients.  There are more officers on 2 West at any given

21     time than there are on any of the other units in the

22     facility.

23  Q  What about nurses?  Were nurses routinely stationed in

24     the area of 2 West?

25  A  Nurses were not stationed on units specifically, but we

```
 1        were constantly moving around and seeing them.  And we

 2        routinely saw all the patients on medical watch on 2 West

 3        every day.

 4   Q    Every day?

 5   A    Or as often as needed, depending on what they were there

 6        for.

 7   Q    Do you have any reason to dispute, based on the

 8        screenshots that we've seen such as Exhibit 14, that

 9        Miss Hill was moved up to 2 West at about 9:08 a.m.?

10   A    I don't have any reason to dispute that, no.

11   Q    And the only instructions that you gave to corrections

12        staff with regard to Miss Hill being up on 2 West and

13        monitoring her are the instructions that you previously

14        testified about that you gave to the unknown corrections

15        officer?

16   A    As far as I recall, yes.

17   Q    If you take a closer look at Exhibit 6, I'd like to ask

18        you:  Were you familiar with this form before you

19        completed it for Miss Hill?

20   A    Yes, I was.

21   Q    Do you know if this is a Spokane County Jail form or, in

22        contrast, a NaphCare form?

23   A    I don't know.

24   Q    When you decided to place Miss Hill on medical watch,

25        could you please tell me, in as much detail as you can,
```

1  A    Patients who are on medical watch are routinely assessed

2       each shift.  Patients who are not on medical watch are

3       assessed if they report issues or if they were on detox

4       protocol.  It was not policy for us to do an assessment

5       on every single patient in the building every single day.

6  Q    Right.

7           But Miss Hill was due to be given another COWS

8       assessment at what time?

9  A    Early to midafternoon.

10 Q    On the 25th?

11 A    Yes.

12 Q    And that would've taken place regardless of whether she

13      was up in 2 West or whether she was down in 3 West where

14      she had been before, correct?

15 A    Yes, it would have.

16 Q    So by putting her up in 2 West, she would not have any

17      more frequent monitoring by a medical person unless

18      a corrections officer reported a change in her status.

19          Is that -- is that accurate?

20 A    I would say that that's correct, yes.

21 Q    Did --

22                     MS. WICK:  If we're at --

23 Q    -- you --

24                     MS. EHLERT:  I'm sorry.  It we're at

25      a good time, we're -- Erin and I are gonna have to

1    A    I did not expect that they would check pupil size.

2    Q    Did you expect that they would check her for worsening

3         abdominal pain?

4    A    Yes, I did.

5    Q    Did you expect that they would check her for any of the

6         other examples that are listed up at the top of the

7         medical watch form?

8    A    I don't believe so, no.  Other than the ones we've

9         already highlighted.

10   Q    Okay.  So of the examples that are up at the top of the

11        medical watch form, you expected that the corrections

12        officers working for the Spokane County Jail would check

13        Miss Hill once every 30 minutes for worsening abdominal

14        pain, correct?

15   A    Correct.

16   Q    And nausea or vomiting, correct?

17   A    Correct.

18   Q    Anything else?

19   A    I don't believe so, though the officers were very good

20        about noticing most any kind of change in patients.

21   Q    How did you expect that the officers, once every

22        30 minutes, would check Miss Hill in the medical watch

23        section of the jail for worsening abdominal pain?  What

24        did you expect them to do in order to determine whether

25        she had worsening abdominal pain throughout the course of

1      the day?

2    A    In my experience working with the officers and my

3         expectation here, they did not just do a visual

4         assessment of patients.  They would speak to them on that

5         30-minute round and say, "How are you feeling?" or

6         "What's going on?"

7    Q    And so you expected that the correctional officers

8         checking the cell every 30 minutes would have verbal

9         communication with her?

10   A    That was my expectation, yes.

11   Q    And you expected that the correctional officers checking

12        her every 30 minutes would ask her if she had abdominal

13        pain and if it was getting worse and how she was feeling

14        and other questions designed to elicit a verbal response?

15   A    I would expect them to ask if she felt any worse.  I

16        don't know the exact verbiage or language they would use

17        in doing so.

18   Q    But in --

19   A    I did not specify that to them.

20   Q    -- but in substance you expected that they would ask

21        questions directed to determining whether she was having

22        worsening abdominal pain?

23   A    Yes.

24   Q    And in substance did you expect that they would ask

25        questions of her relating to whether she was having

1      nausea or vomiting?

2  A   I believe so.  A lot of officers also used a visual

3      assessment for that.

4  Q   So you expected that they would visually assess her in

5      some way to determine if she was nauseous?

6  A   I mean visually and verbally.  Like, it wouldn't just be

7      a verbal conversation.

8  Q   Okay.  So you expected that they would pay close enough

9      attention to her, whether verbal or observing her for

10     a period of time, to determine whether she was nauseous

11     or vomiting?

12 A   Yes.

13 Q   What other things were you expecting that the corrections

14     officers would do in order to have her be on any

15     heightened degree of watch versus what they would do if

16     she was in 3 West 04?

17 A   I would anticipate probably an increased amount of

18     conversation between them and the medical staff,

19     depending on how patients were doing.  There were more

20     of them on the unit at a time, so there were more eyes.

21     And so they were likely to have a second person

22     double-check in case they were, like, not sure.  Maybe

23     have another officer come take a look to see what they

24     thought.  Whereas there was a single officer on 3 West

25     at the time.

1   A   Yes, I did.

2   Q   Did you think that the members of the jail staff would

3       visually observe Miss Hill for any set or designated

4       period of time over and above what she would have been

5       observed if she was in the cell she was in before?

6   A   I believe so, yes.

7   Q   What was your expectation with regard to how long they

8       would look inside the cell?

9   A   My expectation was that it would be more than just

10      a quick glance to make sure that she was awake.  Not

11      necessarily minutes standing at the door, maybe 30 to

12      60 seconds to make contact and have enough of

13      a conversation to kind of quickly gauge better or worse,

14      about the same.

15  Q   More than just five seconds to see if she was alive or

16      dead?

17  A   Yeah.

18  Q   Did you think that members of jail staff working up in

19      2 West, charged with the responsibility for medical

20      watch, would be able to differentiate a person who was

21      sleeping from a person who was unconscious or passed out

22      but not sleeping in the normal sense?

23  A   Yes.

24  Q   Did you think that the Spokane County Jail had trained

25      its officers to closely and carefully monitor the inmate

1        before she was found unresponsive?

2    A   I don't specifically remember.  But based on my practice

3        for doing detox assessments on Saturday afternoons, it

4        was likely sometime between 1:00 and 3:00.

5    Q   And so you have no specific or general memory of when you

6        actually saw Cindy Hill?  You're just thinking that,

7        based on your usual practice, it was sometime between

8        about 1:00 and 3:00 in the afternoon?  Is that accurate?

9    A   I mean, my memory is that it was midafternoon before

10       dinner.  And they usually served dinner kind 4:30 to

11       5:00-ish.  But I don't specifically recall exactly what

12       time I saw her that afternoon.

13   Q   If we look again at Exhibit No. 9, do you see that on

14       your screen?

15   A   I do.

16   Q   This was the report from the Sheriff's Office about

17       a conversation that the reporting officer had with you,

18       Hannah Gubitz, following Cindy Hill's death.  And it says

19       here, "She saw Cindy at approximately 1500 hours," which

20       would be 3:00 in the afternoon.

21           If -- if -- if -- if you had told the investigating

22       sheriff's officer, following Miss Hill's death that

23       night, that you had seen her earlier that day at

24       approximately 3:00 in the afternoon, would that be your

25       best estimate as to when you saw Miss Hill the second

```
 1    time?

 2  A   I mean, I would imagine so.  I don't recall this

 3      conversation, but I imagine I would've been honest with

 4      him.

 5  Q   Do you have any reason to doubt that you told the

 6      sheriff's officer that night that you saw Miss Hill at

 7      3:00 in the afternoon, approximately?

 8  A   I have no reason to doubt that.

 9  Q   Did your second encounter with Miss Hill prior to her

10      death occur when she was confined in Cell 2 West 27?

11  A   Yes, it did.

12  Q   If we look at Exhibit 7 to your deposition, this is

13      a series of photographs showing Cell 2 West 27 and that

14      area around 2 West 27.  Let's just look at those real

15      quick, and then I'll ask you a few questions about those.

16          Okay?

17  A   Okay.

18                             (Exhibit No. 7 marked for

19                               identification.)

20  Q   (By Mr. Budge)  Does that appear to be a series of three

21      photographs, two showing the outside of 2 West 27 and one

22      showing the inside of 2 West 27?

23  A   Yes, it does.

24  Q   And that's where you saw Cindy Hill on the second

25      encounter?
```

```
 1   STATE OF WASHINGTON )     I, April Cook, CCR #3245,
                         ) ss a certified court reporter
 2   County of Pierce    )     in the State of Washington, do
                               hereby certify:
 3
 4
            That the foregoing deposition of HANNAH GUBITZ was
 5   taken before me and completed, within the limits of
     technology, on August 13, 2021, and thereafter was
 6   transcribed under my direction; that the deposition is a
     full, true and complete transcript of the testimony of said
 7   witness, including all questions, answers, objections,
     motions and exceptions;
 8
            That the witness, before examination, was by me duly
 9   sworn to testify the truth, the whole truth, and nothing but
     the truth, and that the witness reserved the right of
10   signature;

11          That I am not a relative, employee, attorney or counsel
     of any party to this action or relative or employee of any
12   such attorney or counsel and that I am not financially
     interested in the said action or the outcome thereof;
13
            That I am herewith securely sealing the said deposition
14   and promptly delivering the same to Edwin Budge.

15          IN WITNESS WHEREOF, I have hereunto set my signature on
     the 16th day of August, 2021.
16

17

18                               _____
19                               April Cook, CCR
20                               Certified Court Reporter No. 3245
                                 (Certification expires 10/11/21.)
21

22

23

24

25
```

*The Estate of Cindy Lou Hill, by and through its personal representative, Joseph A. Grube; and Cynthia Metsker, individually vs. Naphcare, Inc., et al.*

Case No. 2:20-cv-00410-RMP

Declaration of Hank Balson

Exhibit G

## MEDICAL WATCH
### General Observation

Inmate Name: Hill, Cindy          D.O.B [redacted]   CCID# 412473   Cell # 2W27

Observation Time Frame     ****Monitor every 30 hr (min)

Initiated: 8·25 @ 0930          Initiated by: Turn                    Ends: _____ @ _____
           Day      Time                 Please Print/ Employee#              Day    Time

### Examples of Important Changes to Report to Medical

| | | | |
|---|---|---|---|
| ~Nausea/ Vomiting | ~Difficult to wake | ~Increased drowsiness | ~Difficulty breathing | ~Severe Headache |
| ~Unequal pupil size | ~Change in speech | ~Unsteady while walking | ~Seizure like activity | ~Worsening Chest Pain |
| ~Unable to answer simple questions (i.e. where are you/who are you?) | | ~ Facial droop | ~Worsening abdominal pain |
| ~Weakness to one side of the body | ~Other _____ | | |

### CODE LIST

| | | | |
|---|---|---|---|
| A = Awake | G = Talking with officer | L = Yelling/Screaming | T = Talking to Self |
| B = Reading | H = Toilet/Shower | M = Mental Health/Medication/Medical | U = Upset/Crying |
| C = Court | J = Telephone Call | P = Pacing | V = Visit |
| E = Eating | K = Standing at Door | S = Sleeping | |

*For all codes used below this line, further explanation/description/update is required*

*D = Destructive Behavior    *F = Assaultive Behavior    *I = Self-Injurious Behavior    *R = Restraint Chair

*N = Change in condition/new concern noted, Medical Notified    *O = Other: _____

| DATE | TIME | CODE | Employee # | NARRATIVE Please include: Date/Time (Code) change in condition, and end with Employee # |
|---|---|---|---|---|
| 8/25 | 1015 | S | 1314 | |
| | 1169 | A | 1406 | refused lunch |
| | 1123 | S | 1406 | |
| | 1207 | S. | 1314 | |
| | 1240 | S | 1998 | |
| | 1310 | S | 1998 | |
| | 1343 | A | 1314 | |
| | 1350 | S | 1003 | |
| | 1430 | S | 1314 | |
| | 1500 | A | 1314 | |
| | 1520 | A | 1314 | |
| 8/25/18 | | — | 1406 | Was taken to Hospital |
| | | | | |

*The Estate of Cindy Lou Hill, by and through its personal representative, Joseph A. Grube; and Cynthia Metsker, individually vs. Naphcare, Inc., et al.*

Case No. 2:20-cv-00410-RMP

Declaration of Hank Balson

Exhibit H

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON


THE ESTATE OF CINDY LOU HILL, by      )
and through its personal              )
representative, Joseph A. Grube;      )
and CINDY METSKER, individually,      )
                                      )
                Plaintiffs,           )
                                      )
             vs.                      ) No.
                                      ) 2:20-cv-00410-RMP
NAPHCARE, INC., an Alabama            )
corporation; HANNAH GUBITZ,           )
individually; and SPOKANE COUNTY,     )
a political subdivision of the        )
State of Washington,                  )
                                      )
                Defendants.           )


VIDEOTAPED DEPOSITION OF DON HOOPER

July 21, 2021

Taken via Zoom

| | | |
|---|---|---|
| 1 | | As the doors -- as the cells themselves?  The |
| 2 | | five medical cells have more of a medical, like, bed. |
| 3 | | I -- I guess a hospital-type bed that has the tilt |
| 4 | | functions and things like that.  Those would be some of |
| 5 | | the major differences. |
| 6 | Q | If an inmate had a medical concern warranting closer |
| 7 | | observation or monitoring, who decides if the inmate |
| 8 | | should be housed on 2 West or in medical housing? |
| 9 | A | I would say it's typically the nurse, the nurse that's on |
| 10 | | duty, and/or the sergeant. |
| 11 | Q | So either one of those two positions have authority to |
| 12 | | assign an inmate to medical housing or 2 -- |
| 13 | A | Yeah. |
| 14 | Q | -- West? |
| 15 | A | I -- I think we would leave it up -- typically if the |
| 16 | | nurse requests it, let the nurse.  Sometimes it's just |
| 17 | | the -- there's no space so we have to -- we have to make |
| 18 | | a judgment call.  And typically using the medical |
| 19 | | department is the nurse's recommendation. |
| 20 | | If somebody had to come back from medical and -- |
| 21 | | and go to 2 West and we had to move a different inmate |
| 22 | | back and forth, you know, I'd -- I would ask -- |
| 23 | | personally would ask the nurse's opinion. |
| 24 | Q | So is there one person or other that officially has to |
| 25 | | approve it?  Does custody have to officially approve the |

1       there's other spots that are slower and -- and slower

2       paced, and maybe some more senior officers like that.

3       So I'd say it kinda falls in the middle of our bid,

4       actually.

5   Q   Are there any special qualifications or skills or

6       experience required for officers to be assigned to 2 West

7       or is any officer at the jail eligible to bid for that

8       position?

9   A   Any officer that's -- that's certified -- any of our

10      certified corrections officers can work there.

11  Q   As of August 2018, did officers assigned to 2 West

12      receive any special training beyond the training provided

13      to all officers generally?

14  A   No.  We spend a good amount of training in our field

15      training officer program on 2 West because there are --

16      like I said, there's a lot of going on on that floor with

17      the medical watches and suicide watches and all the new

18      intakes come there first.  And so we spend a good amount

19      of time on that module, more than the typical module.

20      But that's given to all of our officers that -- all of

21      our new-hire officers receive the same training.  So

22      I guess that's the answer to your question.

23  Q   As of August 2018, did officers assigned to 2 West

24      receive training on how to medically monitor inmates on

25      medical watch or assess them for medical symptoms?

1   A   Like I say, the same kind of training:  their field
2       training officer program.  There's always people on
3       medical or suicide watches, and their training officer
4       would come by.
5           I -- I was a training officer at one time.  I'd look
6       in the door and just the form that we looked at earlier,
7       in my earlier deposition.  Is the person awake?  Are they
8       sleeping?  Are they eating?  Are -- self-injurious
9       behavior?  Are they currently talking to medical or going
10      to court?  And so just document what you see, what --
11      what your visual assessment is.
12  Q   And did that field training include training on how to
13      assess medical symptoms?
14  A   Not specific medical symptoms.  More looking for distress
15      or duress.  Is the person in pain, obvious pain, or
16      distress?
17  Q   And how are officers trained to recognize distress?
18  A   Like I said -- I'm going a little fast.  I'm sorry.
19          Again, with the -- just the field training officer
20      program, on that floor you're going to see a lot of that.
21      And when your -- our training program is about 12 weeks
22      long, and it's 12 weeks long in its entirety.  So you get
23      to see a lot of everything.
24          And -- and I would expect the officer would just
25      say, "Hey, this person looks like they're under some.

```
 1        Let's call medical.  Let's call the sergeant.  Let's call
 2        for assistance.  Call somebody up here."
 3   Q    Are officers trained to watch for anything specific in
 4        order to determine whether or not an inmate is in
 5        distress?
 6   A    I -- I don't know if I can be any -- any more specific.
 7        I just -- as -- as I look into a cell, does somebody look
 8        like they're in pain?  Are they -- are they complaining?
 9        Are they hitting their medical -- or the emergency
10        buzzer?  You know, are they sick?  Are they -- you know,
11        those kind of things.  Are they throwing up?  Are they on
12        the toilet all day or are they not moving in their bed?
13        You haven't seen any movement?  Those are the kinds of
14        things I would look for.
15   Q    Is it fair to say that the officers don't necessarily
16        receive specific medical training, but they rely on their
17        intuition as laypeople to recognizes signs of distress?
18   A    I -- I would say that's accurate.  We receive -- basic
19        first aid is the medical training we receive.
20   Q    So assessing inmates' medical symptoms was that the
21        responsibility of corrections officers or medical staff?
22   A    For medical symptoms?  Medical staff.
23   Q    As of August 2018, did the duties and responsibilities of
24        officers assigned to 2 West differ in any way from those
25        of officers assigned to other housing units?
```

```
 1  Q  Any significant changes that you're aware of that you can
 2     identify without looking at it?
 3  A  Not significant changes.  I mean, it's wholly the same.
 4     I mean, I read this policy and I would pretty much know
 5     what to do.  And it's pretty much what we do now.  So...
 6  Q  Have you ever observed staff performing checks for
 7     inmates on medical watch?
 8  A  Absolutely, yes.
 9  Q  How long does it typically take for an officer to observe
10     each inmate and document his or her observation before
11     moving on to the next cell?
12                     MR. JUSTICE:  Object to the form.  You
13     can answer.
14                     THE WITNESS:  I think you can --
15     it's -- some can be very quick in the middle of the night
16     when somebody's sleeping and, like I said, no signs of
17     distress.  It'd take a second or two.  You know, you look
18     in, somebody -- no, nothing's going wrong, it appears
19     somebody's sleeping.
20         And then later on in the day if -- you know, you
21     could see somebody maybe pacing in a cell, maybe they
22     were sweating, maybe they were sitting on a toilet or
23     throwing up or something else, it might take much longer.
24         But I would say it could take two seconds, it could
25     take, you know, 20 or 30 seconds to sit there and
```

 1    observe, and anywhere in between.  It kinda depends on

 2    time of day and -- and what the offender's behavior is.

 3  Q  (By Mr. Balson)  And if an officer looks in the cell and

 4    doesn't see anything out of the ordinary or surprising,

 5    how long would you expect that check to take?

 6  A  Call it just -- just a few seconds.  Two or three

 7    seconds, maybe.  I mean, I -- I'm trying to time myself

 8    and think of looking into a window, but not very long.

 9    Just a -- just a handful of seconds.

10  Q  When staff do checks for medical watch, are they expected

11    to open the cell doors or simply observe the inmates

12    through the window in the cell door?

13  A  Typically just observe through the window.  But if

14    there's any reason they need to open the door, they're --

15    they're allowed to.  And -- and it happens quite often

16    where they either -- maybe the person's sleeping really

17    close to the door and they can't get a good visual

18    assessment or medical's with them and they -- the

19    medical -- the nurse needs to take vital signs, then they

20    open the door and go in and talk to them.  So I guess I'd

21    say both.  We do both.

22  Q  Any other reasons that you can think of where an officer

23    would be expected to open the door?

24  A  If somebody -- if somebody is in distress.  Somebody was,

25    like, self-harm, like hanging -- trying to hang

1    well-being and behavior shall occur twice every

2    30 minutes unless ordered otherwise."

3        What does it mean when it refers to "direct visual

4    observation that is sufficient to assess the inmate's

5    well-being"?

6  A   To me it would be look -- looking in the window, like I

7    said, see if -- see how they look, see if they're in any

8    distress or duress.  So I can't take -- check vitals by

9    doing a visual assessment.  I -- I can't do that.  But,

10   like I said, if they were throwing up or visibly sick or

11   complaining -- making a -- a verbal complaint about their

12   condition, something like that.

13 Q   Is there any -- are there any specific things officers

14   are supposed to do to assess an inmate's well-being if

15   there's no obvious signs of distress or complaints from

16   the inmate?

17 A   No.  That's -- that's -- those are things you could look

18   for from outside the cell.

19 Q   What are staff supposed to do if they believe an inmate

20   is not doing well?

21 A   Call medical, have medical come respond.  Call the

22   sergeants and have them respond.  One or the other or --

23 Q   And --

24 A   -- both.

25 Q   -- and under what circumstances are staff expected to

```
 1        contact medical?
 2   A    I think, like you said, if they don't -- if they think
 3        the inmate's not doing well or if the inmate's
 4        complaining about their condition.
 5   Q    And would staff be expected to contact medical regardless
 6        of the severity of the complaint?  So, for instance, if
 7        an inmate says they have a headache, would staff be
 8        expected to contact medical for that?
 9   A    No, they have to make some judgment calls:  "I've got
10        a sore pinkie toe" versus "I'm having chest pains," you
11        know.  So they have -- they have to make some judgment
12        calls based on what the complaint is.
13   Q    And are there any specific criteria given to them to aid
14        them in making those judgment calls?
15   A    Specific criteria?  Like I said, during the field
16        training program I would just -- as I was training
17        people, you know, like I said, chest pains, abdominal
18        issues, things that -- serious and can't wait till the
19        next 30-minute round or till the next med pass.  Or, like
20        I said, if it's a headache or indigestion or something
21        less severe, it can wait till the nurse shows up on the
22        floor with the next med pass.
23   Q    Are there -- is it written down anywhere what conditions
24        or symptoms should result in an officer contacting
25        medical?
```

THE ESTATE OF CINDY LOU HILL vs NAPHCARE
Hooper, Don - July 21, 2021                                                          Page 34

 1  A   Not -- I'm -- I'm struggling to think of the policy.  Not
 2      that I'm aware of.
 3  Q   Is it fair to say that this is another situation where
 4      you would rely on officers' intuition to determine
 5      whether an inmate's complaint or concern is severe enough
 6      to warrant a call to medical?
 7  A   I think that's accurate.
 8  Q   When an inmate is moved to 2 West for medical watch, are
 9      staff on the unit typically told what their medical
10      condition is?
11  A   Typically given some details of what to look for, yes.
12  Q   Given some details by whom?
13  A   The -- the nurse or the sergeant that brought the inmate
14      down.
15  Q   And are those details in writing or orally?
16  A   I believe the watch paperwork has some criteria on what
17      to look for:  Sleeping?  Are they eating?  Those kind of
18      things.
19          And then the top -- and then what -- what the person
20      can have, what kind of clothing items and hygiene items
21      and those kind of things.  So those are minimal details.
22  Q   Actually, to clarify, my question was about the inmate's
23      medical condition.
24          Are staff typically told what their medical
25      condition is when they are moved to 2 West?

```
 1                        MR. JUSTICE:  Okay.

 2                        THE VIDEOGRAPHER:  Please stand by.

 3       We're going off record.  The time is 1:57 p.m.

 4                             (Recess taken.)

 5                        THE VIDEOGRAPHER:  We are back on the

 6       record.  The time is 2:12 p.m.

 7   Q   (By Mr. Balson)  Lieutenant Hooper, you may have answered

 8       this before the break -- and if you did, I apologize --

 9       but am I correct in understanding that when officers on

10       2 West were conducting the cell checks, the 30-minute

11       watches, if they looked in an inmate's cell and didn't

12       observe anything out of the ordinary and if an inmate

13       didn't express any complaints, they weren't expected to

14       interact with every inmate on every -- in every cell

15       check, correct?

16   A   That would be correct.

17                        MR. BALSON:  I was just booted off and

18       it's reconnecting now.  All right.  Can you folks hear

19       me?

20                        THE VIDEOGRAPHER:  We can hear you.

21                        MR. BALSON:  I apologize.  I was

22       kicked off and I'm back now.  So we'll do our best.

23   Q   (By Mr. Balson)  So I'm gonna show you the next exhibit,

24       Exhibit 4.

25
```

1        their recommendation is to change some of that.

2    Q   So looking at that section with all of the symptoms

3        listed in it, as of August 2018, did jail officers

4        working on 2 West receive training on how to assess for

5        the presence or absence of each of these symptoms if it

6        weren't -- if -- if they weren't immediately apparent

7        when they looked in a cell?

8                        MR. JUSTICE:  Objection.  Asked and

9        answered.  You -- you can answer, Lieutenant.

10                       THE WITNESS:  No specific changes that

11       I know of.  No -- no specific training that I know of,

12       no.

13   Q   (By Mr. Balson)  As of August 2018, did you expect

14       officers, when conducting medical watch, to specifically

15       assess each inmate for the presence of these symptoms?

16   A   No, we did not.  Like I said, just distress, duress, and

17       listening to their complaints.

18   Q   So is it fair to say that if an officer looked in an

19       inmate's cell and there was no obvious signs of distress

20       and the inmate wasn't complaining, the inmate might be

21       experiencing one or more of these symptoms and the

22       officer wouldn't necessarily recognize it?

23                       MR. JUSTICE:  Objection.  Calls for

24       speculation, but you can answer.

25                       THE WITNESS:  I would say that's

1        accurate.

2    Q   (By Mr. Balson)  Have you ever communicated with anyone

3        from NaphCare about the fact that officers were not

4        assessing inmates for all the symptoms on this form?

5    A   I have not.

6    Q   Do you know if anybody else at the jail has ever

7        communicated with NaphCare about that?

8    A   I don't know.

9    Q   Are you aware of anybody ever expressing a concern about

10       the fact that -- that officers were not specifically

11       assessing each inmate for the presence of these symptoms?

12   A   **I've never heard of any complaints or -- or any question**

13       **about it, no.**

14   Q   Were officers on 2 West trained, when conducting cell

15       checks, to observe the inmate for a minimum amount of

16       time?  Any certain minimum?

17   A   **Not by the -- not by the watch, but just observe as long**

18       **as they think it takes to make sure they're not in any**

19       **distress or duress.**

20   Q   Were officers trained on how to assess an inmate for the

21       presence and severity of pain the inmate might be

22       experiencing?

23   A   **No.  Not that I know of, no.**

24   Q   Were there any specific questions that officers were

25       expected to ask each inmate when they were conducting

1    medical watch?

2  A  **Not specific questions.  Just what I would've trained**

3     **a new trainee:  If they said -- if they appear to be in**

4     **pain, ask them what's going on, what body part, that kind**

5     **of thing.**

6  Q  But if they did not appear to be in pain, they weren't

7     expected to ask any specific questions?

8  A  **Correct.**

9  Q  What coordination occurred between Spokane County

10    Detention Services and NaphCare so that NaphCare nurses

11    would understand what was and was not being done by jail

12    officers when it came to inmates on medical watch?

13 A  **Coordination mainly I'd say is related to the nurses and**

14    **the officers working together hand-in-hand on the floors.**

15 Q  So just through the nurses' observation when they were on

16    2 West?

17 A  **As well as other floors throughout the jail.  The nurses**

18    **go to all the floors throughout the jail as well as the**

19    **booking area and work with our staff.  We, the officers,**

20    **see what the nurses do at assessment, and they -- they**

21    **observe what we do when we do a security round or**

22    **a watch.  So...**

23 Q  And with respect specifically to 2 West, aside -- aside

24    from the nurse's personal observations of what the

25    officer was doing, are you aware of any other efforts to

 1       coordinate with NaphCare or discuss what officers were

 2       and were not doing in performing medical watch?

 3   A   I have no other -- I have no specific examples, no.

 4   Q   Here's a hypothetical question:  Suppose the NaphCare

 5       nurse who placed Cindy Hill on medical watch on

 6       August 25th were to say that she thought the jail's

 7       corrections staff would specifically check for the signs

 8       and symptoms outlined on Exhibit 4 and report back to her

 9       with any information about those signs and symptoms.

10           What would you say to that?

11                   MS. EHLERT:  Object as to form.  You

12       can answer if you can.

13                   MR. JUSTICE:  And I'll join.  It's a

14       incomplete hypothetical and calls for speculation.  But

15       you can answer.

16                   THE WITNESS:  Okay.  With all that,

17       you better just re-word the question one more time.  I --

18       I apologize.

19   Q   (By Mr. Balson)  Sure.

20           Suppose the nurse who assigned Miss Hill to 2 West

21       were to say that she was expecting the officers doing the

22       medical watch to specifically check for each of the

23       symptoms listed on the medical watch form and report back

24       to her what they found.

25           What would -- how would you respond to that?

 1     somebody says, we get people there right way.

 2          And worsening abdominal pains we'd have somebody

 3     right away.

 4          So I think the wording on it's a little funny is

 5     that we're assessing for those things.  Some of them I

 6     wouldn't call an assessment.  I would call very easy for

 7     a layperson like myself, who has very limited medical

 8     training, to assess some of those things.  I know if

 9     somebody's vomiting.  But other ones, difficult

10     breathing?  Maybe.  But, you know, there's -- there's

11     some that are very difficult for me to assess.  I -- I

12     don't know if that answers your question or over-answers

13     it.

14  Q  (By Mr. Balson)  So would you be surprised if a NaphCare

15     nurse told you that it was her understanding that the

16     officers were specifically checking for each of these

17     symptoms, even if they weren't readily apparent visibly?

18  A  Yes.

19  Q  And do you think it would be unreasonable for the nurse

20     to have that expectation?

21  A  It would be unreasonable for me to expect that of my

22     officers, so yes.

23  Q  This form, Exhibit 4, also includes a list of codes that

24     officers are supposed to use to document inmates'

25     behaviors and activities in the cell when they're

```
 1   STATE OF WASHINGTON )      I, April Cook, CCR #3245,
                         ) ss a certified court reporter
 2   County of Pierce    )      in the State of Washington, do
                                hereby certify:
 3

 4
          That the foregoing deposition of DON HOOPER was taken
 5   before me and completed, within the limits of technology, on
     July 21, 2021, and thereafter was transcribed under my
 6   direction; that the deposition is a full, true and complete
     transcript of the testimony of said witness, including all
 7   questions, answers, objections, motions and exceptions;
 8        That the witness, before examination, was by me duly
     sworn to testify the truth, the whole truth, and nothing but
 9   the truth, and that the witness reserved the right of
     signature;
10
          That I am not a relative, employee, attorney or counsel
11   of any party to this action or relative or employee of any
     such attorney or counsel and that I am not financially
12   interested in the said action or the outcome thereof;

13        That I am herewith securely sealing the said deposition
     and promptly delivering the same to Hank Balson.
14
          IN WITNESS WHEREOF, I have hereunto set my signature on
15   the 27th day of July, 2021.

16

17

18                           _____
19                           April Cook, CCR
                             Certified Court Reporter No. 3245
20                           (Certification expires 10/11/21.)

21

22

23

24

25
```

*The Estate of Cindy Lou Hill, by and through its personal representative, Joseph A. Grube; and Cynthia Metsker, individually vs. Naphcare, Inc., et al.*

Case No. 2:20-cv-00410-RMP

Declaration of Hank Balson

Exhibit I

1
2                    UNITED STATES DISTRICT COURT
3                    EASTERN DISTRICT OF WASHINGTON
4
5   THE ESTATE OF CINDY LOU HILL, by      )
    and through its personal             )
6   representative, Joseph A. Grube;     )
    and CINDY METSKER, individually,     )
7                                        ) No. 2:20-cv-00410-RMP
                      Plaintiff,         )
8                                        )
                      vs.                )
9                                        )
    NAPHCARE, INC., an Alabama           )
10  corporation; HANNAH GUBITZ,          )
    individually; and SPOKANE COUNTY,    )
11  a political subdivision of the       )
    State of Washington,                 )
12                                       )
                      Defendants.        )
13

14           VIDEOTAPED DEPOSITION OF MICHAEL SPARBER

15                      August 16, 2021

16                     Via Videoconference

17

18

19

20

21

22

23

24

25  REPORTED BY:  Valerie L. Torgerson, CCR, RPR
                  License No. 2036

```
 1                        MS. EHLERT:  Erin Ehlert for NaphCare.

 2                        MR. BALSON:  Hank Balson for the

 3       plaintiffs.

 4                        THE VIDEOGRAPHER:  Thank you.

 5            Will the court reporter please -- I'm sorry.  Did I

 6       miss someone?

 7            Will the court reporter please swear in the witness.

 8

 9       MICHAEL SPARBER,         having been first duly sworn

10                                by the Certified Court Reporter,

11                                testified as follows:

12

13                        EXAMINATION

14       BY MR. BUDGE:

15    Q  Good morning.  Could you please state and spell your name

16       for the record?

17    A  Good morning.  My name is Michael Sparber, S-p-a-r-b-e-r,

18       and I am a detention services director for both downtown

19       and Geiger.

20    Q  All right.  So you're the director of the Spokane County

21       Detention Services Department; is that correct?

22    A  That's correct.

23    Q  Were you the director of the Spokane County Detention

24       Services Department as of August 25th, 2018, which is the

25       date of Cindy Lou Hill's death?
```

1  Q   Is Spokane County Detention Services its own separate
2      department within Spokane County distinct from the
3      sheriff's office?
4  A   **Yes, it is.**
5  Q   As the director of Spokane County Detention Services, are
6      you the highest ranking person in charge of the Spokane
7      County Jail?
8  A   **Yes, I am.**
9  Q   What is your role, and what are your duties as the
10     director of Spokane County Detention Services?
11 A   **My role is the oversight of both Geiger Corrections and**
12     **the downtown facility and all operations and all services**
13     **provided.**
14 Q   And when you say "the downtown facility," is that more
15     formally known as the Spokane County Jail?
16 A   **Yes.**
17 Q   As director, has your role essentially been the same
18     since you've been director?
19 A   **As a director, it's essentially the same since I became**
20     **director?  Is that --**
21 Q   Yes.  Has it changed in any significant way since you
22     first became director?
23 A   **I would say yes.  Hopefully for the good, for the better.**
24 Q   Well, my question is, your duties and responsibilities as
25     the director of the Spokane County Detention Services

| | | |
|---|---|---|
| 1 | A | **And then we would start an investigation, if that's your** |
| 2 | | **question.** |
| 3 | Q | No.  Here's my question.  By at least 6:30 p.m. on the |
| 4 | | evening of her death, did Spokane County Detention |
| 5 | | Services consider Ms. Hill's death to be an in-custody |
| 6 | | death? |
| 7 | A | **Oh, I'm sorry.  Yes, we did.** |
| 8 | Q | Now, you're familiar with a person named Steven Hammond; |
| 9 | | correct? |
| 10 | A | **One more time.** |
| 11 | Q | Steven Hammond, you're familiar with Steven Hammond, the |
| 12 | | medical doctor? |
| 13 | A | **Yes, sir.** |
| 14 | Q | And you understand that Dr. Hammond was the former |
| 15 | | medical director for the state prison system known as the |
| 16 | | Washington Department of Corrections? |
| 17 | A | **Yes.** |
| 18 | Q | Does Dr. Hammond have a relationship with the Spokane |
| 19 | | County Detention Services as an outside and independent |
| 20 | | consultant in correctional medicine? |
| 21 | A | **Yeah.  He -- we entered into a contract with Mr. Hammond** |
| 22 | | **as a third party to review the in-custody deaths.** |
| 23 | Q | And is it the intent from Spokane County Detention |
| 24 | | Services that Dr. Hammond will act as an independent and |
| 25 | | unbiased consultant and reviewer of Spokane County |

1    believe that he would be a good person to review and

2    opine about the deaths that happened at the Spokane

3    County Jail?

4  A  It was my understanding from Mark Stern that he had an

5    extensive background with corrections and doing these

6    types of reviews, so being a credible person as Mark

7    Stern is, I went along with that part of it, so...

8  Q  And what was your purpose in making sure that deaths at

9    the Spokane County Jail would be reviewed by an

10   independent, unbiased, and outside expert in correctional

11   health care?

12 A  A root cause analysis.  I was interested in finding out

13   areas where we could improve, you know, understanding how

14   the deaths occurred and why they occurred so that we

15   could make potential adjustments at the jail to, you

16   know, not have those type of things happen again.

17       And then I was also concerned that -- for the

18   families because I believe that the families have -- need

19   closure as well, and they need to understand what

20   happened, and that's not possible until I have a

21   third-party person look at it and determine, and then we

22   sit down as a group and see where we can make some

23   process improvements.

24 Q  Did the Spokane County Detention Services Department use

25   the services of Dr. Hammond as an outside consultant to

```
 1        review the circumstances of Cindy Lou Hill's death?

 2   A    Yes, sir, we did.

 3             I can't hear anybody.

 4   Q    I'm --

 5   A    Okay.

 6   Q    -- going to show you the next exhibit.

 7                           (Technical difficulties.)

 8   A    I wasn't sure if you were talking, Ed, and I couldn't

 9        hear you, so...

10   Q    (By Mr. Budge)  Sir, can you see Exhibit No. 2 on my

11        screen?

12   A    Yes.

13   Q    Do you see that this document, which is divided into two

14        columns, has a description of certain documents being

15        withheld in this litigation and the basis of the

16        withholding as of March 24th, 2021?

17             Are you still with us, sir?

18   A    Yeah.  I'm just looking it over real quick.

19   Q    Oh, sure.  No problem.

20             And if you'd like, I'd be happy to give you control

21        of my screen so you can scroll through it on your own.

22   A    That's okay.  Yeah, I see what -- the documents that are

23        on here.

24   Q    Do you see that this is a document on legal paper titled

25        "Spokane County's Second Amended Discovery Privilege
```

1   A   I don't, yeah.

2   Q   Were they supposed to observe Ms. Hill for any set period

3       of time?

4   A   There -- where it says "ends," there is no -- any

5       duration of time.

6   Q   No.  I mean when they would go for their 30-minute checks

7       and station themselves at Ms. Hill's door in the vicinity

8       of the cell, was there any particular period of time that

9       they were supposed to observe her?

10  A   No.

11                      MR. JUSTICE:  Object to the form.

12  A   Yeah, not that I'm aware of.

13  Q   (By Mr. Budge)  Regardless of whether it's indicated on

14      the form or not, did Spokane County Detention Services

15      have any sort of policy or procedure or custom about how

16      long they were supposed to make their observation?

17  A   Sight and sound.  They're supposed to look into the cell

18      and make sure that they could see signs of life and

19      that -- and/or engage them in conversation.

20  Q   So no set period of time?  It might be five seconds?  It

21      might be more or less?  That would be adequate?

22  A   Correct.

23  Q   Were they required to attempt to engage in some sort of

24      communication with Ms. Hill?

25  A   They're not required to.  They're required to make sure

1    that they see signs of life, you know, but as you're

2    aware, that it could go as you just stated, a minute or

3    two minutes, depending on what they see on the inside, if

4    there's anything concerning.

5  Q  And other than checking for signs of life, did Spokane

6     County Detention Services have any requirement as a

7     matter of policy, custom, or procedure for what the

8     guards were supposed to do when they would come to her

9     cell?

10 A  Observation.  Yeah, their job is to observe in the cell

11    sings of life, engage in conversation if they can, unless

12    otherwise specified on the medical form.

13 Q  Observation can be any number of things.  Do you agree?

14 A  I agree.

15 Q  Okay.  So what were your guards specifically trained to

16    do, if you know -- maybe you don't -- about what they

17    were supposed to do in terms of any observation?

18                    MR. JUSTICE:  Objection.  Asked and

19    answered.  Second or third time now.

20        You can answer, Director Sparber.

21 A  They observe -- look for sight and sound, if they're able

22    to engage them in a conversation, and if there's anything

23    that looks, you know, out of the ordinary.

24 Q  (By Mr. Budge)  That's your best answer to my question?

25 A  That's -- having not been there in the circumstances -- I

1    know what the policies say, and the policy says that you

2    will go up to their windows; you will peer in the

3    windows.  You'll make sure that you have signs of life,

4    sight and sound, like I just said, or try to engage them

5    in conversation, unless you see something out of the

6    ordinary, and then -- in which case they would do more.

7  Q  Was there any type of training program or training that

8    was specifically given to the officers at the Spokane

9    County Jail as of August of 2018 on exactly what they

10   were supposed to do when their duties included medical

11   watch of inmates?

12 A  Yes.  We have an FTO program, which is a program that

13   they're trained by a seasoned officer to go through, and

14   they also receive training from the Washington State

15   Criminal Justice Training Center.  At the time it was a

16   four-week academy.  Now it's -- or a six-week academy.

17   Now it's ten weeks, I guess.

18 Q  Have you reviewed the deposition transcripts of any of

19   the officers who were charged with monitoring Cindy Lou

20   Hill on the date of her death?

21 A  I have not.

22 Q  If you look at Exhibit No. 6, which is the medical watch

23   form for Cindy Lou Hill, do you see that in the lower

24   part of the form that there are handwritten entries at

25   10:15, 11:09, 11:23, 12:07, 12:40, and then continuing

1    work at the jail what they are supposed to do with regard

2    to medical watch?

3  A  I can't recall right now if there is anything

4    specifically that leads to it, but that would be -- you

5    know, it would be in our policy.

6  Q  I will -- I'll show you Exhibit 7 to your deposition.

7    Exhibit 7 is a one-page from the Spokane County Detention

8    Services policy manual on the subject of inmate safety

9    checks.

10       Do you see that?

11  A  Yep.

12  Q  Is this a policy regarding medical watch?

13  A  Yeah, they're one and the same.

14  Q  Okay.  So whatever policy might exist for the purpose of

15    medical watch is encompassed by C 508?

16  A  Mm-hm.

17  Q  Yes?

18  A  I'm sorry.  Say it again.  I'm sorry.  I was reading.  Go

19    ahead.  What was the question?

20  Q  Whatever written policy might exist on the subject of

21    medical watch or that might cover medical watch, is it

22    C 508, the policy on inmate safety checks?

23  A  Yes.

24  Q  Okay.  Are you aware of any other written policy designed

25    to tell corrections officers what they're supposed to do

THE ESTATE OF CINDY LOU HILL vs NAPHCARE
Sparber, Michael - August 16, 2021                                      Page 66

```
 1                    MR. JUSTICE:  Object to the form.
 2          You can answer.
 3                    MS. EHLERT:  Join.
 4  Q   (By Mr. Budge)  Do you know what I mean by my question,
 5      sir?
 6  A   I do.  I understand.
 7  Q   Okay.
 8  A   So there is a level of communication that -- particularly
 9      on medical watches, as I had stated, that it's indicated
10      on the medical watch form.  There would have been
11      exchange of information on that.  And then the
12      expectation for the officer -- once that exchange
13      occurred, the expectation would fall under the policy of
14      observation watches.
15  Q   My question is, I think, a little bit different than the
16      question that you answered.  My question is, was there
17      any -- ever any type of coordination -- and by that I
18      mean a meeting, exchange of written communication, or
19      some type of coordination between NaphCare and the
20      County --
21  A   Not that --
22  Q   -- so that there would be an understanding from --
23      between the nurses and the guards about what the guards
24      were supposed to do when it came to inmates on medical
25      watch?
```

THE ESTATE OF CINDY LOU HILL vs NAPHCARE
Sparber, Michael - August 16, 2021                                                    Page 67

```
 1  A    Inmates --
 2                      MR. JUSTICE:  Object to the form.
 3         Go ahead.
 4                      MS. EHLERT:  Join.
 5  A    Not that I'm aware of.
 6  Q    (By Mr. Budge)  Okay.  Exhibit 9 to your deposition,
 7       which I'm going to show you now, is a document that's 35
 8       pages long titled "Health Services Agreement," and I'll
 9       let you control my screen if you'd like so that you can
10       have the opportunity to scroll through it.
11            My question is, do you understand this document to
12       be the contract between NaphCare and the County on the
13       subject of providing medical services to inmates and
14       detainees of the Spokane County Jail?
15  A    That's what I recognize it to be, yeah.
16  Q    Did you have any involvement in deciding to contract with
17       NaphCare to provide medical services at the jail?
18  A    I did not.
19  Q    Do you know who at the County decided to employ NaphCare
20       as the jail's medical services company?
21  A    That would have been the former director, Director
22       McGrath.
23  Q    Did you have any involvement in any renewal of this
24       contract since you became director or even previously as
25       assistant director?
```

1    Q    No.

2    A    Okay.  What -- I don't -- I mean -- nonmedical guards,

3         I'm hung up, kind of, on that part.

4    Q    Ms. Hill was put on medical watch at roughly 9:15 or 9:30

5         in the morning; correct?

6    A    Mm-hm.

7    Q    And then throughout the day she was supposed to be seen

8         by guards on a periodic basis pursuant to her being

9         placed on medical watch; right?

10   A    Correct.

11   Q    And the guards who were seeing her were not themselves

12        medically trained people; correct?

13   A    Oh, correct.

14   Q    And so my question for you is, why was it nonmedically

15        trained guards who were responsible for monitoring an

16        inmate on medical watch as opposed to a NaphCare medical

17        person being charged with that responsibility?

18                    MR. JUSTICE:  Objection to the form.

19        You can answer.

20   A    Yeah.  In our policy, we generally would do the

21        observation of inmates that are on watches, as provided

22        by the officers, and whatever NaphCare's policy is for

23        folks that end up on a 30-minute watch is their policy.

24   Q    (By Mr. Budge)  Right.  And my question for you is why?

25        I mean, the reason that a person is being put on medical

```
 1      watch is because they're supposed to be medically

 2      monitored; am I right?

 3                      MR. JUSTICE:  Object to form.

 4          Go ahead.

 5   A  If they're placed under a watch, it means that they

 6      wanted closer observation on her, correct.

 7   Q  (By Mr. Budge)  And given that she was being placed on

 8      medical watch as opposed to another form of watch, why

 9      are untrained guards the one doing the medical watches

10      and not medically trained people?

11                      MR. JUSTICE:  Object to the form.

12          You can answer.

13   A  Generally the watches are handled by -- not generally.

14      Most -- probably always handled by the guards, and

15      they're the ones that go by and check the cells.  They're

16      not medically trained, but they are trained to observe,

17      and if they find, as in this case, that the individual

18      wasn't moving, then they respond and call for medical

19      staff to respond.

20   Q  (By Mr. Budge)  But the point of putting somebody on

21      medical watch is to detect signs or symptoms that might

22      demonstrate a deterioration in their condition; right?

23                      MR. JUSTICE:  Object to the form.

24          You can answer.

25   A  Without what was indicated -- I'm not sure what was
```

1    indicated on the medical form, even though I looked at

2    it.  I think it only said a 30-minute watch.  It didn't

3    say anything about anything else.  So other than that, it

4    would be for the officer to observe what's going on, if

5    they -- as in this case -- they observed something that

6    was out of the ordinary based on the medical.

7  Q  (By Mr. Budge)  Isn't the point of putting somebody on a

8    medical watch to pay close attention and detect a

9    deterioration in their condition that would allow

10   intervention before they die?

11                   MR. JUSTICE:  Object to the form.

12        You can answer.

13                   MS. EHLERT:  Join.

14 A  So again, we follow the orders provided by the nurses or

15   the medical staff.  We don't make the determination of

16   who should be on a medical watch and who shouldn't.  So

17   whatever their criteria is, it's either internal or they

18   give us an observation period, which in this case was 30

19   minutes, for us to peer in on her every 30 minutes to see

20   if anything has changed.

21 Q  (By Mr. Budge)  Well, is there any other explanation that

22   you can provide for me about why a person on medical

23   watch is being watched by nonmedically trained guards as

24   opposed to a medically trained person?

25 A  It's been our -- it's been our policy.  It's been our

1      practice.  I know primarily it's because the officers are
2      required to do 30-minute rounds anyway, and it -- the
3      2 West is -- has been set up and created in a way that it
4      allows better observation along the officer station, and
5      then I'm sure that the nurse has got other DT protocols
6      and other things that she's attending to as well, but
7      other than a nurse checking in on them -- ideally that
8      would be the best, if they were making the 30-minute
9      rounds, but that hasn't been our practice, so...
10  Q   Is that because there's just not enough medical staffing?
11  A   I think that it's been our practice since I started in
12      1988.
13  Q   Right.  And my question is, why is it the practice?  Is
14      it just the practice because there's not enough nurses to
15      do the monitoring and, therefore, guards do it?
16  A   I would not -- I don't know that I would say that there's
17      not enough nurses.  I mean, I'm sure that they could hire
18      enough nurses to do it if they felt that that was the
19      case and I required it as part of the contract.  It's not
20      currently in the contract, and so right now our
21      observation is to observe them and report back to medical
22      for observation.
23               MR. BUDGE:  Let me just take two
24      minutes.  We don't need to actually have a formal break.
25      I'm just going to mute myself and look over my notes.

```
 1   STATE OF WASHINGTON )    I, Valerie L. Torgerson, CCR, RPR,
                         ) ss a certified court reporter
 2   County of Pierce   )    in the State of Washington, do
                              hereby certify:
 3

 4
          That the foregoing deposition of MICHAEL SPARBER was
 5   taken before me and completed on August 16, 2021, and
     thereafter was transcribed under my direction; that the
 6   deposition is a full, true and complete transcript of the
     testimony of said witness, including all questions, answers,
 7   objections, motions and exceptions;
 8        That the witness, before examination, was by me duly
     sworn to testify the truth, the whole truth, and nothing but
 9   the truth, and that the witness reserved the right of
     signature;
10
          That I am not a relative, employee, attorney or counsel
11   of any party to this action or relative or employee of any
     such attorney or counsel and that I am not financially
12   interested in the said action or the outcome thereof;

13        That I am herewith securely sealing the said deposition
     and promptly delivering the same to Edwin S. Budge.
14
          IN WITNESS WHEREOF, I have hereunto set my signature on
15   the 23rd day of August 2021.

16

17

18

19        _____
          Valerie L. Torgerson, CCR, RPR
20        Certified Court Reporter No. 2036
          (Certification expires 09/3/21.)
21

22

23

24

25
```

*The Estate of Cindy Lou Hill, by and through its personal representative, Joseph A. Grube; and Cynthia Metsker, individually vs. Naphcare, Inc., et al.*

Case No. 2:20-cv-00410-RMP

Declaration of Hank Balson

Exhibit J



*The Estate of Cindy Lou Hill, by and through its personal representative, Joseph A. Grube; and Cynthia Metsker, individually vs. Naphcare, Inc., et al.*

Case No. 2:20-cv-00410-RMP

Declaration of Hank Balson

Exhibit K

1
2
3

Budge & Heipt, PLLC
808 E. Roy St.
Seattle, WA 98102
(206) 624-3060

4

5
6

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

7
8
9
10

THE ESTATE OF CINDY LOU HILL, by
and through its personal representative,
Joseph A. Grube; and CYNTHIA
METSKER, individually,

Plaintiffs,

vs.

No.  2:20-cv-00410-RMP

PLAINTIFFS' FIRST DISCOVERY
REQUESTS TO DEFENDANT
HANNA GUBITZ

With answers, responses and objections
thereto

11
12
13
14
15

NAPHCARE, INC, an Alabama
corporation; HANNA GUBITZ,
individually; and SPOKANE COUNTY,
a political subdivision of the State of
Washington,

Defendants.

16

17

**TO:    DEFENDANT HANNA GUBITZ;**

18

**AND TO:  Her attorneys.**

19
20
21
22
23

Pursuant to the Federal Rules of Civil Procedure and the Civil Rules of the United States

District Court for the Eastern District of Washington, Plaintiffs propound the following

interrogatories and requests for production to Defendant Hanna Gubitz.  The defendant to whom

these discovery requests are directed must respond and produce the documents and responses

requested herein, within 30 days of service of these requests.  Defendant should deliver the

PLAINTIFFS' FIRST DISCOVERY REQUESTS
TO HANNA GUBITZ.– Page 1

BUDGE&HEIPT,PLLC
ATTORNEYS AT LAW
808 E. Roy St.
SEATTLE, WA  98102
TELEPHONE:  (206) 624-3060

1    Miranda Sanders, RN: Treatment of Ms. Hill

2    William Smith, NP:    Treatment of Ms. Hill

3    Bruce Tsubasa, RN:    Treatment of Ms. Hill

4    Tamara Watternburger, RN:  Treatment of Ms. Hill

5    CO Bocook:    Observations and interactions with Ms. Hill

6    CO Hoschka:    Observations and interactions with Ms. Hill

7    CO Janke:    Observations and interactions with Ms. Hill

8    CO Milholland:    Observations and interactions with Ms. Hill

9    CO Petrie:    Observations and interactions with Ms. Hill

10   CO Strege:    Observations and interactions with Ms. Hill

11   CO Torosian:    Observations and interactions with Ms. Hill

12

13

14   INTERROGATORY NO. 2:  IDENTIFY all dates and times that you had any contact

15   with Cindy Lou Hill through any form of personal observation or oral dialogue.  If you are

16   unable to state the date and time of any such contact, please provide your best estimate.  Please

17   identify when and where such personal observation or oral dialogue occurred and give a

18   description of the encounter.

19   RESPONSE:  I had three contacts with Ms. Hill on August 25, 2018. The first contact

20   was my initial assessment of her while rounding on patients on the withdrawal protocol around

21   lunchtime. Ms. Hill wanted to be assessed but didn't want to come to the door so her cellmate

22   brought her to the door. She then refused most of my assessment, allowing only vital signs and

23   the briefest of palpation assessment.  Because she complained of pain but would not let me do a

PLAINTIFFS' FIRST DISCOVERY REQUESTS
TO HANNA GUBITZ.– Page 6

1    full assessment, I recommended that she be placed on medical watch on the 2nd floor. I

2    attempted a second evaluation later that day before dinner, but she did not want to be assessed.

3    She verbally refused an assessment. The final contact was when the officers requested nursing

4    staff to respond because she was unresponsive at shift change (around 5:30pm).  Multiple people

5    respond to codes, and my usual role (similar to all codes) was to record what was happening,

6    who was there and doing what, dosing of medications, etc.  Ms. Hill was then transferred by

7    ambulance to the hospital.

8

9        INTERROGATORY NO. 3:  IDENTIFY all dates and times that you communicated

10   with any other person (or any person communicated with you) about Cindy Lou Hill or any

11   aspect of her condition or confinement, either before or after her death, whether in person, via

12   telephone, or via any form of written or electronic communication.  If you are unable to state the

13   date and time of any such contact, please provide your best estimate. With respect to each such

14   communication, please state the manner of the communication (e.g., in-person, telephone, e-

15   mail, etc.), IDENTIFY the person(s) with whom you communicated, describe the subject matter

16   of the communication, and IDENTIFY who else was part of the communication (e.g., persons

17   who were copied on e-mails or who were present during the communication).

18   RESPONSE:  I have a memory of talking about Ms. Hill with jail and NaphCare staff on

19   my next work day, August 26, 2018. I do not recall who was present or any details of our

20   conversation.  After a person was found unresponsive, the Health Services Administrator at that

21   time (Jesus Ordaz) would routinely come on-site for a debrief with staff.  This may have

22   happened but I do not recall at this time.  I do not recall any other communications with anyone

23

PLAINTIFFS' FIRST DISCOVERY REQUESTS
TO HANNA GUBITZ.– Page 7

BUDGE&HEIPT, PLLC
ATTORNEYS AT LAW
808 E. Roy St.
SEATTLE, WA 98102
TELEPHONE:  (206) 624-3060

1    RESPONSE:  I have no such materials in my possession.

2

3

4    REQUEST FOR PRODUCTION NO. 12:    Produce  all  e-mails,  letters,  memoranda,

5    notes, and other documents in which any person expressed concern, dissatisfaction, criticism,

6    disapproval, approval, or praise regarding any aspect of your performance of your duties at the

7    Spokane County Jail.

8        RESPONSE:  I have no such materials in my possession.

9

10

11

12        DATED this  14  day of January, 2021 at  Spokane , Washington.

13

14        Signed: _Hannah Gubitz_

15        Hannah Gubitz

16

17

18

19

20

21

22

23

PLAINTIFFS' FIRST DISCOVERY REQUESTS
TO HANNA GUBITZ.– Page 15

BUDGE⬥HEIPT, PLLC
ATTORNEYS AT LAW
808 E. Roy St.
SEATTLE, WA 98102
TELEPHONE: (206) 624-3060

Scanned with CamScanner

1

## **<u>CERTIFICATION</u>**

2

3

ANSWERS TO INTERROGATORIES AND RESPONSES TO REQUESTS FOR

PRODUCTION SUBMITTED this 14th day of January, 2021.

4

5

FAIN ANDERSON VANDERHOEF
ROSENDAHL O'HALLORAN SPILLANE,
PLLC

6

7

*s/Erin E. Ehlert*
Ketia B. Wick, WSBA #27219
Erin E. Ehlert, WSBA #26340
701 Fifth Ave., Suite 4750
Seattle, WA 98101
ketia@favros.com
(206) 749-0094
Attorney for Defendants NaphCare, Inc. and
Hannah Gubitz

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

BUDGE & HEIPT, PLLC
ATTORNEYS AT LAW
808 E. Roy St.
SEATTLE, WA 98102
TELEPHONE: (206) 624-3060

*The Estate of Cindy Lou Hill, by and through its personal representative, Joseph A. Grube; and Cynthia Metsker, individually vs. Naphcare, Inc., et al.*

Case No. 2:20-cv-00410-RMP

Declaration of Hank Balson

Exhibit L

**Date : 8/26/2018 12:18:48 PM**
**From : "Hannah Gubitz"**
**From : "Hannah Gubitz" hannah.gubitz@naphcare.com**
**To : "Jesus Ordaz" jesus.ordaz@naphcare.com, "Ian Oneill" ian.oneill@naphcare.com**
**Subject : CCID 412473**

Hi, both,

Here is what I charted on the morning detox round for Cindy Hill (CCID 412473). The charting was at 10:51 but I actually saw her between 8:30 and 9am with CO Torosian.

"Patient laying on floor on arrival to cell wearing pants but no shirt. Patient indicated she did want to be checked but stated she was too sick to move. Notified patient we could not enter the cell without an additional officer. Patient's roommate rolled her in a blanket and dragged her to the cell door where she lay next to the toilet screaming. Patient's cellmate indicated patient was having severe abdominal pain and it was most likely her appendix. Patient curled in fetal position on floor, barely allowed this RN to check vitals. Patient allowed minimal assessment of abdomen. No bruising, swelling, redness, or masses noted on visual assessment or palpation. Patient screamed even louder before this RN even touched abdomen shouting that this RN was hurting her. Patient would not answer questions about what her pain was on a scale of 1-10, when it started, or what it felt like. She stated it was on her right lower abdomen but screamed in pain on gentle palpation of entire abdomen and back. Patient taken to 2W via wheelchair for medical watch."

At that point, the patient's vitals were 130/86, 78 HR, 16 RR, 95% SpO2. She could not tell me how long it had been there and my physical exam of her abdomen was limited due to her reaction but did not show any bruising, swelling, redness, firmness, or masses. While I did not do a full neuro exam, she did not appear to have any neuro deficits. She had a steady heart rate and steady respirations despite the intermittent screams. Her skin was WNL for her ethnicity to all parts of her body. Her physical exam was why I chose to put her on medical watch. I did not suspect involvement of her spine because she was moving her legs and had feeling in them. A lot of our detox patients complain of stomach, abdominal, or low back pain, and except for the intermittent screaming there were not any symptoms to indicate anything different.

In the afternoon I saw her with Justin CMA and CO Janke between 2 and 3. There was no vomit, blood, urine, diarrhea, or bodily fluids to be seen on the bunk, floor, or toilet in her cell. Her cell was the cleanest I have seen a cell in some time. She was laying on her right side on the bunk with her back against the wall when we arrived and her legs were moving. I asked her if she would like to be checked for detox at that time. She indicated she did want to be checked and sat up some in bed. She sat up enough that I was able to make eye contact with her. Her skin tone to her face, arms, legs were normal for her ethnicity with no redness, swelling, or color change noticeable from the door. While I could not see her pupils up close, her eyes were tracking between CO Janke and I at the door while we spoke with her. She was responsive and forthcoming and was not screaming at all during this conversation. She made a comment that her stomach still hurt and then said she didn't want to be checked and laid back down. As she appeared in no acute or immediate distress we ended the conversation and assessment.

I did not see her after the afternoon assessment until Mike and CO Milholland made the distress call at 1725. When I got down there with Race she was laying supine on the floor in the doorway of her cell with just her underwear on. Mike was applying the AED and Miranda was helping. The patient had dark brown/black liquid in the corner of her mouth and there was a small pile of what looked like coffee ground emesis on the floor in her cell.

Let me know if you need more information or need me to write this up differently.

Thanks,

Hannah

*The Estate of Cindy Lou Hill, by and through its personal representative, Joseph A. Grube; and Cynthia Metsker, individually vs. Naphcare, Inc., et al.*

Case No. 2:20-cv-00410-RMP

Declaration of Hank Balson

Exhibit M

• • •

# CINDY LOU HILL

## FOR BUDGE & HEIPT

Medical Expert Report

# CINDY LOU HILL

### FOR BUDGE & HEIPT

## Case Review

### Background and Timeline

Cindy Lou Hill (CH) was a then 55-year-old woman who was arrested on 8/21/2018 for possession of a controlled substance and brought to the Spokane County Jail. Her initial nursing assessment stated diminished lung sounds, wheezing, a h/o COPD and "stomach problems." She was given oxygen supplementation for a below-normal oxygen saturation level and the albuterol and omeprazole that she reported using. The next day she was placed on a withdrawal protocol after she reported daily heroin use. From 8/22 through 8/24 multiple COWS assessments were performed and noted only mild withdrawal symptoms.

On the morning of 8/25 Hannah Gubitz, RN performed an assessment at approximately 845am where CH was found to be in severe abdominal pain, was unable to move and had to be dragged by her cellmate to the door to be examined as the nurse did not enter the cell. The note from that day is as follows:

*Patient laying on the floor on arrival to cell wearing pants but no shirt. Patient indicated she did want to be checked but stated she was too sick to move. Notified patient we could not enter the cell without an additional officer. Patient's roommate rolled her in a blanket and dragged her to the cell door where she lay next to the toilet screaming. Patient's cellmate indicated patient was having severe abdominal pain and it was most likely her appendix. Patient curled in fetal position on floor, barely allowed this RN to check vitals. Patient allowed minimal assessment of abdomen. No bruising, swelling, redness, or masses noted on visual assessment or palpation. Patient screamed even louder before this RN even touched abdomen shouting that this RN was hurting her. Patient would not answer questions about what her pain was on a scale of 1-10, when it started, or what it felt like. She stated it was on her right lower abdomen but screamed in pain on gentle palpation of entire abdomen and back. Patient taken to 2W via wheelchair for medical watch.*

## SDS Consultants

• • •

#### Team

Sebastian D. Schubl MD

sschubl@uci.edu

Principal

Abran Gonzalez

adrang1@uci.edu

Executive Assistant

• • •

#### Contact

www.sds-consultant.com

sschubl@sds-consultant.com

10140 Morningstar Cir

Villa Park, CA

92861

O (714) 509-2121

F (714) 456-6048

• • •

Subsequent to this evaluation CH was moved to another unit where she was placed on "medical watch," which did not include any clinical monitoring but only a guard looking into CH's cell every 30 minutes. There is little documentation for the remainder of the day. Nurse Gubitz documented that she saw CH in a note written at 410pm, writing that CH "refused assessment" and "No s/sx of distress noted." A lengthy email from the following day detailed this encounter, but the details may have been fabricated or exaggerated. At 5:24pm a guard found CH unresponsive and began CPR and EMTs transported her to Providence Sacred Heart where she was pronounced dead at 6:31pm.

### Persons and Facilities
1. Hannah Gubitz, RN (Charge Nurse)
2. NaphCare, Inc.
3. Spokane County Jail

## Summary of Findings

### Review of Autopsy

The report by Spokane Medical Examiner Sally  Aiken, M.D. shows several pertinent findings. Overall, it is clear that CH died of overwhelming sepsis due to a duodenal perforation resulting in leakage of gastric fluid into her abdomen which incited profound shock and eventual cardiac arrest. There is no trauma/injury either internally or externally of any kind noted.  CH did not display any signs of dehydration, which indicates that her condition was relatively stable until 8/25, and also that appropriate intervention would likely have saved her life. There is evidence of lysed adhesions and necrosis of the undersurface of the liver near the area of perforation of the duodenum.

Of note, the pathologist states the cause of the perforation is "ruptured duodenal-liver adhesions with perforation of the duodenum."  Regardless of whether the cause is as described or a more common cause such as a duodenal ulcer, the consequences of such a perforation and the management thereof are identical in either case and therefore the exact cause is not critical. Also of note, the intestines were adhered in the upper and right abdomen indicating that this perforation had been present for some time, on the order of hours to days.

### Review of Exhibits
Each exhibit was reviewed in detail and the facts therein incorporated in the other elements of this report.  Of note, the medical records were of interest both before CH was moved to "medical watch" and thereafter:

8/21 Intake screening – low oxygen saturation, normal abdominal exam, no evidence of withdrawal

8/22 COWS initiated after patient reported opiate use, mild symptoms

8/22-23 several COWS assessments completed, all with mild symptoms and appropriate intervention

8/24 COWS noted diarrhea or vomiting but "minimal" withdrawal symptoms with a subsequent visit again conforming "mild diffuse discomfort"

8/24 in the evening as CH was in court holding, she stated that she was "feeling much better"

8/25 in the very early AM CH refused assessment and "denied any s/s" and the next evaluation was in the later morning of 8/25 at which time CH was in extreme pain as described by RN Gubitz

This sequence is remarkable as it paints the picture of a mild opiate withdrawal by CH that was seemingly either completed or nearly completed by the end of the day on 8/24, a fact that an experienced nurse should have made a note of and thereby should have informed the decision as to how to manage the clearly significantly worse clinical picture on the morning of 8/25. CH had not shown herself to be a malingerer, never showed severe symptoms even at the peak of her withdrawal, which is usually around 2-3 days after last use, and had no history of abdominal pain. She should have been properly evaluated the morning of 8/25 at an emergency room and by a physician in response to the acute and severe symptoms she displayed that morning.

The video provided also has several interesting elements. First, it appears that having additional guards available was not a barrier to providing appropriate care, as just minutes after RN Gubitz leaves this area three guards appear to move CH to another cell. This means that brining in one additional guard to allow for an exam within the cell should have been readily achievable.

Second, RN Gubitz is visible standing at the door to CH's cell until 2min10s into the video and then reappears from behind the door at 5min28s. It impossible to see what is happening through the door but whatever examination occurred only occurred within 3min18s. This is a short period of time to execute the elements of the assessment that Nurse Gubitz documented, especially given the constraints of performing under the circumstances at hand.

There were several additional nurses on site. Finally, the protocol for a patient refusing evaluation was not followed at the second encounter.

*Review of Report by Dr. Steven Hammond*

The analysis states that CH underwent mild withdrawal but was able to attend a court hearing by 8/24, indicating that her symptoms had largely abated. There is also a statement that RN Gubitz did not escalate CH's case after finding her in extremis and that had she done so, a thorough medical evaluation and closer monitoring might have resulted in an earlier transfer to the hospital, which is certainly the case.

Overall, the report is critical of the care delivered and makes it clear that this should be a sentinel case that should be used as a guide as to what areas of care are deficient.

### Review of Deposition of Hannah Gubitz, RN

This deposition begins with a line of questioning about the general competence of care of CH and if the care was within the bounds of NaphCare's guidelines. There are several questions about the signs, symptoms and diagnosis of an acute abdomen. While RN Gubitz seems to understand the clinical relevance well, the issue is not her ability to diagnose this condition but her understanding the triggers that would necessitate an evaluation by a medical provider, which given her broad understanding of the presentation and serious nature of an acute abdomen, she should have had.

RN Gubitz states that on the morning of 8/25 when she first examined CH she was able to take a blood pressure and a heart rate but not a temperature due to the level of distress of CH. This seems curious as the temperature is the least invasive and fastest vital sign to assess. She also states that while the assessment being done was part of the COWs protocol, CH requested that she be medically assessed as she was too sick to move and in severe pain. RN Gubitz was unable to enter the cell per protocol as she only had one officer present, but she agreed that CH was too ill to move so it begs the question as to why she did not simply find another officer so she could enter the cell and properly examine CH. Clearly, a second officer was available as they soon arrived to move CH to medical watch. The degree of distress CH was in is powerfully underscored by the willingness of her cellmate to place her on a blanket and literally drag her to the door to be examined. Given the extreme pain and position that CH was in, I actually very much doubt that RN Gubitz ever actually assessed her vital signs. Given that a patient with an early perforation and in severe pain will generally be tachycardic and hypertensive the vitals that were recorded seem unlikely. Later in the deposition, RN Gubitz even states that her exam was "mostly visual." It may have been entirely visual.

Overall, the defense RN Gubitz uses is that CH was refusing to be assessed, which actually is not true. CH wanted to be assessed as she was in severe pain, which made it very difficult for her to be able to tolerate an assessment. Also, there is a strong case to be made that the severity of CH's symptoms put her in a category where refusal should have been overruled by a competent clinician. This degree of severe pain can have effects on a patient's mental status and therefore a patient may be deemed not competent to refuse under such circumstances. An example would be a person delirious from pain with a knife sticking out of their chest is delivered to an emergency room but is refusing care, that person is not in a condition where that refusal can be taken seriously by a health care professional. CH's refusal in this case should have been treated similarly, as she was in very real danger and clearly in extremis. Clearly, CH should have gotten a proper exam at the very least, and likely transfer to an emergency room to be examined and worked up by a physician in a hospital setting.

• • •

The question as to why RN Gubitz did not ask the cellmate any questions is an interesting one, and the response really highlights the cursory nature of her evaluation and how little the history and exam mattered in her decision making.  While there is some element of protected health information at play, this only pertains to her history, not to the events and findings that occurred in front of the cellmate and could not be "protected." To the extent CH's cellmate had an opportunity to observe her symptoms, RN Gubitz should have elicited that information from the cellmate and considered it when determining how to address CH's condition as one would do with any other first-hand witness to a patient's history and suffering.

There are two statements that deserve to be highlighted immediately after the above referenced question on querying the cellmate made by RN Gubitz. The first is that doing an abdominal or additional exam on an inmate that is on the detox protocol was a "common occurrence," and therefore should have been done. Second, an admission that a jail is not a healthcare facility but a correctional one with healthcare being a secondary aim—another reason why sending CH to a more appropriate clinical setting was warranted.

Regarding the "second contact alleged by RN Gubitz, given the dramatic change in CH's clinical picture as of the morning of 8/25, an assessment made earlier than 6 hours after she arrived in the medical watch unit was indicated.  In particular, because after the morning rounds RN Gubitz charted her notes from that day and would have had an opportunity to see that CH only had mild if any symptoms up to that date.

RN Gubitz notes that when she appeared at CH's cell for the second visit, she called CH's name and CH "sat up" from a lying position in her bed.  This is physically impossible for someone with the kind of abdominal peritonitis that CH had.  Her abdomen would have been entirely rigid, and any even very slight movement of her abdominal muscles would have caused incredible amounts of pain.  There is no way CH was able to "sit up" without assistance. Additionally, there is nothing about a perforated viscus that allows for the pain to be relapsing/remitting.  It is severe, constant and irrevocably worsening until the patient loses consciousness from shock or dies.  The idea that at the morning assessment she was screaming in pain and in the afternoon, CH was complaining of "feeling a little sick to her stomach" is also impossible.

The concept of charting by exception is being used inappropriately here. One can presume exceptions to certain elements of the physical exam by performing other elements of the exam, for example that a person's reflexes may be normal if their sensory exam is normal, or that their motor function is normal if they are found standing and walking, but there is no charting by exception for a patient that is not examined at all.

*Expert Opinions, Concerns and Questions*

Item 1 – Timing of heroin withdrawal

Given the mild to minimal symptoms of opiate withdrawal in the days preceding the events of 8/25/18, it should have been clear to any nurse that regularly cares for patients in opiate withdrawal that the development of severe abdominal pain after four days is at the very least unusual and indicative of an entirely different problem than opiate withdrawal. This delayed presentation was outside of the 2-3 day window for withdrawal and therefore an alternative underlying cause needed to be considered.

Item 2 – Survivability of perforation

Foregut perforations, including both gastric and duodenal, carry a mortality risk of between 5-25% with the major risk factors for a higher risk of death being age, albumin level, time from perforation to intervention and BUN level. Had CH been seen at a hospital the morning of 8/25/18 after RN Gubitz' morning encounter when she had severe abdominal pain, she would have likely had a risk of death in the 5-10% range based on my experience treating these patients. Given her general state of health and what medical records are available, I would expect her albumin and BUN to be in the normal range.

Item 3 – Medical watch

In many ways it appears that "medical watch" resulted in no more clinical monitoring than CH had in the days prior. While before she had been getting twice daily, or more, nurse visits per day, she was getting checked by only a guard while on this "medical watch" with no increase in nursing visits. The lack of evaluation between 845am and 3pm, assuming that she was even actually evaluated at 3pm on 8/25, is far too long of an interval for someone with a concerning new finding such as CH developed, and this neglect compounded the error of not having her seen by a higher-level provider in the morning.

Item 4 – Experience with duodenal perforations

These kinds of perforations are not uncommon. The mortality of these kinds of perforations with quality surgical management has been reduced in the last several years.  Most general and acute care surgeons at busy academic hospitals will manage several of these cases per month, most of which will be operative in nature. I have personally managed dozens of duodenal perforations over the 17 years that I have been a practicing surgeon and the vast majority have had good outcomes. In a community like Spokane, there is little question that quality surgical care was available at a local hospital, more than sufficient to competently treat this condition.

Item 5 – Expected hospital care

Had CH been transferred to a hospital, in all likelihood her case would have been quickly identified as an acute abdomen and she would have gotten supportive treatment, antibiotics, fluids, an early

surgical consult and an immediate CT scan of the abdomen. This CT would have shown the inflammation of the duodenum, free fluid and free air, and she would have been taken to the operating room within a matter of hours of presenting to the ED for a laparoscopic, possibly open, patch repair of the perforation and washout and drainage.  This operation, as noted in the attached literature, would have had a high probability of success in saving her life though she would have had significant risks of morbidities that increased with the amount of time her definitive treatment was delayed.

Item 6 – CH's chances of survival

More likely than not, CH would have survived had she been transported to a qualified medical center and arrived there before going into septic shock.  If RN Gubitz' deposition and the charting in this case are to be believed, then even up to 3pm on 8/25/18 and while exhibiting consciousness thereafter she would have had a more likely than not probability of survival.  Once she slipped into shock with a depressed blood pressure, the timing of which is unknown in this case but generally results in a loss of consciousness so should be easy to assess even for non-medical personnel, her likelihood of death rose sharply. This is based on my management of these types of perforations and the available literature, two articles of which I have attached to this report.

Item 7 – Credibility of RN Gubitz' description of CH's state in the afternoon of 8/25

The account of CH's state of health at 3pm is medically impossible for the reasons noted above in the Deposition section, second to last paragraph.  I have managed hundreds of patients with perforations, and dozens with gastric and duodenal perforations, and the truly miraculous improvement in CH's symptoms that RN Gubitz details is not possible.

Item 7 – Degree of pain and suffering

Acute peritonitis is among the most painful things that a human being can experience, as the peritoneal lining is incredibly sensitive, quite large as it is the surface of the entire abdominal cavity and is heavily innervated with somatic nerves. A person with a perforation of the duodenum adds the pain of the stomach acid leaking into the abdomen to the already significant pain of the infection and inflammation from the bacterial infection. In addition, there was no treatment delivered in this case.  So the perforation was allowed to evolve in its "natural course" to termination, which will have led to ever increasing pain and suffering.

*Literature Review*
Two manuscripts reviewed and attached to this report.

*Items Reviewed to Generate This Report*
- All NaphCare medical records pertaining to Ms. Hill (including records from previous periods of detention in 2016 and 2017)
- Autopsy photographs and other materials received from the Spokane County Medical Examiner

- Complete transcript of the deposition of Hannah Gubitz, RN
- Initial nursing assessment of Cindy Hill (8/21/18)
- 2018 NaphCare progress notes pertaining to Cindy Hill
- Receiving screening of Cindy Hill (8/21/18)
- 2018 COWS assessments of Cindy Hill
- Jail surveillance video from the morning of 8/25/18
- Medical watch form
- 8/26/18 e-mail from Hannah Gubitz
- Jail incident reports
- NaphCare incident reports
- Records from Providence Sacred Heart Medical Center (including EMT records)
- Autopsy report (including toxicology reports)
- Death Review by Dr. Steven Hammond

## Deposition and Trial Testimony Provided in the Last Four Years

1. John Kleutsch vs State of Washington Department of Corrections
   5/19/2021 Deposition on behalf of The Connelly Law Firm and the Estate of John Kleutsch

## Expert Qualifications

Dr. Schubl was raised and trained on the east coast before completing a fellowship in trauma and critical care surgery at the University of California at Irvine Medical Center. Prior to that he attended Johns Hopkins University, the University of Virginia and New York Presbyterian Hospital/Weill Cornell Medical Center in New York City. He has an active interest in surgical outcomes, surgical infections and translational research involving the care of the injured patient and the critically ill. He is a member of several national societies including the Society for Critical Care Medicine, the Eastern Association for the Surgery of Trauma, the Surgical Infections Society, the Chest Wall Injury Society and is a Fellow in both the American College of Surgeons and the American Association for the Surgery of Trauma. Prior to relocating to Southern California, he was a member of the faculty in the Department of Surgery at Weill Cornell Medical Center and served as the Trauma Medical Director at that institution's trauma affiliate in Queens, Jamaica Hospital, an ACS verified level one trauma center. Currently, he is an Associate Professor of Surgery and Chief of the Division of Emergency General Surgery at UCI Health.

## Hourly Rate for Expert Consulting

Case/document review and report generation: $600.00 per hour

Deposition and trial appearance: $750.00 per hour

## Curriculum Vitae/List of Publications

Attached

## Conclusion

CH displayed the signs and symptoms of an acute abdomen on the morning of 8/25/2018, which any reasonable nurse should have escalated to a physician for further evaluation.  Had CH been moved to a medical facility that morning, as should have occurred, or even in the afternoon of 8/25/2018, her medical condition would have been diagnosed and treated and she would have had a better-than-not chance of survival.

All of the opinions expressed in this report are expressed with a reasonable degree of medical certainty.

_____
Sebastian D. Schubl, MD

**Sebastian D. Schubl, MD FACS**
HS Associate Clinical Professor
Department of Surgery
School of Medicine
333 City Blvd West, Suite 1600
Orange, CA 92868
(714) 509-2121
sschubl@hs.uci.edu

---

**EDUCATION & TRAINING**

| | |
|---|---|
| 8/2016-7/2017 | **University of California at Irvine Medical Center**; Orange, California |
| | Fellow, Surgical Critical Care and Trauma Surgery |
| 11/2005-6/2011 | **New York-Presbyterian Hospital Weill Cornell Medical Center**; New York, New York |
| | **Memorial Sloan Kettering Cancer Center**; New York, New York |
| | Residency and Chief Resident in General Surgery |
| 7/2004-10/2005 | **Louisiana State University**, Medical Center of New Orleans; New Orleans, Louisiana |
| | Internship in General Surgery |
| 8/2000-5/2004 | **University of Virginia School of Medicine**; Charlottesville, Virginia |
| | Medical Doctor |
| 8/1995-5/1999 | **Johns Hopkins University**; Baltimore, Maryland |
| | Bachelor of Arts with Honors, Cellular and Molecular Biology |

**WORK & RESEARCH EXPERIENCE**

| | |
|---|---|
| 8/2017-present | **University of California Irvine, School of Medicine** |
| | HS Associate Clinical Professor, Department of Surgery |
| | Chief, Division of Emergency General Surgery |
| | Division of Trauma, Critical Care, and Burns |
| | Clerkship Director, Surgery Electives |
| | **UCI Health Administration** |
| 2018-present | Bed Czar; UC Irvine Health |
| 2020-present | Medical Director, Patient Progression, UC Irvine Health |
| 2020-present | Medical Director, Surgical Stepdown Unit, UC Irvine Health |
| 6/2011-7/2016 | **Jamaica Hospital Medical Center** |
| | Medical Director, Trauma Services; ACS Verified Level One Trauma Center |
| | Attending Surgeon, Department of Surgery |
| | **Weill Cornell Medical College/New York-Presbyterian Hospital** |
| | Clinical Faculty Instructor, Department of Surgery |
| | **Ross University School of Medicine** |
| | Clinical Faculty Instructor, Surgery and Medicine |
| 6/2007-1/2009 | **New York-Presbyterian Hospital Weill Cornell Medical Center** |
| | Burn Fellow, Division of Burns; Dr. Roger Yurt MD |
| 6/2007-1/2009 | **Weill Cornell Medical College,** Division of Vascular Surgery |
| | Research Fellow; Dr. K. Craig Kent MD |
| 6/2001-8/2001 | **Columbia University College of Physicians & Surgeons,** Department of Cardiothoracic Surgery |
| | Student Research Fellow; Dr. Mehmet Oz MD |
| 8/1999-8/2000 | **Massachusetts Institute of Technology,** Whitehead Institute for Biomedical Research |
| | Laboratory Technician and Manager; Dr. Jacqueline Lees PhD |

**SOCIETY MEMBERSHIPS**

| | |
|---|---|
| 2017-present | ACS, American College of Surgeons; 3216672; Fellow |
| 2017- present | AAST, American Association for the Surgery of Trauma, Fellow |
| 2017- present | CWIS, Chest Wall Injury Society, 580, Member |
| 2017- present | EAST, Eastern Association for the Surgery of Trauma, Member |
| 2017- present | SIS, Surgical Infection Society, Member |

2017- present      SCCM, Society for Critical Care Medicine, 291181, Member
2017- present      SCCACS, Southern California Chapter of the American College of Surgeons; Member

## EXAMINATIONS & LICENSES
BLS, ACLS, ATLS, PALS, DMEP; Licensee
ACS ATLS & ASSET, Course Instructor
National Provider Identifier #1932346004
Collaborative Institutional Training Initiative (CITI); 3458731; Researcher
ORCID researcher identifier: 0000-0001-9431-7735
California Medical Board; C142154; Licensee
American Board of Surgery; Surgery; 060719; Diplomate through 12/2026
American Board of Surgery; Surgical Critical Care; 004012; Diplomate through 12/2028

## GRANTS
2009    Renewal of National Institutes of Health Research Training Grant, T32RR021312-06 PI: K. Craig Kent
2013    New York State Governors Traffic Safety Committee Highway Safety Grant; HS1-2015-Jamaica Hosp-
        00182-(041)
2014    New York State Governors Traffic Safety Committee Highway Safety Grant; HS1-2015-Jamaica Hosp-
        00182-(041)
2019    UROP Fellow Grant. Study PI: Schubl 75192S1
        Use of NIRS to detect NSTI in emergency room patients
2020    **UCOP California Breast Cancer Research Program Grant**; co-PI: Schubl/Khan **R01RG3745** ($150,000, 1
        year)
        Longitudinal Surveillance of Health Care Workers to Correlate SARS-CoV-2 Antibodies with Immunity
2020    **Surgical Infection Society Foundation Grant**; PI Schubl ($30,000)
        Extended Longitudinal Surveillance of Health Care Workers to Monitor SARSCoV-2 Antibody Levels Over
        Time and Correlate with Clinical Immunity.
2020    **NIH- National Institute of Allergy and Infectious Diseases**; PI BenMohammed, Co-I Schubl **R01AI158060
        ($3,727,050, 5 years)** Developing a Multi-epitope Pan-Coronavirus Vaccine
2020    Dean's Award. Study Co-PI: Schubl ($55,000)
        Expanded Funding for Serologic Surveillance of Health Care Workers for SARS-CoV-2 Antibodies During
        COVID-19 Pandemic Using a Coronavirus Antigen Microarray
2020    CRAFT-COVID Grant. PI: Schubl/Khan ($60,000)
        Extended Longitudinal Surveillance of Health Care Workers to Monitor SARSCoV-2 Antibody Levels Over
        Time and Correlate with Clinical Immunity.
2020    CRAFT-COVID Grant. PI: Schubl/Khan ($60,000)
        Serologic Surveillance of Health Care Workers for SARS-CoV-2 Antibodies During COVID-19 Pandemic
        Using a Coronavirus Antigen Microarray.
2020    UCOP COVID-19 Research Seed Funding Grant. PI: Schubl/Khan. R00RG2646 ($25,000)
        Serosurveillance of Health Care Workers for COVID-19 Using a Coronavirus Antigen Microarray
2020    UROP Fellow Grant. Study PI: Schubl 75192S1
        Renewal of grant
2021    UROP Fellow Grant. Study PI: Schubl 75192S1
        Renewal of grant; Students: Steven Pong and Lucille Ortiz


## PUBLICATIONS
1.  **Schubl SD**, Tsai S, Ryer E, Wang C, Liu B, Kent KC. Upregulation of PKCdelta in vascular smooth muscle cells
    promotes inflammation in AAAs. J Surg Res. 2009 May 15;153(2):181-7.
2.  Afaneh C, Aull M, **Schubl SD**, Leeser D, Kapur S. Review Article, Induction therapy: A Modern Review of
    Kidney Transplantation Agents. J Transplant Technol Res. 2011. S04:001.
3.  Aull MJ, Afaneh C, **Schubl S**, Walker JK, Leeser DB, Kapur S.  Recipients of Expanded Criteria Donor Kidney
    Transplants Undergoing Early Corticosteroid Withdrawal Using rATG Induction Are Not at Higher Risk of
    Acute Rejection. American Journal of Transplantation. April 2012. American Transplant Congress, Volume
    12.

4. Thurm CA, **Schubl SD**, Vakil A, Klein TR, Raynor JC, Cervellione KL. "Pilot Study of the Safety of Rivaroxaban for VTE Prophylaxis in Non-Orthopedic Surgical Patients". J of Thrombosis and Haemostasis 12:64-65. June 2014.

5. Sommerhalder C, Fretwell KR, Salzler G, Creasy JM, Robitsek J, **Schubl SD.** Aneurysmal Rupture of a Mesodiverticular Band to Meckel's Diverticulum. Case Rep Surg. 2015; Epub 2015 Jan 21.

6. Karleigh R. Curfman, Brendan R Gontarz, Michael D. Facciolo, Meera Cheerharan, R Jonathan Robitsek, **Sebastian D. Schubl.** Incarcerated Amyand's Hernia with Acute Appendicitis: A Case Report. J Med Cases. 2015;6(12):592-595

7. Michelle Abghari, Alexa Monroy, **Sebastian Schubl,** Roy Davidovitch, Kenneth Egol, Outcomes Following Low-Energy Civilian Gunshot Wound Trauma to the Lower Extremities: Results of a Standard Protocol at an Urban Trauma Center. The Iowa Orthopaedic Journal. Sept 2015; 35:65-69.

8. Karleigh R. Curfman · R. Jonathan Robitsek · Gregory G. Salzler ·Katherine D. Gray · Charles S. Lapunzina · Ravi K. Kothuru ·**Sebastian D. Schubl**. Massive Hemothorax Caused by a Single Intercostal Artery Bleed Ten Days after Solitary Minimally Displaced Rib Fracture. Case Reports in Surgery, vol. 2015, Article ID 120140, 4 pages, 2015 Nov 5.

9. **Schubl SD**, Robitsek RJ, Sommerhalder C, Wilkins KJ, Klein TR, Trepeta S, Ho VP. Cervical spine immobilization may be of value following firearm injury to the head and neck. Am J. Emerg. Med. 2016 Apr; 34(4):726-9. DOI: 10.1016/j.ajem.2016.01.014.

10. **Schubl SD**, Raymond L, Robitsek RJ, Bagheri F. (2016) Isolated Clostridium difficile Small Bowel Enteritis in the Absence of Predisposing Risk Factors, Surgical Infections Case Reports 1.1, 1-3, DOI:10.1089/crsi.2016.0006. 2016 Mar 31

11. **S.D. Schubl**, T.R. Klein, R.J. Robitsek, S. Trepeta, K. Fretwell, D. Seidman, M. Gottlieb. "Temporal Bone Fracture: Evaluation in the Era of Modern Computed Tomography". Injury. 2016 Sept; 47(9):1893-7 PMID: 27387791. DOI: 10.1016/j.injury.2016.06.026

12. Melissa K James PhD, **Sebastian Schubl MD**, Michael P. Francois BS, Geoffrey K. Doughlin MD, FACS, Shi-Wen Lee DO. "Introduction of Pan-scan protocol for blunt trauma activations: what are the consequences?" American Journal of Emergency Medicine. 2016 Sept 22. pii: S0735-6757(16)30605-2. DOI: 10.1016/j.ajem.2016.09.027

13. Amit Basu MD, Taylor Klein BS, R. Jonathan Robitsek PhD, Jeffrey Chan MD, Alfredo Wong MD, David Sammett MD, PhD, Katherine McKenzie DO, K. Geoffrey Doughlin MD, Kenneth Fretwell MD, and **Sebastian D. Schubl MD**. "Effect of the Affordable Care Act on Financial Margins and Access to Care for Appendectomy and Cholecystectomy". Journal American College of Surgeons, 223(4):e34; 2016 Oct.

14. Aldrin C. Alpuerto, Maximo E. Mora, R. Jonathan Robitsek, **Sebastian D. Schubl**. "Primary Pure Squamous Cell Carcinoma of the Gallbladder Locally Invading the Liver, Duodenum, and Stomach: A Case Report and Literature Review." Case Rep Surg. 2017;2017:2534029 Epub 2017, Jan 29..

15. Melissa K. James, PhD, Shi-Wen Lee, DO, Jennifer A. Minneman, MD, Maureen D. Moore MD, Taylor R. Klein, BS, R. Jonathan Robitsek, PhD, Phillip S. Barie, MD, MBA , **Sebastian D. Schubl, M**D. "Variability in CT imaging of blunt trauma among ED physicians, surgical residents, and trauma surgeons." Journal of Surgical Research. February 2017.

16. Melissa K. James, PhD,Vanessa P. Ho, MD, MPH, Simon P. Tiu, MD, Richard J. Tom, MD, Taylor R. Klein, BS, Gloria M. Melnic, RN, **Sebastian D. Schubl, MD.**  Low abdominal wall thickness may predict percutaneous endoscopic gastrostomy complications. The American Surgeon. 2017 Feb; 83(2):183-190.

17. Konda SR, Lott A, Saleh H, **Schubl SD**, Chan J, Egol KA. "How Does Frailty Factor Into Mortality Risk Assessment of a Middle-Aged and Geriatric Trauma Population?" Geriatric Orthopedic Surgery & Rehabilitation 1-6. Oct. 2017 Oct 25.

18. Grigorian A, Joe V, Delaplain P, **Schubl SD**, Barker B, Gabriel V, Dosch A, Barrios C, Nahmias J. Risk of Hysterectomy and Salpingectomy or Oophorectomy Compared to Repair After Pelvic Gynecologic Trauma. European Journal of Trauma and Emergency Surgery (2018), 1-8. 2018 Mar 6.

19. Grigorian A, Albertson S, Delaplain PT, Gabriel V, Maithel S, Dosch A, **Schubl SD,** Joe V, Nahmias J. Cirrhosis Increases Complication Rate and Overall Mortality in Patients with Traumatic Lung Injury. Trauma 2018 May 12.

20. Grigorian A, Sugimoto M, Joe V, **Schubl SD**, Lekawa M, Dolich M, Kuncir E, Barrios C, Nahmias J. Pressure Ulcer in Trauma Patients: A Higher Spinal Cord Injury Level Leads to Higher Risk. Journal of the American College of Clinical Wound Specialists. 2018 June 19.

21. Grigorian A, Wilson S, Kabutey NK, Fujitani RM, de Virgilio C, **Schubl SD**, Gabriel V, Chen S, Joe V, Nahmias J. Decreased National Rate of Below the Knee Amputation in Patients with Popliteal Artery Injury. Annals of Vascular Surgery. 2018 Jul 25.

22. Grigorian A, Milliken J, Livingston J, Spencer D, Gabriel V, **Schubl SD**, Kong A, Barrios C, Joe V, Nahmias J. National Risk Factors for Blunt Cardiac Injury: Hemopneumothorax is the Strongest Predictor. American Journal of Surgery. 2018 Jul 25.

23. Gabriel V, Grigorian A, Phillips J, **Schubl SD**, Barrios C, Pejcinovska M, Won E, Nahmias J. A Propensity Score Analysis of Clostridium Difficile Infection Among Adult Trauma Patients. Surgical Infections. July 30, 2018.

24. Grigorian A, Nahmias J, **Schubl SD**, Gabriel V, Bernal N, Joe V. Rising Mortality in Patients with Combined Burn Trauma. Burns. 2018 Jul 31.

25. Grigorian A, Gambhir S, Al-Khouja L, Gabriel V, **Schubl SD**, Nastanski R, Lekawa F, Joe V, Nahmias J. Decreased Incidence of Venous Thromboembolism Found in Trauma Patients with Positive Blood Alcohol Concentration on Admission. The American Journal of Drug and Alcohol Abuse. 2018 Aug 7.

26. Grigorian A, Livingston J, **Schubl SD**, Hasjim B, Mayers D, Kuncir E, Barrios C, Joe V, Nahmias J. National Analysis of Testicular and Scrotal Trauma in the United States. Res Rep Urol. 2018 Aug 10;2018(10):51-56.

27. Grigorian A, Pigazzi A, Nguyen N, **Schubl SD**, Joe V, Dolich M, Lekawa M, Nahmias J. Use of Laparoscopic Colectomy Increasing in Trauma: Comparison of Laparoscopic Versus Open Colectomy. Updates in Surgery. UPIS-D-18-00082R1. 2018 Aug 24

28. Grigorian A, Kabutey NK, **Schubl SD**, de Virgilio C, Joe V, Dolich M, Elfenbein D, Nahmias J. Blunt Cerebrovascular Injury Incidence, Stroke-Rate, and Mortality with the Expanded Denver Criteria. Surgery 2018 Sep.

29. Grigorian A, Gabriel V, Nguyen N, Smith B, **Schubl S**, Borazjani B, Joe V, Nahmias J. Black Race and Body Mass Index are Risk Factors for Rhabdomyolysis and Acute Kidney Injury in Trauma. Journal of Investigative Surgery. 2018 Sep 13

30. Grigorian A, **Schubl SD,** Barrios C, Joe V, Dolich M, Lekawa M, Nahmias J. Association Heparin-Induced Thrombocytopenia with Bacterial Infection in Trauma Patients. JAMA Surgery. 2018 Oct 1.

31. Grigorian A, Wilson S, de Virgilio C, Kabutey NK, Fujitani RM, Gabriel V, **Schubl SD**, Joe V, Nahmias J. Combined Venous Injury Increases Upper Extremity Limb Loss and Mortality in Patients with Axillar or Subclavian Artery Injury. Journal of Vascular Surgery. 2018 Nov 14.

32. Gabriel V, Grigorian A, **Schubl SD**, Pejcinovska M, Won E, Lekawa M, Bernal N, Nahmias J. Perforated Peptic Ulcer Surgery: Decreased Le ngth of Stay but No Difference in Mortality with Laparoscopic Repair. Surg Laparosc Endosc Tech. In Press. 2018 Dec 28.

33. Hasjim B, Grigorian A, Barrios C, **Schubl S**, Nahmias J, Gabriel V, Soencer D, Donayre C. National Trends of Thoracic Endovascular Aortic Repair (TEVAR) Versus Open Thoracic Aortic Repair in Pediatric Blunt Thoracic Aortic Injury. 2019 Feb 23

34. Grigorian A, **Schubl SD**, Gabriel V, Dosch A, Joe V, Bernal N, Dogar T, Nahmias J. Analysis of Trauma Patients with Unplanned Returns to the Operating Room. Turkish Journal of Surgery. 2019 Mar.

35. Gambhir S, Grigorian A, Ashbaugh A, Spencer D, Ramakrishnan D, **Schubl S**, Dolich M, Nahmias J (2019). Early Versus Late Pulmonary Embolism in Trauma: Not All Pulmonary Embolisms are Created Similarly. Journal of Surgical Research. 2019 Mar 2

36. Gabriel V, Grigorian A, Nahmias J, Won E, Bernal N, Barrios C, **Schubl S**. Risk Factors for Post-Operative Sepsis and Septic Shock in Patients Undergoing Emergency Surgery. Surgical Infections. 2019 Apr 5.

37. Grigorian A**, Schubl SD**, Scolaro J, Gabriel V, Hu A, Petrosian G, Joe V, Nahmias J. No Increased Risk of Acute Osteomyelitis Associated with Close or Open Long Bone Shaft Fractures. J Clin Orthop Trauma 2019 Apr 12

38. Spencer D, Grigorian A, **Schubl SD**, Awad Kyrillos, Elfenbein D, Dogar T, Nahmias J. Thyroid Trauma – A National Analysis of Incidence, Mortality and Concomitant Injury. Journal of Surgical Research. 2019 May 11.

39. Tse C, Grigorian A, Nahmias J, Kabutey NK, **Schubl S**, Beckord B, Bowens N, de Virgilio C. Racial Disparities in Limb Amputations After Traumatic Vascular Injury. J Clin Orthop Trauma. 2019 May 14.

40. Grigorian A, Lekawa M, Dolich M, **Schubl S**, Doben A, Kuza C, Barrios C, Nahmias J. Smoking is Associated with an Improved Short-Term Outcome in Patients with Rib Fractures. European Journal of Trauma and Emergency Surgery. 2019 May 18.

41. Farhat A, Grigorian A, Nguyen N, Smith B, Williams B, **Schubl S**, Joe V, Elfenbein D, Nahmias J. Obese Trauma Patients Have Increased Need for Dialysis. European Journal of Trauma and Emergency Surgery. 2019 May 20.

42. Areg Grigorian, Catherine M. Kuza, **Sebastian D**. Schubl, Ninh T. Nguyen, Christian de Virgilio, Dennis Kim, Michael Lekawa & Jeffry Nahmias. Same-Day Discharge after Non-Perforated Laparoscopic Appendectomy Is Safe. Journal of Investigative Surgery. 2019 Jun 20.

43. Grigorian A, Nahmias J, Dolich M, **Schubl SD** et al. Increased risk of head injury in pediatric patients with attention deficit hyperactivity disorder. J Child Adolesc Psychiatr Nurs. 2019 Jul 21;1–6.

44. Delaplain PT, Grigorian A, Won E, Dosch AR, **Schubl S**, Covarrubias J, Nahmias J. Nonaccidental Trauma Is an Independent Risk Factor for Mortality Among Injured Infants. Pediatric Emergency Care. 2019 Aug 20.

45. Hasjim BJ, Grigorian A, Kuza CM **Schubl SD**, Barrios C, Chin TL, Nahmias J. Ground-level Falls at Skilled Nursing Facilities are Associated with More Serious Lower Extremity Injuries Compared With Home. Int J of LE Wounds 1-7. 2019 Sep 9.

46. Grigorian A, Lester E, Lekawa M, Dolich M, **Schubl SD**, Barrios C Jr, Nahmias J. Marijuana Use and Outcomes in Adult and Pediatric Trauma Patients after Legalization in California. Am J Surg. 2019 Dec;218(6):1189-1194. Epub 2019 Sep 10.

47. Delaplain PT, Philips JL, Barie PS and **Schubl SD**. No reduction in surgical site infection from postoperative antibiotics in facial fractures, regardless of duration or anatomic location:  a systematic review and meta-analysis. Surgical Infections. 2019 Sept 17

48. Gambhir S, Grigorian A, **Schubl SD**, Barrios C, Bernal N, Joe V, Gabriel V, Nahmias J. Analysis of Non-Obstetric Vaginal and Vulvar Trauma: Risk Factors for Operative Intervention. Updates in Surgery. 2019 Sep 19.

49. Abate M, Grigorian A, Nahmias J, **Schubl S**, Kuncir E, Lekawa M. Differing Risk of Mortality in Trauma Patients with Stab Wounds to the Torso: Treating Hospital Matters. JAMA Surgery. 2019 Nov 1.

50. Duong W, Grigorian A, Al-Khouja LT, **Schubl SD**, Kong A, Lekawa M, Nahmias J. Sternotomy for Hemorrhage Control in Trauma, J Surg Res. 2019 Nov 20. pii: S0022-4804(19)30738-3.

51. P.T. Delaplain, C. Barrios, D. Spencer and **S.D. Schubl** et al., The use of computed tomography imaging for abdominal seatbelt sign: A single-center, prospective evaluation. Injury. 2020 Jan;51(1):26-31.

52. Delaplain PT, Grigorian A, Lekawa M, Mallicote M, Joe V, **Schubl SD**, Kuza CM, Dolich M, Nahmias J. Intracranial pressure monitoring associated with increased mortality in pediatric brain injuries. Pediatric Surgery International. 2020 Jan 14:1-8.

53. Nathan Jasperse, Areg Grigorian, Patrick Delaplain, Zeljka Jutric, **Sebastian D. Schubl**, Catherine Kuza, Jeffry Nahmias. Predictors of discharge against medical advice in adult trauma patients, The Surgeon, Volume 18, Issue 1, 2020, Pages 12-18, ISSN 1479-666X, 2020 Feb18.

54. Covarrubias, J., Grigorian, A., **Schubl, S.** et al. Obesity associated with increased postoperative pulmonary complications and mortality after trauma laparotomy. Eur J Trauma Emerg Surg (2020).. EJOT-D-19-00570R1. 2020 Feb 22.

55. Allen, A., Grigorian, A., Christian, A., **Schubl S.D**. et al. Intracranial pressure monitors associated with increased venous thromboembolism in severe traumatic brain injury. Eur J Trauma Emerg Surg (2020). EJOT-D-19-00309R4. 2020 Mar 10.

56. Yeates EO, Grigorian A, **Schubl SD**, et al. Chemoprophylaxis and Venous Thromboembolism in Traumatic Brain Injury at Different Trauma Centers. Am Surg. 2020;86(4):362-368. 2020 Apr 1.

57. Chou, R. L., Grigorian, A., Nahmias, J., **Schubl, S. D.**, Delaplain, P. T., & Barrios, C. (2020). Racial Disparities in Adult Blunt Trauma Patients With Acute Respiratory Distress Syndrome. Journal of Intensive Care Medicine.2020 Apr 7.

58. Bashi, R., Grigorian A., Lekawa M., **Schubl SD**, et al. Octogenarians with blunt splenic injury: not all geriatrics are the same. Updates Surg (2020). https://doi.org/10.1007/s13304-020-00765-y. 2020 Apr 18.

59. Moran, K., Grigorian, A., Elfenbein, D. **Schubl SD**, et al. Energy vessel sealant devices are associated with decreased risk of neck hematoma after thyroid surgery. Updates Surg (2020). UPIS-D-20-00032R1. 2020 Apr 24.

60. Chaudhry H, Grigoria, A, Lekawa M, Dolich M, Nguyen N., Smith, B, **Schubl SD**, Nahmias, J. Decreased Length of Stay After Laparoscopic Diaphragm Repair for Isolated Diaphragm Injury After Penetrating Trauma. The American Surgeon, 86(5), 493–498. 2020 May.

61. Shannon M. Fan, Areg Grigorian, Brian R. Smith, Catherine M. Kuza, Michael Lekawa, **Sebastian D. Schubl,** Ninh T. Nguyen, Jeffry Nahmias. Geriatric patients undergoing appendectomy have increased risk of

intraoperative perforation and/or abscess, Surgery, Volume 168, Issue 2,2020,Pages 322-327. 2020 May 24.

62. Brian Sheehan, Areg Grigorian, **Sebastian D**. **Schubl** and Jeffry Nahmias. Predictors of Blunt Abdominal Aortic Injury in Trauma Patients and Mortality Analysis. J Journal of Vascular Surgery, Volume 69, Issue 3, e28 - e29. 2020 Jun.

63. Kojayan, G.G., Grigorian, A., **Schubl, S.D.** et al. The effects of smoking on adolescent trauma patients: a propensity-score-matched analysis. Pediatr Surg Int (2020). Ms. No. PESI-D-20-00024. 2020 Jun.

64. Delaplain PT, Dosch AR, Kaafarani HM, Barie PS, **Schubl SD**, Scientific Studies Committee of the Surgical Infection Society. Revisiting the Surgical Infection Society Delphi Analysis of the Research Agenda in Surgical Infections: Advancements and Unanswered Questions. Surgical Infections. 2020 Jun 24.

65. Oscar Hernandez Dominguez, Areg Grigorian, Michael Lekawa, **Sebastian D. Schubl**, Theresa Chin, Dennis Y. Kim, Christian de Virgilio, Jeffry Nahmias. Helicopter Transport Has Decreased Over Time and Transport From Scene or Hospital Matters. Air Medical Journal, 2020, ISSN 1067-991X. 2020 Jul – Aug.

66. Christian, Ashton B; Delaplain, Patrick T; Grigorian, Areg; Nahmias, Jeffry; Mueller, Lukas; Tay, Erika; Duong, William Q; Rockne, Wendy Y; **Schubl, Sebastian D.** Research Priorities in Chest Wall Injury, Journal of Trauma and Acute Care Surgery: 2020 July 6.

67. Duong W, Grigorian A, Nahmias J, Farzaneh C, Christian A, Dolich M, Lekawa M, **Schubl S**. An increasing trend in geriatric trauma patients undergoing surgical stabilization of rib fractures. Eur J Trauma Emerg Surg. 2020 Oct 23:1–6. doi: 10.1007/s00068-020-01526-7. Epub ahead of print. PMID: 33095279

68. Duffens A, Grigorian A, de Virgilio C, Chin T, Kim D, Lekawa M, **Schubl SD**, Nahmias J. Association of Risk of Mortality in Pediatric Patients Transferred From Scene by Helicopter With Major But Not Minor Injuries. Pediatr Emerg Care. 2020 Oct 22. doi: 10.1097/PEC.0000000000002263. Epub ahead of print. PMID: 33105460.

69. Awad K, Spencer D, Ramakrishnan D, Pejinovska M, Grigorian A, **Schubl S**, Nahmias J. Adult Trauma Patients with Isolated Thoracolumbar Spinous and Transverse Process Fractures may be Managed Conservatively to Improve Emergency Department Throughput. Journal of Trauma and Injury. Accepted

70. Comparison of Same and Different Level Height Falls on Subsequent Midline Shift in Pediatric Traumatic Brain Injury. PCARE-D-19-00448R1. Pediatric Emergency Care. Accepted

71. Christian AB, Grigorian A, Nahmias J, Duong WQ, Lekawa M, Joe V, Dolich M, **Schubl SD**. Comparison of surgical fixation and non-operative management in patients with traumatic sternum fracture. Eur J Trauma Emerg Surg. 2020 Oct 19:1–6. Epub ahead of print. PMID: 33078258

72. Helmets Protect Pediatric Bicyclists from Head Injury and Do Not Increase Risk of Cervical Spine Injury. Pediatric Emergency Care

73. Jasperse N, Grigorian A, Delaplain P, Jutric Z, **Schubl SD**, Kuza CM, Nahmias J. Predictors of discharge against medical advice in adult trauma patients. JAMA Surgery. Accepted.

74. New York State and the Nation: Trends in Firearm Purchases and Firearm Violence During the COVID-19 Pandemic. The American Surgeon.

75. No Difference in Mortality Between Level I and Level II Trauma Centers Performing Surgical Stabilization of Rib Fracture. American Journal of Surgery. Accepted.

76. Racial and Sex Disparities in Trauma Outcomes Based on Geographical Region. The American Surgeon. Accepted.

77. Tay E, Grigorian A, **Schubl S**, Lekawa M, de Virgilio C, Scolaro J, Kabutey N, Nahmias J. Brachial Plexus Injury Significantly Increases Risk of Axillosubclavian Vessel Injury in Blunt Trauma Patients with Clavicle Fractures. American Surgeon. Accepted.

78. Garfinkle R, Sabboobeh S, Demian M, Barkun A, Boutros M, **Schubl SD**; Management of Uncomplicated Diverticulitis (MUD) Collaborative. Patient and Physician Preferences for Antibiotics in Acute Uncomplicated Diverticulitis: A Delphi Consensus Process to Generate Non-Inferiority Margins. Dis Colon Rectum. 2020 Oct 19. doi:Epub ahead of print. PMID: 33093297.

79. Surgical Infection Society Research Priorities: A Narrative Review of 14 years of Progress. Surgical Infections. Accepted

80. Isolated Thoracic Injury Patients with Rib Fractures Undergoing Rib Fixation Have Improved Mortality. Journal of Surgical Research. Accepted

**BOOK CHAPTERS**

1. Schubl SD, Respiratory Infections, In: Microbiology Recall, Diallo A, Chandrasekhara V, ed., Lippencott, Williams and Wilkins; 2003.
2. Schubl SD, Lekawa ME, Kim C, Yu L, Trauma in Pregnancy, In: ObGyn Hospitalist: Principles and Practice; C Kim et al ed., McGraw Hill, 2018.
3. Barie PS, Schubl SD, Narayan M, Multiple Organ Dysfunction Syndrome, In: Acute Care Surgery, Britt LD et al ed., Lippencott, Williams and Wilkins, 2018
4. Schubl SD, Woods AL, de Virgilio C, Kim DY; Gunshot Wound to the Left Neck; Surgery, De Virgilio et al ed, Springer, 2019.

## INVITED LECTURESHIPS, SCHOLARLY ACTIVITIES & REVIEWS

| | |
|---|---|
| 10/18/2017 | "Sepsis Core Measures and Early Detection of Sepsis", Corona Regional Medical Center, Grand Rounds |
| 10/24/2017 | "Managing interactions with the family of potential donors", One Legacy Annual Meeting; Pomona, California |
| 10/31/2017 | "Great Saves in Trauma" Annual No Fear Trauma Symposium; Orange County Global Medical Center |
| 01/30/2018 | "Sepsis Detection and Treatment", Anaheim Regional Medical Center, Grand Rounds |
| 03/05/2018 | Multiple Presentations, Mammoth EM 37th Annual Conference |
| 05/22/2018 | "Sepsis",Centinela Hospital Medical Center, Grand Rounds |
| 06/08/2018 | "Great Saves in Trauma", Ortho Trauma Symposium, UC Irvine Health |
| 10/5/2018 | "Surgical Stabilization of Rib Fractures", Loma Linda Medical Center Trauma Conference, Loma Linda, CA. |
| 02/21/2019 | "Current Approaches to the Management of Sepsis", St. Vincents Medical Center, Grand Rounds |
| 05/08/2019 | Surgical Infection Society Annual Meeting, Paper Discussant, Plenary Session |
| 9/27/2019 | "Surgical Stabilization of Rib Fractures", **University of Minnesota** Trauma Conference, Minneapolis, MN |
| 10/16/2019 | "Surgical Stabiliation of Rib Fractures", **University of California at Davis** Medical Center Trauma Conference, Davis, CA |
| 10/28/2019 | American College of Surgeons Annual Meeting, Rib Fixation Expert Panel ME113 |
| 2/10/2020 | "Surgical Stabilization of Rib Fractures", **UT Galveston** Trauma Conference, University of Texas, Galveston, TX |
| 2/11/2020 | "Surgical Stabilization of Rib Fractures", **Red Duke Trauma Institute at Texas Medical Center** Trauma Conference, Houston, TX |
| 3/24/2020 | **UCI Health Leadership Forum**, COVID-19 Experience in NYC |
| 3/24/2020 | UCI Irvine Department of Surgery, Division of Trauma Conference, COVID-19 Experience in NYC |
| 04/15/2020 | American Association for the Surgery of Trauma Annual Meeting, Moderator: Panel on Intrathoracic Approached to Surgical Stabilization of Rib Fractures |
| 04/22/2020 | Chest Wall Injury Society Summit, Moderator: Panel Discussion on Intrathoracic Rib Plating |
| 8/31/2020 | "Surgical Stabilization of Rib Fractures", **Intermountain Health** Trauma Course, Intermountain Health, NV |
| 09/10/2020 | "Inside Out: air of Rib Fractures", **University of California Irvine**, Department of Surgery Grand Rounds |
| 12/9/2020 | Rib fixation and program development. **Vanderbilt University Medical Center**, Nashville, TN. |
| 12/21/2020 | Intrathoracic rib plating. Miami Valley Hospital, Dayton, OH. |
| 1/25/2021 | Bascis of rib fixation.  **Northwestern** Memorial Hospital, Chicago, IL |

## ACCEPTED PRESENTATIONS AT NATIONAL MEETINGS

| | |
|---|---|
| 11/08/2018 | Grigorian A, Nahmias J, Sheehan B, Dolich M, Schubl S, Barrios C, Lekawa M. Increased Risk of Bicycle Accident in Pediatric Patients with Attention Deficit Hyperactivity Disorder (ADHD). Pediatric Trauma Society November 2018. |
| 01/17/2019 | Delaplain P, Barrios C, Spencer D, Lekawa M, Schubl S, Dosch A, Grigorian A, Pejcinovska M, Nahmias J. Abdominal Seatbelt Sign: Exclusion of Hollow Viscous Injury is Easier Than Prediction. Eastern Association for the Surgery of Trauma (EAST) Meeting January 2019 |

01/26/2019    Delaplain P, Grigorian A, Won E, Dosch A, Schubl S, McLaughlin C, Nahmias J. Abuse is an Independent Risk Factor for Mortality Among Infants. Southern California American College of Surgery (SCACS) Annual Scientific Meeting January 2019

01/27/2019    Christian A, Grigorian A, Allen A, Schubl S, Barrios C, Lekawa M, Borazjani B, Nahmias J. Intracranial Pressure Monitors Associated with Increased Venous Thromboembolism in Severe Traumatic Brain Injury. Southern California American College of Surgery (SCACS) Annual Scientific Meeting January 2019

01/27/2019    Covarrubias J, Grigorian A, Nahmias J, Chin T, Schubl S, Joe V, Lekawa M. Vices-Paradox in Trauma: Positive Alcohol and Drug Screens Associated with Decreased Mortality. Southern California American College of Surgery (SCACS) Annual Scientific Meeting January 2019

02/06/2019    Gambhir S, Grigorian A, Gabriel V, Schubl S, Barrios C, Bernal N, Joe V, Nahmias J. Analysis of Vaginal and Vulvar Trauma: Risk Factors for Operative Intervention.  Academic Surgical Congress (ASC) Meeting February 2019

02/06/2019    Gambhir S, Grigorian A, Gabriel V, Schubl S, Barrios C, Bernal N, Joe V, Nahmias J. Analysis of Vaginal and Vulvar Trauma: Risk Factors for Operative Intervention.  Academic Surgical Congress (ASC) Meeting February 2019

02/06/2019    Yeates E, Grigorian A, Schubl S, Kuza CM, Joe V, Lekawa M, Borazjani B, Nahmias J. Chemoprophylaxis and Venous Thromboembolism in Traumatic Brain Injury at Different Trauma Centers. Academic Surgical Congress (ASC) Meeting February 2019 (accepted)

02/06/2019    Hasjim BJ, Grigorian A, Kuza CM, Schubl S, Barrios C, Chin T, Nahmias J. Falls at Skilled Nursing Facilities Lead to More Serious Lower Extremity Injuries Compared to Home. Academic Surgical Congress (ASC) Meeting February 2019

02/06/2019    Grigorian A, Lekawa M, Joe V, Schubl S, Kong A, Nahmias J. Octogenarians with Blunt Splenic Injury: Not All Geriatrics are the Same. Academic Surgical Congress (ASC) Meeting February 2019

02/06/2019    Galvin KM, Grigorian A, Schubl S, Gabriel V, Anavim A, Rudd A, Phillips JL, Nahmias J. Imaging May Partly Obviate Laparoscopy for Thoracoabdominal Stab Wounds: A Single Center Pilot Study. Academic Surgical Congress (ASC) Meeting February 2019

02/06/2019    Covarrubias J, Grigorian A, Nahmias J, Chin T, Schubl S, Joe V, Lekawa M. Vices-Paradox in Trauma: Positive Alcohol and Drug Screens Associated with Decreased Mortality. Academic Surgical Congress (ASC)  Meeting February 2019)

2/16/2019    Eastern Association for the Surgery of Trauma Annual Meeting
Presenter: Intrathoracic Approached to Surgical Stabilization of Rib Fractures

02/16/2019    Grigorian A, Abate M, Nahmias J, Schubl S, Kuncir E, Lekawa M. Differing Risk of Mortality in Trauma Patients with Stab Wounds to the Torso: Treating Hospital Matters. Pacific Coast Surgical Association Meeting February 2019 (accepted)

02/16/2019    Grigorian A, Lekawa M, Dolich M, Schubl S, Doben A, Kuza CM, Barrios C, Nahmias J. Smoking Associated with Improved Mortality in Trauma Patients with Rib Fractures. Pacific Coast Surgical Association Meeting February 2019

02/16/2019    Grigorian A, Lekawa M, Dolich M, Schubl S, Doben A, Kuza CM, Barrios C, Nahmias J. Smoking Associated with Improved Mortality in Trauma Patients with Rib Fractures. Pacific Coast Surgical Association Meeting February 2019

03/18/2019    Sheehan B, Grigorian A, de Virgilio C, Fujitani R, Kabutey N, Lekawa M, Schubl S, Nahmias J. Predictors of Blunt Abdominal Aortic Injury in Trauma Patients and Analysis for Mortality. Society for Clinical Vascular Surgery (SCVS) March 2019

03/18/2019    Tse C, Grigorian, A, Nahmias J, Kabutey N, Schubl S, Beckord B, Bowens N, de Virgilio C. Racial Disparities in Limb Amputations After Traumatic Vascular Injury. Society for Clinical Vascular Surgery (SCVS) March 2019

04/16/2019    Chaudhry H, Grigorian A, Lekawa M, Dolich M, Nguyen NT, Smith BR, Schubl SD, Nahmias J. Open versus Laparoscopic Diaphragm Repair for Isolated Penetrating Diaphragm Injury in Trauma. Southwest Surgical Congress April 2019

09/19/2019    Grigorian A, de Virgilio C, Chin T, Kim D, Lekawa M, Schubl S, Nahmias J. Pediatric Helicopter Transport: Flying Less But Also Less Injured. American Association for the Surgery of Trauma (AAST) Assembly September 2019

| | |
|---|---|
| 10/28/2019 | Abate M, Grigorian A, Lekawa M, Schubl S, Dolich M, Delaplain P, Kuza C, Nahmias J. Predictors of Mortality in Trauma Patients with Acute Respiratory Distress Syndrome on Extracorporeal Membrane Oxygenation. American College of Surgeons Clinical Congress October 2019. |
| 10/28/2019 | Covarrubias J,Grigorian A, Schubl S, Gambhir S, Dolich M, Lekawa M, Nguyen N, Nahmias J. Obesity Associated with Increased Postoperative Pulmonary Complications and Mortality After Trauma Laparotomy. American College of Surgeons Clinical Congress October 2019. |
| 10/28/2019 | Grigorian A, Lekawa M, Schubl S, Chin T, Kim D, de Virgilio C, Nahmias J. Helicopter Transport Has Decreased Over Time: Transport from Scene or Hospital Matters. American College of Surgeons Clinical Congress October 2019. |
| 11/13/2019 | Grigorian A, Hasjim B, Schubl S, Lekawa M, Kim D, Bernal N, Nahmias J. Helmets Protect Pediatric Bicyclists From Head Injury And Do Not Increase Risk Of Cervical Spine Injury: Time For A Universal Helmet Law. Pediatric Trauma Society 2019. |

## PROFESSIONAL SOCIETIES/JOURNALS SERVICE

| | |
|---|---|
| 06/2018-present | Instructor for Advanced Trauma Life Support (ATLS©) |
| 01/2018-present | Instructor for Advanced Surgical Skills for Exposure in Trauma (ASSET) |
| 2018-present | Member, Item Writing Committee, Society for Critical Care Medicine |
| 2018-present | Chair, Publications Committee, Chest Wall Injury Society |
| 2018-2020 | Member, Scientific Studies Committee, Surgical Infection Society |
| 2019-present | Member, Executive Council, Chest Wall Injury Society |
| 2019-present | Journal of the American College of Surgeons Ad hoc Reviewer |
| 2019-present | Journal of Trauma and Acute Care Surgery Ad hoc Reviewer |
| 2019-present | Surgical Infections Ad hoc Reviewer |
| 2020-present | Vice-Chair, Scientific Studies Committee, Surgical Infection Society |
| 2020-present | Member, Manuscript and Literature Review Committee, Eastern Association for the Surgery of Trauma |
| 2021 | Journal of Trauma and Acute Care Surgery **Guest Editor- CWIS Edition** |

## INSTITUTIONAL SERVICE

| | |
|---|---|
| 2018-present | Member, OR Governance Committee, UC Irvine Health |
| 2018-present | Member, OR Block Committee, UC Irvine Health |
| 2018-present | Member, Committee of Clerkship Directors, UC Irvine School of Medicine |
| 2018-present | Member, Trauma Performance Improvement Committee, UC Irvine Health |
| 2018-present | Member, Education Committee for the Department of Surgery, UC Irvine |
| 2018-present | Member, Anesthesia Critical Care Competency Committee, UC Irvine Health |
| 2018-present | Member, Surgical Critical Care Fellowship Competency Committee, UC Irvine Health |
| 2018-present | Member, Program Evaluation Committee for General Surgery Residency, UC Irvine Health |
| 2018-present | Member, Antibiotic Stewardship Committee, UC Irvine Health |
| 2018-present | Member, Committee of Clerkship Directors |
| 2018-present | Clerkship Director, 4th Year Medical Students Surgery Electives |
| 2018-present | Applicant Interviewer, Surgical Critical Care Fellowship |
| 2018-present | Applicant Reviewer & Interviewer, General Surgery Residency |
| 2018-present | **Digital screening tool for the Residency Applicant Review Process** |
| 2018-present | **Mentorship Program to prepare students for Residency Application**. |
| 2018-present | Applicant Interviewer, Surgical Critical Care Fellowship |
| 2018-present | Applicant Reviewer & Interviewer, General Surgery Residency |
| 2018-present | Department of Surgery Cabinet member |
| 2018-present | Faculty Interviewer, Trauma Faculty Recruitment Committee |
| 10/27/2018 | Mock Oral Boards Workshop, UCI Department of Surgery, Resident Education |
| 2019-present | Member, Value Management Committee |
| 8/2018-1/2019 | Member, **Chief Operating Officer Search Committee** for UCI Health |
| 5/29/2019 | ABS Board Review, UCI Department of Surgery, Resident Education |

| | |
|---|---|
| 6/2019-10/2019 | Member, **Chief Informatics Officer Search Committee**, UC Irvine Health |
| 8/8/2019 | Practice Mock Orals, UCI Department of Surgery, Resident Education |
| 2019-present | Member, Value Management Committee, UC Irvine Health |
| 2019-present | DOS Robotic Hernia Program Development |
| 2019 | Co-organizer, Department of Surgery Diversity Scholarship for Visiting Acting Interns |
| 06/2019 | Faculty Hooder for 2019 graduation ceremony of University of California Irvine SOM |
| 06/07/2019 | Mock Oral Boards Bootcamp, UCI Department of Surgery, Resident Education |
| 2020 | Member, **Chief Operating Officer Search Committee**, UC Irvine Health |
| 2020 | Member, **Chief Financial Officer Search Committee**, UC Irvine Health |
| 07/2020-present | UCOP Response to COVID-19 Work Group |
| 08/2020 –present | Hospital at Home Pilot Initiative |
| 12/2020 | Medical Director, UCI Mobile Field Hospital |

**EVIDENCE-BASED GUIDELINES**

| | |
|---|---|
| 2017 | VTE Prophylaxis |
| 2018 | Appendicitis |
| 2018 | Clostridium difficile |
| 2018 | Diverticular disease |
| 2018 | Gallbladder |
| 2018 | GI bleeding |
| 2018 | Hernia |
| 2018 | Intestinal obstruction |
| 2018 | Pancreatitis |
| 2018 | Peptic ulcer disease |
| 2018 | Perianal |
| 2018 | Soft tissue infections |
| 2019 | Trauma in Pregnancy |
| 2019 | Geriatric Trauma |
| 2019 | Rib Plating Indications |
| 2020 | Updated VTE Prophylaxis |

**AWARDS**

| | |
|---|---|
| 1995 | Class Trustee at the University of Virginia School of Medicine, Charlottesville, VA |
| 1995 | Cum Laude Society, The Collegiate School, Richmond, VA |
| 1995 | State Advanced Placement Scholar with Distinction, State of Virginia |
| 1999 | Graduated with Scholastic Honors from Johns Hopkins University, Baltimore, MD |
| 2008 | Association of Academic Surgeons/Society of University Surgeons Resident Research Award |
| 2018 | ARIISE Award Nominee - Accountability |
| 2018 | Eastern Association for the Surgery of Trauma Mentorship Program with Joseph Farhat MD, FACS |
| 2019 | ARIISE Award Nominee - Service |
| 2019 | UC Irvine School of Medicine **Humanitarian in Medicine Faculty Award** |
| 2020 | **CalHealthCares Awardee** - Physicians for a Healthy California – Commitment to Diversity |

Menekse et al. World Journal of Emergency Surgery  (2015) 10:7
DOI 10.1186/s13017-015-0008-7



WORLD JOURNAL OF
EMERGENCY SURGERY

**RESEARCH ARTICLE**                                                                   **Open Access**

# A practical scoring system to predict mortality in patients with perforated peptic ulcer

Ebru Menekse[1*], Belma Kocer[2], Ramazan Topcu[3], Aydemir Olmez[4], Mesut Tez[1] and Cuneyt Kayaalp[5]

## Abstract

**Introduction:** The mortality rate of perforated peptic ulcer is still high particularly for aged patients and all the existing scoring systems to predict mortality are complicated or based on history taking which is not always reliable for elderly patients. This study's aim was to develop an easy and applicable scoring system to predict mortality based on hospital admission data.

**Methods:** Total 227 patients operated for perforated peptic ulcer in two centers were included. All data that may be potential predictors with respect to hospital mortality were retrospectively analyzed.

**Results:** The mortality and morbidity rates were 10.1% and 24.2%, respectively. Multivariated analysis pointed out three parameters corresponding 1 point for each which were age >65 years, albumin ≤1,5 g/dl and BUN >45 mg/dl. Its prediction rate was high with 0,931 (95% CI, 0,890 to 0,961) value of AUC. The hospital mortality rates for none, one, two and three positive results were zero, 7.1%, 34.4% and 88.9%, respectively.

**Conclusion:** Because the new system consists only age and routinely measured two simple laboratory tests (albumin and BUN), its application is easy and prediction power is satisfactory. Verification of this new scoring system is required by large scale multicenter studies.

**Keywords:** Peptic ulcer, Perforation, Mortality, Scoring methods

## Introduction

In treatment of peptic ulcer, incidence of elective surgery tended to decrease due to eradication of *Helicobacter pylori* during the recent three decades whereas incidence of emergency surgical interventions for complications of the disease did not decrease [1-3]. Moreover, population ageing and extensive use of non-steroid anti-inflammatory drugs increased the incidence of bleeding and perforation of peptic ulcer [1]. Only 5-10% of the patients with bleeding peptic ulcers require surgical intervention whereas almost all patients with perforated peptic ulcer (PPU) necessitate surgery [1]. The risk of mortality (6-30%) and morbidity (21-43%) at PPU unfortunately have not changed during the last decades [1,3-6]. Perforation was the cause of death in 70% of the patients with peptic ulcer and rate of mortality due to PPU is 10-fold higher than other acute abdominal factors such as acute appendicitis and acute cholecystitis [7].

Some scoring systems such as Boey, Peptic Ulcer Perforation Score (PULP) and ASA (American Society of Anesthesiologists) have been already developed for prediction of mortality at PPU [5,8,9]. PULP score appears to have the greatest predictability of mortality however it is impractical with its complexity [5]. Boey score is a more practical but its predictability value was found varying in several studies [5,10-12]. Both scoring systems require a well history taking to detect the duration of symptoms and co-morbidities [5,8]. However, those data cannot be taken reliably from some elderly patients. ASA as a scoring system is non-specific for PPU, its predictability is not superior than the others and its major drawback is its subjective assessment [5,10]. Detection of patients with high risk for mortality after PPU surgery can allow other treatment modalities except surgery or can necessitate some extra care protocols to decrease the mortality [6].

Our aim was to develop a new and easy applicable scoring system to predict mortality at PPU patients.

* Correspondence: drebrumenekse@gmail.com
[1]Department of General Surgery, Ankara Numune Training and Research Hospital, Ankara 06100, Turkey
Full list of author information is available at the end of the article



© 2015 Menekse et al.; licensee BioMed Central. This is an Open Access article distributed under the terms of the Creative Commons Attribution License (http://creativecommons.org/licenses/by/4.0), which permits unrestricted use, distribution, and reproduction in any medium, provided the original work is properly credited. The Creative Commons Public Domain Dedication waiver (http://creativecommons.org/publicdomain/zero/1.0/) applies to the data made available in this article, unless otherwise stated.

Menekse *et al. World Journal of Emergency Surgery* (2015) 10:7

## Patients and methods

The records of surgically treated PPU patients at Ankara Numune Training and Research Hospital and Inonu University Faculty of Medicine between dates 2009 and 2010 were reviewed as retrospectively. The computerized and documentary archives of patients in both of hospital were used in this study. The cases with malignant perforated tumors, marginal ulcer or incomplete data were excluded from the analysis.

The patients were diagnosed according to preoperative clinical features, routine laboratory tests, radiological findings and operative evidence. All the procedures were conducted via an open surgical approach.

The following data were collected: age, gender, white blood cell count (WBC), hemoglobin (Hb), urea, creatinine (Cre), albumin (Alb), systolic blood pressure (BP-S), diastolic blood pressure (BP-D), mean arterial pressure (MAP), pulse, perforation size, admission duration, ASA, Boey, PULP scores, duration of operation, medical illnesses, postoperative complications, reasons of mortality. Laboratory data's were used at the time of admission. The death that occurred within 30 days after surgical treatment or death at the same admission was defined as hospital mortality. The time interval longer than 24 hours between presumed perforation and surgery was accepted as a delayed admission. Factors associated with mortality and morbidity were analyzed using univariate and multivariate analysis. A clinical POMPP (Practical scoring system of mortality in patients with perforated peptic ulcer) score based on the final logistic regression model was constructed for mortality. Additionally, logistic regression analysis and receiver-operating characteristic (ROC) curve analysis were used to calculate risk predictions for mortality in Boey, PULP and ASA scoring systems and their predictability on mortality was compared with the new scoring system. The definitions of the mentioned scoring systems are presented in the Table 1.

Perforation longer than 24 hours was differently defined by PULP and Boey scorings. This term was defined as time interval from perforation (onset of symptoms or aggravation of symptoms) until admission to hospital for PULP [5] whereas this term was defined as the time interval from perforation until surgery for Boey [13]. We also used the definition of Boey scoring system for perforation duration in all scorings. Therefore, total score of PULP may have resulted higher in our study than the original application.

Preoperative shock was defined as blood pressure < 100 mm Hg and heart rate >100 beats/ min for PULP whereas this term was described as only blood pressure < 100 mm Hg for Boey [5,13]. The parameter of preoperative shock was defined compatible with original form of each study in evaluation of these scoring systems in our study.

## Statistical analysis

Shapiro-Wilk test was used for assessing normality. Continuous data are presented as mean ± SD while differences between groups were analyzed by means of Students $t$ test. Categorical variables were analyzed with $\chi^2$ tests. Logistic regression was used to identify variables associated with mortality. Variables with $p \le 0.2$ in the univariate analyses were included in multivariate analyses. Results of the multivariable analysis were shown as odds ratio (OR) and

**Table 1 Comparison of scoring systems contents for mortality in patients with peptic ulcer perforation**

| Scoring systems | PULP - points | | ASA - scores | | BOEY - points | | POMPP - points | |
|---|---|---|---|---|---|---|---|---|
| **Substances** | Age > 65 | 3 | Normal health | 1 | Medical illness | 1 | Age > 65 | 1 |
| | Comorbid active malign disease or AIDS | 1 | Mild systemic disease | 2 | Preoperative shock | 1 | BUN > 45 mg/dl | 1 |
| | Comorbid liver cirrhosis | 2 | Severe systemic disease | 3 | Duration of peptic ulcer perforation > 24 h | 1 | Albumin < 1.5 g/L | 1 |
| | Concomitant use of steroids | 1 | Severe systemic disease with a constant treat to life | 4 | | | | |
| | Shock | 1 | Not expected survival for patients without surgery | 5 | | | | |
| | Perforation time on admission >24 | 1 | | | | | | |
| | Serum creatinine >1.47 mg/dl | 2 | | | | | | |
| | ASA 2 | 1 | | | | | | |
| | ASA 3 | 3 | | | | | | |
| | ASA 4 | 5 | | | | | | |
| | ASA 5 | 7 | | | | | | |
| **High score** | | >6 | | >3 | | >1 | | >1 |
| **Total score** | | 0-18 | | 1-5 | | 0-3 | | 0-3 |

Case 2:20-cv-00410-MKD    ECF No. 45    filed 02/04/22    PageID.1028    Page 200 of 380

Menekse *et al. World Journal of Emergency Surgery* (2015) 10:7    Page 3 of 6

corresponding 95% confidence interval (CI). The analysis of the ROC curve used to define the optimal cut-off value for continuous variables in mortality. A clinical score based on the final logistic regression model was constructed; 1 point was given to indicate presence of each predictive factor.

Model discrimination was measured by the area under the receiver–operator characteristic (ROC) curve (AUC). The discrimination of a prognostic model is considered perfect, good, moderate and poor for AUC values of 1; >0,8; 0,6–0,8 and <0,6; respectively.

## Results

We enrolled 325 patients underwent surgical treatment for PPU. A total of 98 patients were excluded because the fulfilled at least one of the exclusion criteria. The study population included remaining 227 patients with a mean age of $50.6 \pm 19.6$ (ranged16-95) years. Table 2 shows the clinical characteristics of PPU patients and comparison of these characteristics for mortality and morbidity according to univariate analysis. Hospital mortality was 10.1% (n: 23) in the patients while pneumonia, myocardial failure combined with arrhythmia, septicemia and renal failure were found in 15, five, two and one patients, respectively. Morbidity rate was 24.2% (n: 55). The morbidities were pulmonary failure (n:24), wound infection (n:23), evisceration (n:10), renal failure (n:7), postoperative ileus (n:6), cardiac failure (n:5), suture leakage (n:3) and intraabdominal abscess (n:2)., respectively. Mean length of hospital stay was $7.9 \pm 9.0$ days (ranged 1–115).

The operative procedures included mainly simple closure (n: 218) or some definitive procedures (n:9) such as pyloroplasty or gastrectomy in cases of accompanying hemorrhage, large or multiple perforations.

Three variables were statistically significant in multivariate analysis: albumin level equal or less than 1.5 (OR =0.0445), age over 65 (OR =1.1258), and BUN level higher than 45 (OR =1.0353) (Table 3). A probability score was calculated by adding points given to these variables. Despite the differences in regression coefficients, 1 point was given for each of these risk factors to simplify procedure. The resulting predicting of mortality in perforated peptic ulcer (POMPP) score ranged between score 0 to 3.

**Table 2 Clinical characteristics of patients in terms of mortality**

| Variable | Mortality | No Mortality | P | Morbidity | No morbidity | P |
|---|---|---|---|---|---|---|
| | n = 23 | n = 204 | | n = 55 | n = 172 | |
| Age (years) (mean ± SD) | 74.5 ± 12.1 | 47.9 ± 18.4 | <0.0001 | 61.4 ± 18.1 | 47.2 ± 18.8 | <0.0001 |
| Sex; Male/Female (n,%) | 18(9.1)/5(15.6) | 180(90.9)/27(84.4) | NS† | 43(21.7)/12(37.5) | 155(78.3)/20(62.5) | 0.047 |
| White blood cell count (10/µL) (mean ± SD) | 12.5 ± 7.8 | 13.7 ± 6.5 | NS† | 146.9 ± 86.7 | 132.0 ± 59.8 | NS† |
| Hemoglobin (g/dl) (mean ± SD) | 12.8 ± 2.8 | 15 ± 2.3 | <0.0001 | 14.3 ± 3.2 | 14.9 ± 2.1 | NS† |
| BUN (mg/dl) (mean ± SD) | 123.5 ± 85.9 | 36.6 ± 20.9 | <0.0001 | 70.5 ± 67.1 | 37.4 ± 26.2 | <0.0001 |
| Creatinine (mg/dl) (mean ± SD) | 2.71 ± 2.07 | 1.15 ± 0.86 | <0.0001 | 1.78 ± 1.32 | 1.20 ± 1.21 | 0.003 |
| Albumin (g/L) (mean ± SD) | 1.52 ± 0.51 | 2.57 ± 0.75 | <0.0001 | 2.45 ± 0.69 | 3.12 ± 0.73 | <0.0001 |
| BP-S*(mm/Hg) (mean ± SD) | 107 ± 28.4 | 125.9 ± 21.7 | <0.0001 | 124.1 ± 28.6 | 123.9 ± 21.2 | NS† |
| BP-D**(mm/Hg) (mean ± SD) | 67.2 ± 19.4 | 76.7 ± 13.6 | 0.003 | 77.2 ± 16.9 | 75.3 ± 13.8 | NS† |
| MAP***(mmHg) (mean ± SD) | 80.4 ± 21.8 | 93.1 ± 15.03 | <0.0001 | 92.8 ± 19.7 | 91.5 ± 14.9 | NS† |
| Pulse (/ min) (mean ± SD) | 113.2 ± 30.2 | 94.7 ± 14.3 | <0.0001 | 104.6 ± 22.3 | 93.8 ± 14.7 | <0.0001 |
| Time from perforation to surgery (h) (n, %) | | | | | | |
| <24 h | 1 (1.2) | 80 (98.8) | 0.001 | 28 (17.4) | 133 (82.6) | <0.0001 |
| >24 h | 22 (15.1) | 124 (84.9) | | 27 (39.7) | 41 (60.3) | |
| Perforation size (cm) (n, %) | | | | | | |
| <0.5 | 15 (8.9) | 153 (91.1) | 0.02 | 4 (13.8) | 25 (86.2) | 0.001 |
| 0.5-1 | 1 (3.4) | 28 (96.6) | | 36 (21.1) | 135 (78.9) | |
| >1 | 7 (23.3) | 23 (76.7) | | 15 (50) | 15 (50) | |
| Operation time (min) (mean ± SD) | 103.3 ± 42.4 | 81.6 ± 28.1 | 0.001 | 95.7 ± 46.8 | 80.3 ± 22.8 | 0.002 |
| Other medical illnesses (n,%) | | | | | | |
| Absent | 4 (2.5) | 155 (97.5) | <0.0001 | 22 (13.6) | 140 (86.4) | <0.0001 |
| Present | 19 (27.5) | 49 (72.1) | | 33 (48.5) | 35 (51.5) | |

*BP-S: Blood pressure-systolic, **BP-D: Blood pressure-diastolic, ***MAP: Median artery pressure, †NS: Non-significant.

Menekse et al. World Journal of Emergency Surgery (2015) 10:7

**Table 3 Independent predictor of mortality identified by multivariate logistic regression analysis**

| Predictors | P value | SE* | Odds ratio | 95% CI |
|---|---|---|---|---|
| Albumin | 0.0005 | 0.89 | 0.0445 | 0.0077 to 0.2577 |
| BUN | 0.0003 | 0.009 | 1.0353 | 1.0160 to 1.0550 |
| Age | 0.0013 | 0.03 | 1.1258 | 1.0474 – 1.2100 |

*Standard Error.

Three groups of patients were defined based on the POMPP score. In the first group, with a score 0, there was no mortality. The second group included patients with POMPP score 1, who had a 7.1% risk of mortality; this group comprised approximately 1.8% of the cohort. The third group, comprising approximately 4.8% of the patients, included those with a POMPP score of 2 whose risk of mortality 34.4% and last group with a POMPP score of 3 who had an 88.9% risk of mortality, this group comprised about 3.5% of the cohort (Table 4).

The area under the ROC curve (AUC) was 0.931 (95% CI, 0.89-0.96) (Figure 1). The AUC values of the other scoring systems evaluated in our study have been presented in Table 5. The specificity, sensitivity, negative likelihood and positive likelihood ratios for POMPP score exceeding 1 point were 89.2%; 82.6%; 0.19 and 7.66, respectively.

## Discussion

We described a new and easily applicable scoring system to predict the postoperative mortality rate in patients with PPU. This scoring system simply based on only age and routinely measured two simple laboratory tests (albumin, BUN). Similarly to us, PULP or Boey scores were found that age over 65 or 60 was an independent risk factor for mortality [5,13]. Advanced age had been reported in several studies as an independent risk factor on mortality in PPU patients [4,14-18] and its importance is still remains [16,19].

Another parameter of POMPP scoring system was BUN level which is regulated as a result of several conditions such as protein catabolism, steroid intake and gastrointestinal bleeding. Regardless of renal functions, it is also accepted as a marker of a severity of disease

**Table 4 Risk of mortality according to the POMPP score in patients with peptic ulcer perforation**

| POMPP Score | No Mortality | Mortality |
|---|---|---|
| | n (%) | n (%) |
| 0 | 130 (100) | 0 (0) |
| 1 | 52 (92.9) | 4 (7.1) |
| 2 | 21 (65.6) | 11 (34.4) |
| 3 | 1 (11.1) | 8 (88.9) |

[20]. In the study of Khuri et al., BUN > 40 mg/dl was found as a risk factor that increases 30-day mortality after non-cardiac operations [21]. In PULP and Jabolpur scoring systems, high level of serum creatinine was used in predicting risk for mortality [5,12]. In the study of Thorsen et al., serum creatinine level over 1.33 mg/dl was detected as an independent risk factor that indicates mortality risk in PPU [11]. Additionally, it was stated in this study that hypoalbuminemia and high creatinine levels may reflect some underlying pathologies and diseases such as presence of cancer, chronic severe disease and acute diseases that may cause dehydration or accompany with infection and sepsis [11]. We considered that high predictive power of low albumin and high BUN levels as well as advanced age in mortality is associated with the broad spectrum of underlying pathological events and diseases. Hypoalbuminemia alone had been shown as marker of increased risk of morbidity and mortality in PPU patients [22]. Thorsen et al. was found that hypoalbuminemia was a strong factor which might determine mortality solely (AUC: 0.78) [11]. Strong correlation between hypoalbuminemia and mortality in PPU patients is not surprising when reduction of albumin synthesis is considered in cases of dehydration, hepatic dysfunction, cancer, critical clinical course, systemic inflammatory response syndrome and sepsis [22,23].

PULP scoring system was constructed by testing a large patient population as the national data [5]. Even though, mortality predictive power of PULP scoring system was a little better than ours (PULP AUC: 0,955 vs. POMPP AUC: 9,931; p > 0,5), it is not easy to use the PULP in clinical practice. PULP is based on partially anamnesis and admission time was defined as the end of time interval which didn't reflect total duration of abdominal contamination. Additionally, three variables including missing data more than 20% were excluded from the PULP study and some more missing data below 20% were included in. Moller et al. was given AUC value of 0.83 for mortality prediction for PULP scoring system [5]. In a recent study by Thorsen et al. found the AUC value as 0.79 [11], whereas we have found it as 0.95. While calculating the PULP score in our study, we modified the defined time interval as from perforation onset to the surgery. For this reason, prediction of PULP in our analysis might be higher than the previously reported ones.

The other defined scoring system of Boey is more practical than the PULP. However, prediction values of Boey scoring system were quite varying in several studies as AUC values ranged between 0, 63 to 0, 86 [5,11,12,15,24]. In our analysis we found a better Boey value (AUC: 0.92) for prediction then the reported ones. On the other hand, Boey scoring system didn't involve advanced age which is generally an important parameter for mortality in PPU [8].

Menekse et al. World Journal of Emergency Surgery (2015) 10:7



**Figure 1** ROC curves analysis of POMPP, PULP, Boey and ASA scoring system.

Exclusion of advanced age might be caused by the fact that this scoring system was defined three decades before. Incidence of PPU complications increased in the population of advanced age due to prolonging mean lifetime in the present time and increased use of NSAIs in the advanced ages [25].

Several studies were analyzed the mortality prediction of ASA status in PPU patients and found AUC values between 0, 73 and 0, 91 [5,9,11,15]. ASA is not specific scoring system for neither PPU and it is mainly based on the co-morbid diseases and their severity [11,25,26]. Although co-morbidities are important risk factors for mortality, under diagnosed or unknown chronic diseases on emergency admission can result to underscoring of ASA. On the other hand, sepsis is as important as the additional medical diseases on the mortality of PPU [4,6,9]. Beside all that, the main problem of ASA scoring is that calculation is performed subjectively and differences between interpretations may be observed [10].

In fact, all of the scoring system models compared in our study had similar and well predictive power for mortality in PPU patients. None of the previously described scoring systems were widely accepted in clinical practice yet. The reason can be their complexity, non-specificity or confused and subjective points in the mind of clinicians such as definitions of preoperative shock, perforation duration and severity of medical illnesses. We believe that three very clear parameters (age, albumin and BUN) can be easily adopted in the clinical practice to predict the surgical mortality of PPU patients. Respiratory support, circulatory stabilization, preoperative and postoperative care in ICU, frequent monitorization and perioperative care protocols can be added to the high risk patients with PPU [5,6]. It is demonstrated that if the high risk patients got extra perioperative care, the hospital mortality rate could be reduced from the standard care patients (17% and 27%, respectively, $p = 0.005$) [6]. Therefore, a simple and easy applicable system in predicting mortality for PPU patients may provide reduction in mortality rates.

As a limitation, our study population was only 227 but this number was noticeable when compared with other studies in the literature except cohort study of Moller [5,11,13,15]. Secondly, this was a retrospective analysis, and its prospective confirmation is evitable.

## Conclusion

POMPP is a very simple and appropriate scoring system for clinical practice that may allow surgeon to perform a rapid analysis and may help in predicting mortality rate in PPU with its construction based on objective data.

**Table 5 The ROC curves results of different scoring system for mortality in peptic ulcer perforation**

| Scoring Systems | AUC | SE* | 95% CI |
|---|---|---|---|
| ASA | 0.914 | 0.0401 | 0.870 to 0.947 |
| BOEY | 0.920 | 0.0282 | 0.876 to 0.952 |
| PULP | 0.955 | 0.0164 | 0.919 to 0.978 |
| POMPP | 0.931 | 0.0195 | 0.890 to 0.961 |

*Standard Error.

Menekse *et al. World Journal of Emergency Surgery* (2015) 10:7

**Competing interests**
The authors declare that they have no competing interests.

**Authors' contributions**
Study conception or design: EM, BK. Data collection: AO, RT. Statistical analysis: MT, EM, interpretation: EM, drafting or revision of the manuscript: BK, CK, MT, EM and critical reviewed and approval: EM, BK, RT, AO, MT, CK. All authors read and approved the final manuscript.

**Author details**
¹Department of General Surgery, Ankara Numune Training and Research Hospital, Ankara 06100, Turkey. ²Department of General Surgery, Faculty of Medicine, Sakarya University, Sakarya 54000, Turkey. ³General Surgery Clinic, Turhal State Hospital, 60300 Tokat, Turkey. ⁴Department of Surgery, Faculty of Medicine, Mersin University, 33343 Mersin, Turkey. ⁵Department of Surgery, Faculty of Medicine, Inonu University, 44280 Malatya, Turkey.

Received: 12 January 2015 Accepted: 16 February 2015
Published online: 21 February 2015

**References**
1.  Lee CW, Sarosi Jr GA. Emergency ulcer surgery. Surg Clin North Am. 2011;91:1001–13. doi:10.1016/j.suc.2011.06.008.
2.  Sarosi Jr GA, Jaiswal KR, Nwariaku FE, Asolati M, Fleming JB, Anthony T. Surgical therapy of peptic ulcers in the 21st century: more common than you think. Am J Surg. 2005;190:775–9.
3.  Lau JY, Sung J, Hill C, Henderson C, Howden CW, Metz DC. Systematic review of the epidemiology of complicated peptic ulcer disease: incidence, recurrence, risk factors and mortality. Digestion. 2011;84:102–13. doi:10.1159/000323958.
4.  Kim JM, Jeong SH, Lee YJ, Park ST, Choi SK, Hong SC, et al. Analysis of risk factors for postoperative morbidity in perforated peptic ulcer. J Gastric Cancer. 2012;12:26–35. doi:10.5230/jgc.2012.12.1.26.
5.  Møller MH, Engebjerg MC, Adamsen S, Bendix J, Thomsen RW. The Peptic Ulcer Perforation (PULP) score: a predictor of mortality following peptic ulcer perforation. A cohort study. Acta Anaesthesiol Scand. 2012;56:655–62. doi:10.1111/j.1399-6576.2011.02609.x.
6.  Møller MH, Adamsen S, Thomsen RW, Møller AM. Peptic Ulcer Perforation (PULP) trial group. Multicentre trial of a perioperative protocol to reduce mortality in patients with peptic ulcer perforation. Br J Surg. 2011;98:802–10. doi:10.1002/bjs.7429.
7.  Søreide K, Thorsen K, Søreide JA. Strategies to improve the outcome of emergency surgery for perforated peptic ulcer. Br J Surg. 2014;101:e51–64. doi:10.1002/bjs.9368.
8.  Boey J, Choi SK, Poon A, Alagaratnam TT. Risk stratification in perforated duodenal ulcers. A prospective validation of predictive factors. Ann Surg. 1987;205:22–6.
9.  Mäkelä JT, Kiviniemi H, Ohtonen P, Laitinen SO. Factors that predict morbidity and mortality in patients with perforated peptic ulcers. Eur J Surg. 2002;168:446–51.
10. Thorsen K, Søreide JA, Søreide K. Scoring systems for outcome prediction in patients with perforated peptic ulcer. Scand J Trauma Resusc Emerg Med. 2013;21:25. doi:10.1186/1757-7241-21-25.
11. Thorsen K, Søreide JA, Søreide K. What is the best predictor of mortality in perforated peptic ulcer disease? A population-based, multivariable regression analysis including three clinical scoring systems. J Gastrointest Surg. 2014;18:1261–8. doi:10.1007/s11605-014-2485-5.
12. Mishra A, Sharma D, Raina VK. A simplified prognostic scoring system for peptic ulcer perforation in developing countries. Indian J Gastroenterol. 2003;22:49–53.
13. Boey J, Wong J, Ong GB. A prospective study of operative risk factors in perforated duodenal ulcers. Ann Surg. 1982;195:265–9.
14. Kocer B, Surmeli S, Solak C, Unal B, Bozkurt B, Yildirim O, et al. Factors affecting mortality and morbidity in patients with peptic ulcer perforation. J Gastroenterol Hepatol. 2007;22:565–70.
15. Lohsiriwat V, Prapasrivorakul S, Lohsiriwat D. Perforated peptic ulcer: clinical presentation, surgical outcomes, and the accuracy of the Boey scoring system in predicting postoperative morbidity and mortality. World J Surg. 2009;33:80–5. doi:10.1007/s00268-008-9796-1.
16. Thorsen K, Søreide JA, Kvaløy JT, Glomsaker T, Søreide K. Epidemiology of perforated peptic ulcer: age- and gender-adjusted analysis of incidence and mortality. World J Gastroenterol. 2013;19:347–54. doi:10.3748/wjg.v19.i3.347.
17. Kujath P, Schwandner O, Bruch HP. Morbidity and mortality of perforated peptic gastroduodenal ulcer following emergency surgery. Langenbecks Arch Surg. 2002;387:298–302.
18. Hermansson M, Staël Von Holstein C, Zilling T. Peptic ulcer perforation before and after the introduction of H2-receptor blockers and proton pump inhibitors. Scand J Gastroenterol. 1997;32:523–9.
19. Di Saverio S, Bassi M, Smerieri N, Masetti M, Ferrara F, Fabbri C, et al. Diagnosis and treatment of perforated or bleeding peptic ulcers: 2013 WSES position paper. World J Emerg Surg. 2014;9:45. doi:10.1186/1749-7922-9-45.
20. Uchino S, Bellomo R, Goldsmith D. The meaning of the blood urea nitrogen/creatinine ratio in acute kidney injury. Clin Kidney J. 2012;5:187–91. doi:10.1093/ckj/sfs013.
21. Khuri SF, Daley J, Henderson W, Hur K, Demakis J, Aust JB, et al. The Department of Veterans Affairs' NSQIP: the first national, validated, outcome-based, risk-adjusted, and peer-controlled program for the measurement and enhancement of the quality of surgical care. National VA Surgical Quality Improvement Program. Ann Surg. 1998;228:491–507.
22. Møller MH, Adamsen S, Thomsen RW, Møller AM. Preoperative prognostic factors for mortality in peptic ulcer perforation: a systematic review. Scand J Gastroenterol. 2010;45:785–805. doi:10.3109/00365521003783320.
23. Ñamendys-Silva SA, González-Herrera MO, Texcocano-Becerra J, Herrera-Gómez A. Hypoalbuminemia in critically ill patients with cancer: incidence and mortality. Am J Hosp Palliat Care. 2011;28:253–7. doi:10.1177/1049909110384841.
24. Buck DL, Vester-Andersen M, Møller MH. Accuracy of clinical prediction rules in peptic ulcer perforation: an observational study. Scand J Gastroenterol. 2012;47:28–35. doi:10.3109/00365521.2011.639078.
25. Owens WD. American Society of Anesthesiologists Physical Status Classification System in not a risk classification system. Anesthesiology. 2001;94:378.
26. Daabiss M. American Society of Anaesthesiologists physical status classification. Indian J Anaesth. 2011;55:111–5. doi:10.4103/0019-5049.79879.

**Submit your next manuscript to BioMed Central and take full advantage of:**

- **Convenient online submission**
- **Thorough peer review**
- **No space constraints or color figure charges**
- **Immediate publication on acceptance**
- **Inclusion in PubMed, CAS, Scopus and Google Scholar**
- **Research which is freely available for redistribution**

Submit your manuscript at
www.biomedcentral.com/submit

 BioMed Central

Tarasconi et al. World Journal of Emergency Surgery    (2020) 15:3
https://doi.org/10.1186/s13017-019-0283-9

World Journal of
Emergency Surgery

**REVIEW**                                                                                            **Open Access**

# Perforated and bleeding peptic ulcer: WSES guidelines



Antonio Tarasconi[1*] 🔟, Federico Coccolini[2], Walter L. Biffl[3], Matteo Tomasoni[4], Luca Ansaloni[4], Edoardo Picetti[5], Sarah Molfino[6], Vishal Shelat[7], Stefania Cimbanassi[8], Dieter G. Weber[9], Fikri M. Abu-Zidan[10], Fabio C. Campanile[11], Salomone Di Saverio[12], Gian Luca Baiocchi[6], Claudio Casella[13], Michael D. Kelly[14], Andrew W. Kirkpatrick[15], Ari Leppaniemi[16], Ernest E. Moore[17], Andrew Peitzman[18], Gustavo Pereira Fraga[19], Marco Ceresoli[20], Ronald V. Maier[21], Imtaz Wani[22], Vittoria Pattonieri[1], Gennaro Perrone[1], George Velmahos[23], Michael Sugrue[24], Massimo Sartelli[25], Yoram Kluger[26] and Fausto Catena[1]

## Abstract

**Background:** Peptic ulcer disease is common with a lifetime prevalence in the general population of 5–10% and an incidence of 0.1–0.3% per year. Despite a sharp reduction in incidence and rates of hospital admission and mortality over the past 30 years, complications are still encountered in 10–20% of these patients. Peptic ulcer disease remains a significant healthcare problem, which can consume considerable financial resources. Management may involve various subspecialties including surgeons, gastroenterologists, and radiologists. Successful management of patients with complicated peptic ulcer (CPU) involves prompt recognition, resuscitation when required, appropriate antibiotic therapy, and timely surgical/radiological treatment.

**Methods:** The present guidelines have been developed according to the GRADE methodology. To create these guidelines, a panel of experts was designed and charged by the board of the WSES to perform a systematic review of the available literature and to provide evidence-based statements with immediate practical application. All the statements were presented and discussed during the 5th WSES Congress, and for each statement, a consensus among the WSES panel of experts was reached.

**Conclusions:** The population considered in these guidelines is adult patients with suspected complicated peptic ulcer disease. These guidelines present evidence-based international consensus statements on the management of complicated peptic ulcer from a collaboration of a panel of experts and are intended to improve the knowledge and the awareness of physicians around the world on this specific topic. We divided our work into the two main topics, bleeding and perforated peptic ulcer, and structured it into six main topics that cover the entire management process of patients with complicated peptic ulcer, from diagnosis at ED arrival to post-discharge antimicrobial therapy, to provide an up-to-date, easy-to-use tool that can help physicians and surgeons during the decision-making process.

**Keywords:** Peptic ulcer, High-risk patients, Diagnosis, Non-operative management, Surgery, Antibiotics, Peritonitis, Pancreatitis, Intra-abdominal infection, Technique, Timing, Angiography, Embolization, Guidelines

* Correspondence: ataraskoni@gmail.com
[1]Emergency Surgery Department, Parma University Hospital, Parma, Italy
Full list of author information is available at the end of the article



© The Author(s). 2020 **Open Access** This article is distributed under the terms of the Creative Commons Attribution 4.0 International License (http://creativecommons.org/licenses/by/4.0/), which permits unrestricted use, distribution, and reproduction in any medium, provided you give appropriate credit to the original author(s) and the source, provide a link to the Creative Commons license, and indicate if changes were made. The Creative Commons Public Domain Dedication waiver (http://creativecommons.org/publicdomain/zero/1.0/) applies to the data made available in this article, unless otherwise stated.

Case 2:20-cv-00410-MKD    ECF No. 45    filed 02/04/22    PageID.1033    Page 205 of 380

Tarasconi *et al. World Journal of Emergency Surgery*        (2020) 15:3                                                                Page 2 of 24

## Introduction

Peptic ulcer disease is common with a lifetime prevalence in the general population of 5-10% and an incidence of 0.1–0.3% per year [1]. Peptic ulceration occurs due to acid peptic damage to the gastro-duodenal mucosa, resulting in mucosal erosion that exposes the underlying tissues to the digestive action of gastro-duodenal secretions. This pathology was traditionally related to a hypersecretory acid environment, dietary factors and stress. However, the increasing incidence of the *Helicobacter pylori* infection, the extensive use of NSAIDs, and the increase in alcohol and smoking abuse have changed the epidemiology of this disease. Despite a sharp reduction in incidence and rates of hospital admission and mortality over the past 30 years [2–8], complications are still encountered in 10–20% of these patients [9, 10]. Complications of peptic ulcer disease include perforation and bleeding and improvement in medical management has made obstruction from chronic fibrotic disease a rare event. A recent review on the epidemiology of complicated peptic ulcer disease [10] found that hemorrhage was by far the most common complication of peptic disease, with a reported annual incidence of hemorrhage in the general population ranging from 0.02 to 0.06%, with sample size-weighted average 30-day mortality of 8.6%. Reported annual incidence of perforation ranges from 0.004 to 0.014%, with sample size-weighted average 30-day mortality of 23.5%. Although perforation is less common, with a perforation:bleeding ratio of approximately 1:6, it is the most common indication for emergency operation and causes about 40% of all ulcer-related deaths [11].

Peptic ulcer disease remains a significant healthcare problem, which can consume considerable financial resources. Management may involve various subspecialties including surgeons, gastroenterologists, and radiologists. Successful management of patients with complicated peptic ulcer (CPU) involves prompt recognition, resuscitation when required, appropriate antibiotic therapy and timely surgical/radiological treatment.

### Notes on the use of the guidelines: aims, targets, and limitations

The Guidelines are aimed to present the state-of-the-art regarding diagnosis and therapeutic options for an optimal management of complicated peptic ulcer. These guidelines are thus intended to improve the knowledge and the awareness of physicians around the world on the specific topic of complicated peptic ulcer, providing an up-to-date tool that can help during the decision-making process. For this reason, the Guidelines are evidence-based and the grade of recommendation is provided to summarize the evidences present in literature. The population considered in these guidelines is adult patients with suspected complicated peptic ulcer disease. The practice Guidelines promulgated in this work do not represent a standard of practice. They are

suggested plans of care, based on best available evidence and the consensus of experts but they do not exclude other approaches as being within the standard of practice. For example, they should not be used to compel adherence to a given method of medical management, which method should be finally determined after taking account of the conditions at the relevant medical institution (staff levels, experience, equipment, etc.) and the characteristics of the individual patient. However, responsibility for the results of treatment rests with those who are directly engaged therein, and not with the consensus group.

## Methods

These consensus guidelines are an update of the 2013 WSES position paper on this topic. To create these guidelines, a panel of experts was designed and charged by the board of the WSES to develop questions on six main topics that thoroughly cover the field of this pathology (diagnosis, resuscitation, nonoperative management, surgery, angiography-angioembolization, antimicrobial therapy). Then, leading specialists in the field were asked to perform a thorough search on each of these topics in different databanks (MEDLINE, SCOPUS, EMBASE) for relevant papers between 1985 and June 2018 and a systematic review of the available literature. They were asked to focus their search in order to provide evidence-based answers to every question with immediate practical application and to summarize them in statements. All the statements were presented and discussed during the 5th WSES Congress held in Bertinoro, Italy in June 28th, 2018. For each statement, a consensus among the WSES panel of experts was reached. All the members contributed to the development of the manuscript; the manuscript was reviewed and approved by all the authors.

The present guidelines have been developed according to the GRADE methodology [12, 13].

### Topics and questions

For clarity, we report the six topics together with the questions dividend into each of them.

### Diagnosis

1. In patients with a suspected perforated peptic ulcer, which are the appropriate biochemical and imaging investigations that should be requested?
2. In patients with perforated peptic ulcer, what is the clinical value of risk scores such as Boey Score and Pulp score?
3. In patients with suspected bleeding peptic ulcer, which biochemical and imaging investigations should be requested?
4. In patients with suspected bleeding peptic ulcer, what is the diagnostic role of endoscopy?

Tarasconi *et al. World Journal of Emergency Surgery*        (2020) 15:3        Page 3 of 24

5. In patients with bleeding peptic ulcer, are the endoscopic findings useful to determine the risk for rebleeding and how do they affect the clinical management?

### Resuscitation

1. In patients with perforated peptic ulcer, which parameters should be evaluated ad ED referral?
2. In patients with perforated peptic ulcer, which are the appropriate targets for resuscitation (hemoglobin level, blood pressure/heart rate, lactates level, others)?
3. In patients with bleeding peptic ulcer, which parameters should be evaluated at ED referral and which criteria should be adopted to define an unstable patient?
4. In patients with bleeding peptic ulcer, which are the appropriate targets for resuscitation (hemoglobin level, blood pressure/heart rate, lactates level, others)?

### Non-operative management—endoscopic treatment

1. In patients with perforated peptic ulcer, which are the indications for non-operative management?
2. In patients with perforated peptic ulcer, is there a role for endoscopic treatment?
3. In patients with bleeding peptic ulcer, which are the indications for non-operative management?
4. In patients with bleeding peptic ulcer, which are the indications for endoscopic treatment?
5. In patients with bleeding peptic ulcer, what is the appropriate pharmacological regimen (Erythromycin, PPI, terlipressin, others)?
6. In patients with recurrent bleeding from peptic ulcer, what is the role of non-operative management?

### Angiography–embolization

1. In patients with bleeding peptic ulcer, which are the indications for angiography?
2. In patients with bleeding peptic ulcer, which are the indications for angioembolization?
3. Should embolization be considered for unstable patients with bleeding peptic ulcer?
4. In patients with recurrent bleeding peptic ulcer, which are the indications for angioembolization?
5. In patients who underwent angioembolization, which are the most appropriate embolization techniques and materials?
6. In patients with bleeding peptic ulcer and non-evident bleeding during angiography is there a role for prophylactic embolization?

### Surgery

1. In patients with perforated peptic ulcer, which are the indications for surgical treatment and what is the appropriate timing for surgery?
2. In patients with perforated peptic ulcer what is the most appropriate surgical approach (open vs laparoscopy)?
3. In patients with perforated peptic is there a role for sutureless repair?
4. In patients with perforated peptic ulcer and small perforation (< 2 cm), which surgical procedure should be adopted?
5. In patients with perforated peptic ulcer and large perforation (≥ 2 cm), which surgical procedure should be adopted?
6. In patients with perforated peptic ulcer, what is the role of damage control surgery?
7. In patients with bleeding peptic ulcer, which are the indications for surgical treatment and which is the appropriate timing for surgery?
8. In patients with bleeding peptic ulcer, what is the most appropriate surgical approach (open vs laparoscopy) and what are the most appropriate surgical procedures?
9. In patients with bleeding peptic ulcer, what is the role of damage control surgery?

### Antimicrobial therapy

1. Should antibiotic therapy be prescribed and should anti-fungal therapy be administrated empirically in patients with perforated peptic ulcer?
2. In patients with perforated peptic ulcer, which antimicrobial regimen should be used and what is its correct duration?
3. In patients with bleeding peptic ulcer, which are the indications for antimicrobial therapy and for *Helicobacter pylori* testing?
4. In patients with bleeding peptic ulcer and positive tests for *H. pylori* infection, which are the therapeutic options?

## Perforated peptic ulcer
### Diagnosis
**In patients with a suspected perforated peptic ulcer, which are the appropriate biochemical and imaging investigations that should be requested?**

*In patients with suspected gastroduodenal perforation, we recommend routine laboratory studies and arterial blood gas analysis (strong recommendation based on very low-quality evidences, 1D).*

Tarasconi *et al. World Journal of Emergency Surgery*        (2020) 15:3

*In patients with acute abdomen from suspected perforated peptic ulcer, we recommend a CT scan imaging (Strong recommendation based on low-quality evidences, 1C).*

*In patients with acute abdomen from suspected perforated peptic ulcer, we recommend to perform chest/abdominal X-ray as the initial routine diagnostic assessment in case a CT scan is not promptly available (Strong recommendation based on low-quality evidences, 1C).*

*In patients with acute abdomen from suspected perforated peptic ulcer, when free air is not seen on imaging and there is ongoing suspicion of perforated peptic ulcer, we suggest performing imaging with the addition of water-soluble contrast either oral or via nasogastric tube (weak recommendation based on very low-quality evidences, 2D).*

The clinical presentation of gastroduodenal perforation is usually sudden onset of abdominal pain. Localized or generalized peritonitis is typical of perforated peptic ulcer, but may be present in only two-thirds of the patients [14–16]. Thus, physical examination findings may be equivocal and peritonitis may be minimal or absent, particularly in patients with contained and / sealed leak. Laboratory tests are non-specific, although leukocytosis, metabolic acidosis and elevated serum amylase are usually associated with perforation [17]. The first diagnostic investigation is the radiograph of the abdomen and chest, to detect the presence of free abdominal air. Erect and left lateral decubitus X-rays have similar diagnostic accuracy, the latter being better tolerated by patients presenting with peritonitis. The presence of this radiological sign is highly variable across various studies present in literature and ranges between 30 and 85% of perforations. This high variability and the finding that a negative X-ray does not rule out a possible perforation led multiple authors to state that, in case of clear signs of peritonitis, an abdominal CT scan should be the first radiological examination to be performed. However, in the setting of a peripheral hospital without prompt access to a CT scan, the plain X-ray still has a diagnostic role and free air on X-ray associated with a clear history and signs of peritonitis on physical examination is sufficient to justify surgical exploration [9, 14, 15, 18]. An adjunct to plain X-ray could be the administration through a nasogastric tube (NGT) of water-soluble contrast that can detect the presence of a gastro-duodenal perforation. "Point-of-care" ultrasound could also detect free intra-peritoneal, when performed by a trained operator, with the demonstration of air under the abdominal fascia; anyway, its role in the diagnostic work-up of suspected perforated peptic ulcer still needs to be defined. Suspicious CT scan findings include unexplained intraperitoneal fluid, pneumoperitoneum, bowel wall thickening, mesenteric fat streaking, and presence of extraluminal water-soluble contrast. Indeed, CT scan is increasingly taking the main role in diagnosis of perforation, due to the greater sensitivity in detecting free air and to its ability to characterize the site and size of perforation and to exclude other possible causes [15, 18, 19]. However, up to 12% of patients with perforations may have a normal CT scan; in this scenario, the administration of oral water-soluble contrast or via nasogastric tube and performing triple contrast CT scan may improve diagnostic sensitivity and specificity [17].

**In patients with perforated peptic ulcer, what is the clinical value of risk scores such as Boey Score and Pulp score?**

*In patients with perforated peptic ulcer, we suggest to adopt scoring systems (including the Boey, PULP and ASA score) for risk-stratification of patients and to predict outcomes (weak recommendation, based on low-quality evidences, 2C).*

Numerous scoring systems have been designed and validated with the aim of predicting mortality and morbidity in patients with perforated peptic ulcer [20–22]. The Boey score is the most used, followed by the ASA score and the PULP. Boey's score showed an elevated variability in accuracy across the different studies where it was tested. On the other hand, the PULP score is difficult to apply and has not yet been validated outside the initial center. The new PULP score and the ASA score predicted mortality equally well and better than the Boey score, but hypoalbuminemia still remains the strongest single predictor of mortality [20–22].

**Resuscitation**

**In patients with perforated peptic ulcer, which parameters should be evaluated ad ED referral?**

*We recommend prompt evaluation and early recognition of the patient with perforated peptic ulcer associated sepsis to prevent further organ failure and to reduce mortality (strong recommendation based on moderate-quality evidences, 1B).*

*We suggest adopting scoring systems (SOFA, qSOFA) to evaluate and assess the severity of the disease in patients with perforated peptic ulcer (Weak recommendation based on low-quality evidences, 2 C).*

Perforated peptic ulcer, with associated peritonitis and sepsis/septic shock, is a medical/surgical emergency requiring rapid evaluation and management [23]. It is crucial to identify parameters to assess the severity of the disease (i.e., to define if a patient is stable or unstable). The latest

Tarasconi *et al. World Journal of Emergency Surgery* (2020) 15:3

definition of sepsis/septic shock and related debates/controversies are beyond the scope of this manuscript but are covered in recent papers [24, 25]. The timely recognition of sepsis (i.e., before the occurrence of organ dysfunction) is a priority [25, 26]. During the ED evaluation of every septic patient, several elements should be considered to assess the clinical picture. Specifically, several symptoms (i.e., altered mental state, dyspnea), signs (i.e., tachycardia, tachypnea, reduced pulse pressure, decreased urine output) and laboratory findings (hyperlactatemia, arterial hypoxemia, increased creatinine, coagulation abnormalities) must be evaluated. It is important to keep in mind that these findings may be modified by preexisting disease or medications [27]; for this reason, the collection of clinical history needs to be performed carefully.

Scoring systems, i.e., the sequential organ failure assessment (SOFA) [28] or the quick SOFA (qSOFA) [29], with associated limitations [25, 30–33], are available to assess the severity of the disease.

**In patients with perforated peptic ulcer, which are the appropriate targets for resuscitation (hemoglobin level, blood pressure/heart rate, lactates level, others)?**

*In unstable patients with perforated peptic ulcer, we recommend performing rapid resuscitation to reduce mortality (strong recommendation based on low quality evidences, 1C).*

*In unstable patients with perforated peptic ulcer, we recommend restoring physiological parameters with a mean arterial pressure ≥ 65 mmHg, a urine output ≥ 0.5 ml/kg/h, and a lactate normalization) (strong recommendation based on low-quality evidences,1C).*

*We suggest utlizing different types of hemodynamic monitoring (invasive or not) to optimize fluids/vasopressor therapy and to individualize the resuscitation strategy (strong recommendation based on low quality evidences, 1C).*

Unstable septic perforated peptic ulcer patients need appropriate and rapid (ideally within 1 h) resuscitation to reduce mortality [27, 29]; this must take place simultaneously with surgical consultation, microbiological cultures (blood and other), and antibiotic administration [24, 34]. Primarily, as in any emergency situation, a rapid ABC (airway, breathing, and circulation) evaluation should be done. Secondarily, appropriate targets for resuscitation (the same used for sepsis and septic shock [27, 35]) need to be considered. In general, the most important are:

– Mean arterial pressure (MAP) ≥ 65 mmHg
– Urine output ≥ 0.5 ml/kg/h
– Lactate normalization

Several forms of hemodynamic monitoring (invasive or not) are available to optimize resuscitation and fluid/vasopressors administration. For a more comprehensive approach to sepsis and septic shock, we suggest referring to the last published guidelines of the "Surviving Sepsis Campaign" [35].

## Non-operative management—endoscopic treatment
### In patients with perforated peptic ulcer, which are the indications for non-operative management?

*In patients with perforated peptic ulcer we suggest against a routinely use of non-operative management; non-operative management (NOM) could be considered in extremely selected cases where perforation has sealed as confirmed on water-soluble contrast study (weak recommendation based on low-quality evidences, 2C).*

Non-operative management (NOM) of perforated peptic ulcer is attractive as it avoids surgery and its resultant morbidity, e.g., wound-related morbidity, postoperative adhesions, etc. The rationale of NOM is that, in the case of small perforations, the ulcer seals by omental adhesions and can then heal and the peritonitis does not need operation [36]. In 1989 Croft et al. conducted a prospective randomized trial [37] comparing emergency surgery and NOM in patients with a clinical diagnosis of perforated peptic ulcer: 83 patients were entered in the study over a period of 13 months and were randomly assigned to one the two study groups. In the NOM group, 11 patients (28 percent) had no clinical Improvement after 12 h and required an operation. The overall mortality rates in the two groups were similar (two deaths in each, 5%), and did not differ significantly in the morbidity rates (40% in the surgical group and 50% in the nonsurgical group). The hospital stay was 35% longer in the group treated conservatively and patients over 70 years old were less likely to respond to conservative treatment than younger patients ($p < 0.05$). Songne et al. in 2004 [38] conducted a prospective trial of 82 consecutive patients with diagnosis of perforated peptic ulcer; they initially underwent NOM and clinical improvement was achieved in 54% of patients after NOM. In multivariate analysis, the factors independently related to NOM failure were size of pneumoperitoneum, heart rate > 94 bpm, and abdominal meteorism (defined as distended bowel loops). In conclusion, the most important factors regarding the feasibility of NOM for perforated peptic ulcer are normal vital signs in a stable patient and whether the ulcer itself has sealed as confirmed by a water-soluble contrast study: if there is a free leak of contrast, surgery is needed. On the other hand, NOM could be considered if no contrast extravasation is present and the patient does not have signs of peritonitis or sepsis.

Tarasconi et al. World Journal of Emergency Surgery          (2020) 15:3

The essential pre-requisites and components of non-operative management of PPU can be grouped as "R"s [39]:

– Radiologically undetected leak
– Repeated clinical examination
– Repeated blood investigations
– Respiratory and renal support
– Resources for monitoring and
– Readiness to operate

NOM includes: nil by mouth; intravenous hydration; decompression via nasogastric tube; anti-secretory and PPI therapy; intravenous antibiotics; and follow-up endoscopy at 4–6 weeks. Mortality increases with every hour of delay to surgery, and hence, NOM must be carefully selected. Surapaneni et al. have shown nil mortality in patients who were operated within 24 h of onset of symptoms as compared to surgery beyond 48 h of onset of symptoms [40]. Buck et al. in 2688 Danish patients have shown that every hour of delay from admission to surgery was associated with an adjusted 2.4% decreased probability of survival compared with the previous hour [41]. Elderly patients may experience paradoxical higher mortality if non-operative management fails and caution is advised in patients > 70 years of age.

**In patients with perforated peptic ulcer is there a role for endoscopic treatment?**

*In patients with perforated peptic ulcer, we suggest to avoid endoscopic treatment such clipping, fibrin glue sealing, or stenting (Weak recommendation based on low-quality evidences, 2C)*

Closure of acute iatrogenic perforations with endoscopic clips is described [42, 43]; however, clips may not be effective in perforated ulcer cases due to fibrotic tissue with loss of compliance. Combined laparoscopic-endoscopic approaches for perforated ulcer closures have been described [44, 45]. Bergstrom et al. [46] present a case series of eight patients with perforated duodenal ulcers treated with covered self-expandable metal stents and the results indicate that, in very selected patients or in cases where surgical closure will be difficult, gastroscopy with stent placement could be performed during laparoscopy, followed by laparoscopic drain placement. In patients with severe co-morbidity or delayed diagnosis, gastroscopy and stent placement followed by radiologically guided drain placement could be an alternative to more standard treatment. Endoscopic snaring of omentum and pulling is also described as an effective adjunct along with duodenal plication. Furthermore, endoscopy also allows performing a biopsy and rule out gastric outlet obstruction in case of large perforations. In spite of these case series, all the above

reported modalities are not recognized as standard approaches to perforated peptic ulcer and need further validation.

### Surgery
### In patients with perforated peptic ulcer, which are the indications for surgical treatment and what is the appropriate timing for surgery?

*In patients with perforated peptic ulcer with significant pneumoperitoneum or extraluminal contrast extravasation or signs of peritonitis, we recommend operative treatment (Strong recommendation based on low-quality evidences, 1C)*

*We recommend performing surgery as soon as possible, especially in patients with delayed presentation and patients older than 70 years old (strong recommendation based on moderate-quality evidences, 1B)*

The feasibility of NOM should be weighed with the evidence that an increase in surgical delay significantly impairs surgical outcome. In fact, a cohort study performed in 2013 from the Danish Clinical Register of Emergency Surgery [41] showed that, over the first 24 h after admission, each hour of surgical delay beyond hospital admission was associated with an adjusted 2.4% decreased probability of survival compared with the previous hour, over the entire observation period. Other studies highlighted the importance of a prompt surgical approach to PPU: a retrospective single-center study by Lunevicious et al. [47] showed an increase in the suture leakage rate after a delay in presentation > 9 h, while a recent prospective single-center study on 101 patients with peritonitis from peptic ulcer perforation who underwent laparotomy and simple closure with omental patch found that a perforation-to-surgery interval longer than 36 h was significantly associated with an increase in postoperative mortality [48]. Furthermore, a systematic review [49] performed in 2010 including fifty studies with 37 prognostic factors comprising a total of 29,782 patients provided strong evidence for an association of older age, co-morbidity, and use of NSAIDs or steroids with mortality; shock upon admission, preoperative metabolic acidosis, tachycardia, acute renal failure, low serum albumin level, high ASA score, and preoperative delay > 24 h were also associated with poor prognosis. Limiting pre-operative delay thus seems to be of great importance.

### In patients with perforated peptic ulcer, which is the most appropriate surgical approach (open vs laparoscopy)?

*In stable patients with perforated peptic ulcer, we suggest a laparoscopic approach. An open approach is*

Tarasconi *et al. World Journal of Emergency Surgery*      (2020) 15:3

*recommended in the absence of appropriate laparoscopic skills and equipment (weak recommendation based on moderate-quality evidences, 2B).*

*In unstable patients with perforated peptic ulcer, we recommend open surgery (strong recommendation based on very low-quality of evidences, 1D)*

A recent meta-analysis from Cirocchi et al. [50] compared laparoscopic to open surgery for patients with perforated peptic ulcer: their search identified 8 RCTs for a total of 615 patients (307 patients undergoing laparoscopic repair and 308 patients undergoing open repair); however all the included studies were at high risk of bias. The comparison reported a significant advantage of laparoscopic repair with less postoperative pain in the first 24 h after surgery and less postoperative wound infections. No significant differences between laparoscopic and open surgery were found for overall postoperative mortality, leak of the suture repair, intra-abdominal abscesses and reoperation rate. This is the strongest evidence present so far the literature and suggests it is reasonable to pursue a laparoscopic approach for stable patients and in the presence of appropriate surgical skills.

The effects of increased intra-abdominal pressure and hypercarbia due to $CO_2$ insufflation during laparoscopy are well known (increased systemic vascular resistance, mean arterial pressure, afterload, heart rate, caval pressures, respiratory rate, peak airways pressure, $PaCO_2$; reduced stroke volume, venous return, cardiac output, thoracic compliance, pH) [51] and preclude a laparoscopic approach to hemodynamically unstable patients or patients with severe cardiovascular or pulmonary comorbidity.

**Is there a role for sutureless repair in patients with perforated peptic ulcer?**

*Based on the available literature, no recommendation could be made about the sutureless repair.*

Sutureless repair was proposed with the rationale to shorten operative time and to simplify the surgical technique, making it easily performed by those who have limited experience with laparoscopic surgery. However, it has not gained a wide acceptance due to its high leakage rate compared to suture repair. A prospective study conducted from January 1992 to December 1998 included 374 patients with perforated peptic ulcer [52]; 219 patients were treated by open suture repair, 109 patients received laparoscopic fibrin glue repair and the remaining 46 patients were treated by laparoscopic suture repair. Laparoscopic fibrin glue repair was initially attempted in 149 patients but 40 required conversion to suture repair. The overall conversion rates for laparoscopic fibrin glue repair and laparoscopic suture repair

were 27 and 15%, respectively. The main reasons for conversion were a large (1 cm or more) ulcer perforation and failure to locate the perforation site. The overall leak rates after laparoscopic glue repair and laparoscopic suture repair were 16 and 6% respectively and the reoperation rates for clinical leaks after laparoscopic glue repair and laparoscopic suture repair were 10 and 4% respectively. On the other hand, a retrospective cohort study performed from January 2008 to December 2012 found conflicting results [53]: 107 patients were included, 64 underwent laparoscopic repair with a sutureless on-lay omental patch, and 43 were treated by laparoscopic sutured omental patch. High-risk patients with Boey scores of 2 and 3 or those with perforations larger than 10 mm were excluded. The time to water intake was significantly shorter for patients who had repair with a sutureless omental patch ($p = 0.007$), as well as the mean hospital stay ($p = 0.007$). All patients in both groups survived to the end of the study and no patient experienced leakage after the operation. The evidences listed above are based on low quality studies and do not allow us to make a recommendation for its routine application.

**In patients with perforated peptic ulcer and small perforation (< 2 cm), which surgical procedure should be adopted?**

*In patients with perforated peptic ulcer smaller than 2 cm, we suggest performing primary repair. No recommendation can be made whether the use of an omental patch can provide further protection of the repair (weak recommendation based on low-quality evidences, 2C)*

Historically, repair with the adjunct of an omental patch was considered the "standard" laparoscopic procedure for perforated peptic ulcer repair. This belief is a now matter of debate as multiple studies showed the addition of an omental patch does not add benefits to a simple suture repair, but it significantly increases the operation time.

Multiple retrospective single-center studies support these findings. Lin et al. [54] analyzed 118 patients with PPU who underwent laparoscopic repair with simple closure ($n = 27$) or omentopexy ($n = 91$) and found Three closure leakage: 1 after simple closure and 2 after omentopexy, but no patient died. After matching, the simple closure and omentopexy groups had comparable results regarding leakage rate. Comparison of the operating time in the 4.0- and 5.0–12-mm groups reported that the simple closure took less time than omentopexy for perforations smaller than 12 mm. Abd Ellatif and colleagues [55] enrolled 179 consecutive patients with PPU who were treated by laparoscopic repair; 108 patients with the omental patch technique and 71 with laparoscopic simple repair. Operative time was significantly

Tarasconi *et al. World Journal of Emergency Surgery*          (2020) 15:3

shorter in the non-patch group and no patient was converted to laparotomy. There was no difference in age, gender, ASA score, surgical risk (Boey's) score, and incidence of co-morbidities between two groups and both groups was comparable in terms of hospital stay, time to resume oral intake, postoperative complications and surgical outcomes. Lo et al. retrospectively identified 73 patients undergoing PPU laparoscopic repair, 26 received simple closure repair and 47 received simple closure plus omental patch. There was no difference in age, gender, ASA score, Boey risk score, incidence of co-morbidities, Mannheim Peritonitis index, median operation time or length of stay. Again, they stated that, in terms of leakage rate and surgical outcome, the maneuver to cover an omental patch on the repaired PPU did not show additional advantage compared to simple closure alone [56]. A multicenter non-randomized retrospective study [57] further strengthens these findings: between 2009 and 2013, 297 patients with PPU underwent a laparoscopic procedure in eight Romanian surgical centers. Primary suture repair was performed in 145 patients (48.8%), primary suture repair with omentopexy in 146 patients (49.2%) and the remaining 6 patients were converted to open surgery. The univariate complications rate analysis they performed found no significant association ($p = 0.634$; Fisher's exact test) between the type of the repair and the rate of complications. A prospective non-randomized study by Ates et al. compared laparoscopic simple closure with conventional omental patch open repair for perforated peptic ulcer. Of the 35 patients enrolled, none experienced operative complications nor postoperative leak or residual intra-abdominal abscess [58]. On the other hand, multiple retrospective studies highlight low postoperative leak rates with the omental patch technique, even in case of perforations up to 2 cm in diameter [59]. Multiple authors suggest the adjunct of an omental patch in case of large ulcers with friable edges, to reduce the risk of the suture cutting through the edges of the ulcer [60].

In light of the above, we cannot suggest the routine application of the omental patch because of the longer operative time, the need for advanced laparoscopic skills and the similar results after simple closure, but it could be considered a viable option in selected cases.

**In patients with perforated peptic ulcer and large perforation (≥ 2 cm), which surgical procedure should be adopted?**

*We suggest a tailored approach based upon the location of the ulcer for the treatment of perforated peptic ulcer larger than 2 cm. In case of large gastric ulcers that raise the suspicion of malignancy, we suggest resection with contextual operative frozen pathologic examination whenever possible. In case of large duodenal ulcers, we suggest considering the need of resections or repair plus/minus pyloric exclusion/*

*external bile drainage. We recommend duodenostomy only in extreme circumstances (weak recommendations based on very low-quality evidences, 2D).*

While the treatment of a small ulcer is relatively straightforward, the treatment of giant peptic ulcers (diameter > 2 cm) poses different challenges according to the anatomical location. Furthermore, large gastric ulcers should always raise the suspicion of malignancy [61]. The spontaneous perforation of gastric cancer is a rare complication, occurring in 1% of patients with gastric cancer, and it has been reported that about 10–16% of all gastric perforations are caused by gastric carcinoma [62]. Besides this, there are no specific surgical treatment recommendations since the site of perforation and the secondary effects on the surrounding anatomical structures must direct the necessary interventions. The gastric location is usually easier to treat when compared to the duodenal location and gastric resection and reconstruction should be the surgical choice for the treatment of perforated gastric ulcers larger than 2 cm. On the other hand, only the first portion of the duodenum can be resected easily without risk of injuring the bile duct or the pancreatic head. Antrectomy plus or minus D1–D2 resection with diversion is the classic and most commonly described intervention, if the ampullary region is not involved [63]. The proximity of the defect and its relation to the common bile duct and ampulla of Vater must also be thoroughly investigated and intraoperative cholangiography may even be necessary to verify common bile duct anatomy. Several different procedures, such as a jejunal serosal patch, Roux en-Y duodenojejunostomy, pyloric exclusion, and several variations of omental plugs [64] have been described for large duodenal defects when the defect is felt too large to perform a primary repair. In large ulcers, leak rates up to 12% have been reported from attempted closure with an omental patch procedure [65]. These patients also frequently present in septic shock when the amount of peritoneal spillage is large. This factor alone should significantly influence the choice of operative intervention, because a definitive resectional approach for ulcers involving the ampullary area (i.e., Whipple procedure or similar) is usually not recommended in patients with peritonitis, because of the high physiological impact of these procedures and the great risk of postoperative complications. In these cases, a damage control procedure (such as pyloric exclusion with gastric decompression via a nasogastric tube or a gastrostomy and an external biliary diversion via T-tube) will likely be the safest and most appropriate operation for the patient [66]. Duodenostomy (e.g., over Petzer tube) should be used only as a last resort, in the presence of giant ulcers with severe tissue inflammation and when mobilization

of the duodenum is not possible and the patient is in severe septic shock with hemodynamic instability.

**In patients with perforated peptic ulcer, what is the role of damage control surgery?**

*In patients with septic shock from a perforated peptic ulcer and signs of severe physiological derangement, we suggest a damage control strategy (Weak recommendation based on very low-quality of evidences, 2D)*

In severe peritonitis, some patients may experience disease progression to severe sepsis and septic shock experiencing progressive organ dysfunction, hypotension, myocardial depression, and coagulopathy and a staged approach may be required. If the patient is not in a condition to undergo a definitive repair and/or abdominal wall closure, due to mandatory conditions requiring an open abdomen, the intervention should be abbreviated due to suboptimal local conditions for healing and global susceptibility to spiraling organ failure [67]. Such mandatory conditions include physical inability to close the abdominal fascia without tension, a decision to leave intra-abdominal packing, or a decision to leave blind bowel loops to expedite the procedure. Committing a patient to an open abdomen however has significant risks including the most feared enteroatmospheric fistula which has been reported to be more common in emergency general surgery patients than trauma patients. "Source control" of intra-abdominal contamination remains a discretionary reason to leave the abdomen open, recognizing that "inability to achieve source control" is a frequently quoted but poorly objectified concept in emergency general surgery. Although upper gastrointestinal perforations are often less catastrophic than lower gastrointestinal contaminations, when the patient responded with immunological activation and systemic sepsis, they are suffering from severe complicated intra-abdominal sepsis. If these conditions are met, then we suggest participation and potential enrollment in the COOL Trial [68–70] Closed or Open after Laparotomy (COOL) study (https://clinicaltrials.gov/ct2/show/NCT03163095) to help provide better guidance for clinicians in the future treating such challenging patients. In general, anastomoses should be avoided in the presence of hypotension or hemodynamic instability, especially if the patient requires vasopressors. After copious abdominal irrigation, a temporary abdominal closure device can be placed if there are mandatory factors dictating an OA or if the patient is randomized to this therapy in the COOL trial. The patient can then be resuscitated appropriately in the ICU. The surgeon can return to the OR for re-exploration, restoration of continuity and closure of

the abdomen once the patient is hemodynamically stable. We refer you to the WSES guidelines on Open Abdomen management for further information [67].

### Antimicrobial therapy
**Should antibiotic therapy be prescribed and should anti-fungal therapy be administrated empirically in patients with perforated peptic ulcer?**

*In patients with perforated peptic ulcer, we recommend the administration broad-spectrum antibiotics (strong recommendation based on low-quality evidences, 1C)*

*We recommend the collection of samples for microbiological analysis for both bacteria and fungi in all patients undergoing surgery with subsequent antibiotic therapy adjustment (strong recommendation based on low-quality evidences, 1C*

*We suggest not to administer antifungal agents as standard empiric therapy in patients with perforated peptic ulcer. Antifungal should be administrated in patients at high risk for fungal infection (e.g., immunocompromised, advanced age, comorbidities, prolonged ICU-stay, unresolved intra-abdominal infections) (weak recommendation based on low-quality evidences, 2C)*

The perforation of a peptic ulcer almost invariably leads to peritonitis due to the spillage of gastroduodenal content into the peritoneal cavity; this event brings a great burden of morbidity, which ranges from 17% to 63%, and is usually represented by pulmonary and wound infections [66]. Bacteria involved in peritoneal sepsis vary according to the etiology of the peritonitis, including the site of perforation. They are usually represented by gram-positive, gram-negative as well as anaerobic species [71]. Samples of peritoneal fluid should be collected in perforated patients because fungal infections after perforation are common and are associated with longer hospital stay, higher rate of surgical site infections (SSI), and increased mortality, as reported in a prospective study by Shan and coworkers [72]. In the same way, Prakash and coworkers [73] demonstrated in a prospective study on 84 patients undergoing surgery for perforation peritonitis that mortality was higher in patients having positive peritoneal fluid cultures ($p < 0.001$) compared with those with negative cultures, and in those subjects having mixed bacterial and fungal positive cultures compared with those with isolated bacterial cultures ($p < 0.001$).

Notwithstanding positive peritoneal fungal culture is a significant risk factor for adverse outcome in patients with PPU [72, 73], the addition of an antifungal therapy to a broad-spectrum antibiotic therapy is still a matter of

debate [74]. While antifungal therapy is recommended for hospital-acquired infections and in patients critically ill or severely immunocompromised [75], in case of community-acquired fungal infection, it has been suggested that antifungal therapy should be reserved for only clinically severe cases [76].

In a retrospective analysis of 133 patients admitted to the emergency department for abdominal pain due peptic perforation, Li and coworkers [74] demonstrated that there was not a statistically significant difference in survival rate between patients who received antifungal therapy and those who did not and that, on a multivariate analysis, only shock on admission and an APACHE score higher than 20 were independent risk factors for a poor outcome. According to this evidence, antifungal therapy does not benefit patients suffering from PPU peritonitis with *Candida* spp. isolated from peritoneal fluid cultures in general, and antifungal therapy should be reserved for patients who are critically ill and/or severely immunocompromised.

**In patients with perforated peptic ulcer, which antimicrobial regimen should be used and what is its correct duration?**

*In patients with perforated peptic ulcer, we recommend to start as soon as possible an empiric broad-spectrum antibiotic regimen against a mixture of Gram-negative, Gram-positive, and anaerobic bacteria, possibly after peritoneal fluid has been collected (Strong recommendation based on low-quality evidences, 1C)*

*In patients with perforated peptic ulcer, we suggest a short-course (3–5 days or until inflammatory markers normalize) antibiotic therapy (weak recommendation based on low-quality evidences, 2C).*

Perforated peptic ulcer peritonitis is by definition poly-microbial. Gram-negative and Gram-positive as well as anaerobic bacteria and yeasts can be isolated from peritoneal fluid cultures. Antimicrobial therapy, together with adequate source control, plays a pivotal role in the management of patients with peritonitis, especially in those who are immunocompromised. As stated in a previous published paper [71], an empiric broad-spectrum antimicrobial therapy should be started as soon as possible, and possibly after peritoneal fluid sample collection, irrespective of the presence of severe sepsis or septic shock. In these patients, a de-escalation approach is warranted, to avoid the onset of microbial resistances and to promptly treat eventual sepsis. The empiric antimicrobial regimen should be single or combined, according to the range requirements of antimicrobial coverage and the risk factors for major resistance patterns [76].

Modification of the drug regimen becomes possible when cultures are available, and clinical status can be better assessed. If inflammatory markers do not improve, it is mandatory to rule out other extra-abdominal sources of infections or different pathogens [71]. As widely accepted [71], a beta-lactam/beta-lactamase inhibitor can be used as first-line therapy in case of intra-abdominal infections, due to its vigorous in vitro activity against gram-positive, gram-negative, and anaerobic bacteria [77]. The principles of empiric antibiotic treatment should be defined according to the most frequently isolated bacteria, always taking into consideration the local trend of antibiotic resistance. In this era of prevalent drug-resistant microorganisms, the threat of resistance is a source of major concern that cannot be ignored. In the past 20 years, incidence of healthcare-associated IAIs caused by MDROs has risen dramatically [78], probably in correlation with escalating levels of antibiotic exposure and increasing frequency of patients with one or more predisposing conditions, including elevated severity of illness, advanced age, degree of organ dysfunction, low albumin levels, poor nutritional status, immunosuppression, presence of malignancy, and other comorbidities. The first step in determining potential resistance patterns of a given infection is by establishing whether the infection is community-acquired or healthcare-associated (nosocomial). The spectrum of microorganisms involved in nosocomial infections is significantly broader than in community-acquired infections.

Quinolone resistance, prevalence of ESBL-producing bacteria, prevalence and mechanisms of carbapenem resistance in the local environment, and the place of recent traveling should be always taken into account when an antibiotic therapy is administered empirically. Generally, the most important factors in predicting the presence of resistant pathogens in intra-abdominal infections are acquisition in a healthcare setting (particularly if the patient becomes infected in the ICU or has been hospitalized for more than 1 week), corticosteroid use, organ transplantation, baseline pulmonary or hepatic disease, and previous antimicrobial therapy [78]. In patients with IAIs, when patients are not severely ill and when source control is complete, a short course (3–5 days) of postoperative therapy is suggested. In 2015, a prospective study on appropriate duration of antimicrobial therapy was published [79]: the study randomized 518 patients with IAIs and adequate source control to receive antibiotics until 2 days after the resolution of fever, leukocytosis, and ileus, with a maximum of 10 days of therapy (control group), or to receive a fixed course of antibiotics (experimental group) for 4 ± 1 calendar days. In patients with intra-abdominal infections who had undergone an adequate source control procedure, the outcomes after fixed-duration antibiotic therapy (approximately 4 days) were similar to those after a longer course of antibiotics

Case 2:20-cv-00410-MKD    ECF No. 45    filed 02/04/22    PageID.1042    Page 214 of 380

Tarasconi et al. World Journal of Emergency Surgery        (2020) 15:3                                                        Page 11 of 24

(approximately 8 days) that extended until after the resolution of physiological abnormalities. In this study, most patients were not severely ill.

If yeast are isolated in the peritoneal fluid culture, the antifungal regimen should be selected according to the clinical and immunological status of the patient, severity of disease, prior exposure to other antifungal therapies, and type of infection (community-acquired vs. hospital-acquired) [80]. The duration of hospital stay is a concern, because prolonged stay is associated with antifungal resistance of *Candida* strains [81]. Moreover, biofilm formation of fungi usually goes along with significant changes in virulence and resistance because, once embedded into biofilm, fungi become more protected against the fungicidal/fungistatic effect of drugs.

Four classes of antifungal drugs are available [82]:

1) Azoles (fluconazole, itraconazole, voroconazole, and posaconazole), with fungistatic action against most *Candida* spp.;
2) Echinocandins (caspofungin, micafungin, anidulafungin), with fungicidal effect;
3) Polyenes (deoxycholate and liposomal formulations of amphotericin B), with fungicidal effect but moderate peritoneal penetration;
4) Flucytosine, only used in combination with another antifungal agent in difficult-to-treat cases, because of the high risk of resistance.

Fungistatic drugs should be used in critically ill patients at low-risk for invasive *Candida* infections, without prior exposure to azoles, and the therapy should be administered for 7-10 days or until definitive negative fluid cultures. In high-risk patients with or without prior exposure to azoles, echinocandins should be preferred. The duration of treatment depends on the extent of organ involvement. If candidemia is detected, the administration should be prolonged at least 14 days after the end of episode [82].

Following we report the suggested antibiotic regimens according to WSES guidelines on intra-abdominal infections.

*Community-acquired*
*1) Empiric antibiotic regimens for non-critically ill patients with IAIs and normal renal function:*
– *Amoxicillin/clavulanate 1.2-2.2 g 6-hourly or ceftriaxone 2 g 24-hourly + metronidazole 500 mg 6-hourly or cefotaxime 2 g 8-hourly + metronidazole 500 mg 6-hourly*
– *In patients with beta-lactam allergy: ciprofloxacin 400 mg 8-hourly + metronidazole 500 mg 6-hourly*
– *Patients at risk for infection with community-acquired ESBL-producing Enterobacteriacea: ertapenem 1 g 24 hourly or tigecycline 100 mg initial dose, then 50 mg 12-hourly*

*2) Empiric antibiotic regimens for critically ill patients with IAIs and Normal renal function:*
– *Piperacillin/tazobactam 4.5 g 6-hourly or cefepime 2 g 8-hourly + metronidazole 500 mg 6-hourly*
– *patients at risk for infection with community-acquired ESBL-producing Enterobacteriacea: meropenem 1 g 8-hourly or doripenem 500 mg 8-hourly or imipenem/cilastatin 1 g 8-hourly*

*3) If antifungal therapy is indicated:*
– *Fluconazole (LD 12 mg/kg BW-800 mg; MD 6 mg/kg/day) should be given in critically ill patients, with community-acquired Candida peritonitis, no prior azole exposure, low-risk for infections with fluconazole-resistant Candida spp., as prophylaxis to prevent invasive infections*
– *Echinocandin antifungals are recommended as first-line therapy for invasive infections, and candidemia in non-neutropenic critically ill patients*
– *Amphotericin B (3–5 mg/day) should be considered if alternative therapy is not available or in case of intolerance to echinocandin or azoles*

*Healthcare-associated*
*1) Empiric antimicrobial regimens for non-critically ill patients with IAIs and normal renal function:*
– *Piperacillin/tazobactam 4.5 g 6-hourly*
– *In patients at higher risk for infection with MDROs including recent antibiotic exposure, patient living in a nursing home or long-stay care with an indwelling catheter or postoperative infections*
  ○ *Meropenem 1 g 8-hourly +/– ampicillin 2 g 6-hourly or*
  ○ *Doripenem 500 mg 8-hourly +/– ampicillin 2 g 6-hourly or*
  ○ *Imipenem/Cilastatin 1 g 8-hourly or*
  ○ *As a carbapenem-sparing regimen piperacillin/tazobactam 4.5 g 6-hourly + tigecycline 100 mg initial dose, then 50 mg 12-hourly*

*2) Empiric antimicrobial regimens for critically ill patients with IAIs normal renal function:*
– *Meropenem 1 g 8-hourly or*
– *Doripenem 500 mg 8-hourly or*
– *Imipenem/cilastatin 1 g 8-hourly*

+

– *Vancomycin 25–30 mg/kg loading dose then 15–20 mg/kg/dose 8-hourly or*
– *Teicoplanin 12 mg/kg 12-hourly times 3 loading dose then 12 mg/kg 24-hourly*

*3) In patients at risk for infection with vancomycin-resistant Enterococci (VRE) including patients with*

Case 2:20-cv-00410-MKD   ECF No. 45   filed 02/04/22   PageID.1043   Page 215 of 380

Tarasconi et al. World Journal of Emergency Surgery        (2020) 15:3                                    Page 12 of 24

previous enterococcal infection or colonization, immuno-compromised patients, patients with long ICU stay, or recent vancomycin exposure:

– Linezolid 600 mg 12-hourly or
– Daptomycin 6 mg/kg 24-hourly

## Bleeding peptic ulcer
### Diagnosis
### In patients with suspected bleeding peptic ulcer, which biochemical and imaging investigations should be requested?

*In patients with suspected bleeding peptic ulcer, we recommend blood-typing, determinations of hemoglobin, hematocrit and electrolytes, and coagulation assessment (strong recommendation based on very low-quality evidences, 1D).*

*In patients with suspected bleeding peptic ulcer, when endoscopy is not available, we suggest performing contrast-enhanced CT scan (weak recommendation based on very low-quality evidences, 2D)*

Peptic ulcer is still the primary cause of non-variceal upper gastrointestinal bleeding and hypovolemic shock or its consequences is a major cause of mortality in acute upper gastrointestinal bleeding [1, 83]. In the acute setting, with the suspicion of bleeding peptic ulcer, blood tests that include blood-typing and cross-matching with determinations of hemoglobin, hematocrit, electrolytes, and coagulation assessment should be performed in all patients. Alteration of coagulation with INR greater than 1.5 is associated with an increased risk of mortality [84].

Data are limited in the literature on the use of CT-scan in the evaluation of gastrointestinal bleeding. Given the assumption that gastroscopy is the first diagnostic step, in patients where it is negative or not feasible, CT-scan may be a valuable tool to detect the site and the degree of the bleeding. Otherwise, CT angiography is the first-line investigation of choice for undifferentiated major gastrointestinal hemorrhage (being particularly useful for the localization of small and large intestinal acute hemorrhage). There are increasing data to suggest that CT-scan should be the "next step" investigative procedure in cases of active GI hemorrhage [85, 86].

### In patients with suspected bleeding peptic ulcer, what is the diagnostic role of endoscopy?

*In patients with suspected bleeding peptic, ulcer, we recommend performing endoscopy as soon as possible, especially in high-risk patients (Strong recommendation based on low-quality evidences, 1C)*

Gastroscopy must take place as soon as possible. Many studies, including a meta-analysis of randomized controlled trials [87], have shown the role of gastroscopy in reducing rebleeding, need for surgery, and mortality. Early endoscopy done within 24 h provides both an effective therapy of the bleeding and prognostic information based on endoscopic stigmata [88, 89].

### In patients with bleeding peptic ulcer, are the endoscopic findings useful to determine the risk for rebleeding and how do they affect the clinical management?

*We suggest guiding management decisions according to stigmata of recent hemorrhage during endoscopy because they can predict the risk of further bleeding (strong recommendation based on low-quality evidences, 1C)*

The gastroscopy findings can be classified using the modified Forrest classification. With the identification of lesions with high-risk stigmata, it is possible to stratify the risk of rebleeding, the need for intervention, and mortality [89, 90]. Furthermore, gastroscopy is essential in identifying patients with a low risk that may be discharged early [87, 88]. Numerous scores have been tested to predict the need for surgery and gastroscopy, the Glasgow-Blatchford Score (GBS), the Rockall score, and the AIMS65 being the most widely evaluated and adopted. Risk stratification should identify high-risk patients for early intervention and reduce the duration of hospital stay for low-risk patients [91, 92].

### Resuscitation
### In patients with bleeding peptic ulcer, which parameters should be evaluated at ED referral and which criteria should be adopted to define an unstable patient?

*We recommend a rapid and careful surgical/medical evaluation of bleeding peptic ulcer disease patients to prevent further bleeding and to reduce mortality (strong recommendation based on very low-quality evidences, 1D)*

*We recommend evaluating several elements (symptoms, signs, and laboratory findings) to assess the stability/instability of patients with bleeding peptic ulcer at ED referral (strong recommendation based on low quality evidences, 1C)*

*In patients with bleeding peptic ulcer, we suggest evaluating patients according to Rockall and Glasgow-Blatchford scoring systems to assess the severity of the disease and to guide therapy (weak recommendation based on low-quality evidences, 1C).*

Bleeding peptic ulcer disease is a clinical emergency requiring a rapid surgical/medical evaluation to assess the stability of the clinical picture; the approach is

Case 2:20-cv-00410-MKD    ECF No. 45    filed 02/04/22    PageID.1044    Page 216 of 380

Tarasconi *et al. World Journal of Emergency Surgery*        (2020) 15:3        Page 13 of 24

similar to the bleeding trauma patient [93]. In this regard, we suggest referring to the last edition of the European guideline on management of major bleeding and coagulopathy following trauma [94]. The parameters that should be assessed at ER referral are the same as reported in the American College of Surgeons Advanced Trauma Life Support (ATLS) (American College of Surgeons Committee on Trauma. ATLS® Student Manual 10th Edition; 2018) classification of blood loss (heart rate, blood pressure, pulse pressure, respiratory rate, urine output, Glasgow Coma Scale score, and base deficit). Moreover, it is very important to take an accurate medical history [93] especially regarding:

– Drugs and diseases that may affect the coagulation status (i.e., antiplatelets, anticoagulants, hepatic failure)
– Cardiac (i.e., coronary artery disease) and pulmonary diseases that may make patients more susceptible to adverse effects of anemia
– Neurological diseases (i.e., dementia) that may predispose patients to pulmonary aspiration of gastric contents.

Several scoring systems are available for the evaluation of patients with upper gastrointestinal bleeding. The Rockall score [95] can be utilized to identify patients at risk of adverse outcomes where the Glasgow-Blatchford bleeding score [96] identifies patients needing interventions such as blood transfusions or endoscopy.

**In patients with bleeding peptic ulcer, which are the appropriate targets for resuscitation (hemoglobin level, blood pressure/heart rate, lactates level, others)?**

*We recommend several resuscitation targets, similar to those of damage control resuscitation in the bleeding trauma patient (weak recommendation based on low-quality evidences, 1C).*

*In patients with bleeding peptic ulcer, we recommend to maintain an Hb level of at least > 7 g/dl during the resuscitation phase (strong recommendation based on moderate-quality evidences, 1B).*

Early resuscitation of patients with upper gastrointestinal bleeding is of paramount importance to reduce mortality; this must proceed simultaneously with endoscopic and surgical procedures [97]. A rapid ABC (airway, breathing, and circulation) evaluation should be done immediately. Appropriate targets for resuscitation in bleeding peptic ulcer patients can be considered the same used in bleeding trauma patients (systolic blood pressure of 90–100 mmHg until major bleeding has been stopped; normalization of lactate and base deficit; hemoglobin 7–9 g/dl; correction/prevention of coagulopathy); for this reason, we refer to the

abovementioned guideline [94]. Regarding hemoglobin level, a randomized controlled trial comparing the efficacy and safety of a restrictive transfusion strategy (transfusion with an Hb > 7 g/dl) with those of a liberal transfusion strategy (transfusion with an Hb > 9 g/dl) in severe acute gastrointestinal bleeding has been performed [98]. The restrictive strategy, compared with the liberal strategy, has been significantly associated with a better outcome.

## Non-operative management—endoscopic treatment
### In patients with bleeding peptic ulcer, which are the indications for non-operative management?

*In patients with bleeding peptic ulcer, we recommend non-operative management as the first line of management after endoscopy (strong recommendation based on low-quality evidences, 1C).*

Non-operative management of bleeding peptic ulcer incorporates principles of ABCDE [99]:

– Airway control
– Breathing—ventilation and oxygenation
– Circulation—fluid resuscitation and control of bleeding
– Drugs—pharmacotherapy with PPIs, prokinetics, etc.
– Endoscopy (diagnostic and therapeutic) or embolization (therapeutic)

A meta-analysis from Barkun et al. [100] that included forty-one randomized trials showed that all endoscopic therapies decreased rebleeding versus pharmacotherapy alone. Endoscopy is indicated to establish diagnosis and institute therapy for bleeding peptic ulcer [101]. In acutely bleeding ulcers, endoscopy is a part of resuscitation.

### In patients with bleeding peptic ulcer, which are the indications for endoscopic treatment?

*In patients with bleeding peptic ulcer, we recommend endoscopic treatment to achieve hemostasis and reduce re-bleeding, the need for surgery, and mortality (strong recommendation based on low-quality evidences, 1C).*

*We suggest stratifying patients based on the Blatchford score and adopting a risk-stratified management (weak recommendation based on very low-quality evidences, 2D):*

– *In the very low-risk group, we suggest outpatient endoscopy (weak recommendation based on low-quality evidences, 2C)*
– *In the low-risk group, we recommend early inpatient endoscopy (≤ 24 h of admission) (strong recommendation based on low-quality evidences, 1C).*
– *In the high-risk group, we recommend urgent inpatient endoscopy (≤ 12 h of admission) (strong recommendation based on low-quality evidences, 1C).*

Case 2:20-cv-00410-MKD    ECF No. 45    filed 02/04/22    PageID.1045    Page 217 of 380

Tarasconi *et al. World Journal of Emergency Surgery*        (2020) 15:3        Page 14 of 24

*In patients with spurting ulcer (Forrest 1a), oozing ulcer (Forrest 1b), and ulcer with non-bleeding visible vessel (Forrest 2a), endoscopic hemostasis is recommended (strong recommendation based on low-quality evidences, 1C)*

*In patients with bleeding peptic ulcer, we suggest dual modality for endoscopic hemostasis (weak recommendation based on moderate-quality evidences, 2B)*

*In patients with bleeding peptic ulcer, we suggest considering Doppler probe–guided endoscopic hemostasis if expertise is available (weak recommendation based on very low-quality evidences, 2D).*

Endoscopy not only establishes the diagnosis but also treats the bleeding. WSES advocates patients' risk determination by using Blatchford score, Forrest classification, and clinical judgment. Three levels of risk stratification are proposed:

– Very low risk—safe for outpatient management, low risk of death
– Low risk—need for admission and early endoscopy
– High risk—need for resuscitation and urgent endoscopy

Risk stratification is based on many risk prediction models and Blatchford score is one of the most validated tools. In an international multicenter prospective study including 3012 patients, Stanley et al. [102] has shown that Blatchford score of 1 or less (very low-risk group) had a sensitivity of 98.6%, specificity of 34.6%, positive predictive value of 96.6%, and a negative predictive value of 56.0% for non-intervention and survival both as the combined endpoint. They also reported that a threshold Blatchford score of 7 or more (high-risk group) was best at predicting endoscopic treatment, with a sensitivity of 80.4%, specificity of 57.4%, positive predictive value of 31.3%, and negative predictive value of 92.4%. Endoscopy reassures a safe and early discharge in low-risk patients and assists therapy in high-risk patients. While the timing of endoscopy is determined by local protocols and resources, the sooner the better, WSES advocates to perform endoscopy at the earliest available opportunity regardless of the risk profile and the only limitation would be resources and expertise. Endoscopy by the "clock" is mere guidance, and if endoscopy could be done earlier, then a clinician should do it. Endoscopy is a part of the resuscitative strategy and blood transfusion should not replace early hemostasis. Dual modality of endoscopic hemostasis is advocated in preference to single modality. Marmo et al. has conducted a meta-analysis [103] including 20 randomized controlled trials and 2472 patients comparing dual therapy versus monotherapy in endoscopic treatment of high-risk bleeding ulcers and concluded

that dual endoscopic therapy was superior to epinephrine injection alone in improving outcomes of patients with high-risk bleeding ulcers. In a Cochrane review including 19 randomized studies and 2033 patients, Vergara et al. [104] has shown that additional endoscopic treatment after epinephrine injection reduces further bleeding and the need for surgery in patients with high-risk bleeding peptic ulcer; however, they cannot conclude that a particular form of dual-modality treatment is equal or superior to another. Shi et al. have performed a network meta-analysis on dual therapy choices [105] and shown that the addition of mechanical therapy after epinephrine injection significantly reduced the probability of rebleeding (OR 0.19, 95% CI 0.07–0.52) and surgery (OR 0.10, 95% CI 0.01–0.50). Epinephrine with thermal therapy was shown to reduce the rebleeding rate (OR 0.30, 95% CI 0.10–0.91) but not the need for surgical intervention (OR 0.47, 95% CI 0.16–1.20). Hence, it appears that mechanical therapy along with epinephrine injection is adequate. In patients with adherent clot (Forrest 2b), WSES advocates non-aggressive clot irrigation-flushing attempts rather than mechanical dislodgment. The Asia-Pacific Working Group consensus advocates vigorous target irrigation for at least 5 min and dual-modality hemostasis for patients with adherent clots [106]. We advocate a cautious approach for dislodging the adherent clots. If expertise is available, a vigorous approach could be adopted [107]. The individual endoscopist should be at the liberty to make decisions and we propose individual judgment until further evidence is available to support that clot dislodgment improves outcomes. In the event of bleeding, therapy is strongly advocated. Newer modalities such as over the scope clips (OTSC), hemospray, EUS-guided ultrasound angiography, RFA, Endoclot, endoscopic band ligation, cryotherapy, Ankaferd blood stopper, and endoscopic suturing devices are available. Their role needs to be defined. There are six studies that have investigated the role of over the scope clips either as first-line or as second-line therapy for refractory bleeding [108–113]. Doppler probe–guided lesion assessment is more accurate than endoscopic scoring of predicting rebleeding risk. In a prospective cohort study including 163 patients, Jensen et al. showed spurting (Forrest 1a), visible vessel (Forrest 2a), and adherent clot (Forrest 2b) have a higher Doppler flow compared with oozing (Forrest 1b); Doppler assessment improved risk stratification [114]. It is important to note that rebleeding risk prediction is superior to Forrest classification system, i.e., Forrest 1b has low risk of rebleeding compared with Forrest 2a and Forrest 2b lesions. Doppler probe–guided lesion management is shown to reduce rebleeding and further intervention. In a single blinded randomized controlled

Tarasconi *et al. World Journal of Emergency Surgery*        (2020) 15:3

study including 148 patients with 125 ulcers, Jensen et al. has shown that Doppler probe–guided endoscopic hemostasis significantly reduced 30-day rates of rebleeding compared with standard, visually guided hemostasis with the number needed to treat of 7 [115].

**In patients with bleeding peptic ulcer, what is the appropriate pharmacological regimen (erythromycin, PPI, terlipressin, others)?**

*In patients with bleeding peptic ulcer, we suggest administering pre-endoscopy erythromycin (weak recommendation based on moderate-quality evidences, 2B).*

*In patients with bleeding peptic ulcer, we suggest starting PPI therapy as soon as possible (weak recommendation based on moderate-quality evidences, 2B),*

*In patients with bleeding peptic ulcer, after successful endoscopic hemostasis, we suggest administration of high-dose PPI as continuous infusion for the first 72 h (weak recommendation based on moderate-quality evidences, 2B).*

*In patients with bleeding peptic ulcer, we recommend PPI for 6–8 weeks following endoscopic treatment. Long-term PPI is not recommended unless the patient has ongoing NSAID use (strong recommendation based on moderate-quality evidences, 1B)*

The role of acid suppression in the treatment of peptic ulcer and its complications is well known [116], but the dosage and the duration of PPI administration for the treatment of bleeding peptic ulcer are still a matter of debate. Multiple studies highlighted that high-dose regimens of PPI [117] reduce rebleeding, surgical intervention, and mortality following endoscopic hemostasis. In a randomized placebo-controlled trial of 767 patients with peptic ulcer bleeding treated with endoscopic therapy because of high-risk stigmata, high-dose intravenous PPIs (80 mg of esomeprazole bolus plus 8 mg/h of continuous infusion for 72 h) significantly reduced rebleeding (5.9% vs. 10.3%, $p = 0.03$) and the need for endoscopic retreatment [118]. Similar results were found by meta-analysis; high-dose intravenous PPIs after endoscopic therapy significantly reduced rebleeding, need for surgery, and mortality compared with placebo/no therapy [119]. On the other hand, a Cochrane review [120] focusing on this topic and including twenty-two RCTs found insufficient evidence to conclude superiority, inferiority, or equivalence of high-dose PPI treatment over lower doses in peptic ulcer bleeding. Another systematic review from the Cochrane Collaboration [121] included six RCTs comprising 2223 patients and showed that PPI treatment initiated before endoscopy for upper gastrointestinal bleeding might reduce the proportion of patients with stigmata of recent bleeding at index endoscopy and significantly reduces the requirement for endoscopic therapy during index endoscopy. However, this study found no evidence that

PPI treatment affects clinically important outcomes, namely mortality, rebleeding, or need for surgery. In the light of the above, the administration of high-dose PPI, starting prior to endoscopy and continuing for the first 72 h, seems reasonable and could be suggested, even though further studies are needed to give a strong recommendation. However, the use of proton-pump inhibitors should not replace urgent endoscopy in patients with active bleeding.

A prokinetic drug given before endoscopy helps to empty stomach contents and improves viewing at endoscopy. Only five randomized trials and their pooled analyses have been published: three with the use of erythromycin and two with metoclopramide [122]. Pre-endoscopy erythromycin has been extensively studied and shown to enhance the visualization as well as reduce the need for second endoscopy [123, 124]. However, such practice has not shown to reduce the need for surgical intervention or impact mortality [125].

After initial hemostasis, the risk of rebleeding must be minimized by adjunct therapies. In patients who have PPU complicated by bleeding, there is a 33% risk of rebleeding in 1–2 years. Furthermore, there is a 40–50% rebleeding risk over the subsequent 10 years following the initial episode of bleeding [126]. PPIs are recommended for 6–8 weeks following endoscopic treatment of peptic ulcer bleeding to allow mucosal healing [127]. Once mucosal healing has been achieved, how long PPIs should be continued is still controversial. Randomized prospective trials have demonstrated a benefit to long-term acid-suppression therapy in two settings: chronic NSAID users and *H. pylori*-infected patients [128]. Testing for *H. pylori* is recommended in all patients with BPU. This should be followed by eradication therapy for those who are *H. pylori* positive, with subsequent assessment of the effect of this therapy, and renewed treatment in those in whom eradication fails.

**In patients with recurrent bleeding from peptic ulcer, what is the role of non-operative management?**

*In patients with recurrent bleeding from peptic ulcer, we recommend endoscopy as a first-line treatment (strong recommendation based on low-quality evidences, 1C).*

*In patients with recurrent bleeding, we suggest transcatheter angioembolization as an alternative option where resources are available (weak recommendation based on very low-quality evidences, 2D).*

Emergency endoscopy is the first-line management for rebleeding peptic ulcer [129]. Such endoscopy must be done at the earliest available opportunity. In patients who are hemodynamically stable, angioembolization of the bleeding vessel is an option. However, this should be carefully balanced for its inherent risks of patient transfer, contrast nephropathy, pancreatitis, or cholecystitis

Case 2:20-cv-00410-MKD     ECF No. 45     filed 02/04/22     PageID.1047     Page 219 of 380

Tarasconi *et al. World Journal of Emergency Surgery*          (2020) 15:3

Page 16 of 24

risk due to embolization material and risks associated with vascular access.

### Angiography, embolization

### In patients with bleeding peptic ulcer, which are the indications for angiography?

*In patients with bleeding peptic ulcer, we suggest considering angiography for diagnostic purposes as a second-line investigation after a negative endoscopy (weak recommendation based on low-quality evidences, 2C).*

*No recommendation can be made regarding the role of provocation angiography.*

Angiography may assist both the diagnosis and the treatment of hemorrhage associated with peptic ulcer disease. However, endoscopy remains the first-line investigation of choice for an undifferentiated upper gastrointestinal hemorrhage [130]. Similarly, endoscopy is the first-line diagnostic modality for patients with suspected upper gastrointestinal hemorrhage from ulcer disease [130].

Angiography for diagnostic purposes is a second-line investigation and angiography before endoscopy results in unacceptable rates of negative investigations and is not warranted given the invasive nature of an angiogram. Angiography is useful for the confirmation and localization of the point of hemorrhage and allows treatment by embolization. On occasion, provocation angiography with the use of anticoagulants may be indicated. An inter-specialty consensus should guide this investigation on a case by case basis. Only case reports, case series, and expert opinion are available to guide this decision-making.

### In patients with bleeding peptic ulcer, which are the indications for angioembolization?

*In hemodinamically stable bleeding peptic ulcer patients, where endoscopic hemostasis fails twice or is not possible/feasible, we suggest angiography with angioembolization where technical skills and equipment are available (weak recommendation based on very low-quality evidences, 2D)*

Endoscopy is the established first-line therapy for the management of hemorrhage associated with peptic ulcer disease. It is appropriate (high-level evidence), to also conduct a second endoscopic examination with therapeutic intent, in cases of recurrent hemorrhage. However, where this also fails, surgery has been traditionally indicated. These operations are reported to be associated with mortality rates as high as 40% [129, 131]. Because of this high postoperative mortality, other strategies have been sought and angioembolization has become increasingly described during the past two decades.

High-risk surgical patients have been suggested and recommended as the ideal candidates for angioembolization [130, 132]. However, no specific data exist investigating or defining the definition of "high risk."

Interdisciplinary consensus (surgery, gastroenterology, intensive care, anesthesia) is required to guide this decision-making. Low-risk surgical patients are likely to benefit from an operative strategy due to the likely reduced mortality in this group. No specific studies exist to validate this claim.

Furthermore, according to the physiology behind wound repair, it is possible that angioembolization could complicate a subsequent surgical intervention because of the reduction in the blood flow of the operative field, but no specific data exists to validate this claim.

### Should embolization be considered for unstable patients with bleeding peptic ulcer?

*We suggest against a routinely use of angioembolization unstable patients. Angioembolization in unstable patients could be s considered only in selected cases and in selected facilities (weak recommendation based on very low-quality evidences, 2D).*

There are no specific data to address the relative safety of angioembolization compared with surgery in hemodynamically unstable patients. Variable definitions of hemodynamic stability between studies further complicate meaningful recommendations in this field. Successful reports of angioembolization in patients with hemorrhagic shock are described. A recent retrospective case series describing super-selective angioembolization in 51 patients with active gastrointestinal hemorrhage (with 57% of these upper gastrointestinal in nature), demonstrated the possibility of this approach in patients with physiological shock (defined in this study as a systolic blood pressure of < 90 mmHg) [133].

The appropriateness of angioembolization in hemodynamically unstable patients depends on a number of factors, including the timely availability and skills of the angioembolization service, the quality of the initial and ongoing resuscitation, the quality of the peri-procedural and post-procedural intensive care, and patient variables. Furthermore, the presence of a hybrid OR or strict proximity of OR and the angioembolization facility is mandatory for the angiographic approach to unstable patients. A coordinated, interdisciplinary approach (surgery, interventional radiology, gastroenterology, intensive care, and anesthesia) is likely to benefit these critically ill patients, although there are no specific data to validate this hypothesis.

### In patients with recurrent bleeding peptic ulcer, which are the indications for angioembolization?

*In patients with rebleeding peptic ulcer, we suggest angioembolization as a feasible option (weak recommendation based on low-quality evidences, 2C).*

For recurrent bleeding (defined as re-bleeding after 2 endoscopic therapeutic attempts), angioembolization and surgical options should be considered. Multiple reports and case series of successful angioembolization

of hemorrhage from gastroduodenal ulcer disease are reported [134]. However, no high-level studies comparing the outcomes for angioembolization with surgery exist. One prospective and multiple retrospective cohort studies comparing outcomes between patients undergoing angioembolization with those undergoing surgery for rebleeding after failed endoscopic control are available. These studies were summarized in three meta-analysis [135–137]. Kyaw et al. summarized 6 retrospective cohort studies: surgery was found to significantly reduce the likelihood of further (post-intervention) hemorrhage, and was associated with a trend towards a reduced need for further intervention. However, surgery was also associated with a trend to increased mortality. Beggs et al. included 9 cohort studies (8 retrospective and 1 prospective), and similarly concluded that surgery was associated with a significantly lower risk of rebleeding, and only a marginal trend towards increased mortality. Subsequent to these first two meta-analyses, a case-control study comparing angioembolization with surgery [138] reported a trend to higher rebleeding rates following angioembolization, and a trend towards higher mortality after surgery was seen. A significantly lower rate of post-procedural complications was reported in the angioembolization cohort. The latest meta-analysis [137] found similar results, but interestingly found a slight drift toward a lower mortality for the angioembolization group.

**In patients with bleeding peptic ulcer who underwent angioembolization, which are the most appropriate embolization techniques and materials?**

*Varied techniques and materials exist for the use in the embolization of bleeding duodenal ulcer disease. A tailored approach, guided by the multidisciplinary team, incorporating patient, pathology, and environmental factors is suggested (weak recommendation based on low-quality evidences, 2C).*

Successful embolization of gastric and duodenal arteries is complicated by the rich collateral blood supply. Several technical points are raised in various case reports, series, and review articles in this field. There are no high-level articles to guide these technical considerations. Pre-procedural endoscopic localization of the point of hemorrhage could assist guidance of the selective and super-selective angiography and the angiogram can be further guided by the placement of an endoscopic clip at the ulcer if this has been identified. Diagnostic angiography usually commences with a selective coeliac axis and superior mesenteric artery catheterization and angiogram. Where no extravasation is seen, a super-selective approach normally follows. Imaging from both aspects of the bleeding point is ideally obtained (both sides need to be approached).

**In patients with bleeding peptic ulcer and non-evident bleeding during angiography, is there a role for prophylactic embolization?**

*No recommendation can be made on the role of prophylactic embolization.*

Prophylactic embolization may be considered in two situations

- Empirically, at the time of a negative angiogram: Several authors have suggested a role for blind embolization for upper gastrointestinal hemorrhage, noting that these patients had similar outcomes to patients who underwent embolization after the demonstration of a point of hemorrhage [134, 139, 140]. A variation on this uses the endoscopic information to guide the area for embolization [141, 142]. However, these approaches are based on retrospective cohorts. There are insufficient high-level data to draw firm conclusions.

- As a planned intervention, in association with endoscopic control: The addition of prophylactic embolization in addition to endoscopic hemostasis has been investigated by several authors, including most recently with two randomized controlled trials [143, 144]. Laursen et al. demonstrated a trend toward improved outcomes in patients who underwent additional prophylactic embolization. However, the second RCT by Lau et al. failed to confirm this observation. This approach was also supported by a retrospective series by Mille et al. [145].

At present, the evidences available in the literature appear to be insufficient to routinely recommend this approach.

## Surgery

### In patients with bleeding peptic ulcer, which are the indications for surgical treatment and which is the appropriate timing for surgery?

*In patients with bleeding peptic ulcer, we suggest surgical hemostasis (or angiographic embolization if immediately available and with appropriate skills) after failure of repeated endoscopy. In patients with hypotension and/or hemodynamic instability and/or ulcer larger than 2 cm at first endoscopy, we suggest surgical intervention without repeated endoscopy (strong recommendation based on very low-quality evidences, 1D).*

A renowned RCT conducted in 1999 [129] compared endoscopic retreatment with surgery for peptic ulcer rebleeding after initial endoscopy. Over a 40-month period, 92 patients with recurrent bleeding were enrolled: 48 patients were randomly assigned to undergo immediate endoscopic retreatment and 44 were assigned

to undergo surgery. Of the 48 patients who were assigned to endoscopic retreatment, 35 had long-term control of bleeding. Thirteen underwent salvage surgery, 11 because retreatment failed, and 2 because of perforations resulting from thermocoagulation. Five patients in the endoscopy group died within 30 days, as compared with eight patients in the surgery group ($p = 0.37$). Seven patients in the endoscopy group had complications, as compared with 16 in the surgery group ($p = 0.03$). Duration of hospitalization, need for ICU admission, ICU length of stay, and the number of blood transfusions were similar in the two groups. In multivariate analysis, hypotension at randomization ($p = 0.01$) and an ulcer size of at least 2 cm ($p = 0.03$) were independent factors predictive of the failure of endoscopic retreatment. According to these data, repeated endoscopy is indicated for stable patients with ulcers smaller than 2 cm in diameter, while for patients with a larger ulcer and heavier bleeding, surgery may be taken into account as a first-line therapy.

No evidence is available regarding the impact on clinical outcome of time before surgery for bleeding peptic ulcer. We suggest immediate surgery for unstable patients with bleeding peptic ulcer refractory to endoscopy/angioembolization.

**In patients with bleeding peptic ulcer, what is the most appropriate surgical approach (open vs laparoscopy) and what are the most appropriate surgical procedures?**

*In patients with refractory bleeding peptic ulcer, we suggest surgical intervention with open surgery (weak recommendation based on very low-quality evidences, 2D).*

*In patients operated for bleeding peptic ulcer, we suggest intra-operative endoscopy to facilitate the localization of the bleeding site (weak recommendation based on very low-quality evidences, 2D).*

*We suggest choosing the surgical procedure according to the location and extension of the ulcer and the characteristics of the bleeding vessel (weak recommendation based on low-quality evidences, 2C)*

*An immediate or delayed biopsy is recommended (weak recommendation based on low-quality evidences, 2C)*

A refractory bleeding peptic ulcer is defined as an ulcer still bleeding after repeated endoscopy/angioembolization. Open surgery is recommended when endoscopic treatments have failed and there is evidence of ongoing bleeding, plus or minus hemodynamic instability. The choice of the appropriate surgical procedure for bleeding peptic ulcer should be made on the basis of the location and extension of the ulcer and the characteristics of the bleeding vessel. Surgical approach involves ulcer oversew or resection. Bleeding gastric ulcers should be resected or at least biopsied for the possibility of neoplasms. Conversely, most duodenal ulcers

requiring surgery for persistent bleeding are usually large and posterior lesions, and the bleeding is often from the gastro-duodenal artery. A recent prospective cohort study conducted in Denmark [146] compared the outcomes of duodenal and gastric bleeding peptic ulcers and found a significantly higher 90-day mortality and reoperation rate for the duodenal location, confirming the greater complexity of surgical management of this ulcer. Via duodenotomy, the bleeding vessel can be seen on the floor of the ulcer and can be rapidly oversewn. It is critical to perform triple-loop suturing of bleeding of the GDA due to the collateral blood supply to the transverse pancreatic arteries. The surgeon may not know preoperatively where the bleeding originates and intraoperative endoscopic guidance may be helpful. For patients with intractable ulcer bleeding, Schroeder et al. [147] from the analysis of a large database (ACS-NSQIP) have found that the surgical procedure of vagotomy/drainage is associated with significantly lower mortality than simply simple local ulcer oversew. They further suggest that vagotomy/drainage is preferred to local procedures alone for the surgical management of patients with bleeding peptic ulcer disease requiring emergency operation for intractable bleeding ulcers.

**In patients with bleeding peptic ulcer, what is the role of damage control surgery?**

*We suggest considering damage control surgery for patients with hemorrhagic shock and signs of severe physiological derangement, in order to quickly resolve the bleeding and allow a prompt ICU admission (weak recommendation based on very low-quality evidences, 2D).*

Indications for damage control surgery in bleeding peptic ulcer are similar to those for perforated peptic ulcer and are reported in the WSES guidelines on Open Abdomen management in non-trauma patients [67].

**Antimicrobial therapy**
**In patients with bleeding peptic ulcer, which are the indications for antimicrobial therapy and for *Helicobacter pylori* testing?**

*In patients with bleeding peptic ulcer, empirical antimicrobial therapy is not recommended (strong recommendation based on low-quality evidences, 1C)*

*We recommend performing Helicobacter pylori testing in all patients with bleeding peptic ulcer (strong recommendation based on low-quality evidences, 1C).*

Bleeding peptic ulcer accounts for 75% of patients admitted to ED for peptic ulcer disease [148] and has different etiologies (ulcerogenic medications such as acetylsalicylic acid and NSAIDs, *H. pylori* infection, etc). *H. pylori* infection has a variable prevalence of 20–50% among patients with bleeding peptic ulcer in various countries, but its eradication is associated with a significant reduction in ulcer recurrence rate and rebleeding

Case 2:20-cv-00410-MKD    ECF No. 45    filed 02/04/22    PageID.1050    Page 222 of 380

Tarasconi et al. World Journal of Emergency Surgery        (2020) 15:3        Page 19 of 24

[66, 149–151]. In a systematic review, Gisbert et al. showed a 26% rebleeding rate among patients with *H. pylori* infection–associated bleeding ulcers who did not receive eradication therapy [150]. Conflicting results are reported about appropriate timing to start eradication therapy. Empirical eradication therapy immediately after re-feeding has been suggested as the most cost-effective strategy [151], but its real effectiveness can vary by regional prevalence of the bacteria. Therefore, confirming the result of *H. pylori* test and initiating eradication therapy in *H. pylori*-positive patients prior to discharge would appear to be a more appropriate strategy than to apply empirical therapy to all patients with BPU [66, 152].

For this reason, all patients having BPU should undergo *H. Pylori* testing. Different tests are available to confirm *H. pylori* infection. The urea breath test (UBT) and stool antigen testing are acceptable non-invasive tests with a sensitivity of 88–95% for UBT and 94% for stool antigen testing, respectively. Specificity is 95–100% for UBT and 92% for stool antigen testing, respectively [151]. In cases of bleeding peptic ulcer, *H. pylori* testing on endoscopic tissue biopsy may be available [151].

**In patients with bleeding peptic ulcer and positive tests for HP infection, which are the therapeutic options?**

*In H. pylori-positive BPU patients, eradication therapy is recommended to avoid recurrent bleeding (strong recommendation based on low-quality evidences, 1C)*

*In patients with HP positive tests, standard triple therapy (amoxicillin, clarithromycin, and PPI) regimen is recommended as first-line therapy if low clarithromycin resistance is present (strong recommendation based on moderate-quality evidences, 1B)*

*10 days of sequential therapy with four drugs (amoxicillin, clarythromicin, metronidazole, and PPI) is recommended in selected cases, if compliance to the scheduled regimen can be maintained, and if clarithromycin high resistance is detected (strong recommendation based on low-quality evidences, 1C).*

*In patients with HP positive tests, a 10-day levofloxacin-amoxicillin triple therapy is recommended as second-line therapy if first-line therapy failed (strong recommendation based on moderate-quality evidences, 1B).*

*We recommend to start standard triple therapy (STT) after 72–96 h of intravenous administration of PPI and to administer it for 14 days (strong recommendation based on low-quality evidences, 1C)*

The worldwide prevalence of *H. pylori* infections is approximately 50%, with the highest being in developing countries [153]. Standard treatments for *H. pylori* infections have been endorsed by Western scientific societies, and by regulatory authorities relying on clarithromycin,

metronidazole, or amoxicillin in conjunction with PPI [154].

As the response to eradication therapy is significantly related to the prevalence of primary resistance in the population, the choice of treatment regimen should be based on the knowledge of the underlying prevalence of resistant strains in the community [151–154].

Several international guidelines [151, 152] and available meta-analysis [153, 154] recommend that standard triple therapy (amoxicillin, clarithromycin, and PPI) regimen should be used as first-line therapy if low clarithromycin resistance is present. The suggested doses are:

– PPI standard dose twice a day;
– Clarithromycin 500 mg twice a day;
– Amoxicillin 1000 mg twice a day, or
– Metronidazole 500 mg twice a day.

Sequential therapy with four drugs (amoxicillin, clarithromycin, metronidazole, and PPI) should be considered in selected cases, if compliance to the scheduled regimen can be maintained, and if clarithromycin high resistance is detected. It is defined as the use of one PPI and amoxicillin for the first 5 days followed by PPI plus clarithromycin and metronidazole for the next 5 days [155]. Recommended doses are as follows:

– PPI standard dose twice a day;
– Amoxicillin 1000 mg twice a day;
– Clarithromycin 500 mg twice a day;
– Metronidazole 500 mg twice a day.

If any of these regimens failed, a second-line therapy is represented by a 10-day levofloxacin-amoxicillin triple therapy. The suggested doses are:

– PPI standard dose twice a day;
– Levofloxacin 500 mg once a day or 250 twice a day;
– Amoxicillin 1000 mg twice a day.

## Conclusions

Peptic ulcer disease is still common among the world population and its incidence pattern is evolving in relation to the rise of new risk factors, i.e., the increasing incidence of the *Helicobacter pylori* infection, the extensive use of NSAIDs and the increase in alcohol and smoking abuse. Despite the tremendous improvement in preventive therapies, the rate of complication of this disease is still high and is burdened by high morbidity and mortality. Prompt recognition and treatment of the complications lead invariably to a better outcome, especially in elderly and frail patients. For this reason, these guidelines present evidence-based international consensus statements on the management of complicated

Case 2:20-cv-00410-MKD    ECF No. 45    filed 02/04/22    PageID.1051    Page 223 of 380

Tarasconi et al. World Journal of Emergency Surgery        (2020) 15:3        Page 20 of 24

peptic ulcer from a collaboration of a panel of experts and are intended to improve the knowledge and the awareness of physicians around the world on this specific topic. We divided our work into two main topics, bleeding and perforated peptic ulcer, and structured it into six main topics that cover the entire management process of patients with complicated peptic ulcer, from diagnosis at ED arrival to post-discharge antimicrobial therapy, to provide an up-to-date and easy-to-use tool that can help physicians and surgeons during the decision-making process.

**Abbreviations**
ACS-NSQIP: American college of surgeon National Surgical Quality Improvement Program; APACHE score: Acute Physiology and Chronic Health Evaluation score; ASA score: American Society of Anesthesiologists score; ASA: Acetylsalicylic acid; ATLS: Advanced trauma life support; AXR: Abdominal X-ray; BPU: Bleeding peptic ulcer; COOL trial: Closed or Open after Laparotomy trial; CPU: Complicated peptic ulcer; CT: Computed tomography; ED: emergency department; EUS: Endoscopic ultrasound; GBS: Glasgow-Blatchford score; GI: Gastrointestinal; GRADE: Grading of Recommendations Assessment, Development and Evaluation; Hb: Hemoglobin; IAI: intra-abdominal infection; ICU: Intensive care unit; INR: International normalized ratio; MAP: Mean arterial pressure; MDRO: Multi-drug resistant organism; NGT: Nasogastric tube; NOM: Nonoperative management; NSAIDs: Non-steroidal anti-inflammatory drugs; OA: Open abdomen; OR: Operating room; OTSC: Over the scope clip; PPI: Proton-pomp inhibitor; PPU: Perforated peptic ulcer; PULP score: Peptic ulcer perforation score; qSOFA: Quick sequential organ failure assessment; RCT: randomized controlled trial; RFA: Radiofrequency ablation; SOFA: Sequential organ failure assessment; SSI: Surgical site infection; UBT: Urea breath test; WSES: World Society of Emergency Surgery

**Acknowledgements**
Not applicable.

**Authors' contributions**
Each author wrote a chapter of the manuscript. All the authors reviewed the manuscript and approved the final draft.

**Funding**
None of the authors received funding/grants for this research.

**Availability of data and materials**
The authors are responsible for the data described in the manuscript and assure full availability of the study material upon request to the corresponding author.

**Ethics approval and consent to participate**
Not applicable

**Consent for publication**
Not applicable

**Competing interests**
The authors declare that they have no competing interests.

**Author details**
[1]Emergency Surgery Department, Parma University Hospital, Parma, Italy. [2]General, Emergency and Trauma Surgery Department, Pisa University Hospital, Pisa, Italy. [3]Scripps Memorial Hospital La Jolla, La Jolla, CA, USA. [4]General, Emergency and Trauma Surgery Department, Bufalini hospital, Cesena, Italy. [5]Department of Anesthesia and Intensive Care, Parma University Hospital, Parma, Italy. [6]Department of Clinical and Experimental Sciences, University of Brescia, Brescia, Italy. [7]Tan Tock Seng Hospital, Singapore, Singapore. [8]General Surgery and Trauma Team, ASST Niguarda Milano, University of Milano, Milan, Italy. [9]Royal Perth Hospital, Perth, Australia & The University of Western Australia, Crawley, Australia. [10]Department of

Surgery, College of Medicine and Health Sciences, UAE University, Al-Ain, United Arab Emirates. [11]Division of Surgery, ASL VT - Ospedale "Andosilla", Civita Castellana, Italy. [12]Cambridge Colorectal Unit, Addenbrooke's Hospital, Cambridge University Hospitals NHS Foundation Trust, Cambridge, UK. [13]Department of Molecular and Translational Medicine, Surgical Clinic, University of Brescia, Brescia, Italy. [14]Department of General Surgery, Albury Hospital, Albury, Australia. [15]General, Acute Care, Abdominal Wall Reconstruction, and Trauma Surgery, Foothills Medical Centre, Calgary, Alberta, Canada. [16]Helsinki University Hospital, Helsinki, Finland. [17]Ernest E Moore Shock Trauma Center at Denver Health, Denver, CO, USA. [18]University of Pittsburgh, School of Medicine, UPMC – Presbyterian, Pittsburgh, PA, USA. [19]Division of Trauma Surgery, School of Medical Sciences, University of Campinas, Campinas, SP, Brazil. [20]Department of General and Emergency Surgery, School of Medicine and Surgery, University of Milano-Bicocca, Monza, Italy. [21]Department of Surgery, Harborview Medical Centre, University of Washington, Seattle, USA. [22]Department of Surgery, Sheri-Kashmir Institute of Medical Sciences, Srinagar, India. [23]Trauma, Emergency Surgery and Surgical Critical Care, Massachusetts General Hospital, Boston, USA. [24]Letterkenny University Hospital, Donegal Clinical Research Academy Centre for Personalized Medicine, Donegal, Ireland. [25]Department of Surgery, Macerata Hospital, Macerata, Italy. [26]Department of General Surgery, Rambam Health Care Campus, Haifa, Israel.

Received: 24 October 2019 Accepted: 18 December 2019
Published online: 07 January 2020

**References**
1. Lanas A, Chan FKL. Peptic ulcer disease. Lancet. 2017;390:613–24.
2. Malmi H, Kautiainen H, Virta LJ, Farkkila N, Koskenpato J, Farkkila MA. Incidence and complications of peptic ulcer disease requiring hospitalisation have markedly decreased in Finland. Aliment Pharmacol Ther. 2014;39:496–506.
3. Lanas A, Garcia-Rodriguez LA, Polo-Tomas M, Ponce M, Quintero E, Perez-Aisa MA, Gisbert JP, Bujanda L, Castro M, Munoz M, Del-Pino MD, Garcia S, Calvet X. The changing face of hospitalisation due to gastrointestinal bleeding and perforation. Aliment Pharmacol Ther. 2011;33:585–91.
4. Leow AH, Lim YY, Liew WC, Goh KL. Time trends in upper gastrointestinal diseases and Helicobacter pylori infection in a multiracial Asian population-- a 20-year experience over three time periods. Aliment Pharmacol Ther. 2016;43:831–7.
5. Sonnenberg A. Time trends of ulcer mortality in non-European countries. Am J Gastroenterol. 2007;102:1101–7.
6. Sonnenberg A. Time trends of ulcer mortality in Europe. Gastroenterology. 2007;132:2320–7.
7. Sonnenberg A. Review article: historic changes of Helicobacter pylori-associated diseases. Aliment Pharmacol Ther. 2013;38:329–42.
8. Kavitt RT, Lipowska AM, Anyane-Yeboa A, Gralnek IM. Diagnosis and Treatment of Peptic Ulcer Disease. Am J Med. 2019.
9. Bertleff MJ, Lange JF. Perforated peptic ulcer disease: a review of history and treatment. Dig Surg. 2010;27:161–9.
10. Lau JY, Sung J, Hill C, Henderson C, Howden CW, Metz DC. Systematic review of the epidemiology of complicated peptic ulcer disease: incidence, recurrence, risk factors and mortality. Digestion. 2011;84:102–13.
11. Søreide K, Thorsen K, Harrison EM, Bingener J, Møller MH, Ohene-Yeboah M, Søreide JA. Perforated peptic ulcer. Lancet. 2015;386:1288–98.
12. Guyatt GH, Oxman AD, Kunz R, Falck-Ytter Y, Vist GE, Liberati A, Schunemann HJ, Group GW. Going from evidence to recommendations. BMJ. 2008;336:1049–51.
13. Guyatt GH, Oxman AD, Vist GE, Kunz R, Falck-Ytter Y, Alonso-Coello P, Schunemann HJ, Group GW. GRADE: an emerging consensus on rating quality of evidence and strength of recommendations. BMJ. 2008;336:924–6.
14. Soreide K, Thorsen K, Soreide JA. Strategies to improve the outcome of emergency surgery for perforated peptic ulcer. Br J Surg. 2014;101:e51–64.
15. Thorsen K, Glomsaker TB, von Meer A, Soreide K, Soreide JA. Trends in diagnosis and surgical management of patients with perforated peptic ulcer. Gastrointest Surg. 2011;15:1329–35.
16. Suriya C, Kasatpibal N, Kunaviktikul W, Kayee T. Diagnostic indicators for peptic ulcer perforation at a tertiary care hospital in Thailand. Clin Exp Gastroenterol. 2011;4:283–9.

Case 2:20-cv-00410-MKD   ECF No. 45   filed 02/04/22   PageID.1052   Page 224 of 380

Tarasconi et al. World Journal of Emergency Surgery     (2020) 15:3     Page 21 of 24

17. Malhotra AK, Fabian TC, Katsis SB, Gavant ML, Croce MA. Blunt Bowel and Mesenteric Injuries: The Role of Screening Computed Tomography. J Trauma. 2000;48:991–1000.

18. Grassi R, Romano S, Pinto A, Romano L. Gastro-duodenal perforations: conventional plain film, US and CT findings in 166 consecutive patients. Eur J Radiol. 2004;50:30–6.

19. Yeung K-W, Chang M-S, Hsiao C-P, Huang J-F. CT evaluation of gastrointestinal tract perforation. Clinical Imaging. 2004;28:329–33.

20. Soreide K, Thorsen K, Soreide JA. Predicting outcomes in patients with perforated gastroduodenal ulcers: artificial neural network modelling indicates a highly complex disease. Eur J Trauma Emerg Surg. 2015;41:91–8.

21. Thorsen K, Soreide JA, Soreide K. What is the best predictor of mortality in perforated peptic ulcer disease? A population-based, multivariable regression analysis including three clinical scoring systems. J Gastrointes Surg. 2014;18:1261–8.

22. Thorsen K, Soreide JA, Soreide K. Scoring systems for outcome prediction in patients with perforated peptic ulcer. Scand J Trauma Resusc Emerg Med. 2013;21:25.

23. Ross JT, Matthay MA, Harris HW. Secondary peritonitis: principles of diagnosis and intervention. BMJ. 2018;361:k1407.

24. Singer M, Deutschman CS, Seymour CW, Shankar-Hari M, Annane D, Bauer M, Bellomo R, Bernard GR, Chiche JD, Coopersmith CM, Hotchkiss RS, Levy MM, Marshall JC, Martin GS, Opal SM, Rubenfeld GD, van der Poll T, Vincent JL, Angus DC. The Third International Consensus Definitions for Sepsis and Septic Shock (Sepsis-3). JAMA. 2016;315:801–10.

25. Sartelli M, Kluger Y, Ansaloni L, Hardcastle TC, Rello J, Watkins RR, Bassetti M, Giamarellou E, Coccolini F, Abu-Zidan FM, Adesunkanmi AK, Augustin G, Baiocchi GL, Bala M, Baraket O, Beltran MA, Jusoh AC, Demetrashvili Z, De Simone B, de Souza HP, Cui Y, Davies RJ, Dhingra S, Diaz JJ, Di Saverio S, Dogjani A, Elmangory MM, Enani MA, Ferrada P, Fraga GP, Frattima S, Ghnnam W, Gomes CA, Kanj SS, Karamarkovic A, Kenig J, Khamis F, Khokha V, Koike K, KYY K, Isik A, Labricciosa FM, Latifi R, Lee JG, Litvin A, Machain GM, Manzano-Nunez R, Major P, Marwah S, McFarlane M, Memish ZA, Mesina C, Moore EE, Moore FA, Naidoo N, Negoi I, Ofori-Asenso R, Olaoye I, Ordonez CA, Ouadii M, Paolillo C, Picetti E, Pintar T, Ponce-de-Leon A, Pupelis G, Reis T, Sakakushev B, Kafil HS, Sato N, Shah JN, Siribumrungwong B, Talving P, Trana C, Ulrych J, Yuan KC, Catena F. Raising concerns about the Sepsis-3 definitions. World J Emerg Surg. 2018;13:6.

26. Seymour CW, Gesten F, Prescott HC, Friedrich ME, Iwashyna TJ, Phillips GS, Lemeshow S, Osborn T, Terry KM, Levy MM. Time to Treatment and Mortality during Mandated Emergency Care for Sepsis. N Engl J Med. 2017;376:2235–44.

27. Cecconi M, Evans L, Levy M, Rhodes A. Sepsis and septic shock. Lancet. 2018;392:75–87.

28. Vincent JL, Moreno R, Takala J, Willatts S, De Mendonça A, Bruining H, Reinhart CK, Suter PM, Thijs LG. The SOFA (Sepsis-related Organ Failure Assessment) score to describe organ dysfunction/failure. Intensive Care Med. 1996;22:707–10.

29. Seymour CW, Liu VX, Iwashyna TJ, Brunkhorst FM, Rea TD, Scherag A, Rubenfeld G, Kahn JM, Shankar-Hari M, Singer M, Deutschman CS, Escobar GJ, Angus DC. Assessment of Clinical Criteria for Sepsis: For the Third International Consensus Definitions for Sepsis and Septic Shock (Sepsis-3). JAMA. 2016;315:762–74.

30. Askim A, Moser F, Gustad LT, Stene H, Gundersen M, Asvold BO, Dale J, Bjornsen LP, Damas JK, Solligard E. Poor performance of quick-SOFA (qSOFA) score in predicting severe sepsis and mortality - a prospective study of patients admitted with infection to the emergency department. Scand J Trauma Resusc Emerg Med. 2017;25:56.

31. Giamarellos-Bourboulis EJ, Tsaganos T, Tsangaris I, Lada M, Routsi C, Sinapidis D, Koupetori M, Bristianou M, Adamis G, Mandragos K, Dalekos GN, Kritselis I, Giannikopoulos G, Koutelidakis I, Pavlaki M, Antoniadou E, Vlachogiannis G, Koulouras V, Prekates A, Dimopoulos G, Koutsoukou A, Pnevmatikos I, Ioakeimidou A, Kotanidou A, Orfanos SE, Armaganidis A, Gogos C, Hellenic Sepsis Study G. Validation of the new Sepsis-3 definitions: proposal for improvement in early risk identification. Clin Microbiol Infect. 2017;23:104–9.

32. Tusgul S, Carron PN, Yersin B, Calandra T, Dami F. Low sensitivity of qSOFA, SIRS criteria and sepsis definition to identify infected patients at risk of complication in the prehospital setting and at the emergency department triage. Scand J Trauma Resusc Emerg Med. 2017;25:108.

33. Williams JM, Greenslade JH, McKenzie JV, Chu K, Brown AFT, Lipman J. Systemic Inflammatory Response Syndrome, Quick Sequential Organ Function Assessment, and Organ Dysfunction: Insights From a Prospective Database of ED Patients With Infection. Chest. 2017;151:586–96.

34. Sartelli M, Chichom-Mefire A, Labricciosa FM, Hardcastle T, Abu-Zidan FM, Adesunkanmi AK, Ansaloni L, Bala M, Balogh ZJ, Beltrán MA, Ben-Ishay O, Biffl WL, Birindelli A, Cainzos MA, Catalini G, Ceresoli M, Che Jusoh A, Chiara O, Coccolini F, Coimbra R, Cortese F, Demetrashvili Z, Di Saverio S, Diaz JJ, Egiev VN, Ferrada P, Fraga GP, Ghnnam WM, Lee JG, Gomes CA, Hecker A, Herzog T, Kim JI, Inaba K, Isik A, Karamarkovic A, Kashuk J, Khokha V, Kirkpatrick AW, Kluger Y, Koike K, Kong VY, Leppaniemi A, Machain GM, Maier RV, Marwah S, McFarlane ME, Montori G, Moore EE, Negoi I, Olaoye I, Omari AH, Ordonez CA, Pereira BM, Pereira Júnior GA, Pupelis G, Reis T, Sakakushev B, Sato N, Segovia Lohse HA, Shelat VG, Søreide K, Uhl W, Ulrych J, Van Goor H, Velmahos GC, Yuan K-C, Wani I, Weber DG, Zachariah SK, Catena F. The management of intra-abdominal infections from a global perspective: 2017 WSES guidelines for management of intra-abdominal infections. World J Emerg Surg. 2017;12.

35. Rhodes A, Evans LE, Alhazzani W, Levy MM, Antonelli M, Ferrer R, Kumar A, Sevransky JE, Sprung CL, Nunnally ME, Rochwerg B, Rubenfeld GD, Angus DC, Annane D, Beale RJ, Bellinghan GJ, Bernard GR, Chiche JD, Coopersmith C, De Backer DP, French CJ, Fujishima S, Gerlach H, Hidalgo JL, Hollenberg SM, Jones AE, Karnad DR, Kleinpell RM, Koh Y, Lisboa TC, Machado FR, Marini JJ, Marshall JC, Mazuski JE, LA MI, AS ML, Mehta S, Moreno RP, Myburgh J, Navalesi P, Nishida O, Osborn TM, Perner A, Plunkett CM, Ranieri M, Schorr CA, Seckel MA, Seymour CW, Shieh L, Shukri KA, Simpson SQ, Singer M, Thompson BT, Townsend SR, Van der Poll T, Vincent JL, Wiersinga WJ, Zimmerman JL, Dellinger RP. Surviving Sepsis Campaign: International Guidelines for Management of Sepsis and Septic Shock: 2016. Crit Care Med. 2017;45:486–552.

36. Donovan AJ, Berne TV, Donovan JA. Perforated Duodenal Ulcer. Arch Surg. 1998;133.

37. Crofts TJ, Park KG, Steele RJ, Chung SS, Li AK. A randomized trial of nonoperative treatment for perforated peptic ulcer. N Engl J Med. 1989;320: 970–3.

38. Songne B, Jean F, Foulatier O, Khalil H, Scotte M. Non operative treatment for perforated peptic ulcer: results of a prospective study. Ann Chir. 2004; 129:578–82.

39. Chung KT, Shelat VG. Perforated peptic ulcer - an update. World J Gastrointest Surg. 2017;9:1–12.

40. Surapaneni S, S R, Reddy AV. The Perforation-Operation time Interval; An Important Mortality Indicator in Peptic Ulcer Perforation. J Clin Diagn Res. 2013;7:880–2.

41. Buck DL, Vester-Andersen M, Moller MH. Danish Clinical Register of Emergency S. Surgical delay is a critical determinant of survival in perforated peptic ulcer. Br J Surg. 2013;100:1045–9.

42. Katsinelos P, Beltsis A, Paroutoglou G, Galanis I, Tsolkas P, Mimidis K, Pilpilidis I, Baltagiannis S, Kamberis E, Papaziogas B. Endoclipping for Gastric Perforation After Endoscopic Polypectomy: An Alternative Treatment to Avoid Surgery. Surg Laparosc Endosc Percutan Tech. 2004:279–81.

43. Joshi MA, Gadhire M, Paranjpe AA. Treatment of duodenal peptic ulcer perforation by endoscopic clips: A novel approach. J Dig Endosc. 2017;8:24.

44. Malkov IS, Zaynutdinov AM, Veliyev NA, Tagirov MR, Merrell RC. Laparoscopic and endoscopic management of perforated duodenal ulcers. J Am Coll Surg. 2004;198:352–5.

45. Alvarado-Aparicio HA, Moreno-Portillo M. Multimedia article: management of duodenal ulcer perforation with combined laparoscopic and endoscopic methods. Surg Endosc. 2004;18:1394.

46. Bergstrom M, Arroyo Vazquez JA, Park PO. Self-expandable metal stents as a new treatment option for perforated duodenal ulcer. Endoscopy. 2013;45:222–5.

47. Lunevicius R, Morkevicius M. Risk factors influencing the early outcome results after laparoscopic repair of perforated duodenal ulcer and their predictive value. Langenbecks Arch Surg. 2005;390:413–20.

48. Sivaram P, Sreekumar A. Preoperative factors influencing mortality and morbidity in peptic ulcer perforation. Eur J Trauma Emerg Surg. 2018; 44:251–7.

49. Moller MH, Adamsen S, Thomsen RW, Moller AM. Preoperative prognostic factors for mortality in peptic ulcer perforation: a systematic review. Scand J Gastroenterol. 2010;45:785–805.

50. Cirocchi R, Soreide K, Di Saverio S, Rossi E, Arezzo A, Zago M, Abraha I, Vettoretto N, Chiarugi M. Meta-analysis of perioperative outcomes of acute

Case 2:20-cv-00410-MKD   ECF No. 45   filed 02/04/22   PageID.1053   Page 225 of 380

Tarasconi *et al. World Journal of Emergency Surgery*        (2020) 15:3        Page 22 of 24

laparoscopic vs open repair of perforated gastroduodenal ulcers. J Trauma Acute Care Surg. 2018.

51. Sharma KC, Brandstetter RD, Brensilver JM, Jung LD. Cardiopulmonary Physiology and Pathophysiology as a Consequence Of Laparoscopic Surgery. Chest. 1996;110:810–5.

52. Lee FY, Leung KL, Lai PB, Lau JW. Selection of patients for laparoscopic repair of perforated peptic ulcer. Br J Surg. 2001;88:133–6.

53. Wang YC, Hsieh CH, Lo HC, Su LT. Sutureless onlay omental patch for the laparoscopic repair of perforated peptic ulcers. World J Surg. 2014;38:1917–21.

54. Lin BC, Liao CH, Wang SY, Hwang TL. Laparoscopic repair of perforated peptic ulcer: simple closure versus omentopexy. J Surg Res. 2017;220:341–5.

55. Abd Ellatif ME, Salama AF, Elezaby AF, El-Kaffas HF, Hassan A, Magdy A, Abdallah E, El-Morsy G. Laparoscopic repair of perforated peptic ulcer: patch versus simple closure. Int J Surg. 2013;11:948–51.

56. Lo HC, Wu SC, Huang HC, Yeh CC, Huang JC, Hsieh CH. Laparoscopic simple closure alone is adequate for low risk patients with perforated peptic ulcer. World J Surg. 2011;35:1873–8.

57. Varcus F, Beuran M, Lica I, Turculet C, Cotarlet AV, Georgescu S, Vintila D, Sabau D, Sabau A, Ciuce C, Bintintan V, Georgescu E, Popescu R, Tarta C, Surlin V. Laparoscopic Repair for Perforated Peptic Ulcer: A Retrospective Study. World J Surg. 2017;41:948–53.

58. Ates M, Sevil S, Bakircioglu E, Colak C. Laparoscopic repair of peptic ulcer perforation without omental patch versus conventional open repair. J Laparoendosc Adv Surg Tech A. 2007;17:615–9.

59. Gupta S, Kaushik R, Sharma R, Attri A. The management of large perforations of duodenal ulcers. BMC Surg. 2005;5:15.

60. Siow SL, Mahendran HA. Laparoscopic repair of perforated peptic ulcers: the sutured omental patch and focused sequential lavage technique. Surg Laparosc Endosc Percutan Tech. 2014;24:134–9.

61. Kumar P, Khan HM, Hasanrabba S. Treatment of perforated giant gastric ulcer in an emergency setting. World J Gastrointest Surg. 2014;6:5–8.

62. Ergul E, Gozetlik EO. Emergency spontaneous gastric perforations: ulcus versus cancer. Langenbecks Arch Surg. 2009;394:643–6.

63. Di Saverio S, Segalini E, Birindelli A, Todero S, Podda M, Rizzuto A, Tugnoli G, Biondi A. Pancreas-sparing, ampulla-preserving duodenectomy for major duodenal (D1-D2) perforations. Br J Surg. 2018;105:1487–92.

64. Ansaloni L, Ceresoli M, Fugazzola P, Tomasoni M, Palamara F, Sartelli M, Catena F, Montori G, Raimondo S, Coccolini F. An innovative duodenal perforation surgical repair technique: the BIOPATCH technique. Journal of Peritoneum (and other serosal surfaces) 2018.

65. Jani K, Saxena AK, Vaghasia R. Omental plugging for large-sized duodenal peptic perforations: A prospective randomized study of 100 patients. In: South Med J; 2006:467-71.

66. Di Saverio S, Bassi M, Smerieri N, Masetti M, Ferrara F, Fabbri C, Ansaloni L, Ghersi S, Serenari M, Coccolini F, Naidoo N, Sartelli M, Tugnoli G, Catena F, Cennamo V, Jovine E. Diagnosis and treatment of perforated or bleeding peptic ulcers: 2013 WSES position paper. World J Emerg Surg 2014;9:45.

67. Coccolini F, Montori G, Ceresoli M, Catena F, Moore EE, Ivatury R, Biffl W, Peitzman A, Coimbra R, Rizoli S, Kluger Y, Abu-Zidan FM, Sartelli M, De Moya M, Velmahos G, Fraga GP, Pereira BM, Leppaniemi A, Boermeester MA, Kirkpatrick AW, Maier R, Bala M, Sakakushev B, Khokha V, Malbrain M, Agnoletti V, Martin-Loeches I, Sugrue M, Di Saverio S, Griffiths E, Soreide K, Mazuski JE, May AK, Montravers P, Melotti RM, Pisano M, Salvetti F, Marchesi G, Valetti TM, Scalea T, Chiara O, Kashuk JL, Ansaloni L. The role of open abdomen in non-trauma patient: WSES Consensus Paper. World J Emerg Surg. 2017;12:39.

68. Kirkpatrick AW, Coccolini F, Ansaloni L, Roberts DJ, Tolonen M McKee JL, Leppaniemi A, Faris P, Doig CJ, Catena F, Fabian T, Jenne CN, Chiara O, Kubes P, Manns B, Kluger Y, Fraga GP, Pereira BM, Diaz JJ, Sugrue M, Moore EE, Ren J, Ball CG, Coimbra R, Balogh ZJ, Abu-Zidan FM, Dixon E, Biffl W, MacLean A, Ball I, Drover J, McBeth PB, Posadas-Calleja JG, Parry NG, Di Saverio S, Ordonez CA, Xiao J, Sartelli M. Closed Or Open after Source Control Laparotomy for Severe Complicated Intra-Abdominal Sepsis (the COOL trial): study protocol for a randomized controlled trial. World J Emerg Surg 2018;13.

69. Tolonen M, Coccolini F, Ansaloni L, Sartelli M, Roberts DJ, JL MK, Leppaniemi A, Doig CJ, Catena F, Fabian T, Jenne CN, Chiara O, Kubes P, Kluger Y, Fraga GP, Pereira BM, Diaz JJ, Sugrue M, Moore EE, Ren J, Ball CG, Coimbra R, Dixon E, Biffl W, MacLean A, PB MB, Posadas-Calleja JG, Di Saverio S, Xiao J, Kirkpatrick AW. From the Closed Or Open after

Laparotomy for Source Control in Severe Complicated Intra-Abdominal Sepsis I. Getting the invite list right: a discussion of sepsis severity scoring systems in severe complicated intra-abdominal sepsis and randomized trial inclusion criteria. World J Emerg Surg. 2018;13:17.

70. Doig CJ, Page SA, McKee JL, Moore EE, Abu-Zidan FM, Carroll R, Marshall JC, Faris PD, Tolonen M, Catena F, Cocolini F, Sartelli M, Ansaloni L, Minor SF, Peirera BM, Diaz JJ, Kirkpatrick AW. Ethical considerations in conducting surgical research in severe complicated intra-abdominal sepsis. World J Emerg Surg. 2019;14.

71. Sartelli M, Catena F, Di Saverio S, Ansaloni L, Malangoni M, Moore EE, Moore FA, Ivatury R, Coimbra R, Leppaniemi A, Biffl W, Kluger Y, Fraga GP, Ordonez CA, Marwah S, Gerych I, Lee JG, Trana C, Coccolini F, Corradetti F, Kirkby-Bott J. Current concept of abdominal sepsis: WSES position paper. World J Emerg Surg. 2014;9:22.

72. Shan YS, Hsu HP, Hsieh YH, Sy ED, Lee JC, Lin PW. Significance of intraoperative peritoneal culture of fungus in perforated peptic ulcer. Br J Surg. 2003;90:1215–9.

73. Prakash A, Sharma D, Saxena A, Somashekar U, Khare N, Mishra A, Anvikar A. Effect of Candida infection on outcome in patients with perforation peritonitis. Indian J Gastroenterol. 2008;27:107–9.

74. Li WS, Lee CH, Liu JW. Antifungal therapy did not improve outcomes including 30-day all-cause mortality in patients suffering community-acquired perforated peptic ulcer-associated peritonitis with Candida species isolated from their peritoneal fluid. J Microbiol Immunol Infect. 2017;50:370–6.

75. Montravers P, Mira JP, Gangneux JP, Leroy O, Lortholary O. AmarCand study g. A multicentre study of antifungal strategies and outcome of Candida spp. peritonitis in intensive-care units. Clin Microbiol Infect. 2011;17:1061–7.

76. Solomkin JS, Mazuski JE, Bradley JS, Rodvold KA, Goldstein EJ, Baron EJ, O'Neill PJ, Chow AW, Dellinger EP, Eachempati SR, Gorbach S, Hilfiker M, May AK, Nathens AB, Sawyer RG, Bartlett JG. Diagnosis and management of complicated intra-abdominal infection in adults and children: guidelines by the Surgical Infection Society and the Infectious Diseases Society of America. Clin Infect Dis. 2010;50:133–64.

77. Powell LL, Wilson SE. The role of beta-lactam antimicrobials as single agents in treatment of intra-abdominal infection. Surg Infect (Larchmt). 2000;1:57–63.

78. Sartelli M, Weber DG, Ruppé E, Bassetti M, Wright BJ, Ansaloni L, Catena F, Coccolini F, Abu-Zidan FM, Coimbra R, Moore EE, Moore FA, Maier RV, De Waele JJ, Kirkpatrick AW, Griffiths EA, Eckmann C, Brink AJ, Mazuski JE, May AK, Sawyer RG, Mertz D, Montravers P, Kumar A, Roberts JA, Vincent J-L, Watkins RR, Lowman W, Spellberg B, Abbott IJ, Adesunkanmi AK, Al-Dahir S, Al-Hasan MN, Agresta F, Althani AA, Ansari s, Ansumana R, Augustin G, Bala M, Balogh ZJ, Baraket O, Bhangu A, Beltrán MA, Bernhard M, Biffl WL, Boermeester MA, Brecher SM, Cherry-Bukowiec JR, Buyne OR, Cainzos MA, Cairns KA, Camacho-Ortiz A, Chandy SJ, Che Jusoh A, Chichom-Mefire A, Colijn C, Corcione F, Cui Y, Curcio D, Delibegovic S, Demetrashvili Z, De Simone B, Dhingra S, Diaz JJ, Di Carlo I, Dillip A, Di Saverio S, Doyle MP, Dorj G, Dogjani A, Dupont H, Eachempati SR, Enani MA, Egiev VN, Elmangory MM, Ferrada P, Fitchett JR, Fraga GP, Guessennd N, Giamarellou H, Ghnnam W, Gkiokas G, Goldberg SR, Gomes CA, Gomi H, Guzmán-Blanco M, Haque M, Hansen S, Hecker A, Heizmann WR, Herzog T, Hodonou AM, Hong S-K, Kafka-Ritsch R, Kaplan LJ, Kapoor G, Karamarkovic A, Kees MG, Kenig J, Kiguba R, Kim PK, Kluger Y, Khokha V, Koike K, KYY K, Kong V, Knox MC, Inaba K, Isik A, Iskandar K, Ivatury RR, Labbate M, Labricciosa FM, Laterre P-F, Latifi R, Lee JG, Lee YR, Leone M, Leppaniemi A, Li Y, Liang SY, Loho T, Maegele M, Malama S, Marei HE, Martin-Loeches I, Marwah S, Massele A, McFarlane M, Melo RB, Negoi I, Nicolau DP, Nord CE, Ofori-Asenso R, Omari AH, Ordonez CA, Ouadii M, Pereira Júnior GA, Piazza D, Pupelis G, Rawson TM, Rems M, Rizoli S, Rocha C, Sakakhushev B, Sanchez-Garcia M, Sato N, Segovia Lohse HA, Sganga G, Siribumrungwong B, Shelat VG, Soreide K, Soto R, Talving P, Fitchett JV, Timsit J-F, Trueba G, Trung NT, Ulrych J, van Goor H, Vereczkei A, Vohra RS, Wani I, Uhl W, Xiao Y, Yuan K-C, Zachariah SK, Zahar J-R, Zakrison TL, Corcione A, Melotti RM, Viscoli C, Viale P. Antimicrobials: a global alliance for optimizing their rational use in intra-abdominal infections (AGORA). World J Emerg Surg 2016;11.

79. Sawyer RG, Claridge JA, Nathens AB, Rotstein OD, Duane TM, Evans HL, Cook CH, O'Neill PJ, Mazuski JE, Askari R, Wilson MA, Napolitano LM, Namias N, Miller PR, Dellinger EP, Watson CM, Coimbra R, Dent DL, Lowry SF, Cocanour CS, West MA, Banton KL, Cheadle WG, Lipsett PA, Guidry CA, Popovsky K. Trial of Short-Course Antimicrobial Therapy for Intraabdominal Infection. New England J Med. 2015;372:1996–2005.

Case 2:20-cv-00410-MKD    ECF No. 45    filed 02/04/22    PageID.1054    Page 226 of 380

Tarasconi *et al. World Journal of Emergency Surgery*        (2020) 15:3        Page 23 of 24

80. Carneiro HA, Mavrakis A, Mylonakis E. Candida peritonitis: an update on the latest research and treatments. World J Surg. 2011;35:2650–9.

81. Kourkoumpetis TK, Velmahos GC, Ziakas PD, Tampakakis E, Manolakaki D, Coleman JJ, Mylonakis E. The effect of cumulative length of hospital stay on the antifungal resistance of Candida strains isolated from critically ill surgical patients. Mycopathologia. 2011;171:85–91.

82. Hasibeder W, Halabi M. Candida peritonitis. Minerva Anestesiol. 2014; 80:470–81.

83. Al Dhahab H, McNabb-Baltar J, Al-Taweel T, Barkun A. State-of-the-art management of acute bleeding peptic ulcer disease. Saudi J Gastroenterol. 2013;19:195–204.

84. Shingina A, Barkun AN, Razzaghi A, Martel M, Bardou M, Gralnek I, Investigators R. Systematic review: the presenting international normalised ratio (INR) as a predictor of outcome in patients with upper nonvariceal gastrointestinal bleeding. Aliment Pharmacol Ther. 2011;33:1010–8.

85. Stunell H, Buckley O, Lyburn ID, McGann G, Farrell M, Torreggiani WC. The role of computerized tomography in the evaluation of gastrointestinal bleeding following negative or failed endoscopy: a review of current status. J Postgrad Med. 2008;54:126–34.

86. Laing CJ, Tobias T, Rosenblum DI, Banker WL, Tseng L, Tamarkin SW. Acute gastrointestinal bleeding: emerging role of multidetector CT angiography and review of current imaging techniques. Radiographics. 2007;27:1055–70.

87. Cook DJ, Guyatt GH, Salena BJ, Laine LA. Endoscopic therapy for acute nonvariceal upper gastrointestinal hemorrhage: A meta-analysis. Gastroenterology. 1992;102:139–48.

88. Marmo R, Rotondano G, Bianco MA, Piscopo R, Prisco A, Cipolletta L. Outcome of endoscopic treatment for peptic ulcer bleeding: Is a second look necessary? A meta-analysis. Gastrointest Endosc. 2003;57:62–7.

89. Tsoi KK, Chiu PW, Sung JJ. Endoscopy for upper gastrointestinal bleeding: is routine second-look necessary? Nat Rev Gastroenterol Hepatol. 2009;6:717–22.

90. Wong SH, Sung JJ. Management of GI emergencies: peptic ulcer acute bleeding. Best Pract Res Clin Gastroenterol. 2013;27:639–47.

91. Stanley AJ, Dalton HR, Blatchford O, Ashley D, Mowat C, Cahill A, Gaya DR, Thompson E, Warshow U, Hare N, Groome M, Benson G, Murray W. Multicentre comparison of the Glasgow Blatchford and Rockall Scores in the prediction of clinical end-points after upper gastrointestinal haemorrhage. Aliment Pharmacol Ther. 2011;34:470–5.

92. Mokhtare M, Bozorgi V, Agah S, Nikkhah M, Faghihi A, Boghratian A, Shalbaf N, Khanlari A, Seifmanesh H. Comparison of Glasgow-Blatchford score and full Rockall score systems to predict clinical outcomes in patients with upper gastrointestinal bleeding. Clin Exp Gastroenterol. 2016;9:337–43.

93. Nelms DW, Pelaez CA. The Acute Upper Gastrointestinal Bleed. Surg Clin North Am. 2018;98:1047–57.

94. Spahn DR, Bouillon B, Cerny V, Duranteau J, Filipescu D, Hunt BJ, Komadina R, Maegele M, Nardi G, Riddez L, Samama CM, Vincent JL, Rossaint R. The European guideline on management of major bleeding and coagulopathy following trauma: fifth edition. Crit Care. 2019;23:98.

95. Rockall TA, Logan RF, Devlin HB, Northfield TC. Risk assessment after acute upper gastrointestinal haemorrhage. Gut. 1996;38:316–21.

96. Blatchford O, Murray WR, Blatchford M. A risk score to predict need for treatment for uppergastrointestinal haemorrhage. Lancet. 2000;356:1318–21.

97. Baradarian R, Ramdhaney S, Chapalamadugu R, Skoczylas L, Wang K, Rivilis S, Remus K, Mayer I, Iswara K, Tenner S. Early intensive resuscitation of patients with upper gastrointestinal bleeding decreases mortality. Am J Gastroenterol. 2004;99:619–22.

98. Villanueva C, Colomo A, Bosch A, Concepcion M, Hernandez-Gea V, Aracil C, Graupera I, Poca M, Alvarez-Urturi C, Gordillo J, Guarner-Argente C, Santalo M, Muniz E, Guarner C. Transfusion strategies for acute upper gastrointestinal bleeding. N Engl J Med. 2013;368:11–21.

99. Martinez-Alcala A, Monkemuller K. Emerging Endoscopic Treatments for Nonvariceal Upper Gastrointestinal Hemorrhage. Gastrointest Endosc Clin N Am. 2018;28:307–20.

100. Barkun AN, Martel M, Toubouti Y, Rahme E, Bardou M. Endoscopic hemostasis in peptic ulcer bleeding for patients with high-risk lesions: a series of meta-analyses. Gastrointest Endosc. 2009;69:786–99.

101. Sacks HS, Chalmers TC, Blum AL, Berrier J, Pagano D. Endoscopic hemostasis. An effective therapy for bleeding peptic ulcers. JAMA. 1990;264:494–9.

102. Stanley AJ, Laine L, Dalton HR, Ngu JH, Schultz M, Abazi R, Zakko L, Thornton S, Wilkinson K, Khor CJ, Murray IA, Laursen SB. International

103. Gastrointestinal Bleeding C. Comparison of risk scoring systems for patients presenting with upper gastrointestinal bleeding: international multicentre prospective study. BMJ. 2017;356:i6432.

103. Marmo R, Rotondano G, Piscopo R, Bianco MA, D'Angella R, Cipolletta L. Dual therapy versus monotherapy in the endoscopic treatment of high-risk bleeding ulcers: a meta-analysis of controlled trials. Am J Gastroenterol. 2007;102:279–89 quiz 469.

104. Vergara M, Bennett C, Calvet X, Gisbert JP. Epinephrine injection versus epinephrine injection and a second endoscopic method in high-risk bleeding ulcers. Cochrane Database Syst Rev 2014:CD005584.

105. Shi K, Shen Z, Zhu G, Meng F, Gu M, Ji F. Systematic review with network meta-analysis: dual therapy for high-risk bleeding peptic ulcers. BMC Gastroenterol. 2017;17:55.

106. Sung JJ, Chiu PW, Chan FKL, Lau JY, Goh KL, Ho LH, Jung HY, Sollano JD, Gotoda T, Reddy N, Singh R, Sugano K, Wu KC, Wu CY, Bjorkman DJ, Jensen DM, Kuipers EJ, Lanas A. Asia-Pacific working group consensus on non-variceal upper gastrointestinal bleeding: an update 2018. Gut. 2018;67:1757–68.

107. Bleau BL, Gostout CJ, Sherman KE, Shaw MJ, Harford WV, Keate RF, Bracy WP, Fleischer DE. Recurrent bleeding from peptic ulcer associated with adherent clot: A randomized study comparing endoscopic treatment with medical therapy. Gastrointestinal Endoscopy. 2002;56:1–6.

108. Manno M, Mangiafico S, Caruso A, Barbera C, Bertani H, Mirante VG, Pigo F, Amardeep K, Conigliaro R. First-line endoscopic treatment with OTSC in patients with high-risk non-variceal upper gastrointestinal bleeding: preliminary experience in 40 cases. Surg Endosc. 2016;30:2026–9.

109. Richter-Schrag HJ, Glatz T, Walker C, Fischer A, Thimme R. First-line endoscopic treatment with over-the-scope clips significantly improves the primary failure and rebleeding rates in high-risk gastrointestinal bleeding: A single-center experience with 100 cases. World J Gastroenterol. 2016;22:9162–71.

110. Wedi E, Fischer A, Hochberger J, Jung C, Orkut S, Richter-Schrag HJ. Multicenter evaluation of first-line endoscopic treatment with the OTSC in acute non-variceal upper gastrointestinal bleeding and comparison with the Rockall cohort: the FLETRock study. Surg Endosc. 2018;32:307–14.

111. Manta R, Galloro G, Mangiavillano B, Conigliaro R, Pasquale L, Arezzo A, Masci E, Bassotti G, Frazzoni M. Over-the-scope clip (OTSC) represents an effective endoscopic treatment for acute GI bleeding after failure of conventional techniques. Surg Endosc. 2013;27:3162–4.

112. Skinner M, Gutierrez J, Neumann H, Wilcox C, Burski C, Mönkemüller K. Over-the-scope clip placement is effective rescue therapy for severe acute upper gastrointestinal bleeding. Endoscopy International Open. 2014;2:E37–40.

113. Chan SM, Chiu PW, Teoh AY, Lau JY. Use of the Over-The-Scope Clip for treatment of refractory upper gastrointestinal bleeding: a case series. Endoscopy. 2014;46:428–31.

114. Jensen DM, Ohning GV, Kovacs TO, Ghassemi KA, Jutabha R, Dulai GS, Machicado GA. Doppler endoscopic probe as a guide to risk stratification and definitive hemostasis of peptic ulcer bleeding. Gastrointest Endosc. 2016;83:129–36.

115. Jensen DM, Kovacs TOG, Ohning GV, Ghassemi K, Machicado GA, Dulai GS, Sedarat A, Jutabha R, Gornbein J. Doppler Endoscopic Probe Monitoring of Blood Flow Improves Risk Stratification and Outcomes of Patients With Severe Nonvariceal Upper Gastrointestinal Hemorrhage. Gastroenterology. 2017;152:1310–8 e1.

116. Selby N, Kubba A, Hawkey C. Acid suppression in peptic ulcer haemorrhage: a 'meta-analysis'. Alimentary Pharmacology and Therapeutics. 2000;14:1119–26.

117. Lin HJ, Lo WC, Cheng YC, Perng CL. Role of intravenous omeprazole in patients with high-risk peptic ulcer bleeding after successful endoscopic epinephrine injection: a prospective randomized comparative trial. Am J Gastroenterol. 2006;101:500–5.

118. Sung JJY. Intravenous Esomeprazole for Prevention of Recurrent Peptic Ulcer Bleeding. Ann Intern Med. 2009;150:455.

119. Laine L, McQuaid KR. Endoscopic therapy for bleeding ulcers: an evidence-based approach based on meta-analyses of randomized controlled trials. Clin Gastroenterol Hepatol. 2009;7:33–47 quiz 1-2.

120. Neumann I, Letelier LM, Rada G, Claro JC, Martin J, Howden CW, Yuan Y, Leontiadis GI. Comparison of different regimens of proton pump inhibitors for acute peptic ulcer bleeding. Cochrane Database Syst Rev 2013:CD007999.

Case 2:20-cv-00410-MKD    ECF No. 45    filed 02/04/22    PageID.1055    Page 227 of 380

Tarasconi *et al. World Journal of Emergency Surgery*        (2020) 15:3        Page 24 of 24

121. Sreedharan A, Martin J, Leontiadis GI, Dorward S, Howden CW, Forman D, Moayyedi P. Proton pump inhibitor treatment initiated prior to endoscopic diagnosis in upper gastrointestinal bleeding. Cochrane Database Syst Rev 2010:CD005415.

122. Lau JYW, Barkun A, D-m F, Kuipers EJ, Yang Y-s, Chan FKL. Challenges in the management of acute peptic ulcer bleeding. Lancet. 2013;381:2033–43.

123. Theivanayagam S, Lim RG, Cobell WJ, Gowda JT, Matteson ML, Choudhary A, Bechtold ML. Administration of erythromycin before endoscopy in upper gastrointestinal bleeding: a meta-analysis of randomized controlled trials. Saudi J Gastroenterol. 2013;19:205–10.

124. Szary NM, Gupta R, Choudhary A, Matteson ML, Arif M, Hammad HT, Bechtold ML. Erythromycin prior to endoscopy in acute upper gastrointestinal bleeding: a meta-analysis. Scand J Gastroenterol. 2011; 46:920–4.

125. Barkun AN, Bardou M, Martel M, Gralnek IM, Sung JJ. Prokinetics in acute upper GI bleeding: a meta-analysis. Gastrointest Endosc. 2010;72:1138–45.

126. Aljebreen AM, Fallone CA, Barkun AN, for the Ri. Nasogastric aspirate predicts high-risk endoscopic lesions in patients with acute upper-GI bleeding. Gastrointestinal Endoscopy. 2004;59:172–8.

127. Ali T, Roberts DN, Tierney WM. Long-term safety concerns with proton pump inhibitors. Am J Med. 2009;122:896–903.

128. Chan FKL, Sung JJY, Sydney Chung SC, To KF, Yung MY, Leung VKS, Lee YT, Chan CSY, Li EKM, Woo J. Randomised trial of eradication of Helicobacter pylori before non-steroidal anti-inflammatory drug therapy to prevent peptic ulcers. Lancet. 1997;350:975–9.

129. Lau JY, Sung JJ, Lam YH, Chan AC, Ng EK, Lee DW, Chan FK, Suen RC, Chung SC. Endoscopic retreatment compared with surgery in patients with recurrent bleeding after initial endoscopic control of bleeding ulcers. N Engl J Med. 1999;340:751–6.

130. Gralnek IM, Dumonceau JM, Kuipers EJ, Lanas A, Sanders DS, Kurien M, Rotondano G, Hucl T, Dinis-Ribeiro M, Marmo R, Racz I, Arezzo A, Hoffmann RT, Lesur G, de Franchis R, Aabakken L, Veitch A, Radaelli F, Salgueiro P, Cardoso R, Maia L, Zullo A, Cipolletta L, Hassan C. Diagnosis and management of nonvariceal upper gastrointestinal hemorrhage: European Society of Gastrointestinal Endoscopy (ESGE) Guideline. Endoscopy. 2015;47:a1–46.

131. Cheynel N, Peschaud F, Hagry O, Rat P, Ognois-Ausset P, Favre JP. Ulcère gastroduodénal hémorragique : résultats du traitement chirurgical1Communication présentée à l'Académie nationale de chirurgie au cours de la séance du 31 janvier 2001. Annales de Chirurgie. 2001;126:232–5.

132. Loffroy R, Favelier S, Pottecher P, Estivalet L, Genson PY, Gehin S, Cercueil JP, Krause D. Transcatheter arterial embolization for acute nonvariceal upper gastrointestinal bleeding: Indications, techniques and outcomes. Diagn Interv Imaging. 2015;96:731–44.

133. Mejaddam AY, Cropano CM, Kalva S, Walker TG, Imam AM, Velmahos GC, de Moya MA, King DR. Outcomes following "rescue" superselective angioembolization for gastrointestinal hemorrhage in hemodynamically unstable patients. J Trauma Acute Care Surg. 2013;75:398–403.

134. Loffroy R, Guiu B, D'Athis P, Mezzetta L, Gagnaire A, Jouve JL, Ortega-Deballon P, Cheynel N, Cercueil JP, Krause D. Arterial embolotherapy for endoscopically unmanageable acute gastroduodenal hemorrhage: predictors of early rebleeding. Clin Gastroenterol Hepatol. 2009;7:515–23.

135. Kyaw M, Tse Y, Ang D, Ang TL, Lau J. Embolization versus surgery for peptic ulcer bleeding after failed endoscopic hemostasis: a meta-analysis. Endosc Int Open. 2014;2:E6–E14.

136. Beggs AD, Dilworth MP, Powell SL, Atherton H, Griffiths EA. A systematic review of transarterial embolization versus emergency surgery in treatment of major nonvariceal upper gastrointestinal bleeding. Clin Exp Gastroenterol. 2014;7:93–104.

137. Tarasconi A, Baiocchi GL, Pattonieri V, Perrone G, Abongwa HK, Molfino S, Portolani N, Sartelli M, Di Saverio S, Heyer A, Ansaloni L, Coccolini F, Catena F. Transcatheter arterial embolization versus surgery for refractory nonvariceal upper gastrointestinal bleeding: a meta-analysis. World J Emerg Surg. 2019;14:3.

138. Nykänen T, Peltola E, Kylänpää L, Udd M. Bleeding gastric and duodenal ulcers: case-control study comparing angioembolization and surgery. Scandinavian Journal of Gastroenterology. 2017;52:523–30.

139. Aina R, Oliva VL, Therasse É, Perreault P, Bui BT, Dufresne M-P, Soulez G. Arterial Embolotherapy for Upper Gastrointestinal Hemorrhage: Outcome Assessment. Journal of Vascular and Interventional Radiology. 2001;12:195–200.

140. Padia SA, Geisinger MA, Newman JS, Pierce G, Obuchowski NA, Sands MJ. Effectiveness of coil embolization in angiographically detectable versus nondetectable sources of upper gastrointestinal hemorrhage. J Vasc Interv Radiol. 2009;20:461–6.

141. Walsh R. Role of angiography and embolization for massive gastroduodenal hemorrhage. J Gastrointest Surg. 1999;3:61–6.

142. Defreyne L, Vanlangenhove P, Decruyenaere J, Van Maele G, De Vos M, Troisi R, Pattyn P. Outcome of acute nonvariceal gastrointestinal haemorrhage after nontherapeutic arteriography compared with embolization. Eur Radiol. 2003;13:2604–14.

143. Laursen SB, Hansen JM, Andersen PE, Schaffalitzky de Muckadell OB. Supplementary arterial embolization an option in high-risk ulcer bleeding--a randomized study. Scand J Gastroenterol. 2014;49:75–83.

144. Lau JYW, Pittayanon R, Wong KT, Pinjaroen N, Chiu PWY, Rerknimitr R, Holster IL, Kuipers EJ, Wu KC, Au KWL, Chan FKL, Sung JJY. Prophylactic angiographic embolisation after endoscopic control of bleeding to high-risk peptic ulcers: a randomised controlled trial. Gut. 2018.

145. Mille M, Huber J, Wlasak R, Engelhardt T, Hillner Y, Kriechling H, Aschenbach R, Ende K, Scharf JG, Puls R, Stier A. Prophylactic Transcatheter Arterial Embolization After Successful Endoscopic Hemostasis in the Management of Bleeding Duodenal Ulcer. J Clin Gastroenterol. 2015;49:738–45.

146. Lolle I, Møller MH, Rosenstock SJ. Association between ulcer site and outcome in complicated peptic ulcer disease: a Danish nationwide cohort study. Scand J Gastroenterol. 2016;51:1165–71.

147. Schroder VT, Pappas TN, Vaslef SN, De La Fuente SG, Scarborough JE. Vagotomy/drainage is superior to local oversew in patients who require emergency surgery for bleeding peptic ulcers. Ann Surg. 2014;259:1111–8.

148. Yoon H, Lee DH, Jang ES, Kim J, Shin CM, Park YS, Hwang JH, Kim JW, Jeong SH, Kim N. Optimal initiation of Helicobacter pylori eradication in patients with peptic ulcer bleeding. World J Gastroenterol. 2015;21:2497–503.

149. Satoh K, Yoshino J, Akamatsu T, Itoh T, Kato M, Kamada T, Takagi A, Chiba T, Nomura S, Mizokami Y, Murakami K, Sakamoto C, Hiraishi H, Ichinose M, Uemura N, Goto H, Joh T, Miwa H, Sugano K, Shimosegawa T. Evidence-based clinical practice guidelines for peptic ulcer disease 2015. J Gastroenterol. 2016;51:177–94.

150. Gisbert JP, Khorrami S, Carballo F, Calvet X, Gene E, Dominguez-Munoz E. Meta-analysis: Helicobacter pylori eradication therapy vs. antisecretory non-eradication therapy for the prevention of recurrent bleeding from peptic ulcer. Aliment Pharmacol Ther. 2004;19:617–29.

151. Malfertheiner P, Megraud F, O'Morain CA, Atherton J, Axon AT, Bazzoli F, Gensini GF, Gisbert JP, Graham DY, Rokkas T, El-Omar EM, Kuipers EJ, European Helicobacter Study G. Management of Helicobacter pylori infection--the Maastricht IV/ Florence Consensus Report. Gut. 2012;61:646–64.

152. Zagari RM, Romano M, Ojetti V, Stockbrugger R, Gullini S, Annibale B, Farinati F, Ierardi E, Maconi G, Rugge M, Calabrese C, Di Mario F, Luzza F, Pretolani S, Savio A, Gasbarrini G, Caselli M. Guidelines for the management of Helicobacter pylori infection in Italy: The III Working Group Consensus Report 2015. Dig Liver Dis. 2015;47:903–12.

153. Di Caro S, Fini L, Daoud Y, Grizzi F, Gasbarrini A, De Lorenzo A, Di Renzo L, McCartney S, Bloom S. Levofloxacin/amoxicillin-based schemes vs quadruple therapy for Helicobacter pylori eradication in second-line. World J Gastroenterol. 2012;18:5669–78.

154. Gatta L, Vakil N, Vaira D, Scarpignato C. Global eradication rates for Helicobacter pylori infection: systematic review and meta-analysis of sequential therapy. BMJ. 2013;347:f4587.

155. Das R, Sureshkumar S, Sreenath GS, Kate V. Sequential versus concomitant therapy for eradication of Helicobacter Pylori in patients with perforated duodenal ulcer: A randomized trial. Saudi J Gastroenterol. 2016;22:309–15.

## Publisher's Note

Springer Nature remains neutral with regard to jurisdictional claims in published maps and institutional affiliations.

*The Estate of Cindy Lou Hill, by and through its personal representative, Joseph A. Grube; and Cynthia Metsker, individually vs. Naphcare, Inc., et al.*

Case No. 2:20-cv-00410-RMP

Declaration of Hank Balson

Exhibit N

# Incident Report

| | | |
|---|---|---|
| **Incident #:** 13245 | **Creator:** Milholland, Matthew M | **Date:** 08/25/2018 19:09 |
| **Status:** OPEN | **Closed By:** | **Closed Date:** |
| **Cell:** | **Location:** | |

**Category**

Critical Incident - Death

**Force Used**

**Subjects**

18013056 - HILL, CINDY LOU

**Details**

Creating Officer: Milholland, Matthew M  Time: 08/25/2018 19:53  / Updating Officer: Milholland, Matthew M  Time: 08/25/2018 19:53

At approximately 1624 hours on 08/25/18 I Officer Milholland 591263 was feeding dinner on 2 West when i came to 2w27 and Inmate Hill, Cindy Lou was laying on the floor inside the cell so I knocked on the door unital Inmate Hill responded "what" I stated that I had her dinner for her and that she needed to get up and grab it. she then stated "ugh" I took that as she didn't want to get up so I told her that I would just leave it on her food slot for her to grab.

I then continued to feed the rest of the module and was completing other needed tasks until 1724 hours when I was able to return to 2w27 and check on Inmate Hill to make sure she had eaten her dinner. I knocked on the door and got no response so, I called for medical Via the radio to come and check on her due to the fact that she was not responding to me. Officer Bocook came down to the cell at approximately 1725 and opened the door for Nurse Mike. Mike entered the cell and rolled her over to find a substance that had come out of her mouth and her to be unresponsive.

Nurse Mike instructed the responding staff to move her out of the cell and apply oxygen and to place the defibrillator onto inmate Hills chest, no shock was advised so CPR was started. Officer Strege was the first to do CPR then Officer Hoschka then I took over for her and completed a round of chest compressions which lasted approximately a minute and a half, then I was revealed by nurse Mike.

Once the Fire Department and the ambulance crew were on scene they had Inmate Hill moved out by the phones in front of 2w22 were there was more room. Then they took over CPR and attempted to take care of her medical issues.

At one point inmate Hill was pronounced dead. Then one of the fire department personal found a heart beat, so they continued with her medical care and once they were ready they transported inmate hill to the hospital.

I was informed that Inmate Hill later passed away at the hospital.

End of report
Milholland 591263

Creating Officer: White, Justin L  Time: 08/25/2018 20:19  / Updating Officer: White, Justin L  Time: 08/25/2018 20:29

While working on 082518 at about 1725 hours, I was performing my normal duties as a shift sergeant. Officer Milholland called via the radio that he needed medical to come check an unresponsive female in 2W27. I asked over the radio if the inmate was breathing and Officer Milholland stated he wasn't sure. I instructed Officer N. Petrie to take the red bag up to 2W. I responded to 2W with Officers N. Petrie, Epley and Hoschka.

When I arrived on 2W I began heading to 2W27 where inmate Hill, Cindy L was housed. When I arrived, Hill was being brought out of the cell so chest compressions could be started. Officer Strege began chest compressions at the direction of Nurse Kallsen. I immediately called for a code ambulance and had Officers Epley and N. Petrie standing by for transport.

I instructed Officer Titchenal to go get magnets from the CRT closet and place them over the windows. I also notified Lt. Robison at 1732 hours of the incident. Officers Strege, Hoschka and Milholland rotated through CPR at the direction of Nurse Kallsen.

Spokane Fire Department and American Medical Response both arrived at about 1739 hours and took over life saving measures. SFD requested that Hill be moved from the hallway out to by the phones where there was more room to work. Once Hill was moved out of the hallway lifesaving measures were resumed.

Just before 1800 hours, SFD called Dr. Harris at Sacred Heart Medical Center and he pronounced Hill deceased at 1800 hours via the phone. I notified Lt. Robison of the situation and was about to notify county radio of the in-custody death when one of the fire fighters stated she felt a heartbeat again.

Lifesaving measures were restarted by SFD and AMR. The decision was made to transport Hill to the hospital. Hill was placed on a backboard and then on the stretcher. Hill was taken to the ambulance and transported to SHMC. I notified county radio that we would need them to investigate a potential death at the jail. I instructed the 2W officers to secure 2W27 and not open it until it was cleared by patrol or the detectives.

I received a call from Officer N. Petrie one of the transporting officers that Hill had been pronounced diseased at 1831 hours. I returned to my

*The Estate of Cindy Lou Hill, by and through its personal representative, Joseph A. Grube; and Cynthia Metsker, individually vs. Naphcare, Inc., et al.*

Case No. 2:20-cv-00410-RMP

Declaration of Hank Balson

Exhibit O

WEV PROVIDENCE REGIONAL MEDICAL CENTER EVERETT
1321 Colby Ave
Everett WA 98201-1665

Hill, Cindy Lou
MRN: 60002923644, DOB: ███████, Sex: F

## Patient Demographics

| Name | Patient ID | SSN | Legal Sex | Birth Date |
|------|-----------|-----|-----------|-----------|
| Hill, Cindy Lou | 60002923644 | xxx-xx-4696 | Female | ██████ (DECEASED) |

| Address | Phone | Email |
|---------|-------|-------|
| NEED ADDRESS SPOKANE WA 99201 | 509-869-9187 (W) 509-919-9653 (M) 509-919-9653 (H) | — |

| Reg Status | PCP | Date Last Verified | Next Review Date |
|-----------|-----|-------------------|------------------|
| ELAPSED | Todd Gottschalk, DO509-838-2531 | 08/25/18 | 11/23/18 |

## Admission Information

| | | | | |
|---|---|---|---|---|
| Arrival Date/Time: | 08/25/2018 1822 | Admit Date/Time: | 08/25/2018 1822 | IP Adm. Date/Time: |
| Admission Type: | Emergency | Point of Origin: | Non-healthcare Facility Point Of Orgin | Admit Category: |
| Means of Arrival: | Ambulance | Primary Service: | Emergency Medicine | Secondary Service: |
| Transfer Source: | | Service Area: | PHS WASHINGTON MONTANA | Unit: PROVIDENCE SACRED HEART MED CTR EMERGENCY CENTER |
| Admit Provider: | A B Harris, MD | Attending Provider: | A B Harris, MD | Referring Provider: |

## Account Information

| Hospital Account | Primary Payor | Affiliated Recurring Accounts | Combined from HAR |
|-----------------|---------------|-------------------------------|-------------------|
| 345001318164 - HILL,CINDY LOU | DEPARTMENT OF CORRECTIONS [1051] | None | None |

## Discharge Information

| Discharge Date/Time | Discharge Disposition | Discharge Destination | Discharge Provider | Unit |
|--------------------|----------------------|----------------------|-------------------|------|
| 08/25/2018 2056 | Expired | None | A B Harris, MD | PROVIDENCE SACRED HEART MED CTR EMERGENCY CENTER |

## Admission Diagnoses / Reasons for Visit (ICD-10-CM)

| Code | Description | Comments |
|------|-------------|----------|
| I46.9 | Cardiac arrest, cause unspecified (HCC) | |

## Allergies as of 8/25/2018

Review status set to Review Complete by Jeremy D Graham, DO on 8/25/2017

| | Noted | Reaction Type | Reactions |
|---|-------|---------------|-----------|
| Tetanus Toxoids | 10/10/2011 | | |
| Other reaction(s): Cough | | | |

## Immunizations Administered as of 8/25/2018

Never Reviewed

No immunizations on file.

## Medical as of 8/25/2018

### Past Medical History

| Diagnosis | Date | Comments | Source |
|-----------|------|----------|--------|
| Hernia | — | — | Provider |
| Hypertension | — | — | Provider |
| Reflux | — | — | Provider |
| Spastic colon | — | — | Provider |

## Problem List as of 8/25/2018

Date Reviewed: **8/25/2017**

| | Codes | Priority | Class | Noted - Resolved |
|---|-------|----------|-------|------------------|
| RESOLVED: Intractable nausea and vomiting | ICD-10-CM: R11.2 ICD-9-CM: 536.2 | | | 8/23/2017 - 8/25/2017 |
| **Tobacco abuse** | ICD-10-CM: Z72.0 | | | 8/23/2017 - Present |

Providence Regional Medical Center - Everett
1321 Colby Ave
Everett WA 98201-1665
Inpatient Record

Hill, Cindy Lou
MRN: 60002923644, DOB: ███████, Sex: F
Adm: 8/25/2018, D/C: 8/25/2018

**Problem List (continued)** as of 8/25/2018                                                    Date Reviewed: **8/25/2017**

|  | Codes | Priority | Class | Noted - Resolved |
|---|---|---|---|---|
|  | ICD-9-CM: 305.1 |  |  |  |
| RESOLVED: Acute encephalopathy- TOXIC METABOLIC DELIRIUM | ICD-10-CM: G93.40<br>ICD-9-CM: 348.30 |  |  | 8/23/2017 - 8/25/2017 |
| RESOLVED: Bandemia | ICD-10-CM: D72.825<br>ICD-9-CM: 288.66 |  |  | 8/24/2017 - 8/25/2017 |
| RESOLVED: Leukocytosis | ICD-10-CM: D72.829<br>ICD-9-CM: 288.60 |  |  | 8/24/2017 - 8/25/2017 |
| **Tobacco dependence** | ICD-10-CM: F17.200<br>ICD-9-CM: 305.1 |  |  | **8/24/2017 - Present** |
| RESOLVED: Sepsis (HCC) | ICD-10-CM: A41.9<br>ICD-9-CM: 038.9, 995.91 |  |  | 8/24/2017 - 8/25/2017 |
| RESOLVED: Elevated lactic acid level | ICD-10-CM: R79.89<br>ICD-9-CM: 276.2 |  |  | 8/24/2017 - 8/25/2017 |
| RESOLVED: Poisoning by methamphetamines | ICD-10-CM: T43.621A<br>ICD-9-CM: 969.72, E980.3 |  |  | 8/24/2017 - 8/25/2017 |

### ED Arrival Information

| Expected | Arrival | Acuity | Means of Arrival | Escorted By | Service | Admission Type |
|---|---|---|---|---|---|---|
| - | 8/25/2018 18:22 | - | Ambulance | EMS | Emergency Medicine | Emergency |
| **Arrival Complaint** |  |  |  |  |  |  |
| - |  |  |  |  |  |  |

### ED Events

| Date/Time | Event | User | Comments |
|---|---|---|---|
| 08/25/18 1822 | Patient arrived in ED | DAVIS, MELISSA L |  |
| 08/25/18 1822 | Patient roomed in ED | DAVIS, MELISSA L | To room ED01 |
| 08/25/18 1822 | Emergency encounter created | DAVIS, MELISSA L |  |
| 08/25/18 1823 | Triage Started | WRAY, ANDREA M |  |
| 08/25/18 1823 | Code Start | WRAY, ANDREA M |  |
| 08/25/18 1831 | Code End | WRAY, ANDREA M |  |
| 08/25/18 1838 | Assign Physician | HARRIS, A B |  |
| 08/25/18 1847 | Registration Completed | DAVIS, MELISSA L |  |
| 08/25/18 2056 | Patient discharged | WRAY, ANDREA M |  |
| 08/25/18 2056 | Patient departed from ED | WRAY, ANDREA M |  |

### Chief Complaint

| Complaint | Comment |
|---|---|
| Cardiac Arrest [160088] |  |

### ED Treatment Team

| Provider | Role | From | To | Phone | Pager |
|---|---|---|---|---|---|
| A B Harris, MD | Attending Provider | 08/25/18 1838 | -- | 509-474-3344 |  |
| A B Harris, MD | Admitting Provider | -- | -- | 509-474-3344 |  |

### Diagnosis

| Diagnosis | Comment |
|---|---|
| Cardiac arrest (HCC) |  |

### ED Notes

**ED Provider Notes by A B Harris, MD at 08/25/18 1838**

| Author: A B Harris, MD | Service: Emergency Medicine | Author Type: Physician |
|---|---|---|
| Filed: 08/26/18 0019 | Date of Service: 08/25/18 1838 | Creation Time: 08/25/18 1838 |
| Status: Signed | Editor: A B Harris, MD (Physician) |  |

### Providence Sacred Heart Medical Center
### Emergency Department

## CHIEF COMPLAINT
**Chief Complaint**
Patient presents with
- Cardiac Arrest

Providence Regional Medical Center - Everett
1321 Colby Ave
Everett WA 98201-1665
Inpatient Record

Hill, Cindy Lou
MRN: 60002923644, DOB: ▮▮▮▮▮▮▮ Sex: F
Adm: 8/25/2018, D/C: 8/25/2018

---

**ED Notes (continued)**

---

ED Provider Notes by A B Harris, MD at 08/25/18 1838 (continued)

---

### HPI
Cindy Lou Hill is a 55 y.o. female ED01/ED01 with a chief complaint of brought in by EMS in full cardiac arrest. I had received a phone call by EMS crew prior to the patient's arrival when she was at jail with cardiopulmonary arrest. There was an estimated 30 minutes of down time before their arrival with it was bystander CPR. At their arrival the initial rhythm was asystole. The patient was intubated with a gel intubation and intraosseous line was established and she was given IV fluids and a total of 4 rounds of epinephrine a dose of IV bicarb additionally her glucose was low in the 40s and she was given several doses of IV glucose and just prior to arrival glucose was up in the 200s. At the jail the patient developed PEA rhythm with no spontaneous movements and EMS crew had telephoned to me and the patient was pronounced. They stopped her efforts and the patient began to have some spontaneous respirations and CPR was restarted and she is transported here. They continued with fluids and check with the glucose was up. She stopped breathing on her own and they continued with CPR with PEA prior to arrival. Additionally once prior to arrival they defibrillated ventricular tachycardia. Other than the movement of respiration they haven't seen her move at all. She's been 48 hours at jail with Sea Mar protocol followed and there is no other history known on this patient by EMS crew.
She is brought to trauma room 1 with CPR in progress with symptoms rated as severe.

### PAST MEDICAL HISTORY
Past Medical History:

| Diagnosis | Date |
|---|---|
| • Hernia | |
| • Hypertension | |
| • Reflux | |
| • Spastic colon | |

### SURGICAL HISTORY
Past Surgical History:

| Procedure | Laterality | Date |
|---|---|---|
| • gallbladder removed | | |
| • HERNIA REPAIR | | |

### SOCIAL HISTORY
She presents from a jail where she reportedly had been for 48 hours with CIWA recall in place

### CURRENT MEDICATIONS
Current Facility-Administered Medications

| Medication | Dose | Route | Frequency | Provider | Last Rate | Last Dose |
|---|---|---|---|---|---|---|
| • dextrose 50% injection | | | | | | |

No current outpatient prescriptions on file.

### ALLERGIES
Allergies

| Allergen | Reactions |
|---|---|
| • Tetanus Toxoids | |

---

Printed on 8/13/20  8:54 AM

*The Estate of Cindy Lou Hill, by and through its personal representative, Joseph A. Grube; and Cynthia Metsker, individually vs. Naphcare, Inc., et al.*

Case No. 2:20-cv-00410-RMP

Declaration of Hank Balson

Exhibit P

                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF WASHINGTON


THE ESTATE OF CINDY LOU HILL, by      )
and through its personal              )
representative, Joseph A. Grube;      )
and CINDY METSKER, individually,      )
                                      ) No. 2:20-cv-00410-RMP
               Plaintiffs,            )
                                      )
          vs.                         )
                                      )
NAPHCARE, INC., an Alabama            )
corporation; HANNAH GUBITZ,           )
individually; and SPOKANE COUNTY,     )
a political subdivision of the        )
State of Washington,                  )
                                      )
               Defendants.            )


        VIDEOCONFERENCE DEPOSITION OF TREN C. BYINGTON

                        May 12, 2021


               Taken Remotely via Zoom















          Reporter:  Barbara Castrow, CCR, RMR, CRR



1       the state of Washington?

2  A    Yes.

3  Q    At the academy, did you learn that the medical care of

4       inmates, including medical assessment or evaluation of

5       inmates, was a matter for medical professionals and not

6       for corrections officers?

7  A    Yes.

8  Q    And when it came to policies and procedures that were

9       specific to the Spokane County Jail, I take it that that

10      was not something that they taught you at the academy,

11      correct?

12 A    Can you explain the question?

13 Q    Yes.

14          In terms of policies or procedures that were

15      specific to the Spokane County Jail in particular, I take

16      it that that was something that was not taught to you at

17      the academy in Burien?

18 A    Yes.

19 Q    Okay.  And I take it that the academy in Burien did not

20      teach you anything about the policies, procedures or

21      protocols relating to medical monitoring of inmates in

22      the Spokane County Jail, correct?

23 A    Correct.

24 Q    And so to the extent that you had any training or that

25      there were any policies or procedures or protocols

1      relevant to medical watch of inmates at the Spokane

2      County Jail, that was something that you relied on

3      Spokane County to teach you, correct?

4    A   Correct.

5    Q   When it came to monitoring of inmates who were confined

6      in the 2 West cells for medical watch, did you receive

7      any medical-related training from Spokane County or

8      through Spokane County in order to enable you to monitor

9      inmates confined to 2 West for medical watch?

10   A   No.

11   Q   Did you -- do you remember how the general procedure

12     worked that you personally worked following for

13     conducting medical watch when you were working in 2 West?

14   A   Yes.

15   Q   What was your general procedure when it came to inmates

16     who were subject to 30-minute medical watch in 2 West?

17   A   Every 30 minutes, you would go to the cell, look at the

18     sheet that's on the outside of the cell.  There are

19     certain items that medical would have selected if they

20     were looking for anything specific.  At the top of the

21     watch sheet is where those items are.

22         So medical would circle if they are looking for

23     anything specific.  If there's nothing marked on there,

24     then all they want is an observation of what the inmate

25     is doing as far as sleeping, laying down, awake, doing

1       exercises or anything like that.

2             You would mark down what you see, write down the

3       time and your number and move on with your round.

4    Q  Would you agree that when it came to medical watch, that

5       the usual custom at the jail was that non medically

6       trained corrections officers like yourself were not

7       actually doing any medical observations?

8                         MR. JUSTICE:  Object to the form.

9          Go ahead.

10                        THE WITNESS:  There weren't medical

11      observations, no.

12   Q  (By Mr. Budge)  Okay.  The COs during their 30-minute

13      checks were not checking vital signs, right?

14   A  Correct.

15   Q  You were not checking an inmate's pulse, temperature,

16      respiration, 02 sat, anything like that, right?

17   A  Correct.

18   Q  You would not as a matter of your job feel the inmate's

19      skin or do any type of hands-on medical assessment,

20      correct?

21         Correct?

22   A  Correct.

23   Q  Okay.  You would not check for pupil size such as unequal

24      pupils, correct?

25   A  Correct.

1   Q   Was there any requirement that you spend a specific

2       period of time looking through the window?

3   **A   Long enough to see if there's any signs of distress.**

4   **    That's not specific to any medical watches.   That's**

5   **    normal rules for every round.**

6   Q   No matter where the inmate is in the whole jail.

7           In fact, was it the case at the Spokane County Jail

8       that every single inmate in the jail, whether they were

9       on medical watch or not, was subject to a 30-minute

10      check?

11  **A   Yes.**

12  Q   As a matter of custom, when you did your 30-minute checks

13      for inmates on medical watch, would you open the door or

14      would the door remain closed?

15  **A   It would remain closed.**

16  Q   And as a matter of custom, when you did your 30-minute

17      checks for inmates who were on medical watch, can you

18      give me your best estimate about how long you would gaze

19      through the window at the inmate?

20  **A   Somewhere between 5 and 10 seconds most likely.**

21  Q   Officer Byington, help me out with this question:   How

22      was the process any different when it came to 30-minute

23      checks of inmates on medical watch versus any other

24      inmate in the jail?

25                      MR. JUSTICE:   Object to the form.

 1           Go ahead.
 2                         THE WITNESS:  The only difference
 3      would be to observe what the inmate is doing and write it
 4      down.
 5   Q  (By Mr. Budge)  Asleep or awake, would that be
 6      sufficient?
 7   A  Generally, yes.
 8   Q  So other than writing down whether an inmate was asleep
 9      or awake, was there any difference in the way that
10      inmates on medical watch were checked versus inmates in
11      any other part of the jail?
12                         MR. JUSTICE:  Object to the form;
13      asked and answered.
14           Go ahead.
15                         THE WITNESS:  Can you repeat the
16      question again?
17   Q  (By Mr. Budge)  Other than writing down on the form
18      whether the inmate was asleep or awake, was there any
19      difference with regard to watching inmates designated for
20      medical watch than watching inmates in any other part of
21      the jail?
22   A  No.
23   Q  So what was medical watch?  What was medical about it?
24                         MR. JUSTICE:  Object to the form;
25      argumentative.

1   Q   Headache?

2   A   **Correct.**

3   Q   Facial droop?

4   A   **Correct.**

5   Q   Weakness?

6   A   **Correct.**

7   Q   Vomiting or nausea?

8   A   **Correct.**

9   Q   Or any other thing that is listed on this form, correct?

10  A   **Correct.**

11  Q   And you were not expected to do any of those things,

12      correct?

13  A   **Correct.**

14  Q   You weren't trained to do any of those things, correct?

15  A   **Correct.**

16  Q   And it wasn't the usual custom that you would do any of

17      those things, correct?

18  A   **Correct.**

19  Q   So your only indication after looking through the cell

20      for probably 5 to 10 seconds was that Cindy Hill was

21      sleeping; is that right?

22  A   **Correct.**

23  Q   How do you know she was sleeping and not passed out or in

24      a coma?

25  A   **I guess I wouldn't.**

THE ESTATE OF CINDY LOU HILL vs NAPHCARE
Byington, Tren - May 12, 2021                                                    Page 38

 1  Q    Do you know whether she was lying on the floor or lying

 2       on a mat?

 3  A    I do not recall.

 4  Q    Do you recall anything about her height, weight, hair

 5       color?

 6  A    I do not recall.

 7  Q    Do you recall anything about whether her clothes were on

 8       or off or partially on or off?

 9  A    I do not recall.

10  Q    Is it fair to say that although this is called a Medical

11       Watch form, that at 12:40 p.m., consistent with the usual

12       custom, you did not actually watch her medically?

13                      MR. JUSTICE:  Object to the form.

14          Go ahead.

15                      THE WITNESS:  That is correct.

16  Q    (By Mr. Budge)  And the same thing at 1:10 p.m., you did

17       not actually watch her medically, correct?

18                      MR. JUSTICE:  Same objection.

19          Go ahead.

20                      THE WITNESS:  Correct.

21  Q    (By Mr. Budge)  In fact, the usual custom was that the

22       corrections officers would not actually watch the inmates

23       medically?

24                      MR. JUSTICE:  Object to the form.

25          Go ahead.

THE ESTATE OF CINDY LOU HILL vs NAPHCARE
Byington, Tren - May 12, 2021                                                   Page 39

1                     THE WITNESS:  Correct.

2    Q   (By Mr. Budge)  Do you know anything about Cindy Hill's

3        actual condition as of 1310, that is 1:10 p.m., other

4        than that you indicated she was sleeping?

5    A   No, I do not.

6    Q   Okay.  Do you know whether at 1310, that is 1:10 p.m.,

7        she was actually sleeping as opposed to being unconscious

8        for other reasons?

9    A   No, I do not.

10   Q   And would it be your best estimate that at 1:10 p.m.,

11       like at 12:40 p.m., that you probably looked into her

12       cell for 5 to 10 seconds?

13   A   Correct.

14   Q   Again, just for the record, without opening the door,

15       right?

16   A   Correct.

17   Q   And without checking on anything other than to check that

18       she was alive?

19   A   Correct.

20   Q   And was that basically what was happening with regard to

21       medical watches, that you were looking to see if the

22       inmate was alive, and if the inmate appeared to be alive,

23       then you would move on?

24   A   Correct.

25                     MR. JUSTICE:  Ed, is there a good

```
 1      not actually awake at 12:40 p.m. and 1:10 p.m.?
 2  A   Because she was laying on the bed and appeared to be
 3      asleep.
 4  Q   Are you sure she was laying on the bed and not laying on
 5      the floor?
 6  A   I am fairly sure.  I would normally write down if she was
 7      on the floor as opposed to the bed.
 8                          (Lauren Williams enters.)
 9  Q   (By Mr. Budge)  You don't actually know if she was on the
10      floor or on the bed, right?
11  A   No.
12  Q   And when you say that Cindy Hill was laying down, how did
13      you know that she wasn't laying down with her eyes closed
14      and appeared to be asleep but was actually awake?
15  A   I did not.
16  Q   Other than looking at her for 5 to 10 seconds and seeing
17      that she was in a laying position, did you do anything to
18      confirm that she was asleep rather than awake, like, try
19      and get her attention somehow?
20  A   I did not.
21  Q   When an inmate was placed on medical watch, would you
22      know why the inmate was placed on medical watch?
23  A   Not normally.
24  Q   Do you know why Cindy Hill was placed on medical watch?
25  A   No.
```

THE ESTATE OF CINDY LOU HILL vs NAPHCARE
Byington, Tren - May 12, 2021                                                                Page 42

1   Q   Was it the usual custom at the jail that when an inmate

2       was placed on medical watch, the corrections officers

3       would not know why?

4   A   **Normally, no.  Or, sorry, normally, yes.**

5   Q   Normally you would not know why?

6   A   **Yes.**

7   Q   Was it the usual custom at the jail that when an inmate

8       was placed on medical watch, you would not normally know

9       anything about their condition?

10  A   **Unless medical marked one of the options up at the top,**

11      **we would not.**

12  Q   And so in a case like this where no option was marked,

13      you would not have any reason to note anything about that

14      inmate's condition, correct?

15  A   **Correct.**

16  Q   And you would not have been told by any medical person

17      what specific signs to watch for?

18  A   **No.**

19  Q   How would you know what to watch for?

20  A   **If they would mark something on the paper.**

21  Q   And if they didn't mark something on the paper?

22  A   **There would not be anything specific to watch for.**

23  Q   Was there any specific type of observation that you were

24      obligated to report to medical?

25  A   **Nothing special with the medical watch.**

1   Q   Was there anything specific that you were ever trained

2       about as to what constituted a sign of distress?

3   A   **No, nothing specific.**

4   Q   Was there any type of system in place for monitoring

5       whether inmates were eating or drinking?

6   A   **Yes.**

7   Q   What was that?

8   A   **If medical is concerned about somebody eating or**

9       **drinking, there's a food log they would have us fill out**

10      **that we are required to mark down and observe how much of**

11      **each meal they ate, if any.**

12  Q   And in the absence of a food log, was there any system in

13      place for tracking whether an inmate was eating or

14      drinking?

15  A   **No.**

16  Q   Other than the two entries that you wrote on the form

17      that we have marked as Exhibit No. 1 at 12:40 and 1:10

18      p.m., did you write any other report or document of any

19      kind having to do with Cindy Hill?

20  A   **No.**

21  Q   And other than correspondence that might have occurred as

22      a result of this case, like, with a lawyer, have you ever

23      emailed with anybody about Cindy Hill?

24  A   **No.**

25  Q   Have you ever spoken with anybody about Cindy Hill other

THE ESTATE OF CINDY LOU HILL vs NAPHCARE
Byington, Tren - May 12, 2021                                                    Page 49

```
 1   STATE OF WASHINGTON )     I, Barbara Castrow, CCR, RMR, CRR
                         ) ss a certified court reporter
 2   County of King      )     in the State of Washington, do
                               hereby certify:
 3

 4
          That the foregoing deposition of TREN C. BYINGTON was
 5   taken before me and completed on May 12, 2021, and
     thereafter was transcribed under my direction; that the
 6   deposition is a full, true and complete transcript of the
     testimony of said witness, including all questions, answers,
 7   objections, motions and exceptions;
 8        That the witness, before examination, was by me duly
     sworn to testify the truth, the whole truth, and nothing but
 9   the truth, and that the witness reserved the right of
     signature;
10
          That I am not a relative, employee, attorney or counsel
11   of any party to this action or relative or employee of any
     such attorney or counsel and that I am not financially
12   interested in the said action or the outcome thereof;

13        That I am herewith securely sealing the said deposition
     and promptly delivering the same to Edwin S. Budge.
14
          IN WITNESS WHEREOF, I have hereunto set my signature on
15   this 14th day of May, 2021.

16

17

18

19                        _____
20                        Barbara Castrow, CCR, RMR, CRR
                          Certified Court Reporter No. 2395
21                        (Certification expires 11/24/21.)

22

23

24

25
```

*The Estate of Cindy Lou Hill, by and through its personal representative, Joseph A. Grube; and Cynthia Metsker, individually vs. Naphcare, Inc., et al.*

Case No. 2:20-cv-00410-RMP

Declaration of Hank Balson

Exhibit Q

```
 1
 2                  UNITED STATES DISTRICT COURT
 3                  EASTERN DISTRICT OF WASHINGTON
 4
 5   THE ESTATE OF CINDY LOU HILL, by      )
     and through its personal             )
 6   representative, Joseph A. Grube;     )
     and CINDY METSKER, individually,     )
 7                                        ) No. 2:20-cv-00410-RMP
                          Plaintiffs,     )
 8                                        )
                     vs.                  )
 9                                        )
     NAPHCARE, INC., an Alabama           )
10   corporation; HANNAH GUBITZ,          )
     individually; and SPOKANE COUNTY,    )
11   a political subdivision of the       )
     State of Washington,                 )
12                                        )
                          Defendants.     )
13
14          VIDEOTAPED DEPOSITION OF MATTHEW MILHOLLAND
15                         May 11, 2021
16                      Via Videoconference
17
18
19
20
21
22
23
24
25   REPORTED BY:  Valerie L. Torgerson, CCR, RPR
                    License No. 2036
```

253.627.6401                                        schedule@balitigation.com

B&A LITIGATION SERVICES

```
 1   A    If I did, it was a long time ago.

 2   Q    So you don't remember?

 3   A    I don't remember.

 4   Q    As part of your usual custom and routine, when monitoring

 5        inmates who are on medical watch, did you require that

 6        the inmates stand and present themselves at the cell?

 7   A    No.

 8   Q    Did you require that they answer any specific questions

 9        about any particular checklist of potential symptoms that

10        they might be experiencing?

11   A    No.

12   Q    Were you trained about what specifically to look for in

13        terms of medical distress?

14   A    No.  I simply look for signs of life, and if they are

15        in --

16   Q    What --

17   A    -- I would expect them to tell me that.

18                              (Cross-talk.)

19   Q    (By Mr. Budge)  When you look for signs of life, what if

20        the inmate was sleeping?  What would you do?

21   A    Make sure that there's a rise and fall in the chest; that

22        they've been switching positions between rounds, if at

23        all possible; they're not in an -- you know, an awkward

24        posture; they're not turning blue; anything that would

25        raise some kind of an alarm.
```

1   when you were looking at an inmate who was on medical

2   watch?

3  A   No.

4  Q   Were you required to open the door?

5  A   No.

6  Q   What was your ordinary practice, look through the window

7   or open the door?

8  A   **Look through the window.**

9  Q   And how long would you spend ordinarily looking through

10   the window at an inmate who was on medical watch?

11  A   **Just briefly enough to see if they're in distress or, you**

12   **know, to make a notation of what they're doing.  If they**

13   **appear to be asleep, you mark that they appear to be**

14   **asleep.  If they're reading a book, you mark that they're**

15   **reading a book.**

16  Q   So let me see if I have this straight.  Basically, the

17   idea was that every 30 minutes, if the inmate was on a

18   30-minute medical watch, a corrections officer would come

19   through the section of the jail, look inside, look for

20   signs of life, make a notation on the form as to whether

21   they were asleep or awake, and then move on to the next

22   cell?

23  A   **Right.  I mean, you would make a notation as to what the**

24   **individual inside that cell is doing, so whether it's**

25   **awake, asleep, reading a book, using the bathroom, just**

```
 1        standing there, talking to themselves, whatever it may

 2        be.

 3   Q    Okay.  But there wouldn't be any actual medical

 4        assessment by you; correct?

 5   A    No.

 6   Q    No, I am correct?

 7   A    No, I would not medically assess them, so you are

 8        correct.

 9   Q    All right.  And I take it if you'd been trained to do it

10        any other way that you would have done it; correct?

11   A    Correct.

12   Q    Now, on August 25th, 2018, I take it that you did not

13        actually have specific responsibility for watching Cindy

14        Hill; is that correct?

15   A    Not on day shift.  On swing shift I was working the

16        second floor, so I would have just come on shift and just

17        begun to do rounds and things of that nature.

18   Q    What time would you have begun working on 2 West?

19   A    Between 3:40 and 4:00, probably.

20   Q    I'm going to show you Exhibit 4 to your deposition.

21            Can you see that?

22   A    Yes, medical watch form.

23   Q    Yeah.  This is the medical watch form for Cindy Hill.

24   A    Okay.

25   Q    You can see that it was initiated on the morning of
```

```
 1         Go ahead.
 2   A   It will be brief.
 3   Q   (By Mr. Budge)   Five seconds perhaps?
 4   A   Or less.
 5   Q   And you would not have asked her any medically-oriented
 6       questions; correct?
 7   A   No.
 8   Q   And you would not have checked her medically in any way,
 9       shape, or form; correct?
10   A   Shouldn't have, no.
11   Q   You would have simply seen that she was alive and that
12       she appeared to be sleeping, written down "S" on the
13       form, and then moved on?
14   A   Correct.
15   Q   And that would have been consistent with the normal and
16       customary way that things were done at the jail in terms
17       of medical watch?
18   A   Yes.
19   Q   And how did you know Ms. Hill was sleeping at 1:58 p.m.?
20                   MR. JUSTICE:   Object to the form.
21         Go ahead.
22   A   I guess it would be better "appeared to be sleeping," but
23       she more than likely appeared to be sleeping.
24   Q   (By Mr. Budge)   How did you know that she wasn't
25       unconscious or in a coma?
```

```
 1                      MR. JUSTICE:  Object to the form.
 2           Go ahead.
 3   A   I guess I didn't.
 4   Q   (By Mr. Budge)  Do you know whether she was on the floor
 5       or on the bunk?
 6   A   I have no recollection.
 7   Q   Do you know whether she was on a mat or rather on the
 8       bare concrete floor?
 9   A   I have no recollection of doing that round, so I can't
10       answer that.
11   Q   Okay.  Can you answer any questions for me about her
12       height, her weight, her hair color, anything like that?
13   A   I want to say she had dark hair, but I don't really
14       remember.  It was a long time ago.
15   Q   Can you answer any questions for me about whether she had
16       her jail-issued uniform on, off, or partially on,
17       partially off?
18   A   When I did that round, or at what point --
19   Q   Yes, when you did that round.
20   A   I have no idea.
21   Q   Do you have any idea what her medical condition was at
22       1:58 p.m.?
23   A   No.
24   Q   Do you know why there are no entries on this form that
25       shows that anybody checked on Ms. Hill between -- well, I
```

```
1    STATE OF WASHINGTON )    I, Valerie L. Torgerson, CCR, RPR,
                         ) ss a certified court reporter
2    County of Pierce    )    in the State of Washington, do
                              hereby certify:
3

4
          That the foregoing deposition of MATTHEW MILHOLLAND was
5    taken before me and completed on May 11, 2021, and
     thereafter was transcribed under my direction; that the
6    deposition is a full, true and complete transcript of the
     testimony of said witness, including all questions, answers,
7    objections, motions and exceptions;
8         That the witness, before examination, was by me duly
     sworn to testify the truth, the whole truth, and nothing but
9    the truth, and that the witness reserved the right of
     signature;
10
          That I am not a relative, employee, attorney or counsel
11   of any party to this action or relative or employee of any
     such attorney or counsel and that I am not financially
12   interested in the said action or the outcome thereof;

13        That I am herewith securely sealing the said deposition
     and promptly delivering the same to Edwin S. Budge.
14
          IN WITNESS WHEREOF, I have hereunto set my signature on
15   the 12th day of May 2021.

16

17

18

19                        _____
                          Valerie L. Torgerson, CCR, RPR
20                        Certified Court Reporter No. 2036
                          (Certification expires 09/3/21.)
21

22

23

24

25
```

*The Estate of Cindy Lou Hill, by and through its personal representative, Joseph A. Grube; and Cynthia Metsker, individually vs. Naphcare, Inc., et al.*

Case No. 2:20-cv-00410-RMP

Declaration of Hank Balson

Exhibit R

```
 1
 2                    UNITED STATES DISTRICT COURT
 3                    EASTERN DISTRICT OF WASHINGTON
 4
 5  THE ESTATE OF CINDY LOU HILL, by      )
    and through its personal             )
 6  representative, Joseph A. Grube;     )
    and CINDY METSKER, individually,     )
 7                                        ) No. 2:20-cv-00410-RMP
                         Plaintiffs,      )
 8                                        )
                   vs.                    )
 9                                        )
    NAPHCARE, INC., an Alabama           )
10  corporation; HANNAH GUBITZ,          )
    individually; and SPOKANE COUNTY,    )
11  a political subdivision of the       )
    State of Washington,                 )
12                                        )
                         Defendants.      )
13

14             VIDEOTAPED DEPOSITION OF JESSICA J. WIRTH

15                          May 11, 2021

16                        Via Videoconference

17

18

19

20

21

22

23

24

25  REPORTED BY:  Valerie L. Torgerson, CCR, RPR
                  License No. 2036
```

1  Q   (By Mr. Budge)  What is different about checking an

2      inmate on medical watch in 2 West from checking an inmate

3      at any other location in the jail, in terms of the

4      policies or the procedures at the jail?

5  A   So every 30 minute-wise, there is no difference.  I

6      believe that when somebody is placed on a medical watch

7      or any type of watch, for that matter, it's just -- it's

8      associated with paperwork to make sure that, yes, they're

9      being monitored, but as far as, like you asked, everybody

10     gets checked every 30 minutes.

11         Sometimes our medical watches, for whatever

12     different reasons, are -- they can be down to 15 minutes

13     if the risk is a little bit more substantial as to where

14     30 minutes isn't enough; it needs to be every 15 minutes.

15 Q   So if an inmate is placed on a 30-minute medical watch,

16     and they're up in 2 West, the idea is that some

17     corrections officers will -- some correction officer will

18     go through at least every 30 minutes and look inside the

19     cell; is that right?

20 A   Correct.

21         And 2 West is also a two-officer post, so I -- in my

22     opinion, if there's two officers there and somebody's on

23     a medical watch, better response if there needs to be a

24     response.

25 Q   But in terms of the frequency with which an inmate is

```
 1       training in order to allow you to do any medical
 2       monitoring of inmates confined in these cells?
 3   A   No.
 4                        MR. JUSTICE:  Object to the form.
 5           Go ahead.
 6   Q   (By Mr. Budge)  The answer is no?
 7   A   Correct.  It's no.
 8   Q   Did you or the other corrections officers, to your
 9       knowledge, receive any type of training specifically
10       associated with the observation of inmates who had been
11       placed in these cells for medical watch?
12   A   Outside of basic CPR and medical training, no.
13   Q   Did you ever get any training or was there any
14       instruction or requirement that when monitoring inmates
15       in these cells that you observe their pupils?
16   A   No.
17   Q   That you observe their body in terms of assessing for
18       facial droop?
19   A   No.
20   Q   That you monitor their rate of respiration, either
21       visually or otherwise?
22   A   No.
23   Q   That you ask them any specific questions about their
24       medical symptoms?
25   A   No.
```

1    Q    Were you trained or was there any protocol and

2         requirement that you, in looking at these inmates who are

3         on medical watch, assess them for any signs or symptoms

4         that might be associated with medical problems via any

5         form of a checklist, whether it was a written checklist

6         or a mental checklist?

7    A    No.

8    Q    Was there ever any training that -- or was there a

9         requirement or a policy or a protocol that required that

10        you establish some form of verbal contact with them every

11        time you saw them during one of these 30-minute checks?

12   A    No.

13   Q    Were you trained in any way about what specifically you

14        were looking to see when you looked in on the inmates?

15   A    **Just signs of life: breathing, rise and fall of the**

16        **chest.**

17   Q    And the door would not be open; correct?

18   A    **Correct.**

19   Q    And so were you trained that you should observe the

20        inmate for any particular period of time; like, for

21        example, if you stopped at the window, you had to look in

22        for at least X number of seconds or minutes?

23   A    **No.**

24   Q    When you would look in on an inmate who was in one of

25        these cells through the narrow window, did you have a set

 1 | period of time that you gazed into the window?

 2 | A | I can't say a set period of time, but just to make sure I

 3 | observed those signs of life.

 4 | Q | What was -- what was typical in terms of how long you

 5 | would look in?

 6 | A | I would say two to three seconds.

 7 | Q | And if you saw signs of life, then you'd move on?

 8 | A | Correct.

 9 | Q | And was this customary, as far as you know?

10 | A | As far as I know.

11 | Q | And in all of the other -- in all of the time that you'd

12 | been working at the Spokane County Jail and even up until

13 | now, has it always been this way?

14 | A | Yes, it has.

15 | Q | So would you agree that when it came to inmates who were

16 | put on medical watch that the usual custom of the jail

17 | was that nonmedically trained corrections officers,

18 | including yourself, would look in for signs of life, but

19 | other than that, you weren't actually doing any medical

20 | monitoring?

21 |                     MR. JUSTICE:  Object to the form.

22 | A | I would agree with that.

23 |                     MR. JUSTICE:  Go ahead.

24 | A | That's correct.

25 | Q | (By Mr. Budge)  Was there any expectation or requirement

1    A    So I know in my personal experiences working as a

2         corrections officer in the short six years that I've been

3         here, when I do my general observations of any inmate,

4         specifically inmates that are on watches, if I visibly

5         see somebody that's in distress or looks like they're not

6         feeling good, vomiting, you know, if they have general

7         complaints, I do make it a point to call our nursing

8         staff and say, "Hey, this inmate specifically is

9         complaining of this," or, you know, "I visibly saw them

10        vomiting," or -- and that just comes -- although I'm not

11        trained, anything that seems outside of the ordinary, I

12        always make sure I report it, and I would like to believe

13        that other officers do the same.

14   Q    (By Mr. Budge)  I guess what I'm saying is, when I see

15        this section of the form, "Examples of Important Changes

16        to Report," it was not standard practice when the

17        corrections officers looked inside these cells that they

18        would actually go through this list and --

19   A    No.

20   Q    There was no standard procedure to say, "Hey, how is your

21        abdominal pain now compared to what it was before?  Is it

22        worsening abdominal pain?"

23   A    That is correct.  We do not do that.

24   Q    There was no procedure to say, "Hey, do you have chest

25        pain?  And if so, how is it now compared to what it was

1    before?"  "Worsening chest pain"?

2  A  **That is correct.  We do not do that.**

3  Q  There was no procedure or custom to actually say, "Hey,

4     do you have a headache?  And if so, how bad is it?"

5     "Severe headache"?

6  A  **No, there is not.**

7  Q  And similarly, you were not, as a matter of custom or

8     practice, actually assessing the person for these other

9     things: difficulty breathing, seizure-like activity,

10    facial droop, unsteady while walking, changes in speech,

11    unequal pupil size, unable to answer simple questions,

12    nausea, vomiting, difficulty waking; correct?

13  A  **That is correct.**

14                    MR. JUSTICE:  Object to the form.

15         Go ahead.

16  Q  (By Mr. Budge)  And in fact, with regard to difficulty

17    waking, if they were asleep, you just let them continue

18    to sleep; right?

19  A  **Unless it was a meal period, and then we have to make**

20    **sure they wake up.**

21  Q  Okay.  And so focusing on training, what specifically, if

22    anything, were you actually trained to do when it came to

23    looking at inmates who were placed on medical watch, or

24    was there any training?

25                    MR. JUSTICE:  Object to the form.

```
1   STATE OF WASHINGTON )     I, Valerie L. Torgerson, CCR, RPR,
                        ) ss a certified court reporter
2   County of Pierce    )     in the State of Washington, do
                              hereby certify:

3

4
         That the foregoing deposition of JESSICA J. WIRTH was
5   taken before me and completed on May 11, 2021, and
    thereafter was transcribed under my direction; that the
6   deposition is a full, true and complete transcript of the
    testimony of said witness, including all questions, answers,
7   objections, motions and exceptions;

8        That the witness, before examination, was by me duly
    sworn to testify the truth, the whole truth, and nothing but
9   the truth, and that the witness reserved the right of
    signature;

10
         That I am not a relative, employee, attorney or counsel
11  of any party to this action or relative or employee of any
    such attorney or counsel and that I am not financially
12  interested in the said action or the outcome thereof;

13       That I am herewith securely sealing the said deposition
    and promptly delivering the same to Edwin S. Budge.
14
         IN WITNESS WHEREOF, I have hereunto set my signature on
15  the 12th day of May 2021.

16

17

18

19  _____
    Valerie L. Torgerson, CCR, RPR
20  Certified Court Reporter No. 2036
    (Certification expires 09/3/21.)
21

22

23

24

25
```

*The Estate of Cindy Lou Hill, by and through its personal representative, Joseph A. Grube; and Cynthia Metsker, individually vs. Naphcare, Inc., et al.*

Case No. 2:20-cv-00410-RMP

Declaration of Hank Balson

Exhibit S

1
2                    UNITED STATES DISTRICT COURT
3                    EASTERN DISTRICT OF WASHINGTON
4
5    THE ESTATE OF CINDY LOU HILL, by      )
     and through its personal             )
6    representative, Joseph A. Grube;     )
     and CINDY METSKER, individually,     )
7                                         ) No. 2:20-cv-00410-RMP
                        Plaintiffs,       )
8                                         )
                        vs.               )
9                                         )
     NAPHCARE, INC., an Alabama           )
10   corporation; HANNAH GUBITZ,          )
     individually; and SPOKANE COUNTY,    )
11   a political subdivision of the       )
     State of Washington,                 )
12                                        )
                        Defendants.       )
13

14            VIDEOTAPED DEPOSITION OF TRAVIS TITCHENAL

15                         May 11, 2021

16                       Via Videoconference

17

18

19

20

21

22

23

24

25   REPORTED BY:  Valerie L. Torgerson, CCR, RPR
                   License No. 2036

THE ESTATE OF CINDY LOU HILL vs NAPHCARE
Titchenal, Travis - May 11, 2021                                                    Page 47

 1  A   Correct.

 2  Q   And when it came to the procedures and protocols that

 3      were specific to the Spokane County Jail, that was not

 4      something that was taught at the academy in Burien;

 5      correct?

 6  A   Correct.

 7  Q   And so I take it that the state academy did not teach you

 8      anything specific about policies or procedures or

 9      protocols relating to medical monitoring of Spokane

10      County Jail inmates being held in 2 West; correct?

11  A   Correct.

12  Q   So with regard to the subject of corrections officers'

13      duties at the Spokane County Jail, when it came to

14      inmates who had been placed on medical watch in 2 West,

15      whose job was it to medically monitor the inmates?  Was

16      that the job --

17                      MR. JUSTICE:  Object to the form.

18          Sorry.  Go ahead.

19  Q   (By Mr. Budge)  Was that the job of the corrections

20      officers or the job of the jail nurses?

21  A   Jail nurses.

22                      MR. JUSTICE:  Object to the form.

23          Go ahead.  Sorry.

24                      THE WITNESS:  Sorry.  Jail nurses.

25                      MR. JUSTICE:  Al right.  Object to the

```
 1        form.  The question's been answered, so go ahead.  Next

 2        question.

 3   Q    (By Mr. Budge)  All right.  The answer, just so we have a

 4        clear video record, is that it was the job of the jail

 5        nurses to medically watch the inmates; correct?

 6   A    Correct.

 7   Q    All right.  Was it one of the duties of the corrections

 8        officers at the Spokane County Jail to medically monitor

 9        or medically observe sick inmates confined in 2 West?

10                        MR. JUSTICE:  Object to the form.

11           Go ahead.

12   A    We observed the inmates and documented it as such for

13        medical.

14   Q    (By Mr. Budge)  All right.  But you and the other

15        corrections officers, to your knowledge, did not receive

16        any medical-related training in order to enable you to

17        monitor inmates confined in 2 West on medical watch;

18        correct?

19   A    Correct.

20   Q    And you and the other corrections officers didn't receive

21        any training specifically associated with how to

22        medically observe inmates who had been placed on medical

23        watch; correct?

24                        MR. JUSTICE:  Object to the form.

25           Go ahead.
```

1    A    Correct.

2    Q    (By Mr. Budge)  And what I mean by that is you were not

3         trained or expected to perform any actual medical

4         monitoring of any of the inmates who were confined in

5         these cells; right?

6    A    Correct.

7    Q    When you would go through the hallway where these cells

8         were located, were you trained to ask any particular

9         question of the inmates inside the cells, for example, to

10        establish the presence or the absence of any particular

11        symptoms?

12   A    No.

13   Q    Were you trained what to look for in terms of medical

14        symptoms or distress?

15   A    No.

16   Q    Were you trained that you should open the cell door every

17        time you stop by the person's cell or on some other

18        regular basis?

19   A    No.

20   Q    Were you trained to make any specific type of visual

21        assessment of the inmate's condition?

22   A    No.

23   Q    Were you trained to take any type of actual medical

24        evaluation of the inmates inside these cells?

25   A    No.

 1  Q   Okay.  Anything she said?  Anything you said?

 2  A   No.

 3  Q   So no recollection of anything regarding Cindy Hill's

 4      appearance or behavior or position at 11:23 a.m.;

 5      correct?

 6  A   Correct.

 7  Q   You used an "S" at 11:23 a.m. to indicate that Ms. Hill

 8      was asleep; is that right?

 9  A   Correct.

10  Q   And again, without speculating or guessing -- and if you

11      don't know or remember, just say so -- how did you know

12      she was asleep?

13  A   I don't recall, but typically I would watch for the

14      rise -- to make sure that she's breathing from distance

15      of the window to her lying down or wherever she was

16      positioned.

17  Q   How did you know or how would you know that she wasn't

18      passed out, in a coma, or unconscious but not asleep in

19      the normal sense?

20  A   I wouldn't know.

21  Q   And is that the case generally at the jail, that you

22      really would not ever know if an inmate is asleep as

23      opposed to being passed out or in a coma or unconscious

24      as part of your normal 30-minute watches?

25  A   Correct.

```
 1   STATE OF WASHINGTON )     I, Valerie L. Torgerson, CCR, RPR,
                         ) ss a certified court reporter
 2   County of Pierce    )     in the State of Washington, do
                               hereby certify:

 3

 4
          That the foregoing deposition of TRAVIS TITCHENAL was
 5   taken before me and completed on May 11, 2021, and
     thereafter was transcribed under my direction; that the
 6   deposition is a full, true and complete transcript of the
     testimony of said witness, including all questions, answers,
 7   objections, motions and exceptions;
 8        That the witness, before examination, was by me duly
     sworn to testify the truth, the whole truth, and nothing but
 9   the truth, and that the witness reserved the right of
     signature;
10
          That I am not a relative, employee, attorney or counsel
11   of any party to this action or relative or employee of any
     such attorney or counsel and that I am not financially
12   interested in the said action or the outcome thereof;

13        That I am herewith securely sealing the said deposition
     and promptly delivering the same to Edwin S. Budge.
14
          IN WITNESS WHEREOF, I have hereunto set my signature on
15   the 12th day of May 2021.

16

17

18

19   _____
     Valerie L. Torgerson, CCR, RPR
20   Certified Court Reporter No. 2036
     (Certification expires 09/3/21.)
21

22

23

24

25
```

*The Estate of Cindy Lou Hill, by and through its personal representative, Joseph A. Grube; and Cynthia Metsker, individually vs. Naphcare, Inc., et al.*

Case No. 2:20-cv-00410-RMP

Declaration of Hank Balson

Exhibit T

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON


THE ESTATE OF CINDY LOU HILL, by      )
and through its personal              )
representative, Joseph A. Grube;      )
and CINDY METSKER, individually,      )
                                      ) No.
                    Plaintiffs,       ) 2:20-cv-00410-RMP
                                      )
            vs.                       )
                                      )
NAPHCARE, INC., an Alabama            )
corporation; HANNAH GUBITZ,           )
individually; and SPOKANE COUNTY,     )
a political subdivision of the        )
State of Washington,                  )
                                      )
                    Defendants.       )


VIDEOCONFERENCE DEPOSITION OF CAROLYN HOSCHKA

May 13, 2021

Taken Remotely Via Zoom

1      taught that the medical care of inmates, including the

2      actual medical assessment and evaluation of inmates, was

3      a matter for jail medical professionals and not for

4      corrections officers?

5  A   I do not recall that.

6  Q   Okay.  When it came to the procedures and protocols that

7      governed the Spokane County Jail, was that something that

8      you learned at the academy or was any such information

9      that you gained specific to the Spokane County Jail

10     something that you learned after you came to Spokane

11     County?

12 A   I don't recall.

13 Q   Let's focus now on the subject of corrections officers'

14     duties when it came to inmates who had been placed on

15     medical watch in the 2 West section of the jail, okay?

16 A   Okay.

17 Q   Did you or any of the other corrections officers, to your

18     knowledge, receive any medical-related training for the

19     purpose of enabling you to monitor inmates who had been

20     placed on medical watch?

21 A   Okay.  I can only speak for myself.  I can't speak for

22     others but, no, I have not.

23 Q   Okay.  Fair enough.  Did you ever receive any type of

24     training on anything associated with the observation of

25     inmates who had been placed in medical watch?

THE ESTATE OF CINDY LOU HILL vs NAPHCARE
Hoschka, Carolyn - May 13, 2021                                                        Page 30

1   A   No.

2   Q   How would you personally conduct medical watch when you

3       were working in 2 West and there was an inmate on medical

4       watch?

5   A   I was looking to ensure that the inmate was breathing,

6       and if they were in any what I -- medical crisis.  I

7       would contact medical if that were the case.

8   Q   And so in addition to checking for breathing, what, if

9       anything, did you check for?

10          Let me run through the list to make it easier.  Did

11      you check pupil size?

12  A   No.

13  Q   Body weakness?

14  A   No.

15  Q   Facial droop, chest pain, abdominal pain?

16  A   If they were vocalizing those things then I would.

17  Q   Did you make it a point to check those things every time

18      you came by?

19  A   No.

20  Q   How about headache, breathing difficulties, nausea, or

21      vomiting?

22  A   Those things I would note.

23  Q   If an inmate said something about it?

24  A   Or if I could observe them vomiting or having difficulty

25      breathing.

 1  A   No.

 2  Q   Were you trained to open the cell door for inmates who

 3      were on medical watch, so you could get a better more

 4      close up view of what was happening inside the cell?

 5  **A   Well, it wasn't being trained.  It would just be**

 6  **something that we would do if we thought something might**

 7  **be amiss.  It wasn't a trained thing.  It was just**

 8  **something that we would do instinctively if something**

 9  **seemed amiss.**

10  Q   But my question is -- and I think you have answered it,

11      but let's get it clear on the record, you were not

12      trained to open the cell door to assess the inmates when

13      you went past on the 30-minute watches, correct?

14                  MR. JUSTICE:  Objection, asked and

15      answered.  Go ahead.

16                  **THE WITNESS:  Correct.**

17  Q   (BY Mr. Budge)  And was it your ordinary practice that

18      you would, rather than opening the cell door each time

19      you came past to assess an inmate on a medical watch,

20      that you would look through the vertical window?

21  **A   Yes.**

22  Q   Other than the fact that there was a piece of paper on

23      the door for the inmates who were on medical watch, and

24      that you were supposed to notate something on that paper,

25      how was medical watch any different, assuming that it was

1      a 30-minute medical watch, from all of the other

2      30-minute checks that the officers were required to do

3      throughout the jail?

4  A   **That would depend upon the paperwork.  Sometimes**

5      **paperwork would indicate things that we should be**

6      **watching for or more vigilant, I guess.**

7  Q   And what if the paper did not indicate anything

8      particular to that inmate?

9  A   **Then, no, it would be like any other 30-minute watch or**

10     **round.**

11                   MR. JUSTICE:  Hey, I know we haven't

12     been quite going an hour, but if you could find a natural

13     break point, I had a deposition that was before this one

14     so I actually haven't made -- had any chance to get up

15     yet, so no rush, just if you got -- in a couple of

16     minutes.

17                   MR. BUDGE:  All right.  Just complete

18     this little bit of questioning, John, and then I will

19     absolutely accommodate you.

20  Q   (By Mr. Budge)  Ms. Hoschka, do you see exhibit -- hold

21     on a minute here.  Do you see Exhibit 1 on your screen?

22  A   **I do.**

23  Q   Is that the medical watch form for Cindy Hill?

24  A   **It is.**

25  Q   Is there anything specific noted with regard to Ms. Hill

THE ESTATE OF CINDY LOU HILL vs NAPHCARE
Hoschka, Carolyn -  May 13, 2021                                                                                          Page 43

```
 1                    MR. JUSTICE:  Object to the form.  Go
 2       ahead.
 3                    THE WITNESS:  Yeah, possibly.
 4   Q   (By Mr. Budge)  And, in that circumstance, you wouldn't
 5       know, without doing more, if the person was asleep or
 6       awake, correct?
 7   A   Right.
 8   Q   And so my question for you is, how did you know at 10:15
 9       a.m. that Ms. Hill was actually asleep and not awake?
10   A   I guess I don't know.
11   Q   Okay.  Would your answer be the same for the entry at
12       12:07 p.m. where you also wrote that she was sleeping?
13   A   Yes.
14   Q   You did not check her for any of the signs or symptoms
15       that are listed at the top of the form, correct?
16   A   Correct.
17   Q   And you did not know whether she was actually asleep or
18       awake, correct?
19   A   Correct.
20   Q   And you did not know whether if she was unconscious,
21       whether she was asleep in the normal sense, or rather
22       passed out from pain, or unconscious for another reason,
23       correct?
24   A   Correct.
25   Q   And although your entry at 1:43 p.m. says that Ms. Hill
```

 1  Q   Did anybody that you believe to be associated with
 2      Naphcare ever train you or instruct you on policies and
 3      procedures, protocols, expectations, or requirements
 4      relating to inmates on medical watch?
 5  A   No.
 6  Q   Did anybody at the Spokane County Jail ever train you or
 7      instruct you on policies, procedures, or protocols
 8      relating to inmates on medical watch?
 9  A   No.
10  Q   When you saw Ms. Hill through the window on each of the
11      occasions indicated in the form, is there any way for you
12      to say, even by your best estimate, as to how long you
13      would have looked through the window on these occasions?
14  A   No.
15                  MR. JUSTICE:  Object to the form.
16      Sorry.  Go ahead.
17  Q   (By Mr. Budge)  So you can't tell us whether you probably
18      would have looked through the window for five seconds or
19      10 seconds or 20 seconds or anything like that?
20  A   Correct.
21                  MR. JUSTICE:  Objection, asked and
22      answered.  Go ahead.
23  Q   (By Mr. Budge)  Can you tell us with regard to any of the
24      occasions that you saw Cindy Hill in the cell before she
25      was found unresponsive, as indicated in the form under

```
 1   STATE OF WASHINGTON )      I, Christy Sheppard, CCR, RPR,
                          ) ss a certified court reporter
 2   County of Pierce    )      in the State of Washington, do
                                hereby certify:
 3

 4
            That the foregoing deposition of CAROLYN HOSCHKA was
 5   taken before me and completed on May 13, 2021, and
     thereafter was transcribed under my direction; that the
 6   deposition is a full, true and complete transcript of the
     testimony of said witness, including all questions, answers,
 7   objections, motions and exceptions;
 8          That the witness, before examination, was by me duly
     sworn to testify the truth, the whole truth, and nothing but
 9   the truth, and that the witness reserved the right of
     signature;
10
            That I am not a relative, employee, attorney or counsel
11   of any party to this action or relative or employee of any
     such attorney or counsel and that I am not financially
12   interested in the said action or the outcome thereof;

13          That I am herewith securely sealing the said deposition
     and promptly delivering the same to Edwin S. Budge.
14
            IN WITNESS WHEREOF, I have hereunto set my signature on
15   May 17, 2021.

16

17

18

19   _____
     Christy Sheppard, CCR, RPR
20   Certified Court Reporter No. 1932
     (Certification expires 05/06/22.)
21

22

23

24

25
```

*The Estate of Cindy Lou Hill, by and through its personal representative, Joseph A. Grube; and Cynthia Metsker, individually vs. Naphcare, Inc., et al.*

Case No. 2:20-cv-00410-RMP

Declaration of Hank Balson

Exhibit U

# C 508 - Inmate Safety Checks

**C 508.1    PURPOSE AND SCOPE**
The purpose of this policy is to establish a requirement for conducting visual safety checks at least every 30 minutes for all inmates, and for creating and maintaining a log to document all safety checks.

**C 508.2    POLICY**
It is the policy of Detention Services that all employees shall conduct safety checks at least once every 30 minutes on all inmates, or more frequently as determined by inmate custody status and/or housing classification.

Safety checks shall be made through direct visual observation. Cameras and monitors may supplement the required visual observation safety checks but they shall not replace the need for direct visual observation. Safety checks will be clearly documented on permanent logs in accordance with the Daily Activity Logs and Shift Reports Policy.

**C 508.3    SAFETY CHECKS**
The employees shall adhere to the following procedures when conducting safety checks:

   a) Safety checks shall be conducted at least every 30 minutes and more frequently if necessary.
   b) Safety checks shall be conducted on an irregular schedule (staggered) so that inmates cannot predict when the checks will occur.
   c) Safety checks shall be done by personal observation of the corrections staff and shall be sufficient to determine whether the inmate is experiencing any stress or trauma and whether the inmate is alive or deceased.
   d) Cameras and monitors may supplement the required visual observation safety checks but they shall not replace the need for direct visual observation.
   e) Safety checks will be clearly documented on permanent logs in accordance with the Daily Activity Logs and Shift Reports Policy.
   f) Actual times of the checks and notations should be recorded on the Daily Activity Logs.
   g) Log entries shall never be made in advance of the actual check. Log entries made in this manner do not represent factual information and are prohibited.
   h) Special management inmates shall be checked more frequently as detailed in the Special Management Inmates Plan Policy.

*The Estate of Cindy Lou Hill, by and through its personal representative, Joseph A. Grube; and Cynthia Metsker, individually vs. Naphcare, Inc., et al.*

Case No. 2:20-cv-00410-RMP

Declaration of Hank Balson

Exhibit V



EXPERT WITNESS REPORT OF LORI E. ROSCOE, DNP, APRN, ANP-C, CCHP-RN
REGARDING Cindy Lou Hill

I have been retained to render opinions regarding the care and treatment of Cynthia Lou Hill during her incarceration at the Spokane County Jail from August 21, 2018 through her death on August 25, 2018.  My opinions are based upon my knowledge, education, training and experience, and the health records, videos, and testimony I reviewed regarding this case.

EXPERIENCE AND QUALIFICATIONS:

I am an Advanced Practice Registered Nurse, certified as an Adult Nurse Practitioner. I have a bachelor's degree in Education, a bachelor's degree in Nursing, a master's degree in Public Administration with a healthcare concentration, a master's degree in Nursing, a Doctorate Degree in Healthcare Administration, and a Doctor of Nursing Practice degree.  I am a Certified Correctional Health Professional and a  Certified Correctional Health Professional – Registered Nurse, certified through the National Commission on Correctional Health Care. I am currently the principal of Correctional HealthCare Consultants LLC and The Correctional Nurse LLC, and I am a clinical nurse practitioner. I began in correctional healthcare in 1995, and have worked in various correctional healthcare roles, including as a correctional facility Health Services Administrator, a Regional Administrator, an Associate Program Director, an Executive Director of Clinical Services, a Registered Nurse, and an Advanced Practice Registered Nurse – Nurse Practitioner.  I have an active Registered Nurse license in the states of Washington, Virginia, Florida, California, and Georgia. My Florida license is multi-state,

1

which enables me to practice through the Enhanced Nurse Licensure Compact in 34 states.  In addition, I am licensed as an Autonomous Advanced Practice Registered Nurse (nurse practitioner) in Florida, and an Advanced Practice Registered Nurse (nurse practitioner) in California, Georgia, Virginia, and Kentucky.

I have worked for private contractors, such as Correct Care Solutions and CorrectHealth, LLC, and state subcontractors, such as the Medical College of Georgia. In my administrative roles, I was responsible for policy and procedure development, staff supervision, staff education, Continuous Quality Improvement Programs, and fiscal management. I continue to provide these services to correctional health programs through Correctional HealthCare Consultants LLC.  I am a certified guest instructor for the Georgia Peace Officer Standards and Training Council in Inmate Medical, HIV/ Infection Control, Universal Precautions, and Excited Delirium.  I am a member of the national expert workgroup of the American Nurses Association that reviewed and revised *Correctional Nursing: Scope and Standards of Practice,* most recently published in 2020. I am the Accredited Provider Program Director for the Multi-Disciplinary Education Committee of the National Commission on Correctional Health Care. I am a member of the Editorial Board of the Journal of Correctional Health Care, and also a peer reviewer for that publication.  I am a member of the Board of Directors of the American Correctional Nurses Association, and I am also the Program Committee Chairperson. A complete listing of my education, training, and experience is set forth in my Curriculum Vitae, a copy of which is attached to this report as Exhibit A.

DOCUMENTATION REVIEWED:

Initial Assessment of Cindy Hill (8/21/18);

2018 NaphCare progress notes pertaining to Cindy Hill;

Receiving Screening of Cindy Hill (8/21/18);

2018 COWS assessments of Cindy Hill;

Jail surveillance video of Nurse Gubitz' encounter with Ms. Hill in the morning of 8/25/18;

Jail surveillance video of Ms. Hill's arrival in Unit 2W on 8/25/18;

Medical watch form;

Sheriff's report;

8/26/18 e-mail from Hannah Gubitz;

NaphCare policy re: informed consent and refusal of treatment;

Jail incident reports;

NaphCare incident reports;

Log of access to Ms. Hill's health record;

Records from Providence Sacred Heart Medical Center (including EMT records);

Autopsy report;

Death Review by Dr. Steven Hammond;

Depositions of Gubitz, Feely, Rogers, Maple, Ordaz, Hooper, Millholland, Janke, Sparber, Hoschka, Byington, Titchenal, Wirth;

Spokane County Jail Inmate Safety Checks policy;

Spokane County Jail Watch Cells policy;

Hannah Gubitz' answers to Plaintiffs' initial discovery requests;

NaphCare Health Care Policy & Procedure Manual;

All NaphCare medical records pertaining to Ms. Hill (including records from previous periods of detention in 2016 and 2017);

NaphCare nursing assessment protocol regarding abdominal pain or injury;

National Commission on Correctional Health Care 2018 Standards for Health Services in Jails; and

Merriam-Webster Dictionary, *Merrium-Webster.com dictionary*

COMPENSATION AND PRIOR TESTIMONY:

I have attached to this report as Exhibit B a list of all cases in which I have testified by deposition or at trial in the last four years.  I currently receive compensation of $350 per hour for case review and expert report production, with an initial retainer of $5000 for up to 12 hours of work.  I receive $500 per hour compensation for deposition and court testimony with a four-hour daily minimum and travel time reimbursed at $250 per hour as applicable. Travel expenses are charged per actual cost.


CASE SUMMARY

On August 21, 2018, Cindy Lou Hill was admitted to the Spokane County Jail at approximately 1005 hours Pacific Time (PT).  At approximately 1257 hours PT a physical assessment was completed by registered nurse (RN) Wattenburger.  At that time, RN Wattenburger noted that Ms. Hill's oxygen saturation was very low at 86% and contacted the on-site provider, physician assistant (PA) Denae Paul, who ordered supplemental oxygen.  Ms. Hill's physical examination included diminished breath sounds,  wheezing and a history of Chronic Obstructive Pulmonary Disease.   After five minutes of supplemental oxygen, Ms. Hill's oxygen saturation rose to 97%, then stabilized at 94%. There is no notation that the wheezing was discussed or addressed. Her abdomen was unremarkable and there was a notation that Ms. Hill reported "stomach problems" without further details.


On August 22, 2018, Ms. Hill was seen by charge RN Karen Contabile in the court holding cell at the request of custody.  Ms. Hill disclosed that she used heroin daily, and the assessment completed indicated that she was beginning to show signs of withdrawal. STATCARE was emailed and corporate nurse practitioner (NP) Casey Gladney ordered the initiation of COWS assessments with clonidine as needed, dosed per the COWS

4

score; encourage po fluid intake; and low bunk for safety.  The first COWS assessment was completed at that time, and it was scored 5.

On August 23, 2018, at approximately 0805 hours PT, Ms. Hill's COWS score was 12 (minimal withdrawal per the COWS form). On August 24, 2018, at approximately 0838 hours PT, Ms. Hill's COWS score decreased to 10 (minimal withdrawal per the COWS form).

On August 25, 2018, at approximately 0843 hours, charge RN Gubitz went to Ms. Hill's cell to complete the COWS assessment but was unable to do so because of Ms. Hill's extreme pain.  RN Gubitz documented on the COWS assessment sheet that Ms. Hill was lying on the floor, naked from the waist up, requesting assessment but too sick to move. Because policy prohibited RN Gubitz from entering the cell with only one officer because Ms. Hill had a roommate, the roommate rolled Ms. Hill onto a blanket, and dragged her across the floor to the door to be evaluated by RN Gubitz.  RN Gubitz described Ms. Hill as lying next to the toilet, on the floor, screaming.  Ms. Hill's roommate stated that Ms. Hill had been experiencing severe abdominal pain and she suggested that Ms. Hill was having a problem with her appendix. RN Gubitz documented that Ms. Hill was lying in a fetal position on the floor.  She allowed a minimal assessment of her abdomen and RN Gubitz stated that she was barely able to check vitals. RN Gubitz documented an assessment that included observation and palpation and revealed that Ms. Hill had no bruising, swelling, redness or masses.  Ms. Hill was described as screaming even louder when approached by RN Gubitz, even before she was touched, that RN Gubitz was hurting her.  Ms. Hill did not answer questions about her pain level, when the pain began or what were its characteristics, but she did identify that the pain was in her right lower quadrant.  RN Gubitz documented that Ms. Hill screamed in pain with gentle palpation

5

of her entire abdomen and back. RN Gubitz documented incomplete vital signs (no temperature) and that Ms. Hill was so irritable/anxious that participation in the assessment was difficult.  RN Gubitz made the decision to place Ms. Hill on a Medical Watch, and she was transported via wheelchair to 2 West at approximately 0910 hours PT.

In deposition, RN Gubitz testified that Medical Watch was for patients needing acute medical monitoring, and healthcare staff relied on the officers to inform them if there were changes in the patient's health condition.  RN Gubitz testified that she assumed the officers interacted with each person on medical watch to ascertain their condition at the time.  She also testified that every individual on a Medical Watch should have a medical assessment completed each shift by nursing staff.  Per the testimony of the officers deposed, including Officers Millholland, Hoschka, Wirth, Titchenal, Byington and Lieutenant Hooper, the Medical Watch checks were basically the same as what they would do on any floor, except that they documented the check on a log.  They were not conducting medical assessments, only looking for signs of life, and they were not necessarily required to interact with the individual to inquire how he/she/they were if it was obvious they were alive.  There was no training regarding how to conduct a Medical Watch check, and no training about the "Examples of Important Changes to Report to Medical" list of conditions on the top of the form.   There was no specific policy or procedure regarding Medical Watch, and the policies and procedures that were in place for Inmate Safety Checks and Watch Cells did not address how to identify situations when medical staff must be called to evaluate the watched individual.

Ms. Hill's log included "awake", "sleeping", and "refused lunch".  No medical staff person went to check on Ms. Hill's condition until approximately 1500 hours PT, when

RN Gubitz went to complete a COWS assessment.  It is notable that in testimony RN Gubitz  stated that the encounter could have occurred anywhere between 1300 hours and 1500 hours PT, but the statement she gave during the Sheriff's investigation hours after the death included that she returned to the cell at 1500 hours PT.  RN Gubitz testified that Ms. Hill refused the assessment at that time, but there is no signed refusal in Ms. Hill's health record.  RN Gubitz testified that her usual practice was to obtain a signed refusal per the policy, and she had no explanation for not obtaining one in this instance.  There is a brief encounter note in the health record documenting the refusal at approximately 1610 hours PT.  There is no video footage available for this time period to verify when RN Gubitz attempted to conduct the COWS assessment on the afternoon of August 25th and how long the encounter lasted.

On August 25, 2018, at approximately 1626 hours PT Officer Millholland was distributing the evening meal and left one at Ms. Hill's food slot. His incident report included that Ms. Hill groaned when he told her to get up.  At approximately 1724 hours PT Officer Millholland was picking up the trays and noticed that Ms. Hill had not taken her food.  He knocked on the cell door, and, receiving no response, called for medical. They entered the cell and found Ms. Hill pulseless and not breathing, and cardiopulmonary resuscitation was initiated.  The Automated External Defibrillator (AED) was used, with no shock indicated.  Medical staff administered Narcan and inserted an oral airway.  They attempted to establish intravenous access without success. Fire Rescue arrived and obtained a pulse and assumed care of Ms. Hill. After transport to Providence Sacred Heart Medical Center, Ms. Hill was pronounced dead at 1831 hours PT.  There was no documentation in the health record of the resuscitation efforts, including the administration of Narcan and the attempted intravenous access.

On August 26, 2018, after Ms. Hill died, RN Gubitz authored an email to her supervisors, Health Services Administrator (HSA) Jesus Ordaz and Director of Nursing (DON) Ian O'Neill, outlining in great detail Ms. Hill's presentation the day before when she evaluated Ms. Hill.  She included additional information about her evaluation, including that she did not do a full neurological exam and that she had no cause to suspect "spine involvement" since Ms. Hill was moving her legs.  She also reminded them that "a lot of our detox patients complain of stomach, abdominal, or low back pain, and except for the intermittent screaming there were not any symptoms to indicate differently."  RN Gubitz' email continued with a much more detailed description of Ms. Hill's presentation and the condition of her cell witnessed during the second encounter on August 25, 2018, when Ms. Hill allegedly refused an evaluation.  She noted that Ms. Hill's cell was the cleanest she had seen any cell in some time. Her observations of Ms. Hill included her being forthcoming; not screaming; sitting up; indicating that she wanted to be assessed; and later stating that, while her stomach still hurt, she did not want to be checked, and lying back down.  Because Ms. Hill "appeared in no acute or immediate distress we ended the conversation and assessment."  HSA Ordaz testified that he had not requested any additional information or explanation from RN Gubitz; this email was unsolicited.

An autopsy conducted on August 27, 2018, determined that Ms. Hill died from acute bacterial peritonitis secondary to ruptured duodenal-liver adhesions with perforations of the duodenum.

Dr. Steven Hammond, a former Chief Medical Officer of the Washington Department of Corrections was asked to review Ms. Hill's care and treatment, and his completed report was submitted in the Fall of 2019.  In it, he determined, in part, that there were missed opportunities for clinical intervention and significant lapses related to care delivery that,

had they been properly addressed, may have prevented or significantly delayed death. These included misattributing worsening symptoms on August 25, 2018 to opioid withdrawal; failure to respond more definitively to her worsening status both on the morning of August 25th and in the afternoon when she did not take her dinner tray; and failure to check Ms. Hill for a full hour after the food was delivered.

OPINIONS

On August 25, 2018, when RN Gubitz evaluated Ms. Hill, she documented several significantly abnormal findings, including Ms. Hill's being too sick to move; her lying in a fetal position; her screaming in pain generally and then screaming louder when RN Gubitz came close to do the abdominal palpation; her screaming with light palpation of the abdomen and back; and that the pain was in her right lower quadrant, that required a consultation with a provider, but RN Gubitz failed to do so. Instead, RN Gubitz made the independent decision to place Ms. Hill on a Medical Watch. RN Gubitz testified that she "briefly considered" calling the local on-call provider, but because Ms. Hill presented with "no gross abnormalities," she knew that the "providers at the time would not have necessarily given any orders after the first assessment." A patient screaming in severe right lower quadrant abdominal pain on the floor in a fetal position who is too sick to move is definitely a patient with gross abnormalities.

NaphCare's Nursing Assessment Protocol for Abdominal Pain or Injuries requires the nurse to "notify provider and begin treatment" if the patient is in "acute distress." However, NaphCare and the Protocol do not define "acute distress," and so the nurse is left to interpret that condition. Dr. Maple was asked about acute distress during his deposition. He did not define "acute distress," but testified that acute distress is indicated by abnormal vital signs, altered mental status and/or signs of shock. I do not

9

disagree that these three characteristics may be indicative of acute distress, but they are not inclusive of all situations of acute distress. Merriam-Webster defines distress as "pain or suffering affecting the body, a bodily part, or the mind: trouble; a painful situation: misfortune; a state of danger or desperate need" and acute as " very serious or dangerous, requiring serious attention or action characterized by sharpness or severity of sudden onset; felt, perceived, or experienced intensely: acute distress [Merriam-Webster. n.d. Distress. In *Merrium-Webster.com dictionary*. Retrieved November 29, 2021, from https://merrium-webster.com/dictionary/distress; Merriam-Webster. n.d. Acute. In *Merrium-Webster.com dictionary*. Retrieved November 29, 2021, from https://merrium-webster.com/dictionary/acute]. RN Gubitz' assessment of Ms. Hill, that she was too sick to move; was lying in a fetal position; was screaming in pain generally and then screaming louder when RN Gubitz came close to do the abdominal palpation; was screaming with light palpation of the abdomen and back; and had pain in her right lower quadrant, clearly indicated that Ms. Hill was in acute distress, and even RN Gubitz testified that Ms. Hill was in acute distress. Unfortunately, RN Gubitz chose to ignore Ms. Hill's acute distress and not contact a provider, and not monitor Ms. Hill, and instead placed her on a Medical Watch where only untrained non-medical persons were looking in on her.

RN Gubitz' presumption that a provider presented with Ms. Hill's condition would do nothing is egregious, and in essence, denied Ms. Hill the access to healthcare her very serious medical condition required and a proper diagnosis. The failure of RN Gubitz to contact a provider for Ms. Hill significantly deviated from the standard of nursing care. By deciding, without consulting with a provider, that no orders would be given to diagnose and/or treat Ms. Hill's critical condition, RN Gubitz practiced very much beyond her scope of practice as a registered nurse, which is illegal.

More than six hours later on August 25, 2018, RN Gubitz went to Ms. Hill's cell on 2 West to complete a COWS monitoring assessment. She noted that Ms. Hill refused to allow the assessment, but she failed to have Ms. Hill sign a refusal form indicating this. In deposition, RN Gubitz stated that it was her usual practice to obtain informed refusals, and she did not have a reason for not doing it for Ms. Hill. She also wrote a brief note documenting the refusal, with no description of Ms. Hill's condition or behavior. The failure of RN Gubitz to obtain an informed refusal from Ms. Hill deviated from the standard of nursing care.

As stated previously, the standard of nursing care required RN Gubitz to contact a provider about Ms. Hill's condition when she was presented with being too sick to move; lying in a fetal position; screaming in pain generally and then screaming louder when RN Gubitz came close to do the abdominal palpation; screaming with light palpation of the abdomen and back; and pain in her right lower quadrant. When she failed to do so and instead placed Ms. Hill on Medical Watch on the morning of August 25th, the standard of care required that RN Gubitz complete a reassessment of her abdominal pain, to have occurred many hours prior to the attempted COWS monitoring that afternoon. Prudent nursing care for a patient screaming in severe right lower quadrant abdominal pain, who was lying in a fetal position on the floor and could not move because of the pain dictates that a reassessment is done within one to two hours to determine if the patient is improving, staying the same, or deteriorating. After the reassessment was completed, RN Gubitz should have contacted the provider to report Ms. Hill's condition at that time. Although Ms. Hill was placed on Medical Watch, where purportedly she would be checked every thirty minutes, that did not substitute for the required nursing physical reassessment. The failure of RN Gubitz to return timely to Ms. Hill and conduct a reassessment of her pain and general condition significantly breached the standard of

11

nursing care.

The day after Ms. Hill died, RN Gubitz authored an email to her supervisors, unsolicited, that went into greater detail about her two encounters with Ms. Hill than was documented in the health record.  She never went back into the health record and added any of this information as a "late note," but she should have. She did go in on August 26, 2018 at 0521 hours PT and note that Ms. Hill was no longer on Medical Watch. All known medical information about a patient, especially a patient who is critical or has died, should be included in the health record. The failure of RN Gubitz to document important information about her patient in the health record significantly deviated from the standard of nursing care.

It is notable that the description RN Gubitz shares of Ms. Hill in the afternoon encounter (sat up, responsive and forthcoming, not screaming at all, and laid back down) when she refused the COWS monitoring is inconsistent with the expected presentation of a patient who has a perforated duodenum and peritonitis and is dead within a few hours of the encounter. In her statement, RN Gubitz wrote that "Justin CMA and CO Janke" accompanied her in the afternoon of August 25th when she noted that Ms. Hill's presentation was unremarkable.  However, CMA (certified medical assistant) Rogers and Officer Janke testified in deposition that each did not remember this encounter. Unfortunately, the video footage from the Medical Watch unit that afternoon no longer exists, so it is not possible to confirm whether or not the encounter occurred as RN Gubitz claims.  If the encounter did not occur, then RN Gubitz not only grossly deviated from the standard of nursing care by failing to reassess Ms. Hill, but she also falsified health records, which is a flagrant ethical violation and a crime in many states.

Per the incident reports, the emergency response by healthcare and custody staff was appropriate. However, none of the actions were documented in the health record, and they should have been.  The failure of healthcare staff to document the resuscitation attempt for Ms. Hill in her health record deviated from the standard of nursing care.

Notable in this matter are the Medical Watch procedures and the understanding of staff as to what constitutes a Medical Watch and the type of patients placed on Medical Watch. RN Gubitz testified that individuals transferred to Medical Watch were those needing "acute medical monitoring."  She further testified that officers interacted with patients on Medical Watch to ascertain their medical status.  While the implication was that patients would receive more frequent monitoring for their medical/mental health conditions under a Medical Watch, in fact, the rounds were conducted by officers with no additional health training, who were merely checking the patients for signs of life, as they did in other housing units.  The officer might have done more frequent rounds on patients on Medical Watch if the medical staff ordered them, but more often than not the rounds were conducted on the same schedule as the "regular" housing units – every 30 minutes.  Officers detailed their observations on a paper log that did have an area at the top that included medical symptoms for which the officer should be watching, and if noted, should prompt the officer to contact medical staff, but the officers deposed in this matter, including Officers Millholland, Hoschka, Titchenal, Byington and Wirth testified they had no training in the assessment of these symptoms and there were no written guidelines or algorithms to assist with these judgment calls.  They did not routinely interact with the patients to see how they were feeling.

By placing patients like Ms. Hill in a Medical Watch unit that provided no real health monitoring as their condition required, NaphCare and its staff were exposing their

13

patients to a substantial risk of serious harm.  NaphCare should have identified that there was no Medical Watch policy and procedure and worked with Spokane County Administration to develop one that would reasonably keep their patients safe.  NaphCare should have identified that officers did not have the medical training necessary to identify the symptoms articulated on the Watch Log and should have included more frequent and formalized rounds in the unit by health staff.  It also should have provided additional training for the officers to include the identification of emergency situations and abnormal findings that must be reported to health staff.  The failure of NaphCare to work with Spokane County Jail Administration to develop a policy for Medical Watch that considered the primacy of patient safety deviated significantly from the applicable standard of care.

The reliance by NaphCare and its staff on the officers to round on their patients who were placed on Medical Watch because their conditions warranted close monitoring and identify abnormal and serious changes in their patients' conditions was reckless and significantly deviated from the applicable standard of care.  In essence, NaphCare placed the care of patients already identified as needing "acute medical monitoring" in the hands of  laypersons with no medical training who, for the most part, were not even aware that medical watch rounds included more thorough checks, patient engagement, and additional monitoring.  Under these circumstances, it is foreseeable that any deterioration in condition would not be identified timely.  NaphCare had a responsibility to Ms. Hill and all its patients to ensure that they were monitored by qualified staff and their healthcare needs were addressed, and it failed.  This failure significantly deviated from the applicable standard of care.

My opinions and findings are made to a reasonable degree of nursing, provider and

administrative certainty and are based upon the records reviewed.  I hereby reserve the right to amend, supplement, or withdraw my opinion based upon future discovery and depositions of the relative parties that may be provided to me.

Respectfully Submitted on November 30, 2021.

*Lori E Roscoe*

Lori E. Roscoe, DNP, APRN, ANP-C, CCHP-RN

# Curriculum Vitae

## Lori E. Roscoe, DNP, APRN, ANP-C, CCHP-RN
404-805-9502

---

### PROFILE

---

An innovative Healthcare Manager, certified as an Advanced Practice Registered Nurse, a Correctional Health Professional, and a Correctional Registered Nurse, with 26 years of experience in Correctional Health Care and 32 years of Registered Nursing experience. An expert on National Commission on Correctional Health Care and American Correctional Association standards, and policy and procedure development and compliance.  An educator of both nurses and correctional officers.  A seasoned Continuous Quality Improvement professional.  An experienced correctional health expert legal witness, including case review, expert report authoring, and deposition/trial testimony.

---

### EDUCATION

---

**Doctor of Nursing Practice**
University of Alabama, 2017

**Master of Science in Nursing, Adult Nurse Practitioner**
South University, 2014

**Doctor of Health Care Administration**
Madison University, 2006

**Master of Public Administration, Health Care concentration**
University of Hartford, 1994

**Bachelor of Science in Nursing**
University of Connecticut, 1989

**Bachelor of Science in Education, Secondary Education and Sociology majors**
Southern Connecticut State University, 1978

---

### AWARDS

---

High Honors - South University - 2014

Award for Academic Excellence – University of Hartford 1994

Woodruff Fellow 1992 – 1994 – University of Hartford

---

## EXPERIENCE

---

**Correctional HealthCare Consultants LLC**

   January 2007 – present – Managing Member

   **Marion County, KY – Jailer J. Barry Brady** – (2018-present) Healthcare program transitional and ongoing consultation services

   **Boone County, KY – Jailer Jason Maydak** – (2018-present) Healthcare program development, transition services and consultation services

   **Laurel County, KY – Jailer Jamie Mosley –** (2017-present) Healthcare Program Evaluation, ongoing program development, and consultation services

   **Preceptor for MSN Nurse Practitioner students from Georgia State University – (**2016 – 2017) Semester of Nurse Practitioner experience in a correctional setting

   **CorHealth Solutions, LLC – Dr. D. Brent Cherry** – (2016) Correctional Health Program Development and contract initiation consultation- Somerset, KY

   **National Commission on Correctional Health Care Multi-Disciplinary Education Committee** (2019 – present) – Accredited Provider Program Director  and **Nurse Advisory Council** (2016 – present) **-**  Chairperson and Lead Nurse Planner

   **Journal of Correctional Health Care,** Editorial Board member and peer reviewer (2019 – present)

   **University of Connecticut School of Nursing** (2014 - 2016) – Expert Nurse panelist for a research study regarding the Correctional nurse and stress being conducted by Dr. Denise Panosky.

   **American Nurses Association** (2012-present) **–** Member of the Correctional Nursing workgroup responsible for reviewing and editing the *Correctional Nursing*: *Scope and Standards of Practice* – latest version published November 2020.

   **The Correctional Nurse Educator** (2010-present) – Developed and maintain an online educational site where nurses can earn continuing education credits in topics specifically related to correctional nursing. Accredited as a Provider by the California, Florida, Georgia, South Carolina and other Boards of Nursing.

   **Medical Association of Georgia** (2007-2017) – Accreditation auditor for the Corrections Division.

   **Legal casework** (2007-present) - Multiple cases for both Defendants and Plaintiffs.

   **American Correctional Health Services Association –** Executive Director – 2011-2012

   **Correct Health, LLC –** DeKalb County Jail (2008-2009) - Operational review, Management staff mentoring, CQI Program expansion and Annual Review, Procedures and Post Order development, nursing staff mentoring and education.

   **Comprehensive Nursing Care, Inc.** (2007 - 2009) **–** Development of successful bid proposal for Medical Nursing Services at Hall County Jail – continued association to develop and execute a complete Nursing orientation program, written procedures for staff, Nursing Assessment Protocols, corresponding Nursing Treatment Notes and Blood Borne Pathogen Exposure Plan, CQI Program and ongoing Staff and Management mentoring.

**The Community Health Center, West Palm Beach, FL**

   July 2018 – present – Nurse Practitioner

      Nurse Practitioner volunteer provider at this Free Clinic – evaluate, diagnose and treat patients presenting to the clinic with a wide range of illnesses and injuries, including chronic illnesses such as diabetes, hypertension, seizure disorder and hyperthyroidism; women's health issues;

Lori E. Roscoe, DNP, APRN, ANP-C, CCHP-RN

mental illness; and acute conditions like infections; sprains and minor injuries. Preceptor for Nurse Practitioner, Physician Assistant, Medical and RN students.

**Correct Care Solutions, Nashville, TN**

September 2014 – January 2018 – Nurse Practitioner, Georgia

In collaboration with the Medical Director, provision of the full range of medical services for the patients at the facility, including sick call, urgent/emergent and chronic care. Interpretation of lab results and diagnostic studies ordered through the facility.

**CorrectHealth LLC, Atlanta, Georgia**

January 2013 – June 2013 – Director of Clinical Support

Responsible for Clinical Services Education, Infection Control, Continuous Quality Improvement, and Accreditation. Daily clinical practice and staff contact. Exclusively responsible for the clinical education of staff at 33 sites, which included working side-by-side with staff, conducting needs assessments and evaluations, and the research of evidence based practices and guidelines to ensure staff were adhering to nationally approved standards of care.

January 2012- January 2013 – Executive Director of Clinical Services

Responsible for all aspects of Clinical Services, including Education, Infection Control, Continuous Quality Improvement, Health Information and Accreditation. Policy and Procedure review and development. Responsible for nursing and ancillary staff. Visited sites and interacted with clients on a regular basis.

July 2009 – December 2011 – Director of Special Projects

Participated in projects with the Georgia Department of Corrections; Project Coordinator and Lead Surveyor for an audit of all healthcare services for the Maricopa County Jail, Phoenix, Arizona; Developed projects and procured funding for the CorrectHealth Community Development Center (non-profit); Project Manager for a Special Study for the Wyoming Department of Corrections regarding healthcare access, medical cost and potential efficiencies; internal operations auditing and staff development. Within CorrectHealth, major responsibility for the clinical education of staff, including nurses, providers and ancillary staff. This included working side-by-side with staff, conducting needs assessments and evaluations, and evidence based practices and guidelines research to ensure staff adherence to nationally approved standards of care.

**Correctional Medical Services, St. Louis, Missouri**

2004 - 2006 - Health Service Administrator - DeKalb County Jail (GA)

2004 - Utilization Management Nurse (interim) - New Jersey Department of Corrections contract

2000 - 2002 - Associate Program Director – New Jersey Department of Corrections contract

1996 - 1998 - Associate Program Director – Massachusetts Department of Corrections contract

1995 - 1996 - Health Services Administrator - Framingham Women's Prison (MA)

**Georgia Correctional Health Care, Georgia Department of Corrections**

2006 - 2007 – Staff Nurse/PRN - Georgia Diagnostic and Classification Prison

Lori E. Roscoe, DNP, APRN, ANP-C, CCHP-RN

PRESENTATIONS/LECTURES

**"How to Achieve Success as a Correctional Nurse Manager"** a series of 4 webinars for the National Commission on Correctional Healthcare by the Nurse Advisory Council – Lead Nurse Planner and presenter week 3, Clinical Processes, held August 3rd, 10th, 17th and 24th 2021.

**"Professional Practice in Our Post-COVID World: A Correctional Nurse Conversation"** presented at the Virginia Department of Correction Nursing Conference Keynote speaker July 13, 2021.

**"Honoring Our Practice in a Post-COVID World: A Correctional Nursing Conversation"** presented at the Wisconsin Department of Correction Health Services Administrators' meeting June 17, 2021.

**"How APRNs Can Add Value to Your Correctional Healthcare Operation"** presented at the National Commission on Correctional Health Care Spring 2021 Virtual Conference.

**"Patient Advocacy for the Correctional Nurse"** and **"Skin Assessment for the Correctional Nurse"** presented at the National Conference of the National Commission on Correctional Health Care in Ft. Lauderdale, FL.  October 2019.

**"Clinical Decision Making in Correctional Nursing"; "Advanced Practice Registered Nurses in Corrections:  Roundtable"** presented at the National Conference of the National Commission on Correctional Health Care in Nashville, TN.  April 2019.

**"Clinical Judgment for the Correctional Nurse"** presented at the National Conference of the National Commission on Correctional Health Care in Las Vegas, NV, October 2018 and in Atlanta, GA, May 2017.

**"A Seizure Disorder Primer for the Correctional Nurse"** presented at the National Conference of the National Commission on Correctional Health Care in Nashville, TN, April 2016.

**"A Hypertension Primer for the Correctional Nurse"** and **"The Nurse's Role in Chronic Care Management"** presented at the National Conference of the National Commission on Correctional Health Care in Dallas, TX, October 2015.

**"A Diabetic Primer for the Correctional Nurse"** presented at the National Conference of the National Commission on Correctional Health Care in New Orleans, LA, April 2015.

Guest Expert Panelist, American Association of Legal Nurse Consultants webinar **"Civil Rights Litigation"** held nation-wide on October 30, 2014.

**"The Nurse's Role in Chronic Care Management"** presented at the National Conference of the National Commission on Correctional Health Care in Atlanta, GA, April 2014.

Guest Expert panelist, Omnisure webinar **"The Unscheduled Encounter: Reducing Liability and Risk",** held nation-wide on December 4, 2013**.**

**"The New ANA Scope and Standards of Practice for Correctional Nurses: Implementation Standard", "The New ANA Scope and Standards of Practice for Correctional Nurses: Communication Standard"** and **"The Essentials of Nursing Leadership: Capstone Presentation"** presented at the National Conference of the National Commission on Correctional Health Care in Nashville, TN, October 2013.

**"Unscheduled Encounters:  Managing the Nursing Curbside Consult"** and **"The New ANA Scope and Standards of Practice for Correctional Nurses: Implementation Standard"** presented at the National Conference of the National Commission on Correctional Health Care in Denver, CO, April 2013.

Lori E. Roscoe, DNP, APRN, ANP-C, CCHP-RN

**"Unscheduled Encounters:  Managing the Nursing Curbside Consult"** presented at the National Conference of the National Commission on Correctional Health Care in Las Vegas, NV, October 2012.

**"Children and Prescription Drug Abuse" –** CHAMPS Instructor School, Georgia Sheriff's Association, June 2012.

**"Con Games: Inmate Manipulation"** presented at the Nursing Forum, American Correctional Health Services Association's National Conference in San Antonio, TX, April 2012.

**"HIV Awareness", "Universal Precautions"** and **"Inmate Medical Services"** at the DeKalb County Sheriff's Office 111th Jail Academy, February 2011 through the 124th Jail Academy, August 2014.

**"Crisis Intervention Training"** co-presenter at the American Correctional Health Services Association Georgia Conference, Savannah, Georgia, November 2009.

**"Nursing Forum: Legal Parameters and Best Practice"** at the American Correctional Health Services Association National Conference, Orlando, Florida, March 2009.

**"Dilemmas in Correctional Nursing"** at the American Correctional Health Services Association National Conference, Reno, NV, June 2007.

---

## LICENSES AND CERTIFICATIONS

Advanced Practice Registered Nurse/Nurse Practitioner – Florida (Autonomous Practice APRN9485060), California (95006810), Georgia (RN179490), Kentucky (3012955) and Virginia (0024178346).

Certified Adult Nurse Practitioner – American Academy of Nurse Practitioners National Certification Board (A0614010 – expiration June 2024)

Registered Nurse licensure  - Multi-state and individual license in Florida, Washington, California, Georgia

Certified Correctional Health Provider – Certified Correctional Registered Nurse –

National Commission on Correctional Health Care

Certified Provider of Continuing Education – California Board of Registered Nursing

Certified Guest Instructor - Georgia Peace Officer Standards and Training Council

BLS Healthcare Provider

---

## MEMBERSHIPS

Founding Member and Member-at-Large Board Member - American Correctional Nurses Association

Member – American Association of Nurse Practitioners

Member – American Nurses Association

Member – American College of Correctional Physicians

Lori E. Roscoe, DNP, APRN, ANP-C, CCHP-RN

Member – South East American Correctional Health Services Association

Member – Academy of Correctional Health Professionals

Member – American Correctional Association

Member- American Jail Association

Lori E. Roscoe, DNP, APRN, ANP-C, CCHP-RN

# Legal Cases-Depositions/Trial

## Lori E. Roscoe, DNP, APRN, ANP-C, CCHP-RN
### 2017 - 2021

**Mark Krudys,** **The Krudys Law Firm, PLC**
**Richmond, VA**

Carolyn Mae Sams, Plaintiff vs. Armor Correctional Health, et al.
*Plaintiff - **ongoing litigation***

**Charles Tatum, Esquire and Seth Diamond, Esquire**
 **Jasper, AL**

Lashunna Wilson, as Administrator and personal representative of the Estate of William Henry Harris, Jr., deceased
*Plaintiff - **trial October 2021***

**David S. Fried, Fried. Bonder, White, LLC**
**Atlanta, GA**

Torrey Griffen, Individually, as the legal guardian of the minors, RWR, ABG, and DRR and as the  representative of the Estate of Shannon Rewis, deceased, Plaintiffs, vs. Coffee County, Coffee Regional Medical Center, Inc, et al.
*Plaintiff - **ongoing litigation***

**Jackson Pahlke,** **Connelly Law Offices, PLLC**
**Seattle, WA**

Roxanne Smith, Individually and as Administrator of the Estate of Britney H. Smith, Decedent; Plaintiff, v. Cowlitz County, and WellPath, LLC
*Plaintiff - **settled 2021***

**Edwin Budge and Erik Heipt,** **Budge & Heipt, PLLC**
**Seattle, WA**

Jennifer Louise Jenkins, Administrator ad Litem of the Estate of Sterling Higgins, Plaintiff, vs. Obion County, Union City, TN, et al, Defendants
*Plaintiff - **ongoing litigation***

**Chris Hammons,** **Laird, Hammons, Laird, PLLC**
**Oklahoma City, OK**

Patricia Thompson, as personal representative of the Estate of Marconia Lynn Kessee, vs. Norman Regional Medical Center, et al
*Plaintiff - **ongoing litigation***

**Mark Krudys,** **The Krudys Law Firm, PLC**
**Richmond, VA**

James W. Smith, Administrator of the Estate of Victor Rhea Fountain, Deceased, vs. WellPath, LLC, et al.
*Plaintiff - **ongoing litigation***

# Legal Cases-Depositions/Trial

Lori E. Roscoe, DNP, APRN, ANP-C, CCHP-RN

**2017 - 2021**

**W. David Carter,** **Carter Mercy**
**Texarkana, TX**
> Jones vs. Southwestern Correctional, LLC et al.
> *Plaintiff - **trial April 2021***

**Vincent Colianni II,** **Colianni & Colianni LLC**
**Christiansted, VI**
> Kelly Anderson, Plaintiff vs. St. Francois County Sheriff's Department, et al.
> *Plaintiff - **ongoing litigation***

**Mark Bullman, Esquire, Hillary Hunter, Esquire, & Mel Hewitt, Esquire,** **Isenberg &**
**Hewitt, PC**
**G. Brian Spears, Esquire,** **Spears & Filipovits, LLC**
**Atlanta, GA**
> Brigette Minton, Administrator of the estate of William Jeffrey Minton and Stephanie
> Minton v. William Bradley, Jarvis Culver, Katherine Elizabeth Eubanks, Corrcare, Inc,
> Paul Buczynsky, Valerie Harper, Crystal Bell and Micki Harrison
> *Plaintiff - **ongoing litigation***

**Jeffery Storms, Esquire & Paul Dworak, Esquire,** **Newmark, Storms Dworak Law Office;**
**and Jeffrey Montpetit, Esquire,** **Sieben Carey**
**Minneapolis, MN**
> Dawn Brenner and Kathy Brenner, co-trustees for the heirs and next of kin of Dylan
> Brenner v. Danielle Asfeld, Christina Leaonard, Jannell Hussein, Todd Leonard,
> Rebecca Lucar, Russell Denny, Wes Graves, James Rourke, MEnD Correctional Care
> and Sherburne County
> *Plaintiff - **ongoing litigation***

**Ryan McGraw, Esquire, and Konrad Kircher, Esquire,** **Rittgers & Rittgers**
**Cincinnati, OH**
> Karla Howell, as Administratrix of the Estate of Cornelius Pierre Howell v. NaphCare,
> Inc and Christina Jordan and Pierette Arthur and Jim Neil, Matthew Collini and Daniel
> Erwin.
> *Plaintiff - **ongoing litigation***

**C. Scott Johnson,** **Spears, Moore, Rebman & Williams, P.C.**
**Chattanooga, TN**
> Eden, et al vs. Bradley County, TN, et al.
> *Plaintiff - **ongoing litigation***

# Legal Cases-Depositions/Trial

Lori E. Roscoe, DNP, APRN, ANP-C, CCHP-RN
**2017 - 2021**

**Matthew Garmon,  Morris Haynes, Attorneys at Law**
**Birmingham, AL**
> Hunter vs.  Advance Correctional Healthcare, et al.
> *Plaintiff - **ongoing litigation***

**Paul Dunphy, Esquire,  and Michael Cerjak, Esquire, Canon & Dunphy, S.C.**
**Brookfield, WI**
> Madden vs.  Milwaukee County, et al.
> *Plaintiff - **ongoing litigation***

**Vincent Colianni II,  Colianni & Colianni LLC**
**Christiansted, VI**
> William James, Jr., et al., vs.  St. Francois County Sheriff's Department, et al.
> *Plaintiff - **settled 2021***

**Laura Landenwich,  Adams, Landenwich, Walton, PLLC**
**Louisville, KY**
> *Janice Sweet, As Personal Representative and Administrator of the Estate of*
> *Christopher R. Sweet, et al, Plaintiffs, vs. Sheriff  Jamey Noel, Clark County Sheriff's*
> *Dept., Charlestown Primary Care, LLC, William Hoke, M.D., et al.*
> *Plaintiff - **settled 2020***

**William Bird, Bird Law Firm and Michelle Carpenter, Kranitz, Sadoun & Carpenter, PC**
**St. Joseph, MO**
> *Ashten Haylee Surritte, et al. vs. Advanced Correctional Healthcare Inc, et al.*
> *Plaintiff - **settled 2020***

**William Bird, Bird Law Firm and Michelle Carpenter, Kranitz, Sadoun & Carpenter, PC**
**St. Joseph, MO**
> *Amanda Thomas, et al. vs. Advanced Correctional Healthcare,Inc, et al.*
> *Plaintiff - **settled 2020***

**S. Luke Largess,  Tin, Fulton, Walker & Owen, PLLC**
**Charlotte, NC**
> Mary McNeilly, Administrator of the estate of Archie K. McNeilly, Jr., Plaintiff v. Southern
> Health Partners, Inc., et. al, Defendants
> *Plaintiff - **settled 2020***

**Derek Franseen, Walsh and Franseen**
**Edmond, OK**
> Craig Shipp, Plaintiff vs CorrectCare Solutions, LLC; Dr. Lorene Lomax, et al,
> Defendents
> *Plaintiff - **closed 2020***

# Legal Cases-Depositions/Trial

Lori E. Roscoe, DNP, APRN, ANP-C, CCHP-RN

**2017 - 2021**

<u>**Hank Balson and Edwin Budge,**</u> **Budge & Heipt, PLLC**
<u>**Seattle, WA**</u>
> The Estate of Marc A. Moreno, by and through its personal representative, Miguel Angel Moreno; Miguel Angel Moreno, individually;   and Alicia Maga-Mendez  individually, Plaintiffs,  vs. Correctional Healthcare Companies, Inc.; Correct Care Solutions, LLC.; Our Lady of Lourdes Hospital at Pasco, Inc.; Ashley Castenada, individually; and Anita Valee, individually  Defendants.
> *Plaintiff -* ***settled 2020***

<u>**Michael Fairhurst,**</u>  **Killmer, Lane & Newman, LLP**
**Denver, CO**
> Estate of Marciano Briones;  Marc Briones, et al, Plaintiffs, vs. Adams County; Correct Care Solutions, Correctional Healthcare Companies, et. al, Defendants
> *Plaintiff -* ***settled 2020***

<u>**Daniel R. Shaffer,**</u> **Matthew S. Martin**
**Grand Junction and Glendale, CO**
> Estate of Daniel Allard, Aanda Slocum, as Personal Representative of the Estate of Daniel Allard, deceased, vs Corizon Health, Inc., Sarah Richardson, LPN, in her individual capacity; and Deborah Kinder, in her individual capacity, Defendants.
> *Plaintiff -* ***ongoing litigation***

<u>**J. Timothy Smith,**</u> **Elliott and Smith**
**Fayetteville, AK**
> Kathy Jordan, as guardian of the Person and the Estate of Lindsey B. Jordan, an incapacitated person Plaintiff vs. Southern Health Partners, Inc.; Leah Branyan, RN; Tyranny D. Ray, LPN; Benton County, Arkansas, et al., Defendants.
> *Plaintiff -* ***settled 2020***

<u>**Andrew McNulty,**</u> **Killmer, Lane & Newman, LLP**
**Denver, CO**
> Estate of Tomas Beauford, Tiffany Marsh, personally and as a representative of the Estate of Tomas Beauford, Deceased, Plaintiffs, vs. Mesa County, Colorado, a Government Entity; et al., Defendants.
> *Plaintiff -* ***ongoing litigation***

<u>**William Bird,**</u> **Bird Law Firm and Michelle Carpenter, Kranitz, Sadoun & Carpenter, PC**
**St. Joseph, MO**
> Brenda Davis, et al. vs. Buchanan County, et al.
> *Plaintiff -* ***ongoing litigation***

# Legal Cases-Depositions/Trial

Lori E. Roscoe, DNP, APRN, ANP-C, CCHP-RN
**2017 - 2021**

**Anna Holland-Edwards,** **Erica Grossman, Holland, Holland-Edwards & Grossman**
**Denver, CO**
>  Estate of Jeffrey Scott Lillis, et al. vs. CorrectCare Solutions, LLC, et al.
> *Plaintiff - **settled 2019***

**Erik Heipt and Edwin Budge,** **Budge & Heipt, PLLC**
**Seattle, WA**
> Teresa Sabbie, individually, as personal representative of the Estate of Michael Sabbie,
> et al, Plaintiffs v. Southwestern Correctional, LLC d/b/a Lasalle Corrections, LLC and
> Lasalle Southwest Corrections, et al. Defendants
> *Plaintiff - **settled 2019***

**Francis "Brink" Hinson IV,** **FINKEL LAW FIRM LLC**
**Columbia, SC**
> Robert Kenneth Hilliard, Plaintiff v. Southern Health Partners, Inc, Charles A. Bush,
> M.D., and Marlboro County, Defendants
> *Plaintiff - **trial June 2019***

**Reid Allison, Darold Killmer,** **Killmer, Lane & Newman, LLP**
**Denver, CO**
**Roy A. Jacobson,** **Jacobson Law Offices**
**Jackson, WY**
> Steven M. MIllward and Riley J. Millward v. Teton County Board of Commissioners, et al.
> *Plaintiff - **settled 2020***

**Anthony Marchetti, Jr.,** **Marchetti Law, PC**
**Cherry Hill, NJ**
> Webster v. State of New Jersey, et al.
> *Plaintiff - **settled 2019***

**Cherie Wade, ADA; Tony Lawrence, DA,** **State of Mississippi**
**19th District Court**
> State of Mississippi v. Carmon Sue Brannan
> *State of Mississippi - **trial 2018***

**Alan Lassetter**, Shuttlesworth Lassetter, LLC
**Birmingham, AL**
> Timothy Hays, as the personal representative of the Estate of Brandon
> Lee Hays, Plaintiff, vs. Shelby County, Alabama, et al.,
> *Plaintiff - **settled 2018***

# Legal Cases-Depositions/Trial

Lori E. Roscoe, DNP, APRN, ANP-C, CCHP-RN
**2017 - 2021**

**Vincent DeSalvo,** The Law Offices of Vincent DeSalvo
**Baton Rouge, LA**
> Brandie Melton, et al v. East Baton Rouge Sheriff's Office.
> *Plaintiff -* ***settled 2020***

**David Damick,** **Law Offices of David N. Damick**
**St. Louis, MO**
> Jacob Benoit and Zachary Benoit, Plaintiffs v. Lindell Riffle, et al.
> *Plaintiff -* ***settled 2018***

**Trent Lowry,** **Griffith, Lowry & Meherg, LLC**
**Cullman, AL**
> Steven C. Smith, as conservator for Brandon Jeffries v. Travis Turner, et al,
> *Plaintiff -* ***settled 2018***

**Cameron Kuhlman,** **The Claiborne Firm, PC**
**Troy Rafferty and William Cash III**, **Levin, Papantonio Thomas, Mitchell Rafferty and Proctor, P. A.**
**Mark O'Mara**, **O'Mara Law Group**
> Soloman Oludamisi Ajibade and Adenike Hannah AJjibade, as natural parents of
> Mathew Ajibade, and the Estate of Mathew Ajibade and Chris Oladapo, its Executor,
> Plaintiffs, vs. John Wilcher, in his official capacity as Chatham County Sheriff, et al.,
> Defendants
> *Plaintiff -* ***settled 2019***

*The Estate of Cindy Lou Hill, by and through its personal representative, Joseph A. Grube; and Cynthia Metsker, individually vs. Naphcare, Inc., et al.*

Case No. 2:20-cv-00410-RMP

Declaration of Hank Balson

Exhibit W

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON


THE ESTATE OF CINDY LOU HILL, by        )
and through its personal                )
representative, Joseph A. Grube;        )
and CINDY METSKER, individually,        )
                                        )
                    Plaintiffs,         )
                                        )
            vs.                         ) No.
                                        ) 2:20-cv-00410-RMP
NAPHCARE, INC., an Alabama              )
corporation; HANNAH GUBITZ,             )
individually; and SPOKANE COUNTY,       )
a political subdivision of the          )
State of Washington,                    )
                                        )
                    Defendants.         )


VIDEOTAPED DEPOSITION OF EMILY FEELY, MD

October 25, 2021

Taken via Zoom

1      only minimal or mild symptoms of withdrawal and suddenly

2      exhibits severe abdominal pain, is it reasonable, in your

3      opinion, for the nurse to leave that patient suffering

4      that severe pain without notifying a higher level

5      provider of the situation?

6                     MS. WICK:  Object to the form.  Go

7      ahead if you can.

8                     **THE WITNESS:  If she feels that it's**

9      **detox related potentially and not something life**

10     **threatening or severe, then I could see her putting the**

11     **person on medical watch or, you know, evaluating them**

12     **more frequently but not sending them out and contacting a**

13     **provider.  It's gonna be a clinical judgment thing again.**

14   Q   (By Mr. Balson)  So if the patient is experiencing severe

15     pain and even if it is due to withdrawal, is it the

16     practice, the accepted practice at NaphCare, to just

17     leave that patient to continue suffering that pain

18     without doing anything to treat the pain?

19                    MS. WICK:  Object to the form.  Calls

20     for speculation.  Go ahead.

21                    **THE WITNESS:  No.  We have protocols**

22     **in place with bentyl and things like that to help manage**

23     **abdominal pain.  Ibuprofen and other medications that**

24     **could be given.  And it's gonna depend on the severity of**

25     **the pain again.  And, no, we don't want anyone to suffer**

1    in pain.

2         But another thing to know is that, you know, if

3    you're dealing with people who are withdrawing from

4    things like opioids, their pain tolerance is lot lower.

5    And so it's difficult to know if patients are drug

6    seeking or if they truly have pain.

7         It's -- it's -- it's very difficult to manage these

8    patients in a jail setting.  And -- and that's not an

9    excuse, it's the truth.  And so knowing who is -- is

10   severely having pain, who is -- is something more serious

11   than withdrawal, it can be very difficult in these

12   situations.  It's -- it's never gonna be black and white.

13 Q  (By Mr. Balson)  I understand that.

14        In a situation where the nurse believes the

15   patient's complaints of pain and doesn't think the

16   patient is -- is exaggerating, in that situation is it

17   reasonable to leave the patient, again, suffering that

18   pain without doing anything to treat the pain?

19                   MS. WICK:  Object to the form.

20                   THE WITNESS:  If a nurse believes that

21   someone's having severe pain, they should treat it.

22 Q  (By Mr. Balson)  And if the -- and can the nurse treat

23   that pain on her own or in that situation should she

24   contact a higher level provider for a recommendation or

25   order?

```
 1   STATE OF WASHINGTON )    I, April Cook, CCR #3245,
                        ) ss a certified court reporter
 2   County of Pierce   )    in the State of Washington, do
                             hereby certify:
 3

 4
         That the foregoing deposition of EMILY FEELY, MD was
 5   taken before me and completed on October 25, 2021, and
     thereafter was transcribed under my direction; that the
 6   deposition is a full, true and complete transcript of the
     testimony of said witness, including all questions, answers,
 7   objections, motions and exceptions;
 8       That the witness, before examination, was by me duly
     sworn to testify the truth, the whole truth, and nothing but
 9   the truth, and that the witness reserved the right of
     signature;
10
         That I am not a relative, employee, attorney or counsel
11   of any party to this action or relative or employee of any
     such attorney or counsel and that I am not financially
12   interested in the said action or the outcome thereof;

13       That I am herewith securely sealing the said deposition
     and promptly delivering the same to Hank Balson.
14
         IN WITNESS WHEREOF, I have hereunto set my signature on
15   the 30th day of October, 2021.

16

17

18
                             _____
19                           April Cook, CCR
20                           Certified Court Reporter No. 3245
                             (Certification expires 10/11/22.)
21

22

23

24

25
```

*The Estate of Cindy Lou Hill, by and through its personal representative, Joseph A. Grube; and Cynthia Metsker, individually vs. Naphcare, Inc., et al.*

Case No. 2:20-cv-00410-RMP

Declaration of Hank Balson

Exhibit X

# HEALTH CARE
## Policy & Procedure Manual

---

Spokane

---



## Nursing Assessment Protocols

**Policy Revised:** 09/04/2014

**NCCHC Standard:** Nursing Assessment Protocols (J-E-11)

**ACA Standard:** None

### Purpose

To ensure that nurses who provide clinical services are trained and do so under specific guidelines.

### Policy

Nursing assessment protocols shall be used by nursing staff when providing clinical care, to the extent possible. Nurses shall comply with relevant state practice acts and conduct data gathering and treatments appropriate to their skill levels.

### Procedure

1) NaphCare has developed Nursing Assessment Protocols that have been approved by and reviewed annually by the Nursing Administrator, and responsible physician.

2) Documentation of nurses' training in protocol use exists, including:

    a)   Evidence that all new nursing staff are trained;

    b)   Demonstration of knowledge and skills through competency testing;

    c)   Evidence of annual review of skills; and

    d)   Evidence of training when new protocols are introduced or revised.

3)   Nursing assessment protocols do not include the use of prescription medications, except for those covering emergency, life-threatening situations. Emergency administration of these medications requires a subsequent provider's order.



Figure: This TechCare screenshot shows an example of a nursing assessment protocol form.

### Relevant Forms

No relevant forms for this policy.

### References

RFP 26 03847

*Nursing Assessment Protocols (J-E-11). National Commission on Correctional Health Care: Standards for Health Services in Jails, 2014.*

Specific Site Addendum

Spokane

RFP 26 03848

*The Estate of Cindy Lou Hill, by and through its personal representative, Joseph A. Grube; and Cynthia Metsker, individually vs. Naphcare, Inc., et al.*

Case No. 2:20-cv-00410-RMP

Declaration of Hank Balson

Exhibit Y



# ABDOMINAL PAIN OR INJURIES - Created on

4/23/2021 11:38:47 AM CDT

| Patient: | _____, _____ | **#:** | _____ | **Lang:** | |
|---|---|---|---|---|---|
| **DOB:** | 4/23/1995 (Age=26) | **Sex:** | Male | **Race:** | |
| **Housing:** | _____ | **SSN:** | **HIDDEN** | **Type:** | |
| **Status:** | ACTIVE | | | | |

PICTURE NOT AVAILABLE

Current Allergies

Allergy History Not Known

Current Medications:

No Medications

Chronic Conditions:

No Flags

## SUBJECTIVE:

☐ History of Abdominal Pain

Pain Level (1 - 10)

☐ Nausea        ☐ Vomiting Duration

Last time eaten  What was eaten  Date of last BM

NCHG 001019

☐ Diarrhea Times

(in 24 hours)    ☐ Blood stools Amount    Duration

☐ Trauma When:    ☐ What type of trauma?

# OBJECTIVE: ** If patient on NSAIDS - D/C order and collect KOP's

# Orthostatic Vital Signs: Lying:

☐ Patient Refused

| BP | Temp | Pulse | Resp | SaO2 | BS | Pain | Height(ft) |
| / | Height(in) | Weight | BMI | MAP | | | |

# Orthostatic Vital Signs: Sitting:

☐ Patient Refused

| BP | Temp | Pulse | Resp | SaO2 | BS | Pain | Height(ft) |
| / | Height(in) | Weight | BMI | MAP | | | |

# Orthostatic Vital Signs: Standing:

☐ Patient Refused

| BP | Temp | Pulse | Resp | SaO2 | BS | Pain | Height(ft) |
| / | Height(in) | Weight | BMI | MAP | | | |

☐ Weight loss    ☐ per health record

# Skin Color:

| ☐ WNL | ☐ Flushed | ☐ Pale |
| ☐ Cyanotic | ☐ Grey/ashen | |

# Skin:

| ☐ Hot | ☐ Warm | ☐ Cool |
| ☐ Dry | ☐ Moist/clammy | |

# Abdomen Palpation:

| ☐ Soft | ☐ Tender to palpation | ☐ Guarding/pulling away |
| ☐ Rigid | | |

# Rebound Tenderness Quadrant location:

| ☐ RUQ | ☐ RLQ | ☐ LUQ |

NCHG 001020

☐ LLQ

☐ None

## Bowel Sounds:

☐ Present                    ☐ Absent

Other:

## ASSESSMENT:

☐ VS WNL/no acute distress (see education for plan)

☐ VS WNL/Diarrhea use Diarrhea Nursing Protocol

☐ VS WNL/Nausea and vomiting use Nausea and Vomiting Nursing protocol

☐ Acute distress NOTIFY Provider and begin treatment

PLAN:

Provider must be contacted for medication orders for any PREGNANT patients

☐ If systolic blood pressure is less than 90 mm Hg, follow standard procedures for shock (e.g., place patient in Trendelenburg if possible or elevate lower extremities with blankets/towels)

☐ Contact provider if Patient has significant orthostatic vital sign changes: Decrease in SBP> 20mmHg, decrease in DBP> 10mmHg  OR increase in pulse> 20 beats/minute

☐ Consult provider if nausea and vomiting present with abdominal pain

☐ Provider contacted

Time

☐ If indicated, active EMS, prepare for transport and notify detention: Time

☐ Start IV with Normal Saline 0.9% up to 200 cc/hr. Site:

☐ Gauge:

☐ Time:

☐ Obtain vital signs hourly while patient is being administered IV solutions

☐ Other

Other:

NCHG 001021

☐ Time of transfer to EMS Personnel:    ☐ Name of Ambulance Company:

## EDUCATION:

☐ Deferred until patient's condition stabilizes

☐ Submit request to see Health Care Provider if symptoms worsen or do not resolve

☐ Education for Nausea and Vomiting on Nausea and Vomiting Nursing Protocol

☐ Education for Diarrhea on Diarrhea Nursing Protocol

☐ Submit request to see Medical Provider if symptoms worsen or do not resolve

Comments:

*The Estate of Cindy Lou Hill, by and through its personal representative, Joseph A. Grube; and Cynthia Metsker, individually vs. Naphcare, Inc., et al.*

Case No. 2:20-cv-00410-RMP

Declaration of Hank Balson

Exhibit Z

Plaintiffs' Medical Expert Report

*In the matter of:*

**The Estate of Hill, et al. v. NaphCare, Inc., et al.**
**U.S. District Court Cause No. 2:20-cv-00410 RMP**

*Submitted by:*

Dr. Andy S. Barnett, MD, FACEP, FAAFP

Clinical Assistant Professor of Emergency Medicine
Elson Floyd College of Medicine, Washington State University
Legacy Salmon Creek Hospital
Vancouver, Washington

Assistant Professor of Family Medicine
Oregon Health & Science University
Portland, Oregon

Nov 21, 2021

*Prepared at the Request of:*

Budge & Heipt, PLLC
808 E. Roy St.
Seattle, WA 98102

## Qualifications

I am a Board Certified and Residency Trained Physician in both Family Medicine and Emergency Medicine. I am duly licensed to practice medicine in California (since 2003), Washington (since 2005), and Oregon (since 2010). I am active in clinical practice as an Associate Professor of Family Medicine at Oregon Health & Sciences University and as an Attending Physician in the Emergency Department at Legacy Salmon Creek Hospital in Vancouver, Washington. I have been Board Certified and in continuous full-time clinical practice since 2005. I have been an Attending Physician in the Emergency Department of numerous hospitals since 2006, and have cared for tens of thousands of acutely ill adult patients over the years. During that time, I have regularly cared for patients presenting with abdominal peritonitis from a number of causes. In several of those cases the peritonitis was the result of a perforated peptic ulcer, either in the stomach or the duodenum. I have also cared for many patients who present with or progress to overwhelming sepsis from a number of different sources. Additional details regarding my training, credentials, and experience can be found on my attached Curriculum Vitae.

## Materials reviewed

1. Death review by Steven Hammond, MD
2. NaphCare Medical Records (2016-2018)
3. Initial assessment at SCJ
4. 2018 progress notes
5. Receiving screening
6. 2018 COWS assessments
7. Video surveillance from 8/25/18 a.m.
8. Medical watch form
9. 8/26/18 email from Hannah Gubitz
10. Jail incident reports
11. NaphCare incident reports
12. NaphCare nursing assessment protocol for abdominal pain
13. Providence Sacred Heart Medical Center records
14. Autopsy report and photographs

15. Deposition of Hannah Gubitz, RN
16. Deposition of Jeffrey Maple, MD
17. Deposition of Emily Feely, MD
18. Deposition of CO Matthew Milholland
19. Cindy Hill Death Certificate

## Summary of Facts

Cindy Lou Hill was a 55 year old woman who was arrested and booked into Spokane County Jail on August 21, 2018. As per usual protocol for the Jail, Ms. Hill underwent an intake medical assessment shortly after her arrival, in the early afternoon of August 21st. This evaluation indicated that Ms. Hill was in relatively good overall health, although she did have some wheezing on exam (consistent with her known diagnosis of COPD), and had slightly low blood oxygen levels. Nurse Wattenburger consulted with the on-call medical provider (PA Denae) who recommended treatment with oxygen and albuterol, which successfully improved Ms Hill's wheezing and her blood oxygen levels returned to normal. In addition to the respiratory issues addressed, Nurse Wattenburger documented that Ms. Hill reported "stomach problems" but that her abdominal exam was normal, specifically that it was "soft, nontender, nondistended" and that her "bowel sounds [were] active and normally pitched".

The Spokane County Jail had a protocol in place for monitoring inmates for withdrawal symptoms if they were habitual or recent drug users.  Because Ms. Hill admitted to regular and recent use of heroin and began to experience withdrawal symptoms on August 22nd, the nursing staff started her on regular assessments of the severity of her withdrawal. This was done using a standardized clinical assessment tool known as the Clinical Opiate Withdrawal Scale (COWS). In additional to regular assessments of the severity of her withdrawal, she received multiple oral medications to treat the symptoms of her withdrawal including loperamide, ondansetron, dicyclomine, ibuprofen, and clonidine.  All of these medications are typical in the treatment of opiate withdrawal, and the medication record indicates that these medications were given in typical amounts and frequencies over the next several days. All of the COWS assessments documented in the medical record indicated that Ms. Hill was having withdrawal symptoms in the 'minimal' to 'mild' range between August 22nd and August 25th, with scores ranging from 4 (minimal) to 12 (mild). It should be noted that the nurses documented that Ms. Hill 'refused' 4 of the 10 COWS assessments that were attempted, including 3 of the last 4 on August 24th and 25th. What follows is a list of the dates and times that COWS scores were documented for Ms. Hill by various nurses at the jail.

- 8/22/18, 3:57pm = 5 (minimal)
- 8/22, 4:38pm = 5
- 8/23, 3:01am = REFUSED
- 8/23, 8:05am = 12 (mild)
- 8/24, 12:30am = 6 (minimal)

- 8/24, 8:38am = 10 (mild)
- 8/24, 2:55am = REFUSED
- 8/24, 11:44pm = REFUSED
- 8/25, 10:51am = 4 (minimal); first eval by Gubitz RN
- 8/25, 4:10pm = REFUSED

Ms. Hill appears to have attended a court hearing on August 24th. The primary source documents needed to verify this have not been reviewed by me, but are referenced in the Death Review by Dr. Steven Hammond and in the interview of Ms. Hill's cellmate by Spokane Police Detective Drapeau.

In the early morning of August 25, 2018, Ms. Hill presented with severe abdominal pain. Her cellmate for the several days prior to this, Ms. Kimberly McNichol, alerted prison staff during their morning rounds to Ms. Hill's illness. Nurse Hannah Gubitz, RN was on her morning rounds (which included performing COWS assessments for inmates such as Ms. Hill), and came to the door of Ms. Hill's cell along with a Correctional Officer (CO). Due to Jail policy at that time, Nurse Gubitz was unable to enter Ms. Hill's cell, and when necessary she would typically ask an inmate to come to the door of the cell to allow her to perform an assessment. Ms. Hill was apparently unable to get to the door under her own power, and so her cellmate dragged her to the door on a blanket so she could be assessed more closely. Nurse Gubitz performed an assessment across the threshold of the door, and her observation at that time was that Ms. Hill was in severe abdominal pain. She obtained a partial set of vital signs (Blood pressure of 130/86, Heart rate of 78, Respiratory rate of 16, and Oxygen saturation of 95%) which were all essentially normal. She did not obtain a temperature and was only able to perform a limited exam of Ms. Hill's abdomen due to her abdominal pain. Nurse Gubitz documented a COWS score of 4 at that time, which is in the 'minimal' range for opiate withdrawal. This interaction took approximately 5 minutes, and occurred at approximately 8:45am.

Nurse Gubitz described this interaction in her own words, as documented in the medical record shortly after it occurred:

"Patient laying on floor on arrival to cell wearing pants but no shirt. Patient indicated she did want to be checked but stated she was too sick to move. Notified patient we could not enter the cell without an additional officer. Patient's roommate rolled her in a blanket and dragged her to the cell door where she lay next to the toilet screaming. Patient's cell mate indicated patient was having severe abdominal pain and it was most likely her appendix. Patient curled in fetal position on floor, barely allowed this RN to check vitals. Patient allowed minimal assessment of abdomen. No bruising, swelling, redness, or masses noted on visual assessment or palpation. Patient screamed even louder before this RN even touched abdomen shouting that this RN was hurting her. Patient would not answer questions about what her pain was on a scale of 1~ 10, when it started, or what it felt like. She stated it was on her right lower abdomen but screamed in pain on gentle palpation of entire abdomen and back. Patient taken to 2Wvia wheelchair for medical watch."

Based on the assessment above by Nurse Gubitz at approximately 8:45am, she placed Ms. Hill on a 'Medical Watch 30', which means that Ms. Hill would be moved to a single occupancy cell in a different section of the jail. It also meant that the prison guards should check on Ms. Hill every 30 minutes to assess her wellbeing. This transfer took place shortly after 9am on August 25, and Ms. Hill was transported by wheelchair. After arrival on the Medical Watch floor, prison staff documented checking on Ms. Hill roughly every 30 minutes between 10:15am and 3:20pm. Each assessment indicated whether she was Awake or Asleep, and one entry also noted that she refused lunch at 11:09am. There is no additional information in the medical watch log, other than an untimed entry on 8/25/18 that Ms. Hill "was taken to Hospital". Nurse Gubitz reported after Ms. Hill died that she also assessed Ms. Hill at roughly 3pm and that Ms. Hill "sat up some", was "Responsive and forthcoming", and "appeared in no acute or immediate distress" but that Ms. Hill declined any further evaluation. Nurse Gubitz has stated that she did not document this refusal of evaluation in the typical manner, which requires either a signature from either the inmate or by a staff member who is witness to the refusal.

Ms. Hill was regularly receiving oral doses of clonidine for the management of her opiate withdrawal symptoms, with the last dose recorded at 8:38AM on 8/24/18. Clonidine is commonly used for the treatment of opiate withdrawal and the dosing is usually once or twice a day, as it was ordered for Ms. Hill. Clonidine is a medication which works on the brain to lower blood pressure and heart rate and has an approximate half-life of 5-13 hours. Based on this, Ms. Hill could have had approximately 25% of the active dose of clonidine still in her system at the time of Nurse Gubitz evaluation in the morning of 8/25/18.

There was no medical watch log entry after 3:20pm. At approximately 4:24pm (a little over one hour since the last Medical Watch log entry), CO Milholland brought dinner to Ms. Hill's cell on his usual dinner rounds. He reports that Ms. Hill said "what" and then "ugh" but did not otherwise move or speak to him. He continued his dinner delivery rounds and returned to Ms. Hill's cell at 5:24pm to see if she had eaten. He saw her laying down in her cell and she did not respond in any way to his verbal call. He attempted to engage her verbally several times and she remained unresponsive. He called for medical help and RN Kallsen reports that he arrived at 5:25pm with another officer, and the door was unlocked to allow him to enter the cell. Upon entering he determined that Ms. Hill was in cardiac arrest. He pulled her out of her cell and began a typical course of Cardiopulmonary Resuscitation (CPR) including application of an Automated External Defibrillator (AED). Spokane Fire Department and American Medical Response reportedly arrived on scene a few minutes later at approximately 5:39pm and took over resuscitation efforts. At approximately 6:00pm the team in the Jail contacted an Emergency Department physician (Dr. Harris) who agreed that further resuscitation efforts would be futile, and Ms. Hill was pronounced dead on the scene at 6:00pm.

At 6:02pm one of the Fire Medics believed that that they saw signs of life and felt a pulse, so resuscitation was started again and Ms. Hill was transported emergently to Sacred Heart Medical Center in Spokane, WA. After arrival in the Emergency Department and ongoing CPR for another 10 minutes, the Emergency Physician performed an ultrasound which

demonstrated "no cardiac movement", and resuscitation efforts were stopped. Ms. Hill was pronounced dead by the Emergency Physician (Dr. A B Harris) at 6:31pm on August 25th, 2018.

On August 27, 2018, an autopsy was performed on Ms. Hill's body by Dr. Sally Aiken with the Spokane County Medical Examiner's Office. The cause of death was determined to be "acute bacterial peritonitis due to ruptured duodenal liver adhesions with perforation of the duodenum". There were no other serious or life-threatening medical conditions or injuries found during this autopsy.

## Medical Opinions

Based upon my review of the above materials, my training and experience as an Emergency Medicine Physician and my review of the medical literature, I believe the following to be true on a more probable than not basis:

1. Cindy Hill died due to a perforation of her duodenum which occurred while she was incarcerated at the Spokane County Jail.

2. Ms Hill's duodenal perforation led to the spilling of her bowel contents into the inside of her abdominal cavity, which led to peritonitis, sepsis, shock, and ultimately cardiac arrest.

3. Ms. Hill's clinical signs and symptoms in the morning of 8/25/18 were typical of a patient suffering from a bowel perforation. Namely, she reported severe abdominal pain that was made worse by any palpation of her abdomen. It also appears from the limited records that her pain came on somewhat suddenly in the early hours of 8/25/18; this is the usual pattern of pain presentation for a bowel perforation, because the acid contents of the stomach are extremely caustic and cause severe pain when they are no longer contained in the intestinal tract.

4. The limited assessment performed by Nurse Gubitz at approximately 8:45am on 8/25/18 indicated that that Ms. Hill was in acute distress. Dr. Maple testified in his deposition that "acute distress" is indicated by abnormal vital signs, altered mental status, and/or signs of shock. While it is true that these factors can indicate acute distress, a patient can also be in acute distress even if none of these findings are present. There is no universally accepted medical definition of "acute distress", but in general it refers to a patient who exhibits either signs or symptoms that suggest they are either acutely ill or suffering from a severe and unpleasant symptom. For any trained medical professional, it should be abundantly obvious that a patient who is lying on the floor in a fetal position, screaming in pain, and unable to tolerate a basic abdominal exam, is in acute distress. The only relevant caveat to this would be a situation where there are solid grounds to believe that the patient is not reporting their

symptoms honestly. In the case of Ms. Hill, it is important to note that Nurse Gubitz
testified in her deposition that she did not believe that Ms. Hill was lying about the
severity of her pain. Given Ms. Hill's credible and severe pain as an obvious sign of
"acute distress", Nurse Gubitz should have followed the "NaphCare Nursing Assessment
Protocol re Abdominal Pain or Injuries". Based on this protocol and Ms. Hill's clinical
picture on the morning of 8/25/18, Nurse Gubitz should have consulted with a Medical
Provider or transferred Ms. Hill to the Emergency Department for further evaluation
and treatment. She failed to do this.

5. Nurse Gubitz determined that Ms. Hill had essentially normal—if limited—vital signs at
the time of her assessment on the morning of 8/25/18. It is possible that Ms. Hill's vital
signs, in particular her heart rate, were affected by the clonidine dose given the day
before. It is impossible to say the degree to which her heart rate would have been
lowered by clonidine in her system, but the heart rate is a key parameter in the
assessment of possible sepsis. As sepsis progresses, the heart rate typically elevates (this
is one of the key features of sepsis) and this fact may have been obscured by the
pharmacologic activity of the clonidine. However, the dose given on 8/24/18 was quite
low, and would likely have had only a minimal effect on Ms. Hill's heart rate in the
morning of 8/25/18.

6. Ms. Hill should have been transported to a hospital emergently when she was first
noted to have severe abdominal pain. The possible causes of Ms. Hill's presentation at
that time included a number of serious and emergently life-threatening conditions, and
it was impossible to perform a clinically adequate assessment without advanced
diagnostic equipment and lab tests.

7. If a medical provider had been consulted by Nurse Gubitz with the information she
documented in the medical record after her 8:45am assessment on 8/25/18, it is more
likely than not that she would have been instructed to transfer Ms. Hill to the
Emergency Department for further evaluation. Transfer to the emergency department
in this situation would have met the standard of care. It is not surprising that Dr. Jeffrey
Maple, MD—the Medical Director of the Spokane County Jail at the time of Ms. Hill's
death—agreed at his deposition that he would have advised Nurse Gubitz to transfer
Ms. Hill to the Emergency Department if he had been consulted on that day and with
that information. It is also not surprising that Dr. Emily Feely—the Chief Medical Officer
of NaphCare at the time of Ms. Hill's death—described herself in an email as "livid"
when reading the medical record entry by Nurse Gubitz following that same assessment.

8. Ms. Hill suffered severe pain from the time that her bowel perforated until the time of
her death, or at least for as long as she remained conscious. Judging from the records I
was given to review, I would estimate that this time began before 8:45am on 8/25/18
(when she was placed on Medical Watch by Nurse Gubitz for severe abdominal pain)
and lasted at least until 4:24pm that same day when she was minimally responsive to

CO Milholland during dinner delivery.

9.  Ms. Hill's bowel perforation, while not a highly common condition, can be routinely diagnosed and managed in any typical Emergency Department. A diagnosis can be rapidly established with an X-ray or CT scan, and emergent surgical management can be initiated. While bowel perforations are medically serious, they are not typically fatal if diagnosed and treated promptly. This conclusion is based on both my own personal experience managing patients with bowel perforations over the last 15 years, as well as a significant body of medical literature addressing this specific question. Several large studies have shown that the mortality rate for perforations such as Ms. Hill's is typically much lower than 50% if treated promptly and with surgical repair. The length of time between perforation and surgery has a significant impact on the mortality rate, with longer delays resulting in higher mortality. See Refs 1-4 below.

10. Transportation to an Emergency Department after Nurse Gubitz' first evaluation on 8/25/18, at approximately 8:45am, would have more likely than not led to a diagnosis and surgical intervention within 6 hours or less. This is based on my own experience of the typical amount of time for the diagnosis to be made by an Emergency Physician, and for a surgical team to be assembled and initiate surgery. My experience in this area includes work in hospitals that are both rural and urban, large and small. If Ms. Hill was in the hospital shortly after 8:45am, her pain would also have been treated, antibiotics would have been administered, her clinical status would have been monitored carefully by trained medical providers, and her chance of survival would have been significantly higher than 50%.

11. When Ms. Hill was seen by CO Milholland at 4:24pm, she was still apparently responsive, albeit minimally. It can be assumed based on the typical progression of bacterial peritonitis and overwhelming sepsis that she was already quite sick at that point. Nonetheless, the fact that she was still conscious makes it more likely than not that she would have survived if she was emergently transferred to the emergency department at that point. This conclusion is based on my own experience managing similar patients and on the medical literature cited below which describes the factors associated with mortality following a bowel perforation such as Ms. Hill's. (See Refs 1-4).

12. If Nurse Gubitz had requested emergent transportation to the Emergency Department after her 8:45am evaluation, Ms. Hill could have been transported and evaluated in the Emergency Department in a timely fashion. This is based on the amount of time it took for AMR to respond to the call that was made later in the day, and the time it took them to transport Ms. Hill after her cardiac arrest, all of which occurred in less than 45 minutes.

13. Once Ms. Hill was found to be in cardiac arrest at 5:25pm by RN Kallson, she had a much less than 50% chance of survival. This is based on my own experience attempting to

resuscitate patients who experienced out of hospital cardiac arrest due to sepsis, as well as multiple large studies which have looked at this question. (See Ref 5)

## Conclusion

Bowel perforation in this exact scenario might not be common, but recognition of the need to further investigate severe abdominal pain is the expected standard of care. This standard was breached by Nurse Gubitz in her failure to consult with a licensed provider or to transport Ms. Hill to an Emergency Department when she first found her to be in severe abdominal pain. The failure to transport her to an Emergency Department resulted in Ms. Hill suffering severe pain from at least 830am until at least 4:24pm on 8/25/18. Had Ms. Hill been transported to an Emergency Department at any time prior to 4:24pm, she would have more likely than not survived her duodenal perforation.

I hold the opinions expressed above on a more likely than not basis and to a reasonable degree of medical certainty. I respectfully reserve the right to revise these opinions based on receipt of additional relevant information.

References:
1. Møller MH, Engebjerg MC, Adamsen S, Bendix J, Thomsen RW. The Peptic Ulcer Perforation (PULP) score: a predictor of mortality following peptic ulcer perforation. A cohort study. Acta Anaesthesiol Scand. 2012;56:655–62. doi:10.1111/j.1399-6576.2011.02609.x.
2. Mäkelä JT, Kiviniemi H, Ohtonen P, Laitinen SO. Factors that predict morbidity and mortality in patients with perforated peptic ulcers. Eur J Surg. 2002;168:446–51.
3. Kocer B, Surmeli S, Solak C, Unal B, Bozkurt B, Yildirim O, et al. Factors affecting mortality and morbidity in patients with peptic ulcer perforation. J Gastroenterol Hepatol. 2007;22:565–70.
4. Møller MH, Adamsen S, Thomsen RW, Møller AM. Preoperative prognostic factors for mortality in peptic ulcer perforation: a systematic review. Scand J Gastroenterol. 2010;45:785–805. doi:10.3109/00365521003783320.
5. Riva, G., Ringh, M., Jonsson, M., Svensson, L., Herlitz, J., Claesson, A., Djärv, T., Nordberg, P., Forsberg, S., Rubertsson, S. and Nord, A., 2019. Survival in out-of-hospital cardiac arrest after standard cardiopulmonary resuscitation or chest compressions only before arrival of emergency medical services: nationwide study during three guideline periods. *Circulation*, *139*(23), pp.2600-2609.

## Compensation

My fees for the review of materials, preparation of documents, and meetings with the attorney in this matter are $500/hr. My fees for appearance at hearings, deposition, or trial are $900/hr.

## Prior expert testimony

I have participated as a medical expert in the review of multiple prior cases. I have been deposed once and have appeared at 1 trial. Details are below.

| Year | Parties | Court | Role | Notes |
|------|---------|-------|------|-------|
| 2021 | Multnomah County v. Richmond | Multnomah County Court, Portland, OR | Criminal Defense Expert | Trial |
| 2020 | Lukovenko v. Legacy Health | Multnomah County Court, Portland, OR | Defense Expert | Deposition |

# Curriculum Vitae
# Andy S. Barnett, MD, FACEP, FAAFP
# November 2021

## CURRENT PRACTICE

Board Certified and Residency trained in both Family Medicine and Emergency Medicine, and actively in practice in both specialties on a weekly basis, for 16 years continuously. Currently serving as the Medical Director of Immediate Care Services and the Director of Education for Advanced Practice Providers, in the #1 Department of Family Medicine in the country (according to U.S. News & World Report). Regularly working clinical shifts in the Emergency Department as an attending physician and Clinical Assistant Professor in the Emergency Department at a large urban multispecialty hospital. Military Veteran with 9 years served in the United States Air Force.

## BOARD CERTIFICATION

   a. American Board of Family Medicine, Diplomate in 2005
   b. American Board of Emergency Medicine, Diplomate in 2014

## MEDICAL LICENSURE

   a.  State of California, Physician and Surgeon (2003 - present)
   b.  State of Washington, Physician and Surgeon (2005 -  present)
   c.  State of Oregon, Physician and Surgeon (2010 - present)

## EDUCATION

   a. Undergraduate:
          i. **Harvard University**
          ii. Degree: Bachelor of Arts, *cum laude* in Chemistry
          iii. Graduated June 1997
   b. Medical School:
          i. **Duke University**
          ii. Degree: Doctor of Medicine
          iii. Graduated May 2002
   c. Military Training Courses:
          i. Commissioned Officer Training (July 2000)
          ii. Combat Casualty Care Course (Sep 2004)
          iii. Traumatic Brain Injury for Military Providers (Sep 2007)

## POSTGRADUATE TRAINING

    i. **Family Medicine**
- 1. UC Davis – David Grant Medical Center
- 2. Travis Air Force Base, California
- 3. July 2002 – June 2005

    ii. **Emergency Medicine**
- 1. Oregon Health  & Science University
- 2. Portland, Oregon
- 3. March 2010 – February 2013

## HONORS AND AWARDS

a. Undergraduate – **Harvard University**
- i. Degree Cum Laude with honors in Chemistry
- ii. Division 1 NCAA Varsity Athlete in wrestling
- iii. Dean's list all semesters
- iv. Harvard College Scholarship for Academic Distinction
- v. Advanced standing designation (eligible to graduate after 3 years)
- vi. Derek Bok Award for Excellence in the Teaching of Harvard Undergraduates

b. Medical – **Duke University**
- i. Honors received in Anatomy, Pharmacology, Psychiatry, Internal Medicine, and Family Medicine

c. Military – **U.S. Air Force**
- i. Commissioned Officer Training Distinguished Graduate
- ii. United States Air Force Health Professions Scholarship
- iii. Society of Teachers of Family Medicine Resident Scholar Award
- iv. Outstanding Resident Teacher Award – David Grant Med Center
- v. Outstanding unit award, Air Force Achievement Medal
- vi. #1 Primary care team in the U.S. Air Force, 2007

## ACADEMIC/TEACHING EXPERIENCE

a. Assistant Professor of Family Medicine
- a. Oregon Health & Science University
- b. February 2020 –

b. Clinical Assistant Professor of Medicine
- a. Washington State University, Ellen S Floyd College of Medicine
- b. November 2019 –

c. Clinical Instructor of Family Medicine and Gastroenterology
- i. Oregon Health & Science University
- ii. Dec 2011 – June 2013

d. Clinical Instructor of Family Medicine
- a. University of Washington
- b. March 2009 – June 2012

e. Staff Physician – Family Medicine Residency Program

      i. Madigan Army Medical Center
      ii. October 2008 – March 2010

## HOSPITAL/CLINICAL EXPERIENCE

   **a. Medical Director**
      **i.   Oregon Health & Science University**
      **ii.  Department of Family Medicine, Immediate Care Services**
      **iii. April 2020 - Present**
   **b. Staff Physician**
      **i.   Legacy Salmon Creek Medical Center**
      **ii.  Department of Emergency Medicine**
      **iii. March 2019 - Present**
   c. Strategic Consultant, Immediate Care Services
      i.   Oregon Health & Science University
      ii.  Department of Family Medicine
      iii. Feb 2020 - Present
   d. Medical Director
      i.   Legacy-GoHealth Urgent Care
      ii.  Legacy Medical Group and Access Clinical Partners Joint Venture
      iii. March 2016 – December 2018
   e. Staff Physician
      i.   Kaiser Permanente Northwest
      ii.  Department of Emergency Medicine, Department of Gastroenterology
      iii. September 2013 – Present
   f. Staff Physician
      i.   Portland VA Medical Center
      ii.  Department of Emergency Medicine
      iii. June 2010 – February 2013
   g. Staff Physician
      i.   Jefferson General Hospital, Port Townsend, WA
      ii.  Department of Emergency Medicine
      iii. Oct 2006 – December 2011
   h. Clinic Chief
      i.   Madigan Army Medical Center, Tacoma, WA
      ii.  Department of Family Medicine
      iii. July 2009 – March 2010
   i. Staff Physician
      i.   Madigan Army Medical Center, Tacoma, WA
      ii.  Department of Family Medicine
      iii. Feb 2006 – Dec 2010
   j. Staff Physician
      i.   McChord Medical Center, Tacoma, WA
      ii.  Family Medicine Clinic
      iii. July 2005 – August 2008

k.   Trauma Fellow and Consultant
    i.   Chris Hani – Baragwanath Hospital, South Africa
    ii.   Department of Surgery
    iii.   March – April 2005, October—November 2011

## PROFESSIONAL ORGANIZATIONS

c   American College of Emergency Physicians
    i. **Awarded the Degree of Fellow in 2018**
d.   American Academy of Family Physicians
    i. **Awarded the Degree of Fellow in 2010**
e.   American Academy of Primary Care Endoscopy (inactive)
f.   Uniformed Services Academy of Family Physicians (inactive)
g.   Society of Teachers of Family Medicine (inactive)

## OTHER TEACHING RESPONSIBILITIES

a. Harvard University Department of Chemistry
    i. Head Teaching Fellow, 1997 – 1998 (Course taught by Nobel Laureate Dudley Herschbach)
    ii. Teaching Fellow, 1996 – 1997
    iii. Teaching Assistant, 1995 – 1996
b. American College of Surgeons
    i. Advanced Trauma Life Support Instructor, 2005 – 2015
c. American Heart Association
    i. Advanced Cardiac Life Support Instructor, 2005 – 2013
    ii. ACLS Course Director, 2009 – 2011

## EDITORIAL RESPONSIBILITIES

a. Journal of Military Medicine
    i. Peer reviewer
b. ReelDx.com
    i.  Editorial board member
c. Journal of Urgent Care Medicine
    i. **Senior Research Editor**
    ii. Editorial Board Member

## SPECIAL LOCAL RESPONSIBILITIES

a.   Massive Transfusion Committee Member
    i.   Legacy Salmon Creek Hospital
    ii.   2019 - present
b.   Section Chair, Urgent Care Medicine
    i.   Legacy Emanuel Hospital
    ii.   2016-present
c.   Hospital Credentials Committee Member

        i.     Legacy Emanuel Medical Center
        ii.    2018-present

d.  Chair of Peer Review Committee
        i.     Legacy-GoHealth Urgent Care
        ii.    2016-2018

e.  Information Technology Steering Committee Member
        i.     GoHealth Urgent Care
        ii.    2016-2018

f.  Clinical Steering Committee Operations Director
        i.     GoHealth Urgent Care
        ii.    2017-2018

g.  Emergency Department Continuous Quality Improvement Committee
        i.     Oregon Health & Science University
        ii.    2012 – 2013

h.  Emergency Department Disaster Operations Committee
        i.     Oregon Health & Science University
        ii.    2010 – 2013

i.  Advanced Cardiac Life Support – Course Director
        i.     Madigan Department of Family Medicine
        ii.    2009 – 2010

j.  Code Blue Program Director
        i.     McChord Air Force Base
        ii.    2005 – 2008

k.  Facility HIV Care Coordinator
        i.     McChord Air Force Base
        ii.    2005 – 2008

l.  Mass Casualty Critical Team Chief
        i.     McChord Air Force Base
        ii.    2005 – 2008

## **BIBLIOGRAPHY**

a. Peer Reviewed/Refereed Journals

    i.    **Barnett A,** Wang N, Sahni R, Hsia R, Haukoos J, Barton E, Holmes J, Newgard C.  Variation in Prehospital Use and Uptake of the National Field Triage Decision Scheme.  Prehospital Emergency Care.  17(2): 135-148, Apr 2013.

    ii.    **Barnett A**, Cedar A, Weed E, Siddiqi F, Herzig D, Thomas CR.  Colorectal Cancer Emergencies; A Review.  Journal of GI Cancer.  44(2):132-142, Jun 2013.

    iii.   Egol KA. Sheikhazadeh A. Mogatederi S. **Barnett A**. Koval KJ. Lower-extremity function for driving an automobile after operative treatment of ankle fracture. Journal of Bone & Joint Surgery –American.  85-A(7):1185-9, Jul 2003.

b. Book chapters

      i.  **Barnett A**.  Oral mucocele management.  Pfeninger and Fowler's Procedures for Primary Care.  3rd Ed., 2010.

c. Other publications

      i.  Michael R. Carmont, Kenneth A. Egol, Ali Sheikhazadeh, Sam Mogatederi, **Andy Barnett**, and Kenneth J. Koval. Lower-Extremity Function for Driving an Automobile After Operative Treatment of Ankle Fracture • K.A. Egol, A. Sheikhazadeh, S. Mogatederi, A. Barnett, and K.J. Koval reply.  J. Bone Joint Surg. Am., Aug 2004; 86: 1829 - 1830.

      ii.  **Barnett A**, Egol K, Sheikzadeh A, and Koval K.  Automobile Driving Following Ankle Trauma and Internal Fixation:  A pilot study.  Research Year Thesis, Duke University School of  Medicine.  2001.

      iii.  **Barnett A**.  High Resolution Spectroscopy of NO2 under Atmospheric Conditions.  Honors Degree Thesis.  Department of Earth and Planetary Sciences.  Harvard University.  1997.

      iv.  **Barnett A**, Tanen B. Inclusion of Cobalt (II) in Ethylenediammonium dihydrochloride.  Journal of Undergraduate Science.  Harvard University.  1995.

d. Abstracts

      i.  **Barnett A**, Chen Y, Chen Y, Daya M, Thomas CR, Herzig D.  Curative versus palliative therapy for patients with colorectal cancer presenting to the emergency department.  Academic Emergency Medicine.  Special Issue: 2012 Annual Meeting.  Volume 19, Supplement S1, pp s286.  Apr 2012.

e. National invitational lectures, posters

      i.  **Barnett A**. The 10 Most Important Urgent Care Articles of 2018. Peer reviewed presentation. Urgent Care Association of America National Conference. Houston, TX. October 13, 2018.

      ii.  **Barnett A,** Russell J.  The 10 Most Important Urgent Care Articles this Year. Peer reviewed presentation.  Urgent Care Association of America National Conference.  National Harbor, MD.  May 2, 2017.

      iii.  Russell J, **Barnett A**.  Urgent Care to Emergency Department Transitions of Care – Best Practices and Lessons Learned. Urgent Care Association of America National Conference.  National Harbor, MD.  May 2, 2017.

      iv.  **Barnett A**, Chen Y, Chen Y, Daya M, Thomas CR, Herzig D.  Curative versus palliative therapy for patients with colorectal cancer presenting to the emergency department.  Poster Presentation.  ASCO GI Cancer Symposium. San Francisco, CA.  Jan 21, 2012.

      v.  **Barnett A** and Short M.  Colonoscopy workshop.  Full day workshop presentation, USAFP National Conference.   Palm Springs, CA.  April 4, 2011

      vi.  **Barnett A** and Short M.  Colonoscopy workshop.  Full day workshop presentation, USAFP National Conference.   New Orleans, LA.  February 21, 2010.

      vii.  Short M and **Barnett A**. Colonoscopy workshop. Full day workshop presentation, USAFP National Conference. Portland, OR. March 14, 2008.

      viii.    **Barnett A** and Vandehoef S.  Subperiosteal Abscess – A Previously Unreported Complication of Lower Extremity Cellulitis.  Poster Presentation, USAFP National Conference.  Snowbird, UT.  April 2005.

      ix.    **Barnett A**. "Did You Find the Alcoholic in your Clinic Today?".   Mainstage Presentation, USAFP National Conference.  Snowbird, UT.  April 18, 2005.

      x.    **Barnett A** and Duncan C.  Taking the PDA Pulse:  Application and Device Use Among STFM Members. Poster Presentation, STFM Patient  Education Conference.  San Francisco, CA.  November 2004.

f.   Peer Reviewed Podcasts/Online content

      i.    Barnett, A, Russell, J, DeLaney, M, DeClerck, M. **Anisocoria**. HIPPO ED: Urgent Care Reviews and Perspectives, Episode 51. *Posted May 2019.*  https://www.hippoed.com/urgentcare/rap/episode/urgentcarerap5/anisocoria

      ii.    Delaney, M, Russell J, Barnett, A, Morrison M. **Shared Decision Making**. HIPPO ED: Urgent Care Reviews and Perspectives, Episode 53. *Posted July 2019.* https://www.hippoed.com/urgentcare/rap/episode/ucrapjuly2019/shareddecision

      iii.    Barnett, A, Barnett, A, Bright, A. **The Art of the Presentation**. HIPPO ED: Urgent Care Boot Camp. https://www.hippoed.com/urgentcare/account/bootcamp/lecture/theartofthe

      iv.    Russell, J, Barnett, A, Bright, A. **Efficient and Effective Charting**. HIPPO ED: Urgent Care Boot Camp. https://www.hippoed.com/urgentcare/account/bootcamp/lecture/efficientand

      v.    Russell, J, Barnett, A, Bright, A. **Safe ED Referrals**. HIPPO ED: Urgent Care Boot Camp. https://www.hippoed.com/urgentcare/account/bootcamp/lecture/safeedreferrals

      vi.    Barnett, A, Russell, J, DeLaney, M. **Renal Laceration.** HIPPO ED: Urgent Care Reviews and Perspectives. *In Press.*

      vii.    Barnett, A, DeClerck, M. **Workers Compensation**. HIPPO ED: Urgent Care Reviews and Perspectives, Episode 59. *Posted January 2020.* https://www.hippoed.com/urgentcare/rap/episode/mainlining/occupational

      viii.    Barnett, A, DeClerck, M. **Seasonal Allergies**. HIPPO ED: Urgent Care Boot Camp. *In Press*

      ix.    Barnett, A, DeClerck, M. **Mononucleosis vs. Strep Pharyngitis.** HIPPO ED: Urgent Care Boot Camp. *March 2020.*

      x.    Barnett, A, DeClerck, M. **Kidney Stones**. HIPPO ED: Urgent Care Boot Camp. *In Press.*

      xi.    Barnett, A, DeClerck, M. **Work Related Injuries**. HIPPO ED: Urgent Care Boot Camp. *In Press.*

xii.   Barnett, A, DeClerck, M., Morrison, M. **<u>Allergic Conjunctivitis</u>**. HIPPO ED: Urgent Care Reviews and Perspectives, Episode 73. *Posted March 2021*. <u>https://www.hippoed.com/urgentcare/rap/episode/TheFutureofUCPracticeduetoCOVID/thefutureofuc</u>

xiii.  Barnett, A, DeClerck, M., Morrison, M. **<u>The Future of Urgent Care After the Pandemic.</u>** HIPPO ED: UC Fest Spring 2021. *In Press.*

xiv.  Barnett, A, DeClerck, M., Morrison, M. **<u>Seasonal Allergies.</u>** HIPPO ED: Urgent Care Reviews and Perspectives. *Posted September 2021.*

xv.   Barnett, A, DeClerck, M., Morrison, M. **<u>Legally Defensible Charting</u>**. HIPPO ED: UC Fest Fall 2021. *In Press.*

xvi.  Barnett, A, DeClerck, M., Morrison, M. **<u>Use of Chaperones in Urgent Care.</u>** HIPPO ED: UC Fest Fall 2021. *In Press.*

xvii. Barnett, A, DeClerck, M., Morrison, M. **<u>The Trauma Informed GU Exam.</u>** HIPPO ED: UC Fest Fall 2021. *In Press.*

*The Estate of Cindy Lou Hill, by and through its personal representative, Joseph A. Grube; and Cynthia Metsker, individually vs. Naphcare, Inc., et al.*

Case No. 2:20-cv-00410-RMP

Declaration of Hank Balson

Exhibit AA

THE ESTATE OF CINDY LOU HILL vs NAPHCARE
Maple, Jeffrey - October 18, 2021

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON


THE ESTATE OF CINDY LOU HILL, by )
and through its personal )
representative, Joseph A. Grube; )
and CINDY METSKER, individually, )
 ) No. 2:20-cv-00410-RMP
    Plaintiffs, )
 )
   vs. )
 )
NAPHCARE, INC., an Alabama )
corporation; HANNAH GUBITZ, )
individually; and SPOKANE COUNTY, )
a political subdivision of the )
State of Washington, )
 )
    Defendants. )


VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF
JEFFREY E. MAPLE, MD

October 18, 2021


Taken Remotely via Zoom


Reporter:  Barbara Castrow, CCR, RMR, CRR

1      patient?

2  A   Yes, I would have been available by phone.

3  Q   If Nurse Gubitz had contacted you and reported to you the

4      same information that she documented on the assessment

5      form that we just looked at after her morning encounter

6      with Ms. Hill, what would you have done?

7                      MS. WICK:  Object to the form.

8          Go ahead.

9                      THE WITNESS:  You are asking me to

10     speculate on something, and I'm always uncomfortable

11     doing that because it's situational dependent, and it

12     would depend on the situation in the jail, what the nurse

13     reports to me.

14         If I was -- if she was to call me and tell me that

15     the patient had normal vital signs, normal mental

16     function, normal visual exam, was refusing care and had

17     enough mental capacity to do that in a lawful way and has

18     the right to do that, I wouldn't disagree with the

19     medical watch.

20 Q   (By Mr. Balson)  Okay.  Well, there's something you left

21     out in that summary.  What if her report to you also

22     included the information that Ms. Hill was screaming in

23     pain -- screamed in pain when Ms. Gubitz tried to touch

24     her abdomen for an assessment, had to be dragged to the

25     cell door by her cell mate and that her cell mate stated

1      that she had been in severe pain and thought it might be

2      her appendix?  Would that influence the recommendation

3      that you made to the nurse?

4    A   Yes, it would.  I would probably have recommended that

5      she go take this patient for further care probably to an

6      emergency room.

7    Q   Why is that?

8    A   There are too many unknowns.  But, again, I wasn't there,

9      and we're speculating.  The nurse was there.  She had

10     information in front of her.  She made a clinical

11     judgment.

12                    MR. BALSON:  Ed, can you please put

13     back up Exhibit 4.

14   Q   (By Mr. Balson)  So looking back at this narrative

15     description that Ms. Gubitz wrote, it looks like she

16     documented -- so this is the morning encounter on

17     August 25th.

18         It looks like she documented a blood pressure -- and

19     this was above -- a blood pressure, a pulse rate, a

20     respiration rate and an oxygen saturation level.  It also

21     looks like she interacted a bit with Ms. Hill's cell

22     mate, made a visualization of Ms. Hill, asked her

23     questions about her pain and palpated her abdomen and

24     back.

25         Based on your familiarity with these procedures,

```
 1 | STATE OF WASHINGTON )    I, Barbara Castrow, CCR, RMR, CRR
   |                     ) ss a certified court reporter
 2 | County of King       )    in the State of Washington, do
   |                           hereby certify:
 3 |
 4 |
   |      That the foregoing deposition of JEFFREY E. MAPLE, MD,
 5 | was taken before me and completed on October 18, 2021, and
   | thereafter was transcribed under my direction; that the
 6 | deposition is a full, true and complete transcript of the
   | testimony of said witness, including all questions, answers,
 7 | objections, motions and exceptions;
 8 |      That the witness, before examination, was by me duly
   | sworn to testify the truth, the whole truth, and nothing but
 9 | the truth, and that the witness reserved the right of
   | signature;
10 |
   |      That I am not a relative, employee, attorney or counsel
11 | of any party to this action or relative or employee of any
   | such attorney or counsel and that I am not financially
12 | interested in the said action or the outcome thereof;
13 |      That I am herewith securely sealing the said deposition
   | and promptly delivering the same to Hank Balson.
14 |
   |      IN WITNESS WHEREOF, I have hereunto set my signature on
15 | this 25th day of October, 2021.
16 |
17 |
18 |
19 |                          _Barbara Castrow_
20 |                          Barbara Castrow, CCR, RMR, CRR
   |                          Certified Court Reporter No. 2395
21 |                          (Certification expires 11/24/21.)
22 |
23 |
24 |
25 |
```

*The Estate of Cindy Lou Hill, by and through its personal representative, Joseph A. Grube; and Cynthia Metsker, individually vs. Naphcare, Inc., et al.*

Case No. 2:20-cv-00410-RMP

Declaration of Hank Balson

Exhibit BB



# ROBERT L AYERS JR LTD
## CORRECTIONS CONSULTANT

315 Twin Lakes Dr., Santa Rosa, CA  95409

(415) 250-5934 | cittern@comcast.net

EIN – 82-1080564

**November 6, 2021**

**ENGAGEMENT:**

I have been retained as a corrections expert by the law firm of Budge & Heipt, PLLC regarding the *Estate of Cindy Lou Hill, et al. v. NaphCare, Inc., et al.* Eastern District of Washington, Cause No. 2:20-cv-00410 RMP.  I have been asked to prepare an expert opinion report concerning the medical watch practices in place at the Spokane County Jail (SCJ) in 2018.

I am being compensated for this work and/or testimony and reimbursed for approved expenses.  My fees for this engagement are $200 per hour plus expense reimbursement.  Compensation is not contingent on my conclusions or recommendations.

**QUALIFICATIONS AS AN EXPERT:**

I have been associated with the corrections environment for over 53 years.  I was the appointed Warden at three California prisons:  California State Prison (CSP) Sacramento, Pelican Bay State Prison, and San Quentin State Prison.  I was the interim Warden at High Desert State Prison and CSP Los Angeles County.  I began my career as a Correctional Officer at San Quentin in 1968.  Over the next 18 years I worked a variety of assignments through the rank of Lieutenant.  Those assignments included the full spectrum of work inside a prison to include classification, gang management, investigations, emergency management, hostage negotiations, and specialized housing.

Over the next eight years I gained experience working in a women's prison and departmental headquarters.  That experience included budget and fiscal oversight, personnel management practices, labor relations, inspections and audits, and preparing corrective actions plans in accordance with litigation management.

In 1994 I was appointed Chief Deputy Warden at Pelican Bay State Prison (PBSP) where I helped design and implement remedial plans to address issues found in the "Madrid Decision," a class action federal lawsuit which addressed myriad issues associated with conditions of confinement at Pelican Bay's Security Housing Unit (SHU). The remedial plans involved housing of mentally ill inmates in the Security Housing Unit, management of prison gang members, access to health care, and the application and oversight of using force.  My involvement included creation of a Psychiatric Services Unit to house violent, high security inmates with mental health needs, creation of a Transitional Housing Unit for prison gang dropouts, creation of access to care models, and managing the creation of use of force policies and oversight procedures.  I was subsequently assigned as interim Warden at High Desert State Prison and California State Prison – Los Angeles County then appointed Warden at CSP-Sacramento and Pelican Bay State Prison.

I retired from state service in 2000.  During my first five years of retirement, I was asked by the California Department of Corrections (CDC) to be a Retired Annuitant (RA) and be part of teams which conducted fiscal and sick leave audits and provided training and remedial action implementation for statewide mental health programs.  I also managed CDC efforts to achieve American Correctional Association (ACA) accreditation.

In 2005 I was appointed Warden at San Quentin State Prison.  At the same time Federal Judge Thelton Henderson appointed a federal Receiver to oversee medical care in CDC.  San Quentin was designated as the "test site" for the receivership.  For the next two years I worked with the Receiver and his staff to develop successful health care delivery systems in the prison environment.

After my (re)retirement in 2008 I have been hired as a corrections expert in numerous venues.  I completed a use of force review for the Nevada Department of Corrections.  I provided expert rebuttal for the State of Alabama concerning conditions of confinement.  I have provided expert witness testimony and reports in use of force cases in Nevada and California as well as expert testimony regarding conditions of confinement in federal court.  I have been deposed numerous times.  I have been retained to provide expert reports and testimony regarding inmate release and transfer suitability.

Due to the nature of this case – *Estate of Hill, et al. v. NaphCare, et al.* -- I believe it is important to elaborate on my work with health care professionals in developing coordinated custody and health care delivery system policies.  In 1994 I was appointed Chief Deputy Warden at Pelican Bay State Prison specifically to prepare remedial action plans and implement changes required after the federal court class action ruling *in re Madrid v. Gomez*.  One of the major issues in this ruling was the determination that

2

custody requirements often impeded clinical staff from providing medical services in accordance with their license requirements.  I worked with health care staff to develop policies in which custody efforts *supported* clinical requirements without being involved in clinical decision making.  In other words, clinicians were enabled to provide health care in line with their licensure requirements and community standards and custody staff provided for safety and security accordingly.  As part of this effort health care professionals sensitized me to the reality that only clinical staff make clinical decisions and determinations.

After my initial retirement I was asked to work with mental health clinicians to develop policies, procedures and practices which supported corrective actions associated with *in re Coleman*, a class action suit concerning mental health programs.  Because of my past work with health care clinicians, I was asked to accept appointment as the Warden at San Quentin in 2005 because the Northern District Federal Court had appointed a Receiver to implement health care delivery system changes in the California Department of Corrections and Rehabilitation (CDCR) and San Quentin was to be the pilot effort for the Receiver.  I worked closely with the federal court, the Receiver, and health care professionals to implement infrastructure changes and policy revisions to ensure coordinated and supportive efforts in providing constitutional health care to inmates.

After my (re)retirement in 2008 I was asked by CDCR to manage its fledgling efforts to achieve accreditation by the American Correctional Association (ACA).  These efforts required significant work with health care staff because about 60% of ACA's mandatory standards are directly health care related.  After my work with the ACA accreditation efforts the Receiver asked that I work with his staff to coordinate Joint Commission accreditation efforts with CDCR and the prisons designated for Joint Commission accreditation. This required that I work with institutional executives to ensure they embraced their responsibilities regarding the health and welfare of the inmate population and in support of medical enhancement efforts.

In 2015 I was retained by a law firm representing the State of Alabama in a federal class action suit which alleged severe overcrowding adversely affected conditions of confinement for the Alabama Department of Corrections' (ADC) inmate population.  I was retained as a corrections expert to provide rebuttal to portions of the litigation.  Part of my work included spending a great deal of time with Corizon staff who were providing contract health care to the ADC.  This work included a review of how overcrowding impacted Corizon's ability to provide constitutionally adequate health care.   In short, I have over 20 years of experience working with health care staff to ensure the success of health care delivery systems in the challenging detention environment.

3



I graduated from Pacific Western University with a BS in Penology.  I am also a graduate of the United States Army Command and General Staff College.  I retired from the United States Army at the rank of Lieutenant Colonel.

Over the last four years I have provided expert testimony in the following cases:

- 2017    *Braggs et al. v. State of Alabama, Dunn et al.*, 2:14-cv-00601-MHT-TFM; US District Court, Alabama Middle District.  Expert rebuttal witness concerning conditions of confinement issues related to overcrowding.
- 2019    *State of Calif v. Robert Hayden*, Case #PA023303, Los Angeles County Superior Court.  Corrections expert concerning release suitability.
- 2020    *Sergey Dermendzhyan*, Case #BD 653764, Los Angeles County Superior Court. Corrections expert concerning visitation suitability.
  2020    *State of Calif v. Edward Sanchez*, Case #BA 101352, Los Angeles County Superior Court.  Corrections expert concerning release suitability.

I have not been deposed in the last four years.

**METHODOLOGY:**

Budge & Heipt, PLLC has provided me with a number of documents associated with this case.  A listing of these documents is in Attachment A.  Also listed in Attachment A are other resources I consulted from the ACA and National Institute of Corrections (NIC).  I will use this documentation and my 50+ years of corrections experience to provide a detailed analysis of staff actions in this case and opinions regarding the medical watch practice at the Spokane County Jail.

My executive and litigation management experience in the detention environment has taught me there are four keys to successfully providing for safety, security, health, and welfare in a detention facility:  Policy, Procedure(s), Training, and Oversight.  Policy specifies what an organization seeks to achieve in a particular aspect of its operation.  Procedure(s) reference how staff members will achieve the policy goals.  Training references how those staff are taught what the organization wants to achieve, and the detailed processes used to reach that goal.  Oversight ensures the organization periodically reviews the continued validity of its policy(ies), efficacy of its procedures, timeliness and efficacy of its training, and supervision to ensure staff are held accountable in the actual execution of these processes.  These periodic reviews are essential to ensure the changing demands of mission, industry standards, laws/regulations, training standards, and human resources are properly addressed.

4



In this case I will examine Spokane County's "medical watch" policy, procedures, training, and oversight to form my opinion(s).

**ANALYSIS:**

Case overview:  Cindy Lou Hill was a 55-year-old woman who was arrested on August 21, 2018 for possession of a controlled substance.  She was being held for pre-trial detention on the 3rd floor of the Spokane County Jail with regular SCJ intake inmates.  There is documentation she was seen by a registered nurse the following day.  She was suffering from mild heroin withdrawal and placed on the withdrawal protocol Clinical Opiate Withdrawal Scale (COWS) by the RN who saw her on August 22.  There is documentation that she experienced mild withdrawal symptoms over the next four days.  In the early morning hours of the fifth day – August 25 – Ms. Hill complained to RN Hannah Gubitz, a NaphCare employee working at SCJ, that she was experiencing extreme abdominal pain.  RN Gubitz did a limited examination after which she placed Ms. Hill on "medical watch" where she was to be monitored approximately every 30 minutes by correctional officers who had no medical training.  Ms. Hill was moved to the 2nd floor of SCJ to a section where "medical watch" was to be provided.  This monitoring did not include any clinical assessment such as checking vital signs or physical examination.  There is documentation that RN Gubitz saw Ms. Hill in the "medical watch" unit in the afternoon, but that Ms. Hill refused an assessment. Approximately 9 hours after the morning COWS assessment by RN Gubitz Ms. Hill was found unresponsive in her "medical watch" cell.  SCJ staff requested an ambulance and initiated CPR.  Ms. Hill was transported to Providence Regional Medical Center where she was pronounced dead.  An autopsy revealed acute bacterial peritonitis due to ruptured duodenal-liver adhesions with perforation of the duodenum.

The SCJ is organized a bit differently than many other county jails.  It is not part of the county sheriff's department. In 2013 it became an independent entity which reports directly to the county executive officer.  The SCJ is led by a Director of Detention Services.  Staff under the Director are an Assistant Director, 2 Lieutenants, Sergeants who are first line supervisors, and Correctional Officers.  Health care is provided under contract with NaphCare, which is based in Alabama and provides contract health care to multiple correctional venues in the United States.

For a variety of reasons – fiscal and human resource chief among them – many detention facilities have chosen to use contract organizations to provide health care for their detainees.  Regardless of how health care is provided to inmates, whether in-house or via contract, the *responsibility* for health and welfare of its detainees remains with the detaining organization.  As pointed out in the NIC's Guidelines for the Management of an Adequate Delivery System[i] "The use of independent contractors, however, does not

5

relieve the institution (or the contractors) of legal responsibility for health care."  The health care provider is simply a tool the detaining authority uses to fulfill its responsibility.

The first question that comes to my mind is what is the purpose of a "medical watch"?  The term itself connotes a need for clinical attention.  It indicates a medical issue has arisen which requires ongoing medical observation.  It is reasonable to believe that someone trained to observe and evaluate medical symptoms would be the individual providing any "medical watch."  It is also reasonable to believe that a "medical watch" would likely include some kind of clinical action such as checking vital signs.  An evaluation of policy, procedure, and training may provide clarification.

**Policy review:**

During his deposition Detention Services Director Michael Sparber was asked, "Whatever written policy might exist on the subject of medical watch or that might cover medical watch, is it C 508, the policy on inmate safety checks?"  Sparber's response was, "Yes."  C 508 is one of the documents provided to me by Budge & Heipt.  It is titled, "Inmate Safety Checks."  This policy is divided into 3 sections: C 508.1 Purpose and Scope, C 508.2 Policy, and C 508.3 Safety Checks.  Not once in this policy is the term "medical watch" used or mentioned.

There is another policy, C 538 Watch Cells.  I reviewed this policy in detail to see if, perhaps, Mr. Sparber may have misidentified the policy number.  Again, there is no mention of the term "medical watch" in C 538.  There are two references to medical in C 538.  The first is in paragraph C 538.3.a, which allows for an inmate to be placed in a watch cell on "…approval of the Shift Sergeant, Mental Health Unit or Medical Unit."  The second reference is contained in paragraph C 538.3.h, which states, "A medical assessment of the inmate in the watch cell shall occur within 12 hours of placement…" and, "Continued assessment of the inmate in the watch cell shall be conducted by a *qualified health care professional* (my italics)…at least every 24 hours thereafter."  I have not been able to find any NaphCare written policy for "medical watch".  It is clear to me that SCJ does NOT have a written policy for "medical watch."

Testifying in his deposition Director Sparber was asked if he saw any flaws in the way Ms. Hill's monitoring took place.  He testified, "…I believe the policy was followed."  Basically, he was saying the correctional officers were doing their normal duty rounds because, again, there is no written policy for medical watch.  Further in his response he did say that "…apparently Officer Milholland had missed one 30-minute round within the period while he was feeding lunch to the other inmates."

6

I believe the Watch Cells policy C 538 is problematic.  It is understandable that within the limited physical resources of a county jail some cell space may be required for multiple uses such as protective custody, suicide watch, etc.  However, if such cells are available for multi-discipline use the policies and procedures MUST be detailed enough to give solid guidance to staff working in and supervising that area.  An inmate on suicide watch will require much different care and supervision than an inmate in protective custody.  While I question the use of such a cell for medical reasons, it requires still different care protocols.  C 538 does not provide adequate detail and guidance for staff and, in my opinion, invites potential for miscommunication and error.

**Procedure review:**

It is difficult to develop procedures for a policy that does not exist.  Instead, it appears staff at the SCJ developed the illusion of "medical watch," which was loosely followed and not formally trained in any material way.  It is unclear when this "medical watch" was started.  There is a form – MEDICAL WATCH, General Observation – which has a designation on the bottom right corner "RFP 1-0019."  During his deposition Mr. Sparber was unable to answer when this form came into use, nor did he know who or what organization developed the form.  Aside from not knowing how practices were started and who developed forms used in the practice, it is also evident to me that there is no universal understanding at SCJ of how a "medical watch" is to be conducted.

In the depositions I reviewed there is ample evidence that there was no material difference between "medical watch" and the normal rounds officers were required to perform throughout the jail every 30 minutes.  Officers testified they were not expected to engage in conversation with the inmates on "medical watch" or even ask them about their medical symptoms.  Instead, they usually just looked into the cells for a few seconds to confirm that the inmates were alive and to note whether the inmates were asleep or awake. Some might note what the inmate was doing (reading a book, for example), but that was not universal. For example, Ms. Hill's medical watch form contained no observations about her behavior or activities or than whether she was awake or asleep and that she once refused lunch.  Each officer testified that they did not specifically check for changes in medical symptoms, nor had they been trained to do so. They all acknowledged they couldn't necessarily tell the difference between an inmate who was sleeping and one who was unconscious. The "medical watch" as testified by those officers was nothing more than their normal observational rounds.  There was no medical monitoring by them at all. Indeed, when asked during his deposition, Lt. Hooper could not identify any differences between medical watch and the jail's regular 30-minute safety checks, other than the form on which the checks were documented.

7

This practice which SCJ employees refer to as "medical watch" consisted of a nurse filling out information under the heading of a "Medical Watch" form, allegedly giving verbal instructions to 2W correctional officers, placing the Medical Watch form on the cell door, and the officers noting their rounds on the Medical Watch form.  Deposition testimony made it abundantly clear that there was no "medical watching" by officers assigned to 2W.  Other than the Medical Watch form, nothing was in writing.  Instructions (if any) from medical staff were verbal.  Information passed between/among officers was all verbal if, in fact, they even passed information to each other.  One officer, Brett Janke, testified in his deposition that he entered information into JailTracker (a jail database system) about inmates.  He also testified that he would look at the JailTracker to see if there was any information about inmates.  However, testimony by other officers indicates this was not a universal practice thus, I regard JailTracker entries as an unreliable information source.

Given this practice it is entirely possible a nurse could request an inmate be placed on "medical watch" and not one correctional officer would ever know why, let alone what to look for.  In short, "medical watch" at SCJ was an illusion which put inmates with serious medical concerns at risk.  An inmate placed on "medical watch" under these circumstances would likely be at greatly increased risk, not decreased risk because, due to single celling, they would not have a cell mate who could get the attention of floor officers if the need arose.

In his deposition Mr. Sparber was asked, "Were they (correctional officers involved in medical watch) required to attempt to engage in some sort of communication with Ms. Hill?"  Sparber's response was "They're not required to."  Lt Don Hooper was the Custody Lieutenant, the senior uniformed staff member in the SCJ.  In his deposition Lt Hooper was asked if he would be surprised to find out a NaphCare nurse expected his officers to check for each of the symptoms noted on the Medical Watch, General Observation Form.  He answered, "Yes."  NaphCare RN Hannah Gubritz, on the other hand, had a much different view of both the qualifications and the responsibilities of correctional officers assigned to 2West, the designated medical watch section.

In her deposition Ms. Gubritz said she told the floor officers to look for increased pain or any other major changes in health status.  Ms. Gubritz also expressed an expectation that officers would engage Ms. Hill, or other inmate/patients, in verbal conversation.  Ms. Gubritz also apparently believed that the correctional officers were "well trained" on how to do medical watch.  This conflicts with the testimony of officers deposed for this case who said they did not systematically engage patients on medical watch in verbal conversation, and that they received NO specific training designed to ensure that medical watch was meaningful.  Although I have also discussed training elsewhere, I note this here because it is another example of an apparent disconnect between NaphCare staff and custody staff.

8

At least one medical staff member (RN Gubitz) had one expectation, not based on any written policy or procedure, of how medical watch was to happen.  And custody staff had an entirely different view of what was to happen.  The "medical watch" was illusory: not formalized in policy, not trained, and not being adequately applied.  Due to lack of formalization, it put inmates at substantial risk.

The ACA places very high importance on documentation.  In the ACA's Core Jail Standards, 2010[ii] a Mandatory Standard 1-CORE-4D-04 requires "…If inmates are assessed or treated by nonlicensed (sic) health care personnel, the care is provided pursuant to written standing or direct orders by personnel authorized to give such orders."  When NaphCare staff directed SCJ correctional officers to monitor inmate/patients' symptoms and to recognize if they were getting worse, they, in effect, designated the correctional officers as unlicensed health care personnel, as they were performing medical assessments.  There is no evidence that SCJ administrators objected to such direction.  Therefore, I would expect the SCJ administration to have required written procedures, and certainly training.  The reason for this is that the expectation of symptom assessment in the medical watch practice far exceeds the normal duties and training of the typical correctional officer

Another example of ACA's high regard for health care issues in correctional settings is contained in Mandatory Standard 4-4382.[iii]  This Standard reads in part "If the facility provides health care services, they are provided by qualified health care personnel whose duties and responsibilities are governed by written job descriptions…"  There is no question in my mind that a medical watch is a health care service.  A medical watch is initiated when a healthcare provider identifies an inmate with symptoms or a condition that, in the provider's judgment, requires regular monitoring.  The supposed purpose of the medical watch is to monitor for any changes in the level of the patient's medical complaint or symptoms.  That is clearly a health care function— one that was not actually occurring at the SCJ.

One method of documenting procedures is in the form of Duty Statements or Post Orders.  These documents, typically on site at staff workplaces, are detailed accountings of daily duties to be performed, usually accompanied by associated times.  If medical watch is part of the duties of correctional officers assigned to 2W at the SCJ, I would expect to see detailed instructions of the duties to be performed as part of the Post Orders.  SCJ does not have Post Orders.  This was pointed out in both the 2015 and 2018 NIC Technical Assistance Visit reports.  I find this very troubling because line staff have no clear written direction on the conduct of their daily duties, especially medical watches.

The entire issue of written communication seems to be problematic at SCJ.  Nurse Gubitz testified in her deposition that she verbally communicated medical watch instructions to floor officers either face to face or

9

telephonically.  When I looked at the Medical Watch form for Ms. Hill, I saw no instructions except that 30 minute monitoring was circled.  There was no indication of why Ms. Hill was on medical watch and nothing to indicate which symptoms to check.  If I were an incoming officer starting a new shift and didn't get any verbal communication from the off going officer, I would have no idea about what to look for with Ms. Hill.  This lack of written communication is dangerous because it leads to miscommunication and no communication.  It places staff in jeopardy and will most assuredly put the inmates in a position of not getting necessary attention or services.

**TRAINING review:**

It is entirely possible that even without written policy or procedures some staff may have *some* training which leads them to believe conducting an informal medical practice is in the best interest of the organization and its mission.  In his deposition Director Sparber was asked if any type of training was given to correctional officers which included medical watch of inmates.  Mr. Sparber said, "Yes" and referenced an FTO program wherein new officers are essentially given on-the-job training by "seasoned" officers.  He also mentioned that the officers go through an academy at the Washington State Criminal Justice Training Center.

I have been associated with regional criminal justice training programs in Sonoma, Mendocino, and Napa counties in California, as well as the California Department of Corrections training academy.  I have also evaluated the training program at the Nevada Department of Corrections Academy.  My experience with regional type academies is they provide general and broad overviews of the criminal justice system and the corrections environment.  I have not seen one regional training program which addressed site or institution-specific actions unless it was to further a teaching point on a particular subject.  The only medical type training I have ever seen in regional training situations for correctional officers has been certification for CPR and the use of generic defibrillators.  More recent training has included administering Narcan in some corrections venues.  I know of no training program at a regional facility for correctional officers which includes any form of clinical evaluation of symptoms, examination, or reading of vital signs.  These are all functions I would associate with a medical watch.  While I have not reviewed the training curriculum for the Washington State Criminal Justice Training Center, I would be very surprised if such medical training is part of that curriculum. In fact, the officers on the shift on August 25th confirmed that they received no such training at the academy. Any such training would have to have been provided at the facility, and it was not.

FTO (Field Training Officer) programs are used by many criminal justice agencies.  This is usually a formalized training program during which an experienced officer, ***certified*** to train and evaluate, helps a

10

new officer apply the general knowledge gained at an academy to the actual work environment.  The new officer is typically evaluated on specific tasks included in a written training program.  Those evaluations are normally documented and become part of the new officer's training record.  In essence, an FTO teaches and evaluates a new officer's policy understanding, procedural execution, and decision making.  Therefore, it is plausible that Mr. Sparber might conclude that the SCJ FTO program could train new officers in medical watch practices.

There are, however, two problems that I see with such a conclusion.  First, unless the FTO's have specific and relevant medical training, we have one person with no medical training instructing and evaluating another person with no medical training on medical protocols.  As a corrections executive I find such a practice unacceptable and ethically challenging because it encourages correctional officers to act beyond their scope of function and potentially risks the health and welfare of the inmates in their charge.  Secondly, if it is not documented as part of the FTO program and included in individual officers' training files, the presumption is it didn't happen.  I have seen nothing which supports the contention that medical watch is part of the FTO program at SCJ.

In his deposition Lt. Hooper was asked if jail officers received training on how to assess for the presence or absence of each of the symptoms listed on the Medical Watch sheet.  His response was, "No – no specific training that I know of."  Six correctional officers were deposed in this case and each one testified that they did not receive any training to conduct evaluation of symptoms listed on the Medical Watch form.  The only conclusion that can be drawn is that, in spite of Nurse Gubritz's assertion to the contrary, correctional officer staff at SCJ received no training relative to assessing symptoms listed on the Medical Watch form.

The question of propriety aside, had the Director of Detention Services requested or NaphCare demanded, there is a section in the Health Services Agreement which provides that NaphCare could provide " training to Facility staff in the effective use of clinical services or other related health care operations."  My understanding of this is that NaphCare could have and, perhaps, would have given some level of training to correctional officers expected to conduct medical watch.  There is no evidence this was ever requested or provided.

It is significant that the ACA regards training so highly it makes special note in its Standards for Adult Correctional Institutions.[iv]  This section requires "…all staff be adequately trained and qualified and can demonstrate competency in their assigned duties."  This does not say "just health care staff."  It implies – in my opinion, strongly – that any staff performing a health care function such as medical watch must be trained and demonstrate competency.  I cannot emphasize enough that every correctional officer testified

11



they received no training on how to conduct a meaningful "medical watch" and there is absolutely no documentation that any "medical watch" training was ever written, designed, or delivered to any staff at SCJ.

**OVERSIGHT review:**

A detention facility can have excellent written policy, comprehensive procedures, and state of the art training but, without adequate management oversight the facility will eventually encounter problems, some potentially life threatening.  Adequate management oversight starts with regular periodic reviews of policy, procedures, and training to ensure changes in mission, environment, regulation, equipment, training requirements, and human resources are considered.  This gives organization executives and administrators the opportunity to make necessary updates and give staff the correct guidance to perform their duties in a dynamic workplace.

Another key element to managerial oversight is accountability.  It is not enough for management to give employees good guidance and adequate tools to do their jobs.  Management must also ensure that the employees actually do those jobs the way guidance intended, and the tools were designed.

It is not uncommon for a management team to write a policy of which the intent is clear to management only to find out it is less so to the line staff.  Such miscues are often discovered when executives and administrators are familiar with how line staff are functioning.  They visit work sites and talk with line staff to determine if policy intent is understood and being executed.  Clarifications and changes can then be immediately made to correct misunderstandings.  This is management holding itself accountable.  If, however, policy is clear, procedures are solid, training is current, and requisite tools are adequate and the employee still fails to perform to standard there must be a system of progressive discipline to hold employees accountable.

The circumstances of Cindy Lou Hill's death demand an examination of management oversight at the Spokane County Jail.  Of particular concern is when any detention facility contracts with an outside resource to fulfill one or more of the responsibilities of that detention facility, management oversight becomes critical.  It is not uncommon, once a contract is finalized, for a facility administrator to believe they are relieved of the responsibility of the service provided by the contractor.  As I pointed out earlier in this report, however, industry standards and legal precedent do not relieve facility administrators from responsibility.  Therefore, I looked closely at the documentation provided to determine any level of oversight Director Sparber exercised in working with the contractor NaphCare.

12

In his deposition Mr. Sparber was asked to explain his duties as the Director of Spokane County Detention Services.   Mr. Sparber testified, "My role is the oversight of both Geiger Corrections and the downtown facility and all operations and all services provided."  This is the correct response the leader of an organization should give.  However, Director Sparber's subsequent responses indicate a lack of understanding and/or concern for the role he defined.

Mr. Sparber was asked if there was "…any specific change in policy that was specifically in reaction to Ms. Hill's death and the conclusions of Dr. Hammond's report on her death."  Mr. Sparber testified, "Again, I can't speak to the medical side of it and any, you know, protocols or any improvement they did on their side."  I find this response problematic and an indicator that the facility director was disengaged from critical health functions provided to inmates for whom he was responsible.  While Mr. Sparber did continue his response by saying he initiated some procedural changes by custody staff, his lack of concern about any changes his contract medical staff might make in the delivery of health care services to his inmates is noteworthy.  My expectation would be that someone in charge of such a facility would demand of the contractor to present corrective action designed to prevent recurrence.

In his Death Review Report Dr. Hammond listed the root causes of Ms. Hill's death.  All are medical in nature and need to be addressed from a clinical standpoint.  Dr. Hammond also pointed out some contributing factors for which custody staff were responsible and which Mr. Sparber, to his credit, addressed.  Although the actual change that he made was to increase supervision of an ineffective practice.  So, it is unclear to me how that actually improved anything.

But it is stunning that Mr. Sparber did not demand of NaphCare to be informed of how they would respond to the issues raised by Dr. Hammond concerning the death of one of Mr. Sparber's inmates.  It would not be incumbent on Mr. Sparber to approve or evaluate the efficacy of clinical improvement but, in my opinion, it would be his responsibility to demand such a response.  Director Sparber testified that Detention Services used the services of Mark Stern, MD for "oversight."  In my opinion such oversight would be well used to review corrective actions proposed by NaphCare.  Another option to assist with health care oversight would be the Spokane Regional Health District.  Between these two resources Director Sparber has sufficient health care expertise to advise him regarding his oversight responsibilities.

In another stunning example of indifference, when asked during his deposition if he had received an adequate explanation from NaphCare about what might have gone wrong in the death of Ms. Hill his response was, "Not that I recall."  When asked if that concerned him, he replied, "It – it doesn't concern me."

13

In the Death Review completed by Dr. Hammond he clearly articulated 3 root causes for the death of Cindy Lou Hill:

- Misattributing worsening symptoms…
- An unusual pathological process…
- Failure to respond more definitively...

This should have driven an immediate response from Spokane County administration, SCJ administration, and NaphCare administration.  An inmate died.  Dr. Hammond opined the death as possibly preventable.  This should have spurred the people in oversight roles to determine what corrective actions should be taken to prevent a recurrence.  This was not done.

Medical people sometimes have a unique way of understating.  Doctors may sometimes say, "You may feel some discomfort."  When, in reality, it hurts like crazy.  In the last paragraph of the Hill Death Review Dr. Hammond wrote, "This should be a sentinel case for both custody and medical staff at SCJ."  What this really means is he was shining a bright light on a problem and telling SCJ this needs immediate attention.  It should have set off alarm bells in policy makers' minds.  Mr. Sparber testified in his deposition that he shared Dr. Hammond's report with, "…the risk manager, our attorney at the time, the prosecutor, our CEO, which was Gerry Gemmill at the time – and I'm trying to remember Steve Kinn was in that period of time…"  These are the policy and decision makers concerned with the SCJ and it isn't unrealistic to expect some kind of urgency would have inspired corrective action endeavors after a possibly preventable death.  As of August 16, 2021 the date of his deposition, that hadn't happened according to Mr. Sparber.  It is unclear if this inaction is a sign of indifference or is a planned litigation strategy.

Another stunning example of management indifference is revealed in Mr. Sparber's deposition when he was asked "…was there any – ever any type of coordination – and by that I mean a meeting, exchange of written communication, or some type of coordination between NaphCare and the County…so that there would be an understanding from – between the nurses and guards about what the guards were supposed to do when it came to inmates on medical watch?"  His response was "Not that I'm aware of."

Providing oversight isn't simply applying the principle of "management by walking around."  That is certainly part of it but, leaders in high-risk environments such as detention facilities constantly need to seek areas for improvement and adjustment if for no other reason than to better provide for safety, security, health and welfare of inmates and staff.  And, though litigation avoidance alone shouldn't drive decision making it is always a consideration while pondering policy, procedure, and training modifications.  Mr. Sparber indicated he was aware of litigation vulnerability when he was asked if he was aware that "…any inmate death at the jail is reasonably likely to result in civil litigation?"  His response was, "Yes." Yet his only action was to enhance supervision for officers providing medical watch rounds. The only mention

14



of policy, procedure, or training reviews is made when he referenced "some recommendations" made by NIC.  Director Sparber said, "…we were working on the policies, I stated earlier, on areas where we think we could improve.  None of it is in concrete yet, and it's still theory…"  Nor has the practice of using clinically untrained staff to conduct medical watch been questioned.

As part of management oversight my expectation is an administrator would actively seek to clarify his/her staff's duties, especially when those requested duties go beyond the scope of their training and functional responsibility.  It is not only a matter of supporting staff, but also a matter of making sure the health and safety of those for whom you are responsible is not adversely impacted.  The death of Ms. Hill has every indication of being a management oversight failure.

**CONCLUSION(S):**

Whenever a person is detained, the detaining entity becomes responsible for that person's safety, security, health, and welfare.  The size and jurisdiction of the detaining entity is not relevant.  It could be a municipal jail housing 5 detainees or a state/federal prison housing thousands of inmates.  Nor does the duration of detention matter – a few days or years – the detaining entity's responsibilities regarding the provision for safety, security, health, and welfare remain the same.  The Guidelines for the Management of an Adequate Delivery System reinforces this contention citing "No jail is too small to provide adequate medical care…the administrator has a responsibility to protect the health of his prisoners…"[v]

And lack of resources can't be used as a reason for no or inadequate care for detainees.  Again, the aforementioned Guidelines provide industry standard insight as contained in a statement from the National Sheriff's Association "Insufficient resources and inadequately trained custodial personnel are repeatedly cited…  But while all these conditions and problems may prevail in a given institution, they do not alter the responsibility of the jail administrator…"[vi]  The jail administrator remains responsible to provide for the health, welfare, safety, and security of the inmates in their charge and employees providing services.  And whether those providing services are full time employees, part time employees, or contractors, management still has the responsibility to ensure they are provided at appropriate and required levels.

Lastly, I will point out that there is one overriding organizational leadership principle:  The leader of that organization is ultimately responsible for everything that organization does or doesn't do.  This is an age-old military principle that the commander can delegate authority, but they cannot delegate responsibility. In corrections administration the leader of an institution hires a multitude of specialists to fulfill myriad functions, but the leader remains responsible for the functions to be done.

15

I offer the following opinions regarding the medical watch practices at the Spokane County Jail:

1.  **Spokane County's medical watch practices do not meet the standard of care expected of correctional facilities in caring for inmates with acute medical needs.**

There is no written policy for medical watch which details the intent, levels of responsibility, or oversight.  SCJ did not have any written procedures for staff to follow regarding medical watch.  This was an informal practice based by verbal communication.  Custody staff supposedly responsible to do the medical watch received no training to do a medical watch.  Even if they had received training, clinical evaluation of symptoms is well beyond the scope of function for custody staff.

There was a Medical Watch form used, in this case for Ms. Hill, but it did not specify Ms. Hill's symptomatic complaints, nor did it specify the specific changes of which staff were supposed to take note.  As all communication was verbal, I doubt accurate information was passed to all staff who did not hear the original verbal requests from the nurse requesting a medical watch.

"Medical watch" at SCJ was a *practice* not supported by any policy – SCJ or NaphCare --, without any written protocols or procedures which would support consistency, nor was any training provided for staff. Every health care standard I have seen with the ACA and Joint Commission requires written protocols and training.  The informal medical watch practice at SCJ blurred the functional lines between health care staff and custody staff and virtually assured failure to provide health care meeting the industry standards in correctional settings.  Based on my long association with health care professionals and my experience in developing corrective action plans for correctional health care judicial findings, I can find nothing in this medical watch practice that meets the standards of care in a modern detention environment.

2.  **Spokane County's medial watch practices expose inmates and detainees with acute medical needs to a substantial risk of suffering serious harm.**

The SCJ medical watch practice amounted to nothing more than the correctional officers on 2W doing their normal jobs.  They were already required to do rounds every 30 minutes.  The reality of those 30-minute checks is to make sure the inmate is where they are supposed to be and alive.  Unless something is glaringly obvious, such as bleeding or unusual behavior, there is little likelihood a medical problem would be noticed during those routine 30-minute checks.  This informal medical watch practice depended on clinically untrained correctional officers to recognize and report symptom changes without any written authorization or direction.  Apparently, the officer who received the verbal

16

request from a nurse was expected to verbally pass on the nurse's request to any other officer who might come onto the 2W floor.  I am skeptical that such verbal exchanges happened consistently and, without written proof of practice I don't believe SCJ can support that it did.  With more than 50 years of experience in the field of corrections it is my opinion that such an informal practice is haphazard and guaranteed to fail, putting inmates and detainees at substantial risk of suffering serious harm.

**3.   The risks posed by the County's medical watch practices should have been obvious to the jail's administrators and policymakers.**

Spokane is not a rural community.  It is a modern, metropolitan area.  The SCJ is not a small, isolated county jail.  It houses over 850 inmates in 2 facilities – a medium size county jail in a metropolitan area.  Cindy Lou Hill died while an inmate at the SCJ in 2018 not 1988.  Yet, with regard to "medical watch" the SCJ was functioning at a level reminiscent of the 1970's.  Director Sparber testified that the medical watch practice in 2018 was the same as when he started in 1988.  I find it astonishing that over the course of 30 years a modern county jail in a metropolitan area hadn't come to the realization that a medical watch at least implies a medical process and that having clinically untrained staff make symptom assessments (particularly with no training or standards) is improper from a correctional standpoint.

Director Sparber is a well-educated and very experienced corrections administrator.  During his deposition he acknowledged his responsibility to provide oversight of all aspects of jail operations.  He also mentioned familiarity with the ACA, NIC, and NCCHC--three major criminal justice organizations which foster industry standards in the field of corrections.  It inconceivable that he did not understand the danger posed by having untrained staff perform an informal medical practice with poorly crafted policy and no procedures.

In 1988 medical protocols and propriety were not universally given high priority in detention facilities in the United States.  In 2018, mostly as a result of class action litigation, correctional health care standards were highly regarded among detention administrators and widely disseminated by organizations such as ACA, NIC, and NCCHC of which Director Sparber expressed familiarity.

In my opinion there are indicators that should have been readily apparent to anyone with responsibility for ensuring that detainees receive appropriate medical care from professionals with the knowledge and training to provide it competently:

- In spite of Mr. Sparber's testimony to the contrary, there was no written policy at SCJ for "medical watch."  This should have been seen long ago and corrected.

17

- There were no written procedures, only verbal communication.
- Staff performing medical watch were not properly trained.
- Documentation was totally inadequate.
- There was virtually no communication between SCJ administration and NaphCare regarding medical watch practices.
- Both the 2015 and 2018 NIC Technical Assistance reports cite that one of the reasons for the visit was due to the number of in custody inmate deaths. Each report referenced inadequate written policies and a lack of any post orders. Yet, there is no evidence that SCJ made a good faith effort to remedy these deficiencies. In my opinion the policy issues raised in the NIC reports should have alerted SCJ policy makers to operational issues which put SCJ inmates at risk.

As previously noted, Mr. Sparber ably articulated his duties as Director of Detention Services. Also noted was his knowledge that an inmate death would likely make SCJ vulnerable to litigation. He also testified that he had not, at the time of his deposition, received an adequate explanation from NaphCare for what might have gone wrong in Ms. Hill's death. When further asked if he expected NaphCare to share with him their conclusions regarding Ms. Hill's death. He answered, "I would expect it at some point." At another point in his deposition Mr. Sparber was asked if he anticipated demanding an answer from NaphCare regarding what went wrong in the case of Cindy Lou Hill. He testified, "I would expect at some point there would be a meeting together with NaphCare to discuss and do root cause analysis, yes." This testimony was made **_3 years after_** the death of Ms. Hill. It is clear to me this indifference didn't just start after the death of Ms. Hill.

At the time of his deposition the only change to the SCJ medical watch practice was Director Sparber's additional supervision of custody staff. In my opinion SCJ can quadruple the supervision of custody staff on 2W and it would still not reduce the risk to the inmates put on medical watch. This practice is dangerous and, I believe unethical as it calls on untrained non-clinical staff to make clinical judgements. The fact is that 3 years after a possibly preventable inmate death the SCJ, NaphCare and Spokane County have done virtually nothing to decrease the likelihood of recurrence and continue to put custody staff in the position of working beyond their scope of function and put inmates at serious risk of harm.

18



This report was prepared based on the materials provided to me by Budge & Heipt, PLLC as well as the documents I also included in Attachment A. Should I receive additional or new information which alter the facts I reviewed I reserve the right to change my opinions accordingly.

ROBERT L AYERS JR

Warden (Retired)

Corrections Consultant

Attachment:

Attachment A, Listing of resources used in preparation of this report.

---

[i] Attachment A, #24, page 50, sec. 4 – Contracting Out
[xiii] Attachment A, #30, Core Jail Standards, page 35, 1-CORE-4D-04
[xiv] Attachment A, #25, Adult Correctional Institutions, page 115, Personnel Qualifications
[xxi] Attachment A, #25, page 114, Performance Standard: Staff Training, 2A
[xxxi] Attachment A, #24, page 19, paragraph 5
[xxxii] Attachment A, #24, page 19, paragraph 6

19

# ATTACHMENT A

**Listing of resources used in the completion of the report – Hill v. NaphCare et al. (R. Ayers)**

1.  2018 NaphCare progress notes pertaining to Cindy Hill
2.  2018 COWS assessments of Cindy Hill
3.  Deposition of Defendant Hannah Gubitz
4.  Jail surveillance video of Unit 2W from the morning of 8/25/18
5.  Medical Watch form, Spokane County Jail
6.  Sheriff's report
7.  8/26/18 email from Hannah Gubitz
8.  NaphCare policy re:  informed consent and refusal of treatment
9.  Jail incident reports
10. NaphCare incident reports
11. Records from Providence Sacred Heart Medical Center (including EMT records)
12. Autopsy report
13. Death review by Steven Hammond, MD
14. Deposition of Lt. Don Hooper
15. Deposition of Matthew Milholland
16. Deposition of Spokane County Jail Director Mike Sparber
17. C 508 Spokane County Jail Inmate Safety Checks policy
18. All NaphCare medical records pertaining to Ms. Hill
19. Deposition of Carolyn Hoschka
20. Deposition of Tren Byington
21. Deposition of Travis Titchenal
22. Deposition of Jessica Wirth
23. Jail surveillance video of Unit 2W from the afternoon of 8/25/18
24. Guidelines for the Management of an Adequate Delivery System – Correctional Health Care, National Institute of Corrections, 2001 Edition
25. American Correctional Association Standards for Adult Correctional Institutions, 4th Edition
26. Spokane County Purchasing Department RFP P10051 dated 11/23/16 and prepared by NaphCare.
27. Health Services Agreement #NCHG 001551 between Spokane County and NaphCare
28. Inmate Intake Process flow chart from the National Institute of Corrections; extracted from Accession Number:  027545 – Flow Charts of Jail Procedures:  Health Intake, Assessments, and Routine Care Procedures in County Jails
29. C 538 SCJ Watch Cells Policy
30. American Correctional Association Core Jail Standards, 2010
31. 2015 NIC Technical Assistance Visit Report, Spokane County Detention Services
32. 2018 NIC Technical Assistance Visit Report (Draft), Spokane County Detention Services
33. Deposition of Brett Janke
34. NaphCare Health Care Policy and Procedure Manual

# ROBERT L. AYERS, JR.                        (415.250.5934)
315 Twin Lakes Dr., Santa Rosa, CA  95409                        cittern@comcast.net

## EXPERIENCE

**RETIREMENT ACTIVITY**                        **July 2000 – Present**
Retired Annuitant work for the California Department of Corrections and Rehabilitation conducting fiscal and management practice reviews and work as a Team Leader for the Mental Health Quality Management Assessment Team; part-time Administration of Justice Programs Coordinator at Mendocino College, Ukiah; part-time Adjunct Instructor at the Public Safety Training Center, Santa Rosa Junior College.  Managed American Correctional Association Accreditation efforts for California Department of Corrections and Rehabilitation (CDCR) part time as a Retired Annuitant. Currently working as a Retired Annuitant with the California Corrections Health Care Services to help facilitate accreditation by the Joint Commission for the CDCR.  Contracted with the Association of State Correctional Administrators to complete a use of force review for the Nevada Department of Corrections.  Retained by law firms in San Francisco and Los Angeles to provide expert consultation, reports, and testimony (as necessary) in use of force cases.  I have worked with the Nevada Attorney General's Office on a use of force case.  Expert witness for the Alabama Department of Corrections in a class action civil suit concerning overcrowding and understaffing.  Currently retained by the Los Angeles County Office of the Public Defender regarding death penalty sentencing consultation.  I have also consulted on a number of cases regarding Proposition 36 and Proposition 47 resentencing.  I am currently engaged civil suits alleging improper provision of health care to county jail inmates in Washington and Missouri.  I am also retained in a case alleging conditions of confinement violations at a county jail in Tennessee.

**WARDEN (Reinstatement)**                        **June 2006 to December 2008**
**CALIFORNIA STATE PRISON, SAN QUENTIN**
Responsible for managing activities at San Quentin, a multi-mission prison housing over 5000 Condemned Row, Reception Center and General Population inmates and 1,700 staff.  Working with the California Prison Receiver to implement major health care reforms at San Quentin, including the design and implementation of a pilot Reception Diagnostic process.  Revised execution protocols to meet federal court requirements.  Managed a $180 million budget.  Retired December 30, 2008.

**INTERIM WARDEN (Retired Annuitant)**                        **November 2005 to May 2006**
**CALIFORNIA STATE PRISON, LOS ANGELES COUNTY**
Responsible for managing all activities of the California State Prison, LAC housing over 4000 Level III and Level IV inmates.  Was responsible for implementing a major program change to Reception Center in December 2005.  Responsible for ensuring public safety by managing a safe and secure prison.

**WARDEN**                        **January 9, 1998 to July 4, 2000**
**PELICAN BAY STATE PRISON**
Responsible for the management of all activities at Pelican Bay State Prison, a maximum security and Security Housing Unit (SHU) institution.  Pelican Bay State Prison houses approximately 1,700 General Population and 1,500 SHU inmates with a staff of over 1,400 and a $100 million budget. Pelican Bay State Prison also houses the first Psychiatric Services Unit and Transitional Housing Unit.  Responsible for interaction with Governor's staff, legislators, and key community leaders. Responsible for ensuring public safety by managing a safe and secure prison.  Helped develop remedial plans re: Madrid v. Gomez including departmental use of force policy.  Retired effective July 4, 2000, from the Department of Corrections.

**WARDEN**                        **October 1, 1997 to January 8, 1998**
**CALIFORNIA STATE PRISON, SACRAMENTO**
Responsible for the management of all activities of the California State Prison, Sacramento, a major high security prison, housing over 3,000 inmates, employing approximately 1,100 staff with an operating budget of just over $80 million.  Maintain effective liaison with Prison Industries Authority, Board of Prison Terms, Governor's staff, legislators and key community leaders.  Responsible for ensuring public safety by maintaining a secure prison which is safe for staff and inmates.

1

**CHIEF DEPUTY WARDEN, CEA**                    **December 1994 to September 30, 1997**
**PELICAN BAY STATE PRISON**
Responsible for the daily operation of Pelican Bay State Prison.  Management and coordination of the General Population, the SHU, Central Services, Business Services, and In-Service-Training.  Assisted in developing and implementing Madrid v. Gomez remedies including developing a Use of Force policy which ultimately became the model policy for the Department.  Temporary assignment as Interim Warden, High Desert State Prison (May 26, 1997, through July 1, 1997).

**CORRECTIONAL ADMINISTRATOR**                    **January 1993 to December 1994**
**CALIFORNIA STATE PRISON, SACRAMENTO**
As a Correctional Administrator, Business Services, responsible for the management of all units in the Business Services Division, including Accounting, Personnel, Warehouse, Procurement, Food Services, and Plant Operations.

**CHIEF, PROGRAM SUPPORT UNIT**                    **June 1989 to December 1992**
**INSTITUTIONS DIVISION**
Program Administrator from June 1991 to December 1992.  Training and Development (T&D) assignment as a Staff Services Manager I from June 1989 to May 1991.  Promoted to Correctional Captain while on T&D assignment during July 1989.  This unit provided liaison between Institutions Division and other departmental divisions and control agencies, especially with regard to fiscal, capital outlay, population, and program matters.

**CHIEF, CORRECTIONAL SYSTEMS SUPPORT UNIT**            **November 1988 to June 1989**
Training and Development assignment as a Staff Services Manager I.  This unit provided staff support to the Blue Ribbon Commission on Inmate Population Management and The Presley Institute on Correctional Research and Training.

**CORRECTIONAL LIEUTENANT**
**NORTHERN CALIFORNIA WOMEN'S FACILITY**            **September 1987 to November 1988**
**SAN QUENTIN STATE PRISON**                    **June 1981 to September 1987**
Assignments included Special Security Squad Commander, Special Emergency Response Team Commander, Watch Commander, Yard Lieutenant, Emergency Services, Food Services, Inmate Assignments, Personnel Assignments, and Unit Lieutenant.

**CORRECTIONAL SERGEANT**                    **January 1978 to May 1981**
**SAN QUENTIN SATE PRISON**
Assignments included Unit Sergeant, Watch Sergeant, and Transportation Sergeant.

**CORRECTIONAL OFFICER**                    **January 1968 to December 1978**
**SAN QUENTIN STATE PRISON**
Assignments included all Correctional Officer positions and one year (1971) as a Correctional Management Trainee I.


**MILITARY EXPERIENCE**

Lieutenant Colonel, Infantry, U.S. Army (Retired)


**EDUCATION**

Associate of Science in Police Science, College of Marin, 1967
Bachelor of Science in Penology, Pacific Western University, 1983
Graduate of the U.S. Army Command and General Staff College, 1987

## **CERTIFIED SPECIAL TRAINING**

Leadership Institute – 1994                                   Special Weapons & Tactics Instructors' Course – 1983
Interagency Management Institute – 1990            Tactical Command Course – 1983
Management Training – 1989                                Terrorist and Hostage Seminar – 1983
Budget Building Workshop – 1986                        Hostage Negotiations – 1982
Post Assignment Schedule Training – 1984          Organizing Operations – 1982
Techniques of Teaching – 1984                            Training for Trainers – 1981 (Military)
Urban Terrorist Activity – 1984                           Training Management Workshop – 1980 (Military)
Effective Time Management – 1984                        Special Weapons and Tactics – 1978
Managing People – 1984                                      Negotiations – 1977 (Military)
Protection of Public Officials – 1983

## **TRAINING EXPERIENCE**
Training consultant to the American Correctional Association and the National Institute of Corrections.  Over 5,200 hours as an instructor in general correctional subjects, tactical operations, hostage negotiations, incident management, terrorist activities, managing and monitoring uses of force, fiscal responsibility, and general institutional administration.  Adjunct instructor at Santa Rosa Junior College.

## **Federal Court Recognition**
I have been recognized and accepted by the Federal Court in Alabama as a subject matter expert in the areas of use of force and conditions of confinement.  I have been retained as a Use of Force Subject Matter Expert by the State of Nevada.

3

*The Estate of Cindy Lou Hill, by and through its personal representative, Joseph A. Grube; and Cynthia Metsker, individually vs. Naphcare, Inc., et al.*

Case No. 2:20-cv-00410-RMP

Declaration of Hank Balson

Exhibit CC

Cindy Lou Hill Death Review

Cindy Lou Hill was booked into the Spokane County Jail (SCJ) on 8/21/18. On 8/25/18 without much warning she became unresponsive, was found to be pulseless and not breathing, CPR was initiated, emergency medical services were summoned, she was transferred promptly to the Sacred Heart Medical Center (SHMC) in Spokane, where she died in the emergency room. Autopsy concluded that the cause of death was "acute bacterial peritonitis due to ruptured duodenal-liver adhesions with perforation of the duodenum".

I was asked, as a physician with extensive experience in correctional health care, to review the case and perform a root cause analysis of the incident for the purpose of quality improvement in custodial and health care practice at the SCJ.

I was provided the following records to review:

- Death certificate
- Police and Medical Examiner's reports
- SCJ staff incident reports
- Medical records printed from the NaphCare electronic medical record; records of the community emergency medical response by American Medical Response; and the record of the custody medical watch on Cindy Hill that was established on 8/25/18
- Records pertaining to Ms. Hill's booking into SCJ; record of Ms. Hill's court appearance on 8/24/18 pertaining to release conditions pending trial; a copy of a bench warrant dated 7/23/18 authorizing Ms. Hill's arrest; and a copy of a newspaper article about Ms. Hill's death in the Spokane Spokesman-Review, published 8/27/18
- Several policies of SCJ, including those pertaining to procedures around the death of an inmate .

**Chronological Narrative:**

Ms. Hill was booked into SCJ about noon on 8/21/18, a Tuesday. The medical records I reviewed indicated that Ms. Hill had been in the SCJ at least 3 times previously, in June, 2016, October, 2016, and December, 2017. Records from each of the evidently brief incarcerations prior to August of 2018 indicate that management of heroin detoxification/withdrawal was the predominant healthcare concern during these incarcerations.

Interestingly, on the intake health screening performed by Tamara Wattenburger RN, there was no indication of a history of drug or alcohol abuse or prior episodes of drug or alcohol withdrawal. Questions in the 8/21/18 health screening assessment under a section titled "Substance Use Assessments" were left blank. The receiving assessment appears to have been completed during the first 3 hours of incarceration, judging by the date/timestamp of the records. She was noted to be using an albuterol inhaler and omeprazole prior to incarceration. Physical examination was unremarkable with the exception of a low arterial oxygen saturation of 86%. Vital signs were otherwise normal, Ms. Hill appeared to be in no obvious distress, and she was described as "cooperative". Heart and lung exams were normal, as was an abdominal exam. Documentation of the abdominal exam indicated "Abdomen soft, nontender, nondistended", "No hernia or masses palpated", and "Bowel sounds active and normally pitched". With respect to the low oxygen saturation measured initially, RN Wattenburger

evidently discussed this with "onsite provider Denae" who suggested administering oxygen to see if there was improvement. RN Wattenburger commented further that the saturation reading seemed to be variable, the patient showed no sign of respiratory distress and was not cyanotic (did not appear blue), and that with administration of oxygen the saturation normalized and then remained normal when the oxygen was removed (and oxygen saturation remained normal for the remainder of the incarceration). Ms. Hill was consequently assigned to housing in general population.

Further assessment by "Casey Gladney Corporate NP [nurse practitioner]" is documented in a note date/timestamped 8/22/18 6:04:31 PM. The note states that "Patient reports recent and/or significant opiate use" and the assessment says "opiate withdrawal". The plan was to initiate "COWS assessments" [with standardized Clinical Opiate Withdrawal Scale] and standard treatment per protocol. There is a nearly simultaneous note posted by Sheila Hudgins Charge RN (at 6:40:43 PM on 8/22/18) that includes normal vital signs and a pain rating of 5 (not further elaborated), mentions patient's report of daily use of heroin, and notes piloerection of the skin on arms and mild dilation of the pupils, both consistent with mild opiate withdrawal, though no COWS score is reported in the progress note. However, another note with identical vital signs, posted at 5:57:29 PM on 8/22 in the COWS section of the chart (evidently a section of the chart dedicated to serial COWS ratings), gives a COWS score of 5 which is interpreted by protocol as showing "Minimal withdrawal symptoms. Consider reassessing within 8 hours."

Per NP Gladney, dicyclomine (prn [as needed for] abdominal cramping), loperamide (prn diarrhea), ibuprofen (prn pain), and ondansetron (prn nausea/vomiting) were ordered to be administered as needed. These are common treatments for symptoms related to opiate withdrawal, in addition to clonidine, which is given for objective signs of withdrawal that generate a COWS score above a certain level (Jeffrey Maple MD is the ordering physician for clonidine, presumably as the author of a standard opiate withdrawal management protocol in effect at SCJ via NaphCare). The drug administration record shows that loperamide and ondansetron were administered on the evening of 8/22.

A series of COWS ratings are recorded in the chart over the next few days. It appears a repeat COWS was obtained on the evening of 8/22 (by RN Contable), note posted at 6:38:56 PM, at which the rating was again 5. On 8/23 at 5:01 AM Ms. Hill reportedly refused formal assessment but stated she was having no symptoms of withdrawal (reported by RN Tsubasa). On 8/23, reported at 10:05:59 AM by RN Contable, a COWS rating of 12 was obtained, interpreted as "Mild withdrawal symptoms. Consider reassessing within 8 hours." Per protocol, a dose of clonidine was administered. At the same time (10:06:23 AM on 8/23) doses of ibuprofen, dicyclomine, and ondansetron were administered.

The next COWS score on the record is timestamped 8/24/18 at 2:30:47 AM, reported by RN Kallsen, a score of 6 ("Minimal withdrawal symptoms. Consider reassessing within 8 hours"). The main contributor to the COWS score on this occasion was "Multiple episodes of diarrhea or vomiting" [not indicated which or whether both were present].

The next COWS score was reported by RN Contable on 8/24/18 at 10:38:36, score 10, for which a dose of clonidine was administered per protocol. At the same time RN Contable administered doses of ibuprofen and ondansetron. Contributors to this COWS score were "Mild diffuse discomfort", "Nasal stuffiness or unusually moist eyes", "Vomiting or diarrhea" [again, no indication of which], "Patient increasing irritability or anxiousness", and "Piloerection [gooseflesh] of skin can be felt or hairs standing up on arms". Throughout the period from 8/22-8/24/18 in the AM, vital signs were normal and unremarkable.

On 8/24/18 at 4:55:52 PM (this was Friday afternoon) RN Contabile reported that "Pt refused VS. Will continue to monitor. Pt in court holding. Sts [presumably, states] feeling much better". Another document that was reviewed was a record of a court appearance on 8/24/18 at which Ms. Hill was present.

On 8/25/18 (Saturday) at 1:44:24 AM RN Kallsen reported that Ms. Hill refused to be assessed, adding these comments: "Inmate declined to be checked at this time, verbalized denial of any S/S [presumably, signs or symptoms] of DT's [presumably, delirium tremens, which is typically associated with alcohol withdrawal rather than opioid withdrawal], None noted CO Najera present".

The next note on the medical record, chronologically, was entered by Gubitz Charge RN, timestamped 12:45:41 on 8/25/18. It is a progress note that says only: "Patient placed on 30" medical watch for severe abdominal pain and having to be dragged to door by cellmate to be assessed. Patient refused to get up or walk to door, screaming and repeating 'I'm sick' over and over. CO Torosian notified."

A Medical Watch General Observation log was initiated at 9:30 AM on 8/25/18 and the first monitoring record entry was indicated with the notation "1015" under the Time column.

A COWS record was timestamped at 12:51:45 PM by RN Gubitz; as other records indicate that Ms. Hill was transferred to the medical observation unit between 9 and 10 that morning, I presume this medical record note reflects an assessment that was done prior to the transfer. At this time vital signs were recorded as BP 130/86, P 78, Respirations 16, oxygen saturation 95%, i.e., normal and unremarkable. Temperature was not recorded; "na" [presumably, not applicable] is indicated in the space where temperatures are recorded. The COWS score was 4, due entirely to "Patient so irritable/anxious that participation in the assessment is difficult". This chart entry included a comment that will be quoted in its entirety:

> "Patient laying on floor on arrival to cell wearing pants but no shirt. Patient indicated she did not want to be checked but stated she was too sick to move. Notified patient we could not enter the cell without an additional officer. Patient's roommate rolled her in a blanket and dragged her to the cell door where she lay next to the toilet screaming. Patient's cellmate indicated patient was having severe abdominal pain and it was most likely her appendix. Patient curled in fetal position on floor, barely allowed this RN to check vitals. Patient allowed minimal assessment of abdomen. No bruising, swelling, redness, or masses noted on visual assessment or palpation. Patient screamed even louder before this RN even touched abdomen shouting that this RN was hurting her. Patient would not answer questions about where her pain was on a scale of 1-10, when it started, or what it felt like. She stated it was on her right lower abdomen but screamed in pain on gentle palpation of entire abdomen and back. Patient taken to 2W via wheelchair for medical watch."

There is another COWS record entered by RN Gubitz timestamped 6:10:32 PM on 8/25/18 (at which time Ms. Hill was at SHMC ER) that indicates "Patient Refused" and shows no entry of other clinical data. Presumably this was entered at a point when Ms. Hill was not present for assessment. There is another COWS record entered by Polston LPN timestamped 2:13:39 AM on 8/26/18 (which was after Ms. Hill had expired) that simply indicates "Unavailable" with no other entry of clinical data.

The Medical Watch general observation log indicates that, as of 0930, monitoring was to be done every 30 minutes. The log shows entries as follows on 8/25/18: 1015 [time] – S [code for sleeping]; 1109 – A [code for awake] plus narrative "refused lunch"; 1123 – S; 1207 – S; 1240 – S; 1310 – S; 1343 – A; 1358 – S; 1430 – S; 1500 – A; 1520 – A. There is an additional entry without a time that says "was taken to Hospital".

I found no further clinical documentation by NaphCare staff of subsequent events at SCJ. The remainder of documentation of the sequence of events at SCJ was obtained from police reports and incident reports by involved jail staff.

Deputy Urrutia's Field Case Report of the investigation of the incident, dated 8/25/18, included a report of an interview with CO Milholland, who is the custody staff officer who first reported that Ms. Hill was unresponsive, initiating the emergency medical response at SCJ. This is Deputy Urrutia's report of his interview with CO Milholland:

> "He was making his found [sic] rounds, giving the inmates food. At approximately 1624 hours [on 8/25/18], he opened the food slot on Cindy's cell # 2West 27, and told Cindy to wake up. He saw Cindy laying down in her underwear on her stomach. At approximately 1626 he placed food on Cindy's food slot. He saw Cindy laying on the floor and told Cindy to get up and get her food. He said Cindy replied by groaning "ugh". He did not think much of it and thought Cindy was just tired. At approximately 1724 he came to Cindy's cell and saw Cindy had not taken her food from the food slot. He knocked on Cindy's cell door at least two times, and there was no response. He requested for medical assistance. Two medical assistants arrived and rolled Cindy over on her side. He saw what appeared to be vomit or bile on the ground near her face. Cindy was slid out of her cell by Michael [RN Killsen], a registered nurse, who started CPR. CPR was done for approximately one hour. He conducted one round of chest compressions on Cindy for approximately two minutes until fire arrived. Cindy was transported by AMR unit #121. Cindy was pronounced deceased at 1831 at SMHC."

This is CO Milholland's account in his incident report:

> "At approximately 1624 hours on 08/25/18 I Officer Milholland 591263 was feeding dinner on 2 West when I came to 2W27 and Inmate Hill, Cindy Lou was laying on the floor inside the cell so I knocked on the door until Inmate Hill responded "what" I stated I had her dinner for her and that she needed to get up and grab it. She then stated "ugh" I took that as she didn't want to get up so I told her that I would just leave it on her food slot for her to grab.
>
> I then continued to feed the rest of the module and was completing other needed tasks until 1724 hours when I was able to return to 2W27 and check on Inmate Hill to make sure she had eaten her dinner. I knocked on the door and got no response so, I called for medical via the radio to come and check on her due to the fact that she was not responding to me. Officer Babcock came down to the cell at approximately 1725 and opened the door for Nurse Mike. Mike entered the cell and rolled her over to find a substance that had come out of her mouth and her to be unresponsive.
>
> Nurse Mike instructed the responding staff to move her out of the cell and apply oxygen and to place the defibrillator onto inmate Hills chest, no shock was advised so CPR was started..."

Incident reports indicate that AMR and Spokane Fire Department were summoned and personnel arrived at some time between 17:30 and 17:40 (the reports vary slightly) and took over the resuscitation efforts.

Although the police and incident review records describe the emergency medical response in some detail, I could find no documentation of it in the NaphCare records I reviewed.

From the available accounts it appeared that the emergency medical response by SCJ custody and medical (nursing) staff was appropriate and there was a smooth handoff to the community emergency response personnel. Ms. Hill was pronounced dead at SHMC ER at 18:31.

Ms. Hill was clearly in extremis by the time she arrived at SHMC and was pronounced dead within minutes of having arrived there.

The autopsy/post-mortem examination was notable for duodenal rupture, acute peritonitis, and absence of drug levels to suggest that drug ingestion in jail contributed to her clinical deterioration (only naloxone, which had been administered during the emergency medical response, and traces of methamphetamine almost certainly ingested prior to incarceration were found).

**Analysis:**

This death review will adopt the approach that has been developed by the California Department of Corrections and Rehabilitation. Accordingly, I believe this death was possibly preventable, that is: "A death wherein opportunities for clinical intervention or significant lapses related to care delivery have been identified that may have prevented or significantly delayed the patient's death."

Ms. Hill was reasonably assessed as being at risk for and in some degree of opioid withdrawal early in her August, 2018 stay at SCJ, although this does not seem to have been recognized immediately at the receiving screening. In any event, her risk for opioid withdrawal was recognized the day following her admission to SCJ and before she developed significant withdrawal symptoms.

Ms. Hill did appear to develop mild symptoms of opioid withdrawal by 8/23, which were appropriately treated per protocol. Judging by the clinical notes and the patient's reported symptoms, it appears that symptoms of opioid withdrawal were abating by the evening of 8/24. Also, it appears that Ms. Hill was able to attend a court hearing sometime on 8/24 (I did not find documentation of the time of the court hearing, but I surmise it was most likely in the afternoon). As of early on 8/25 (1:44 AM), per the medical record, Ms. Hill denied having symptoms of "DT's" and evidently did not voice other complaints.

However, by later in the morning of 8/25 Ms. Hill was voicing complaints of "severe abdominal pain", in the words of RN Gubitz. Even though vital signs were stable, RN Gubitz was concerned enough to request Ms. Hill's transfer to a unit for closer medical observation. It is impossible from the records provided to get the precise timing of medical events, assessments, and interventions because notes are timed on the record according to when they were entered, which appears to have been after some delay. As best as I can tell, the last medical evaluation before the emergency medical response in the afternoon of 8/25 was before the transfer to 2 West which appears to have occurred before 9:30 AM on 8/25/18.

Several questions arise in reviewing the events of the morning of 8/25. The report by the patient of severe abdominal pain that morning was different from anything previously documented by medical

personnel during this incarceration. Although abdominal cramping is a symptom of opioid withdrawal, by the time of her evaluation by RN Gubitz that morning, her COWS score was minimally elevated and the score that was assessed was based entirely on irritability and anxiety. This should have raised the question whether Ms. Hill's symptoms at this time were due to something other than opioid withdrawal; RN Gubitz's notes do not reflect consideration that there may have been another cause of Ms. Hill's pain. One also wonders whether RN Gubitz considered reporting the change in Ms. Hill's clinical status to a medical provider to assist in further evaluation and management. Another question is whether RN Gubitz might have considered that closer monitoring by medical personnel would have been appropriate, given the change in Ms. Hill's status. There is no indication in the medical record that RN Gubitz discerned a need to engage a medical provider to assist in management decision making, or to increase the intensity of Ms. Hill's clinical monitoring by healthcare staff (as opposed to every-30-minute checks by custody staff). In retrospect, more thorough medical evaluation and closer clinical monitoring might have resulted in earlier transfer to the hospital, before she had a cardiac arrest, which could have changed the outcome in this case.

Another opportunity for earlier recognition of the seriousness of Ms. Hill's condition was missed when CO Milholland left her dinner at her cell at 16:24 on 8/25. She was not responding normally at that time, but it was a full hour before he checked on her again (even though she was supposed to be on every-30-minute checks, as I understand it), by which time she was unresponsive and apparently in cardiorespiratory arrest. It should be noted also that Ms. Hill was supposed to have been on an every-30-minute medical watch monitoring schedule as of the morning of 8/25/18. The last monitoring check recorded on the medical watch monitoring log was at 1520 and CO Milholland's reported first check on Ms. Hill was at 1624, over an hour after the previously recorded check, and his next reported check on Ms. Hill was at 1725, another hour later. This documentation appears to represent a deviation from the intended every-30-minute monitoring schedule of the requested medical watch.

As best as I can judge by review of the case, Ms. Hill probably suffered the injury to her duodenum sometime during the night of 8/24-25, probably after the 1:44 AM check on the morning of 8/25.

There are mitigating factors that likely made recognition of Ms. Hill's serious illness difficult. For one, it was entirely reasonable to conclude that she was in opioid withdrawal and that primarily accounted for whatever reported symptoms and objective clinical signs she presented, at least until later in the morning of 8/25 when she was assessed by RN Gubitz. The documented vital signs were not abnormal. Clinical presentations in the jail setting can be very complicated, being the result of multiple factors including medical illness, mental illness, intoxication and/or withdrawal, and social stresses involved in incarceration. Still, Ms. Hill had no history of significant mental illness other than substance use, and the worsening of symptoms of withdrawal 4 days after discontinuing use of heroin would not be expected (withdrawal symptoms after heroin use typically peak 2-3 days after cessation of use). Still, continued use of opioids in the jail or her use prior to incarceration of longer-acting opioids that are associated with more delayed withdrawal would have been possibilities to consider and might have explained a longer-than-usual course of withdrawal symptoms (even though, after retrospective review of the available information in this case, this seems unlikely).

It must be said also that Ms. Hill's clinical deterioration was quite abrupt and her illness was unusual. She was presumably reasonably normally responsive the day before she died, when she was in court. There was no pattern of worsening abnormal vital signs to signal that she was developing serious illness.

Also, rupture of the duodenum, presumably related to nausea and vomiting related to withdrawal and old scarring from a prior cholecystectomy, is not a common clinical presentation.

Therefore, the root causes of Ms. Hill's sudden deterioration and death were:

- Misattributing worsening symptoms on 8/25/18 to opioid withdrawal
- An unusual pathological process, rupture of the duodenum, with a very rapid course of deterioration
- Failure to respond more definitively to her worsening status both on the morning of 8/25/18 when she was evaluated by RN Gubitz and in the afternoon when she did not take her dinner tray, with the added problem that it was a full hour after that event before she was checked again

I will also comment that the medical records in this case were difficult to review because printed-out electronic medical records (EMRs) are scattered and not in an order to facilitate chronological review of events. The lack of timestamping of the medical records except for when they are entered into the EMR makes it difficult to piece together the sequence of clinical events. Beyond this, the records were rather sparse, although perhaps not inappropriate for a case of presumed uncomplicated opioid withdrawal. Finally, I found no medical record of the emergency medical response or administration of naloxone.

This should be a sentinel case for both custody and medical staff at SCJ. The main lessons to be learned are that opioid withdrawal, which is most often fairly routine and uncomplicated, can be complicated by other serious medical conditions and that when a patient/inmate shows signs of distress that are out of line with the expected recovery, more intensive evaluation and closer monitoring are necessary.