Fain Anderson VanDerhoef Rosendahl
O'Halloran Spillane PLLC
701 Fifth Avenue, Suite 4750
Seattle, WA 98104
Phone: (206) 749-0094

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| THE ESTATE OF CINDY LOU HILL, by and through its personal representative, Joseph A. Grube,<br><br>Plaintiff,<br><br>v.<br><br>NAPHCARE, INC, an Alabama corporation; and SPOKANE COUNTY, a political subdivision of the State of Washington,<br><br>Defendants. | NO. 2:20-cv-00410-MKD<br><br>DECLARATION OF ERIN E. EHLERT IN SUPPORT OF DEFENDANT NAPHCARE, INC.'S AMENDED SUPPLEMENTAL PLEADING RE. EXPLANATION OF ANTICIPATED TRIAL TESTIMONY OF NAPHCARE FACT WITNESS DR. MAPLE |

Erin E. Ehlert declares as follows:

1. I am one of the attorneys representing defendant NaphCare, Inc. in this lawsuit. I am over the age of 18 and competent to testify as to the statements in this declaration. I make the following statements based upon personal knowledge.

DECLARATION OF ERIN E. EHLERT IN SUPPORT OF DEFENDANTS NAPHCARE, INC.'s AMENDED SUPPLEMENTAL PLEADING RE EXPLANATION OF ANTICIPATED TRIAL TESTIMONY OF NAPHCARE FACT WITNESS DR. MAPLE- 1

**FAIN ANDERSON VANDERHOEF ROSENDAHL O'HALLORAN SPILLANE, PLLC**
701 Fifth Avenue, Suite 4750
Seattle, WA 98104
p. 206-749-0094 · f. 206-749-0194

2. The following excerpts from the October 18, 2021 deposition of Dr. Maple are examples of the opinions that Dr. Maple would testify to if admissible at trial. Answers of Dr. Maple are highlighted in **bold.**

a. **When I reviewed the medical records on this patient and reviewed the testimony of the nurse, the key thing that kept popping up was that the vital signs were normal. They were within normal limits, which indicates a stable patient.**
*Dr. Maple Deposition, p. 40 lines 2-8.*

b. **And also this patient had the mental capacity to say no to care. She had the right to do that, and she did multiple times. I reviewed this record and saw that six or seven times during this incarceration, the young lady said no. Prior incarcerations, she said no many times as well.**

**This is a person who valued her autonomy and her right to say no. When this nurse at the moment in time saw that the vital signs were stable, that the patient had normal mental capabilities, and a visual exam, which was all she could do, that showed no evidence of shock, at this point, the patient said, "No, I don't want further care."**

**And the nurse could have at that point said, "Okay. I have other patients that I need to attend to. I will respect your autonomy in saying no" but she didn't.**

**What she did was she continued to engage the patient. She did a positive active care. She continued to talk to the patient. She continued to encourage the patient to allow her to examine her.**

**So we've got three things up here that say vital signs within normal limits. This nurse saw vital signs within normal limits.**
*Page 40 line 12 through page 41 line 9.*

DECLARATION OF ERIN E. EHLERT IN SUPPORT OF DEFENDANTS NAPHCARE, INC.'s AMENDED SUPPLEMENTAL PLEADING RE EXPLANATION OF ANTICIPATED TRIAL TESTIMONY OF NAPHCARE FACT WITNESS DR. MAPLE- 2

**FAIN ANDERSON VANDERHOEF ROSENDAHL O'HALLORAN SPILLANE, PLLC**
701 Fifth Avenue, Suite 4750
Seattle, WA 98104
p. 206-749-0094 • f. 206-749-0194

c. **In this instance under these circumstances, what is the reasonable thing for this nurse to do?**

**……**

**Normal vital signs, normal mental functioning. This patient had the right to say no. The patient said no.**

**So to expect the nurse to do further exam at that point is not appropriate, and it's not reasonable. But I want to make this point: The nurse didn't give up on the patient. She just stopped performing the physical part of the exam.**

**She continued to do a visual exam. She looked at the patient. Now, the patient can refuse care, and at that point I can't touch her, but I can still look at her. The nurse didn't leave the room.**

**At this point in time, the patient had made it clear that she didn't want further care. The nurse could have reasonably walked away and taken care of other patients. But right then and there, she stayed there. She re-engaged. She took further positive actions of care.**

**I believe that what this nurse did was reasonable given the very limited information she had at the time.**
*Page 47 line 14 through page 49 line 3.*

d. Q: Based on Ms. Gubitz' description of Ms. Hill in her August 25th morning COWS assessment, is it fair to say that Ms. Hill was suffering with an acute abdomen at that time?

A: That is possible, but we're looking backwards at this point. At the time that the nurse was interviewing and examining the patient, she saw a stable patient based on the clinical findings that she had.
*Page 62 line 9-19.*

DECLARATION OF ERIN E. EHLERT IN SUPPORT OF DEFENDANTS NAPHCARE, INC.'s AMENDED SUPPLEMENTAL PLEADING RE EXPLANATION OF ANTICIPATED TRIAL TESTIMONY OF NAPHCARE FACT WITNESS DR. MAPLE- 3

**FAIN ANDERSON VANDERHOEF ROSENDAHL O'HALLORAN SPILLANE, PLLC**
701 Fifth Avenue, Suite 4750
Seattle, WA 98104
p. 206-749-0094 • f. 206-749-0194

e. Q: Okay. We now know that Nurse Gubitz did not contact a higher-level medical provider about Ms. Hill. Instead, she had Ms. Hill transferred to Unit 2 West for medical watch.

Given Ms. Hill's presentation that morning, was that the proper course of action?

**A: ….. And given the facts that the patient had normal vital signs, was answering questions appropriately and was alert and oriented and did not have any visual signs of severe disease, it is a reasonable course of action to do what she did.**
*Page 66, lines 9-23.*

f. Q: I thought I saw in the description, and correct me if you disagree, that she didn't answer some of Ms. Gubitz' questions, for instance, about when the pain started and how severe it was on the pain scale.

**A: Not answering questions is an act – is not necessarily an act of a changed mental status. The questions that she did answer and what I draw conclusions from the records and the testimony is that the questions that the patient did answer were appropriate. She was alert. She was responsive. That indicates normal mental functioning.**

Q: And so based on all of those factors, your testimony is that it was reasonable for Nurse Gubitz to transfer Ms. Hill to medical watch without contacting a higher-level provider?

**A: With normal vital signs, normal mental status, normal visual exam, would it be reasonable for someone with normal vital signs and normal mental exams to call a provider? Not necessarily.**

**I mean, this was a matter of clinical judgment on the nurse's part, and I think it's reasonable for her to make that clinical judgment based on what she saw at that time.**

DECLARATION OF ERIN E. EHLERT IN SUPPORT OF DEFENDANTS NAPHCARE, INC.'s AMENDED SUPPLEMENTAL PLEADING RE EXPLANATION OF ANTICIPATED TRIAL TESTIMONY OF NAPHCARE FACT WITNESS DR. MAPLE- 4

**FAIN ANDERSON VANDERHOEF**
**ROSENDAHL O'HALLORAN SPILLANE, PLLC**
701 Fifth Avenue, Suite 4750
Seattle, WA 98104
p. 206-749-0094 • f. 206-749-0194

Q: Did Ms. Gubitz conduct a mental status exam?

**A: Mental status exams can come in many forms, and one of those forms comes from experience. All right?**

**Just talking with the patient, getting that vibe from the patient, those are important pieces of clinical knowledge that we learn through experience.**

**And this nurse had enough experience to be able to make those clinical judgments based on her interaction with the patient. The nurse was there. You and I were not. So we're kind of second-guessing. The nurse was there and made a clinical judgment.**
*Page 67 line 8 through 68 line 16.*

g. Q: You said you discussed with Mr. Ordaz and Mr. O'Neill the facts of the death and the dramatic nature of the death. Were you just kind of going over the facts, or were you expressing opinions about the care that was provided? Was anybody raising any concerns?

**A: When I spoke with them, I made a couple of comments. And the essence of my comments were I believe that the nurse didn't do anything wrong.**
*Page 83 line 23 through page 84 line 10.*

h. Q: Okay. So even if you felt that Ms. Gubitz followed the standard of care, were there any changes in health care management or procedures or protocols that you thought could be considered in order to avoid deaths in similar circumstances in the future?

(Objection by Ms. Wick)

**A: This was a very unusual situation. I don't remember any other situation like this happening in the jail.**

DECLARATION OF ERIN E. EHLERT IN SUPPORT OF DEFENDANTS NAPHCARE, INC.'s AMENDED SUPPLEMENTAL PLEADING RE EXPLANATION OF ANTICIPATED TRIAL TESTIMONY OF NAPHCARE FACT WITNESS DR. MAPLE- 5

**FAIN ANDERSON VANDERHOEF ROSENDAHL O'HALLORAN SPILLANE, PLLC**
701 Fifth Avenue, Suite 4750
Seattle, WA 98104
p. 206-749-0094 • f. 206-749-0194

**So to make a standard protocol or a recommendation for a change for this particular situation, I don't know that it would benefit in the long term because it was so unusual.**
*Page 94 line 20 through page 95 line 9.*

i.   Q: Did you learn any lessons from Cindy Hill's death?

**A: What I learned from Cindy Hill's death was that the care was appropriate given the circumstances that the nurse faced at that moment.**

Q: Did you learn anything else?

**A: I'm going to go back to my original statement that we learned that the care given was reasonable given the circumstances the patient and the nurse were under at that point in time.**
*Page 104 line 9-17*

j.   Q: Did you or anyone else that you know of take any actions to prevent future deaths from causes similar to those that led to Cindy Hill's death?

**A: I can't speak for anyone else, especially at the corporate headquarters. But as for me during this review, this was a unique situation that I don't know that another situation like that would pop up with enough frequency to be able to warrant making significant changes to what we do.**

**The review that I did showed that the nurse saw a stable patient with stable vital signs and made a clinical judgment based on that.**
*Page 105 line 18 through page 106 line 4.*

k.   Q: Was Ms. Hill's death the result of a drug problem?

**A: Not directly, but a drug problem certainly played a role in her chronic health conditions.**

DECLARATION OF ERIN E. EHLERT IN SUPPORT OF DEFENDANTS NAPHCARE, INC.'s AMENDED SUPPLEMENTAL PLEADING RE EXPLANATION OF ANTICIPATED TRIAL TESTIMONY OF NAPHCARE FACT WITNESS DR. MAPLE- 6

**FAIN ANDERSON VANDERHOEF ROSENDAHL O'HALLORAN SPILLANE, PLLC**
701 Fifth Avenue, Suite 4750
Seattle, WA 98104
p. 206-749-0094 • f. 206-749-0194

Q: What role did Ms. Hill's drug problem play in the conditions that resulted in her death?

**A: The patients that I have taken care of that use drugs over a long period of time, their health is affected. Their overall general health goes down. They are unable to fight off infection as well. They oftentimes have hepatitis or other intestinal problems. People who use drugs have unhealthy lives.**
*Page 110 line 6-16*

l. **For one, it was entirely reasonable to conclude that she was in opioid withdrawal and that primarily accounted for whatever reported symptoms and objective clinical signs she presented.**
*Page 119 line 22-25.*

The foregoing statements are made under penalty of perjury under the laws of the State of Washington.

Signed in Seattle, WA this 1st day of July, 2022.

                                        *s/Erin E. Ehlert*
                                        Erin E. Ehlert, WSBA #26340
                                        Attorney for Defendant NaphCare, Inc.
                                        Fain Anderson VanDerhoef Rosendahl O'Halloran Spillane, PLLC
                                        701 Fifth Avenue, Suite 4750
                                        Seattle, WA 98104
                                        Ph: 206-749-2375
                                        Email: erine@favros.com

DECLARATION OF ERIN E. EHLERT IN SUPPORT OF DEFENDANTS NAPHCARE, INC.'s AMENDED SUPPLEMENTAL PLEADING RE EXPLANATION OF ANTICIPATED TRIAL TESTIMONY OF NAPHCARE FACT WITNESS DR. MAPLE- 7

**FAIN ANDERSON VANDERHOEF ROSENDAHL O'HALLORAN SPILLANE, PLLC**
701 Fifth Avenue, Suite 4750
Seattle, WA 98104
p. 206-749-0094 • f. 206-749-0194