FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Sep 27, 2023

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| ESTATE OF CINDY LOU HILL, by and through its personal representative, Joseph A. Grube,<br><br>                    Plaintiff,<br><br>        v.<br><br>NAPHCARE, INC., an Alabama corporation; and SPOKANE COUNTY, a political subdivision of the State of Washington,<br><br>                    Defendants. | No.  2:20-CV-00410-MKD<br><br>ORDER DENYING NAPHCARE'S MOTIONS FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL, AND REMITTITUR<br><br>**ECF No. 286** |

Before the Court is Defendant NaphCare, Inc.'s ("NaphCare") Rule 50 and 59 Motions for Judgment as a Matter of Law, New Trial, and/or Remittitur.  ECF No. 286.  On November 16, 2022, the Court held a hearing on the motion.  Edwin S. Budge and Hank L. Balson appeared on behalf of Plaintiff Estate of Cindy Lou Hill ("the Estate").  Eric B. Wolff, David A. Perez, and Michelle M. Maley

ORDER - 1

appeared on behalf of NaphCare.  John E. Justice appeared on behalf of Defendant Spokane County ("the County").

The Estate brought a 42 U.S.C. § 1983 claim and a state negligence claim, alleging that NaphCare and the County caused the death of decedent Cindy Lou Hill at the Spokane County Jail.  ECF No. 1 at 20-22 ¶¶ 39-42.  On July 19, 2022, a jury returned a verdict in favor of the Estate on both claims and awarded compensatory and punitive damages.  ECF No. 240.  The jury found NaphCare ninety percent at fault and the County ten percent at fault for the Estate's negligence damages.  ECF No. 240 at 4.  The jury awarded punitive damages against NaphCare in the amount of $24,000,000 for the Estate's Section 1983 claim.  ECF No. 240 at 5.

NaphCare challenges the jury verdict pursuant to Fed. R. Civ. P. 50.  ECF No. 286 at 9-10.  NaphCare moves for a new trial, arguing (1) that the weight of the evidence was against the jury's verdict, (2) that the Court's instructions to the jury were improper, and (3) that the Court's failure to bifurcate the claims against NaphCare and the County caused prejudice.  ECF No. 286 at 9-10.  NaphCare seeks a remittitur of the $24,000,000 punitive award, arguing that the award is in excess of what due process and federal common law will allow, and is against the weight of the evidence.  ECF No. 286 at 10.  For the reasons stated below, NaphCare's post-trial motion is **DENIED.**

# BACKGROUND

## A. Facts Established by Stipulation or at Trial

The following factual recitation is derived from the evidence presented at trial. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000).

### 1. Ms. Hill

On August 21, 2018, Ms. Hill was arrested for drug possession and taken to the Spokane County Jail. ECF No. 261 at 167:19-24; ECF No. 218 at 2 ¶ 5. NaphCare had a contract with the County to provide medical care at the Jail. ECF No. 261 at 167:12-17. Upon arrival, a NaphCare nurse saw Ms. Hill for an intake assessment. ECF No. 261 at 167:25-168:12; ECF No. 231 at 38:9-14; Ex. 1. Ms. Hill was fifty-five years old and suffered from several medical conditions, including methamphetamine and heroin abuse, hypertension, chronic obstructive pulmonary disease, and gastroesophageal reflux disease. ECF No. 231 at 16:18-24.

On August 22, 2018, Ms. Hill informed a NaphCare nurse that she used heroin. ECF No. 261 at 168:20-169:2; ECF No. 218 at 2 ¶ 6. NaphCare nurses placed Ms. Hill under NaphCare's standard withdrawal assessments, which apply the "Clinical Opiate Withdrawal Scale," known as "COWS screenings." ECF No. 261 at 169:12-170:2, 172:6-11. Ms. Hill underwent several COWS screenings

from August 22 to August 24, 2018.  ECF No. 261 at 178:14-20.  Her withdrawal symptoms were reported in the mild range.  ECF No. 261 at 178:21-23; Ex. 4.

On the morning of August 25, 2018, NaphCare nurse Hanna Gubitz ("Nurse Gubitz") went to Ms. Hill's cell to conduct a COWS screening.  ECF No. 261 at 180:22-181:16; ECF No. 267 at 613:5-16.  Ms. Hill was on the concrete floor shirtless and screaming in pain, exclaiming that she was too sick to move.  ECF No. 261 at 182:6-11; ECF No. 267 at 620:11-622:18; Ex. 4 at 27.  Ms. Hill's roommate rolled Ms. Hill on a blanket and dragged her to the cell door, where Ms. Hill laid in the fetal position, screaming.  ECF No. 267 at 622:12-625:8; Ex. 4 at 27.  Nurse Gubitz attempted to check Ms. Hill's vitals; Ms. Hill again screamed and claimed that Nurse Gubitz was causing her pain, even before Nurse Gubitz had touched her.  ECF No. 267 at 625:24-626:5; Ex. 4 at 27.

This exchange lasted about five-and-a-half minutes, and at its conclusion, Nurse Gubitz transferred Ms. Hill to "medical watch."  ECF No. 261 at 200:5-25; ECF No. 267 at 643:8-12, 647:1-4.  Jessica Wirth, a corrections officer, arrived at Ms. Hill's cell and took Ms. Hill to cell 2-West-27 ("2W27") in a wheelchair. ECF No. 262 at 330:20-331:6.

While on medical watch, Ms. Hill was alone in a cell, and every thirty minutes a corrections officer would pass by and observe her status through a cell window, noting brief observations on a form.  ECF No. 262 at 376:1-9.

Corrections officers recorded whether she was sleeping or awake during these periodic observations, and that she refused lunch at 11:09 a.m. that day. ECF No. 262 at 376:6-9; Ex. 5. Corrections officers noted that Ms. Hill was awake at 11:09 a.m., 1:43 p.m., 3:00 p.m., and 3:20 p.m. Ex. 5. She appeared asleep for each of the seven other observations in the morning and afternoon. Ex. 5. No medical staff observed Ms. Hill during these check-ins. ECF No. 231 at 97:13-18, ECF No. 261 at 95:20-96:6. Around 3:00 p.m., Nurse Gubitz saw Ms. Hill for less than two minutes, noting a normal presentation with no signs of medical distress. ECF No. 231 at 98:23-3; ECF No. 261 at 96:21-97:8; Ex. 6.

Around 4:20 p.m., a corrections officer brought Ms. Hill a meal. ECF No. 261 at 99:14-18. At approximately 5:25 p.m., a corrections officer realized that Ms. Hill was unconscious and began CPR. ECF No. 261 at 99:19-23, 100:9-12. The staff made further resuscitative efforts before taking Ms. Hill to a hospital, where she was soon pronounced dead. ECF No. 261 at 100:2-9. An autopsy later revealed that Ms. Hill died from "acute bacterial peritonitis due to ruptured duodenal-liver adhesions with perforation of duodenum." Ex. 8 at 2; ECF No. 231 at 53:2-4; ECF No. 261 at 56:2-5.

### 2. NaphCare's Policies and Customs at the Spokane County Jail

NaphCare employs nurses and physicians to provide care for inmates at its jail facilities. ECF No. 263 at 558:12-18. NaphCare nurses conduct intake

assessments as inmates enter the Jail.  ECF No. 261 at 167:25-168:12; ECF No. 231 at 38:9-12.  Nurses have access to internal systems to connect with on-call providers to answer questions.  ECF No. 263 at 559:9-13.  On weekends, NaphCare staffs the Jail with two registered nurses, two licensed practical nurses, and one medical assistant.  ECF No. 267 at 637:19-641:23.  The inmate population at the Jail on a given weekend may range from 450 to 800.  ECF No. 267 at 637:19-641:23.  Nurses are not permitted to make medical diagnoses.  ECF No. 261 at 18:4-8, 38:3-8, 93:2-4; ECF No. 267 at 698:21-23.

When NaphCare staff determines that an inmate needs to go to the hospital, they contact the Jail's sergeant on duty, who calls an ambulance.  ECF No. 262 at 332:11-18.  Two officers accompany the ambulance to the hospital.  ECF No. 262 at 332:16-18.  There are also procedures for sending patients to the hospital in the County's vehicles.  ECF No. 262 at 333:2-5.

In NaphCare facilities, certain areas are designated "medical observation areas" or "medical watch," where inmates are placed outside of general population. ECF No. 262 at 318:1-319:22; ECF No. 263 at 560:20-25.  At the Spokane County Jail, NaphCare nurses determine who is sent to medical watch, which is in an area called 2-West.  ECF No. 262 at 318:11-319:15, 368:21-23, 399:8-10; ECF No. 267 at 647:11-16.

ORDER - 6

### 3. Medical Watch

NaphCare nurses place inmates with medical issues on medical watch, with the aim of providing the inmates privacy and closer observation.  ECF No. 267 at 647:11-15.  NaphCare does not have written policies about the use of medical watch at the Spokane County Jail.  ECF No. 263 at 591:15-592:10.  2-West is often used to monitor inmates at risk of suicide or self-harm.  ECF No. 262 at 422:22-24. NaphCare nurses assess inmates on medical watch at least once a shift.  ECF No. 267 at 649:14-18.

The cells used for medical watch are essentially the same as the cells in the rest of the Jail.  ECF No. 262 at 324:7-21.  The medical watch cells do not have video or audio monitoring.  ECF No. 262 at 325:15-25.  There are no medical staff stations in 2-West.  ECF No. 262 at 398:11-18.  Inmates put on medical watch are placed in cells without cellmates.  ECF No. 262 at 325:5-8.  The cells have an emergency light button that, when triggered, will activate a light on the outside of the door and sound an alarm at the guard station.  ECF No. 262 at 326:12-16.

Corrections officers are responsible for monitoring medical watch, which is added to their normal rotation.  ECF No. 262 at 318:7-9, 319:7-15; 399:11-400:13. Inmates on medical watch are subject to check-ins every thirty minutes, or more frequently if NaphCare staff so direct.  ECF No. 261 at 201:4-15; ECF No. 262 at 317:9-319:18; ECF No. 267 at 648:24-649:6.  Thirty-minute check-ins are standard

procedure in the rest of the Jail.  ECF No. 261 at 201:16-202:1; ECF No. 262 at 318:25-319:22, 400:13-19, 418:8-12.  Medical watch check-ins are substantially the same as check-ins in general population: corrections officers look through a small window and check for signs of life.  ECF No. 261 at 201:16-202:1; ECF No. 262 at 318:25-319:15, 327:7-17, 400:20-402:23.  The only additional protocol for medical watch check-ins is that corrections officers must document the check-ins on a Medical Watch Observation form posted outside of each medical watch cell.  ECF No. 261 at 201:16-202:1; ECF No. 262 at 318:25-319:15.

The Medical Watch Observation form includes sections to note an inmate's name and identification number, and the employee who initiated the medical watch.  Ex. 5.  The form includes a list of physical symptoms to report to medical including, for example, nausea or vomiting, changes in speech, facial droop, difficulty breathing, weakness to one side of the body, and worsening abdominal pain.  Ex. 5.  The form includes a list of "Codes" including, among others, Awake, Sleeping, Pacing, Upset, or Talking with Officer, for noting inmate activity during each check-in.  Ex. 5.  The form is generated by the Jail and filled out by corrections officers.  ECF No. 263 at 566:14-17.

Corrections officers are not instructed to ask the patient how they feel, check for symptoms, or otherwise investigate medical conditions.  ECF No. 261 at 202:18-23, 203:11-204:22, ECF No. 262 at 319:23-320:8.  Corrections officers

assigned to medical watch receive no training on medical observation or treatment. ECF No. 262 at 319:23-320:8, 417:8-418:13.  If corrections officers witness a patient in medical distress, they contact medical staff.  ECF No. 262 at 402:21-405:15.

**B. Procedural History**

The Estate and Cynthia Metsker, Ms. Hill's sole-surviving child, filed a Complaint on November 4, 2020, which named NaphCare, Spokane County, and Nurse Gubitz as defendants.  *See* ECF No. 1.

On May 9, 2022, the Court granted default judgment for liability against the County on the Estate's negligence and Section 1983 claims.[1]  ECF No. 88 at 44. On May 24, 2022, NaphCare and Nurse Gubitz moved for a bifurcated trial, seeking for an initial trial on their liability, then another on compensatory and

---

[1] The Jail had a camera aimed at the hallway outside of Ms. Hill's room, 2W27. ECF No. 88 at 8.  In discovery, the County produced portions of footage from that camera, from 8:43 a.m. to 9:15 a.m. and from 4:00 p.m. to 6:30 p.m., but could not produce the most relevant portions of the footage.  ECF No. 88 at 8-9.  The Court granted default judgment as a sanction for the spoliation of evidence.  *See* ECF No. 88.

punitive damages against all Defendants.  ECF No. 115 at 1-2.  On June 14, 2022, the Court denied the motion.  ECF No. 147.

On June 21, 2022, the parties filed a stipulation dismissing the Estate's claims against Nurse Gubitz.  ECF No. 166.  On June 24, 2022, the parties filed a stipulation dismissing all claims pursued by Ms. Metsker.  ECF No. 171.  The remaining claims were the Estate's negligence and Section 1983 claims against NaphCare and the County.

This case proceeded to trial on July 11, 2022.  ECF No. 222.  On July 18, 2022, the Estate rested, and NaphCare made an oral Fed. R. Civ. P. 50(a) motion.  ECF No. 233 at 3; ECF No. 267 at 759:14-771:5.  The Court took the motion under advisement.  ECF No. 233 at 3; ECF No. 267 at 779:25-780:1.  NaphCare and the County also rested the same day.  ECF No. 267 at 781:3-8.[2]  On July 19, 2022, the Court submitted the case to the jury.  ECF No. 236 at 1-2.

---

[2] Due to witness scheduling limitations, the parties agreed to call witnesses out of order.  The Estate called witnesses on July 12 and July 13.  ECF Nos. 261, 262.  NaphCare called witnesses on July 14, ECF Nos. 231, 263.  The Estate then called its final witness on July 18 and rested, and Defendants rested shortly thereafter.  ECF No. 267 at 759:14-781:8.

The jury returned a verdict for the Estate.  ECF No. 236 at 2.  The jury found NaphCare liable under Section 1983 and for negligence, and awarded $2,750,000 in compensatory damages.  ECF No. 240 at 2-4.  The jury found NaphCare responsible for ninety percent, and Spokane County ten percent, of the total combined negligence that proximately caused the Estate's damages.  ECF No. 240 at 4.  The jury awarded $24,000,000 in punitive damages for the Estate's Section 1983 claim against NaphCare.  ECF No. 240 at 2-5.  On July 29, 2022, the Court denied NaphCare's oral Fed. R. Civ. P. 50(a) motion.  ECF No. 250.  On August 24, 2022, NaphCare filed the instant renewed Fed. R. Civ. P. 50(b) motion and motion for new trial.  ECF No. 286.

## LEGAL STANDARD

### A. Judgment as a Matter of Law

A court may grant a motion for judgment as a matter of law only where the nonmoving party has been fully heard on an issue and the jury has no legally sufficient evidentiary basis to find for that party on that issue.  *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1018 (9th Cir. 2015) (quoting Fed. R. Civ. P. 50(a)).  In other words, such a motion is granted only where "under the governing law, there can be but one reasonable conclusion as to the verdict."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted).

Fed. R. Civ. P. 50(a)(2) requires that a motion for judgment as a matter of law be made before the case is submitted to the jury. *Williams v. Gaye*, 895 F.3d 1106, 1131 (9th Cir. 2018). If the motion is denied or the ruling is deferred, the party who so moved may renew its motion, limited to the grounds asserted therein, under Fed. R. Civ. P. 50(b). *See EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009).

"[I]n entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record [and] draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves*, 530 U.S. at 150. "[T]he court . . . must disregard all evidence favorable to the moving party that the jury is not required to believe . . . . That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Id.* at 151 (quotation and citations omitted). "A jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002).

**B. New Trial**

Fed. R. Civ. P. 59(a)(1) provides that "[t]he court may, on motion, grant a new trial . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]"  Grounds for a new trial include that the verdict is against the weight of the evidence, that damages are excessive, that the trial was not fair to the moving party, *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007), or that there were incorrect or inadequate jury instructions, *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990). When considering a Fed. R. Civ. P. 59(a) motion for a new trial, the court must weigh the evidence "as [the court] saw it."  *Molski*, 481 F.3d at 729 (quoting *Murphy*, 914 F.2d at 187) (alteration in original).

## DISCUSSION

The Court begins with NaphCare's motion for judgment as a matter of law, then turns to NaphCare's motion for a new trial and for remittitur.

**A. Motion for Judgment as a Matter of Law[3]**

NaphCare represents that it "will not appeal or challenge the jury's finding of negligence" and concedes to "paying its share of the compensatory award." ECF No. 286 at 8.  In Washington, punitive damages are prohibited unless expressly authorized by the legislature.  *Dailey v. North Coast Life Ins. Co.*, 919 P.2d 589, 591 (Wash. 1996) (en banc); *Barr v. Interbay Citizens Bank*, 635 P.2d 441, 444 (Wash. 1981) (en banc).  Punitive damages are available in Section 1983 cases.  *Dang v. Cross*, 422 F.3d 800, 807-09 (9th Cir. 2005) (citing *Smith v. Wade*, 461 U.S. 30, 34 (1983)).  For the jury's $24,000,000 punitive damage award to stand, it must have had legally sufficient evidence supporting *Monell* liability against NaphCare.

*1. Section 1983*

Section 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured

---

[3] NaphCare moved for judgment as a matter of law before the case was submitted to the jury, preserving the arguments in the instant renewed motion.  ECF No. 233; *see Go Daddy Software*, 581 F.3d at 961 (citing Fed. R. Civ. P. 50(a)).

ORDER - 14

in an action at law, suit in equity, or other proper proceeding for redress . . . .

"[Section] 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (internal quotation marks omitted). To state a claim under Section 1983, a plaintiff must show that she was "deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999).

The basic elements of a Section 1983 claim are met. First, NaphCare does not challenge that Ms. Hill's Fourteenth Amendment rights were violated, at least under the standard applied by the Ninth Circuit.[4] ECF No. 286 at 18. Pretrial

---

[4] NaphCare "preserves the argument that the Ninth Circuit's 'objective' standard for proving deliberate indifference in a medical-care case under the 14th Amendment is erroneous . . . ." ECF No. 286 at 18. NaphCare cites to *Farmer v. Brennan*, which discusses "deliberate indifference" in the context of a prisoner's failure-to-protect claim against an individual prison official. 511 U.S. 825, 837-38 (1994). *Farmer* and related analyses in cases *Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015), *Castro*, 833 F.3d at 1067-73, and *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018) (hereinafter *Gordon I*), concern claims

detainees have a constitutional right to adequate medical care while in the custody

of the government and awaiting trial.  *Russell v. Lumitap*, 31 F.4th 729, 738 (9th

Cir. 2022); *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 667 (9th Cir. 2021).

The jury found that Nurse Gubitz denied Ms. Hill needed medical care, which put

Ms. Hill at a substantial risk of suffering serious harm, and that the denial caused

Ms. Hill harm.  ECF No. 236 at 39-41.  Second, the parties have stipulated that

---

against individual defendants.  The Estate voluntarily dismissed its claim against

the only individual defendant.  ECF No. 168.  NaphCare may be found liable

through *Monell* if one of its policies or customs violated Ms. Hill's constitutional

rights.  *Castro*, 833 F.3d at 1073.  The "deliberate indifference" required for

liability to attach in the *Monell* context is different than that used in the failure-to-

protect context.  *Farmer*, 511 U.S. at 840-42 ("[W]hile deliberate indifference

serves under the Eighth Amendment to ensure that only inflictions of punishment

carry liability, the term was used in the *Canton* case for the quite different purpose

of identifying the threshold for holding a city responsible for the constitutional

torts committed by its inadequately trained agents . . . .") (quotation marks and

citation omitted).  NaphCare's challenge on this ground is not before the Court,

and the Court treats it as conceded that Ms. Hill suffered a deprivation of her

constitutional rights.

both Nurse Gubitz and NaphCare acted under color of state law at all relevant

times, and the jury was instructed as to that stipulation.  ECF No. 218 at 2 ¶¶ 1-2;

ECF No. 268 at 855:16-19; *see Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1138-

40 (9th Cir. 2012).

Therefore, the parties agree that Ms. Hill was "deprived of a right secured by

the Constitution" and that the deprivation "was committed under color of state

law." *Am. Mfrs. Mut. Ins.*, 526 U.S. at 49-50.

2.  *Monell*

NaphCare argues that the deprivation of Ms. Hill's constitutional rights

cannot be attributed to it.  ECF No. 286 at 18.  "A municipality or other local

government may be liable under [Section 1983] if the governmental body itself

'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected'

to such deprivation."  *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting

*Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 692 (1978)).

Municipalities may not be held "vicariously liable" or liable under a theory of

"respondeat superior" for the acts of their employees.  *Id.*; *see also Castro*, 833

F.3d at 1073.  Private entities may be subject to Section 1983 liability for acts

committed under color of state law.  *Tsao*, 698 F.3d at 1139.

NaphCare offers three arguments to contend that the Estate failed to

demonstrate the requisite elements to support *Monell* liability.  ECF No. 286 at 18.

First, NaphCare contends that the Estate failed to show that NaphCare maintained a policy or custom that violated Ms. Hill's constitutional rights.  ECF No. 286 at 19-21.  Second, NaphCare contends that the Estate failed to show that NaphCare ignored a pattern of constitutional violations committed under its watch, or that NaphCare ignored such a substantial risk of constitutional violations that it should have known that violations would occur—in other words, that NaphCare was "deliberately indifferent."  ECF No. 286 at 21-27.  Third, NaphCare contends the Estate failed to show that, insofar as NaphCare had a "practice," its "practice" did not cause Ms. Hill's harm.  ECF No. 286 at 26-27.  The Court will first consider whether a policy or custom was established, then whether that policy or custom caused Ms. Hill's constitutional injury, and then turn to deliberate indifference.

i.    Policy or Custom

A *Monell* plaintiff must demonstrate that "an official policy, custom, or pattern" on the part of the municipal defendant "was the actionable cause of the claimed injury."  *Tsao*, 698 F.3d at 1143.  The custom or policy must be a "deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question."  *Castro*, 833 F.3d at 1073 (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986)).

There are three ways to establish a "policy" sufficient to hold an entity defendant liable under *Monell*,[5] *Gordon v. Cnty. Of Orange*, 6 F.4th 961, 973 (9th Cir. 2021) (hereinafter *Gordon II*): first, where the entity "acts pursuant to an expressly adopted official policy," *id.* (citing *Thomas v. Cnty. of Riverside*, 763 F.3d 1167, 1170 (9th Cir. 2014) (per curiam)); second, where a "longstanding practice or custom" causes a constitutional injury, including where the defendant "fails to implement procedural safeguards to prevent constitutional violations or, sometimes, when it fails to train its employees adequately," *id.* (citing *Tsao*, 698 F.3d at 1143; *Connick*, 563 U.S. at 61); and third, where the constitutional tortfeasor is an official with final law-making authority or where that official ratified a subordinates' unconstitutional act. *Id.* (citation omitted).[6]

---

[5] Elsewhere, the Ninth Circuit has explained more broadly that "policies" for *Monell* purposes include "written policies, unwritten customs and practices, [and] failure to train municipal employees on avoiding certain obvious constitutional violations." *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1153 (9th Cir. 2021).

[6] In some cases, the Ninth Circuit has described policies giving rise to *Monell* liability as policies either of "action" or "inaction." *See, e.g.*, *Park v. City & Cnty. of Honolulu*, 952 F.3d 1136, 1141 (9th Cir. 2020); *Jackson v. Barnes*, 749 F.3d 755, 763 (9th Cir. 2014); *Tsao*, 698 F.3d at 1143; *Waggy v. Spokane Cnty. Wash.*,

ORDER - 19

The custom that the Estate sought to establish at trial is narrow.  The Estate argues that NaphCare violated the Constitution by "using medically untrained jail guards to monitor NaphCare patients in need of medical monitoring by medical professionals."  ECF No. 300 at 8-9; *see also* ECF No. 236 at 39.  NaphCare argues that Nurse Gubitz, not NaphCare, denied Ms. Hill healthcare, and that Nurse Gubitz was not acting pursuant to any NaphCare policy or custom in doing so.  ECF No. 286 at 21.  To the contrary, the evidence at trial was sufficient to establish that Nurse Gubitz (1) believed Ms. Hill needed monitoring for medical issues, and (2) sent Ms. Hill to medical watch pursuant to NaphCare's unofficial custom.[7]

---

594 F.3d 707, 713 (9th Cir. 2010); *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006).

[7] NaphCare does not defend medical watch as a sufficient means of providing medical care to inmates.  ECF No. 286 at 12.  That medical watch was not "medical" in nature, and does not constitute "medical" care or monitoring in any genuine sense, was well established at trial.  ECF No. 261 at 201:16-202:23, 202:34-204:22; ECF No. 262 at 318:7-9, 319:7-320:8, 324:7-21, 325:5-25, 398:11-18, 399:11-402:23, 417:8-418:13; ECF No. 267 at 648:24-649:6.

First, the evidence, although conflicting, is sufficient to support a jury finding that Nurse Gubitz believed Ms. Hill needed medical monitoring by medical professionals when she decided to send Ms. Hill to medical watch. To be clear, Nurse Gubitz testified to the contrary.[8] Nurse Gubitz testified that her assessment of Ms. Hill's presentation was consistent with withdrawal, but that she put Ms. Hill on medical watch to "keep a better eye on the symptoms she was presenting with." ECF No. 267 at 713:25-717:17. Nurse Gubitz documented in an email the day following Ms. Hill's death that she believed Ms. Hill was experiencing symptoms of withdrawal. Ex. 6; ECF No. 267 at 725:18-21.

However, in a note made prior to Ms. Hill's death, Nurse Gubitz wrote that she placed Ms. Hill on medical watch not due to withdrawal, but "for severe abdominal pain and having to be dragged to door by cellmate to be assessed." Ex. 3 at 1. Nurse Gubitz also recorded that Ms. Hill's withdrawal symptoms were minimal and described in detail Ms. Hill's apparent pain and the circumstances of

---

[8] The Court, when entertaining a Fed. R. Civ. P. 50(b) motion, is required to "draw all reasonable inferences in favor of the nonmoving party" and "disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 150. The jury was free to disbelieve Nurse Gubitz's testimony as self-serving and contradicted by other evidence.

ORDER - 21

their interaction.  Ex. 4 at 25-27.  Further, Nurse Gubitz admitted on cross examination that she placed Ms. Hill on medical watch not due to opioid withdrawal protocols, but because of severe abdominal pain.  ECF No. 267 at 755:9-12.

Experts Dr. Schubl and Dr. Roscoe testified that someone with Nurse Gubitz's qualifications would likely have identified that Ms. Hill had a significant condition needing medical monitoring, rather than mere withdrawal.  ECF No. 261 at 88:6-90:9, 195:16-198:8.  Nurse Gubitz herself testified that someone presenting with Ms. Hill's symptoms might have an acute abdomen, ECF No. 267 at 625:14-23, a medical condition that, as an expert explained, should raise significant concern to any medical professional.  ECF No. 261 at 86:20-89:19.  Nurse Gubitz testified that, based upon Ms. Hill's presentation and the limited examination, it was possible that Ms. Hill was suffering from a number of life-threatening conditions:

> Q. Okay.  So whatever is happening, it's happening deep within, correct?
> A. You could say that, yes.
> Q. Could have been appendicitis, do you agree?
> A. Sure.
> Q. Could have been pancreatitis, right?
> A. Yes.
> Q. Could have been acute diverticulitis, right?
> A. Yes, though I think that usually occurs on the left more often.
> Q. Okay. Could have been an intestinal ischemia, which is where --

A. Sure.

Q. -- the blood flow to the intestine through an artery is blocked, right?

A. Mm-hmm. Yeah.

Q. Could have been a hole in her digestive tract, right?

A. Correct.

ECF No. 267 at 637:21-638:24.  The jury had evidence to conclude that Nurse Gubitz offered "withdrawal" as an after-the-fact and contrived justification for her decisionmaking.  The evidence supports that Nurse Gubitz believed Ms. Hill needed medical monitoring when she referred Ms. Hill to medical watch.

Second, the evidence was sufficient for the jury to conclude that Nurse Gubitz sent Ms. Hill to medical watch pursuant to NaphCare's custom for patients like Ms. Hill.  Nurse Gubitz's testimony supports the theory, as she testified that everything she did relating to Ms. Hill was pursuant to regular NaphCare customs and practices.  ECF No. 267 at 675:22-676:12.

Lieutenant Donald Hooper, acting director for Spokane County corrections services, testified that 2-West was primarily for suicide or self-harm watch, but that some individuals located at 2-West have medical conditions.  ECF No. 262 at 422:22-423:2.  Lt. Hooper affirmed that nurses "want a little bit more attention for these individuals[.]"  ECF No. 262 at 423:4-6.  NaphCare's use of 2-West for monitoring inmates with medical conditions was sufficiently persistent to warrant the development of the Medical Watch Observation form.  Ex. 5.  Although the form was made by the County, ECF No. 263 at 566:11-18; ECF No. 267 at 724:14-

15, it is, at least circumstantial evidence that NaphCare nurses regularly entrusted corrections officers with monitoring patients for the symptoms listed. The form identifies serious symptoms such as "[w]eakness to one side of the body[,]" "[d]ifficulty breathing[,]" and "[w]orsening abdominal pain[.]" Ex. 5.

As further circumstantial evidence, Lt. Hooper testified as to a financial motive for NaphCare's preference for sending inmates in medical distress to medical watch rather than the hospital. ECF No. 262 at 413:8-21. Under NaphCare's contract with the County, if a NaphCare nurse sent a patient to the hospital, NaphCare would pay up to $15,000 per patient per incident in resulting expenses. ECF No. 262 at 413:8-12; Ex. 31 at 2 ¶ 1.7. Medical watch, on the other hand, was free. ECF No. 262 at 413:18-21.

Nurse Gubitz testified that when she sent patients to medical watch and completed the Medical Watch Observation form, it was her standard practice not to check off or mark items in the "Examples of Important Changes to Report to Medical" section because she "didn't want to limit what the officers were looking for." ECF No. 267 at 725:5-6. She testified that, following a NaphCare nurse's identification of a medical issue, corrections officers "would keep an eye on how patients were doing and notify medical if they were concerned about something or if anything changed that they wanted us to take a look at before we came back

around." ECF No. 267 at 654:8-11.[9] With regard to Ms. Hill, Nurse Gubitz "expected officers to look for any change in her condition[,]" specifically to "look at [Ms. Hill] and contact her if they have a concern." ECF No. 267 at 725:17-18.

NaphCare presented its Chief Medical Officer, Dr. Jeffrey Alvarez, who testified that some jails have an infirmary with higher levels of care, and medical watch at the Spokane County Jail is for patients who need to be "closer to nursing or more close eyes in some ways." ECF No. 261 at 38:4-10. Dr. Alfred Joshua, NaphCare's expert in correctional medicine, testified that the Spokane County Jail

---

[9] There is some dispute over what Nurse Gubitz meant when she testified that NaphCare nurses used medical watch for "acute" medical monitoring. ECF No. 267 at 647:11-16. She testified at trial that "acute," as she used the word in context, meant "a short amount of time." ECF No. 267 at 647:24-648:1. The Estate argues that her testimony at trial was a "post hoc explanation" to downplay the significance of her prior use of the term, ECF No. 300 at 10, as "acute" can also mean "gravely sick or ill." ECF No. 261 at 112:1-3. Her deposition was read into the record as impeachment evidence. ECF No. 267 at 647:17-648:1. Depositions may be used to contradict or impeach the testimony of the deponent. Fed. R. Civ. P. 32(a)(2). The Court finds this dispute has no significance to the ultimate disposition of the instant motion.

1  was a relatively small jail, and "in a smaller jail, the correctional officers take a

2  larger role versus in a larger jail, more medical staff might take a larger role based

3  on just the sheer number of people."  ECF No. 231 at 104:4-7.

4          In sum, the circumstantial evidence presented at trial sufficiently illustrated

5  that it was NaphCare's custom for its nurses to place patients with concerning

6  medical conditions on medical watch in 2-West, where observation was largely

7  carried out by corrections officers with no medical training.

8          To dispute this evidence, NaphCare points to its protocols for medical

9  assessment, arguing that "a correct application of NaphCare's policies would have

10  resulted in Ms. Hill being sent to a hospital immediately upon the onset of her

11  severe abdominal pain."  ECF No. 286 at 19.  NaphCare introduced screenshots

12  from its nursing protocols, which included a protocol for abdominal pain.  Ex. 18

13  at 201.  The screenshots include as a purported instruction to staff, "[r]efer to

14  Provider for sick call if [abdominal] pain is severe[.]"  Ex. 18 at 201.  Several

15  experts opined that NaphCare's nursing assessment protocol, if applied to Ms. Hill,

16  would have required Nurse Gubitz to call a doctor.  ECF No. 261 at 235:7-18; ECF

17  No. 262 at 479:22-480:12; ECF No. 231 at 90:25-91:11.  However, as Dr. Roscoe

18  explained, what was presented was not a "policy," it was a protocol in NaphCare's

19  electronic system where nurses, if they entered "abdominal pain" in the search

20  form, could find next steps toward treatment, checking boxes about the patient's

particular condition along the way.  ECF No. 261 at 240:18-241:1.  The evidence at trial did not conclusively demonstrate that this protocol was in use at the Spokane County Jail, and the jury was free to conclude to the contrary.

In fact, NaphCare presented no evidence indicating that the abdominal-pain protocol was used at the Spokane County Jail other than its existence within NaphCare's computer system.[10]  No one who worked at the Spokane County Jail testified that they had ever applied the protocol or knew it existed.  That NaphCare had written policies does not legally defeat the conclusion that there was "a custom or practice of violating a written policy; otherwise an entity, no matter how flagrant its actual routine practices, always could avoid liability by pointing to a pristine set of policies."  *Castro*, 833 F.3d at 1075 n.10.

---

[10] The only evidence suggesting the abdominal-pain protocol was used came from Dr. Alvarez, who had been to the Spokane County Jail "a few times[,]" testified that nurses were trained on NaphCare's policies and procedures.  ECF No. 263 at 554:1-6; 560:14-16.  He testified as to a broad policy of "[w]hen in doubt, send them out."  ECF No. 263 at 562:18-22.  However, Dr. Alvarez did not know why Nurse Gubitz failed to consult the abdominal protocol or call a provider.  ECF No. 263 at 583:4-13.  Dr. Alvarez's testimony was inconclusive at best.

NaphCare relies on *Gordon II*, which explained that "[g]enerally, a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*." 6 F.4th at 974. In *Gordon II*, the decedent was detained in jail. *Id.* at 965. The jail had a detoxification protocol for alcohol and another for opioids. *Id.* The jail placed the decedent, a heroin user, on the alcohol protocol, and the decedent died. *Id.* at 965-66. The Ninth Circuit affirmed summary judgment on a Section 1983 claim from the decedent's estate because the plaintiff failed to identify any other instances where the alcohol withdrawal protocol was used for heroin withdrawal. *Id.* at 974 ("[T]he record lacks evidence of any other event involving similar conduct or constitutional violations and plaintiff's reference to the subsequent changes to operating procedures is insufficient."). The record here is not so devoid of evidence, as Nurse Gubitz's testimony, correctional officer testimony, and the Medical Watch Observation form indicate that NaphCare regularly used medical watch for detainees in need of medical monitoring.

As explained in *Castro*, that a plaintiff must "prov[e] prior instance of harm" is "legally inaccurate." 833 F.3d at 1073 n.7 (citing *Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 409 (1997)). The *Castro* court, sitting *en banc*, affirmed judgment against a municipal defendant. *Id.* at 1078. The policy at issue in *Castro* was the defendant's use of sobering cells without adequate monitoring, which was evidenced by testimony as to the practice. *Id.* at 1075. The plaintiffs in *Castro*

1    attempted to introduce evidence of prior incidents in the sobering cell, but the trial

2    court excluded the evidence.  *See* Plaintiff's Memorandum, *Castro v. Cnty. of Los*

3    *Angeles*, No. 10-cv-5425-DSF (C.D. Cal. Aug. 20, 2012), ECF No. 151 at 20 n.6.

4    The plaintiffs instead relied upon expert testimony to demonstrate that the sobering

5    cells were a known risk that state regulations were imposed to curb, and the fact of

6    the incident giving rise to the lawsuit, as evidence of a practice.  *Id.* at 15.

7         Similarly, in *Sandoval*, the Ninth Circuit considered an informal policy of

8    verbal communication regarding a jail's placement of inmates in cells used for

9    both medical care and general holding.  985 F.3d at 681.  The suit concerned an

10   inmate who needed medical monitoring but did not receive it.  *Id.* at 681-82.

11   Reversing a grant of summary judgment, the Ninth Circuit found sufficient

12   evidence for a jury to determine that the informal communication practices

13   constituted a policy of using a mixed-use cell without necessary safeguards.  *Id.*

14   The evidence submitted was largely deposition transcripts from staff at the jail.  *Id.*

15   at 681-82; *see also* Briefing, *Sandoval v. Cnty. of San Diego*, No. 3:16-cv-01004-

16   BEN-AGS (S.D. Cal. 2010), ECF Nos. 20, 20-3, 24, 25-4, 25-5.

17        As *Sandoval* and *Castro* indicate, another instance of a constitutional

18   violation is not a necessary finding for a jury to conclude that a *Monell* defendant

19   had a "final policy" sufficient to give rise to liability.  *Castro*, 833 F.3d at 1075.

20   The evidence presented in this case demonstrated that NaphCare maintained a

1  custom of sending patients in need of medical monitoring to medical watch, and

2  that Nurse Gubitz acted pursuant to that custom when she sent Ms. Hill to medical

3  watch.

4          ii.    Causation

5          To establish liability under Section 1983, there must be a "direct causal link"

6  between a *Monell* defendant's policy or custom and the plaintiff's constitutional

7  injuries. *Sandoval*, 985 F.3d at 681 (quoting *Castro*, 833 F.3d at 1075).

8          NaphCare argues that the evidence at trial "pinpointed the moment things

9  went wrong in this case: Nurse Gubitz's initial encounter with Ms. Hill." ECF No.

10  286 at 26-27. NaphCare argues that "[t]he monitoring Ms. Hill received on

11  'Medical Watch' was comparable to the monitoring she would have received in her

12  original cell. Accordingly, the move to 'Medical Watch' was not the *cause* of

13  Ms. Hill's death." ECF No. 286 at 27. NaphCare argues that "[t]he cause was an

14  intestinal rupture and the judgment call not to elevate her care to a higher-level

15  medical provider upon the onset of her severe stomach pain." ECF No. 286 at 27.

16  The Estate counterargues that "[h]ad NaphCare not permitted its nurses to send its

17  ill patients to be monitored by medically untrained jail guards on 'medical watch,'

18  Nurse Gubitz instead would have had to either (1) transfer Ms. Hill to the hospital,

19  (2) consult with a higher-level provider, or (3) direct that Ms. Hill be monitored on

20  a regular basis by nurses." ECF No. 300 at 17. In reply, NaphCare argues curtly

that "[t]hat makes no sense[,]" and that "[n]o Medical Watch almost certainly would have meant keeping Ms. Hill in her original cell on the existing monitoring protocols (COWS/safety checks) because of the mistaken belief that Ms. Hill was suffering from opioid withdrawal." ECF No. 302 at 10.

Whether the practice was for Nurse Gubitz, upon belief that Ms. Hill was in medical distress worth medical monitoring, to send Ms. Hill to medical watch or to leave Ms. Hill in her original cell is of no moment. Indeed, the care and monitoring that Ms. Hill received in medical watch was substantively similar to what she would have received in her original cell. *See* ECF No. 262 at 321:13-16, 366:10-12, 366:2-5, 369:3-5, 369:24-370:2, 367:25-368:11 (corrections officer testimony regarding medical watch).

The relevant causal factor of NaphCare's custom was that it denied Ms. Hill the medical care that she needed. Dr. Schubl and Dr. Roscoe testified that they would expect a healthcare provider to have identified the severity of Ms. Hill's condition and sent her to the emergency room, which, if done, would likely have prevented Ms. Hill's death that day. ECF No. 261 at 89:14-19, 107:18-108:22, 195:16-197:8. Instead, the only further "medical monitoring" that occurred was when Nurse Gubitz returned for a two-minute interaction at 3:00 p.m. ECF No. 267 at 726:17-25.

The facts of this case are comparable to *Castro*, where the Ninth Circuit found that "the absence of frequent visual checks and the lack of audio monitoring clearly made the risk of serious harm to such prisoners substantial." 833 F.3d at 1076. This case is also comparable to *Sandoval*, where the Ninth Circuit found that "[a] jury could find that had [the decedent] been monitored by the nursing staff—instead of being abandoned for nearly eight hours—his deteriorating medical condition would have been discovered earlier." 985 F.3d at 682. Here, the jury was presented evidence sufficient to conclude that NaphCare's custom of sending patients in need of medical monitoring to medical watch, or, as NaphCare suggests, leaving them in their original cells, created a substantial risk that those patients would die from their illnesses.

### iii. Deliberate Indifference

NaphCare argues that the Estate "failed to show that NaphCare was on actual or constructive notice of, and therefore deliberately indifferent to, the alleged constitutional inadequacy of that practice." ECF No. 286 at 21. The Estate argues that deliberate indifference was not a requisite showing and, in the alternative, that the jury had evidence of deliberate indifference. ECF No. 300 at 15-16.

#### A. The Estate was Not Required to Demonstrate Deliberate Indifference at Trial.

ORDER - 32

The role that deliberate indifference plays in *Monell* claims in this circuit is not easily discerned from case law.  In *Rodriguez v. Cnty. of Los Angeles*, the Ninth Circuit described "deliberate indifference" as one of three "type[s] of *Monell* liability[.]"  891 F.3d 776, 803 (9th Cir. 2018) (citing *Hunter v. Cnty. of Sacramento*, 352 F.3d 1225, 1234 n.8 (9th Cir. 2011)).  According to *Rodriguez*, this "deliberate indifference" theory is where the defendant "fail[s] to train employees in a manner that amounts to 'deliberate indifference' to a constitutional right[.]"  *Id.* at 802.  In other cases, where the Ninth Circuit divides the policies underlying *Monell* claims into policies of "action" or "inaction," when "a plaintiff pursues liability based on a failure to act, she must allege that the municipality exhibited deliberate indifference[.]"  *Park*, 952 F.3d at 1141 (citing *Tsao*, 698 F.3d at 1143); *see also Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1185-86 (9th Cir. 2002), *overruled in part by Castro*, 833 F.3d at 1076 (9th Cir. 2016).

More often, the Ninth Circuit has included "deliberate indifference" as one element in a four-part test generally describing a *Monell* claim, which NaphCare cites here.  ECF No. 286 at 18.  The test is, "(1) that the plaintiff possessed a constitutional right of which she was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and, (4) that the policy is the moving force behind the constitutional violation."  *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir.

2011); *see also Gordon II*, 6 F.4th at 973; *Lockett v. Cnty. of Los Angeles*, 977 F.3d 737, 741 (9th Cir. 2020); *Plumeau v. Sch. Dist. #40*, 130 F.3d 432, 438 (9th Cir. 1997); *Oviatt v. Pearce*, 954 F.2d 1470, 1475 (9th Cir. 1992).  On its face, the third element suggests that, in every *Monell* case, the plaintiff must show deliberate indifference to establish liability regardless of the theory pursued.  A closer look at the cases reciting this four-part test is not so conclusive.

The Ninth Circuit recently applied the four-part test in *Gordon II*, 6 F.4th at 973, citing to *Dougherty*, 654 F.3d at 900, which cites to *Plumeau*, 130 F.3d at 438, which cites to *Oviatt*, 954 F.2d 1474.  *Oviatt* conceives the four-part test as a summary of the Supreme Court's decision in *City of Canton v. Harris*.  954 F.2d at 1474 (citing 489 U.S. 378, 389-91 (1989)).  With *Canton*, the Supreme Court resolved a circuit split as to the "degree of fault" that a municipality must exhibit before liability attaches in a failure-to-train case, pronouncing that a *Monell* defendant's failure to train employees to avoid violations of constitutional rights must "amount[] to deliberate indifference" to those rights.  *Id.*  489 U.S. at 389.  *Oviatt* distilled *Canton*'s analysis into four parts and instructed that this four-part

ORDER - 34

test applies "[t]o impose liability . . . for failing to act to preserve constitutional rights[.]"  954 F.2d at 1474.[11]

Following *Oviatt*, the Ninth Circuit recited the four-part test in a number of failure-to-act cases.  *See Van Ort v. Est. of Stanewich*, 92 F.3d 831, 835 (9th Cir. 1996) (applying the four-part test "for failing to act"); *Lewis v. Sacramento County*, 98 F.3d 434, 446 (9th Cir. 1996), *rev'd on other grounds,* 523 U.S. 833 (1998) (applying the four-part test to a failure-to-train claim).  However, in 1997, the Ninth Circuit cited the four-part test "[t]o impose municipal liability under [Section] 1983 for a violation of constitutional rights," without qualifying that the four-part test is specifically for failure-to-train or failure-to-act cases.  *Plumeau*, 130 F.3d at 438.  Still, *Plumeau* clarified in a footnote that "a municipality's

---

[11] In *Oviatt*, the Ninth Circuit found that a municipal defendant, acting through its sheriff, the lone policymaker, failed to act to end a criminal defendant's 114-day incarceration without a prompt court appearance, in violation of the Fourteenth Amendment.  954 F.2d at 1477-78.  Because the municipality was on notice that other incidents like this occurred, and the lack of procedures to alleviate the issue, "it was virtually certain" that more violations would occur.  *Id.* at 1478.

*failure to train* must amount to 'deliberate indifference' to the rights of others." *Id.* at 439 n.4 (emphasis added).[12]

In 2011, the Ninth Circuit in *Dougherty* reviewed the dismissal of a complaint for failure to state a *Monell* claim; a decision that has also since been cited for the four-part test. 654 F.3d at 897; *see Gordon II*, 6 F.4th at 973; *Lockett*, 977 F.3d at 741. The Ninth Circuit affirmed dismissal because "[t]he Complaint lacked any factual allegations regarding key elements of the *Monell* claims, or, more specifically, any facts demonstrating that his constitutional deprivation was the result of a custom or practice of the [municipal defendant] or that the custom or practice was the 'moving force' behind his constitutional deprivation." 654 F.3d at 900-01. Therefore, deliberate indifference was not the dispositive concern in *Dougherty*. *Id.*

---

[12] *Plumeau* concerned Section 1983 claims on behalf of a child against a school district for sexual abuse at a school. 130 F.3d at 438. The Ninth Circuit affirmed summary judgment because there was no evidence genuinely disputing that the sexual abuse was not pursuant to a custom or practice, was an unconstitutional action by individuals with policy-making authority, or occurred in spite of an affirmative duty to protect. *Id.* at 439.

ORDER - 36

In *Lockett*, the Ninth Circuit cited the four-part test to reject a *Monell* claim not for a lack of deliberate indifference, but for the lack of any underlying constitutional violation.  977 F.3d at 742.  In *Gordon II*, the Ninth Circuit cited the four-part test to reject a *Monell* claim because the appellant had not demonstrated that his rights were violated pursuant to a policy, custom, or practice of the municipality defendant.  6 F.4th at 973-74.

After review of Ninth Circuit case law following *Oviatt*, the Court has not found a decision of the Ninth Circuit that recited the four-part test and rejected a *Monell* claim because the plaintiff had failed to demonstrate deliberate indifference.

With another formulation of *Monell* liability, the Ninth Circuit sitting *en banc* in *Castro*, did not reiterate any of its prior standards and instead cited directly to *Canton* to observe that "[t]he [Supreme] Court has further required that the plaintiff demonstrate that the policy or custom of a municipality 'reflects deliberate indifference to the constitutional rights of its inhabitants.'"  833 F.3d at 1073 (citing 489 U.S. at 392).  The Ninth Circuit found deliberate indifference in the municipal defendant's failure to adhere to its own city ordinances and police manuals, which suggested the defendants knew the danger of using noncompliant sobering cells.  *Id.* at 1076-78.  However, four-and-a-half years later, in *Sandoval*, the Ninth Circuit clarified that "[t]his deliberate indifference standard does not

apply when a *Monell* defendant's policies, customs, or practices directly require

unconstitutional conduct."  985 F.3d at 682 n.17.

Supreme Court precedent following *Canton* also suggests that deliberate

indifference only applies to failure-to-act cases.  To be sure, the Supreme Court has

reaffirmed, time and time again, that to hold a municipality liable under *Monell*,

the plaintiff must establish that her rights were violated pursuant to a policy or

custom of the defendant.  *See, e.g.*, *Connick*, 563 U.S. at 60; *Los Angeles Cnty. v.

Humphries*, 562 U.S. 29, 34-36 (2010); *Brown*, 520 U.S. at 403-04.  As the

Supreme Court explained in *Connick*, "[i]n limited circumstances, a local

government's decision not to train certain employees about their legal duty to

avoid violating citizens' rights may rise to the level of an official government

policy for purposes of [Section] 1983."  563 U.S. at 61.  The Supreme Court

continued, "[a] municipality's culpability for a deprivation of rights is at its most

tenuous where a claim turns on a failure to train" and for liability to attach in such

cases, "a municipality's failure to train . . . must amount to 'deliberate indifference

to the rights of persons with whom the [untrained employees] come into contact.'"

*Id.* (citing *Canton*, 489 U.S. at 388) (alteration in original).

The above case law, although difficult to read in concert, indicates that

"deliberate indifference" is not a stand-alone element required in every *Monell*

case.  "Deliberate indifference" is used to establish a policy or custom;

specifically, where the alleged policy or custom is the "decision not to train certain employees about their legal duty to avoid violating citizens' rights[,]" *Connick*, 563 U.S. at 61, or, more broadly, whenever "a plaintiff pursues liability based on a failure to act[.]" *Park*, 952 F.3d at 1141.

Returning to this case, the jury had sufficient evidence to determine that NaphCare maintained an unwritten custom of sending patients in need of medical monitoring to medical watch, as explained above. This is not a case involving a failure to train or act.

Some Ninth Circuit jail-injury opinions have considered similar claims in the failure-to-act context. In *Sandoval*, the Ninth Circuit explained that deliberate indifference was required because the constitutional injury was "a tragic consequence of [the municipality defendant's] failure to implement measures necessary to ensure the nursing staff knew when an individual was being held in [the mixed-use cell] for medical reasons." 985 F.3d at 682 n.17. Specifically, there was "no evidence that the [municipality defendant] wanted nurses to ignore all inmates in [the mixed-use cell], even those suffering from medical problems," and the evidence suggested that nurses knew they were supposed to monitor the mixed-use cell when it was occupied by someone needing medical care. *Id.* In *Castro*, the Ninth Circuit found that "substantial evidence supported the jury's finding that the County knew that its cell design might lead to a constitutional

1   violation among its inhabitants." 833 F.3d at 1076. The *en banc* panel required

2   deliberate indifference and found it in the municipality defendant's regulations and

3   policy manuals that revealed it "knew of the risk of the very type of harm that

4   befell [the plaintiff]." *Id.* at 1076.

5        In both *Sandoval* and *Castro*, the municipal defendants' policies created a

6   risk that inmates would have their constitutional rights violated, and the municipal

7   defendants ignored that risk. Here, the relevant policy supported by evidence at

8   trial necessarily resulted in the violation of constitutional rights. Rather than

9   ignore a risk that a medically compromised inmate would be ignored for hours, as

10   in *Sandoval*, 985 F.3d at 682 n.17, or a risk that an inmate would be attacked by a

11   belligerent bunkmate, as in *Castro*, 833 F.3d at 1077, NaphCare's custom violated

12   the Constitution with certainty—patients who needed medical care were denied it.

13        In short, the Court considers NaphCare's practice as a "polic[y] of action[,]"

14   *Tsao*, 689 F.3d at 1143, that NaphCare "*itself* violate[d] federal law, or direct[ed]

15   an employee to do so[,]"*Park*, 952 F.3d at 1141 (emphasis in original), and that

16   NaphCare's "policies, customs, or practices directly require unconstitutional

17   conduct[,]" *Sandoval*, 985 F.3d at 682 n.17. The Estate was not required to

18   demonstrate deliberate indifference as outlined in *Canton*, 489 U.S. at 388-89,

19   *Connick*, 563 U.S. at 61, and *Castro*, 833 F.3d at 1076-77.

20

B.    There was Sufficient Evidence of Deliberate Indifference Presented at Trial.

Even should the Court find that NaphCare's deliberate indifference was a required element of the Estate's Section 1983 claim, the jury had sufficient evidence to conclude that NaphCare's policy or custom of sending seriously ill patients to "medical watch" where they would be monitored by individuals with no medical training was deliberately indifferent to detainees' constitutional rights.

A municipal defendant is deliberately indifferent when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Castro*, 833 F.3d at 1076.  Deliberate indifference requires "actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights." *Id.* at 1076.

Deliberate indifference can be inferred from "sufficient circumstantial evidence." *Sandoval*, 985 F.3d at 683.  In *Sandoval*, the Ninth Circuit reversed summary judgment because the plaintiff presented evidence that the jail had in place more rigorous policies for tracking inmates in sobering and safety cells, compared to the mixed-use cell that the decedent died in.  *Id.*  The Ninth Circuit explained that "[a] reasonable jury could conclude that the [defendant] implemented these practices [in the sobering and safety cells] because it

understood they were necessary to ensure that inmates requiring medical care would not fall through the cracks." *Id.*

Similarly, in *Castro*, the Ninth Circuit found sufficient evidence of deliberate indifference in the county defendant's own ordinances and manual, which required that sobering cells allow maximum visual supervision and audio monitoring. 833 F.3d at 1076-77. The Ninth Circuit explained that "[t]he [defendant's] affirmative adoption of regulations aimed at mitigating the risk of serious injury to individuals housed in sobering cells, and a statement to the same effect in the station's manual, conclusively prove that the [defendant] knew of the risk of the very type of harm that befell [the plaintiff]." *Id.* at 1077. Similarly, here, NaphCare's experience in correctional medicine, and the obvious inadequacy of medical watch as a method of medical monitoring or care, constitute evidence of its constructive notice that sending inmates requiring medical monitoring to medical watch would result in constitutional injury.

To begin, Dr. Alvarez—who writes NaphCare's policies—testified that NaphCare operates in many jails, some of which have "infirmaries or higher-level case," and others like the Spokane County Jail have less sophisticated monitoring areas. ECF No. 263 at 561:1-565:10, 590:21-591:5. Broadly, the evidence showed that NaphCare was a sophisticated provider of medical care in correctional facilities. *See* ECF No. 263 at 549:8-16.

ORDER - 42

Nurse Gubitz testified that, on a typical weekend, NaphCare staffed the Spokane County Jail with three registered nurses, two licensed practical nurses, a medical assistant, and no other medical staff.  ECF No. 267 at 637:19-640:5.  Nurse Gubitz testified that as a registered nurse, she could not diagnose significant medical concerns.  ECF No. 267 at 643:3-7.  Nurse Gubitz testified that she expressed frustration with the lack of a medical provider onsite on weekends to her supervisors, which the jury may have concluded put NaphCare on notice of the deficiency.  ECF No. 267 at 641:3-643:2.

Lt. Hooper testified that officers on medical watch had no medical training and could not assess inmates for worsening abdominal pain.  ECF No. 262 at 398:11-24, 401:10-18.  He testified that NaphCare had not coordinated with him, and he was not aware of any coordination between the County and NaphCare, regarding what officers should be doing on medical watch.  ECF No. 262 at 406:5-15.  Nurse Gubitz was unaware of any effort by NaphCare to coordinate with the County to develop protocols and expectations for medical watch.  ECF No. 267 at 654:14-24.  As repeatedly stated above, medical watch was insufficient to monitor patients in medical distress.  ECF No. 261 at 321:13-16; ECF No. 262 at 366:2-12; 367:25-368:11, 369:3-370:2.

The evidence, viewed in totality, shows that NaphCare's custom at the Spokane County Jail was to send patients requiring medical monitoring to medical

1    watch.  A reasonable juror could conclude that NaphCare, a sophisticated provider

2    of correctional medical services, was on constructive notice that this practice was

3    substantially certain to violate the inmate's right to medical care while detained,

4    due to its experience in the field, warning from Nurse Gubitz, and the obvious

5    deficiency in care provided to those on medical watch.  ECF No. 261 at 38:3-8,

6    93:2-4; ECF No. 267 at 653:25-655:13; 698:21-23.  Therefore, the jury had legally

7    sufficient evidence of deliberate indifference.  *See Sandoval*, 985 F.3d at 683;

8    *Castro*, 833 F.3d at 1076.

9    **B. Motion for a New Trial**

10   NaphCare moves for new trial on the following grounds: (1) that the Court's

11   jury instructions were incorrect, (2) that the weight of the evidence cannot sustain

12   *Monell* liability, and (3) that the failure to bifurcate prejudiced NaphCare.  ECF

13   No. 286 at 9-10.  NaphCare also seeks a remittitur.  ECF No. 286 at 9-10.

14   *1. The Monell Jury Instructions*

15   NaphCare argues that "[a]n error in the jury instructions wrongly allowed

16   the jury to hold NaphCare responsible for the actions of Nurse Gubitz."  ECF

17   No. 286 at 16.  NaphCare admits that it did not object to the purportedly faulty

18   instructions.  ECF No. 286 at 17.

19   "Jury instructions must be formulated so that they fairly and adequately

20   cover the issues presented, correctly state the law, and are not misleading."

ORDER - 44

*Gilbrook v. City of Westminster*, 177 F.3d 839, 860 (9th Cir. 1999).  "[E]rroneous jury instructions, as well as the failure to give adequate instructions, are . . . bases for a new trial."  *Murphy*, 914 F.2d at 187.  "A court may consider a plain error in the instructions that has not been preserved as required by Rule 51(d)(1) if the error affects substantial rights."  Fed. R. Civ. P. 50(d)(2); *see C.B. v. City of Sonora*, 769 F.3d 1005, 1016 (9th Cir. 2014).  "The plain error standard requires the party challenging an instruction to show that: (1) there was error; (2) the error was plain; (3) the error affected that party's substantial rights; and (4) the error seriously affected the fairness, integrity, or public reputation of judicial proceedings."  *Bearchild v. Cobban*, 947 F.3d 1130, 1140 (9th Cir. 2020) (citing *C.B.*, 769 F.3d at 1017-19).  The court "consider[s] the entire set of instructions as a whole to determine whether an individual instruction was misleading or incorrectly stated the law."  *Id.* at 1139-40.

NaphCare challenges Instruction No. 31, ECF No. 286 at 16-17, which, in full, reads as follows:

### INSTRUCTION NO. 31

In the Section 1983 claim, the Plaintiff contends that Defendant NaphCare violated the U.S. Constitution by maintaining a longstanding practice of using medically untrained jail guards to monitor NaphCare patients in need of medical monitoring by medical professionals.  In order to prevail on this claim, the Plaintiff must prove each of the following elements by a preponderance of the evidence:

1. NaphCare acted under color of state law;

2. The acts of a NaphCare employee deprived Cindy Hill of her particular right to needed medical care under the Fourteenth Amendment to the United States Constitution while detained at the Spokane County Jail as explained in Instruction No. 32;

3. NaphCare's employee acted pursuant to a widespread or longstanding practice or custom of NaphCare; and

4. NaphCare's widespread or longstanding practice or custom caused the deprivation of Cindy Hill's rights by Hannah Gubitz; that is, NaphCare's widespread or longstanding practice or custom is so closely related to the deprivation of Cindy Hill's rights as to be the moving force that caused the ultimate injury.

A person acts "under color of state law" when the person acts or purports to act in the performance of official duties under any state, county, or municipal law, ordinance or regulation. The parties have stipulated that NaphCare and Nurse Gubitz acted under color of state law.

"Practice or custom" means any longstanding, widespread, or well-settled practice or custom that constitutes a standard operating procedure of NaphCare.

If you find that the Plaintiff has proved each of these elements, and if you find that the Plaintiff has proved all the elements it is required to prove under Instruction No. 32, your verdict should be for the Plaintiff. If, on the other hand, you find that the Plaintiff has failed to prove one or more of these elements, your verdict should be for NaphCare.

ORDER - 46

1   ECF No. 236 at 39-40.  Instruction No. 31 is based upon the Ninth Circuit's Model

2   Jury Instruction No. 9.5.  NaphCare argues that Instruction No. 31 fails to instruct

3   that the jury must find that it adhered to the relevant practice with deliberate

4   indifference.  ECF No. 286 at 17.  NaphCare highlights that Instruction No. 31

5   references Instruction No. 32, which instructs that the jury must find that Nurse

6   Gubitz, as a NaphCare employee, acted with deliberate indifference to prevail

7   against NaphCare.  ECF No. 286 at 17; ECF No. 302 at 12.

8        The Court begins with whether its failure to instruct the jury on the

9   deliberate indifference standard constituted error.  *Bearchild*, 947 F.3d at 1139.

10  Instruction No. 31 properly listed the elements of a *Monell* claim, namely, that

11  NaphCare acted under color of state law, that a NaphCare employee deprived

12  Ms. Hill of needed medical care while detained, that the employee acted pursuant

13  to NaphCare's custom, and that the custom or practice caused the deprivation of

14  Ms. Hill's rights.  ECF No. 236 at 39.  The jury found each of these elements when

15  it found in favor of the Estate on the Section 1983 claim.  ECF No. 240 at 2.

16       NaphCare argues that the instructions improperly led the jury to "h[o]ld

17  NaphCare responsible under *Monell* and for punitives for the results of one nurse's

18  error."  ECF No. 302 at 12-13.  NaphCare argues that Instruction No. 32, which

19  "referred only to *Nurse Gubitz's* culpable conduct . . . further entwined NaphCare

20  with Nurse Gubitz and heightened the risk of an improper verdict based upon

ORDER - 47

*respondeat superior*." ECF No. 302 at 12 (emphasis in original).  An incorrect jury instruction is sufficiently prejudicial where it is "impossible to determine from the jury's verdict and evidentiary record that the jury would have reached the same result had it been properly instructed." *Bearchild*, 947 F.3d at 1139 (quotations omitted).

The comment to Model Jury Instruction 9.5 directs a court to give the instruction in conjunction with a "particular rights" instruction.  However, the Court's near-verbatim use of Model Jury Instruction 9.30 as the "particular rights" instruction in this case required more than was necessary for the Estate to succeed in its Section 1983 claim.  The Court's instructions, in effect, asked the jury whether Nurse Gubitz was liable, under the standard applied to Section 1983 claims against individual defendants denying medical care to detainees.  *See Sandoval*, 985 F.3d at 667-68; *Castro*, 833 F.3d at 1070-71.

Despite the error, it is far from "impossible to determine from the jury's verdict and evidentiary record that the jury would have reached the same result had it been properly instructed." *See Bearchild*, 947 F.3d at 1139 (quotations omitted).  Proper instruction would have asked only whether NaphCare's employee deprived Ms. Hill of needed medical care while in custody and whether that denial of care was pursuant to NaphCare's custom.  Presuming that the jury followed the instructions as given, as the Court must do, *see Leatherman Tool Grp. v. Cooper*

*Indus.*, 285 F.3d 1146, 1150 (9th Cir. 2002), the jury found each of those elements and further found that Nurse Gubitz acted with deliberate indifference, as the term is applied in suits against individual Section 1983 defendants. *See Castro*, 833 F.3d at 1070-71.

Although there was error, and "plain" in that at the time it was given it was an incorrect statement of the Estate's burden, the error did not affect NaphCare's substantial rights nor the fairness, integrity, or public reputation of the judicial proceedings. *See Bearchild*, 947 F.3d at 1139. If the error caused prejudice, it was to the Estate, as it increased the Estate's burden.

Further, if this case were construed as one requiring a finding of deliberate indifference, the Court finds no error affecting NaphCare's substantial rights. As the Estate highlights, Instruction No. 44 instructs the jury on punitive damages. ECF No. 236 at 44. Instruction No. 44 explains that the jury may award punitive damages after finding

> . . . that NaphCare's conduct that harmed Cindy Hill was in reckless disregard of Cindy Hill's rights. Conduct is in reckless disregard of a person's rights if, under the circumstances, it reflects a complete indifference to the person's safety or rights, or if the defendant acts in the face of a perceived risk that its actions will violate a person's rights under federal law.

ECF No. 236 at 44.

ORDER - 49

Deliberate indifference, comparatively, is when "the facts available to city policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens." *Castro*, 833 F.3d at 1076 (quoting 489 U.S. at 396).

The Court finds no error affecting substantial rights in failing to give a deliberate indifference instruction, given the Court's instruction and the jury's finding on punitive damages. The jury found that NaphCare's conduct either "reflect[ed] a complete indifference to [Ms. Hill's] . . . rights," or that NaphCare "act[ed] in the face of a perceived risk that its actions w[ould] violate Ms. Hill's rights under federal law." ECF No. 236 at 44. Under either prong, the punitive damages instruction is not a substantial departure from the deliberate indifference standard, which asks whether NaphCare was "on actual or constructive notice that the particular omission is substantially certain to result in the violation of . . . constitutional rights. . . ." *See Castro*, 833 F.3d at 1076 (quoting *Canton*, 489 U.S. at 396). Therefore, although there was error, the error did not affect NaphCare's "substantial rights." *See Bearchild*, 947 F.3d at 1139.

### 2. Weight of the Evidence

When considering a motion for a new trial based upon the weight of the evidence, "the district court has the duty to weigh the evidence as the court saw it, and to set aside the verdict of the jury, even though supported by substantial

evidence, where, in the court's conscientious opinion, the verdict is contrary to the clear weight of the evidence." *Molski*, 481 F.3d at 729 (citing *Murphy*, 914 F.2d at 187) (alterations and quotations omitted).  The standard applied upon a Fed. R. Civ. P. 59 motion differs from that of a Fed. R. Civ. P. 50 motion in that the district court is not required to consider evidence in the light most favorable to the non-movant or make reasonable inferences in the non-movant's favor.  *Dees v. Cnty. of San Diego*, 960 F.3d 1145, 1151, 1153-54 (9th Cir. 2020).

As discussed at length above, the evidence at trial was sufficient to establish a *Monell* claim against NaphCare.  *See supra* § A.  In addition to legal sufficiency, the verdict was not against the clear weight of the evidence.  *See Molski*, 481 F.3d at 729.

NaphCare argues that the Estate failed to establish an unconstitutional practice and deliberate indifference.  ECF No. 286 at 19-20.  Although NaphCare argues that the Estate only showed "a one-time mistake by a nurse," the evidence at trial demonstrated to the contrary.  ECF No. 286 at 28.  Expert testimony demonstrated that someone in Nurse Gubitz's position likely knew that Ms. Hill required monitoring by medical professionals.  ECF No. 261 at 88:6-90:9, 195:16-198:8.  Nurse Gubitz all but admitted that she believed Ms. Hill was suffering from serious medical distress separate from opiate withdrawal.  ECF No. 267 at 625:14-23, 637:21-638:24.  Nurse Gubitz testified that her interactions and decisions

related to Ms. Hill were all "done pursuant to the usual and the regular customs and practices of NaphCare."  ECF No. 267 at 675:22-25.

The Medical Watch Observation form demonstrates that the practice was persistent enough to require a specialized form directing corrections officers to look for certain signs of distress.  Ex. 5.  Nurse Gubitz testified that she avoided marking the form because she did not want to limit the officers' observations to certain conditions.  ECF No. 267 at 725:5-6.  The evidence at trial supports the jury's conclusion that NaphCare nurses regularly used corrections officers, with no medical training, to monitor patients that they knew required observation by medical professionals, and that NaphCare never trained them on medical watch.  ECF No. 261 at 201:16-202:1; ECF No. 262 at 318:11-319:15, 318:7-9, 319:7-15, 399:11-400:13, 422:22-423:2; ECF No. 263 at 591:9-592:19; ECF No. 267 at 647:11-15, 655:5-13, 675:22-676:12, 725:5-6; Ex. 5.

NaphCare highlights its "abdominal pain policy" and insists that its practice was to send patients with abdominal pain to the hospital.  ECF No. 286 at 10-11.  As stated above, a written and "pristine set of policies" is insufficient to avoid liability.  *Castro*, 833 F.3d at 1075 n.10.  Paramount are the actual practices employed, and NaphCare failed to introduce evidence in support of its theory.  Not one person who regularly works at the Spokane County Jail testified that the abdominal pain policy was employed as regular practice.

NaphCare argues that the evidence did not support causation. ECF No. 286 at 26-27. Again, the clear weight of the evidence is not against the jury's conclusion that NaphCare's use of medical watch at the Spokane County Jail substantially increased the risk of harm to prisoners, and that, had Ms. Hill been provided monitoring by medical professionals, her deteriorating medical condition would have been discovered earlier, and her life saved. *See Castro*, 833 F.3d at 1076; *Sandoval*, 985 F.3d at 682.

Upon review of the evidence, the Court declines to upend the jury verdict. *Molski*, 481 F.3d at 729. Each element of the Estate's claim was supported by evidence presented at trial.

### 3. Bifurcation

NaphCare argues that the Court's denial of its motion to bifurcate resulted in unfair prejudice that now requires a new trial. ECF No. 286 at 29-31. NaphCare argues that the Court's instruction that the County was already at fault caused the jury to preemptively conclude that NaphCare did something wrong as well, and permitted the Estate to "aim their full firepower at NaphCare[.]" ECF No. 286 at 30. NaphCare argues that the jury's finding that NaphCare was ninety percent at fault for negligence and the large punitive damages award are the product of unfair prejudice. ECF No. 286 at 30-31.

The County filed a response addressing only NaphCare's argument regarding bifurcation.  ECF No. 301.  The County opposes a new trial on this ground, arguing that the Court's decision not to bifurcate was not an abuse of discretion.  ECF No. 301 at 2-3.

The Court considered NaphCare's pretrial motion for bifurcation and denied NaphCare's request for two trials, one on liability and another on damages.  ECF No. 147.  The decision to bifurcate is well within a trial court's discretion.  *Est. of Diaz v. City of Anaheim*, 840 F.3d 592, 601 (9th Cir. 2016).  The Court declines to reconsider its order denying bifurcation and construes NaphCare's arguments relating to bifurcation as an attempt to establish a "miscarriage of justice" sufficient to grant a new trial.  *Molski*, 481 F.3d at 729.

First, NaphCare's characterization of the Estate's trial strategy as "prejudicial" is unavailing.  *See* ECF No. 286 at 30.  The Court asked the jury whether NaphCare was liable—if NaphCare now complains that it was the County, and not it, that was mostly responsible for Ms. Hill's injury, its choice to avoid presenting any evidence to that effect at trial is not a miscarriage of justice.  The fact that the Estate "cast NaphCare as the villain" is hardly a unique or surprising strategic choice for a plaintiff, and certainly not one that has caused a miscarriage of justice.  ECF No. 286 at 30-31.

1    Second, NaphCare complains that the Estate's "campaign for punitive

2    damages" was "stressed . . . to punish solely NaphCare."  ECF No. 286 at 30.

3    Punitive damages are just that—punitive—and are not available against

4    municipalities in Section 1983 suits.  *City of Newport v. Fact Concerts, Inc.*, 453

5    U.S. 247, 271 (1981).  The Court finds no miscarriage of justice in the decision to

6    hold a single trial on liability and damages in this case.

7        *4.  Remittitur*

8        "Where the court determines that a damage award is excessive, the court

9    may either grant the motion for a new trial or deny the motion conditional on the

10    plaintiff accepting a remittitur, that is, agreeing to pay a lesser amount of damages

11    that the court considers justified."  *Funai Elec. Co., Ltd. v. Daewoo Elecs. Corp.*,

12    593 F.Supp.2d 1088, 1093 (N.D. Cal. 2009) (citing *Fenner v. Dependable*

13    *Trucking, Co., Inc.*, 716 F.2d 598, 603 (9th Cir. 1983)); *see also Gasperini v. Ctr.*

14    *for Humanities*, 518 U.S. 415, 433 (1996); *Oracle Corp. v. SAP AG*, 765 F.3d

15    1081, 1094 (9th Cir. 2014).

16        NaphCare confuses several principles of law related to punitive damages in

17    its attempt to establish that the punitive damages award in this case is legally

18    impermissible and not supported by the evidence.  ECF No. 286 at 31-36.  The

19    Court starts by detangling the legal arguments, then turns to the evidentiary

20    arguments.

i.      Punitive Damages and Due Process

NaphCare is correct that the Constitution, as a matter of due process, limits punitive damages awards and the Supreme Court "ha[s] announced due process standards that every award must pass." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 501 (2008); *see also State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003).  The limit is rooted in "elementary notions of fairness enshrined in our constitutional jurisprudence [that] dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty . . . ." *State Farm*, 538 U.S. at 416 (quotation and citations omitted).

The Supreme Court has instructed courts reviewing punitive damages for constitutionality to consider three guideposts:

> (1) the degree of reprehensibility of the defendant's misconduct;
>
> (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and
>
> (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

*State Farm*, 538 U.S. at 418.

First, the degree of reprehensibility of a defendant's conduct is "the weightiest factor." *Hardeman v. Monsanto Co.*, 997 F.3d 941, 972 (9th Cir. 2021). Reprehensibility is reviewed by consideration of five factors:

ORDER - 56

> [1] the harm caused was physical as opposed to economic;
> [2] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others;
> [3] the target of the conduct had financial vulnerability;
> [4] the conduct involved repeated actions or was an isolated incident; and
> [5] the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Id.* at 972-73 (quoting *State Farm*, 538 U.S. at 419). Here, the harm was physical and mortal. Physical harm "highlight[s] the reprehensibility of causing serious physical harm and the need to deter future harm." *Id.* at 973. As explained at length above, although NaphCare contests that the evidence demonstrated that it was its custom to deny medical care to those who needed it, the jury disagreed, as does the Court, and such a custom highlights its "indifference to or [] reckless disregard of the health or safety" of inmates in need of medical care. *See id.* Financial vulnerability "is not particularly relevant in a mostly noneconomic damages case like this one." *Id.* at 973-74. However, the Court finds it relevant that "this is a case of a large corporation and an individual[,]" and that the individual at issue was vulnerable and placed in NaphCare's care. *Id.* at 974. These three factors support a finding of reprehensibility that justifies a significant punitive damages awards, within the bounds of due process.

The fourth and fifth factors are less conclusive. As to whether this case involved repeated actions or was an isolated incident, although only evidence pertaining to Ms. Hill was presented, the fact that the constitutional deprivation

ORDER - 57

was committed pursuant to NaphCare's custom broadly suggests that others may

be subject to similar risk. And, although there is indication that NaphCare's

custom disregarded the safety of those in its care, there was no evidence suggesting

that NaphCare intended for inmates to suffer or die from medical distress.

Irrespective of the fourth and fifth factors, the Court finds sufficient

reprehensibility justifying a significant punitive damages award. Moreover, the

Court finds it significant that the custom established at trial is a dereliction of the

very responsibility that NaphCare voluntarily assumed for its financial benefit—to

provide professional medical care to inmates like Ms. Hill. ECF No. 262 at 407:3-

8. The Court cannot ignore the significance of NaphCare's voluntary assumption

of the responsibility and finds that the manner in which it conducted its business at

the Spokane County Jail constituted "particularly egregious" conduct. *See*

*Hardeman*, 997 F.3d at 974.

Second, there are no "concrete constitutional limits on the ratio between

harm, or potential harm, to the plaintiff and the punitive damages award." *State*

*Farm*, 538 U.S. at 425. However, where compensatory damages are "substantial,"

due process may only allow a "lesser ratio, perhaps only equal to compensatory

damages[.]" *Id.* The Ninth Circuit has suggested that compensatory awards are

"substantial" when in the millions of dollars. *Hardeman*, 997 F.3d at 976.

More broadly, the Supreme Court has suggested that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm*, 538 U.S. at 425.  The Ninth Circuit has explained that "[i]n cases with significant economic damages and more egregious behavior, a single-digit ratio greater than 4 to 1 might be constitutional." *Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 422 F.3d 949, 962 (9th Cir. 2005).  Overall, "[t]he precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff[,]" and "courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered."  *State Farm*, 538 U.S. at 426.

The jury calculated Ms. Hill's compensatory damages at $2,750,000 and awarded punitive damages in the amount of $24 million, producing an approximate ratio of 8.7 to 1.  ECF No. 240.  NaphCare argues that $2,750,000 in compensatory damages is "unquestionably substantial."  ECF No. 286 at 33.  Even if the Court were to agree, the punitive award is not unconstitutional.  In *Planned Parenthood of the Columbia/Willamette*, where "[m]ost of the compensatory awards [we]re substantial[,]" the Ninth Circuit found that the defendants' conduct was "particularly reprehensible."  522 F.3d at 963.  The panel explained that, in the circumstances of that case, "[o]ur constitutional sensibilities are not offended by a

9 to 1 ratio." *Id.* In another case concerning "highly reprehensible conduct, though not threatening to life or limb, that caused economic harm to a corporation[,]" the Ninth Circuit explained that a 9 to 1 ratio was the upper limit that due process would allow, applying *State Farm*. *Bains LLC v. ARCO Prods. Co.*, 405 F.3d 764, 777 (9th Cir. 2005).

In cases where the Ninth Circuit or the Supreme Court have determined that a punitive damages award should be reduced to 4 to 1, the reason given was that the conduct at issue was not particularly reprehensible. *Hardeman*, 997 F.3d at 975 (holding that limiting punitive damages to 4 to 1 was appropriate in a case with significant economic damages and conduct that was not "particularly egregious"); *Ramirez v. TransUnion LLC*, 951 F.3d 1008, 1037 (9th Cir. 2020), *rev'd on other grounds,* 141 S. Ct. 2190 (2021) (limiting punitive damages to 4 to 1 because, although the defendant's "conduct was reprehensible, it was not so egregious as to justify a punitive award of more than six times an already substantial compensatory award"). NaphCare's custom as demonstrated at trial was particularly egregious, and the Court finds sufficient reprehensibility such that due process does not require a punitive damages ratio below 8.7 to 1.

Third, a punitive damages award should be compared to "civil penalties authorized or imposed in comparable cases." *State Farm*, 538 U.S. at 428. NaphCare errantly urges the Court to consider punitive damages awarded in

comparable Section 1983 litigation.  ECF No. 286 at 34-35.  When the Supreme

Court and the Ninth Circuit refer to "civil penalties," it refers to statutorily

imposed fines for similar conduct, not awards in comparable civil cases.  *See, e.g.*,

*State Farm*, 538 U.S. at 428 ("The most relevant civil sanction under Utah state

law for the wrong done to the Campbells appears to be a $10,000 fine for an act of

fraud . . . ."); *BMW of N. Am. v. Gore*, 517 U.S. 559, 583-84 (1996) ("[A]

reviewing court . . . should accord substantial deference to legislative judgments

concerning appropriate sanctions for the conduct at issue.") (quotations omitted);

*Hardeman*, 997 F.3d at 975 ("The parties failed below, and again on appeal, to

explain what the relevant civil fines are . . . ."); *Planned Parenthood of the*

*Columbia/Willamette*, 422 F.3d at 963 ("We need not go beyond [the relevant

statute] itself, as it provides for criminal fines . . . and civil penalties . . . .").

The Supreme Court has cautioned against comparing punitive damages

awards in the due process analysis, albeit in a pre-*Gore* opinion.  *TXO Prod. Corp.*

*v. Alliance Res. Corp.*, 509 U.S. 443, 458 (1993).  The purpose of this factor is to

ensure that defendants are not punished severely in excess of an amount that

should be anticipated by looking to a relevant statute.  *See Gore*, 517 U.S. at 584

("[T]here does not appear to have been any judicial decision in Alabama or

elsewhere indicating that application of that policy might give rise to such severe

punishment."); *Planned Parenthood of the Columbia/Willamette*, 422 F.3d at 963

("[The statute]'s provision for punitive damages is uncapped, so [defendants] would have known that its exposure to penalties in a civil action for violating that Act could be significant.").

The Estate suggests that the closest civil sanction is the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997 *et seq.*, which offers only "equitable relief." 42 U.S.C. § 1997a. As the parties have not identified a comparable civil sanction, the Court finds, as the Ninth Circuit did in *Hardeman*, that "this guidepost is not particularly helpful here." *See* 997 F.3d at 975 (quotations omitted).

Considering the reprehensibility of NaphCare's underlying conduct and that the ratio that the jury imposed does not exceed single digits, the Court finds no violation of due process by allowing the award to stand.

ii.    Punitive Damages and Federal Common Law

NaphCare argues that the jury's punitive damages award, in addition to violating due process, is in excess of what federal common law will allow. ECF No. 286 at 33. NaphCare argues that the Supreme Court's opinion in *Exxon Shipping Co.* is controlling. 554 U.S. 471 (2008).

*Exxon* is a decision of maritime law and imposes a limit on punitive damages for claims arising out of federal maritime law. *Id.* at 475-76. The Supreme Court concluded, after considering alternative options and the history of

1  punitive damages, that "a 1:1 ratio . . . is a fair upper limit in such maritime cases."

2  *Id.* at 513.  NaphCare argues that "Section 1983 permits punitive damages because

3  the common law permits punitive damages."  ECF No. 302 at 14.  Therefore,

4  NaphCare argues, *Exxon* imposes a 1:1 ratio between punitive and compensatory

5  damages in Section 1983 cases.  ECF No. 302 at 14.

6       Section 1983 creates a "species of tort liability in favor of persons deprived

7  of federally secured rights."  *Smith*, 461 U.S. at 34.  Section 1983 does not provide

8  rules concerning damages recoverable for constitutional deprivations.  *Id.*

9  "Constitutional torts are governed by the federal common law, subject to the

10  authority of Congress to legislate otherwise."  *Mendez v. Cnty. of San Bernardino*,

11  540 F.3d 1109, 1122 (9th Cir. 2008).  "In the absence of more specific guidance,

12  [the Supreme Court] looked first to the common law of torts (both modern and as

13  of 1871), with such modification or adaptation as might be necessary to carry out

14  the purpose and policy of the statute."  *Smith*, 461 U.S. at 34.

15       The Ninth Circuit discussed *Exxon* in *Mendez*, which concerned a Section

16  1983 claim.  540 F.3d at 1122.  The punitive damages award in *Mendez* violated

17  due process, and the Ninth Circuit declined to consider whether the award was also

18  impermissible as a matter of federal common law.  *Id.*  Although not deciding the

19  issue, the Ninth Circuit observed that *Exxon* concerned "the federal common law

20  of maritime torts[,]" and that "[a]ny attempt to fashion a federal common law rule

of reasonableness for punitive damage awards for constitutional torts, however, would have to make 'such modification or adaptation [to the common law] as might be necessary to carry out the purpose and policy' of § 1983." *Id.* (quoting *Smith*, 461 U.S. at 34).

NaphCare offers no authority suggesting that the *Exxon* limit should be extended to cases arising out of Section 1983, and the Court cannot find such authority. Further, NaphCare makes no attempt to demonstrate how the purpose and policy of Section 1983 should require such a limit. The Court declines to apply NaphCare's novel and sweeping theory to this case absent clear authority.

iii.    Punitive Damages as Supported by the Evidence

Finally, separate from considerations of the Constitution or federal common law, a district court has discretion to order remittitur or a new trial when an excessive damages award "resulted from passion and prejudice of the jury connected to its misunderstanding of the injuries for which [a defendant] could properly be held responsible." *Watson v. City of San Jose*, 800 F.3d 1135, 1142, 1142 n.11 (9th Cir. 2015). A court considering a request for remittitur views the evidence in the light most favorable to the prevailing party and will not disturb a damages award unless it is "clearly not supported by the evidence." *See Thomas v. Cannon*, 289 F.3d 1182, 1205 (W.D. Wash. 2018) (citations omitted). "An otherwise supportable verdict must be affirmed unless it is grossly excessive or

monstrous or shocking the conscience." *Brady v. Gebbie*, 859 F.2d 1543, 1557

(9th Cir. 1988) (quotations omitted).

NaphCare argues that "[t]he punitive damages award is not supported by the

evidence[,]" specifically, that the evidence failed to show deliberate indifference

toward incarcerated individuals or that NaphCare had notice that its practices were

deficient. ECF No. 286 at 31-34. NaphCare argues that the evidence failed to

show that NaphCare exhibited the type of reprehensibility justifying punitive

damages. ECF No. 286 at 34.

The Court refers to its above discussion of reprehensibility. NaphCare

largely disputes the conclusions the jury reached from the evidence. While the

record lacks evidence of intentional malice, trickery, or deceit, the evidence

demonstrates NaphCare's reckless disregard and derogation for the rights of those

under its care, which it was hired to protect. Further, the consequence of its

dereliction of duty under its contract with the County was a loss of life, which it

should have been well positioned to prevent as a professional and institutional

provider of correctional medicine. ECF No. 262 at 407:3-8. The evidence

supports the punitive damages award.

NaphCare further argues that the "sting" of the jury's punitive damages

award is grossly excessive. ECF No. 286. A jury may consider a defendant's net

worth when assessing punitive damages. *White v. Ford Motor Co.*, 500 F.3d 963,

976 n.10 (9th Cir. 2007).  The jury had evidence of NaphCare's net worth.  ECF No. 262 at 515:19-517:13.  NaphCare urges that punitive damages are meant to "sting" but not "kill" the defendant.  ECF No. 286 (quoting *Morris v. Parke, Davis & Co.*, 573 F. Supp. 1324, 1328-29 (C.D. Cal. 1983)).  Indeed, the large punitive damages award will undoubtedly cause financial difficulty to NaphCare.  However, in a case involving death such as this one, the Court does not find that the $24 million punitive damages award is "grossly excessive," "monstrous," or "shocking to the conscience."  *See Brady*, 859 F.2d at 1557.

## CONCLUSION

NaphCare's Fed. R. Civ. P. 50(b) motion for judgment as a matter of law is denied because the Court finds there was legally sufficient evidence in support of the jury's verdict.  NaphCare's Rule 59 motion for a new trial is also denied because the Court finds no error in jury instructions affecting NaphCare's substantial rights or impugning the fairness, integrity, or public reputation of the judicial proceedings; the verdict was not against the clear weight of the evidence; and the decision not to bifurcate did not cause prejudice requiring a new trial.  NaphCare's motion for a remittitur is denied because the punitive damages award does not violate due process or run contrary to federal common law, and is supported by the evidence.

Accordingly, **IT IS HEREBY ORDERED:**

**1.**      NaphCare's Rule 50 & 59 Motions for Judgment as a Matter of Law, New Trial, and/or Remittitur, **ECF No. 286**, is **DENIED**.

**IT IS SO ORDERED.**  The District Court Executive is directed to enter this Order and provide copies to the parties.

DATED September 27, 2023.

<u>s/Mary K. Dimke</u>
MARY K. DIMKE
UNITED STATES DISTRICT JUDGE